UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JEANNE CHILTON, Individually and on Behalf of
All Others Similarly Situated,

                              Plaintiff,

        v.

SMITH BARNEY FUND MANAGEMENT LLC,
and CITIGROUP GLOBAL MARKETS, INC.,

                              Defendants.

---

## CLASS ACTION COMPLAINT

Plaintiff Jeanne Chilton alleges upon information and belief, except for paragraph 7

hereof, which is alleged upon knowledge, as follows:

## NATURE OF THE ACTION

1.      This is a case about an investment adviser placing its interest in making a profit

ahead of the interests of the mutual funds it serves.  Investment advisers have a fiduciary duty to

act in the best interests of the mutual funds they advise and their shareholders.  Mutual funds pay

fees for various services provided to the mutual funds, including transfer agent services.  Among

its duties, the adviser may advise fund boards about the retention of a particular transfer agent

and how much to pay for the transfer agent's services.  In this case, Defendant Smith Barney

Fund Management LLC (the "Adviser"), which serves as investment adviser to the Smith Barney

Family of Funds (the "Funds"), recommended that the Funds contract with an affiliate of the

Adviser, which would perform limited transfer agent services and sub-contract with the Funds'

existing transfer agent.  The existing transfer agent would perform almost all of the same services

it had performed previously, but at deeply discounted rates, permitting the affiliate of the Adviser to keep most of the discount for itself and make a high profit for performing limited work. This self-interested transaction permitted the Adviser and its affiliates to profit from the transfer agent function at the expense of the Funds and their shareholders.

2.      The Adviser and the asset management operations of Defendant Citigroup Global Markets, Inc. ("Global Markets") are part of Citigroup Asset Management ("CAM"), a business unit of Citigroup Inc. ("Citigroup") that provides investment advisory and management services to Citigroup-sponsored funds. In 1997, CAM began a formal study of the transfer agent ("TA") function in anticipation of the expiration of the existing contract between the Funds and First Data Investor Services Group ("First Data"). CAM representatives knew that First Data had been making high profit margins on the TA contract. Instead of using its strong bargaining position to benefit the Funds in the negation of a new TA contract, CAM sought to keep for itself much of the profit First Data had been making. In fact, CAM did not pursue or inform the Funds' boards of an offer by First Data to continue to perform all transfer agent services for the Funds at a $25 million annual fee discount.

3.      CAM ultimately recommended that the Funds replace First Data with an affiliate of the Adviser. The recommended structure called for the affiliated TA (which is now Citicorp Trust Bank, fsb ("CTB"))[1] to contract directly with the Funds as named TA, perform limited functions and subcontract with First Data for the bulk of the transfer agent service (CAM referred to First Data as "sub-TA"). Except for a small customer service function that the affiliated TA would undertake, First Data would continue to perform the same work it performed under the

---

[1] The Adviser initially anticipated that it would serve as the TA, but subsequently determined that CTB should serve as the TA.

expiring contract, but at a significant discount from the fees it had been charging the Funds — a

discount that would start at 33.5% and increase to as much as 60% over the five-year term of the

contract.  CAM kept the majority of the savings it had negotiated with First Data for itself, and

offered the Funds a limited fee reduction through the institution of fee caps.

      4.      CAM should have first offered these substantial savings to the Funds and their

shareholders, as an opportunity belonging to the Funds and their shareholders.  At the very least,

CAM should have disclosed this opportunity for significant savings to the Funds.  CAM did

neither.  Instead, CAM took the opportunity for itself and then presented a recommendation to

the Funds' boards in a memo that gave them the impression that the affiliated TA proposal was

the best deal that the Funds could have achieved, which was not true.  In presenting its

recommendation to the Funds' boards, CAM did not disclose that First Data was to perform

almost all of the same work as before, with the affiliated TA taking most of the profit for doing

limited work.

      5.      CAM's recommendation also contained numerous material misrepresentations

about the particulars of the arrangement, including the extent of the benefits CAM would realize.

Among other things, CAM failed to disclose that it had entered into a side letter agreement (the

"Side Letter") with First Data, pursuant to which First Data committed to providing millions of

dollars of investment banking and asset management revenue to Citigroup entities (the "Revenue

Guarantee").

      6.      Over the past five years, CTB has received more than $100 million in net fees for

operating a small customer service call center and performing limited additional oversight and

quality control functions at a total cost of approximately $11 million.

## PARTIES

7.    Plaintiff Jeanne Chilton is a Class (as defined hereafter) member who owned

shares of one of the Funds during the Class Period.

8.    Defendant Smith Barney Fund Management LLC is a limited liability company

organized under the laws of Delaware and a subsidiary of Citigroup Global Market Holdings,

Inc. The Adviser is located at 333 West 34th Street, New York City. The Adviser is registered

with the Securities and Exchange Commission ("SEC") as an investment adviser pursuant to

Section 203(c) of the Investment Adviser Act (the "IAA"), and serves as investment adviser to

the Funds. The Adviser is part of CAM, the Citigroup business unit that provides investment

advisory and management services to Citigroup-sponsored funds, including the Funds.

9.    Defendant Global Markets is a New York corporation and a direct subsidiary of

Citigroup Global Markets Holdings, Inc., and an indirect subsidiary of Citigroup. Formerly

known as Salomon Smith Barney Inc., Global Markets is a registered investment adviser and

broker-dealer. The asset management segment of Global Markets falls within the CAM business

unit.

