## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| IN RE SMITH BARNEY FUND TRANSFER AGENT LITIGATION | 05 Civ. 7583 (WHP) |
|---|---|

### CONSOLIDATED AND AMENDED CLASS ACTION COMPLAINT

Lead Plaintiff Operating Local 649 Annuity Trust Fund ("Plaintiff" or "Local 649") brings this action as a class action on behalf of all persons and entities who purchased, redeemed, or held shares of the Smith Barney Funds (as defined herein) between September 11, 2000 and May 31, 2005 (the "Class Period"), and who were damaged thereby. As a result of the wrongdoing alleged herein, the members of the Class (as defined below) were damaged.

Plaintiff alleges upon information and belief, except for paragraphs 12-14 hereof, which are alleged upon knowledge, as follows:

### NATURE OF THE ACTION

1.    This action concerns the scheme of two Citigroup-related investment advisers and two executives, to place their interests in making a profit ahead of the interests of the mutual funds they served.[1] Defendant Smith Barney Fund Management LLC (the "Adviser"), which serves as investment adviser to the Smith Barney Family of Funds (the "Funds"), recommended that the Funds contract with an affiliate of the Adviser, which would perform limited transfer agent services and sub-contract with the Funds' existing transfer agent. The existing transfer agent would perform almost all of the same services it had performed

---

[1] Investment advisers have a fiduciary duty to act in the best interests of the mutual funds they advise and their shareholders. Mutual funds pay fees for various services provided to the mutual funds, including transfer agent services. Among its duties, an adviser may advise fund boards

previously, but at deeply discounted rates, permitting the affiliate of the Adviser to keep most

of the discount for itself and make a high profit for performing limited work. This self-

interested transaction permitted the Adviser and its affiliates to pocket over $90 million from

the transfer agent function at the direct expense of the Funds and their shareholders.

2.     By way of background, the Adviser and the asset management operations of

Defendant Citigroup Global Markets, Inc. ("Global Markets") are part of Citigroup Asset

Management ("CAM"), a business unit of Citigroup Inc. ("Citigroup") that provides

investment advisory and management services to Citigroup-sponsored funds. In 1997, CAM

began a formal study of the transfer agent ("TA") function in anticipation of the expiration of

the existing contract between the Funds and First Data Investor Services Group ("First Data").

Michael Yellin ("Yellin"), who reported to CAM's chief executive officer, Defendant

Thomas W. Jones ("Jones"), supervised the TA review project and personally handled

negotiations with First Data. Yellin briefed Defendant Jones on the status of the TA review

project on a regular basis.

3.     Accordingly, Defendant Jones knew that First Data had been making high profit

margins on the TA contract. Instead of using CAM's strong bargaining position to benefit the

Funds in the negotiation of a new TA contract, Defendant Jones sought to keep for CAM

much of the profit First Data had been making. In fact, CAM did not pursue or even inform

the Funds' boards of an offer by First Data to continue to perform all transfer agent services

for the Funds at a $25 million annual fee discount.

---

about the retention of a particular transfer agent and how much to pay for the transfer agent's
services.

4.     CAM ultimately recommended that the Funds replace First Data with an affiliate of the Adviser.  The recommended structure called for the affiliated TA (which is now Citicorp Trust Bank, fsb ("CTB"))[2] to contract directly with the Funds as named TA, perform limited functions and subcontract with First Data for the bulk of the transfer agent service (CAM referred to First Data as "sub-TA").  Except for a small customer service function that the affiliated TA would undertake, First Data would continue to perform the *very same work* it performed under the expiring contract, but at a significant discount from the fees it had been charging the Funds — a discount that would start at 33.5% and increase to as much as 60% over the five-year term of the contract.  CAM kept the majority of the savings it had negotiated with First Data for itself,  offering the Funds only a limited fee reduction through the institution of fee caps.

5.     CAM should have first offered these substantial savings to the Funds and their shareholders, as an opportunity belonging to the Funds and their shareholders. At the very least, CAM should have disclosed this opportunity for significant savings to the Funds.  CAM did neither.  Instead, CAM took the opportunity for itself and then presented a recommendation to the Funds' boards in a memo that gave them the impression that the affiliated TA proposal was the best deal that the Funds could have achieved, which was not true.  In presenting its recommendation to the Funds' boards, CAM did not disclose that First Data was to perform almost all of the same work as before, with the affiliated TA taking most of the profit for doing limited work.

---

[2] The Adviser initially anticipated that it would serve as the TA, but subsequently determined that CTB should serve as the TA.

6.     CAM's recommendation also contained numerous material misrepresentations about the particulars of the arrangement, including the extent of the benefits CAM would realize. Among other things, CAM failed to disclose that it had entered into a side letter agreement (the "Side Letter") with First Data, pursuant to which First Data committed to providing millions of dollars of investment banking and asset management revenue to Citigroup entities (the "Revenue Guarantee").

7.     Defendant Lewis Daidone ("Daidone") had an instrumental role in the scheme. Defendant Daidone was Senior Vice President and a director of the Adviser and a managing director of Global Markets during the Class Period.  Defendant Daidone negotiated the very contracts that constituted the aforementioned self-dealing.  Further, Defendant Daidone helped prepare and present the materially misleading materials to the Funds' boards.  Defendant Daidone also signed many prospectuses containing materially misleading statements and omissions about the Adviser, as discussed below.

