CAM recommended that CTB be appointed TA and that PFPC be appointed as sub-TA on the same terms that existed for existing Funds.

99.  At a board meeting on August 6, 2001, for example, CAM proposed that the trustees of a sub-group of funds, known as the Smith Barney Trust II ("SBTII"), approve the creation of a new fund called the Smith Barney Investors Value Fund, which would become one of the SBTII subfamilies of funds. During that meeting, representatives of CAM recommended that CTB (then known as Citi Fiduciary Trust Company) be appointed as TA for the newly-created fund and that PFPC be appointed as sub-TA on the same terms as existed between those entities and the already-existing Funds. Neither Defendant Jones, who was still CEO of CAM in 2001, nor Defendant Daidone, who attended the August 6, 2001 board meeting, informed the SBTII trustees of all material facts regarding the TA arrangements with CTB, including, but not limited to, that the affiliated TA was receiving tens of millions of dollars per year for limited work, that First Data PFPC had offered to renew as full-service TA at deeply discounted rates, and that CAM and First Data had entered into the Side Letter. The SBTII trustees approved CAM's recommendation to appoint CTB as TA and PFPC as sub-TA without knowing these and other material facts. Sometime after the August 6, 2001 meeting, CTB began serving as TA for the Smith Barney Investors Value Fund and receiving TA fees.

100. On March 22, 2002, CAM recommended that the trustees of SBTII approve the creation of the Smith Barney Capital Preservation Fund, shares of which were bought by Lead Plaintiff Local 649. As with the recommendation to create the Smith Barney Investors Value Fund, CAM recommended that CTB (then Travelers Bank and Trust, fsb) be appointed TA

and PFPC be appointed sub-TA for the newly-created fund on the same terms as existed between those entities and the already-existing Funds. And, as with the prior recommendation, neither Defendant Jones nor Defendant Daidone made full disclosure of all material facts regarding the TA arrangements with CTB and PFPC. The trustees approved the recommendation at the March 22, 2002 meeting, which Defendant Daidone attended. Sometime after the March 22, 2002 meeting, CTB became TA for the Smith Barney Capital Preservation Fund and began receiving TA fees.

101. On September 4, 2002, CAM held an organizational meeting for a new sub-family of Funds, the Smith Barney Multiple Discipline Trust ("SBMDT"). At the meeting, which Defendant Daidone attended, the newly-constituted board of SBMDT voted to approve, among other things, the creation of the new funds that constituted SBMDT and CAM's recommendation that CTB be appointed TA and PFPC sub-TA for the newly-created funds. Four of the six trustees of SBMDT were also members of boards that voted on the TA proposal in 1999 based on the materially misleading board presentation. At no point prior to, during or after the September 4, 2002 meeting of the SBMDT board, did Defendant Jones, Defendant Daidone or anyone within CAM inform the members of the SBMDT board or any of the new funds' boards that the 1999 board presentations and materials were materially misleading. Based on the misleading information provided in 1999 and the failure of Defendant Jones and Defendant Daidone to make full disclosure regarding the TA proposal and operations subsequent to 1999, the trustees of SBMDT approved the recommendation to appoint CTB as TA and PFPC as sub-TA. CTB became TA for the SBMDT in 2002 and began receiving TA fees.

31

102. CTB was appointed TA for additional newly-created funds during meetings in February, May and August 2002. Neither Defendant Jones nor Defendant Daidone informed the boards of the newly created funds of material information regarding the TA agreements with CTB and PFPC.

## CTB Made Exorbitant Profits for Performing Limited Work

103. As intended, CTB has realized high profits for performing limited work. The one function that CTB assumed from First Data PFPC was the customer service function, which consisted primarily of a call center. As described above, from the inception of the CTB TA contract through September 30, 2004, the call center was staffed by approximately seven full-time employees who are dedicated to Fund business. Five of those employees answered calls; two were supervisors. The seven call center staff members were the only CTB employees who spent all of their time on Fund-related work. Approximately eight other CTB employees performed work for the Funds during that period. None of those other employees devoted 100% of their time to the Funds. It cost CTB approximately $2.2 million per year to provide these limited services.

104. As mentioned above, for the period September 11, 2000 through May 31, 2005, CTB earned net pretax revenues of an estimated $100 million from Funds business. The profit is lower than the originally projected profit due to, among other things, the downturn in the market that began in 2001. Over the same period, CTB had total operating expenses (excluding sub-TA payments) of approximately $10.5 million. In addition, CAM and its affiliates received approximately $17 million under the Revenue Guarantee.

105. From the inception of the CTB TA contract in October 1999, CTB billed the Funds and received TA fee payments on a monthly basis. Defendants Jones and Daidone had an ongoing fiduciary duty to make full disclosure of the material facts regarding the TA contract and operations to the Funds' boards throughout the contract period, but failed to fulfill that duty. Had Defendant Jones or Defendant Daidone made full disclosure, the TA contract could have been voided.

106. CAM representatives supervise the TA operations of CTB, which are part of the CAM business unit for budget and reporting purposes. For purpose of setting compensation, Defendant Jones received credit for the revenue that CTB's TA operations generated.

**Despite Earning High Profits in 2000-2002, CAM Sought a Fee Increase in 2003**

107. In 2000, 2001 and 2002, CTB had pre-tax revenues from Funds-TA business of $26.2 million, $26.3 million and $21 million, respectively. The annual operating expenses of the CTB TA unit for those same years were $2.2 million, $2.3 million and $2.2 million, respectively. Thus, during the first three years of the contract, CTB made $73.5 million for doing $6.7 million worth of work.

