nothing in the Investment Company Act (15 U.S.C. § 80a-1 *et seq*.) which would authorize a shareholder of one mutual fund to bring a derivative action on behalf of another mutual fund in which he holds no shares."); *see generally* 10 Fed. Proc., L. Ed. § 25:86 (2005) ("A shareholder in a mutual fund may maintain a derivative action to enforce a right of that mutual fund, but not of other mutual funds of which the plaintiff is not a shareholder.").

Similarly, because the Plaintiffs only have standing to assert claims on behalf of Funds in which they actually own shares, they cannot maintain their section 36(b) claim as a class action. *See Kauffman*, 434 F.2d at 734. Furthermore, ". . . named plaintiffs who represent a class 'must allege and show that they personally have been injured, not that the injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent'." *Lewis v. Casey*, 518 U.S. 343, 357 (1996) (internal citations omitted). District courts have therefore uniformly rejected 36(b) claims styled as a class action. *See Forsythe*, 417 F. Supp. 2d at 118 ("the plaintiffs have no standing to sue under § 36(b) 'on behalf of' other funds in the MFS fund complex simply because they style their case as a class action"); *In re Lord Abbett Mut. Funds Fee Litig.*, 407 F. Supp. 2d at 633 ("Plaintiffs may not maintain [an ICA section 36(b) claim] as a class action claim, given the derivative nature of the claim."); *In re Dreyfus Mut. Funds Fee Litig.*, 428 F. Supp. 2d at 360 ("Because they are derivative, the section 36(b) claims cannot be asserted as class action claims."); *Herman v. Steadman*, 50 F.R.D. 488, 490 (S.D.N.Y. 1970) ("The right of action is that of the corporation and is derivative only. He thus cannot sue in a representative capacity on behalf of the shareholders of his own fund . . . .").

The *AllianceBernstein* case is again directly on point. There, twenty-nine named plaintiffs who owned shares in thirteen AllianceBernstein mutual funds brought a purported class action against the investment adviser of all AllianceBernstein funds for charging undisclosed

Case 1:05-cv-07583-WHP   Document 70-2   Filed 10/03/06   Page 2 of 35

marketing fees to the funds and misusing the fees for the adviser's own benefit. 2005 WL
2677753 at *1-*2. After dismissing the plaintiffs' direct breach of duty claims under sections
36(a) and 34(b) of the ICA, the court went on to consider whether plaintiffs had standing to bring
a section 36(b) claim – which had properly been pleaded as derivative – on behalf of
AllianceBernstein funds that the named plaintiffs did not own. *Id.* at *9-*10. The court
concluded that because "the named Plaintiffs have not purchased shares in the forty-eight Funds
at issue, they cannot establish injuries caused by the advisers of those Funds," and thus lacked
standing to sue. *Id.* at *10. The court noted that "[t]his conclusion is strengthened by a literal
reading of the text of Section 36(b), which states that an action may only be brought by either the
SEC 'or by a *security holder of such registered investment company*.'" *Id.* (emphasis in
original).

　　　In light of this uniform body of case law, even if Plaintiffs had properly asserted their
36(b) claim to recover the excessive fee claims as a derivative claim (and they have not), they
could not style it as a class action, and would lack standing to assert the claim on behalf of Funds
in which the named plaintiffs hold no shares.

### C.　　Plaintiffs' 36(b) Claim Should Be Dismissed Because None Of The Defendants Received TA Fees.

　　　Even if the Plaintiffs had properly pleaded their 36(b) claim as a derivative claim on
behalf of the two Funds in which the named plaintiffs held shares, Count III would still be
deficient because the Complaint names the wrong defendants. The plain language of section
36(b)(3) indicates Congress' intent that excessive fee claims by shareholders may only be
brought against the persons or entities that actually received the excessive fees. 15 U.S.C. § 80a-
35(b)(3) ("[N]o such action will be brought or maintained against any person other than the
recipient of such compensation"). Courts in this and other Circuits have strictly construed this

statutory mandate, and have dismissed section 36(b) claims brought by mutual fund shareholders against parties that did not actually receive the excessive fees.  *See In re Evergreen Mut. Funds Fee Litig.*, 423 F. Supp. 2d 249, 259 (S.D.N.Y. 2006) (dismissing section 36(b) claim against fund directors and fund distributor because they did not receive fees); *In re Goldman Sachs Mut. Funds Fee Litig.*, No. 04 Civ. 2567, 2006 WL 126772, at *7-*8 (S.D.N.Y. Jan. 17, 2006) (dismissing section 36(b) claim against officers and directors who received no fees); *In re AllianceBernstein*, 2005 WL 2677753, at *6 (same); *In re Eaton Vance Mut. Funds Fee Litig.*, 380 F. Supp. 2d 222, 238 (S.D.N.Y. 2005) (dismissing brokerage fee claims against adviser who did not receive fees), *adhered to on reconsideration*, 403 F. Supp. 2d 310 (S.D.N.Y. 2005); *Zucker*, 371 F. Supp. 2d at 848-49  (funds' investment adviser could not be held liable under 36(b) where the adviser's affiliate, rather than the adviser, allegedly received the fees); *Green*, 186 F.R.D. at 491-92 (dismissing section 36(b) claim against individual defendants who were not alleged to have received fees); *see also Pfeiffer v. Bjurman, Barry & Assocs.*, No. 03 Civ. 9741(DLC), 2004 WL 1903075, at *4 & n.11 (S.D.N.Y. Aug. 24, 2004) (dismissing section 36(b) claim based on transfer agent fees but allowing section 36(b) claim based on marketing fees where none of the defendants received transfer agent fees but did receive marketing fees).

In this case, the Complaint does not allege that any of the named Defendants actually received the TA fees paid by the Funds.  The Funds paid TA fees directly to CTB, not to the named Defendants.  (Compl. ¶¶ 104-05.)  Plaintiffs' section 36(b) claim against the current Defendants should therefore be dismissed in its entirety.

### D.     Section 36(b) Limits Recovery To Fees Paid By The Funds In The 12 Months Before Suit Was Filed.

Finally, even if Plaintiffs had named CTB as a defendant, Congress, in the plain text of section 36(b), limited any recovery under the statute to the actual damages incurred by the

injured fund in the twelve months before the complaint was filed. 15 U.S.C. § 80a-35(b)(3).

Courts have uniformly enforced this strict damages limitation. *See, e.g., In re Salomon Smith*

*Barney Mut. Fund Fees Litig.*, 441 F. Supp. 2d at 598; *Forsythe*, 417 F. Supp. 2d at 116-17;

*Green*, 186 F.R.D. at 493; *In re Am. Mut. Funds Fee Litig.*, 2005 WL 3989803, at *4. Thus,

even if the Court holds that Plaintiffs may maintain their section 36(b) claim on behalf of the two

funds in which the named plaintiffs held shares, Plaintiffs' claims to recover fees paid prior to

August 27, 2004 (one year before the filing of the original complaint in this action) should be

dismissed.

**III.   CTB'S DISGORGEMENT OF VIRTUALLY ALL TA PROFITS RECEIVED FROM ALL SMITH BARNEY FUNDS OVER A SIX-YEAR PERIOD PRECLUDES FURTHER RECOVERY FROM ANY DEFENDANT.**

The preceding section demonstrates that even if Plaintiffs had properly pleaded their

section 36(b) claim as a derivative action and had named CTB as a defendant, they would only

be entitled to recover excessive fees paid by the two funds in which the named Plaintiffs held

shares that paid fees to CTB, and only for the 12 months prior to the filing of the Complaint. In

light of these limitations on the Plaintiffs' 36(b) claim, CTB's disgorgement of *over six years*

worth of TA profits under the Settlement Order for *all Smith Barney Funds* plainly obviates any

further recovery by Plaintiffs under section 36(b). Indeed, further recovery by Plaintiffs – under

section 36(b), section 10(b) and Rule 10b-5, section 20(a), or any other legal theory – would

constitute an impermissible windfall under the time-honored bar against double recovery.