## OTHER RELEVANT ENTITIES

10.    CTB is a chartered federal savings bank and is an indirect subsidiary of Citigroup.

CTB is registered as a transfer agent and an investment adviser. CTB provides customer service

and oversight functions for the Funds and contracts with PFPC, Inc. ("PFPC"), as successor to

First Data, for technology, transaction processing and other services. In addition. CTB's trust

department provides investment advisory and other services for high net worth clients.

11.     Citigroup is a global financial services company that was organized under the laws of Delaware and maintains its headquarters in New York, New York. Citigroup was formed in October 1998, by the merger of Citicorp and Travelers Group Inc. ("Travelers"). Prior to the merger, the Adviser, Global Markets and CAM (which was formerly known as Salomon Smith Barney Asset Management), were divisions or subsidiaries of Travelers.

12.     The Funds consist of more than 105 open-end management investment companies registered with the SEC, and include equity, money market, fixed income, municipal, and various specialty funds. The Funds currently have more than $97 billion in assets. Currently, and at all relevant times, all of the directors of the Funds are unaffiliated except the chairman, who is an employee and officer of the Adviser.

13.     CAM is the Citigroup business unit that provides investment advisory and management services to Citigroup-sponsored funds, including the Funds. Various Citigroup entities fall within and comprise CAM, including the Adviser, the asset management operations of Global Markets, and the other registered investment advisers for the Citigroup-sponsored funds. Although the investment advisers, including the Adviser, are separate juridical entities, with their own officers and employees, they are limited in size and function. The bulk of the administrative services that the advisers provide to their respective fund families are performed by Global Markets employees who fall within the CAM unit.

14.     First Data, a subsidiary of First Data Corporation, provided transfer agent and other services to mutual funds for a portion of the relevant period. First Data served as full-service TA to the Funds from June 1, 1989 until September 30, 1999, after which it became sub-TA. In or around December 1999, First Data Corporation sold the transfer agent unit to PFPC,

5

which assumed the role of sub-TA for the Funds. (The term "First Data" will be used to refer to the TA unit. The parent company will be referred to as "First Data Corporation.")

15.     PFPC acquired First Data in late 1999, assumed First Data's obligations under a sub-TA agreement with CTB, and now serves as sub-TA for the Funds.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over this action pursuant to the Investment Company Act of 1940 ("ICA"), 15 U.S.C. § 80a-43, the Investment Advisers Act of 1940 ("IAA"), 15 U.S.C. § 80b-14, and 28 U.S.C. § 1331(a).

17.     This Court also has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367(a), over the state law claims asserted herein, because they arise out of and are part of the same case or controversy as Plaintiff's federal claims.

18.     Venue is proper in this District because many of the wrongful acts alleged herein took place or originated in this district.

## CLASS ACTION ALLEGATIONS

19.     Plaintiff brings this action as a class action, pursuant to Federal Rule of Civil Procedure 23, on behalf of all purchasers, redeemers and holders of the mutual fund shares or other ownership interests of one or more of the Funds from August 26, 2000 through the present, who were damaged thereby (except the defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any of the defendants and those who have engaged in the wrongful activities described herein) and their successors in interest, who are or will be threatened with injury arising from defendants' actions as more fully described herein (the "Class").

6

20.     This action is properly maintainable as a class action.

21.     The Class is so numerous that joinder of all members is impracticable.  There are millions of shares of the Funds outstanding.

22.     There are questions of law and fact which are common to the Class including, inter alia, the following:  (a) whether defendants have breached their fiduciary, statutory and other common law duties owed by them to Plaintiff and the members of the Class; (b) whether defendants have violated the ICA, the IAA, and numerous state laws; and (c) whether Defendants have benefited to the detriment of Plaintiff and the other members of the Class.

23.     Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  The claims of the Plaintiff are typical of the claims of other members of the Class and Plaintiff has the same interests as the other members of the Class.  Plaintiff will fairly and adequately represent the Class.

24.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action. This Court is an appropriate forum for this dispute.

## FACTS

### The TA Function and First Data Contract

25.     From 1994 through September 30, 1999, First Data served as full-service TA for the Funds.  As transfer agent, First Data performed a variety of functions for the Funds, including

7

processing buy and sell transactions in Fund shares, processing dividend transactions, calculating

daily net asset values, calculating sales charges and commissions, operating a customer service

call center, distributing proxy and other materials, and performing a variety of additional

accounting functions, including year-end tax reporting.

26.     The Funds' business was very profitable to First Data as a result of a very

favorable fee schedule and the low cost of servicing the Funds. Because the Funds are

proprietary — sold mostly by Smith Barney brokers — many of the TA functions are and at all

relevant times were highly automated. In addition, Smith Barney brokers performed most of the

customer service work — shareholders typically called them with questions and requests.

Accordingly, First Data's customer service function was limited, and consisted primarily of a

small call center of approximately eight to twelve people who fielded inquiries from Smith

Barney Brokers and shareholders who did not have brokers (who constitute a small minority of

Funds shareholders). As a result of a favorable fee schedule and the low cost of servicing the

Funds, First Data realized high profit margins throughout the 1990s, particularly in the late

1990s, when the fee structure changed from a per-account fee to a fee based on a percentage of

assets. As a result of strong markets of the late 1990s, the Funds' assets, and thus TA fees,

increased.