8.     Defendant Jones also had an integral role in the scheme.  Defendant Jones was the CEO of CAM.  Defendant Jones made the decision to recommend the affiliated TA proposal to the Funds' boards, fully aware that the affiliated TA would make a huge windfall at the expense of Funds' shareholders through the proposal.  Defendant Jones also performed only a cursory review of the memorandum to the Funds' boards and took no meaningful steps to insure that the Funds' boards were informed of the material terms of the TA proposal.

9.     During the Class Period, CTB received an estimated $100 million in net fees for operating a small customer service call center and performing limited additional oversight and quality control functions at a total cost of approximately $10.5 million.  Thus, Citigroup

4

entities appropriated approximately $90 million which rightfully belonged to shareholders of the Funds.[3]

10. Significantly, Defendants Adviser and Global Markets have now *admitted* to the entire scheme of self-dealing described above. On May 31, 2005, the Adviser and Global Markets entered into an agreement with the Securities and Exchange Commission ("SEC"), agreeing to pay a total of over $200 million in fines and disgorgement penalties as a result of their violation of the Investment Advisers Act of 1940 ("IAA"). Similarly, on March 23, 2006, Adviser Executive Vice President Yellin entered into an agreement with the SEC, paying a fine of $50,000 as a result of his IAA violations, and also admitting to the facts as alleged herein. Further, Yellin has specifically implicated Defendants Daidone and Jones in the scheme, as has the SEC in an action alleging IAA violations against Daidone and Jones, which is currently pending in this Court.[4]

11. In prospectuses throughout the Class Period (many of which were signed by Defendant Daidone), the issuers (who were the Funds themselves or families of Funds) made statements concerning the sub-TA arrangement that were misleading due to their failure to disclose the elaborate scheme to inflate profits which was the motivating force behind creating the sub-TA. These statements, along with the participation of all the Defendants in the manipulative scheme at issue, violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

---

[3] The amount appropriated by the Citigroup entities is only an estimate; Plaintiff cannot pinpoint the precise damages without the benefit of discovery.

[4] Judge Casey denied Daidone and Jones' motion to dismiss in an opinion (the "Casey Decision") dated April 25, 2006 in the case, which is denominated *SEC v. Thomas Jones and Lewis Daidone*, 05 Civ. 7044 (RCC).

12. The Adviser also violated the Investment Company Act of 1940 ("ICA") by breaching its fiduciary duties to Funds shareholders by virtue of the scheme alleged herein.

13. As a result of the scheme, Plaintiff and members of the Class suffered harm. Among other things, Defendants' actions drained money out of the Funds throughout the Class Period, increased the Funds' expenses, and distorted the net asset value ("NAV") of the Funds.

## PARTIES

14. Lead Plaintiff Operating Local 649 Annuity Trust bought shares of one of the Funds, the Smith Barney Capital Preservation Fund, during the Class Period.

15. Plaintiff Jeanne Chilton bought shares of one of the Funds, the Citistreet Large Company Stock Fund, during the Class Period.

16. Plaintiff Jeffrey Weber held shares of one of the Funds, the Smith Barney Large Cap Growth And Value Fund, during the Class Period.[5]

17. Defendant Smith Barney Fund Management LLC (the Adviser) is a limited liability company organized under the laws of Delaware and a subsidiary of Citigroup Global Market Holdings, Inc. The Adviser is located at 333 West 34th Street, New York City. The Adviser is registered with the SEC as an investment adviser pursuant to Section 203(c) of the IAA, and serves as investment adviser to the Funds. The Adviser is part of CAM, the

---

[5] If the Court deems it necessary, Plaintiff will, at a later stage of the litigation, add additional class representatives for other Funds. *Cf.* the Court's April 17, 2006 Order at 8 ("'Defendants' arguments [that the lead plaintiff applicants lacked standing] are properly addressed at the class certification stage',… [citing *Yates v. Open Jt. Stock Co.*, No. 04 Civ. 9742 (NRB), 2005 U.S. Dist. LEXIS 7717, at *6-7 (Apr. 29, 2005)]…. If, in fact, every Fund requires representation in the class leadership, the lead plaintiff may include additional named plaintiffs in this consolidated action.") (First alteration in original).

Citigroup business unit that provides investment advisory and management services to Citigroup-sponsored funds, including the Funds.

18. Defendant Global Markets is a New York corporation and a direct subsidiary of Citigroup Global Markets Holdings, Inc., and an indirect subsidiary of Citigroup. Formerly known as Salomon Smith Barney Inc., Global Markets is a registered investment adviser and broker-dealer. The asset management segment of Global Markets falls within the CAM business unit.

19. Defendant Jones was the Chief Executive Officer of CAM during the Class Period.

20. Defendant Daidone was Senior Vice President and a director of the Adviser, Managing Director of Global Markets, and Principle Accounting Officer for many subfamilies of the Funds during the Class Period.

**OTHER RELEVANT ENTITIES**

21. CTB is a chartered federal savings bank and is an indirect subsidiary of Citigroup. CTB is registered as a transfer agent and an investment adviser. CTB provides customer service and oversight functions for the Funds and contracts with PFPC, Inc. ("PFPC"), as successor to First Data, for technology, transaction processing and other services. In addition, CTB's trust department provides investment advisory and other services for high net worth clients.