108. For CAM, this profit was not enough. During the first quarter of 2003, CAM went back to the Funds' boards and requested a fee increase. In its original proposal to the Funds' boards in 1999, CAM proposed charging the Funds a percentage of assets under management, expecting that the markets would continue to perform well and the Funds' assets levels would continue to increase. The Funds agreed. When the market did not perform as CAM expected, it proposed that the Funds agree to return to a per account structure at per account fee levels that were above what even First Data had been charging the Funds.

109. CAM presented its recommendation for a fee increase to certain of the Funds' boards in February and March 2003. Defendant Daidone was a member of the team that made the presentation. As with CAM's initial presentations to the Funds in 1999, CAM's presentation to the Funds' boards in 2003 was again materially misleading. Among other things, CAM representatives failed to provide complete information regarding CTB's profitability. A power point presentation given to the boards indicated that CTB's fees and profitability were below market levels. Nowhere in the presentation, however, did CAM disclose how much profit CTB had made during the first three years of the contract. Nor did it disclose just how little work CTB did to earn that profit.

110. CAM tried to justify the fee increase by stating that an increase in CTB's profitability would benefit the Funds by allowing CTB "to stay competitive with industry peers, devote the required resources to the business, continue to improve service and stay current with technological improvements." The presentation, however, did not identify any areas in which service was lagging or any specific projects that CTB had been unable to fund. Having made pre-tax profit of approximately $66 million the prior three years, CTB did not need a fee increase to stay competitive with industry peers. CAM simply wanted to increase its profit margin on the TA business.

111. At least one board approved the request for a fee increase. One board, however, rejected the request. The Funds had not been performing well over the prior couple of years, and the board believed it was an inappropriate time to request a fee increase from the shareholders. CAM then withdrew the request as to all Funds, and the fee increase never went into effect.

34

**A Whistleblower Comes Forward in September 2003**

112. On September 30, 2003, a former Citigroup employee alerted the SEC staff of the scheme. Thereafter, the SEC began a cause examination of CAM and CTB, and requested documents and information. In late November 2003, Citigroup's counsel reported to the SEC staff that Citigroup had discovered the Side Letter and Revenue Guarantee. Citigroup's counsel told the SEC staff that the Revenue Guarantee had never been disclosed to the Funds' boards, and admitted that it should have been disclosed.

113. The SEC's Order Instituting Administrative and Cease and Desist Proceedings against the Adviser and Global Markets was not filed until May 31, 2005, the last day of the Class Period.

**DEFENDANTS' MATERIALLY MISLEADING STATEMENTS TO INVESTORS**

114. The Class Period begins on September 11, 2000. On that date, the Smith Barney Allocation Series ("SBAS"), a sub-family of the Funds, issued an amended prospectus, originally issued on May 26, 2000, which contained the following statements:

Transfer agent and shareholder servicing agent

Citi Fiduciary Trust Company [successor to CTB] serves as the portfolios' transfer agent and shareholder servicing agent (the "transfer agent"). The transfer agent has entered into sub-transfer agency and services agreements with PFPC Global Fund Services and PFS Shareholder Services to serve as the portfolios' sub-transfer agents (the "sub-transfer agents"). The sub-transfer agents will perform certain shareholder record keeping and accounting services.

* * *

Transfer Agent. Citi Fiduciary Trust Company, located at 388 Greenwich Street, New York, New York 10013, serves as the fund's transfer and dividend-paying agent. Under the transfer agency agreement, the transfer agent

35

maintains the shareholder account records for the fund, handles certain
communications between shareholders and the fund, distributes
dividends and distributions payable by the fund and produces statements with
respect to account activity for the fund and its shareholders.  For these
services, the transfer agent receives fees from the fund computed on the basis
of the number of shareholder accounts that the transfer agent maintains
for the fund during the month and is reimbursed for out-of-pocket expenses.

Sub-Transfer Agent.  PFPC Global Fund Services, located at P.O. Box 9699,
Providence, RI 02940-9699, serves as one of the fund's sub-transfer agents.
Under the transfer agency agreement, the sub-transfer agent maintains the
shareholder account records for the fund, handles certain communications
between shareholders and the fund and distributes dividends and distributions
payable by the fund.  For these services, the sub-transfer agent receives a
monthly fee computed on the basis of the number of shareholder accounts it
maintains for the fund during the month, and is reimbursed for out-of-pocket
expenses.

The fund has also engaged the services of PFS Shareholder Services as a sub-
transfer agent for PFS Accounts.  This sub-transfer agent is located at 3100
Breckinridge Blvd., Bldg. 200, Duluth, GA 30099.

    115. These statements were materially false and misleading and omitted material

information when made because:

> (i)      they suggest that this was a garden-variety arrangement between a TA
>
> and a sub-TA and failed to disclose that the sub-TA structure was
>
> nothing more than an elaborate scheme to inflate Citigroup profits at
>
> the expense of Funds' shareholders;
>
> (ii)     they omitted to disclose the scheme complained of herein whereby
>
> PFPC was doing the bulk of the work, while the middleman transfer
>
> agent (Citi Fiduciary Trust), a Citibank-related entity, received tens of
>
> millions of dollars that rightfully belonged to Funds' shareholders for
>
> doing next to nothing;

(iii)     they failed to disclose the misleading process which led to the
          appointment of the sub-TA; and

(iv)      they failed to disclose the Revenue Guarantee, a material part of the
          scheme, which provided Citgroup entities with millions of dollars of
          investment banking profits.