The Corporate Defendants have already caused CTB to disgorge TA fee revenue received

from the Funds from October 1, 1999 through September 30, 2004 (minus sub-TA payments and

actual operating expenses), plus interest. This fee disgorgement plus interest – an aggregate total

of over $100 million – is now held by the United States Treasury under the Fair Funds provisions

of the Sarbanes-Oxley Act, 15 U.S.C. § 7246(a), and, if the proposed Distribution Plan is

approved by the SEC, will be repaid to the Funds on a pro rata basis. In addition, the Settlement

Order required the Corporate Defendants to pay an $80 million civil penalty that is also being

held by the United States Treasury for distribution to the Funds. (Rothermich Decl., Ex. B, at

19-20, ¶¶ IV.G-H). Finally, CTB has already repaid the Funds its approximately $9.4 million in

TA profits for the period from December 1, 2004 through January 1, 2006 which had been held

in escrow pursuant to the Settlement Order (*Id.*, Ex. B, at 18, ¶ 72 & Ex. E), and SBFM has

already paid to the Funds the approximately $17 million received under the Revenue Guarantee.

(*Id.*, Ex. B, at 19, ¶ IV.E.) In all, once the proposed Distribution Plan is consummated, the Funds

will have been paid over $210 million in disgorgement, interest and penalties.

Since any recovery Plaintiffs may obtain on behalf of the Funds under section 36(b) of

the ICA is limited to *actual damages* incurred for only 12 months before the Complaint was

filed, the Complaint alleges no basis for the Funds to recover more than the amount already

disgorged by the Corporate Defendants and CTB. *See* 15 U.S.C. § 80a-35(b) (limiting claims

under section 36(b) of ICA to actual damages incurred by mutual fund). "Once ill-gotten profits

have been disgorged to the SEC, further disgorgement as damages in a private action is clearly

punitive in its effect and would constitute an impermissible penalty assessment." *Litton Indus.,*

*Inc. v. Lehman Bros. Kuhn Loeb Inc.*, 734 F. Supp. 1071, 1076 (1990), *rev'd on other grounds*,

967 F.2d 742, 745 (2d Cir. 1992). Courts have repeatedly followed the rule that "restitutionary

awards to private plaintiffs should [] be reduced by the extent of any prior disgorgement to the

SEC." *Id.* at 1076-77; *see, e.g., SEC v. Texas Gulf Sulfur Co.*, 446 F.2d 1301, 1307 (2d Cir.

1971); *see also Singer v. Olympia Brewing Co.*, 878 F.2d 596, 600 (2d Cir. 1989); *Segen ex. rel.*

*KFx Inc. v. Westcliff Capital Mgmt.*, 299 F. Supp. 2d 262, 273 n.11 (S.D.N.Y. 2004). So too, in

SEC enforcement actions, do courts credit defendants for amounts already paid to private plaintiffs. *See, e.g., S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1475 (2d Cir. 1996).

In short, since any recovery plaintiffs could conceivably obtain for the Funds would be reduced by the amount already disgorged by the Corporate Defendants and CTB, and since the Complaint contains no allegations of injuries to the Funds other than those already contained in the Settlement Order, there are no damages for Plaintiffs left to recover and their derivative section 36(b) claim should be dismissed.  Similarly, to the extent that Plaintiffs' section 10(b) and 20(a) claims seek recovery of TA fees paid by the Funds, they should be dismissed for the same reason. *See Int'l Fid. Ins. Co. v. City of New York*, 263 F. Supp. 2d 619, 636 (E.D.N.Y. 2003); *In re Nat'l Mortgage Equity Corp. Mortgage Pool Certificates Sec. Litig.*, 636 F. Supp. 1138, 1146-52 (C.D. Cal. 1986); *Friedman v. Bache Halsey Stuart Shields, Inc.*, No. 80-C-1111, 1985 U.S. Dist. LEXIS 21106, at *5-*7 (N.D. Ill. Apr. 2, 1985);[3] *cf. In re NYSE Specialists Sec. Litig.*, 405 F. Supp. 2d 281 (S.D.N.Y. 2005).

## IV.    PLAINTIFFS' COMPLAINT DOES NOT STATE A FRAUD CLAIM UNDER SECTION 10(b) OF THE SECURITIES EXCHANGE ACT AND RULE 10b-5.

The foregoing sections demonstrate that Plaintiffs' primary claim under section 10(b) of the Securities and Exchange Act of 1934 and Rule 10b-5 promulgated thereunder – to recover the excessive TA fees paid by the Funds – cannot be asserted as a direct claim and seeks recovery for injuries already redressed by the Settlement Order.  But even if the Complaint did not suffer from these fundamental flaws, the fact that the total fees paid by every Smith Barney

---

[3]     The Class Period technically covers two months that were not part of the disgorgement calculation or escrow period in the Settlement Order – October and November, 2004.  Plaintiffs have not alleged any injury during that two-month period – let alone any injury to the two funds in which they held shares – for which the Funds will not have been fully compensated once the Distribution Plan is approved by the SEC.

Fund – including TA fees – were disclosed in the Funds' prospectuses raises an insurmountable obstacle to the Complaint's fraud claims.[4]

To state a claim under section 10(b) or Rule 10b-5, Plaintiffs must allege "(1) a material misrepresentation (or omission); (2) scienter . . . . ; (3) a connection with the purchase or sale of a security; (4) reliance, often referred to . . . as 'transaction causation' . . . ; (5) economic loss; and (6) 'loss causation,' *i.e.*, a causal connection between the material misrepresentation [or omission] and the loss." *Dura Pharm. Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005). In securities fraud allegations, the circumstances constituting the elements of the fraud must be pleaded with particularity. Fed. R. Civ. P. 9(b); *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1127 (2d Cir. 1994).

As explained below in subpart A, Plaintiffs cannot allege the first element – a material misrepresentation or omission – because total fees were disclosed to the public and Defendants had no duty to make additional disclosures concerning the TA arrangement. As set forth in subpart B, the Complaint also fails to allege a second element of a section 10(b) claim – that such misrepresentations or omissions caused shareholders an actionable injury. And finally, as addressed in Subpart C, the Complaint fails to adequately allege scienter as to the Individual Defendants. For these reasons, consistent with other recently decided mutual fund cases, Plaintiffs' Section 10(b) claim should be dismissed in its entirety as against all Defendants.

---

[4]    Plaintiffs' fraud claims on behalf of shareholders that merely "held" shares of the Smith Barney Funds during the Class Period should be independently dismissed. The Supreme Court established over thirty years ago that a section 10(b) claim may only be asserted by shareholders that bought or sold shares as a result of the alleged fraud. *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 737-38, 753-55 (1975). Under this rule, Jeffery Weber should be dismissed as a named plaintiff since the Complaint alleges merely that he held shares of the Smith Barney Large Cap Growth and Value Fund during the Class Period.

### A.    The Complaint Does Not Allege Any Actionable Misrepresentations Or Omissions.

The law is clear that where total fees paid by the Funds were properly disclosed in Fund prospectuses, shareholders cannot bring a fraud claim under section 10(b) and Rule 10b-5 to recover the disclosed fees.  Defendants simply had no duty, as a matter of law, to disclose the division of fees and services between CTB and First Data or CTB's profit margin.

### 1.    Plaintiffs' Fraud Claim Rests Entirely On Alleged Omissions Concerning The Details Of The New Transfer Agent Arrangement.

The Complaint does not allege that Fund shareholders were misled concerning the *amount* of advisory and management fees – including TA fees – paid by the Funds, or the way such fees were calculated.  As required by SEC Form N-1A, which specifies required mutual fund prospectus disclosures, the Funds' prospectuses disclosed the amount of fees the Funds paid.  Annual fees for TA services were included in the "Other Expenses" category of the fee tables at the front of the Funds' prospectuses, calculated as a percentage of the Funds' assets. (*See, e.g.*, Rothermich Decl., Ex. C.)  The Complaint does not allege that the fee tables in any of the prospectuses were inaccurate.

Confronted with accurate disclosures of the amount of fees paid by the Funds, Plaintiffs strain to allege that the prospectuses' brief descriptions of the transfer agency services provided to the Funds were somehow misleading.  (Comp. ¶¶ 114-35).  But the portions of the prospectuses and other shareholder disclosures excerpted in the Complaint merely truthfully stated that an affiliated TA was serving as the Funds' TA and had entered into the Sub-TA Agreement with First Data.  These documents also briefly described the services provided by CTB and First Data.  (Compl. ¶¶ 114, 117, 119, 120).  The Complaint does not allege that any of these disclosures were inaccurate.  (Compl. ¶ 115.)