**The TA Review Process**

27.     Pursuant to a non-compete agreement between the predecessors of First Data and

the respondents, CAM was prevented from offering TA services until the expiration of that non-

compete agreement in 1999. With the First Data contract and the non-compete provision due to

expire in June 1999, CAM retained Deloitte & Touche Consulting ("Deloitte") in July 1997 to

8

assist it in reviewing the TA function and options going forward. The Deloitte team worked closely with representatives of CAM, including a Global Markets executive vice president who was in charge of the review and negotiation process (the "EVP"), and a Global Markets managing director who also served as senior vice president of the Adviser (the "SVP").

28.     Deloitte and CAM established several objectives, including improving service to Funds shareholders and increasing flexibility for the future. But CAM also wanted to capture some of the profits that First Data was making on the TA contract. CAM determined that it would enter the TA business and it directed Deloitte to develop a variety of options to accomplish this.

29.     During the first phase of the review process, Deloitte and CAM analyzed different structural alternatives to determine which model was most appropriate in light of CAM's established objectives. Deloitte and CAM analyzed the models based on information obtained from First Data and two of its competitors — DST and SunGard. Deloitte and CAM assessed several different models, including a "full-service" option, a "remote vendor" option, and full internalization.

30.     The full-service option called for CAM to create an affiliated TA unit of approximately fourteen people to perform oversight and control functions and to contract with DST to provide the bulk of transfer agent functions. Under the full-service option, DST would receive the bulk of the fees. Deloitte projected that CAM would realize annual profits of approximately $8.3 million. A draft Deloitte presentation dated November 4, 1997 noted: "DST full service provides little cost advantage over the current state (under which CAM received no revenue)."

9

31.     The remote vendor alternative called for CAM to create an affiliated TA unit to handle customer service and operations and to contract with DST, First Data or SunGard for technology only. Deloitte estimated that the internal TA unit would require 121 full-time employees. The November 4 presentation noted that the remote vendor option required a greater initial investment and conversion effort than the DST full service option, but offered greater annual profit to CAM (between $16.1 and $22.8 million).

32.     The full-internalization option called for CAM to assume responsibility for all aspects of the TA function, including technology (by acquiring software). Although full-internalization would have offered the highest projected profit — approximately $548 million per year — the option would have taken more than eighteen months to implement and would have required a staff of approximately 236 full-time employees. Because of the long implementation time and extensive start-up costs required by this option, Deloitte and CAM decided not to pursue it.

33.     CAM and Deloitte concluded that the remote vendor option, which offered significantly greater profit to CAM than the full-service option, was the preferred alternative. Accordingly, Deloitte and CAM solicited remote vendor bids from First Data, DST and SunGard. DST and SunGard responded with remote vendor proposals. First Data declined to submit a remote vendor bid, and instead proposed to renew as full-service TA with a modest fee discount of its rate under the existing contract of approximately ten percent.

**Deloitte and CMA's Recommendations to Contract with DST**

34.     After analyzing the specific proposals it received from the vendors, in February 1998, Deloitte recommended that CAM contract with DST as remote service provider. The DST

proposal, as of February 1998, called for CAM to create an affiliated TA unit of approximately

100 employees to handle customer service and operations, and to contract with DST for

technology. The CAM affiliate would be the named TA, receive fees from the Funds and pay

DST a per account fee for technology. Deloitte projected that the CAM affiliate would receive

more than $40 million per year in profit under the proposals.

35.     Deloitte concluded that DST's proposal was superior to other options, including

options utilizing First Data, in terms both pricing and technology. Because First Data had not

submitted a remote vendor proposal and had offered only a modest fee discount, the DST

proposal was greatly superior in terms of the profit potential it offered to CAM. As for

technology, Deloitte found that DST offered industry-leading technology (superior to that of First

Data) and that switching to DST would better position the Funds for the future.

36.     After learning that it was at risk of losing the business, First Data offered

significant fee discounts. By letter dated March 12, 1998, First Data offered a $25 million annual

"fee concession" to CAM if the Funds renewed with First Data as full-service TA. In the March

12 letter, First Data committed to increasing the level of resources First Data dedicated to the

Funds and to offering Smith Barney brokers use of SuRPAS, First Data's proprietary sub-

accounting system. The SuRPAS system would permit Smith Barney brokers to charge investors

a processing fee on sales of non-proprietary (non-Smith Barney) funds, and generate an

additional $40 million in annual revenue. In addition, by the middle of March 1998, First Data

had pointed out to CAM that First Data Corporation provided $9 million in revenue to various

Citigroup (then Travelers) entities through investment banking fees, asset management fees and

the purchase of insurance and other products.

37.     CAM, however, did not pursue the option of renewing with First Data as full-service TA and passing along the proposed discount directly to the Funds.  Nor did CAM inform the Funds' boards that First Data had made the offer to renew as full-service TA at deeply discounted rates.  Instead, CAM pursued a deal that would allow CAM to benefit from the discounts First Data was offering.

38.     Later in March, First Data improved its bid and offered a deeper discount, measured as a percentage of the total annual TA fees that First Data would receive from the Funds.  The discounts would start at 32% in 1999 and increase by two percentage points each year, reaching 40% of total TA fees in 2003.  Deloitte and CAM projected that the percentage discounts would translate into $21 million the first year and grow to $39 million in the final year of the contract.

39.     Deloitte questioned whether the discount offered by First Data would be passed along to the Funds or kept by an internal affiliated TA, which would perform only limited duties.  In a presentation dated March 24, 1998, Deloitte wrote:

> Clarify the "Discount" proposed
> A true discount would go to the *funds* not SSB TA.
> This relationship will be extremely difficult to sell to the fund boards.

(Emphasis in original).