22. Citigroup is a global financial services company that was organized under the laws of Delaware and maintains its headquarters in New York, New York. Citigroup was formed in October 1998, by the merger of Citicorp and Travelers Group Inc. ("Travelers").

7

Prior to the merger, the Adviser, Global Markets and CAM, were divisions or subsidiaries of Travelers.

23.   The Funds consist of more than 105 open-end management investment companies registered with the SEC, and include equity, money market, fixed income, municipal, and various specialty funds.  The Funds currently have more than $97 billion in assets.  Currently, and at all relevant times, all of the directors of the Funds are unaffiliated except the chairman, who is an employee and officer of the Adviser.

24.   CAM is the Citigroup business unit that provides investment advisory and management services to Citigroup-sponsored funds, including the Funds.  Various Citigroup entities fall within and comprise CAM, including the Adviser, the asset management operations of Global Markets, and the other registered investment advisers for the Citigroup-sponsored funds.  Although the investment advisers, including the Adviser, are separate juridical entities, with their own officers and employees, they are limited in size and function. The bulk of the administrative services that the advisers provide to their respective fund families are performed by Global Markets employees who fall within the CAM unit.

25.   First Data, a subsidiary of First Data Corporation, provided transfer agent and other services to mutual funds until December 1999.  First Data served as full-service TA to the Funds from June 1, 1989 until September 30, 1999, after which it became sub-TA.  In or around December 1999, First Data Corporation sold the transfer agent unit to PFPC, which assumed the role of sub-TA for the Funds.  (The term "First Data" will be used to refer to the TA unit.  The parent company will be referred to as "First Data Corporation").

8

26.  PFPC acquired First Data in late 1999, assumed First Data's obligations under a sub-TA agreement with CTB, and now serves as sub-TA for the Funds.

## JURISDICTION AND VENUE

27.  The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)], Rule 10b-5 promulgated under Section 10(b) by the SEC [17 C.F.R. § 240.10b-5], as well as pursuant to the ICA, 15 U.S.C. § 80.

28.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, Section 27 of the Exchange Act [15 U.S.C. § 78aa], as well as pursuant to the ICA, 15 U.S.C. § 80a-43.

29.  Venue is proper in this District because many of the wrongful acts alleged herein took place or originated in this district.

## CLASS ACTION ALLEGATIONS

30.  Plaintiff brings this action as a class action, pursuant to Federal Rule of Civil Procedure 23, on behalf of all purchasers, redeemers and holders of the mutual fund shares or other ownership interests of one or more of the Funds from September 11, 2000 through May 31, 2005, who were damaged thereby (except the Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any of the Defendants and those who have engaged in the wrongful activities described herein) and their successors in interest, who are or will be threatened with injury arising from Defendants' actions as more fully described herein (the "Class").

9

31.  This action is properly maintainable as a class action.

32.  The Class is so numerous that joinder of all members is impracticable.  There are millions of shares of the Funds outstanding.

33.  There are questions of law and fact which are common to the Class including, *inter alia*, the following:  (a) whether Defendants made omissions of material fact; (b) whether Defendants participated in a manipulative scheme; and (c) whether Defendants have benefited to the detriment of Plaintiff and the other members of the Class.

34.  Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  The claims of the Plaintiff are typical of the claims of other members of the Class and Plaintiff has the same interests as the other members of the Class.  Plaintiff will fairly and adequately represent the Class.

35.  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action. This Court is an appropriate forum for this dispute.

## STATEMENT OF FACTS

### The TA Function and First Data Contract

36.  From 1994 through September 30, 1999, First Data served as full-service TA for the Funds.  As transfer agent, First Data performed a variety of functions for the Funds, including processing buy and sell transactions in Funds shares, processing dividend

transactions, calculating daily net asset values, calculating sales charges and commissions, operating a customer service call center, distributing proxy and other materials, and performing a variety of additional accounting functions, including year-end tax reporting.

37. The Funds' business was very profitable to First Data as a result of a very favorable fee schedule and the low cost of servicing the Funds. Because the Funds are proprietary — sold mostly by Smith Barney brokers — many of the TA functions are and at all relevant times were highly automated. In addition, Smith Barney brokers performed most of the customer service work — shareholders typically called them with questions and requests. Accordingly, First Data's customer service function was limited, and consisted primarily of a small call center of approximately eight to twelve people who fielded inquiries from Smith Barney Brokers and shareholders who did not have brokers (who constitute a small minority of Funds shareholders). As a result of a favorable fee schedule and the low cost of servicing the Funds, First Data realized high profit margins throughout the 1990s, particularly in the late 1990s, when the fee structure changed from a per-account fee to a fee based on a percentage of assets. As a result of strong markets of the late 1990s, the Funds' assets, and thus TA fees, increased.

**The TA Review Process**

38. Pursuant to a non-compete agreement between the predecessors of First Data and the Adviser and Global Markets, CAM was prevented from offering TA services until the expiration of that non-compete agreement in 1999. With the First Data contract and the non-compete provision due to expire in June 1999, CAM retained Deloitte & Touche Consulting ("Deloitte") in July 1997 to assist it in reviewing the TA function and options going forward.