116. This prospectus listed Defendant Daidone as Senior Vice President and Treasurer

of the SBAS.  The amended prospectus contained no signatures but Defendant Daidone signed

the original May 26, 2000 prospectus.[7]

117. On April 24, 2001, a prospectus for the SBAS was issued stating:

Transfer Agent and shareholder servicing agent

Citi Fiduciary Trust Company serves as the portfolios' transfer agent and
shareholder servicing agent (the "transfer agent"). Pursuant to a sub-transfer
agency and services agreement with the transfer agent, PFPC Global Fund
Services serves as the portfolios' sub-transfer agent (the "sub-transfer agent").
The sub-transfer agent performs certain shareholder record keeping and
accounting services.

118. These statements were materially false and misleading for the reasons given in

paragraph 115.  Defendant Daidone signed this prospectus as Principle Accounting Officer for

SBAS.

119. On March 29, 2002, Smith Barney Trust II sub-family caused to be filed a Form

485BPOS (a registration statement for investment companies) with the SEC.  Smith Barney

Trust II covers several funds including the Smith Barney Capital Appreciation Fund

---

[7] Since there are 105 different Funds and many Funds, as well as sub-families, issue numerous
prospectuses per year, Plaintiff has given a sample of the scores of Defendants' Class Period
misleading statements, which, for each fund, are substantially similar if not verbatim.

("SBCAF"), shares of which were purchased by Local 649 during the Class Period. The

March 2002 Form 485BPOS, which was signed by Defendant Daidone, stated:

> Travelers Bank & Trust, fsb serves as the fund's transfer agent and shareholder
> servicing agent. The transfer agent has entered into sub-transfer agency and
> services agreements with PFPC Global Fund Services and Primerica
> Shareholder Services to serve as the fund's sub-transfer agent. The sub-
> transfer agents will perform certain functions including shareholder record
> keeping and accounting services.

120. Later in the same document, the Form 485BPOS stated:

TRANSFER AGENT

> The trust has entered into a Transfer Agency and Service Agreement
> pursuant to which Travelers Bank & Trust, fsb, an affiliate of Salomon Smith
> Barney ("Travelers"), acts as transfer agent for the fund. Under the Transfer
> Agency and Service Agreement, Travelers maintains the shareholder account
> records for the fund, handles certain communications between shareholders
> and the fund and distributes dividends and distributions payable by the fund.
> For these services, Travelers receives a monthly fee computed on the basis of
> the number of shareholder accounts it maintains for the fund during the month
> and is reimbursed for out-of-pocket expenses.
>
> PFPC Global Fund Services ("PFPC") and Primerica Shareholder Services act
> as sub-transfer agents pursuant to agreements with Travelers. Under each sub-
> transfer agency agreement, the sub-transfer agent maintains the shareholder
> account records for the fund, handles certain communications between
> shareholders and the fund, and distributes dividends and distributions payable
> by the fund. For these services, each sub-transfer agent receives a monthly
> fee computed on the basis of the number of shareholder accounts it maintains
> for the fund during the month, and is reimbursed for out-of-pocket expenses.

121. The statements in paragraphs 121 and 122 were materially false and misleading

for the reasons given in paragraph 115. As mentioned above, this document was signed by

Senior Vice President Daidone. Daidone also acted as Principle Accounting Officer of the

registrant, Smith Barney Trust II.

38

122. On June 24, 2002, Citistreet Funds, a sub family of the Funds including the Large

Company Stock Fund ("LCSF"), shares of which were then held by additional named plaintiff

Jeanne Chilton, filed a proxy statement on Form 14A requesting approval of the Adviser as

LCSF's subadviser:

> Dear CitiStreet Funds Investor:
>
> I am writing to let you know that CitiStreet Funds, Inc. will hold a special
> meeting on July 30, 2002. The purpose of the meeting is to vote on two
> proposals for the Funds. You have the opportunity to voice your opinion by
> voting on these proposals, and we encourage you to do so.
>
> This package contains detailed information about the proposals and voting
> instruction cards for you to use in casting your vote. Proposal 1 seeks your
> approval of Smith Barney Fund Management LLC as a new subadviser for the
> Large Company Stock Fund. If approved, Smith Barney Fund Management
> LLC would replace Putnam Investment Management, LLC. Based on the
> amount of assets the Fund currently allocates to its subadvisers, advisory fees
> paid by the Fund would decrease if you approve Proposal 1. Proposal 2 seeks
> your approval of revised fundamental investment restrictions for the Funds.

123. These statements were materially false and misleading for the reasons given in

paragraph 115.

124. There were substantially similar, if not verbatim, statements in numerous Funds

prospectuses throughout the Class Period. *See, e.g.*, the April 30, 2002 SBAS prospectus, the

June 14, 2002 Smith Barney Capital Preservation Fund 2 ("SBCPF2") prospectus, which was

signed by Defendant Daidone, the September 17, 2002 SBCPF2 prospectus, the December 13,

2002 SBCPF prospectus, the January 24, 2003 SBAGF prospectus, the February 6, 2003 and

February 28, 2003 SBCPF and SBCPF2 prospectuses, which were both signed by Defendant

Daidone, the April 30, 2003 SBAS prospectus, and the May 29, 2003 SBAS prospectus.

**The December 1, 2003 Partial Disclosure**

39

125. After a whistleblower came forward to the SEC in September of 2003, the truth was subsequently partially disclosed on December 1, 2003 in a supplement to certain of the Funds' prospectuses, including those issued for the Smith Barney Capital Preservation Fund:

SUPPLEMENT DATED DECEMBER 1, 2003
TO THE
PROSPECTUSES
OF THE
FUNDS INDICATED BELOW

The following text supplements the section entitled "Management" in each of the currently effective Prospectuses for each of the Funds listed below.