The second set of allegedly misleading statements, first disseminated in supplements to Funds' prospectuses in late November 2003, concerned the Revenue Guarantee and CAM's investigations into the fairness of the TA fees.[5]  (Compl. ¶¶ 125, 127.)  These disclosures stated: the terms of the Revenue Guarantee between CAM and First Data; that CAM was repaying the amount received under the Revenue Guarantee to the Funds; that CAM was undertaking a review of the fairness of TA fees paid by the Funds; and that CAM was cooperating with several governmental investigations into the TA arrangement.  (*Id.*)  The Complaint does not allege that these descriptions of the Revenue Guarantee, or the steps being taken by CAM to investigate possible problems, were inaccurate.

Instead, the Complaint is clear that Plaintiffs' section 10(b) claim is based entirely on alleged omissions:  Defendants "failed to disclose that the sub-TA structure was nothing more than an elaborate scheme to inflate Citigroup profits"; "omitted to disclose the scheme . . . whereby PFPC was doing the bulk of the work"; "failed to disclose the misleading process which led to the appointment of the sub-TA"; and "failed to disclose the Revenue Guarantee."[6] (Compl. ¶¶ 115, 126.)  In a nutshell, Plaintiffs complain that the Funds' prospectuses and other public filings did not state that Defendants had allegedly misled the Fund Boards into approving

---

[5]      The Complaint cites a prospectus supplement dated December 1, 2003 that disclosed facts concerning the Revenue Guarantee.  (Compl. ¶125).  For certain Funds, these facts were disclosed in prospectus supplements dated November 28, 2003.  The content of the November 28 supplements is identical to the content of the December 1 supplement cited in the Complaint.

[6]      Plaintiffs' attempt to use the Form 14A proxy statement for the Citistreet Funds is especially nonsensical.  The excerpt cited in the Complaint only concerns the appointment of SBMF to act as investment advisor, and says absolutely nothing about transfer agents, transfer agent services or transfer agent fees.  In fact, as noted above, CTB never acted as the TA for any Citistreet-branded funds.

the TA contract and that CTB was allegedly receiving excessive compensation for doing limited work.[7]

2.   Defendants Had No Duty To Disclose The Details Of The New TA Arrangement.

It is black letter law that "[s]ilence, absent a duty to disclose," is not actionable pursuant to section 10(b).  *Basic, Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988).  Applying this simple rule, several recent cases have dismissed analogous section 10(b) claims where total fees charged to mutual fund shareholders were disclosed in the fund prospectuses and SEC regulations did not require disclosure of the precise allocation of such fees.  *See In re Morgan Stanley & Van Kampen Mut. Fund Sec. Litig.*, No. 03 Civ. 8208 (RO), 2006 WL 1008138, at *7 (S.D.N.Y. Apr. 18, 2006) (dismissing section 10(b) claims based on marketing fees where total fees were disclosed because there was no duty to disclose precise allocation of fees); *Castillo v. Dean Witter Discover & Co.*, No. 97 Civ. 1272 (RPP), 1998 WL 342050, at *9 (S.D.N.Y. June 25, 1998) (no "violation of the antifraud provisions of the securities laws" where "total fees were disclosed . . . ."); *Benzon v. Morgan Stanley Distrib., Inc.*, No. 03 Civ. 0159, 2004 WL 62747, at *4 (M.D. Tenn. Jan. 8, 2004) ("[T]he prospectus at issue discloses the total amounts paid to Defendants for the various options.  It is not 'hidden' from potential investors that Defendants make money and how much they make for each option."), *aff'd*, 420 F.3d 598, 609 (6th Cir.

---

[7]      To the extent that Plaintiffs allege that Defendants made any affirmative material misstatements, Plaintiffs are not entitled to a presumption of reliance pursuant to either the fraud-on-the-market doctrine or *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), and their 10b-5 claim must be dismissed for failure to plead reliance.  *See, e.g. Clark v. Nevis Capital Mgmt., LLC* , 04 Civ. 2702 (RWS), 2005 WL 488641, *18 (S.D.N.Y. Mar. 2, 2005) (internal citation omitted) (Fraud-on-the-market doctrine is inapplicable to fraud claim by mutual fund shareholder where the alleged misrepresentations and omissions do not relate to "the underlying securities it [the fund] holds"); *In re Salomon Analyst Metromedia Litig.*, 236 F.R.D. 208, 219-20 (S.D.N.Y. 2006) (internal citations omitted) (*Affiliated Ute* presumption of reliance is inappropriate where plaintiff alleges both affirmative misstatements and omissions).

2006); *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243, 249

(S.D.N.Y. 2003) (no duty for mutual funds to disclose investment banking activities by affiliated

entity where SEC Form N-1A did not require such disclosure); *see also Resnik v. Swartz*, 303

F.3d 147, 154 (2d Cir. 2002) (no duty to disclose in proxy statement the present value of

directors' stock options where not required by Regulation S-K).

      The *Morgan Stanley* case – another case that piggybacks on a preceding SEC

investigation and settlement – is particularly on point.  There, mutual fund shareholders brought

a section 10(b) class action against the investment advisers, *inter alia*, for more than 120 Morgan

Stanley and Van Kampen mutual funds.  *In re Morgan Stanley & Van Kampen Mut. Fund Sec.

Litig.*, 2006 WL 1008138, at *1.  The class plaintiffs alleged that they were defrauded by

defendants' failure to disclose in fund prospectuses the way that various marketing fees paid by

the funds were allocated to brokers affiliated with the adviser in return for the brokers' pushing

sales of Morgan Stanley and Van Kampen funds.  *Id.* at *7-*8.  In dismissing the plaintiffs'

claim, the court emphasized that SEC Form N1-A required disclosure only of total commissions

paid by the funds and not the allocation of these commissions.  *Id.* at *7.  Because the

prospectuses accurately disclosed total fees, and the defendants "did not have the duty to disclose

the differential compensation, bonuses, and sales contests[,] any failure to disclose them [was]

not actionable." *Id.* at *8; *see also Benzon*, 2004 WL 62747, at *4 ("[a]s for the disclosure of

fees, the prospectus at issue discloses the total amounts paid to Defendants . . . . Defendants had

no duty to provide more specific information in the prospectus concerning specific allocations or

incentives given to brokers.").

      Here, just as in *Morgan Stanley* and *Benzon*, the Funds' prospectuses accurately made all

required disclosures concerning TA fees.  SEC Form N-1A requires mutual fund prospectuses to

disclose each Fund's annual operating expenses, and to subdivide these total expenses into three categories.  SEC Form N1-A, Part A, Item 3, Fee Table and §3(a)-(c).  One of these categories is for "Other Fees," which includes transfer agent and sub-transfer agent fees.  *Id.*  As stated above, the "Total Fees" and "Other Fees" amounts contained in the prospectuses were accurate, and the prospectuses accurately disclosed that the TA for the funds was an affiliate of the investment adviser, and that they were contracting some TA functions to a sub-TA.  (Compl. ¶¶ 114, 119.) The regulations required no more.  Accordingly, Defendants' alleged failure to disclose the allocation of the fees between CTB and First Data, the process by which CTB became TA, the precise distribution of services between CTB and First Data, or the Revenue Guarantee simply cannot be the basis for a section 10(b) claim.

3. <u>The Alleged Omissions Were Not Material.</u>

There is a good reason, of course, that the SEC does not require the disclosure of the details of transfer agent services and profit margins in mutual fund prospectuses; such details are not material to a mutual fund shareholders' investment decision.  The price and value of mutual fund shares is determined by a mathematical calculation dependent on the value of the underlying securities held by the fund (the net asset value or "NAV").  The allocation of management fees is irrelevant to the investment's potential risks, rewards, or other investment characteristics.  *See In re Morgan Stanley & Van Kampen Mut. Fund Sec. Litig.*, 2006 WL 1008138, at *9 ("All fees charged to the shareholder were disclosed in the offering prospectuses . . . . *The allocation of [these] fees is immaterial, because it could have no effect on share price.*") (emphasis added); *see also Geiger v. Solomon-Page Group, Ltd.*, 933 F. Supp. 1180, 1184 (S.D.N.Y. 1996) (omission of fact that selling shareholders were employed by issuers' underwriters was immaterial as a matter of law).  Information concerning the TA's profit margin or services performed by the TA is not necessary for Plaintiffs to compare the Funds with

32

competing mutual funds. *See Benzon v. Morgan Stanley Distrib. Inc.*, 420 F.3d 598, 609 (6th Cir. 2005) ("Given that all of the information necessary to compare the different class shares was in the prospectuses, the alleged omissions [in the fund prospectuses] . . . are not material."); *see also Tr. of the HERIU Welfare Pension Fund v. Amivest Corp.*, 733 F. Supp. 1180, 1186 (N.D. Ill. 1990) (investment adviser's failure to disclose that adviser retained portions of commissions paid by funds was not material because irrelevant to plaintiff's decision whether or not purchase shares). Indeed, the only material consideration for a mutual fund investor concerning TA fees is the total fees paid by the fund, which was disclosed in the prospectuses as required by law.