40.     After considering First Data's improved offer, CAM representatives concluded, as did Deloitte, that contracting with DST as remote service provider was the best option and made a formal recommendation to the chief executive officer of CAM (the "CEO"), by memorandum dated April 2, 1998.  The April 2 memo stated that the DST proposal was superior to the First Data proposal in terms of technology and pricing.  The memo reiterated Deloitte's findings

12

regarding technology, and indicated that the DST proposal offered $139 million more in profit to CAM over the projected five-year contract period than the First Data proposal offered. The April 2 memo noted that there was conversion risk with switching to DST, but concluded that the conversion risk was minimal.

41.     The April 2 memo noted that switching to DST could cost affiliates of Citigroup — then Travelers — $8 to $10 million annually in lost revenues from First Data Corporation. The memo concluded:

> Based on economics and technology, our recommendation is to move the Transfer Agency processing to DST. We realize that a corporate relationship exists between First Data and [Travelers] and that relationship should be considered before any decision is made.

The CEO agreed with the recommendation.

## CAM Continues Negotiating With First Data

42.     Sometime after April 2, 1998, Travelers senior management directed CAM to continue to negotiate with First Data, stating a preference for remaining with First Data if First Data improved its offer to the point where it was roughly equivalent to the DST proposal in terms of pricing. Accordingly, CAM continued negotiating with First Data.

43.     On April 6, 1998, Travelers announced a proposed merger with Citicorp. The contemplated merger increased the risk of converting to a new service provider because it would decrease the resources available for such a conversion.

44.     In a letter dated June 5, 1998, First Data set forth an improved offer, which increased the discount First Data was willing to offer. The June 5 letter included the following fee schedule:

13

| June 1, 1999 to Dec. 31, 2000 | 32% discount on total fee revenue |
| Jan. 1 to Dec. 31, 2001 | 35% discount on fee revenue up to $80 million |
| | 60% discount on fee revenue over $80 million |
| Jan. 1, 2002 to Dec. 31, 2003 | 50% discount on fee revenue up to $80 million |
| | 60% discount on fee revenue over $80 million |
| Jan. 1, 2004 to Dec. 31, 2004 | 55% discount on fee revenue up to $80 million |
| | 60% discount on fee revenue over $80 million |

45.     Deloitte again questioned the structure of First Data's proposal.  In a presentation

dated June 10, 1998, entitled "Transfer Agency Project: Lunch and Learn — Financial Model

Review," Deloitte questioned the structure in two respects.  First, Deloitte questioned whether

CAM could justify receiving TA fees for operating a fourteen-person customer service center:

> We Anticipate a Larger Organization Would be Needed to Satisfy the
> Fund Boards in the First Data Scenario.
>
> * * *
>
> We believe at a minimum, the SSB TA would have to assume
> responsibility for Customer Service and Transaction Processing to justify
> receiving TA fees.  This would require at least 65 [full-time employees]
> (rather than 14).

Second, Deloitte questioned the legality of the discount taking the form of a rebate to be paid to

CAM, not the Funds:

> First Data's proposal requires that First Data remains the TA; First Data
> receives full revenues of TA fees, providing a "rebate" to SSB (proposed
> as a "discount" by First Data).
>
> This legal structure is questionable at best.  Our advisers indicate that this
> arrangement would in no way be acceptable to the fund boards and may
> not be legally viable.

46.     Deloitte's written warning about the legality of the structure followed several

occasions on which Deloitte's team leader raised the issue orally with CAM representatives.

47.     Sometime after June 10, 1998, CAM clarified that the CAM-affiliated TA unit

would serve as the named TA and First Data would serve as sub-TA.  Under this structure, all

TA fees would pass through the CAM affiliate, so First Data would not be collecting fees and "rebating" them to CAM. This clarification, however, did not address the substance of Deloitte's concerns. CAM did not change the proposed size or scope of responsibility of the affiliated TA unit — it would still be limited to a small customer service center. In addition, even though there would be no "rebate" in a strict sense of the word, the affiliated unit would still be taking the fee discount offered by First Data for itself, instead of passing it along to the Funds.

**CAM's Decision to Recommend First Data Proposal**

48.     In July 1998, First Data improved its offer in three respects. First, it increased the fee discount. Second, it agreed to migrate the Funds from its old technology to its more modern Full Service Retail ("FSR") platform. Third, by letter dated July 14, 1998, First Data offered the Revenue Guarantee. The July 14 letter stated:

> First Data Corporation and Travelers will agree on "basket of services" from which First Data Corporation will generate $8 million of revenue to Travelers annually. A "make-whole" provision will be included which commits First Data Corporation to a fee credit on transfer agent services for any shortfall to the $8 million. The credit will be 50 cents on each dollar of revenue shortfall.

49.     By memorandum to the CEO dated July 24, 1998, the EVP recommended that CAM establish an affiliated TA unit of approximately fifteen people to assume responsibility for the customer service call center and contract with First Data for the bulk of the transfer agency services. The memo estimated the cost of the fifteen call center employees would be $1 million per year.