The Deloitte team worked closely with representatives of CAM, including Defendant Daidone and Yellin.

39. Deloitte and CAM established several objectives, including improving service to Funds shareholders and increasing flexibility for the future. But CAM also wanted to capture some of the profits that First Data was making on the TA contract. CAM determined that it would enter the TA business and it directed Deloitte to develop a variety of options to accomplish this.

40. During the first phase of the review process, Deloitte and CAM analyzed different structural alternatives to determine which model was most appropriate in light of CAM's established objectives. Deloitte and CAM analyzed the models based on information obtained from First Data and two of its competitors — DST and SunGard. Deloitte and CAM assessed several different models, including a "full-service" option, a "remote vendor" option, and full internalization.

41. The full-service option called for CAM to create an affiliated TA unit of approximately fourteen people to perform oversight and control functions and to contract with DST to provide the bulk of transfer agent functions. Under the full-service option, DST would receive the bulk of the fees. Deloitte projected that CAM would realize annual profits of approximately $8.3 million. A draft Deloitte presentation dated November 4, 1997 noted: "DST full service provides little cost advantage over the current state (under which CAM received no revenue)."

42. The remote vendor alternative called for CAM to create an affiliated TA unit to handle customer service and operations and to contract with DST, First Data or SunGard for

12

technology only. Deloitte estimated that the internal TA unit would require 121 full-time employees. The November 4 presentation noted that the remote vendor option required a greater initial investment and conversion effort than the DST full service option, but offered greater annual profit to CAM (between $16.1 and $22.8 million).

43. The full-internalization option called for CAM to assume responsibility for all aspects of the TA function, including technology (by acquiring software). Although full-internalization would have offered the highest projected profit — approximately $548 million per year — the option would have taken more than eighteen months to implement and would have required a staff of approximately 236 full-time employees. Because of the long implementation time and extensive start-up costs required by this option, Deloitte and CAM decided not to pursue it.

44. CAM and Deloitte concluded that the remote vendor option, which offered significantly greater profit to CAM than the full-service option, was the preferred alternative. Accordingly, Deloitte and CAM solicited remote vendor bids from First Data, DST and SunGard. DST and SunGard responded with remote vendor proposals. First Data declined to submit a remote vendor bid, and instead proposed to renew as full-service TA with a modest fee discount of its rate under the existing contract of approximately ten percent.

**Deloitte and CAM's Recommendations to Contract with DST**

45. After analyzing the specific proposals it received from the vendors, in February 1998, Deloitte recommended that CAM contract with DST as remote service provider. The DST proposal, as of February 1998, called for CAM to create an affiliated TA unit of approximately 100 employees to handle customer service and operations, and to contract with

13

DST for technology. The CAM affiliate would be the named TA, receive fees from the Funds and pay DST a per account fee for technology. Deloitte projected that the CAM affiliate would receive more than $40 million per year in profit under the proposals.

46. Deloitte concluded that DST's proposal was superior to other options, including options utilizing First Data, in terms of both pricing and technology. Because First Data had not submitted a remote vendor proposal and had offered only a modest fee discount, the DST proposal was greatly superior in terms of the profit potential it offered to CAM. As for technology, Deloitte found that DST offered industry-leading technology (superior to that of First Data) and that switching to DST would better position the Funds for the future.

47. After learning that it was at risk of losing the business, First Data offered significant fee discounts. By letter to Yellin dated March 12, 1998, First Data offered a $25 million annual "fee concession" to CAM if the Funds renewed with First Data as full-service TA. Yellin, however, did not pursue the option of renewing with First Data as full-Service TA and passing along the proposed discount directly to the Funds. Nor did he or anyone else within CAM inform the Funds' boards that First Data had made the offer to renew as full-service TA at deeply discounted rates. Instead, Yellin pursued a deal that would allow CAM to benefit from the discounts First Data was offering.

48. In the March 12 letter, First Data committed to increasing the level of resources First Data dedicated to the Funds and to offering Smith Barney brokers use of SuRPAS, First Data's proprietary sub-accounting system. The SuRPAS system would permit Smith Barney brokers to charge investors a processing fee on sales of non-proprietary (non-Smith Barney) funds, and generate an additional $40 million in annual revenue. In addition, by the middle of

14

March 1998, First Data had pointed out to CAM that First Data Corporation provided $9 million in revenue to various Citigroup (then Travelers) entities through investment banking fees, asset management fees and the purchase of insurance and other products.

49.  Later in March, First Data improved its bid and offered a deeper discount, measured as a percentage of the total annual TA fees that First Data would receive from the Funds.  The discounts would start at 32% in 1999 and increase by two percentage points each year, reaching 40% of total TA fees in 2003.  Deloitte and CAM projected that the percentage discounts would translate into $21 million the first year and grow to $39 million in the final year of the contract.

50.  Deloitte questioned whether the discount offered by First Data would be passed along to the Funds or kept by an internal affiliated TA, which would perform only limited duties. In a presentation dated March 24, 1998, which Yellin received, Deloitte wrote:

> Clarify the "Discount" proposed
> A true discount would go to the *funds* not SSB TA.
> This relationship will be extremely difficult to sell to the fund boards.

(Emphasis in original).