Recent Developments

The Fund has received the following information from Citigroup Asset Management ("CAM"), the Citigroup business unit which includes the Fund's Investment Manager and other investment advisory companies, all of which are indirect, wholly-owned subsidiaries of Citigroup. CAM is reviewing its entry, through an affiliate, into the transfer agent business in the period 1997-1999. As CAM currently understands the facts, at the time CAM decided to enter the transfer agent business, CAM sub-contracted for a period of five years certain of the transfer agency services to a third party and also concluded a revenue guarantee agreement with this sub-contractor providing that the sub-contractor would guarantee certain benefits to CAM or its affiliates (the "Revenue Guarantee Agreement"). In connection with the subsequent purchase of the sub-contractor's business by an affiliate of the current sub-transfer agent (PFPC Inc.) used by CAM on many of the funds it manages, this Revenue Guarantee Agreement was amended, eliminating those benefits in exchange for arrangements that included a one-time payment from the subcontractor.

The Boards of CAM-managed funds (the "Boards") were not informed of the Revenue Guarantee Agreement with the sub-contractor at the time the Boards considered and approved the transfer agent arrangements. Nor were the Boards informed of the subsequent amendment to the Revenue Guarantee Agreement when that occurred.

CAM has begun to take corrective actions. CAM will pay to the applicable funds $16 million (plus interest) that CAM and its affiliates received from the Revenue Guarantee Agreement and its amendment. CAM also plans an independent review to verify that the transfer agency fees charged by CAM were fairly priced as compared to competitive alternatives. CAM is instituting

40

new procedures and making changes designed to ensure no similar arrangements are entered into in the future.

CAM has briefed the SEC, the New York State Attorney General and other regulators with respect to this matter, as well as the U.S. Attorney who is investigating the matter. CAM is cooperating with governmental authorities on this matter.

-----------------

SMITH BARNEY CONNECTICUT MONEY
  MARKET PORTFOLIO      December 31, 2002
    Class A and Y Shares

SB ADJUSTABLE RATE INCOME FUND    September 26, 2003
  Smith Barney Shares

SMITH BARNEY AGGRESSIVE GROWTH    December 30, 2002
  FUND INC.

SMITH BARNEY ALLOCATION SERIES INC. May 30, 2003
  BALANCED PORTFOLIO
  CONSERVATIVE PORTFOLIO
  GLOBAL PORTFOLIO
  GROWTH PORTFOLIO
  HIGH GROWTH PORTFOLIO
  INCOME PORTFOLIO

SMITH BARNEY APPRECIATION FUND INC. April 30, 2003
SMITH BARNEY ARIZONA MUNICIPALS    September 26, 2003
  FUND INC.
SMITH BARNEY CALIFORNIA MUNICIPALS  June 27, 2003
  FUND INC.

SMITH BARNEY EQUITY FUNDS    May 31, 2003
  SMITH BARNEY SOCIAL AWARENESS
    FUND
SMITH BARNEY FUNDAMENTAL VALUE    January 28, 2003
  FUND INC.

SMITH BARNEY FUNDS, INC.
  SMITH BARNEY LARGE CAP VALUE FUND  April 30, 2003
  SMITH BARNEY SHORT-TERM HIGH    April 30, 2003
    GRADE BOND FUND

41

U.S. GOVERNMENT SECURITIES FUND    April 30, 2003

SMITH BARNEY INSTITUTIONAL CASH        September 29, 2003
  MANAGEMENT FUND INC.
  CASH PORTFOLIO
  GOVERNMENT PORTFOLIO
  MUNICIPAL PORTFOLIO

SMITH BARNEY INVESTMENT FUNDS INC.
  SMITH BARNEY GOVERNMENT        April 30, 2003
    SECURITIES FUND
  SMITH BARNEY GROUP SPECTRUM FUND    January 28, 2003
  SMITH BARNEY HANSBERGER GLOBAL    August 28, 2003
    VALUE FUND
  SMITH BARNEY INVESTMENT GRADE    April 30, 2003
    BOND FUND
  SMITH BARNEY PREMIER SELECTIONS    August 28, 2003
    ALL CAP GROWTH FUND
  SMITH BARNEY PREMIER SELECTIONS    August 28, 2003
    GLOBAL GROWTH FUND
  SMITH BARNEY PREMIER SELECTIONS    August 28, 2003
    LARGE CAP FUND
  SMITH BARNEY SMALL CAP VALUE FUND  January 28, 2003
  SMITH BARNEY SMALL CAP GROWTH    January 28, 2003
    FUND

SMITH BARNEY INVESTMENT SERIES        February 28, 2003
  SB GROWTH AND INCOME FUND
    Smith Barney Shares
  SMITH BARNEY INTERNATIONAL FUND
  SMITH BARNEY LARGE CAP CORE FUND
SMITH BARNEY INVESTMENT TRUST
  SMITH BARNEY INTERMEDIATE        March 28, 2003
    MATURITY CALIFORNIA MUNICIPALS
    FUND
  SMITH BARNEY INTERMEDIATE        March 28, 2003
    MATURITY NEW YORK MUNICIPALS
    FUND
  SMITH BARNEY LARGE CAPITALIZATION  March 28, 2003
    GROWTH FUND
  SMITH BARNEY MID CAP CORE FUND    March 28, 2003
  SMITH BARNEY CLASSIC VALUES FUND  February 10, 2003

SMITH BARNEY MANAGED MUNICIPALS        June 27, 2003

42

FUND INC.
SMITH BARNEY MASSACHUSETTS      March 28, 2003
  MUNICIPALS FUND
SMITH BARNEY MONEY FUNDS, INC.    April 30, 2003

SMITH BARNEY MUNI FUNDS
  CALIFORNIA MONEY MARKET      July 29, 2003
    PORTFOLIO
  FLORIDA PORTFOLIO      July 29, 2003
  GEORGIA PORTFOLIO      July 29, 2003
  LIMITED TERM PORTFOLIO      July 29, 2003
  MASSACHUSETTS MONEY MARKET      July 29, 2003
    PORTFOLIO
  NATIONAL PORTFOLIO      July 29, 2003
  NEW YORK MONEY MARKET PORTFOLIO  July 29, 2003
  NEW YORK PORTFOLIO      July 29, 2003
  PENNSYLVANIA PORTFOLIO      July 29, 2003

SMITH BARNEY MUNICIPAL MONEY MARKET  July 29, 2003
  FUND, INC.