In light of the fact that Defendants had no duty to disclose the allocation of TA fees or services between the CTB and First Data, and that such information cannot be material where total fees are disclosed, the Complaint does not allege an actionable misrepresentation or omission and Plaintiffs' section 10(b) claim should be dismissed.

### B.      The Complaint Does Not Allege Loss Causation.

Plaintiffs' section 10(b) claim should also be dismissed because it does not adequately plead that Defendants' alleged omissions caused any damage to Fund shareholders independent of the damage allegedly suffered by the Funds themselves. For the Plaintiffs' direct section 10(b) claim to survive, the Complaint must allege that Defendants' alleged omissions regarding the details of the TA selection process and division of fees and services between CTB and First Data caused shareholders some damage *other than the allegedly excessive fees paid by the Funds*. The Complaint's vague and conclusory allegations that shareholders were "damaged by purchasing Funds' shares at distorted NAV values" and that the Funds' share prices were "distorted and did not reflect their true value[s]" fall well short of satisfying this fundamental pleading requirement. (Compl. ¶¶ 137, 144.)

33

A section 10(b) claim must allege a causal connection between Defendants' alleged misrepresentations or omissions and plaintiffs' alleged damages. *Dura*, 544 U.S. at 347; *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 175 (2d Cir. 2005) ("plaintiff must allege . . . that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered.") (emphasis in original) (internal citation omitted). In order to establish the required causal connection, the omissions identified in the Complaint must, as an initial matter, "relate[] to the value of the shares" traded by the plaintiff, such as its potential risks and rewards, and not a subject "extrinsic" to that security's investment characteristics. *Suez Equity Investors L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 97 (S.D.N.Y. 2001); *see Bennett v. United States Trust Co.*, 770 F.2d 308, 313-14 (2d Cir. 1985) (dismissing section 10(b) claim because alleged misstatement concerning applicability of Federal Reserve's margin rules to public utility shares did not relate to the investment quality of the securities at issue).

In the present case, the omissions alleged in the prospectus could not have caused any damages to fund shareholders for precisely the same reason that such omissions are not material as a matter of law: Facts concerning the division of fees or services between CTB and First Data or the process by which CTB was selected as TA could not have had any effect on the value of Fund shares. Thus, by definition, these facts are "extrinsic" to the investment characteristics of the Funds.

Once again, the *Morgan Stanley* case is right on point. There, the court held that mutual fund shareholders' allegations that defendants' failure to disclose the allocation of marketing fees paid by the funds could somehow distort funds' NAVs were "incorrect as a matter of law" when the total amount of fees paid was accurately disclosed:

> Unlike an ordinary share of stock traded on the open market, the
> value of a mutual fund share is calculated according to a statutory

34

> formula.  Share price is a function of "Net Asset Value," the pro-
> rata share of assets under management, minus liabilities such as
> fees.  Plaintiffs explain no mechanism by which a mutual fund's
> share price could differ from its objective "value."

*Morgan Stanley*, 2006 WL 1008138, at *9.  Because the alleged omissions concerning improper

marketing fees could not affect the funds' NAVs, the court held that the plaintiffs had failed to

allege the loss causation element of their section 10(b) claim against the investment adviser.  *Id.*

Similarly, in *Castillo*, 1998 WL 342050, at *5, the court dismissed mutual fund investors'

section 10(b) claim because "the allocation of [total] fees [paid by mutual funds] would not

affect the damages for the losses claimed by plaintiffs."  The court concluded that "[i]t is the

total fees charged that would affect the asset value [price] of a mutual fund and the decision to

invest.  The prospectuses disclosed these amounts."  *Id.*; *see In re Salomon Smith Barney Mut.*

*Fund Fees Litig.*, 441 F. Supp. 2d at 590 (S.D.N.Y. 2006) ("[W]here Defendants at all times

disclosed the total fees in the Fund Prospectuses, allocation of fees would not affect mutual fund

share value.").

    In the instant case, just as in *Morgan Stanley, Castillo*, and *Salomon Smith Barney*, total

fees (including TA fees) were disclosed. The alleged misrepresentations or omissions in the

prospectuses and other public filings were therefore not capable of "distorting" the Funds'

NAVs.  *In re Morgan Stanley & Van Kampen Mut. Fund Sec. Litig.*, 2006 WL 1008138, at *9.

The Complaint does not allege how the Funds' Net Asset Values could differ from their "true

value[s]" (Compl. ¶ 144) as a result of the alleged misstatements and omissions when total fees

paid by the Funds were accurately disclosed.  Because the subjects of the Defendants' alleged

misstatements and omissions – the division of fees and services between CTB and First Data and

the Revenue Guarantee – could not possibly cause the Funds' Net Asset Values to differ from

their "true value[s]," (Compl. ¶ 144), Plaintiffs have not satisfied the baseline pleading

requirement that the "*subject* of the fraudulent statement or omission was the cause of the actual

loss suffered." *Lentell*, 396 F.3d at 175.

The Complaint not only fails to allege a causal connection between the alleged omissions

and the value of Fund shares, it also contains no allegations concerning when Plaintiffs' shares

were purchased; whether they were sold; when they were sold; the price of the shares at the time

of purchase or sale; or whether the price of the shares increased or decreased at any time before,

during, or after the Class Period.  Without such allegations it is impossible to tell whether the

named Plaintiffs – or any Fund shareholders – suffered any losses at all.  *See In re Salomon*

*Smith Barney Mut. Fund Fees Litig.*, 441 F. Supp. 2d at 591 (loss causation pleadings

insufficient where complaint did not allege that plaintiffs' fund shares lost value or otherwise

contain any information about the funds' performance during the Class Period).  The Complaint

does not even state whether these alleged "distortions" caused the Funds' NAVs to be inflated or

undervalued.  Merely alleging that the Funds' per share NAVs were distorted at the time of

Plaintiffs' purchases is insufficient as a matter of law.  *Dura*, 544 U.S. at 342-43, 347; *Lentell*,

396 F.3d at 174 (allegations "that a defendant's misrepresentations and omissions induced a

'purchase-time value disparity' between the price paid for a security and its 'true [value]',"

without more, are insufficient) (internal citations omitted).

Finally, the inadequacy of the loss causation allegations is further highlighted by

Plaintiffs' failure to allege that subsequent disclosure of the facts allegedly omitted from the

prospectuses altered the price of Fund shares from their previously "distorted" level in a manner

that caused shareholders damages.  *See, e.g.*, *Dura*, 544 U.S. at 342-43; *Lentell*, 396 F.3d at 175;

*In re Initial Pub. Offering Sec. Litig.*, 399 F. Supp. 2d 261, 265-66 (S.D.N.Y. 2005).  A

complaint that only alleges the purchase of a security at a price that was "distorted" by

36

defendants' misrepresentation or omission (Compl. ¶¶ 137, 141, 142, 144, 145, 147) does not sufficiently plead loss causation because no harm is incurred merely by purchasing a security at an allegedly "distorted" value. *See Dura*, 544 U.S. at 342-43, 347; *Lentell*, 396 F.3d at 174.  The Complaint alleges numerous disclosures relating to the TA matter and regulators' investigations – in December 2003, March 2004, August 2004, January 2005, February 2005, and May 2005. (Compl. ¶¶ 125, 127, 129, 131, 133, 135.)  However, the Complaint does not allege a single change in the Fund NAVs or share price correlating to these disclosures, let alone a change that harmed shareholders.  Thus, Plaintiffs' section 10(b) claim must be dismissed.  *Lentell*, 396 F.3d at 175 (finding loss causation allegations insufficient where there was "no allegation that the market reacted negatively to a corrective disclosure regarding" the alleged fraud.)