50.     Although the structure of the proposal had been changed so that First Data would not pay a "rebate" to CAM, in substance the fee arrangement remained largely the same as in the prior proposals — First Data would be sharing its profits with CAM. The July 24 memo set forth

15

the following fee arrangement, which was referred to in the memo as a "revenue sharing
arrangement":

| | Percentage that is earned by [CAM] on: | |
|---|---|---|
| | First $80MM | Over $80 MM [in total TA fees] |
| Year 1 | 33.5% | 33.5% |
| Year 2 | 40 | 60 |
| Year 3 | 55 | 60 |
| Year 4 | 55 | 60 |
| Year 5 | 58 | 60 |

51.    The memo projected that CAM would earn the following profit under the revenue

sharing arrangement (taking into account the $1 million in salaries projected for new staff):

| Year 1 | $29 million |
|---|---|
| Year 2 | $40 million |
| Year 3 | $57 million |
| Year 4 | $62 million |
| Year 5 | $70 million |

52.    The July 24 memo indicated that Citigroup's projected profit under the First Data

proposal was $16 million less over the five-year contract period than its projected profit under

the DST proposal.  The EVP recommended accepting the differential because contracting with

First Data eliminated risks associated with the conversion process and permitted CAM personnel

to focus on issues relating to Y2K, the integration of the Salomon Brothers funds, and the

Travelers-Citicorp merger, which had been announced in April of that year.

53.    The July 24 memo also stated that, because of CAM's fiduciary obligations to the

Funds, it was obligated to implement a fee reduction.  The recommended reduction called for the

Funds to continue to pay the same asset-based fees that were being charged by First Data, subject

to caps that limited TA fees to the lesser of the asset-based fee or a set amount (which ranged

16

from $13 to $14.50 per account). The July 24 memo projected an annual fee reduction of $6-$8 million.

54.    The July 24 memo noted that because of the different structures of the DST and First Data proposals, implementing the fee reduction would virtually eliminate the $16 million differential between the DST and First Data proposals. This was because the reduced revenue stream that would result from the fee reduction would have a greater impact on CAM's profit under the DST proposal than under the First Data proposal.

55.    With respect to the Revenue Guarantee, the July 24 memo indicated that First Data had committed to:

> Providing CAM with additional assets to manage sufficient to generate $1.5 million per year in asset management fees.
>
> Making Salomon Smith Barney First Data's investment banker of choice and generating at least $3 million per year in investment banking fees.
>
> Paying 50 cents for every dollar of shortfall of investment banking fees and 90 cents for every dollar of shortfall of asset management fees, by way of credit on TA fees paid by CAM to First Data.

56.    The memo stated that the Revenue Guarantee would generate at least $22.5 million in revenue or $14 million of "pre-tax bottom line" over the five years of the agreement.

57.    Finally, in a section entitled "Mutual Fund Board Issues," the memo stated that the chairman of the Funds' boards, who was an officer of CAM, was "comfortable that the new First Data arrangement is supportable to the Fund boards." The memo noted that service levels, "while good, will improve," and the funds would receive a fee reduction. The CEO approved the recommendation.

**The Sub-TA Agreement and Side Letter**

58.     On August 4, 1998, First Data produced the first draft of the Side Letter, which

addressed the Revenue Guarantee and other significant commitments between the parties,

including First Data's commitment to migrate the Funds to FSR.

59.     Representatives of CAM and First Data negotiated the terms of the Side Letter

and simultaneously prepared a sub-TA agreement (the "Sub-TA Agreement") between First Data

and Mutual Management Corp., the Citigroup entity initially chosen by CAM to serve as the

affiliated TA.  At some point prior to the finalization of the two agreements, First Data's

commitment to migrate the Funds to FSR was removed from the Side Letter and included as a

schedule to the Sub-TA Agreement.

60.     Both agreements were finalized on November 20, 1998.  The Side Letter, which

specifically referenced the Sub-TA Agreement, contained the following provisions:

> The Revenue Guarantee;
>
> First Data's commitment to provide its SuRPAS system for sub-accounting;
>
> CAM's commitment to treat First Data as "favored nation vendor" for proxy and fulfillment services (which required CAM to solicit a bid from First Data when proxy and fulfillment services were required and to recommend First Data if CAM determined in good faith that its bid was competitive with the other bids received)
>
> CAM's agreement, subject to its fiduciary duties, to "use all reasonable and lawful means to encourage the Funds" "to continue [First Data] as sub-transfer agent for existing Funds and any or all subsequent expansion, consolidation, affiliation, or addition to the Funds for which CAM provides investment management services";
>
> CAM's agreement to consider in good faith retaining or recommending First Data to provide other services to the Funds.

18

61.    The Sub-TA Agreement included an integration clause, which provided that the Agreement, "including Schedules, Addenda and Exhibits" thereto, constituted the parties' entire agreement about the subject matter of the Sub-TA Agreement and superseded all prior and contemporaneous agreements regarding the subject matter.  Notwithstanding the obvious significance to the Funds of the benefits to CAM affiliates contained in the Side Letter, the Side Letter (or its substance) was not provided to the Funds' boards or filed with the Commission as part of the Funds' registration statements.

**The Materially Misleading Board Materials**

62.    In late February-early March 1999, CAM prepared a memorandum (the "Board Memo") and a Power Point presentation (the "Power Point") to present to the Funds' boards concerning its recommendation for a new TA contract.  CAM included the final version of the Board Memo, which is dated March 4, 1999, and the Sub-TA Agreement in the materials that it sent to board members in advance of the meetings.  Neither the Side Letter nor the Power Point was included in the packet of materials that was sent to board members.

63.    The Board Memo did not candidly present the proposal in terms that would have made clear to the board that First Data would continue to perform almost all of the TA functions, leaving CTB with a tremendous profit for manning a fifteen-person call center and performing limited additional oversight and quality control functions.  The Board Memo did not explain in a meaningful way how duties were to be divided between CTB and First Data.  To the contrary, the Board Memo gave the misleading impression that First Data was providing "technology" only, which was not true, and that CTB would be a much more substantial operation then it actually would be.