51.  After considering First Data's improved offer, CAM representatives, including Defendant Daidone and Yellin, concluded, as did Deloitte, that contracting with DST as remote service provider was the best option and made a formal recommendation to the chief executive officer of CAM, Defendant Jones, by memorandum dated April 2, 1998.  The April 2 memo stated that the DST proposal was superior to the First Data proposal in terms of technology and pricing.  The memo reiterated Deloitte's findings regarding technology, and indicated that the DST proposal offered $139 million more in profit to CAM over the

15

projected five-year contract period than the First Data proposal offered. The April 2 memo noted that there was conversion risk with switching to DST, but concluded that the conversion risk was minimal.

52. The April 2 memo noted that switching to DST could cost affiliates of Citigroup — then Travelers — $8 to $10 million annually in lost revenues from First Data Corporation but recommended switching to DST notwithstanding the business risk. The memo concluded:

> Based on economics and technology, our recommendation is to move the Transfer Agency processing to DST. We realize that a corporate relationship exists between First Data and [Travelers] and that relationship should be considered before any decision is made.

**CAM Continues Negotiating With First Data**

53. Defendant Jones agreed with the recommendation, but sometime after April 2, 1998, the chairman of Travelers asked Defendant Jones to negotiate further with First Data, stating a preference for remaining with First Data if First Data improved its offer to the point where it was roughly equivalent to the DST proposal in terms of pricing. Accordingly, Defendant Jones instructed Yellin to resume negotiating with First Data, which Yellin did.

54. On April 6, 1998, Travelers announced a proposed merger with Citicorp. The contemplated merger increased the risk of converting to a new service provider because it would decrease the resources available for such a conversion.

55. In a letter dated June 5, 1998, First Data set forth an improved offer, which increased the discount First Data was willing to offer. The June 5 letter included the following fee schedule:

16

| June 1, 1999 to Dec. 31, 2000 | 32% discount on total fee revenue |
|---|---|
| Jan. 1 to Dec. 31, 2001 | 35% discount on fee revenue up to $80 million |
| | 60% discount on fee revenue over $80 million |
| Jan. 1, 2002 to Dec. 31, 2003 | 50% discount on fee revenue up to $80 million |
| | 60% discount on fee revenue over $80 million |
| Jan. 1, 2004 to Dec. 31, 2004 | 55% discount on fee revenue up to $80 million |
| | 60% discount on fee revenue over $80 million |

56. Deloitte again questioned the structure of First Data's proposal. In a presentation dated June 10, 1998, entitled "Transfer Agency Project: Lunch and Learn — Financial Model Review," Deloitte questioned the structure in two respects.

57. First, Deloitte questioned whether CAM could justify receiving TA fees for operating a fourteen-person customer service center:

> We Anticipate a Larger Organization Would be Needed to Satisfy the Fund Boards in the First Data Scenario.
>
>            * * *
>
> We believe at a minimum, the SSB TA would have to assume responsibility for Customer Service and Transaction Processing to justify receiving TA fees. This would require at least 65 [full-time employees] (rather than 14).

58. Second, Deloitte questioned the legality of the discount taking the form of a rebate to be paid to CAM, not the Funds:

> First Data's proposal requires that First Data remains the TA; First Data receives full revenues of TA fees, providing a "rebate" to SSB (proposed as a "discount" by First Data).
>
> **This legal structure is questionable at best. Our advisers indicate that this arrangement would in no way be acceptable to the fund boards and may not be legally viable.**

(Emphasis added).

59. Deloitte's written warning about the legality of the structure followed several occasions on which Deloitte's team leader raised the issue orally with CAM representatives.

60. Deloitte's team leader personally presented the Lunch and Learn presentation to address the issues raised by the structure of the First Data proposal. Deloitte considered the issues to be very significant and had raised them with CAM representatives prior to the Lunch and Learn meeting. Indeed, CAM's failure to address the issues prompted Deloitte to schedule the June 10 meeting.

61. Sometime after June 10, 1998, CAM clarified that the CAM-affiliated TA unit would serve as the named TA and First Data would serve as sub-TA. Under this structure, all TA fees would pass through the CAM affiliate, so First Data would not be collecting fees and "rebating" them to CAM. This clarification, however, did *not* address the substance of Deloitte's concerns. CAM did not change the proposed size (the affiliated TA would still be extremely limited in size and would not perform sufficient functions to justify receiving TA fees) or scope of responsibility of the affiliated TA unit — it would still be limited to a small customer service center. In addition, even though there would be no "rebate" in a strict sense of the word, the affiliated unit would still be taking the fee discount offered by First Data for itself, instead of passing it along to the Funds.

**CAM's Decision to Recommend First Data Proposal**

62. In July 1998, First Data improved its offer in three respects. First, it increased the fee discount. Second, it agreed to migrate the Funds from its old technology to its more modern Full Service Retail ("FSR") platform. Third, and most significantly, by letter to Yellin dated July 14, 1998, First Data offered the Revenue Guarantee. The July 14 letter stated:

> First Data Corporation and Travelers will agree on "basket of services" from which First Data Corporation will generate $8 million of revenue to

18

Travelers annually. A "make-whole" provision will be included which
commits First Data Corporation to a fee credit on transfer agent services
for any shortfall to the $8 million. The credit will be 50 cents on each
dollar of revenue shortfall.