SMITH BARNEY NEW JERSEY MUNICIPALS  July 29, 2003
  FUND, INC.
SMITH BARNEY OREGON MUNICIPALS FUND  August 28, 2003
SMITH BARNEY PRINCIPAL RETURN FUND
  SECURITY AND GROWTH FUND      March 31, 2003

SMITH BARNEY SECTOR SERIES FUND INC.  February 28, 2003
  SMITH BARNEY FINANCIAL SERVICES
    FUND
  SMITH BARNEY HEALTH SCIENCES FUND
  SMITH BARNEY TECHNOLOGY FUND

SMITH BARNEY SMALL CAP CORE FUND, INC. April 30, 2003

SMITH BARNEY TELECOMMUNICATIONS
  TRUST
  SMITH BARNEY TELECOMMUNICATIONS
    INCOME FUND      April 30, 2003

SMITH BARNEY TRUST II
  SMITH BARNEY DIVERSIFIED LARGE CAP  February 28, 2003
    GROWTH FUND
  SMITH BARNEY INTERNATIONAL LARGE   April 30, 2003

CAP FUND
SMITH BARNEY SMALL CAP GROWTH          February 28, 2003
  OPPORTUNITIES FUND
SMITH BARNEY CAPITAL PRESERVATION   February 28, 2003
  FUND
SMITH BARNEY CAPITAL PRESERVATION   February 28, 2003
  FUND II
SMITH BARNEY SHORT DURATION               March 3, 2003
  MUNICIPAL INCOME FUND

SMITH BARNEY WORLD FUNDS, INC.           February 28, 2003
  GLOBAL GOVERNMENT BOND
   PORTFOLIO
  INTERNATIONAL ALL CAP GROWTH
   PORTFOLIO

126. This statement disclosed some of the facts surrounding the Revenue Guarantee. It

was still misleading, however, because it failed to disclose the scheme behind the sub-TA,

*e.g.*, that CTB was paid tens of millions of dollars (that rightfully belonged to shareholders)

for doing little work while, moreover, PFPC did the bulk of the work at radically reduced

rates. That information was not made public until the SEC instituted proceedings against the

Adviser and Global Markets on May 31, 2005.

127. The misleading statements continued throughout 2004. On March 1, 2004, the

Smith Barney Trust II, a sub-family of the Funds including the Smith Barney Capital

Preservation Fund, made the following statements in a prospectus:

> TRANSFER AGENT AND SHAREHOLDER SERVICING AGENT Citicorp
> Trust Bank, fsb, an affiliate of the manager, serves as the fund's transfer agent
> and shareholder servicing agent (the "transfer agent"). The transfer agent has
> entered into a sub-transfer agency and services agreement with PFPC Inc. to
> serve as the fund's sub-transfer agent (the "sub-transfer agent"). The sub-
> transfer agent will perform certain functions including shareholder record
> keeping and accounting services.
>
> RECENT DEVELOPMENTS During the period from 1997-1999, Citicorp
> Trust Bank, fsb ("Citicorp Trust"), an affiliate of Citigroup Asset Management

("CAM"), entered the transfer agent business. CAM is the Citigroup business unit that includes the fund's investment manager and other investment advisory companies. Citicorp Trust hired a subcontractor to perform some of the transfer agent services. The subcontractor, in exchange, signed a separate agreement with CAM in 1998 that guaranteed investment management revenue to CAM and investment banking revenue to a CAM affiliate. The sub-contractor's business was later taken over by PFPC Inc. (the fund's current sub-transfer agent), and at that time the revenue guarantee was eliminated and a one-time payment was made by the subcontractor to a CAM affiliate.

CAM did not disclose the revenue guarantee agreement when the Board of the fund and various other CAM-managed funds hired Citicorp Trust as transfer agent. Nor did CAM disclose the one-time payment to the boards of the CAM-managed funds when it was made.

CAM is taking corrective actions. CAM will pay to the applicable funds approximately $17 million (plus interest) that CAM and its affiliates received from the revenue guarantee agreement and the one-time payment. CAM is also conducting an independent review to verify that the transfer agency fees charged by Citicorp Trust were fair compared to competitive alternatives. CAM is strengthening its procedures in order to avoid similar situations in the future.

CAM has given this information to regulators and other government authorities, and understands that the SEC and the U.S. Attorney are investigating this situation.

128. These statements were materially false and misleading for the reasons given in paragraph 126.

129. On August 28, 2004, the SBIF, a sub-family of the Funds which includes the Smith Barney Large Cap Growth and Value Fund, shares of which were held by additional named plaintiff Jeffrey Weber, issued a prospectus stating:

Transfer agent and shareholder servicing agent Citicorp Trust Bank, fsb ("Citicorp Trust") serves as each fund's transfer agent and shareholder servicing agent (the "transfer agent"). The transfer agent has entered into sub-transfer agency and services agreements with PFPC Inc. and Primerica Shareholder Services to serve as each fund's sub-transfer agents (the "sub-transfer agents"). The sub-transfer agents will perform certain functions including shareholder record keeping and accounting services.