The Complaint tacks on an additional conclusory allegation that "Plaintiff and the Class have also suffered lost opportunity damages because the money that was drained from their accounts . . . could have been invested for further gains."  (Compl. ¶ 138.)  Because the TA fees were paid by the Funds, it was the *Funds* that allegedly lost an investment opportunity; a claim to recover these alleged damages is purely derivative.  *See* Part I, *supra*.  Moreover, this theory of loss causation, similar to Plaintiffs' "distorted NAVs" theory of loss causation, is insufficient as a matter of law because the Funds' prospectuses accurately disclosed the amount of TA fees paid by the Funds as a percentage of the Funds' assets.  (Rothermich Decl., ¶ 4 & Ex. C).  Plaintiffs could not have been deceived regarding the percentage of Fund assets that would be available to invest and the percentage of Fund assets that would be expended on TA fees where total TA fees paid by the Funds were accurately disclosed.  *See In re Salomon Smith Barney Mut. Fund Fees Litig.*, 441 F. Supp. 2d at 590; *In re Morgan Stanley & Van Kampen Mut. Fund Sec. Litig.*, 2006 WL 1008138, at *9; *Castillo*, 1998 WL 342050, at *5.  Finally, securities fraud plaintiffs can

37

only recover "actual damages," and not speculative damages such as the lost investment opportunities alleged in the Complaint.  15 U.S.C. § 78bb(a).

**C.    Plaintiffs' Section 10(b) Claims Against The Individual Defendants Should Also Be Dismissed For Failure Adequately To Plead Scienter.**

As codified by the PSLRA, "in securities fraud actions, scienter may not be averred generally.  Rather, plaintiffs must 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'"  *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 404 (S.D.N.Y. 2001) (internal citation omitted).  Under section 10(b) and Rule 10b-5, the required state of mind is "fraudulent intent."  *In re Carter-Wallace, Inc. Sec. Litig.*, 220 F.3d 36, 39 (2d Cir. 2000).

To sufficiently plead fraudulent intent, the Complaint must allege facts that either (a) show the Individual Defendants had *both* motive and opportunity to commit fraud, or (b) constitute strong circumstantial evidence of the Individual Defendants' conscious misbehavior or recklessness.  *See Kalnit v. Eichler*, 264 F.3d 131, 138-41 (2d Cir. 2001); *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 52 (2d Cir. 1995); *Citytrust Bancorp, Inc.*, 25 F.3d at 1128.  Plaintiffs' section 10(b) claim against the Individual Defendants should be dismissed because the Complaint fails to plead facts that support a strong inference of Jones' or Daidone's fraudulent intent.  *See Acito*, 47 F.3d at 49, 52.

1.    The Complaint Does Not Allege Facts Showing That Jones Or Daidone Had Any Motive To Engage In Wrongdoing.

To sufficiently establish motive, the Complaint must allege a "concrete and personal benefit" that each of the Individual Defendants stood to receive by defrauding shareholders of the Funds.  *See Kalnit*, 264 F.3d at 139.  It is black-letter law that "[m]otives that are generally possessed by most corporate directors and officers" – such as the desire to maximize corporate profits or individual compensation – are insufficient.  *Id.* at 139-40; *see also San Leandro*

*Emergency Med. Group Profit Sharing Plan v. Phillip Morris Co.*, 75 F.3d 801, 813-14 (2d Cir. 1996) (plaintiff's allegations of motive too common to show scienter); *Acito*, 47 F.3d at 54 ("[I]ncentive compensation can hardly be the basis on which an allegation of fraud is predicated.") (internal citation omitted).

The Complaint's motive allegations are insufficient.  The Complaint's primary motive allegation is that Jones and Daidone hoped that "Citigroup entities" would make "extra profits." (*See* Compl. ¶ 139.)  Because the vast majority of corporate executives and officers hope their companies are as profitable as possible however, such allegations are too generic and common to satisfy the PSLRA's pleading requirements.  *Kalnit*, 264 F.3d at 139-40.  Plaintiffs do not allege any financial benefit to Daidone as a result of the transfer agent transaction.  With respect to Jones, the Complaint merely includes the conclusory allegation that "[f]or purpose of setting compensation, defendant Jones received credit for the revenue that CTB's TA operations generated."  (Compl. ¶ 106.)  Even if this allegation were true, Jones' desire to qualify for "incentive compensation" is insufficient to establish scienter.  *See Acito*, 47 F.3d at 54.

Plaintiffs' failure to allege any "concrete and personal benefit" Jones or Daidone would receive from defrauding Fund shareholders is fatal to their section 10(b) claim.  *Kalnit*, 264 F.3d at 139.

2.    The Complaint Does Not Allege Facts Demonstrating Conscious Misbehavior Or Recklessness By Jones Or Daidone.

Scienter can also be pleaded "by identifying circumstances indicating conscious misbehavior [or recklessness] by the defendant." *Kalnit*, 264 F.3d at 142 (emphasis added). Conscious misbehavior "encompasses deliberate illegal behavior, such as securities trading by insiders privy to undisclosed material information." *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000) (internal citation omitted).  Proper recklessness allegations require facts showing that

39

defendants' conduct was "highly unreasonable, representing an extreme departure from the

standards of ordinary care . . . to the extent that the danger was either known to the defendant or

so obvious that the defendant must have been aware of it." *Id.* (internal citation omitted).

Plaintiffs bear a "significant burden" when pleading fraud based on conscious misbehavior or

recklessness, *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 270 (2d Cir. 1993), especially where, as here,

"motive is not apparent." *See Kalnit*, 264 F.3d at 142 (where motive "is not apparent . . . the

strength of the circumstantial allegations must be correspondingly greater") (quotation marks

omitted).

The Complaint fails to allege facts supporting a strong inference of conscious

misbehavior or recklessness by Jones or Daidone. Plaintiffs' allegations that Jones "supervised

the TA review project and personally handled negotiations with First Data" (Compl. ¶ 2) and that

he "made the decision to recommend the affiliated TA proposal to the Funds' boards" (*Id.* ¶ 8)

fail to establish conscious misbehavior or recklessness. *See Kalnit*, 264 F.3d at 142. Plaintiffs

cannot establish scienter based merely on a defendant's "position in the corporate hierarchy." *In

re Dynex Capital, Inc. Sec. Litig.*, No. 05 Civ. 1897 (HB), 2006 WL 314524, at *8-*9 (S.D.N.Y.

Feb. 10, 2006). If the law were otherwise, high-level corporate employees would be unduly

subject to liability for securities fraud. *Id.*

The Complaint's allegations concerning Daidone's role in the TA selection process are

also insufficient. *First*, allegations that Daidone misled the Funds' boards during presentations

in 1999 (Compl. ¶¶ 77, 96) do not allege scienter in connection with the prospectuses and the

Form 485BPOS underlying Plaintiffs' section 10(b) claim. Even if Daidone *knew* that facts were

allegedly omitted from the Board Memo and the Presentation (*Id.* ¶ 96), this would establish

40

neither his knowledge that statements in SEC filings, many of which were filed years after the board presentations, were allegedly materially misleading, nor his intent to mislead shareholders.

*Second*, Plaintiffs gloss over the fact that Daidone must have known that the directors of the Funds, as fiduciaries, would carefully scrutinize the presentation he made regarding the transfer agent proposal.  Daidone's willingness to make the 1999 presentations to the Funds' boards when he knew that he could be called on to answer additional questions from the directors is inconsistent with the conduct of a person trying to hide behind incomplete disclosure.  Plaintiffs also acknowledge that the Power Point included detailed financial information and cannot hope to establish scienter by suggesting that Daidone would have anticipated, against all logic, that the well-educated and sophisticated board members were incapable of understanding information that was not presented to them in advance of the meeting.  (*See Id.* ¶ 89).

*Third*, Plaintiffs' allegations that Daidone signed the SEC filings that allegedly contained misleading statements do not suffice.  (*Id.* ¶¶ 7, 11, 116, 118, 119, 121, 124.)  An individual's signature of allegedly misleading documents "says nothing about whether [he] intended to defraud investors in doing so."  *In re Keyspan Corp. Secs. Litig.*, 383 F. Supp. 2d 358, 388 (E.D.N.Y. 2003).  Daidone's signing of these documents alone, absent allegations that he knew these documents allegedly misrepresented or omitted material information, does not support a strong inference of Daidone's intent to defraud shareholders of the Funds.  *See Id*.