19

64.     The board materials also stated that CAM approached the TA review process by looking at all available alternatives to provide the Funds with better service at lower prices. This was also untrue. From the beginning, CAM approached the review process with the goal of maximizing profit to CAM and, in order to attain its own goals, CAM did not pursue options that would have provided much greater value to the Funds. Contrary to representations in the board materials, the only options CAM ever seriously considered were options that involved making a CAM affiliate the TA. The Board Memo did not disclose that First Data had made a series of offers to perform all TA services at deeply discounted rates — including the initial $25 million annual fee discount offer and the later percentage-based discount offers — all proposals that, if offered directly to the Funds, would have provided greater savings than the proposal CAM recommended.

65.     Even with respect to the alternatives that CAM actually considered, CAM did not disclose that Deloitte and CAM management had initially recommended DST, that CAM resumed negotiating with First Data only after Travelers management had requested that they do so because First Data was an investment banking client, and that CAM decided to recommend First Data only after First Data had increased the value of its proposal to CAM and offered the Revenue Guarantee. In fact, CAM failed to disclose the Side Letter or any of its terms. Instead of making full and accurate disclosure regarding the TA review process and CAM's interest in the proposal the Board Memo gave the incorrect impression that CAM was acting in the Funds' best interest and had expended significant effort and money to identify and negotiate the best deal for the Funds. The introduction of the Board Memo contains the following statement:

20

> [I]n anticipation of the expiration of the non-compete agreement [with
> First Data], SSB began an exhaustive study in late 1997 utilizing the
> services of Deloitte Consulting to examine transfer agency alternatives to
> First Data with the goal of reducing fees, improving service and offering
> the Smith Barney Funds access to alternative channels of distribution (e.g.,
> 401k) to promote further growth. This effort was completed in mid-1998
> at a cost of $2.5 million.

66.     This paragraph was inaccurate and misleading. Reducing fees was not a goal of

the review process. The idea of a fee reduction was first raised in the summer of 1998, by the

chairman of the Funds' boards, and was separate from the decision on how to structure the TA

function.

67.     The Board Memo bolstered the case for the recommended proposal by giving the

incorrect impression that no viable alternatives existed. The following paragraph, entitled

"Change of Transfer Agent Vendor," was intended to describe all remote TA vendor proposals,

including the DST proposal:

> Results showed that the internalization of transfer agency functions and
> engagement of another technology vendor could reduce the fees paid by
> the Smith Barney Funds and also be the most profitable alternative to SSB.
> However, full internalization of the transfer agent functionality would
> have entailed the creation of an organization of 150 employees. In
> addition, the conversion and software modifications required to migrate to
> a new technology and services provider would have taken at least two and
> a half years. In short the Smith Barney Funds would not realize any cost
> savings for several years under this scenario.

68.     The paragraph failed to discuss the DST proposal in any detail or to disclose that

Deloitte had recommended it. In addition, to the extent that the figures contained in the

paragraph were intended to describe the DST proposal, they are inaccurate. The DST proposal

would have required CAM to hire approximately 100 employees, not 150; the conversion to DST

would have taken twelve to eighteen months, not thirty; and under the DST proposal the Funds

would have realized savings in the first year after conversion. Moreover, the paragraph falsely suggests that CAM was foregoing some profit and recommending First Data in order to pass along fee reductions to the Funds. The First Data proposal, however, was economically superior — for CAM and its affiliates — to the DST proposal.

69.     In a separate paragraph, the Board Memo reinforced the false impression that CAM was sacrificing its own interests to the benefit of the Funds:

> The decision to remain with First Data and establish an internal transfer agency capability was made with the recognition that although not the most favorable option financially to SSB, it represented a prudent course of action with immediate results. The revenue shortfall as a result of accepting the proposed First Data contract over our most attractive alternative was approximately $16.0 million.

70.     These statements were incorrect. The First Data proposal was projected to provide greater profit to CAM than the DST proposal, not $16 million less.

71.     Although the Board Memo disclosed that the affiliated TA would make a profit, the disclosure regarding the economic benefit to CAM was limited and misleading. The only paragraph of the Board Memo that discusses the projected profit to CAM appears in a section entitled "Proposed Transfer Agency Fee and Fund Savings Analysis," and states:

> SSB commits to reviewing the transfer agent service and fees on an annual basis with the Smith Barney Fund boards. SSB anticipates that the SSB transfer agency business unit will operate on a 33% margin based on the June 1, 1999 First Data fee schedules. While First Data discounts may increase over the life of the contract, it is expected that expenses will rise on a commensurate basis as SSB adds to its transfer agent capabilities.

72.     At the time, CAM was projecting that it would earns tens of millions of dollars in profit each year for operating a fifteen person call center and performing limited additional

oversight and quality control functions. There was no meaningful disclosure about how limited the services were that CTB was to contribute in return for all this profit.

73.     Because virtually all of the work was to be done by First Data, the 33% profit margin figure was itself misleading. The margin was based on an analysis that treated sub-TA payments to First Data as expenses of CTB. The economic reality would have been more accurately portrayed by deducting payments to First Data from revenue – not treating them as expenses of CTB. CTB is essentially a pass-through for those payments. In fact, internally, CAM described the fee arrangement with First Data as a revenue sharing agreement. Had payments to First Data not been treated as an expense of CTB, the projected pre-tax profit margin would have been approximately 70%.