63. By memorandum to Defendant Jones dated July 24, 1998, Yellin recommended

that CAM establish an affiliated TA unit of approximately fifteen people to assume

responsibility for the customer service call center and contract with First Data for the bulk of

the transfer agency services. The memo estimated the cost of the fifteen call center employees

would be $1 million per year.

64. Although the structure of the proposal had been changed so that First Data would

not pay a "rebate" to CAM, in substance the fee arrangement remained largely the same as in

the prior proposals — First Data would be sharing its profits with CAM. The July 24 memo

set forth the following fee arrangement, which was referred to in the memo as a "revenue

sharing arrangement":

Percentage that is earned by [CAM] on:

|        | First $80MM | Over $80 MM [in total TA fees] |
|--------|-------------|-------------------------------|
| Year 1 | 33.5%       | 33.5%                         |
| Year 2 | 40          | 60                            |
| Year 3 | 55          | 60                            |
| Year 4 | 55          | 60                            |
| Year 5 | 58          | 60                            |

65. The memo projected that CAM would earn the following profit under the revenue

sharing arrangement (taking into account the $1 million in salaries projected for new staff):

| Year 1 | $29 million |
|--------|-------------|
| Year 2 | $40 million |
| Year 3 | $57 million |
| Year 4 | $62 million |
| Year 5 | $70 million |

19

66. The July 24 memo indicated that Citigroup's projected profit under the First Data proposal was $16 million less over the five-year contract period than its projected profit under the DST proposal. Yellin recommended accepting the differential because contracting with First Data eliminated risks associated with the conversion process and permitted CAM personnel to focus on issues relating to Y2K, the integration of the Salomon Brothers funds, and the Travelers-Citicorp merger, which had been announced in April of that year.

67. The July 24 memo also stated that, because of CAM's fiduciary obligations to the Funds, it was obligated to implement a fee reduction. The recommended reduction called for the Funds to continue to pay the same asset-based fees that were being charged by First Data, subject to caps that limited TA fees to the lesser of the asset-based fee or a set amount (which ranged from $13 to $14.50 per account). The July 24 memo projected an annual fee reduction of $6-$8 million.

68. The July 24 memo noted that because of the different structures of the DST and First Data proposals, implementing the fee reduction would virtually eliminate the $16 million differential between the DST and First Data proposals. This was because the reduced revenue stream that would result from the fee reduction would have a greater impact on CAM's profit under the DST proposal than under the First Data proposal.

69. With respect to the Revenue Guarantee, Yellin's July 24 memo indicated that First Data had committed to:

> Providing CAM with additional assets to manage sufficient to generate $1.5 million per year in asset management fees.
>
> Making Salomon Smith Barney First Data's investment banker of choice and generating at least $3 million per year in investment banking fees.

20

> Paying 50 cents for every dollar of shortfall of investment banking fees
> and 90 cents for every dollar of shortfall of asset management fees, by way
> of credit on TA fees paid by CAM to First Data.

70.   Yellin's memo stated that the Revenue Guarantee would generate at least $22.5 million in revenue or $14 million of "pre-tax bottom line" over the five years of the agreement.

71.   Finally, in a section entitled "Mutual Fund Board Issues," Yellin's memo stated that the chairman of the Funds' boards, who was an officer of CAM, was "comfortable that the new First Data arrangement is supportable to the Fund boards." The memo noted that service levels, "while good, will improve," and the funds would receive a fee reduction. Defendant Jones approved the recommendation.

## The Sub-TA Agreement and Side Letter

72.   On August 4, 1998, First Data produced the first draft of the Side Letter to Yellin, which addressed the Revenue Guarantee and other significant commitments between the parties, including First Data's commitment to migrate the Funds to FSR.

73.   Representatives of CAM and First Data negotiated the terms of the Side Letter and simultaneously prepared a sub-TA agreement (the "Sub-TA Agreement") between First Data and Mutual Management Corp., the Citigroup entity initially chosen by CAM to serve as the affiliated TA. At some point prior to the finalization of the two agreements, First Data's commitment to migrate the Funds to FSR was removed from the Side Letter and included as a schedule to the Sub-TA Agreement.

74.   Both agreements were finalized on November 20, 1998. The Side Letter, which specifically referenced the Sub-TA Agreement, contained the following provisions:

> The Revenue Guarantee;

21

First Data's commitment to provide its SuRPAS system for sub-accounting;

CAM's commitment to treat First Data as "favored nation vendor" for proxy and fulfillment services (which required CAM to solicit a bid from First Data when proxy and fulfillment services were required and to recommend First Data if CAM determined in good faith that its bid was competitive with the other bids received)

CAM's agreement, subject to its fiduciary duties, to "use all reasonable and lawful means to encourage the Funds" "to continue [First Data] as sub-transfer agent for existing Funds and any or all subsequent expansion, consolidation, affiliation, or addition to the Funds for which CAM provides investment management services";

CAM's agreement to consider in good faith retaining or recommending First Data to provide other services to the Funds.

75. The Sub-TA Agreement included an integration clause, which provided that the

Agreement, "including Schedules, Addenda and Exhibits" thereto, constituted the parties'

entire agreement about the subject matter of the Sub-TA Agreement and superseded all prior

and contemporaneous agreements regarding the subject matter. Notwithstanding the obvious

significance to the Funds of the benefits to CAM affiliates contained in the Side Letter, the

Side Letter (or its substance) was not provided to the Funds' boards or filed with the SEC as

part of the Funds' registration statements.