45

Citigroup has been notified by the Staff of the SEC that the Staff is
considering recommending a civil injunctive action and/or an administrative
proceeding against Citigroup Asset Management (CAM), including its
applicable investment advisory companies and Citicorp Trust, relating to the
creation and operation of the internal transfer agent unit to serve certain CAM-
managed funds, including the funds. This notification arises out of a previously
disclosed investigation by the SEC and the U.S. Attorney and relates to
Citicorp Trust's entry in 1999 into the transfer agency business, CAM's
retention of, and agreements with an unaffiliated sub-transfer agent, the
adequacy of the disclosures made to the fund boards that approved the transfer
agency arrangements (including CAM's failure to disclose a related revenue
guarantee agreement benefiting CAM and its affiliates), and CAM's operation
of and compensation for the transfer agency business. The revenue guarantee
described above was terminated in 1999 and CAM will be paying the
applicable funds, primarily through fee waivers, a total of approximately $17
million (plus interest) that is the amount of the revenue received by Citigroup
relating to the revenue guarantee. Citigroup is cooperating fully in the
investigation and will seek to resolve the matter in discussions with the SEC
Staff. Although there can be no assurance, Citigroup does not believe that this
matter will have a material adverse effect on the funds.

130. These statements were materially false and misleading for the reasons given in

paragraph 126.

131. On January 21, 2005, Citigroup, Global Markets' parent company, announced in a

supplement to numerous Funds' prospectuses:

In connection with an investigation previously disclosed by Citigroup, the Staff
of the Securities and Exchange Commission (SEC) has notified Citigroup
Asset Management (CAM), the Citigroup business unit that includes the funds'
investment manager and other investment advisory companies; Citicorp Trust
Bank (CTB), an affiliate of CAM; Thomas W. Jones, the former CEO of
CAM; and three other individuals, one of whom is an employee and two of
whom are former employees of CAM, that the SEC Staff is considering
recommending a civil injunctive action and/or an administrative proceeding
against each of them relating to the creation and operation of an internal
transfer agent unit to serve various CAM-managed funds.

In 1999, CTB entered the transfer agent business. CTB hired an unaffiliated
subcontractor to perform some of the transfer agent services. The
subcontractor, in exchange, had signed a separate agreement with CAM in
1998 that guaranteed investment management revenue to CAM and investment

46

banking revenue to a CAM affiliate. The subcontractor's business was later taken over by PFPC Inc., and at that time the revenue guarantee was eliminated and a one-time payment was made by the subcontractor to a CAM affiliate.

CAM did not disclose the revenue guarantee when the boards of various CAM-managed funds hired CTB as transfer agent. Nor did CAM disclose to the boards of the various CAM-managed funds the one-time payment received by the CAM affiliate when it was made. As previously disclosed, CAM has already paid the applicable funds, primarily through fee waivers, a total of approximately $17 million (plus interest) that is the amount of the revenue received by Citigroup relating to the revenue guarantee.

In addition, the SEC Staff has indicated that it is considering recommending action based on the adequacy of the disclosures made to the fund boards that approved the transfer agency arrangement, CAM's initiation and operation of, and compensation for, the transfer agent business and CAM's retention of, and agreements with, the subcontractor.

Citigroup is cooperating fully in the SEC's investigation and is seeking to resolve the matter in discussions with the SEC staff. On January 20, 2005, Citigroup stated that it had established an aggregate reserve of $196 million ($25 million in the third quarter of 2004 and $171 million in the fourth quarter of 2004) related to its discussions with the SEC Staff. Settlement negotiations are ongoing and any settlement of this matter with the SEC will require approval by the Citigroup Board and acceptance by the Commission.

Unless and until any settlement is consummated, there can be no assurance that any amount reserved by Citigroup will be distributed. Nor is there at this time any certainty as to how the proceeds of any settlement would be distributed, to whom any such distribution would be made, the methodology by which such distribution would be allocated, and when such distribution would be made.

Although there can be no assurance, Citigroup does not believe that this matter will have a material adverse effect on the funds.

132. These statements were materially false and misleading for the reasons given in

paragraph 126.

133. On February 25, 2005, the Smith Barney Trust II stated the following in a

prospectus:

47

TRANSFER AGENT AND SHAREHOLDER SERVICING AGENT Citicorp Trust Bank, fsb, serves as the fund's transfer agent and shareholder servicing agent (the "transfer agent"). The transfer agent has entered into a sub-transfer agency and services agreement with PFPC Inc. to serve as the fund's sub-transfer agent (the "sub-transfer agent"). The sub-transfer agent will perform certain shareholder record keeping and accounting services.

RECENT DEVELOPMENTS
In connection with an investigation previously disclosed by Citigroup, the Staff of the SEC has notified Citigroup Asset Management (CAM), the Citigroup business unit that includes the fund's investment manager and other investment advisory companies; Citigroup Trust Bank (CTB), an affiliate of CAM; Thomas W. Jones, the former CEO of CAM; and three other individuals, one of whom is an employee and the other two of whom are former employees of CAM, that the SEC Staff is considering recommending a civil injunctive action and/or an administrative proceeding against each of them relating to the creation and operation of an internal transfer agent unit to serve various CAM-managed funds.

In 1999, CTB entered the transfer agent business. CTB hired an unaffiliated subcontractor to perform some of the transfer agent services. The subcontractor, in exchange, had signed a separate agreement with CAM in 1998 that guaranteed investment management revenue to CAM and investment banking revenue to a CAM affiliate. The subcontractor's business was later taken over by PFPC Inc., and at that time the revenue guarantee was eliminated and a one-time payment was made by the subcontractor to a CAM affiliate.