While a plaintiff can establish recklessness by "specifically alleg[ing] defendants' knowledge of facts or access to information contradicting their public statements," *Novak*, 216 F.3d at 308, here, Plaintiffs can point to no public statement made by Daidone or Jones that is materially misleading in light of information allegedly known to them but unknown to the Funds' shareholders.  The only "public statements" arguably made by the Individual Defendants

41

are the prospectuses signed by Daidone, which accurately disclosed total fees, including TA fees. Thus, allegations of Daidone's recklessness rest solely on the prospectuses' omissions of information concerning the Revenue Guarantee and the division of fees and services between CTB and First Data.  However, as noted in Part IV.A.1-3, *supra*, this information is immaterial and there was no duty to disclose it.  The omission of immaterial information which there was no duty to disclose cannot create a strong inference of Daidone's scienter – especially where, as here, Daidone lacked a motive to defraud investors.  *See Kalnit*, 264 F.3d at 143-44 (holding that where there is no clear duty to disclose information, failure to disclose that information does not give rise to a strong inference of recklessness); *In re Merrill Lynch,* 272 F. Supp. 2d 243, 263-64 (S.D.N.Y. 2003) (same).

The Complaint's failure to allege particularized facts supporting a strong inference of conscious misbehavior or recklessness by Jones or Daidone is fatal to the claims against them.

## V.    PLAINTIFFS' SECTION 10(b) CLAIMS AGAINST THE CORPORATE DEFENDANTS AND ALL CLAIMS AGAINST THE INDIVIDUAL DEFENDANTS ARE TIME-BARRED.

Plaintiffs' fraud allegations are not only facially deficient, they are also time barred.  The Complaints' allegations of omissions in Fund prospectuses and other public statements did not appear in any of the five original complaints filed before the present action was consolidated. Nor did any of the original complaints name the Individual Defendants.  Plaintiffs' claims against the Individual Defendants and the section 10(b) claim against the Corporate Defendants thus do not "relate back" to any of the preceding complaints.  They are therefore measured for statute-of-limitations purposes from June 1, 2006, when Plaintiffs filed the present Complaint. Because Fund shareholders had constructive knowledge of the facts constituting Defendants' alleged fraud by December 1, 2003 – more than two years before June 1, 2006 – the new

42

allegations are time-barred under the statute of limitations imposed by the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley").

**A.    The Allegations Concerning Public Disclosures Do Not Relate Back To The Original Complaints.**

When an amended complaint makes a new allegation that did not arise "out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading," the newly alleged claim is measured for statute-of-limitations purposes from the date the amended complaint was filed. Fed. R. Civ. P. 15(c)(2). If the allegations in an amended complaint set forth "a different set of operative facts," then they are not based on the same conduct, transaction, or occurrence set forth in the original pleading and do not relate back to the original complaint. *In re Am. Express Co. Sec. Litig.*, 02-CV-5533 (WHP), 2004 WL 632750, at *7 (S.D.N.Y. Mar. 31, 2004); *Bank Brussels Lambert v. Chase Manhattan Bank*, No. 93 Civ. 5298 (LMM), 1999 WL 672302, at *2 (S.D.N.Y. Aug. 27, 1999).

Courts have held that allegations of securities fraud in an amended complaint which are based upon different misrepresentations or omissions than those alleged in the original complaint do not relate back to the allegations in the original complaint. In *S.E.C. v. Seaboard Corp.*, for instance, the SEC filed a complaint against mutual funds, against the funds' parent company (The Seaboard Corporation), and against some of the funds' directors, alleging that they used fund assets to manipulate the market for shares of DMS, a separate corporation, in violation of section 10(b). *S.E.C. v. Seaboard Corp.*, 677 F.2d 1301, 1304-05 (9th Cir. 1982). The mutual funds filed cross-claims against these directors and against the underwriter of the DMS securities offering, essentially duplicating the SEC's allegations. *Id.* The funds' second amended cross-claim, filed after the statute of limitations had run, mentioned for the first time DMS's registration statements and prospectuses, and added claims pursuant to the Securities Act of 1933

43

based on material misstatements and omissions in these documents. *Id.* The Court of Appeals affirmed the trial court's ruling that the cross-claims against the underwriters based on misstatements and omissions in the registration form and prospectuses did not relate back to the original pleading. Just as in the present case, the Court noted that the previous cross-claims merely restated the SEC's complaint against the same defendant, which alleged only a scheme to manipulate the market in DMS stock at the expense of cross-claimant mutual funds, and that "the second amended cross-claims alleged for the first time the misrepresentations and omissions in the prospectus." *Id.* at 1314.

Likewise, when amended securities fraud claims allege misrepresentations made in a different time period than those alleged in the original complaint, they do not relate back for limitations purposes. In *In re Bausch & Lomb, Inc. Sec. Litig.*, plaintiffs' amended complaint sought to extend the class period backward by three months based on a press release issued on the first day of the proposed class period where defendant misstated demand for its products and its profitability. 941 F. Supp. 1352, 1365-66 (W.D.N.Y. 1996). The court held that this press release, which "was not mentioned in the prior pleadings, constitute[d] a *separate alleged act of fraud*" that did not relate back to the original complaints even though the prior complaints brought a similar fraud claim mentioning *other* documents containing alleged misstatements or omissions. *Id.* at 1366 (emphasis added). *See also In re Worldcom Inc. Sec. Litig.*, 308 F. Supp. 2d 214, 231-32 (S.D.N.Y. 2003) (amended fraud claims concerning 2000 bond offering did not relate back to claims concerning 2001 bond offering even though both claims were based on the same statutory provision, concerned the same type of transaction, and alleged similar misrepresentations and omissions); *Ainbinder v. Kelleher*, No. 92 Civ. 7315 (SS), 1997 WL 420279, at *9 (S.D.N.Y. July 25, 1997) (amended complaint's allegations of securities fraud

occurring in connection with November 1988 transactions did not relate back to original

complaint's allegations of securities fraud occurring in July 1988 because the original complaint

focused exclusively on the July 1988 time period), *aff'd*, 152 F.3d 917 (2d Cir. 1998).

Here, just as in *Seaboard* and *Bausch & Lomb,* the Plaintiffs' present section 10(b)

allegations based on the Fund prospectuses and other public filings are based on different alleged

omissions and misrepresentations and involve a different time period than the allegations in the

previous complaints against the Corporate Defendants. (Compl. ¶¶ 140-47.)  All the previous

complaints filed in this and related cases were essentially verbatim recitations of the SEC's

allegations in the Settlement Order, which focused exclusively on misstatements and omissions

to the Funds' boards in 1999.  They alleged misstatements and omissions by Defendants to the

Funds' boards, but made no mention of the Funds' prospectuses or any other public disclosures

to shareholders.  In fact, only one of the five prior complaints – plaintiffs Shropshire's and

Levine's amended complaint – included a fraud claim under section 10(b), and it still only

alleged misrepresentations or omissions by the Corporate Defendants to the Funds' boards made

during 1999.  Shropshire Am. Compl., ¶¶ 63-76, 81-90, No. 05 Civ. 7818(WHP), Dkt. No. 6

(Oct. 10, 2005).

The present section 10(b) claim is thus based on different alleged omissions than those

alleged in the original complaints.  By alleging fraudulent acts through 2005, it expands

significantly the time period when alleged fraudulent acts occurred.  Plaintiffs' new section 10(b)

allegations of misstatements and omissions in Fund prospectuses and other public filings thus

present a different set of "operative facts" than those alleged in the initial complaints and should

be treated as filed on June 1, 2006 for statute of limitations purposes. *Ainbinder*, 1997 WL

420279, at *9; *In re Am. Express Co. Sec. Litig.*, 2004 WL 632750, at *8; *Bank Brussels*, 1999 WL 672302, at *2.

      **B.**     **The New Complaint Against The Individual Defendants Does Not Relate Back To The Original Complaints Against The Corporate Defendants.**

Jones and Daidone were not named as parties in this suit until the June 1, 2006 Complaint.  Prior complaints named only the Corporate Defendants.  Federal Rule of Civil Procedure 15(c)(3) explicitly bars relation back under such circumstances.