74.     The Power Point disclosed that "Revenue Generation" was one of CAM's goals, and included a table that contained profit projections in dollar amounts. The table, however, was not provided to the directors in advance of the meeting. Had board members received the projections in advance and had the opportunity to scrutinize them, they at least would have had a chance to understand that CAM expected to earn tens of millions in profit. But they still would not have understood just how limited CAM's proposed contribution to the venture really was.

75.     Finally, the Board Memo incorrectly indicated that the fees charged to the Funds by First Data were significantly below industry average.

**CTB's Fees and Expenses as TA**

76.     At regularly scheduled meetings during the first half of 1999, the Adviser presented the proposal to the Funds' boards — including counsel for the Funds and directors — which approved the proposal. During a transition period between June 1999 and October 1999,

23

CAM received revenue from First Data associated with the establishment of the affiliated TA unit. On October 1, 1999, a CAM affiliate, now CTB, became the named TA for the Funds, and assumed responsibility for the customer service function, First Data — now PFPC — continued to perform the bulk of the TA services as sub-TA. As named TA, CTB receives 100% of the fees and makes sub-TA payments to PFPC and to Primerica Financial Services ("PFS"), a Citigroup affiliate that sells certain of the Funds and performs sub-TA work.[2]

77.    CTB currently has approximately fifteen employees performing work for the Funds, only seven of whom work full-time for the Funds. As intended, CTB has realized high profits for performing limited work. The one function that CTB assumed from First Data/PFPC is the customer service function, which consists primarily of a call center staffed by seven full-time employees who are dedicated to Funds business. Five of those employees answer calls, two are supervisors. The seven call center staff members are the only CTB employees who spend all of their time on Funds-related work.

78.    CAM representatives supervise the TA operations of CTB, which are part the CAM business unit for budget and reporting purposes. CAM is responsible for the cost of CTB's TA operations and receives the benefit of the revenue that the TA operations generate.

79.    For the period October 1, 1999 through September 30, 2004, CTB earned pre-tax revenues of approximately $104 million from Funds business (which is lower than projected due to, among other things, the downturn in the market that began in 2001). Over the same period, CTB has had total operating expenses (excluding sub-TA payments) of approximately $11.5

---

[2] The approved TA arrangement included implementation of per account fee caps. The fee caps had the effect of lowering the total fees paid by the Funds by 23% for the period June 1999, when the fee caps were implemented, through September 2004. During the first quarter of 2003, CTB requested a fee increase from the Funds' boards, but withdrew the request after it was rejected by one board.

million. In addition, CAM and its affiliates received approximately $17 under the Revenue

Guarantee.

## CAUSES OF ACTION

### COUNT I

### VIOLATION OF SECTION 36(a) OF THE INVESTMENT COMPANY ACT

#### (Against The Adviser)

80.     Plaintiff incorporates by reference the preceding paragraphs.

81.     The Funds consist of registered investment companies, as defined by Section 2 of

the ICA.

82.     The Adviser is an investment adviser under Section 36(a) as that term is defined

in Section 2 of the ICA.

83.     Pursuant to Section 36(a) of the ICA, 15 U.S.C. §80a-35(a), the Adviser owes and

owed to the Funds and their shareholders the fiduciary duties of loyalty, candor, and due care,

including the duty of the advisers to seek approval of any advisory agreement with full disclosure

of information material to a board's decision.

84.     Pursuant to Section 15(c) of the ICA, 15 U.S.C. § 80a-15(c), the investment

adviser of a mutual fund owes to the mutual fund the duty to furnish the directors of the fund

"such information as may reasonably be necessary to evaluate the terms of any contract whereby

a person undertakes regularly to serve or act as investment adviser of such [mutual fund]

company."

85.     After a reasonable opportunity to conduct discovery, Plaintiff believes the

evidence will show that the Adviser did not make full and fair disclosure of all information that

25

would be material to a board's decision regarding the Adviser's recommendation for transfer agent.

86.     Pursuant to Section 47(b) of the ICA, 15 U.S.C. § 46(b), an investment advisory or distribution agreement that is made in, or whose performance involves a, violation of the ICA, is null and void, and "is unenforceable by either party." Pursuant to that provision, any such agreement made in, or whose performance involves a, violation of the ICA, may be rescinded by the mutual fund.

87.     The Adviser violated the ICA and breached its fiduciary duty to the Funds and their shareholders by the acts alleged in this Complaint including, without limitation, recommending an affiliate of the Adviser, CBT, to serve as transfer agent for the Funds at excessive rates.

88.     By recommending that an affiliate of the Adviser serve as transfer agent for the Funds, the Adviser placed its own self-interest in maximizing its compensation and other payments over the interests of the Funds.

89.     As a direct and proximate result of the wrongful conduct alleged above, the Funds and their shareholders were harmed by, among other things, the excessive fees they paid for transfer agent services.

90.     This conduct constituted willful misfeasance, bad faith, or gross negligence, or reckless disregard of the Adviser's duties.

## COUNT II

## VIOLATION OF SECTION 36(b) OF THE INVESTMENT COMPANY ACT

### (Against The Adviser)

91.     Plaintiff incorporates by reference the preceding paragraphs.

92.     The Funds consist of registered investment companies within the meaning of Section 2 of the ICA.

93.     The Adviser is an investment adviser for the Funds as that term is defined in Section 2 of the ICA.

94.     Pursuant to Section 36(b) of the ICA, 15 U.S.C. § 80a-35(b), the investment adviser of a mutual fund owes to its mutual funds and their shareholders the fiduciary duties of loyalty, candor, and due care with respect to the receipt of compensation for services or payments of a material nature paid by the mutual fund to such investment adviser or any affiliated person. Those fiduciary duties apply not only to the terms of the advisory fee agreements, but also to the manner in which advisers seek approval of such agreements.