**The Materially Misleading Board Materials**

76. In late February-early March 1999, after Yellin left the mutual fund business,

Defendant Daidone took the lead in preparing a memorandum (the "Board Memo") and a

Power Point presentation (the "Power Point") to present to the Funds' boards concerning its

recommendation for a new TA contract. CAM included the final version of the Board Memo,

which is dated March 4, 1999, and the Sub-TA Agreement in the materials that it sent to board

members in advance of the meetings. Neither the Side Letter nor the Power Point was included in the packet of materials that was sent to board members.

77. Defendant Daidone prepared the memorandum in a way that would make the affiliated TA proposal *appear* as if it was in the Funds' best interest, which was not true. The Board Memo did not candidly present the proposal in terms that would have made clear to the board that First Data would continue to perform almost all of the TA functions, leaving CTB with a tremendous profit for manning a fifteen-person call center and performing limited additional oversight and quality control functions. The Board Memo did not explain in a meaningful way how duties were to be divided between CTB and First Data. To the contrary, the Board Memo gave the misleading impression that First Data was providing "technology" only, which was not true, and that CTB would be a much more substantial operation then it actually would be.

78. The board materials also stated that CAM approached the TA review process by looking at all available alternatives to provide the Funds with better service at lower prices. This was also untrue. From the beginning, CAM approached the review process with the goal of maximizing profit to CAM and, in order to attain its own goals, CAM did not pursue options that would have provided much greater value to the Funds. Contrary to representations in the board materials, the only options CAM ever seriously considered were options that involved making a CAM affiliate the TA. The Board Memo did not disclose that First Data had made a series of offers to perform all TA services at deeply discounted rates — including the initial $25 million annual fee discount offer and the later percentage-based

discount offers — all proposals that, if offered directly to the Funds, would have provided greater savings than the proposal CAM recommended.

79. Even with respect to the alternatives that CAM actually considered, CAM did not disclose that Deloitte and CAM management had initially recommended DST, that CAM resumed negotiating with First Data only after Travelers management had requested that they do so because First Data was an investment banking client, and that CAM decided to recommend First Data only after First Data had increased the value of its proposal to CAM and offered the Revenue Guarantee. In fact, CAM failed to disclose the Side Letter or any of its terms.

80. Instead of making full and accurate disclosure regarding the TA review process and CAM's interest in the proposal, the Board Memo gave the incorrect impression that CAM was acting in the Funds' best interest and had expended significant effort and money to identify and negotiate the best deal for the Funds. The introduction of the Board Memo contains the following statement:

> [I]n anticipation of the expiration of the non-compete agreement [with First Data], SSB began an exhaustive study in late 1997 utilizing the services of Deloitte Consulting to examine transfer agency alternatives to First Data with the goal of reducing fees, improving service and offering the Smith Barney Funds access to alternative channels of distribution (e.g., 401k) to promote further growth. This effort was completed in mid-1998 at a cost of $2.5 million.

81. This paragraph was materially inaccurate and misleading. Reducing fees was not a goal of the review process. The idea of a fee reduction was first raised in the summer of 1998, by the chairman of the Funds' boards, and was separate from the decision on how to structure the TA function.

24

82. The Board Memo also bolstered the case for the recommended proposal by giving the incorrect impression that no viable alternatives existed. The following paragraph, entitled "Change of Transfer Agent Vendor," was intended to describe all remote TA vendor proposals, including the DST proposal:

> Results showed that the internalization of transfer agency functions and engagement of another technology vendor could reduce the fees paid by the Smith Barney Funds and also be the most profitable alternative to SSB. However, full internalization of the transfer agent functionality would have entailed the creation of an organization of 150 employees. In addition, the conversion and software modifications required to migrate to a new technology and services provider would have taken at least two and a half years. In short the Smith Barney Funds would not realize any cost savings for several years under this scenario.

83. This paragraph failed to discuss the DST proposal in any detail or to disclose that Deloitte had recommended it. In addition, to the extent that the figures contained in the paragraph were intended to describe the DST proposal, they are inaccurate. The DST proposal would have required CAM to hire approximately 100 employees, not 150; the conversion to DST would have taken twelve to eighteen months, not thirty; and under the DST proposal the Funds would have realized savings in the first year after conversion. Moreover, the paragraph falsely suggests that CAM was foregoing some profit and recommending First Data in order to pass along fee reductions to the Funds. The First Data proposal, however, was economically superior — for CAM and its affiliates — to the DST proposal.

84. In a separate paragraph, the Board Memo reinforced the false impression that CAM was sacrificing its own interests to the benefit of the Funds:

> The decision to remain with First Data and establish an internal transfer agency capability was made with the recognition that although not the most favorable option financially to SSB, it represented a prudent course of action with immediate results. The revenue shortfall as a result of

25

accepting the proposed First Data contract over our most attractive alternative was approximately $16.0 million.

85. These statements were materially incorrect. The First Data proposal was projected to provide greater profit to CAM than the DST proposal, not $16 million less.