CAM did not disclose the revenue guarantee when the boards of various CAM-managed funds hired CTB as transfer agent. Nor did CAM disclose to the boards of the various CAM-managed funds the one-time payment received by the CAM affiliate when it was made. As previously disclosed, CAM has already paid the applicable funds, primarily through fee waivers, a total of approximately $17 million (plus interest) that is the amount of the revenue received by Citigroup relating to the revenue guarantee. In addition, the SEC Staff has indicated that it is considering recommending action based on the adequacy of the disclosures made to the fund boards that approved the transfer agency arrangement, CAM's initiation and operation of, and compensation for, the transfer agent business and CAM's retention of, and agreements with, the subcontractor.

Citigroup is cooperating fully in the SEC's investigation and is seeking to resolve the matter in discussions with the SEC Staff. On January 20, 2005, Citigroup stated that it had established an aggregate reserve of $196 million ($25 million in the third quarter of 2004 and $171 million in the fourth

48

quarter of 2004) related to its discussions with the SEC Staff. Settlement negotiations are ongoing and any settlement of this matter with the SEC will require approval by the Citigroup Board and acceptance by the Commission.

Unless and until any settlement is consummated, there can be no assurance that any amount reserved by Citigroup will be distributed. Nor is there at this time any certainty as to how the proceeds of any settlement would be distributed, to whom any such distribution would be made, the methodology by which such distribution would be allocated, and when such distribution would be made.

Although there can be no assurance, Citigroup does not believe that this matter will have a material adverse effect on the fund.

134. These statements were materially false and misleading for the reasons given in paragraph 126.

135. On May 31, 2005, the last day of the Class Period, the SEC published an Order announcing that in anticipation of proceedings against the Adviser and Global Markets, these entities submitted an offer to the SEC which the SEC had "determined to accept". This order, for the first time, revealed the intricate scheme behind the creation of the sub-TA by which Defendants diverted tens of millions of dollars from the Funds to another Citigroup entity.

## DAMAGES SUFFERED BY THE CLASS/LOSS CAUSATION

136. Throughout the Class Period, Plaintiff and Class members were damaged by Defendants' fraudulent scheme alleged herein. As described above, Defendants' scheme diminished the value of Funds' shares by mis-appropriating and diverting tens of millions of dollars from Funds' shareholders through the creation of a Citigroup-related entity (CTB) as transfer agent while the original transfer agent, PFPC (originally First Data) performed the

bulk of the work as sub-transfer agent for radically reduced fees.  Defendants' scheme also harmed Funds' shareholders by increasing transaction fees by using two transfer agents instead of one.  Accordingly, Defendants paid tens of millions of dollars more for transfer agent services than was necessary and money that belonged to Funds' shareholders went right back into the coffers of Citigroup-related entities.

137. Class members were also damaged by purchasing Funds' shares at distorted NAV values.

138. Plaintiff and the Class have also suffered lost opportunity damages because the money that was drained from their accounts by Defendants' actions could have been invested for further gains.

## SCIENTER

139. Defendants' scienter is clear because the elaborate scheme discussed herein could not have occurred absent actual knowledge.  Indeed, Defendants Adviser, Global Markets, Jones, and Daidone were integral participants in the scheme.  Defendants were also motivated to construct the scheme alleged herein because it provided tens of millions of dollars in extra profits for Citigroup entities.  *Cf.* Casey Decision at 6-9.

## CAUSES OF ACTION

### COUNT I

**Violation Of Section 10(b) Of The Exchange Act And Rule 10b-5
Promulgated Thereunder Against The Adviser, Global Markets, Jones, and Daidone**

140. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

50

141. Throughout the Class Period, the Adviser, Global Markets, Jones and Daidone carried out a plan, scheme, and course of conduct that was intended to and did: (i) deceive the investing public, including Plaintiff and the other Class members, as alleged herein; and (ii) induce Class members to purchase shares of the Funds at distorted prices. In furtherance of this unlawful scheme and course of conduct, Defendants took the actions set forth herein.

142. Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Funds in an effort to induce Class members to purchase shares of the Funds at distorted prices in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

143. The Adviser, Global Markets, Jones, and Daidone, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct in order to profit as a result of the undisclosed scheme discussed herein.

144. As a result of Defendants' scheme and failure to disclose material facts, as set forth above, the price of Funds shares was distorted and did not reflect their true value. In ignorance of this, and relying directly or indirectly on the false and misleading public statements alleged herein, or upon the integrity of the market in which the Funds trade, Plaintiff and Class members suffered harm throughout the Class Period.

145. At the time of said omissions, Plaintiff and the other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of

51

the Class and the marketplace known of the truth, which was not disclosed by the Adviser,

Global Markets, Jones, or Daidone, Plaintiff and the other members of the Class would not

have purchased or held their Funds shares during the Class Period, or if they had, they would

not have done so at distorted prices.

146. By virtue of the foregoing, the Adviser, Global Markets, Jones, and Daidone have

violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

147. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and

the other members of the Class suffered damages during the Class Period.

**COUNT II**

**Violation Of Section 20(a) Of The Exchange Act Against Daidone and Jones**

148. Plaintiff repeats and realleges each and every allegation contained above as if fully

set forth herein.