An amendment which "changes the party . . . against whom a claim is asserted" relates back to an original pleading only when the claims arose out of the same conduct, transaction, or occurrence, *and* where the newly added party "knew or should have known that, *but for a mistake* concerning the identity of the proper party, the action would have been brought against the party." Rule 15(c)(3) (emphasis added).  As the text makes clear, the Rule allows relation back of claims against a new defendant only where "in fact the reason for his not being named [in the previous complaint] was a *mistake*." *Cornwell v. Robinson,* 23 F.3d 694, 705 (2d Cir. 1994) (emphasis added); *see, e.g.*, *Enter. Mortgage Acceptance Co., LLC, Sec. Litig. v. Enter. Mortgage Acceptance Co.*, 391 F.3d 401, 405 n.2 (2d Cir. 2005) ("Because McBride did not sue another accountant by mistake, but rather chose not to name [Ernst & Young] in their original complaint, Rule 15(c)'s relation back doctrine was inapplicable.").

The rule therefore bars relation back against Jones and Daidone.  This is not a case where the plaintiff mistakenly sued one person in place of another – for instance, by getting the name of a known person wrong, or by suing the wrong corporate subsidiary.  This is a case where the original complaints, deliberately or by oversight, simply passed over Jones and Daidone. *See Cornwell,* 23 F.3d at 705.  Accordingly, the date of suit for limitations purposes as against the Individual Defendants is June 1, 2006.

**C.      Because Plaintiffs Had Constructive Knowledge Of The Facts Underlying
          Their Allegations Before June 1, 2004, The Section 10(b) Claim Against The
          Corporate Defendants, And All Claims Against Jones And Daidone, Are
          Time-Barred.**

The two-year limitation period under Sarbanes-Oxley begins to run when the plaintiff

"obtains actual knowledge of the facts giving rise to the action or notice of the facts, which in the

exercise of reasonable diligence, would have led to actual knowledge." *Shah v. Meeker*, 435

F.3d 244, 249 (2d Cir. 2006) (quoting *Kahn v. Kohlberg, Kravis, Roberts & Co.*, 970 F.2d 1030,

1042 (2d Cir. 1992)) (internal quotation marks omitted).  A duty to inquire arises when

circumstances –also known as "storm warnings" – would suggest to a reasonable investor the

probability that he or she may have a cause of action.  *See Id.*  "If the investor makes no inquiry

once the duty arises, knowledge will be imputed as of the date the duty arose."  *Id.* (quoting *LC

Capital Partners, L.P. v. Frontier Ins. Group, Inc.*, 318 F.3d 148, 154 (2d Cir. 2003) (quotation

marks omitted)).  In proper circumstances, the question of inquiry notice may be resolved as a

matter of law, on the pleadings.  *See In re Merrill Lynch & Co., Inc. Research Reports Sec.

Litig.*, 289 F. Supp. 2d 416, 423 (S.D.N.Y. 2003) (Pollack, J.) (citing *Dodds v. Cigna Sec., Inc.*,

12 F.3d 346, 352 n.3; (2d Cir. 1993); *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 60 (2d

Cir. 1998)).

In this case, public disclosures in the Fund prospectuses in late 2003 and early 2004,

together with a flood of news coverage shortly thereafter, were more than sufficient to put

Plaintiffs on inquiry notice before June 1, 2004.  The Complaint acknowledges that in late 2003,

supplements to the Funds' prospectuses disclosed the Corporate Defendants' agreement to

refund payments received under the Revenue Guarantee, that this arrangement had not been

disclosed to the Funds' boards of directors, and CAM's undertaking to independently review the

fairness of TA fees.  (Compl. ¶ 125.)  (The Complaint cites a prospectus supplement dated

December 1, 2003.  For some Funds, the prospectus supplements disclosing this information were dated between November 28, 2003 and January 24, 2004; the content of these prospectus supplements is identical to the supplement dated December 1, 2003 that is cited in the Complaint.)  The potential seriousness of the issue was made clear by the Supplements' statement that CAM had "briefed the SEC, the New York State Attorney General and other regulators . . . , as well as the U.S. Attorney who is investigating the matter."  *Id.*  In addition, the Supplement underscored the seriousness of the issue by disclosing CAM's corrective actions, including a $16 million reimbursement to the Funds.  *Id.*

These warnings were continued in subsequent prospectuses, dated March 1, 2004 through May 31, 2004, which disclosed that "the SEC and the U.S. Attorney are investigating this situation."  (Compl. ¶ 127.)  Such explicit notice in the Fund prospectuses constituted particularized, "company-specific" "storm warnings" of a potential fraud more than two years before the June 1, 2006 Complaint.  *Cf. Shah*, 435 F.3d at 249; *see also In re Gen. Dev. Corp. Bond. Litig.* (*Gen. Dev. I*), 800 F. Supp. 1128, 1136 (S.D.N.Y. 1992), *aff'd sub nom. Menowitz v. Brown*, 991 F.2d 36 (2d Cir. 1993).  Based on these disclosures alone – ones alleged in the Complaint itself – the Plaintiffs' section 10(b) claims should be dismissed.

Moreover, the disclosures by the Funds led to thorough coverage in the domestic and foreign media, and on wire services and Internet news sites.  Attached as Exhibit F to the Rothermich Declaration are 28 publications dated November or December 2003 from various media sources discussing the TA matter and/or related government investigations.  (Rothermich Decl., ¶ 7 & Ex. F.)

After this initial wave of publicity, on March 1, 2004, Citigroup, Inc., in its Form 10-K Annual Report filed with the SEC, disclosed that "[t]he Company has received subpoenas and

other requests for information from various government regulators regarding market timing, fees,

sales practices and other mutual fund issues in connection with various investigations, including

an investigation by the Securities and Exchange Commission and a United States Attorney into

the arrangements under which we became the transfer agent for many of the mutual funds in the

Smith Barney fund complex." (Rothermich Decl., Ex. G, at 126.)  This statement led to a second

wave of press coverage – coverage that once again put reasonable investors on notice of the need

to inquire.  Attached as Exhibit H are 15 publications dated March 1 or 2, 2004 from various

media sources that discuss investigations by the SEC, New York Attorney General, and/or U.S.

Attorney's Office concerning the TA matter.  (Rothermich Decl., ¶ 9 & Ex. H.)

　　　　Given two waves of publicity disclosing investigations by the SEC and the U.S. Attorney,

investors were certainly on reasonable notice of the need to inquire into potential fraud in March

2004 – more than two years before the June 1, 2006 Complaint.  "Information contained in

articles in the financial press may trigger the duty to investigate," *Shah,* 435 F.3d at 249, and

courts may properly take judicial notice of the *existence* of such articles – not for the truth of the

matters they state, but rather as statements that, true or not, should have put a plaintiff on inquiry

notice of potential problems.  *See In re Salomon Analyst Winstar Litig.*, No. 02 Civ. 6171 (GEL),

2006 WL 510526, at *4 n.6 (S.D.N.Y. Feb. 28, 2006).

　　　　Plaintiffs' section 10(b) claims against the Corporate and Individual Defendants are

therefore time-barred under Sarbanes-Oxley's two-year limitations period for securities fraud

claims.  Plaintiffs' Count II controlling person claims against the Individual Defendants are

similarly time-barred.[8]

---

[8]　　　The section 20(a) controlling persons claim is covered by the Sarbanes-Oxley statute of
limitations because it is predicated on a primary fraud violation.  Of course, if Plaintiffs choose

## VI.   PLAINTIFFS FAIL TO STATE A SECTION 20(A) CLAIM AGAINST THE INDIVIDUAL DEFENDANTS.

"In order to establish a prima facie case of liability under § 20(a) [of the Exchange Act], a plaintiff must show: (1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) that the controlling person was in some meaningful sense a culpable participant in the primary violation." *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998); *S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1473 (2d Cir. 1996); *see Marcus v. Frome*, 275 F. Supp. 2d 496, 502 (S.D.N.Y. 2003).  Plaintiffs' case fails on all three elements. First and foremost, the section 20(a) claims against Jones and Daidone must be dismissed because Plaintiffs have failed to establish a primary violation by the Corporate Defendants. Second, Plaintiffs have failed to plead with the requisite specificity and consistency Jones' and Daidone's control over the precise entities, transactions, and communications that are alleged to have harmed the Plaintiffs.  And finally, Plaintiffs have failed to adequately plead Jones' and Daidone's culpable participation in the alleged fraud.