95.     Pursuant to Section 36(b) of the ICA, 15 U.S.C. §80a-35(b), the Adviser owes and owed to the Funds and their shareholders the fiduciary duties of loyalty, candor, and due care with respect to its receipt of compensation for services or payments of any material nature paid by the Funds or its shareholders to the Adviser or any affiliated person.

96.     Pursuant to Section 15(c) of the ICA, 15 U.S.C. § 80a-15(c), the investment adviser of a mutual fund owes to the mutual fund the duty to furnish the directors of the fund "such information as may reasonably be necessary to evaluate the terms of any contract whereby

27

a person undertakes regularly to serve or act as investment adviser of such [mutual fund] company."

97. Thus, among other things, Section 36(b) of the ICA prohibits and prohibited the Adviser from soliciting the approval of any advisory agreement from the Funds by use of false or misleading information, or by failing to disclose information material to the Funds regarding the Adviser's compensation or the compensation of the Adviser's affiliate, CBT. Information concerning conflicts of interest are particularly important to the Funds.

98. After a reasonable opportunity to conduct discovery, Plaintiff believes the evidence will show that, for any of the Funds, the Adviser did not make full and fair disclosure to the Funds' boards of all information that would be material to the Funds' decision regarding the choice of its transfer agent.

99. Pursuant to Section 36(b) of the Investment Company Act, 15 U.S.C. § 80a-35(b), a mutual fund shareholder may bring a civil action against an investment adviser or any affiliated person who has breached his or its fiduciary duty concerning such compensation or other payments.

100. The Adviser breached its fiduciary duty to the Funds by the acts alleged in this Complaint including, without limitation, recommending that the Funds contract with CBT for transfer agent services at excessive rates.

101. By recommending that the Funds contract with an affiliate of the Adviser for transfer agent services, the Adviser placed its own self-interest in maximizing its compensation and other payments over the interests of the Funds and their shareholders.

28

102.    As alleged herein, the Adviser breached its fiduciary duties with respect to the receipt of compensation for services or other payments of a material nature from the Funds or their shareholders.

103.    By virtue of the foregoing, the Adviser has violated Section 36(b) of the Investment Company Act, 15 U.S.C. § 80a-35(b).

104.    As a direct and proximate result of the wrongful conduct alleged above, the Funds were harmed by, among other things, the adoption and approval of the advisory agreements.

**COUNT III**

**UNJUST ENRICHMENT**

**(Against The Adviser and Global Markets)**

105.    Plaintiff incorporates by reference the preceding paragraphs.

106.    The Adviser and Global Markets received a benefit in the profits they earned as a result of their unlawful conduct as described in this Complaint.

107.    Justice and equity require that the Adviser and Global Markets not be allowed to retain those profits.

108.    Justice and equity require that the Adviser and Global Markets' unlawfully earned profits be disgorged and returned to Funds and their shareholders because such profits belong to the Funds and their shareholders.

109.    The Adviser and Global Markets' conduct constituted willful misfeasance, bad faith, or gross negligence, or reckless disregard of their duties.

## COUNT IV

## CIVIL CONSPIRACY

### (Against The Adviser and Global Markets)

110.    Plaintiff incorporates by reference the preceding paragraphs.

111.    The Adviser and Global Markets entered into an agreement or agreements or combinations with each other to accomplish by common plan the illegal acts described in this Complaint and by their actions demonstrated the existence of an agreement and combination.

112.    The Adviser and Global Markets, by their actions, have manifested actual knowledge that a tortuous or illegal act or acts was planned and their intention to aid in such act or acts.

113.    The Adviser and Global Markets maliciously and intentionally conspired, combined and agreed with one another to commit the unlawful acts alleged in this Complaint or to commit acts by unlawful means proximately causing injury and damages to the Funds and their shareholders for which they are jointly and severally liable.

114.    As a direct and proximate result of the wrongful conduct alleged above, the Funds and their shareholders were harmed by the excessive fees they paid to the Adviser's affiliate, CBT, for CBT's services as transfer agent, for which the Adviser and Global Markets are liable.

115.    The Adviser and Global Markets' conduct constituted willful misfeasance, bad faith, or gross negligence, or reckless disregard of its duties.

WHEREFORE, Plaintiff prays for judgment as follows:

A.    Removing the Adviser;

B.    Rescinding the management and other contracts for the Funds with the Adviser;

30

C.   Ordering Defendants to disgorge all management fees and other compensation paid to the Adviser;

D.   Awarding monetary damages against all of the Defendants, individually, jointly, or severally, for all losses and damages suffered as a result of the wrongdoings alleged in this Complaint, including punitive damages where appropriate, together with interest thereon;

E.   Awarding Plaintiffs the fees and expenses incurred in this action including reasonable allowance of fees for Plaintiffs' attorneys, and experts; and

F.   Granting Plaintiffs such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs hereby demand a trial by jury of all issues so triable.

Dated:  August 26, 2005

BERNSTEIN LIEBHARD & LIFSHITZ, LLP

Sandy A. Liebhard (SL-0835)
U. Seth Ottensoser (UO-9703)
Joseph R. Seidman, Jr. (JS-9260)
10 East 40th Street
New York, NY  10016
Tel:  (212) 779-1414

Attorneys For Plaintiff

31