86. Although the Board Memo disclosed that the affiliated TA would make a profit, the disclosure regarding the economic benefit to CAM was limited and misleading. The only paragraph of the Board Memo that discusses the projected profit to CAM appears in a section entitled "Proposed Transfer Agency Fee and Fund Savings Analysis," and states:

> SSB commits to reviewing the transfer agent service and fees on an annual basis with the Smith Barney Fund boards. SSB anticipates that the SSB transfer agency business unit will operate on a 33% margin based on the June 1, 1999 First Data fee schedules. While First Data discounts may increase over the life of the contract, it is expected that expenses will rise on a commensurate basis as SSB adds to its transfer agent capabilities.

87. At the time, CAM was projecting that it would earns tens of millions of dollars in profit each year for operating a fifteen person call center and performing limited additional oversight and quality control functions. There was no meaningful disclosure about how limited the services were that CTB was to contribute in return for all this profit.

88. Because virtually all of the work was to be done by First Data, the 33% profit margin figure was itself misleading. The margin was based on an analysis that treated sub-TA payments to First Data as expenses of CTB. The economic reality would have been more accurately portrayed by deducting payments to First Data from revenue – not treating them as expenses of CTB. CTB is essentially a pass-through for those payments. In fact, internally, CAM described the fee arrangement with First Data as a revenue sharing agreement. Had

26

payments to First Data not been treated as an expense of CTB, the projected pre-tax profit margin would have been approximately 70%.

89.  The Power Point disclosed that "Revenue Generation" was one of CAM's goals, and included a table that contained profit projections in dollar amounts.  The table, however, was not provided to the directors in advance of the meeting.  Had board members received the projections in advance and had the opportunity to scrutinize them, they at least would have had a chance to understand that CAM expected to earn tens of millions in profit.  But they still would not have understood just how limited CAM's proposed contribution to the venture really was.

90.  Finally, the Board Memo incorrectly indicated that the fees charged to the Funds by First Data were significantly below industry average.

**CTB's Fees and Expenses as TA**

91.  At regularly scheduled meetings during the first half of 1999, Defendant Daidone presented the TA proposal to the Funds' boards — including counsel for the Funds and directors — which approved the proposal.  During a transition period between June 1999 and October 1999, CAM received revenue from First Data associated with the establishment of the affiliated TA unit.  On October 1, 1999, a CAM affiliate, now CTB, became the named TA for the Funds, and assumed responsibility for the customer service function, First Data — now PFPC — continued to perform the bulk of the TA services as sub-TA.  As named TA, CTB receives 100% of the fees and makes sub-TA payments to PFPC and to Primerica Financial

Services ("PFS"), a Citigroup affiliate that sells certain of the Funds and performs sub-TA work.[6]

92. CTB had approximately fifteen employees performing work for the Funds, only seven of whom worked full-time for the Funds. As intended, CTB realized high profits for performing limited work. The one function that CTB assumed from First Data/PFPC is the customer service function, which consists primarily of a call center staffed by seven full-time employees who are dedicated to Funds business. Five of those employees answer calls, two are supervisors. The seven call center staff members are the only CTB employees who spend all of their time on Funds-related work.

93. CAM representatives supervise the TA operations of CTB, which are part the CAM business unit for budget and reporting purposes. CAM is responsible for the cost of CTB's TA operations and receives the benefit of the revenue that the TA operations generate.

94. For the period September 11, 2000 through May 31, 2005, CTB earned pre-tax revenues of an estimated $100 million from Funds business (which is lower than projected due to, among other things, the downturn in the market that began in 2001). Over the same period, CTB has had total operating expenses (excluding sub-TA payments) of approximately $10.5 million. In addition, CAM and its affiliates received approximately $17 under the Revenue Guarantee.

---

[6] The approved TA arrangement included implementation of per account fee caps. The fee caps had the effect of lowering the total fees paid by the Funds by 23% for the period June 1999, when the fee caps were implemented, through September 2004. During the first quarter of 2003, CTB requested a fee increase from the Funds' boards, but withdrew the request after it was rejected by one board.

95.  At regularly scheduled board meetings during the first half of 1999, Defendant Daidone presented the proposal to the Funds' boards.  The meetings took place on March 10, 1999, March 19, 1999, March 30, 1999, April 14, 1999, April 28, 1999, May 26, 1999, June 2, 1999, and June 14, 1999.

96.  In his presentation to the Funds' boards at those meetings, Defendant Daidone intentionally led the boards to believe that the affiliated TA would be a substantial organization, and that approving the affiliated TA proposal was in the Funds' best interest, which was not true. Defendant Daidone used the Power Point presentation, which, like the Board Memo, was spun to sell the proposal to the Funds' boards and failed to make full and accurate disclosure regarding the material terms of the proposal.  At the meetings, Defendant Daidone failed to disclose, among other things that First Data had offered to renew as full-service TA at deeply discounted rates, CAM management and Deloitte had first recommended DST as a technology provider, the affiliated TA would do minimal work, Deloitte had warned CAM about the structure of the affiliated TA proposal, and CAM and First Data had entered into the Side Letter.

97.  All of the boards approved the recommendation during the meetings at which it was presented.

**New Funds Are Added To The TA-Scheme**

98.  In 2001 and 2002, CAM proposed the creation of new mutual funds, which would become part of the Funds.  CAM made its recommendations to the boards of trustees/directors that would serve as the boards for the newly created funds.  As part of its recommendation,