149. Jones and Daidone acted as controlling persons of the Adviser and Global

Markets within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue

of their high-level positions, and their ownership and contractual rights, participation in and/or

awareness of the Adviser and Global Markets' operations and/or intimate knowledge of the

statements filed by the Funds and/or the Adviser and Global Markets with the SEC and

disseminated to the investing public, Jones and Daidone had the power to influence and

control and did influence and control, directly or indirectly, the decision-making of the

Adviser and Global Markets, including the content and dissemination of the various

statements that Plaintiff contends are false and misleading.  Jones and Daidone were provided

with or had unlimited access to copies of the Funds, the Adviser and/or Global Markets'

52

reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

150. In particular, Jones and Daidone had direct and supervisory involvement in the day-to-day operations of the Adviser and Global Markets and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

151. As set forth above, the Adviser, Global Markets, Jones, and Daidone violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, Jones and Daidone are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of the Adviser, Global Markets, Jones and Daidone's wrongful conduct, Plaintiff and the other members of the Class suffered damages during the Class Period.

**COUNT III**

**Violation of Section 36(b) of the ICA Against the Adviser**

152. Plaintiff incorporates by reference the preceding paragraphs.

153. The Funds consist of registered investment companies within the meaning of Section 2 of the ICA.

154. The Adviser is an investment adviser for the Funds as that term is defined in Section 2 of the ICA.

155. Pursuant to Section 36(b) of the ICA, 15 U.S.C. § 80a-35(b), the investment adviser of a mutual fund owes to its mutual funds and their shareholders the fiduciary duties of

53

loyalty, candor, and due care with respect to the receipt of compensation for services or payments of a material nature paid by the mutual fund to such investment adviser or any affiliated person. Those fiduciary duties apply not only to the terms of the advisory fee agreements, but also to the manner in which advisers seek approval of such agreements.

156. Pursuant to Section 36(b) of the ICA, 15 U.S.C. §80a-35(b), the Adviser owes and owed to the Funds and their shareholders the fiduciary duties of loyalty, candor, and due care with respect to its receipt of compensation for services or payments of any material nature paid by the Funds or its shareholders to the Adviser or any affiliated person.

157. Pursuant to Section 15(c) of the ICA, 15 U.S.C. § 80a-15(c), the investment adviser of a mutual fund owes to the mutual fund the duty to furnish the directors of the fund "such information as may reasonably be necessary to evaluate the terms of any contract whereby a person undertakes regularly to serve or act as investment adviser of such [mutual fund] company."

158. Thus, among other things, Section 36(b) of the ICA prohibits and prohibited the Adviser from soliciting the approval of any advisory agreement from the Funds by use of false or misleading information, or by failing to disclose information material to the Funds regarding the Adviser's compensation or the compensation of the Adviser's affiliate, CTB. Information concerning conflicts of interest are particularly important to the Funds.

159. The Adviser did not make full and fair disclosure to the Funds' boards of all information that would be material to the Funds' decision regarding the choice of its transfer agent.

54

160. Pursuant to Section 36(b) of the Investment Company Act, 15 U.S.C. § 80a-35(b), a mutual fund shareholder may bring a civil action against an investment adviser or any affiliated person who has breached his or its fiduciary duty concerning such compensation or other payments.

161. The Adviser breached its fiduciary duty to the Funds by the acts alleged in this Complaint including, without limitation, participating in the sub-TA scheme, by which the Funds contracted with CTB for transfer agent services at excessive rates for little work, which scheme inured to the benefit of Citigroup entities and to the detriment of Funds' shareholders.

162. By recommending that the Funds contract with an affiliate of the Adviser for transfer agent services, the Adviser placed its own self-interest in maximizing its compensation and other payments over the interests of the Funds and their shareholders.

163. As alleged herein, the Adviser breached its fiduciary duties with respect to the receipt of compensation for services or other payments of a material nature from the Funds or their shareholders.

164. By virtue of the foregoing, the Adviser has violated Section 36(b) of the Investment Company Act, 15 U.S.C. § 80a-35(b).

165. As a direct and proximate result of the wrongful conduct alleged above, the Funds were harmed by, among other things, the adoption and approval of the advisory agreements.

WHEREFORE, Plaintiff prays for judgment as follows:

A.      Awarding monetary damages against all of the Defendants for all losses and damages suffered as a result of the wrongdoings alleged in this Complaint, together with interest thereon;

B.     Removing the Adviser;

C.     Rescinding the management and other contracts for the Funds with the Adviser;

D.     Ordering Defendants to disgorge all management fees and other compensation

paid to the Adviser;

E.     Awarding Plaintiff the fees and expenses incurred in this action including

reasonable allowance of fees for Plaintiff's attorneys, and experts; and

F.     Granting Plaintiff such other and further relief as the Court may deem just and

proper.

## JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff hereby demand a trial by jury

of all issues so triable.

Dated:  June 1, 2006

BERNSTEIN LIEBHARD & LIFSHITZ, LLP

_____

Sandy A. Liebhard (SL-0836)
U. Seth Ottensoser (UO-9703)
Joseph R. Seidman, Jr. (JS-9260)
10 East 40th Street
New York, New York  10016
Tel:  (212) 779-1414

**Lead Counsel for Lead Plaintiff and the Class**

Brad Lakin
**LAKIN LAW FIRM, P.C.**
300 Evans Ave., P.O. Box 229
Wood River, Illinois  62095-0229
Tel:  (618) 254-1127

56

# CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the attached document was served upon the following counsel of record in the actions filed in this Court electronically on June 1, 2006 and by hand and by federal express, respectively, on June 2, 2006:

Robert B. McCaw, Esq.
**WILMER CUTLER PICKERING HALE**
    **& DORR LLP**
399 Park Avenue, 30th Floor
New York, NY  10022

Mark D. Cahn, Esq.
Michael Plotnick, Esq.
**WILMER CUTLER PICKERING HALE**
    **& DORR LLP**
2445 M Street, NW
Washington, DC  20037

JOSEPH R. SEIDMAN, JR.