### A.   Plaintiffs' Failure To State A Claim Against The Controlled Entities Precludes Recovery Against Any Controlling Persons.

By its terms, section 20(a) makes a controlling person liable only "to the same extent as [the] controlled person" who committed the primary securities violation.  Parts I-IV, *supra*, set forth in detail how the Complaint fails to state a case against the Corporate Defendants.

---

to argue that Count II does not sound in fraud and is exempt from the PSLRA's heightened pleading requirements, that would mean that that the special Sarbanes-Oxley limitations period did not apply.  In that case, the controlling persons claim would be governed by the ordinary 1-year/3-year statute of limitations prescribed in *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350 (1991).  *Cf. In re Worldcom, Inc., Sec. Litig.*, 308 F. Supp. 2d 214, 225-28 (S.D.N.Y. 2004) (declining to apply section 804 statute of limitations to '33 Act claims, where plaintiffs had deliberately pled the claims as not involving fraud in an effort to avoid removal and Rule 9 particularity requirements). That would make the claim even more untimely.

Plaintiffs' failure to state a claim for underlying primary liability "eviscerates their controlling-person liability claim" under section 20(a). *Dresner v. Utility.com, Inc.*, 371 F. Supp. 2d 476, 501 (S.D.N.Y. 2005). Because "claims for secondary liability must be dismissed when primary violation claims are dismissed," *Ferber v. Travelers Corp.*, 785 F. Supp. 1101, 1111 (D. Conn. 1991), should the Court dismiss the section 10(b) claims brought against the Corporate Defendants it must also dismiss the section 20(a) claims against Jones and Daidone.

**B.      Plaintiffs Have Inadequately Pleaded Control As To This Specific Transaction.**

Plaintiffs have also failed to meet their pleading burden on the element of control. "Control over a primary violator may be established by showing that the defendant possessed 'the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.'" *First Jersey,* 101 F.3d at 1472-73. Because of the drastic nature of secondary liability, "[a]llegations of control under this section must be substantial." *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 308 F. Supp. 2d 249, 274 (S.D.N.Y. 2004). Rather than establish any particular theory of control with respect to either Daidone or Jones, however, Plaintiffs simply let loose with a grab-bag of unsupported accusations (Compl. ¶ 149), none of which are sufficient as a matter of law. *See In re Flag Telecom,* 308 F. Supp. 2d at 274 ("Plaintiff's allegation that '[b]y reason of their positions as officers and/or directors of Flag, and their ownership of Flag stock, the [i]ndividual [d]efendants had the power and authority to cause Flag to engage in the wrongful conduct,' is similarly inadequate.").

The fact that Jones and Daidone held "high-level positions," (Compl. ¶ 149), does not by itself show control. *See In re CINAR Corp. Sec. Litig.*, 186 F. Supp. 2d 279, 309 (E.D.N.Y. 2002) ("It is well accepted that merely alleging that a particular defendant is a director or an

officer of a company is not sufficient to allege control."); *In re Livent, Inc. Sec. Litig.*, 78 F.

Supp. 2d 194, 221 (S.D.N.Y. 1999). Nor is the control element satisfied by the allegation that

Jones and Daidone had a hypothetical "power" to control. "Actual control is essential to control

person liability." *In re Blech Sec. Litig.*, 961 F. Supp. 569, 586 (S.D.N.Y. 1997). The

Complaint's remaining theories are simply incomprehensible. The Complaint never explains

what it means by Jones' or Daidone's "ownership or contractual rights" to control the TA

decision or disclosure. (Compl. ¶ 149.) To the extent the Plaintiffs mean that Jones' and

Daidone's employment contracts gave them a right to set policy for the Corporate Defendants,

that has things completely backwards: As officers of the corporation, they served at the pleasure

of the company boards, and had no contractual or ownership rights to control board policy at all.

While they may have had substantial *influence* over their employers' decisions, such influence is

not equivalent to *control. See Barker v. Henderson, Franklin, Starnes & Holt*, 797 F.2d 490, 494

(7th Cir. 1986) ("ability to persuade and give counsel is not the same thing as 'control,' which

almost always means the practical ability to direct the actions" of the primary violator); *accord*

*Dietrich v. Bauer*, 76 F. Supp. 2d 312, 332 (S.D.N.Y. 1999).

### C.    Plaintiffs Have Not Adequately Pleaded Jones' and Daidone's Culpable Participation.

Most courts in this circuit require plaintiffs bringing a section 20(a) claim to plead a third

element—the controlling person's *culpable participation* in the controlled person's violation.

Culpable participation must be pled in the complaint, *In re Twinlab Corp. Sec. Litig.*, 103 F.

Supp. 2d 193, 208 (E.D.N.Y. 2000), and "is subject to the PSLRA's heightened pleading

standard." *Cromer Fin. Ltd. v. Berger*, 137 F. Supp. 2d 452, 484 (S.D.N.Y. 2001); *see also In re*

*CINAR*, 186 F.Supp.2d at 320 (". . . the 'culpable participation' requirement is governed by the

PSLRA . . . . Accordingly, plaintiffs must 'state with particularity facts giving rise to a strong

inference that [the individual defendant] . . . culpably participated in [CINAR's] primary violation.'") (internal citations omitted). *See also In re Indep. Energy Holdings PLC Sec. Litig.*, 154 F. Supp. 2d 741, 771 (S.D.N.Y. 2001) ("Because the culpable participation element requires plaintiffs to prove the controlling person's state of mind, the PSLRA's heightened pleading requirements apply."); *Gabriel Capital, L.P. v. NatWest Fin., Inc.*, 122 F. Supp. 2d 407, 427 (S.D.N.Y. 2000), *abrogated by In re IPO Sec. Litig.*, 241 F. Supp. 2d 281 (S.D.N.Y. 2003).

Strict adherence to the pleading requirement is especially appropriate in this case, because Plaintiffs appear to be relying on the special, extended statute of limitations for securities fraud claims. *See* Part V.C, *supra*. As demonstrated in the discussion of the section 10(b) scienter element in Section IV.C.1-2, *supra*, Plaintiffs have failed to plead with sufficient particularity facts giving rise to a strong inference that Jones and Daidone acted intentionally, knowingly, or recklessly in withholding pertinent information from investors. As a result, the Complaint fails to adequately plead the culpable participation element of the section 20(a) claim, and the claim must be dismissed.

## CONCLUSION

For the foregoing reasons, the Plaintiffs have failed to state a claim against the Corporate Defendants under either Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder or under section 36(b) of the ICA. Plaintiffs have likewise failed to state a claim against the Individual Defendants under section 10(b), Rule 10b-5, or section 20(a). The Complaint should therefore be dismissed in its entirety as against all Defendants.

53

Dated: October 3, 2006

Respectfully submitted,


_____/s/_____
Robert B. McCaw (RM-7427)
John C. Rothermich (JR-8594)
WILMER CUTLER PICKERING HALE
  AND DORR LLP
399 Park Avenue
New York, NY 10022
Tel: (212) 230-8800
Fax: (212) 230-8888

and

Mark D. Cahn
David P. Nicolardi
WILMER CUTLER PICKERING HALE
  AND DORR LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20036
Tel: (202) 663-6000
Fax: (202) 663-6363

**Counsel for Defendants Smith Barney
Fund Management LLC and
Citigroup Global Markets, Inc.**

54

_____/s/_____
Michael O. Ware (MW-0290)
Ryan P. Farley (RF-2486)
MAYER, BROWN, ROWE & MAW LLP
1675 Broadway
New York, NY 10019
(212) 506-2500

and

Richard J. Morvillo (RM-0441)
Peter H. White (PW-6556)
MAYER, BROWN, ROWE & MAW LLP
1909 K St., NW
Washington, DC 20006
(202) 263-3000

***Counsel for Defendant***
***Lewis E. Daidone***


_____/s/_____
G. Irvin Terrell, Jr. (GT-3459)
BAKER BOTTS LLP
One Shell Plaza
910 Louisiana St.
Houston, TX 77002-4995
(713) 229-1231

and

Joshua A. Klein
BAKER BOTTS LLP
The Warner
1299 Pennsylvania Avenue, NW
Washington, DC 20004-2400
(202) 639-7700

***Counsel for Defendant***
***Thomas W. Jones***

55