**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| IN RE SMITH BARNEY FUND TRANSFER AGENT LITIGATION |
|---|

05 Civ. 7583 (WHP)

**LEAD PLAINTIFF'S MEMORANDUM IN**

**OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

817v1

TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... iii

PRELIMINARY STATEMENT ...................................................................................... 1

STATEMENT OF FACTS .............................................................................................. 2

ARGUMENT .................................................................................................................. 7

I.      DEFENDANTS CANNOT OVERCOME THEIR HEAVY BURDEN
        ON THIS MOTION ............................................................................................. 7

        A.      The Applicable Legal Standards ............................................................... 7

II.     PLAINTIFF HAS STANDING TO ASSERT ALL CLAIMS ............................ 8

        A.      Defendants' "Standing" Argument Is Premature Prior To A Motion For
                Class Certification ..................................................................................... 9

        B.      Practical Considerations In This Litigation Warrant Maintaining The
                Present Named Plaintiff Structure ........................................................... 12

        C.      At The Class Certification Stage, Plaintiff Will Be Able To Show That It
                Is Able To Represent All The Proposed Members Of The Class ........................ 13

                1.      Plaintiff May Represent Other Members Of The Class Since Its
                        Claims Are Based On The Same Legal Theories And Arise From The
                        Same Scheme And Course Of Conduct ................................................ 13

III.    PLAINTIFF ALLEGES ACTIONABLE MISSTATEMENTS AND
        OMISSIONS UNDER SECTION 10(b) ............................................................. 15

IV.     PLAINTIFF ADEQUATELY PLEADS SCIENTER ....................................... 21

V.      PLAINTIFF ADEQUATELY PLEADS LOSS CAUSATION ......................... 24

VI.     The Complaint Sufficiently Alleges Reliance ................................................... 26

VII.    DAMAGES ARE NOT RIPE FOR DETERMINATION AT THIS POINT .................. 27

VIII.   DEFENDANTS' STATUTE OF LIMITATIONS ARGUMENTS ARE
        WRONG ............................................................................................................ 31

        A.      Section 10(b) Claims Relate Back to the Original Complaints ........................... 31

        B.      Even if the 10(b) Claims Do Not Relate Back, Plaintiff Was Not on
                Inquiry Notice Until May 31, 2005 ......................................................... 34

        C.      Defendants Confuse Storm Warnings With Inquiry Notice ................................. 36

        D.      Questions Of Fact Concerning Inquiry Notice Cannot Be Resolved On A
                Motion To Dismiss .................................................................................. 37

IX.     PLAINTIFF ADEQUATELY ALLEGES CONTROL PERSON
        LIABILITY ....................................................................................................... 38

      A.     To the Extent that Culpable Participation Is An  Element Of A Section 20 Claim, it Does Not Equate with Scienter ............................................................... 38

      B.     Plaintiff Has Adequately Pled Its Section 20 Claims........................................... 40

X.     PLAINTIFF ALLEGES VIABLE ICA CLAIMS ........................................................... 42

CONCLUSION ................................................................................................................................. 45

# TABLE OF AUTHORITIES

## CASES

*Affiliated Ute Citizens of Utah v. U.S.,*
  406 U.S. 128 (1972)............................................................27

*Ainbinder v. Kelleher*, No. 92 Civ. 7315 (SS),
  1997 WL 420279 (S.D.N.Y. July 25, 1997) ............................34

*Allstate Ins. Co. v. Siegel,*
  312 F. Supp. 2d 260 (D. Conn. 2004)....................................28

*BRS Assocs., L.P. v. Dansker,*
  246 B.R. 755 (Bankr. S.D.N.Y. 2000)...................................33

*Blue Chip Stamps v. Manor Drugs Stores,*
  421 U.S. 723 (1975)............................................................21

*Castillo v. Dean Witter Discover & Co.*, No. 97 Civ. 1272 (RPP),
  1998 WL 342050 (S.D.N.Y. June 25, 1998) ......................20, 26

*Chris-Craft Indus., Inc. v. Piper Aircraft Corp.,*
  516 F.2d 172 (2d Cir. 1976)..................................................29

*Chosun Intern., Inc. v. Chrisha Creations, Ltd.,*
  413 F.3d 324 (2d Cir. 2005)..................................................18

*Clapsaddle v. Telscape Int'l,*
  50 F. Supp. 2d 1086 (D.N.M. 1998) ......................................21

*Clark v. Nevis Capital Mgmt., LLC*, No. 04 Civ. 2702 (RWS),
  2005 WL 488641 (S.D.N.Y. Mar. 2, 2005) ............................27

*Cohen v. Fund Asset Mgmt.,* No. 79 Civ. 2512 (RWS),
  1980 WL 1488 (S.D.N.Y. Mar. 31, 1980)...............................44

*Compudyne Corp. v. Shane*, No. 05 Civ. 4300 (RWS),
  2006 WL 2792206 (S.D.N.Y. Sept. 29, 2006)..........................41

*Conley v. Gibson,*
  355 U.S. 41 (1957)................................................................7

*Dietrich v. Bauer,*
  126 F. Supp. 2d 759 (S.D.N.Y. 2001).....................................41

*Dura Pharm., Inc. v. Broudo,*
  544 U.S. 336 (2003)...........................................................2, 24

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*,
    343 F.3d 189 (2d Cir. 2003)............................................................................25

*Fallick v. Nationwide Mut. Ins. Co.*,
    162 F.3d 410 (6th Cir. 1998) ..............................................................12, 13

*Flag Telecom Holding, Ltd. Sec. Litg.*,
    352 F. Supp. 2d 429 (S.D.N.Y. 2005)........................................................45

*Fogarazzo v. Lehman Bros.*,
    341 F. Supp. 2d 274 (S.D.N.Y. 2004)........................................................19

*Fox. v. Reich & Tang, Inc.*,
    692 F. 2d 250 (2d Cir. 1982)......................................................................44

*Ganino v. Citizens Utils. Co.*,
    228 F.3d 154 (2d Cir. 2000).......................................................................15

*Gen. Tel. Co. of the Southwest v. Falcon*,
    457 U.S. 147 (1982)...................................................................................10

*Global Network Commun. Inc. v. City of New York*,
    458 F.3d 150 (2d Cir. 2006).......................................................................36

*Gollust v. Mendell*,
    501 U.S. 115 (1991)...................................................................................15

*Goodman v. Lukens Steel Co.*,
    777 F.2d 113 (3d Cir. 1985), *aff'd on other grounds,* 482 U.S. 656 (1987) .................9

*Greenes v. Empire Blue Cross Blue Shield*, No. 92 Civ. 8599 (KMW),
    1996 WL 640873 (S.D.N.Y. Nov. 4, 1996)...............................................28

*Hevesi v. Citigroup, Inc.*,
    366 F. 3d 70 (2d Cir. 2004)...............................................................10, 12

*Hicks v. Morgan Stanley & Co.*, No. 01 Civ. 10071 (HB),
    2003 WL 21672085 (S.D.N.Y. July 16, 2003) ...............................11, 14, 45

*In re AllianceBernstein Mutual Fund Excessive Fee Litig.*, No. 04 Civ. 4885 (SWK),
    2005 WL 2677753 (S.D.N.Y. Oct. 19, 2005) .......................................12, 45

*In re Alstom, SA*, No. 03 Civ. 6595 (VM),
    2006 WL 2819588 (S.D.N.Y. Sept. 29, 2006)............................................42

*In re Alstom SA*,
    406 F. Supp. 2d 402 (S.D.N.Y. 2005).........................................................34

*In re Am. Cont'l Corp./Lincoln Sav. & Loan Sec. Litig.,*
  794 F. Supp. 1424, 1461 (D. Ariz. 1992) ....................................................14

*In re AOL Time Warner, Inc. Sec. and "ERISA" Litig.,*
  381 F. Supp. 2d 192, 235 (S.D.N.Y. 2004).................................................39

*In re Bausch & Lomb, Inc. Sec. Litig.,*
  941 F. Supp. 1352 (W.D.N.Y. 1996) ..........................................................33

*In re Campbell Soup Co. Sec. Litig.,*
  145 F. Supp. 2d 574 (D.N.J. 2001) ............................................................32

*In re CINAR Corp. Sec. Litig.,*
  186 F. Supp. 2d 279 (E.D.N.Y. 2002) ........................................................43

*In re Complete Mgmt. Inc. Sec. Litig.,*
  153 F. Supp. 2d 314 (S.D.N.Y. 2001)...........................................8, 31, 35, 36

*In re Drexel Burnham Lambert Group,*
  960 F.2d 285 (2d Cir. 1992).......................................................................14

*In re Dreyfus Aggressive Growth Mut. Fund Litig.,* No. 98 Civ. 4318 (HB),
  2000 WL 1357509 (S.D.N.Y. Sept. 20, 2000)...............................12, 13, 45

*In re Enron Corp. Sec. Litig.,*
  206 F.R.D. 427, 451 (S.D. Tex. 2002)..................................................12, 15

*In re Evergreen Mut. Funds Fee Litig.,*
  423 F. Supp. 2d 249 (S.D.N.Y. 2006)........................................................46

*In re First Cent. Finan. Corp.,*
  269 B.R. 502 (Bankr. E.D.N.Y. 2001)........................................................28

*In re Global Crossing, Ltd. Sec. Litig.,* No. 02 Civ. 910,
  2006 WL 1628469 (S.D.N.Y. June 13, 2006) ............................................42

*In re Indep. Energy Holdings PLC Sec. Litig.,*
  154 F. Supp. 2d 741 (S.D.N.Y. 2001)....................................................8, 19

*In re Initial Pub. Offering  Sec. Litig.,*
  214 F.R.D. 117 (S.D.N.Y. 2002) ...............................................................10

*In re Initial Pub. Offering Sec. Litig.,*
  241 F. Supp. 2d 281 (S.D.N.Y. 2003)........................................25, 28, 39, 40, 41, 43

*In re Integrated Res. Real Estate Ltd. P'ship. Sec. Litig.,*
  815 F. Supp. 620 (S.D.N.Y. 1993) ............................................................38

*In re Luxottica Group, Spa, Inc. Sec. Litig.*,
   293 F. Supp. 2d 224 (E.D.N.Y. 2003) ........................................................36

*In re Marsh & McLennan Cos., Inc., Sec. Litig.*, No. 04 Civ. 8144 (SWK),
   2006 WL 2057194 (S.D.N.Y. July 20, 2006) ...........................................36

*In re Merrill Lynch & Co., Inc.*,
   273 F. Supp. 2d 351 (2d Cir. 2001) .........................................................37

*In re MobileMedia Sec. Litig.*,
   28 F. Supp. 2d 901 (D.N.J. 1998) ......................................................11, 15

*In re Morgan Stanley & Van Kampen Mut. Fund. Sec. Litig.*, No. 03 8208 (RO),
   2006 WL 1008138 (S.D.N.Y. Apr. 18, 2006)........................................20, 26

*In re Motel 6 Sec. Litig.*,
   161 F. Supp. 2d 227 (S.D.N.Y. 2001)..................................................28, 29

*In re Mutual Funds Inv. Litig.*,
   384 F. Supp. 2d 845 (D. Md. 2005)..........................2, 21, 23, 25, 44, 45

*In re Nat'l Mortgage Equity Corp. Mortgage Pool Certificates Sec. Litig.*,
   636 F. Supp. 1138 (C.D. Cal. 1986) ......................................................30

*In re Nortel Networks Corp. Sec. Litig.*,
   238 F. Supp. 2d 613 (S.D.N.Y. 2003)......................................................7

*In re Northwestern Corp. Sec. Litig.*,
   299 F. Supp. 2d 997 (D.S.D. 2003) ......................................................11

*In re NYSE Specialists Sec. Litig.*,
   405 F. Supp. 2d 281 (S.D.N.Y. 2005)..................................................25, 30

*In re Oppenheimer Funds Fees Litig.*,
   419 F. Supp. 2d 593 (S.D.N.Y. 2006)...................................................46

*In re Oxford Health Plans Inc. Sec. Litig.*,
   187 F.R.D. 133 (S.D.N.Y. 1999) .........................................................41

*In re Philip Servs. Corp. Sec. Litig.*,
   383 F. Supp. 2d 463 (S.D.N.Y. 2004)...................................................43

*In re Prudential Sec. Inc. Ltd. P'ships Litig.*,
   163 F.R.D. 200 (S.D.N.Y. 1995) .....................................................10, 13

*In re Salomon Analyst Metromedia Litig.*,
   236 F.R.D. 208 (S.D.N.Y. 2006) ........................................................27

*In re Salomon Smith Barney Mut. Fund Fees Litig.,*
    441 F. Supp. 2d 579 (S.D.N.Y. 2006)...............................................................12, 21, 26

*In re Sumitomo Copper Litig.,*
    182 F.R.D. 85 (S.D.N.Y. 1998) ...............................................................................14

*In re Vivendi Universal, S.A.,*
    381 F. Supp. 2d 158 (S.D.N.Y. 2003).....................................................................39

*In re WorldCom, Inc. Sec. Litig.,*
    294 F. Supp. 2d 392 (S.D.N.Y. 2003).....................................................................39

*In re Worldcom Inc. Sec. Litig.,*
    308 F. Supp. 2d 214 (S.D.N.Y. 2003).....................................................................34

*In re WorldCom Inc. Sec. Litig.,* No. 02 Civ. 3288 (DLC),
    2005 WL 638268 (S.D.N.Y. March 21, 2005) .........................................................39

*Kamen v. Kemper Fin. Serv.,*
    506 U.S. 90 (1992)..................................................................................................44

*Kramer v. Time Warner, Inc.,*
    937 F.2d 767 (2d Cir. 2001).....................................................................................36

*Krinsk v. Fund Asset Mgmt,*
    654 F. Supp. 1227 (S.D.N.Y. 1987).........................................................................44

*LC Capital Partners LP v. Frontier Ins. Group, Inc.,*
    318 F.3d 148 (2d Cir. 2003)...............................................................................37, 38

*Lentell v. Merrill Lynch & Co., Inc.,*
    396 F. 3d 161 (2d Cir. 2005)....................................................................................26

*Levitt v. Bear Stearns & Co., Inc.,*
    340 F.3d 94 (2d Cir. 2003).......................................................................................38

*Litton Indus. Inc. v. Lehman Bros. Kuhn Loeb Inc.,*
    734 F. Supp. 1071 (1990) .........................................................................................30

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992)....................................................................................................8

*Marbury Mgmt., Inc. v. Kohn,*
    629 F.2d 705 (2d Cir. 1980).....................................................................................40

*Maywalt v. Parker & Parsley Petroleum Co.,*
    147 F.R.D. 51 (S.D.N.Y. 1993) ...............................................................................14

*McMahan & Co. v. Wherehouse Entm't., Inc.*,
　900 F.2d 576 (2d Cir. 1990)..................................................................19

*Meyer v. Oppenheimer Mgmt. Corp.*,
　895 F.2d 861 (2d Cir. 1990)..................................................................44

*Mishkin v. Ageloff*, No. 97 Civ. 2690 (LAP),
　1998 WL 651065 (S.D.N.Y. Sept. 23, 1998)..................................................8

*Migdal v. Rowe-Price Fleming Int'l*,
　248 F.3d 321 (4th Cir. 2001) ...........................................................43, 44

*Newman v. Warnaco Group, Inc.*,
　335 F.3d 187 (2d Cir. 2003)..................................................................36

*Novak v. Kasaks*,
　216 F.3d 300 (2d Cir. 2000)...................................................................8

*Nat'l Fid. Ins. Co. v. City of New York*,
　263 F. Supp. 2d 619 (E.D.N.Y. 2003) .......................................................30

*Nat'l W. Life Ins. Co. v. Merrill Lynch, Pierce, Fenner & Smith*,
　89 Fed. Appx. 287 (2d Cir. 2005)............................................................38

*Olkey v. Hyperion 1999 Term Trust, Inc.*,
　98 F.3d 2 (2d Cir. 1996)....................................................................19

*Papilsky v. Berndt*,
　466 F.2d 251 (2d Cir. 1972).................................................................45

*Payton v. County of Kane*,
　308 F.3d 673 (7th Cir. 2002), *cert. denied*, 540 U.S. 812 (2003)............................10

*Pfeiffer v. Bjurman, Barry & Assocs.*, No. 03 Civ. 9741 (DLC),
　2004 WL 1903075 (S.D.N.Y Aug. 26, 2004).........................................43, 44

*Rothman v. Gregor*,
　220 F.3d 81 (2d Cir. 2000).............................................................24, 36, 37

*Rudinger v. Insurance Data Processing, Inc.*,
　778 F. Supp. 1334 (E.D. Pa. 1991) ..........................................................29

*SEC v. First Jersey Sec., Inc.*,
　101 F.3d 1450 (2d Cir. 1996)............................................................30, 40

*SEC v. Jones*, No. 05 Civ. 7044 (RCC),
　2006 WL 1084276 (S.D.N.Y. April 25, 2006) ....................................7, 24, 25

*SEC v. PIMCO Fund Mgmt. Advisors, LLC,*
    341 F. Supp. 2d 454 (S.D.N.Y. 2004)...................................................................18

*SEC v. Seaboard Corp.,*
    677 F.2d 1301 (9th Cir. 1982) ...........................................................................33

*Segen ex rel. KFx Inc. v. Westcliff Capital Mgmt.,*
    299 F. Supp. 2d 262 (S.D.N.Y. 2004)..................................................................30

*Siegel v. Converters Transp., Inc.,*
    714 F.2d 213 (2d Cir.1983).................................................................................32

*Siemers v. Wells Fargo & Co., Inc.,* No. 05 Civ. 04518 (WHA)
    2006 WL 2355411 (N.D. Cal. Aug. 14, 2006) ................................19, 26, 45

*Singer v. Olympia Brewing Co.,*
    878 F. 2d 596 (2d Cir. 1989)...............................................................................30

*Sommer v. PMEC Assocs and Co. Ltd.,* No. 88 Civ. 2537 (JFK)
    1993 WL 361660 (S.D.N.Y. Sept. 14, 1993)........................................................33

*Sosna v. Iowa,*
    419 U.S. 393 (1975)...............................................................................................9

*Stevelman v. Alias Research, Inc.,*
    174 F.3d 79 (2d Cir. 1999)............................................................................33, 34

*Sperber Adams Assocs. v. Jem Mgmt Assocs.,* No. 90 Civ. 7450 (JSM)
    1992 WL 28444 (S.D.N.Y. February 7, 1992) ..........................................33

*Suez Equity Investors, L.P. v. Toronto-Dominion Bank,*
    250 F.3d 87 (2d Cir. 2001)............................................................................39, 40

*Swierkiewicz v. Sorema N.A.,*
    534 U.S. 506 (2002)..............................................................................................43

*Tracinda Corp. v. DaimlerChrysler AG,*
    197 F. Supp. 2d 42 (D. Del. 2002)......................................................................29

*Wagner v. Barrick Gold Corp.,* No. 03 Civ. 4302 (RMB)
    2006 WL 268753 (S.D.N.Y. May 9, 2006) ................................................15

*Weinberg v. Atlas Air Worldwide Holdings, Inc. Sec. Litig.,*
    216 F.R.D. 248 (S.D.N.Y. 2003) .......................................................................10

*Xpedior Creditor Trust, Inc. v. Credit Suisse First Boston (USA), Inc.,*
    341 F. Supp. 2d 258 (S.D.N.Y. 2004)..................................................................28

*Yoder v. Orthomolecular Nutrition Inst., Inc.*,
   751 F.2d 555 (2d Cir. 1985)..................................................................................8

## STATUTES

15 U.S.C. § 80a-35(b).............................................................................................48

Fed. R. Civ. P. 8(a)(2)............................................................................................45

Fed. R. Civ. P. 9(b) ...................................................................................................9

Fed. R. Civ. P. 12(b)(6)............................................................................................8

Fed.R.Civ.P. 15(c) .................................................................................................35

## MISCELLANEOUS

*Alba Conte & Herbert B. Newbert*,
   *Newberg on Class Actions* (4th Ed. 2002)...........................................................9

## PRELIMINARY STATEMENT

Defendants Smith Barney and Global Markets have admitted the central allegations of this action. Likewise, a complaint filed by the United States Securities and Exchange Commission ("SEC") against Defendants Thomas Jones and Lewis Daidone concerning similar allegations as this case, alleging violations of the Investment Advisors Act of 1940 ("IAA"), was recently sustained by Judge Richard C. Casey of this Court. The only open issue is the amount of damages suffered by the Class – and that is not an issue ripe for determination on this motion.

Lead Plaintiff Operating Local 649 Annuity Trust Fund ("Plaintiff" or "Local 649") alleges that Defendants[1] have defrauded the Class[2] by inflating the profits of Citigroup entities at the Class' expense. As described in detail below, Defendants concocted a scheme involving a phony sub-transfer agent to divert tens of millions of dollars from Class members' accounts to Citigroup coffers. As part of the scheme, Defendant Daidone signed numerous Funds' prospectuses that failed to disclose the true nature of the transfer agent arrangement in violation of the Securities and Exchange Act of 1934 (the "Exchange Act"). Finally, Smith Barney, the investment advisor to the affected funds, which breached its fiduciary duties to the Class, violated the Investment Company Act of 1940 ("ICA").

Defendants claim that Plaintiff has failed to plead loss causation, but their arguments simply do not bear scrutiny. In this regard, Defendants try to force Plaintiff's loss causation allegations into the traditional mold of artificially inflated stock followed by a corrective disclosure causing market

---

[1] Defendants are Smith Barney Asset Management, LLC ("Smith Barney" or the "Adviser"), Citigroup Global Markets, Inc. ("Global Markets"), Thomas Jones ("Jones"), and Lewis Daidone ("Daidone").
[2] The "Class" is all persons and entities who purchased, redeemed, or held shares of the Smith Barney family of mutual funds ("Funds") between September 11, 2000 and May 31, 2005 (the "Class Period").

817v1                                    1

losses. However, there are other ways of pleading loss causation that have been approved by courts, even after *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336 (2003). The seminal mutual fund litigation, *In re Mutual Funds Inv. Litig.*, 384 F. Supp. 2d 845, 864-65 (D. Md. 2005) – involving hundreds of filed actions relating to market timing and late trading – is the perfect example. The *Mutual Funds* court found that plaintiffs sufficiently alleged loss causation where they alleged, like Plaintiff here, that money was drained out of their accounts throughout the class period, and where there was no stock drop after a corrective disclosure. *Id.*

Defendants also claim that the settlement with the SEC bars the recovery of damages here. On the contrary, the SEC order explicitly left open the possibility of a "related investor action". Further, it is well-settled that damages cannot be determined as a matter of law on a motion to dismiss because they involve inherently factual issues.

Finally, Defendants argue that investors were on notice of the fraud as of December 1, 2003. They are wrong. The December 1, 2003 announcement said nothing about the nature of the fraud at issue: namely, an elaborate scheme with a phony transfer agent middleman setup to kickback tens of millions of dollars to Citigroup coffers. The December 1, 2003 announcement only discussed the promise of the transfer agent to guarantee certain investment banking work by Citigroup.

For these reasons, and the others set forth herein, Defendants' motion to dismiss should be denied in its entirety.

## STATEMENT OF FACTS

This action concerns the scheme of two Citigroup-related investment advisers and two executives, to place their interests in making a profit ahead of the interests of the mutual funds they

served.[3] Defendant Smith Barney, which serves as investment adviser to the Funds, recommended that the Funds contract with an affiliate of the Adviser, which would perform limited transfer agent services and sub-contract with the Funds' existing transfer agent. The existing transfer agent would perform almost all of the same services it had performed previously, but at deeply discounted rates, permitting the affiliate of the Adviser to keep most of the discount for itself and make a high profit for performing limited work. This self-interested transaction permitted the Adviser and its affiliates to pocket over $90 million from the transfer agent function at the direct expense of the Funds and their shareholders. ¶1.[4]

By way of background, the Adviser and the asset management operations of Defendant Global Markets are part of Citigroup Asset Management ("CAM"), a business unit of Citigroup Inc. ("Citigroup") that provides investment advisory and management services to Citigroup-sponsored funds. In 1997, CAM began a formal study of the transfer agent ("TA") function in anticipation of the expiration of the existing contract between the Funds and First Data Investor Services Group ("First Data"). Michael Yellin ("Yellin"), who reported to CAM's chief executive officer, Defendant Jones, supervised the TA review project and personally handled negotiations with First Data. Yellin briefed Defendant Jones on the status of the TA review project on a regular basis. ¶2.

Accordingly, Defendant Jones knew that First Data had been making high profit margins on the TA contract. Instead of using CAM's strong bargaining position to benefit the Funds in the negotiation of a new TA contract, Defendant Jones sought to keep for CAM much of the profit First

---

[3] Investment advisers have a fiduciary duty to act in the best interests of the mutual funds they advise and their shareholders. Mutual funds pay fees for various services provided to the mutual funds, including transfer agent services. Among its duties, an adviser may advise fund boards about the retention of a particular transfer agent and how much to pay for the transfer agent's services.

Data had been making. In fact, CAM did not pursue or even inform the Funds' boards of an offer by First Data to continue to perform all transfer agent services for the Funds at a $25 million annual fee discount. ¶3.

CAM ultimately recommended that the Funds replace First Data with an affiliate of the Adviser. The recommended structure called for the affiliated TA (which is now Citicorp Trust Bank, fsb ("CTB"))[5] to contract directly with the Funds as named TA, perform limited functions and subcontract with First Data for the bulk of the transfer agent service (CAM referred to First Data as "sub-TA"). Except for a small customer service function that the affiliated TA would undertake, First Data would continue to perform the very same work it performed under the expiring contract, but at a significant discount from the fees it had been charging the Funds — a discount that would start at 33.5% and increase to as much as 60% over the five-year term of the contract. CAM kept the majority of the savings it had negotiated with First Data for itself, offering the Funds only a limited fee reduction through the institution of fee caps. ¶4.

CAM should have first offered these substantial savings to the Funds and their shareholders, as an opportunity belonging to the Funds and their shareholders. At the very least, CAM should have disclosed this opportunity for significant savings to the Funds. CAM did neither. Instead, CAM took the opportunity for itself and then presented a recommendation to the Funds' boards in a memo that gave them the impression that the affiliated TA proposal was the best deal that the Funds could have achieved, which was not true. In presenting its recommendation to the Funds' boards, CAM

---

[4] All paragraph cites, unless otherwise noted are to Plaintiff's consolidated and amended complaint (the "Amended Complaint") filed June 1, 2006.

5 The Adviser initially anticipated that it would serve as the TA, but subsequently determined that CTB should serve as the TA.

did not disclose that First Data was to perform almost all of the same work as before, with the affiliated TA taking most of the profit for doing limited work.  ¶5.

CAM's recommendation also contained numerous material misrepresentations about the particulars of the arrangement, including the extent of the benefits CAM would realize.  Among other things, CAM failed to disclose that it had entered into a side letter agreement (the "Side Letter") with First Data, pursuant to which First Data committed to providing millions of dollars of investment banking and asset management revenue to Citigroup entities (the "Revenue Guarantee"). ¶6.

Defendant Daidone had an instrumental role in the scheme.  Defendant Daidone was Senior Vice President and a director of the Adviser and a managing director of Global Markets during the Class Period.  Defendant Daidone negotiated the very contracts that constituted the aforementioned self-dealing.  Further, Defendant Daidone helped prepare and present the materially misleading materials to the Funds' boards.  Defendant Daidone also signed many prospectuses containing materially misleading statements and omissions about the Adviser, as discussed below.  ¶7.[6]

Defendant Jones also had an integral role in the scheme.  Defendant Jones was the CEO of CAM.  Defendant Jones made the decision to recommend the affiliated TA proposal to the Funds' boards, fully aware that the affiliated TA would make a huge windfall at the expense of Funds' shareholders through the proposal.  Defendant Jones also performed only a cursory review of the memorandum to the Funds' boards and took no meaningful steps to insure that the Funds' boards were informed of the material terms of the TA proposal.  ¶8.

---

6 Defendants point out that Daidone left his CAM job in 2003.  Def. Mem. at 12.  This is irrelevant because Daidone still had a pivotal role in the scheme and signed numerous misleading filings during the Class Period.

During the Class Period, CTB received an estimated $100 million in net fees for operating a small customer service call center and performing limited additional oversight and quality control functions at a total cost of approximately $10.5 million. Thus, Citigroup entities appropriated at least $90 million which rightfully belonged to shareholders of the Funds. ¶9.[7]

Significantly, Defendants Adviser and Global Markets have now admitted to the entire scheme of self-dealing described above. On May 31, 2005, the Adviser and Global Markets entered into an agreement with the SEC, agreeing to pay a total of over $200 million in fines and disgorgement penalties as a result of their violation of the IAA. Similarly, on March 23, 2006, Adviser Executive Vice President Yellin entered into an agreement with the SEC, paying a fine of $50,000 as a result of his IAA violations, and also admitting to the facts as alleged herein. Further, Yellin has specifically implicated Defendants Daidone and Jones in the scheme, as has the SEC in an action alleging IAA violations against Daidone and Jones, which, as mentioned above, is currently pending in this Court. ¶10.[8]

In prospectuses throughout the Class Period (many of which were signed by Defendant Daidone), the issuers (who were the Funds themselves or families of Funds) made misstatements and omissions concerning the sub-TA arrangement that were misleading because they misrepresented the nature of the transfer agent arrangement and failed to disclose the elaborate scheme to inflate profits which was the motivating force behind creating the sub-TA.

_____

[7] The amount appropriated by the Citigroup entities is only an estimate; Plaintiff cannot pinpoint the precise damages without the benefit of discovery.

[8] Judge Casey denied Daidone and Jones' motion to dismiss in an opinion (the "Casey Decision") dated April 25, 2006 in the case, which is denominated *SEC v. Jones*, No. 05 Civ. 7044 (RCC), 2006 WL 1084276 (S.D.N.Y. April 25, 2006).

For example, the prospectuses made the transfer agent structure look like an innocent business circumstance: "The transfer agent has entered into sub-transfer agency and services agreements with PFPC Global Fund Services and PFS Shareholder Services to serve as the portfolios' sub-transfer agents." ¶114. In reality, the sub-transfer agent structure was created solely to siphon money back to Citigroup.

These statements, along with the participation of all the Defendants in the manipulative scheme at issue, violated Sections 10(b) and 20(a) of the Exchange Act. The Adviser also violated the ICA by breaching its fiduciary duties to Funds shareholders by virtue of the scheme alleged herein. ¶11.

As a result of the scheme, Plaintiff and members of the Class suffered harm. Among other things, Defendants' actions drained money out of the Funds throughout the Class Period, increased the Funds' expenses, and distorted the net asset value ("NAV") of the Funds. ¶12.

## ARGUMENT

I.  **DEFENDANTS CANNOT OVERCOME**
    **THEIR HEAVY BURDEN ON THIS MOTION**

    A.  **The Applicable Legal Standards**

    The standards for review on a motion to dismiss under Fed. R. Civ. P. 12(b)(6) are well-settled. In assessing a complaint, the Court must accept the facts alleged as true and draw all reasonable inferences in the plaintiffs' favor. A court may not dismiss a complaint under Rule 12(b)(6) "unless it appears beyond doubt that the plaintiff can prove *no set of facts* in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-6 (1957) (emphasis added). *See also In re Nortel Networks Corp. Sec. Litig.*, 238 F. Supp. 2d 613, 621 (S.D.N.Y. 2003) ("The issue is not whether a plaintiff is likely to prevail ultimately, 'but whether the claimant is entitled to offer evidence to support the claims'") (quoting *Gant v. Wallingford Bd. of Educ.*, 69 F.3d

817v1                                        7

669, 673 (2d Cir. 1995)).

Moreover, in ruling on a 12(b)(6) motion to dismiss, the Court is to consider the complaint's

allegations in the aggregate, not piecemeal. *See, e.g., In re Complete Mgmt. Inc. Sec. Litig.*, 153 F.

Supp. 2d 314, 333 (S.D.N.Y. 2001) ("the inferences raised in the aggregate are sufficient, at this pre-

factual investigation stage, to sustain the complaint"); *Yoder v. Orthomolecular Nutrition Inst., Inc.*,

751 F.2d 555, 562 (2d Cir. 1985) ("[i]t is elementary that, on a motion to dismiss, a complaint must

be read as a whole"); *Mishkin v. Ageloff*, No. 97 Civ. 2690 LAP, 1998 WL 651065, at *26 (S.D.N.Y.

Sept. 23, 1998) (noting that the Court "must read the Complaint as a whole, not in the piecemeal

fashion that [defendant] adopts).[9]

## II.    PLAINTIFF HAS STANDING TO ASSERT ALL CLAIMS

Plaintiff meets the requirements of Article III standing by alleging actual injury from its

purchase and/or holding of funds harmed by Defendants' conduct, the causal connection between

Defendants' conduct and the injury, and that its injury will be redressed by the requested relief. *See*

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (the standing requirement of Article III

consists of an injury to plaintiff, a causal connection between the conduct complained of and the

injury, and that the injury is redressable by a favorable decision from the court). Accordingly,

Plaintiff meets Constitutional standing requirements.

Disregarding the relatively early procedural stages of the litigation, Defendants attempt to re-

cast class certification issues as pertaining to "standing," and assert that claims involving mutual

---

[9] Moreover, neither the Private Securities Litigation Reform Act of 1995 ("PSLRA") nor Fed. R.
Civ. P. 9(b) imposes upon plaintiffs a pleading burden that is impossible to satisfy pre-discovery.
*Novak v. Kasaks*, 216 F.3d 300, 313 (2d Cir. 2000). *See also In re Indep. Energy Holdings PLC*
*Sec. Litig.*, 154 F. Supp. 2d 741, 747-8 (S.D.N.Y. 2001) ("While Congress has acted to
discourage the filing of strike suits, nothing Congress has done suggests that the general
principles of a motion to dismiss are no longer applicable in securities fraud cases.").

funds in which no named plaintiff invested must be dismissed now. Defendants' argument is contrary to law, and would serve no purpose other than to burden the Court with needless logistical and organizational complications.

### A.    Defendants' "Standing" Argument Is Premature Prior To A Motion For Class Certification

As an initial point, the Court stated in its April 17, 2006 Order that "[i]f, in fact, every Fund requires representation in the class leadership, the lead plaintiff may include additional named plaintiffs in this consolidated action." *Id.* at 8.

Once individual standing has been established, whether a plaintiff can represent a class of investors depends solely on whether the plaintiff meets the requirements of Rule 23. *See, e.g., Payton v. County of Kane*, 308 F.3d 673, 680 (7th Cir. 2002), *cert. denied*, 540 U.S. 812 (2003). As stated by the Supreme Court, in *Sosna v. Iowa*:

> A named plaintiff in a class action must show that the threat of injury in a case such as this is "real and immediate," not "conjectural" or "hypothetical." ... This conclusion does not automatically establish that appellant is entitled to litigate the interests of the class she seeks to represent, but it does shift the focus of examination from the elements of justiciability to the ability of the named representative to "fairly and adequately protect the interests of the class."

419 U.S. 393, 402-03 (1975) (citations omitted); *see Goodman v. Lukens Steel Co.*, 777 F.2d 113, 122 (3d Cir. 1985) ("[C]ontrary to the defendants' contentions, the issue here is one of compliance with the provisions of Rule 23, not one of Article III standing. Each of the named plaintiffs has presented claims of injury to himself and has alleged facts which present a case or controversy under the Constitution"), *aff'd on other grounds*, 482 U.S. 656 (1987).[10]

---

[10] The seminal class action treatise, *Alba Conte & Herbert B. Newbert, Newberg on Class Actions*, §2:1 at 51 (4th Ed. 2002), offers the following explanation of the relationship between standing and the Rule 23: "Once the class representative has established her or

The Rule 23 inquiry, which defendants advance under the guise of a "standing" argument, involves an examination of various factual issues and is not properly undertaken in a motion to dismiss, but which may become relevant as to class certification. *Gen. Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147, 160 (1982) ("[T]he class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.") Citations and internal quotation marks omitted.

The Second Circuit has weighed in on this issue. In *Hevesi v. Citigroup, Inc.*, 366 F. 3d 70, 82-84 (2d Cir. 2004), after the class was certified, defendants appealed, arguing that the appeals court "adopt a rule that a class may not be certified where a lead plaintiff does not have standing to bring every available claim." *Id.* at 82. The Second Circuit held:

> This *per se* rule has little to recommend it. Nothing in the PSLRA indicates that district courts must choose a lead plaintiff with standing to sue on every available cause of action. Rather, because the PSLRA mandates that courts must choose a party who has, among other things, the largest financial stake in the outcome of the case, it is inevitable that, in some cases, the lead plaintiff will not have standing to sue on every claim. *See In re Initial Pub. Offering Sec. Litig.*, 214 F.R.D. 117, 123 (S.D.N.Y.2002) ("[T]he fact that the lead plaintiff is to be selected in accordance with objective criteria that have nothing to do with the nature of the claims ⋯ strongly suggests the need for named plaintiffs in addition to any lead plaintiff."). In those cases, just as a class representative can establish the requisite typicality under Rule 23 if the defendants "committed the same wrongful acts in the same manner against all members of the class," *In re Prudential Sec. Inc. Ltd. P'ships Litig.*, 163 F.R.D. 200, 208 (S.D.N.Y.1995) (internal quotation marks omitted), so too can lead plaintiffs.

*Id.* at 82-83. *See also Weinberg v. Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 216 F.R.D. 248, 253 (S.D.N.Y. 2003) ("It is well established that the Lead Plaintiffs claims do not have to be identical to the other class members' claims and in fact, the idea that there should [be] multiple

---

his standing to bring an action, issues of class representation involve the analysis of Rule 23 procedural requirements rather than the constitutional case or controversy requirement

Lead Plaintiffs with standing to sue on all possible causes of action has been rejected by the Southern District") (citations omitted); *In re Northwestern Corp. Sec. Litig.*, 299 F. Supp. 2d 997, 1007 (D.S.D. 2003) ("[I]t is not a requirement that a lead plaintiff under the PSLRA suffer losses on each type of security that may be at issue in the class action"); *In re MobileMedia Sec. Litig.*, 28 F. Supp. 2d 901 (D.N.J. 1998) ("[c]oncerns over whether stock purchasers should represent notes purchasers are better addressed at the time of class certification").

*Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410 (6th Cir. 1998), is also instructive. In *Fallick*, an employee alleged that Nationwide breached its fiduciary duties with respect to the ERISA benefit plan of which he was a member and other ERISA plans of which he was not a member. The district court dismissed the claims as to all ERISA plans other than Fallick's plan on standing grounds. *Id.* at 411-12. The Sixth Circuit reversed, holding that the district court's reasoning was "fundamentally flawed" because it confused the issues of Article III standing for a plaintiff with the Rule 23 issues applicable to his ability to sue on behalf of a class. *Id.* at 422. The court concluded that "once a potential ERISA class representative establishes his individual standing to sue his own ERISA-governed plan, there is no additional constitutional standing requirement related to his suitability to represent the putative class of members of other plans to which he does not belong." *Id.* at 424.

Significantly, the Sixth Circuit also found that an individual in one ERISA plan can represent a class of participants in numerous plans *other* than his own. *Fallick*, 162 F.3d at 412. Similar authority exists with respect to mutual funds. *See, e.g., Hicks v. Morgan Stanley & Co.*, No. 01 Civ.

---

mandate of Article III."

10071 (HB), 2003 WL 21672085, at *3 (S.D.N.Y. July 16, 2003); *In re Dreyfus Aggressive Growth Mut. Fund Litig.*, No. 98 Civ. 4318 (HB), 2000 WL 1357509, at *5 (S.D.N.Y. Sept. 20, 2000).[11]

**B.      Practical Considerations In This Litigation
          Warrant Maintaining The Present Named Plaintiff Structure**

The current representative structure not only satisfies the legal requirements described above, but makes practical sense. Plaintiff could have added scores of additional named plaintiffs when amending its complaint, and could still do so if deemed necessary. However, Plaintiff believed that adding additional plaintiffs for each fund at this stage might create substantial litigation inefficiencies in the management of this litigation and would certainly increase expenses. *Cf. In re Enron Corp. Sec. Litig.*, 206 F.R.D. 427, 451 (S.D. Tex. 2002) ("[W]hile the parties have set out some well-founded and persuasive arguments for separate representation and classes or subclasses at class certification, as well as for trial, the court does not find that such divisions are essential now").[12]  Defendants' gun jumping on class certification issues invites chaos and makes no practical sense. While plaintiffs do not necessarily disagree that appointing additional class representatives in the future may be desirable, at this stage, it is simply impractical and unnecessary to require each fund within an affected family to have a separate class representative.

Finally, Defendants' "standing" argument is not a basis for dismissal of any claims with prejudice at this stage of the litigation. More sensible procedural mechanisms – short of dismissal –

---

[11] Defendants' citations (*In re Salomon Smith Barney Mut. Fund Fees Litig.*, 441 F. Supp. 2d at 607, *In re AllianceBernstein Mutual Fund Excessive Fee Litig.*, No. 04 Civ. 4885 (SWK), 2005 WL 2677753, at *10 (S.D.N.Y. October 19, 2005) and *Forsythe v. Sun Life Fin. Inc.*, 417 F. Supp. 2d 100, 117-19 (D. Mass. 2006)), fly in the face of Second Circuit law (*cf. Hevesi*, 366 F. 3d at 82).

exist for dealing with any issues regarding Plaintiff's representation of the putative Class. For instance, the Court may (i) allow Plaintiff to proceed and add named plaintiffs at the class certification stage, after the close of discovery, or at another point prior to trial, if the Court deems such a step necessary, which Plaintiff believes makes the most sense; or (ii) order plaintiffs to provide a list of additional plaintiffs, who can be added, and the Court can deem the complaints amended *nunc pro tunc* in this regard, if necessary.

**C.    At The Class Certification Stage, Plaintiff Will Re Able To Show<br>That It Is Able To Represent All The Proposed Members Of The Class**

As shown above, given that Plaintiff has standing to assert its claims, the appropriate time to address their representation of purchasers and holders of all injured plaintiffs is on a motion for class certification, which is not currently before the Court. Because defendants have prematurely addressed this issue, Plaintiff briefly responds and reserves the right to make a more complete presentation at the class certification stage.

**1.    Plaintiff May Represent Other Members Of The Class<br>Since Its Claims Are Based On The Same Legal Theories<br>And Arise From The Same Scheme And Course Of Conduct**

Ample case law confirms that Plaintiff may represent purchasers and/or holders of mutual funds in the same mutual fund complex, including other than those it purchased or held. This is so because of the substantially identical nature of the sub-TA scheme at issue and its effect on all of the affected funds. *See Dreyfus*, 2000 WL 1357509 at *5 (certifying named plaintiffs who invested in the Dreyfus Aggressive Growth Fund to represent purchasers in the Dreyfus Premier Aggressive Growth Fund).[13]

---

[12] Although Plaintiff did add as named plaintiffs two plaintiffs who filed initial complaints, Jeffrey Weber and Jeanne Chilton. *See* ¶¶15, 16.

[13] *Cf. In re Prudential Sec. Inc.. Ltd. P'shp Litig.*, 163 F.R.D. 200, 208 (S.D.N.Y. 1995) (class representatives were not required to have invested in all limited partnerships at issue, where

Plaintiff's allegations are "top-down" in that the Complaint alleges that Class members were harmed by the wrongful course of conduct by Defendants.  Defendants, on the other hand, seek to re-cast the allegations as being "bottom-up," focusing on the Funds themselves, and claiming that Plaintiff must have standing with respect to each fund.

Because of the dominant role played by the fund advisor, Smith Barney, by proving its claims, Plaintiff will substantially prove the claims of all other Class members.  *See, e.g., In re Sumitomo Copper Litig.*, 182 F.R.D. 85, 94-95 (S.D.N.Y. 1998) ("Rule 23(a)(3) is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability.") (quoting *In re Drexel Burnham Lambert Group*, 960 F.2d 285, 290 (2d Cir. 1992)).  Here, the Funds were all advised (within each fund family) by Smith Barney.  Also, the Funds made similar misrepresentations and omissions in their respective public filings, and the Plaintiff's claims are based on the same legal theories as those of other Class members.[14]

Similarly, many cases hold that a named plaintiff may represent persons who purchased securities that are different from the securities purchased by the plaintiff, when purchasers of both types of securities were subjected to a common course of deceptive conduct.  *See, e.g., In re Am. Cont'l Corp./Lincoln Sav. & Loan Sec. Litig.*, 794 F. Supp. 1424, 1461 (D. Ariz. 1992)

---

complaint alleged a "uniform course of improper conduct and standardized sales approach applied by defendants"); *Maywalt v. Parker & Parsley Petroleum Co.*, 147 F.R.D. 51, 56-57 (S.D.N.Y. 1993) (plaintiffs who invested in three limited partnerships could represent persons who had invested in two other limited partnerships, where the complaint alleged that investors in all five limited partnerships were victims of a single pattern of fraud by defendants).

[14]  The fact that a plaintiff may have purchased shares pursuant to one prospectus issued during a class period does not mean that he may not properly represent a class member who purchased shares pursuant to another similar prospectus during the class period.  *See Hicks*, 2003 WL 21672085 at *3.

("[Defendant] argues that the plaintiff class has no standing under Sections 10(b), 11, and 12, because there is not a named plaintiff representing each of the different securities at issue. The court concludes that plaintiffs need not name a representative of the class for each subgroup of securities, where common issues predominate as to all securities"). *See also, e.g., MobileMedia, supra* at 11.

Accordingly, Plaintiff's interest in the litigation and allegations against Smith Barney and Global Markets is sufficient to allow Plaintiff to bring claims on behalf of all Funds shareholders injured by their conduct. *Cf. Gollust v. Mendell*, 501 U.S. 115, 125-27 (1991) (noting that even a modest or indirect financial interest in the litigation is sufficient for a plaintiff to pursue claims). *See also Enron*, 206 F.R.D. at 451 (refusing to permit separate lead plaintiff for Securities Act claims arising from separate public offerings, on grounds that "taken to its logical extreme [the] argument that each group of notes issued pursuant to a different Registration Statement and Prospectus requires a different class or subclass and separate Lead Plaintiff would fracture this litigation into hundreds of classes or subclasses and obstruct any efficient and controlled progress").

## III.   PLAINTIFF ALLEGES ACTIONABLE MISSTATEMENTS AND OMISSIONS UNDER SECTION 10(b)

To state a claim under Section 10(b), a plaintiff "must plead that the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff." *Wagner v. Barrick Gold Corp.*, No. 03 Civ. 4302 (RMB), 2006 WL 268753, at *2 (S.D.N.Y. May 9, 2006) (citing *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000)).

Plaintiff has plead detailed facts demonstrating that the public statements at issue were misleading because they misrepresented and/or failed to disclose the true nature of the transfer agent arrangement. For example, on September 11, 2000, the first day of the Class Period, the Smith

Barney Allocation Series ("SBAS"), a sub-family of the Funds, issued an amended prospectus,

originally issued on May 26, 2000, which contained the following statement:

> Transfer agent and shareholder servicing agent
>
> Citi Fiduciary Trust Company [successor to CTB] serves as the portfolios' transfer agent and shareholder servicing agent (the "transfer agent"). The transfer agent has entered into sub-transfer agency and services agreements with PFPC Global Fund Services and PFS Shareholder Services to serve as the portfolios' sub-transfer agents (the "sub-transfer agents"). The sub-transfer agents will perform certain shareholder record keeping and accounting services.
>
> *     *     *
>
> Transfer Agent.  Citi Fiduciary Trust Company, located at 388 Greenwich Street, New York, New York 10013, serves as the fund's transfer and dividend-paying agent.  Under the transfer agency agreement, the transfer agent maintains the shareholder account records for the fund, handles certain communications between shareholders and the fund, distributes dividends and distributions payable by the fund and produces statements with respect to account activity for the fund and its shareholders.  For these services, the transfer agent receives fees from the fund computed on the basis of the number of shareholder accounts that the transfer agent maintains for the fund during the month and is reimbursed for out-of-pocket expenses.
>
> Sub-Transfer Agent.  PFPC Global Fund Services, located at P.O. Box 9699, Providence, RI 02940-9699, serves as one of the fund's sub-transfer agents. Under the transfer agency agreement, the sub-transfer agent maintains the shareholder account records for the fund, handles certain communications between shareholders and the fund and distributes dividends and distributions payable by the fund.  For these services, the sub-transfer agent receives a monthly fee computed on the basis of the number of shareholder accounts it maintains for the fund during the month, and is reimbursed for out-of-pocket expenses.
>
> The fund has also engaged the services of PFS Shareholder Services as a sub-transfer agent for PFS Accounts.  This sub-transfer agent is located at 3100 Breckinridge Blvd., Bldg. 200, Duluth, GA 30099.

¶114.

These statements were materially false and misleading and omitted material information

when made because:  (1) they suggest that this was a garden-variety arrangement between a TA and a

sub-TA and failed to disclose that the sub-TA structure was nothing more than an elaborate scheme

to inflate Citigroup profits at the expense of Funds' shareholders; (2) they omitted to disclose the scheme complained of herein whereby PFPC was doing the bulk of the work, while the middleman transfer agent (Citi Fiduciary Trust), a Citibank-related entity, received tens of millions of dollars that rightfully belonged to Funds' shareholders for doing next to nothing; (3) they failed to disclose the misleading process which led to the appointment of the sub-TA; and (4) they failed to disclose the Revenue Guarantee, a material part of the scheme, which provided Citgroup entities with millions of dollars of investment banking profits. ¶115. This prospectus listed Defendant Daidone as Senior Vice President and Treasurer of the SBAS. The amended prospectus contained no signatures but Defendant Daidone signed the original May 26, 2000 prospectus. *Id.*[15]

Defendants misconstrue Plaintiff's allegations, claiming that Plaintiff does not allege that the description of "services provided by CTB and First Data" was misleading. Def. Mem. at 28. On the contrary, Plaintiff alleges that Defendants "suggest[ed] that this was a garden-variety arrangement between a TA and a sub-TA and failed to disclose that the sub-TA structure was nothing more than an elaborate scheme to inflate Citigroup profits at the expense of Funds' shareholders." ¶115. Similarly, Defendants misconstrue Plaintiff's allegations about misstatements following the purported partial disclosure. For instance, Defendants state that Plaintiff "does not allege that these descriptions of the Revenue Guarantee, or the steps taken by CAM to investigate possible problems, were inaccurate." Def. Mem. at 29. In fact, Plaintiff alleges the statement was *still* misleading and why:

> This statement disclosed some of the facts surrounding the Revenue Guarantee. It was still misleading, however, because it failed to disclose the scheme behind the

---

[15] Since there are 105 different Funds and many Funds, as well as sub-families, issue numerous prospectuses per year, Plaintiff gave a sample in its Amended Complaint of the scores of Defendants' Class Period misleading statements, which, for each fund, are substantially similar if not verbatim. *See* ¶¶23, 116 n.7.

sub-TA, *e.g.*, that CTB was paid tens of millions of dollars (that rightfully belonged to shareholders) for doing little work while, moreover, PFPC did the bulk of the work at radically reduced rates. That information was not made public until the SEC instituted proceedings against the Adviser and Global Markets on May 31, 2005.

¶126.[16]

This Court has found companies liable for making misstatements when selling mutual funds.

For example, in *SEC v. PIMCO Fund Mgmt. Advisors, LLC*, 341 F. Supp. 2d 454, 464 (S.D.N.Y. 2004), the SEC alleged that:

> The PIMCO Funds made several disclosures concerning market timing that could be characterized as either material misrepresentations or material omissions. The disclosures could constitute misrepresentations because they gave the clear impression to investors that the PIMCO Funds were hostile to market timing activities and intended for use by long-term investors at the same time that PIMCO was negotiating and maintaining a market timing relationship with Canary.

The Court agreed, holding that:

> Because the disclosures here could easily be read by a factfinder to strictly limit market timing, and because the Canary arrangement was so out of keeping with the PIMCO Funds' policy against market timing, dismissal of the SEC's misrepresentation claim is inappropriate at this stage of the proceedings.

*Id.*

Defendants claim that the statements in the prospectuses were literally "true" because they "accurately" described the sub-transfer agent arrangement and the amount of TA fees. This argument is simply ridiculous. The prospectuses portrayed the sub-TA arrangement as an innocent and/or garden-variety business circumstance when, in reality, it was – from its inception – nothing more than a vehicle to siphon off money to Citigroup entities. ¶115.

---

[16] Finally, Defendants' claim that, although Citistreet Funds used Smith Barney Asset Management as its asset manager, it never used CTB as TA for any of its funds, is a fact issue not relevant at this juncture. *See Chosun Intern., Inc. v. Chrisha Creations, Ltd.*, 413 F.3d 324, 329-330 (2d Cir. 2005).

The Second Circuit, and this Court, have found such literally "true" statements misleading. *See McMahan & Co. v. Wherehouse Entm't., Inc.,* 900 F.2d 576, 579 (2d Cir.1990) ("statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors. For that reason, the disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers"); *Fogarazzo v. Lehman Bros.,* 341 F. Supp. 2d 274, 294 (S.D.N.Y. 2004) (technically accurate statement can be actionable when material omissions render the statement a "half-truth"); *Indep. Energy Holdings,* 154 F. Supp. 2d at 754 ("[T]he central issue is not whether the…statements…were literally true, but whether [the] representations …would have misled a reasonable investor…   A prospectus will violate federal securities laws if it does not disclose material objective factual matters…") (citing *Olkey v. Hyperion 1999 Term Trust, Inc.,* 98 F.3d 2, 5 (2d Cir. 1996)).

The recent case of *Siemers v. Wells Fargo & Co., Inc.,* No. 05 Civ. 04518 (WHA), 2006 WL 2355411, at *12 (N.D. Cal. Aug. 14, 2006) is particularly instructive. In *Wells Fargo,* the plaintiffs alleged the defendants violated Section 10(b) by making misstatements concerning investment adviser fees, which were inflated due to a kickback scheme. *Id.* The defendants in that case, like Defendants here, claimed their statements were not misleading since the total amount of the fees were disclosed. *Id* at 18. The Court disagreed:

> Plaintiff is not, however, alleging a failure to disclose the overall amount of all fees. Instead, he claims that defendants deceived him into thinking the fees were for worthwhile investment advice or something else of value to shareholders when, in fact, these fees were merely a cover for funneling kickbacks to broker-dealers.

*Id.* That is *precisely* what happened here: Class members were deceived into thinking that the transfer agent fees taken from their accounts were for legitimate business purposes rather than a "cover for funneling kickbacks" to other Citigroup entities.

Defendants also argue that the misstatements were immaterial because they concerned mere "details of transfer agent services." Def. Mem. at 32. This argument is completely disingenuous. Plaintiff does not complain of being unaware of the nitty-gritty details of transfer agents and their responsibilities. Rather, Plaintiff complains of being mislead into believing that the transfer agent setup was a legitimate and honest one – not a complicated scheme to kickback money to Citigroup.

Defendants' citations on this point are unavailing because they all concern situations where disclosing total fees to the public neutralized any allegations of fraud. In *In re Morgan Stanley & Van Kampen Mut. Fund. Sec. Litig.*, No. 03 Civ. 8208 (RO), 2006 WL 1008138, at *9 (S.D.N.Y. Apr. 18, 2006), the Court held that defendants' statements concerning mutual fund fees were not misleading because total fees were disclosed. However, in this case, disclosing total fees would *not* have cured the fraud. Here, the nature of the fraud was not in the excessive nature of the *fees* but in the fraudulent nature of the fee *structure*, *i.e.*, the phony transfer agent middleman put in place to divert money to Citigroup. *Castillo v. Dean Witter Discover & Co.*, No. 97 Civ.1272 (RPP), 1998 WL 342050, at *5 (S.D.N.Y. June 25, 1998) also found it significant that the "total amount" of fees were disclosed. *See also In re Salomon Smith Barney Mut. Fund Fees Litig.*, 441 F. Supp. 2d at 590 (S.D.N.Y. 2006) (rejecting plaintiff's theory where total fees were disclosed).

Defendants also claim that holders (as opposed to purchasers and sellers) cannot assert Section 10(b) violations. Defendants are wrong. Courts have allowed holders of mutual funds to assert such claims. In *Mutual Funds*, 384 F. Supp. 2d at 854, Judge Motz rejected the very argument proffered by Defendants here:

817v1                                         20

I question whether *Blue Chip Stamps v. Manor Drugs Stores,* 421 U.S. 723 (1975) bars suits under Rule 10b-5 by persons who held (but did not purchase or sell) mutual fund shares during a relevant class period when profits were being siphoned off from the funds by market timers and late traders. In my view, to so hold might, as is too often done, elevate rule over principle. A court-made rule that is created in one context to implement a fundamental precept should not be mechanically applied in a new context without asking the threshold question whether the same principled considerations that gave rise to the rule dictate a different rule under different circumstances. Here, the prudential consideration that led the Supreme Court to adopt (in my view wisely) the *Blue Chip Stamps* rule-the risk of vexatious, manufactured litigation-does not exist because holder plaintiffs by definition held mutual fund shares during the period that the value of the shares was diluted by late trades and market timing. Their claims are not based upon an inherently speculative inquiry into their subjective state of mind but upon the concrete fact of their continued share ownership.

*Id.*

*Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 737-38, 753-55 (1975), which Defendants cite, only held that a private right of action under §10(b) is not available to one who neither purchased nor sold a security, but claims he *would have purchased* but for an overly pessimistic prospectus. *Blue Chip Stamps*, 421 U.S. at 726, 743. "None of the plaintiffs in Blue Chip actually purchased any of the stock. Thus, the plaintiffs were complaining about a transaction that never occurred; no securities or compensation ever changed hands." *Clapsaddle v. Telscape Int'l*, 50 F. Supp. 2d 1086, 1089 (D.N.M. 1998). Further, unlike in *Blue Chip Stamps*, or most other securities cases, Plaintiff's injuries were incurred primarily when the Defendants drained money out of their accounts through the transfer agent scheme − not when the plaintiffs purchased or sold funds.

## IV.    PLAINTIFF ADEQUATELY PLEADS SCIENTER

Defendants concede scienter for the corporate defendants. Def. Mem. at 38. As to Jones and Daidone, this Court recently held − in a case based on the *exact same allegations* as here, that they acted with scienter in aiding and abetting IAA violations:

The Complaint alleges that Jones made CAM's transfer agent arrangement a priority (Complaint ¶¶ 26, 28), that he wanted to capture the profit that First Data had been

enjoying at CAM's expense (*id.* ¶ 28), that he instructed the executive vice president to continue negotiations with First Data after April 2, 1998 (*id.* ¶ 46), and that he approved the ultimate CAM-affiliate arrangement and the allegedly misrepresenting board materials with the understanding that doing so would guarantee CAM $8 million in annual revenue from First Data (*id.* ¶¶ 54, 61, 94). Further, the Complaint alleges that he did so in disregard of his fiduciary responsibilities to the Funds and their shareholders. (*Id.* 61.) The Court finds that the existence of a securities law violation by Citigroup and CAM has been established. (May 31, 2005 Cease and Desist Order.) With respect to the scienter requirement, the SEC claims that Jones knew that First Data was making large profits as CAM's transfer agent (Complaint ¶ 26), that First Data was willing to commit to providing a certain level of business to CAM's then-parent Travelers (*id.* ¶ 54), and that he "understood" that the true economics of the TA arrangement ultimately presented to the Funds' boards would not be disclosed (*id.* ¶ 58). Without addressing the question of whether Jones owed the Funds a fiduciary duty, the Court finds these claims, which still must be proven to the satisfaction of a jury, adequately allege Jones' knowledge of the underlying violation.

*Jones*, 2006 WL 1084276, at *7. These allegations concerning Jones are also alleged here. *See*

¶¶51, 53, 63, 76, 99-101, 102, 105.

Daidone was also found to have acted with scienter:

Plaintiffs allege Daidone aided and abetted CAM's fraud by not disclosing to the Funds' boards the true nature of the agreed upon transfer agent arrangement. In conformity with Rule 9(b), the Complaint alleges that Daidone led the Funds' boards to believe that the transfer agent arrangement involving the CAM-affiliate and First Data was in the Funds' best interests, when in reality it was supported by Defendants because it would result in profits to CAM and other Citigroup entities. (Complaint ¶ 96.) It identifies Daidone as the lead author of the board materials and the presentation given at the board meetings. (*Id.* ¶¶ 6, 68, 73-74, 96-97.) It also clearly identifies the dates on which Daidone made his presentations and distributed the board materials. (*Id.* ¶ 96.) Finally, it adequately explains why the board materials and Daidione's presentation were fraudulent. For example, it alleges that Daidone spun the facts to make it appear the Funds were getting the best transfer agent deal available (*id.* ¶¶ 6, 75, 78-9, 81, 83, 86, 88, 93, 95); that he did not disclose the existence of the revenue guarantee from First Data that would benefit Citigroup entities (*id.* ¶ 7, 80, 97); and that he did not explain that the CAM-affiliate transfer agent would, in reality, be doing very little transfer agent work (*id.* ¶¶ 76-77, 90, 97). Accordingly, the Court finds Daidone's objection that the circumstances surrounding his participation in the alleged fraud have not be plead with sufficient specificity unavailing....

Here, the Complaint alleges that Daidone knew that First Data had been making substantial profits from its role as CAM's transfer agent, which CAM intended to

enjoy itself. (Complaint ¶¶ 3, 31.) The SEC claims Daidone was a member of CAM's transfer agent team, was privy to Deloitte's concerns about the CAM-affiliate proposal, understood CAM's desire to press ahead with the CAM-affiliate and First Data deal and the negotiations leading to the ultimate arrangement, including First Data's revenue guarantee. (*Id.* ¶¶ 29, 50, 63, 65.) Further, Daidone allegedly instructed the Deloitte representative charged with preparing the first draft of the board materials to describe the arrangement in a way that would be attractive to the Funds' boards without clearly identifying the profit that CAM would enjoy. (*Id.* ¶¶ 70-71, 75.) Finally, the SEC claims Daidone was well aware of the revenue guarantee, as he signed the document himself (*id.* ¶ 65), but never disclosed its existence to the boards in the materials he prepared or the presentations he made ( *id.* ¶ 97). Accordingly, the Court finds that the Complaint presents a sufficient factual basis to support its allegations of scienter against Daidone.

*Id.*, 2006 WL 1084276, at *8-9. These allegations concerning Daidone are, like those for Jones, contained in the Amended Complaint. *See* ¶¶38, 51, 77, 91-96, 99-101, 102, 105, 109.[17]

Thus, Defendants' scienter is clear because they committed deceptive acts in furtherance of the sub-TA scheme – indeed, they have *admitted* their role in the scheme in the SEC settlement. ¶¶7-10.[18] *Compare Mutual Funds*, 384 F. Supp. 2d at 865 (scienter plead against Bear Stearns and Bank of America by virtue of their deceptive acts, "the very commission of which reflect guilty knowledge.")

Defendants raise a host of groundless arguments on scienter. First, they claim Plaintiff has not alleged motive or concrete gain (Def. Mem. at 11). Plaintiff does not have to – motive is *one* way of pleading scienter in this Circuit,[19] and Plaintiff has plead *voluminous* allegations

---

[17] Further, the *Jones* Court weighed the allegations of IAA violations against Daidone under the heightened pleading requirements of Rule 9(b). *See id.*, 2006 WL 1084276, at *8.

[18] Defendants Jones and Daidone, the chief architects of the scheme, were senior members of the Adviser and Markets. ¶¶7, 8.

[19] "To state a claim for securities fraud, the PSLRA requires that plaintiffs "state with particularity [the] facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). In order to satisfy this requirement, "a complaint may (1) allege facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness, or (2) allege facts to show that defendants had both motive and opportunity to

demonstrating conscious misbehavior. Second, Defendants argue that Plaintiff is simply basing scienter on Jones and Daidone "position in the corporate hierarchy". Def. Mem. at 40 (citing *In re Dynex Capital Inc. Sec. Litig.,* 2006 WL 314524, at \*8-9 (S.D.N.Y. 2006)). Nothing could be farther from the truth. As argued above, Plaintiff predicates Daidone and Jones' scienter on extensive facts implicating them in deceptive acts. Third, Defendants ignore the fact that Daidone's signing of *numerous* misleading public filings was *one* of *many* scienter allegations. Thus, Defendants' statement that "signing of documents *alone*" (Def. Mem. at 41) (emphasis added) does not support a strong inference of scienter, is irrelevant.

## V.     PLAINTIFF ADEQUATELY PLEADS LOSS CAUSATION

Plaintiff has adequately plead loss causation in its Complaint. *See* ¶¶136-138. Defendants incorrectly interpret "loss causation" as requiring a specific false statement or omission that causes price inflation until the truth is revealed and the price inflation disappears. As the Supreme Court recently reiterated, loss causation requires *only* that plaintiffs plead a causal connection between the misrepresentation or omission and the economic loss suffered. *Dura,* 544 U.S. at 347. *See also Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.,* 343 F.3d 189, 197 (2d Cir. 2003) ("Loss causation simply is the causal link between the alleged misconduct and the economic harm suffered by the plaintiff"). Further, "[s]o long as Plaintiffs allege a coherent scheme to defraud the accounts directly for their losses, loss causation has been adequately pled." *In re NYSE Specialists Sec. Litig.,* 405 F. Supp. 2d 281, 315 (S.D.N.Y. 2005) (citing *In re Initial Pub. Offering Sec. Litig.,* 241 F. Supp. 2d 281, 375 (S.D.N.Y. 2003)). *NYSE* is particularly relevant here because this Court

---

commit fraud." *Rombach v. Chang,* 355 F.3d 164, 176 (2d Cir. 2004) (citing *Rothman v. Gregor,* 220 F.3d 81, 90 (2d Cir. 2000)).

held there that loss causation allegations had to be judged in the context of the "unique facts" of each case. *NYSE*, 405 F. Supp. 2d at 315.

In this case, loss causation is simple: Defendants' omissions regarding the TA scheme caused Plaintiff to purchase shares of one of the Funds, and over the period Plaintiff held its investments, tens of millions of dollars were drained out of Class members' accounts and diverted to Citigroup entities. ¶136. Plaintiff also received less return on the investments than it would have absent the fraudulent scheme. ¶138. There can be no serious question, at least on a pleading motion, that Defendants' scheme caused Plaintiff harm.

In the seminal *Mutual Funds* decision, Judge Motz sustained similar loss causation allegations:

> According to [plaintiffs'] allegations, they were harmed as a result of defendants' fraudulent scheme and course of business which diminished the value of their shares by, *inter alia*, siphoning off from the funds profits to which shareholders were entitled,... [t]hese allegations of loss are clear and direct, and while the theory upon which they are based must ultimately be put to the test of evidentiary proof, it is at least facially plausible.

*Id*.

Again, *Wells Fargo* is also instructive. *Wells Fargo* held that fees diverted to broker-dealers that were drained out investors' accounts were causally related to misstatements concerning fees:

> The secret paybacks to the broker-dealers came out of the mutual funds' assets. Without any such secret diversion, the net assets of the fund would have been greater, thus saving investors money and increasing their net return on their investment.

*Wells Fargo*, 2006 WL 2355411, at *18. Similarly, here, the phony transfer agent scheme drained tens of millions of dollars out of class members' accounts during the Class Period. There is no need for a market reaction to the "curative disclosure" when money is drained out throughout the Class Period – as opposed to a garden-variety loss causation scenario where money is lost when the stock falls. Accordingly, Defendants' citation to *Lentell v. Merrill Lynch*

817v1                                    25

& Co., Inc., 396 F. 3d 161, 175 (2d Cir. 2005) is inapposite (finding loss causation allegations insufficient where there was no allegation of adverse market reaction). Defendants are trying to fit all loss causation theories into the same mold when different fact patterns result in different outcomes.

As discussed *supra* at 20-21, Defendants' other authorities here are also inapplicable. In *Morgan Stanley*, 2006 WL 1008138, at *9, this Court rejected loss causation arguments where plaintiffs alleged *only* inflated NAV prices. In contrast, Plaintiff here alleges *not* merely distorted NAV prices, but that the TA scheme drained tens of millions of dollars out of Class members' accounts during the Class Period. Similarly, in *Castillo*, 1998 WL 342050, at *5, the plaintiffs alleged that total fees to brokers were too large. Here, Plaintiff alleges not that the fees were too large but that they were part of an elaborate scheme to kickback money to Citigroup entities. That is far different. Likewise, in *Salomon Smith Barney*, 441 F. Supp. 2d at 590, this Court found it dispositive that total fees were disclosed. Further, in *Salomon Smith Barney*, the plaintiffs alleged that they paid excessive fees. Here, Plaintiff alleges that the whole transfer agent setup was a sham. In other words, disclosing total fees did not reveal the truth to Plaintiff.

## VI.    THE COMPLAINT SUFFICIENTLY ALLEGES RELIANCE

This case principally concerns omissions by Defendants concerning the transfer agent scheme. *See generally* ¶¶114-124. Where a securities fraud action centers on omissions, reliance is presumed. *See Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128, 153-54 (1972).

Plaintiff alleges, *inter alia*, that the affected public filings failed to disclose that the whole sub-TA arrangement was a setup to siphon money back to Citigroup entities, not an innocent example of a transfer agent farming out work to another. *See generally* ¶¶1-13. The sub-TA scheme drained tens of millions of dollars from Class members' accounts during the Class Period. ¶136.

817v1                                         26

Inasmuch as Plaintiff for common sense reasons cannot affirmatively demonstrate reliance on an omission, reliance on omissions is presumed. *Affiliated Ute*, 406 U.S. 128 at 153-54 (in cases "involving *primarily* a failure to disclose, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision.")

Defendants' reading of *Affiliated Ute* is simply wrong. *Affiliated Ute* holds that "positive proof of reliance is not a prerequisite" when the case involves "*primarily* a failure to disclose," not *exclusively* a failure to disclose. 406 U.S. at 153 (emphasis added). Defendants' other citations are misplaced. *See Clark v. Nevis Capital Mgmt., LLC*, 04 Civ. 2702 (RWS), 2005 WL 488641, at *18 (S.D.N.Y. Mar. 2, 2005) (did not even concern *Affiliated Ute* presumption); *In re Salomon Analyst Metromedia Litig.*, 236 F.R.D. 208, 219-20 (S.D.N.Y. 2006) (case did not primarily involve omissions).

## VII.   DAMAGES ARE NOT RIPE FOR DETERMINATION AT THIS POINT

Plaintiff and the Class were damaged because Defendants, through their sub-TA scheme, drained tens of millions of dollars our of their mutual fund accounts. These monies were diverted, through a Citigroup-related sub-transfer agent, right back to Citigroup coffers. *See* ¶¶13, 136.

It is well settled that determinations of damages are premature on a motion to dismiss. This Court has also consistently held that damages are a fact question inappropriate for adjudication on a motion to dismiss. *See Xpedior Creditor Trust, Inc. v. Credit Suisse First Boston (USA), Inc.*, 341 F. Supp. 2d 258, 271-72 (S.D.N.Y. 2004) (holding that damage questions were "appropriately handled at summary judgment or trial, not on a motion to dismiss"); *Initial Pub. Offering,* 241 F. Supp. 2d at

351 n. 80 ("While such Plaintiffs may indeed be unable to *prove* damages, that is not an appropriate question at this stage") (emphasis added).[20]

*In re Motel 6 Sec. Litig.,* 161 F. Supp. 2d 227, 233-34 (S.D.N.Y. 2001) is also instructive. On a motion for summary judgment (*i.e.*, with a much lower burden than Defendants here), defendants made an argument similar to that of Defendants here. Plaintiffs alleged Section 10(b) violations against tippees who traded on inside information. *Id.* at 230. Defendants argued that plaintiffs' Exchange Act claims could not stand because they had disgorged all their profits. *Id.* at 233-34. Plaintiffs argued that their expert stated that all the profits had not, in fact, been disgorged. This Court held that:

> Since there exists a genuine issue of fact regarding the amount of damages Plaintiffs could obtain from Chammah were liability proven, Chammah's motion for summary judgment on Plaintiffs' claims for direct violations of §§ 10(b) and 14(e) and Rules 10b-5 and 14e-3 is hereby denied.

This is *a fortiori* true on this motion.

Accordingly, while Defendants are purportedly disgorging *some* monies to the Funds, like in *Motel 6*, it is an issue of fact for later resolution whether or not such disgorgement will make Plaintiff and the Class whole. This is particularly true because the monies disgorged under the SEC

---

[20] *Cf. Allstate Ins. Co. v. Siegel*, 312 F. Supp. 2d 260, 270 (D. Conn. 2004) (rejecting defendants' motion to dismiss on issue of damages, holding that "it is premature to decide *ex ante* that Allstate will not under any circumstances be able to present proof of its damages with the precision required by relevant case law"); *Greenes v. Empire Blue Cross Blue Shield*, No. 92 Civ. 8599 (KMW), 1996 WL 640873, at *3 (S.D.N.Y. Nov. 4, 1996) (denying defendants' motion to dismiss claim for punitive damages as "not yet ripe for decision"); *In re First Cent. Finan. Corp.*, 269 B.R. 502, 514 (Bankr. E.D.N.Y. 2001) ("Whether or not, at trial, the Trustee will be unable to establish the existence of any such damages, is a factual matter that cannot be determined on a motion to dismiss. The Court's inquiry on this motion is limited to determining whether the Trustee has pleaded claims which, if proved, would entitle him to relief").

settlement concerned different (ICA) claims for, more importantly, a different time period.[21]

Moreover, from the Defendants' brief, it appears to be their assertion that the fraudulent transfer

agent scheme only applied to Smith Barney "open funds", *a.k.a.* funds purchased directly from Smith

Barney. Def. Mem. at 4. While Smith Barney may currently have no "closed" or publicly traded

funds in its portfolio, as of December 1, 2005, Smith Barney sold its closed fund business to Legg

Mason; prior to December 1, 2005, Smith Barney had 34 closed-end funds traded on the NYSE and

the American Stock Exchange. Additionally, Defendants fail to acknowledge Smith Barney mutual

funds held in non-traditional sources like WRAP accounts (where money managers invest and

manage a group of investments consisting of stocks, bonds and cash funds for a set annual fee) and

as sub-accounts within Variable Annuities and Variable Life and Variable Universal Life Insurance

Policies. Therefore, discovery is necessary to examine the true number of funds affected by the

Defendants' fraud. It is also unclear whether the damage methodology utilized by the SEC was

sufficient.

Further, Plaintiff brought its case on behalf of all purchasers and sellers – not only those who

currently hold shares in the Funds, and it is unclear whether purchasers and sellers of Funds' shares

will be recompensed for their losses – as opposed to current holders. *See* ¶30. Finally, unlike the

SEC, Plaintiffs have also alleged lost opportunity damages.[22]

---

[21] The relevant time period in the SEC action was October 1, 1999 through September 30, 2004. *See* Ex. B to Rothermich Decl (SEC Order) at 15 para. 67. The Class Period here is September 11, 2000 through and including May 31, 2005.

[22] *See Chris-Craft Indus., Inc. v. Piper Aircraft Corp.*, 516 F. 2d 172, 188-192 (2d Cir. 1976) (lost opportunity damages sustained under Section 10(b)); *Tracinda Corp. v. DaimlerChrysler AG*, 197 F. Supp. 2d 42, 68 (D. Del. 2002) ("A plaintiff can maintain a claim under Section 10(b) of the Exchange Act based on 'lost opportunity' damages") (citation omitted); *Rudinger v. Insurance Data Processing, Inc.*, 778 F. Supp. 1334, 1340 (E.D. Pa. 1991) (recovery under Section 10(b) not limited to out-of-pocket loss because otherwise "securities laws could be

Defendants cite *Litton Indus. Inc. v. Lehman Bros. Kuhn Loeb Inc.*, 734 F. Supp. 1071, 1076 (1990), *rev'd on other grounds*, 967 F.2d 742, 745 (2d Cir. 1992) on this point. However, *Litton Indus.* actually supports Plaintiff's argument because the disgorgement issue in that case was decided on a motion for summary judgment, *i.e.*, the Second Circuit made a factual determination. That is precisely Plaintiff's point – the Court cannot determine at this point whether here the Class has been made whole by the SEC action.

Defendants also, strangely, cite to *NYSE Specialists*, 405 F. Supp. 2d 281 on their damage argument. Def. Mem. at 26. In *NYSE*, this Court rejected the precise argument made by Defendants here. In *NYSE*, defendants argued that the plaintiffs' case should be dismissed because damages were disgorged in an SEC proceeding. *Id.* at 308. The Court disagreed because, just as here, there was a "dispute...as to whether the sums paid by the Specialist Defendants pursuant to Settlement Orders are equivalent to the full value of the losses suffered by the Plaintiffs." *Id.* at 309.[23]

Defendants' arguments concerning lost opportunity damages are misplaced. Defendants argue that only the Funds, not investors, suffered lost opportunity damages. Def. Mem. at 37. Defendants' distinction is of no moment. Investors suffered loss caused by Defendants' scheme and

---

violated with impunity in any situation in which the violation does not cause out of pocket loss") (citing *Gould v. American-Hawaiian S.S. Co.*, 535 F.2d 761, 781 (3d Cir. 1976).

[23] Defendants also cite a whole slew of other cases, all of which beg the question at issue – whether or not Plaintiff and the Class will be made whole by the SEC action, which cannot be determined now as a matter of law. *See Singer v. Olympia Brewing Co.*, 878 F. 2d 596, 600 (2d Cir. 1989) (plaintiffs are not entitled to double recovery); *Segen ex rel. KFx Inc. v. Westcliff Capital Mgmt.*, 299 F. Supp. 2d 262, 273 n.11 (S.D.N.Y. 2004) (finding, on *summary judgment*, that plaintiff may not recover profits already disgorged); *SEC v. First Jersey Sec., Inc.*, 101 F. 3d 1450, 1475 (2d Cir. 1996) (defendants would be given credit for amounts already paid); *Ntl Fid. Ins. Co. v. City of New York*, 263 F. Supp. 2d 619, 636 (E.D.N.Y. 2003) (no fact issue of whether prior judgments made party whole); *In re Nat'l Mortgage Equity Corp. Mortgage Pool Certificates Sec. Litig.*, 636 F. Supp. 1138, 1146-52 (C.D. Cal. 1986) (full compensation not at issue).

such losses were not limited to money drained out of their accounts during the Class Period, but also to "lost opportunity" damages, *i.e.*, the loss of further gains if such drained funds were invested.

Finally, Defendants claim Plaintiff has not alleged any injury in October and November, 2004. On the contrary, Plaintiff alleges injury *throughout* the Class Period. ¶136. Further, a question as to what level of damages investors suffered at different times during the Class Period is a fact question unsuitable for determination at this point. *See supra* at 18 n.16.

## VIII.    DEFENDANTS' STATUTE OF LIMITATIONS ARGUMENTS ARE WRONG

### A.    Section 10(b) Claims Relate Back to the Original Complaints

"[T]he central inquiry is whether adequate notice of the matters raised in the amended pleading has been given to the opposing party within the statute of limitations 'by the general fact situation alleged in the original pleading.'" *Stevelman v. Alias Research, Inc.*, 174 F.3d 79, 86 (2d Cir. 1999). *See also Complete Mgmt.*, 153 F. Supp. 2d at 336 ("[T]he touchstone for this inquiry is whether the original pleading placed the opposing party on notice of the claim in the amended pleading.") With this in mind, Defendants' claim they were not on notice of Section 10(b) claims is completely disingenuous.

The first complaint, *Chilton v. Smith Barney Asset Management, Inc., et al.*, in these consolidated actions was filed on August 27, 2005. The *Chilton* complaint alleged violations of the ICA, as well as various related state law claims. Four more complaints followed. One of these complaints, filed on September 7, 2005 and denominated *Shropshire v. Smith Barney Asset Mgmt., et al.* (No. 05-7818), alleged Section 10(b) claims against Smith Barney and Global Markets. *All* of these complaints were based on the same central facts as the Amended Complaint: Defendants' scheme to inflate profits through a phony transfer agent middleman. Thus, Defendants were on notice of Section 10(b) claims since *at least* September 7, 2005.

This September 7, 2005 date is less than two years from December 1, 2003, the date when Defendants claim (wrongly) that Plaintiff was on inquiry notice. Accordingly, even accepting Defendants' December 1, 2003 announcement as putting investors on inquiry notice of the fraudulent scheme, Plaintiff's claims are timely.

Defendants argue that they were not on notice because the specific omissions and misstatements were not included in the *Shropshire* complaint. This is simply not the standard. Every specific alleged misstatement does not have to be included in an original pleading – only "the general fact situation". *Stevelman*, 174 F.3d at 86.

Further, in securities fraud class actions where "Plaintiffs' clarification and recasting of some of their claims upon further investigation is par for the course," defendants are not prejudiced if they are "on notice [of] the gravamen of Plaintiffs' case." *In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 602-03 (D.N.J. 2001); *see also Siegel v. Converters Transp., Inc.*, 714 F.2d 213, 216 (2d Cir. 1983) ("When a suit is filed in a federal court under the Rules, the defendant knows that the whole transaction described in it will be fully sifted, by amendment if need be.") Defendants know full well that initial complaints in securities class actions are typically amended and expanded upon. Finally, how Defendants could claim ignorance of 10(b) claims when *Shropshire* contained such allegations is a mystery.

Even assuming Defendants were not on notice of 10(b) claims since September 2005, the 10(b) claims relate back to the original complaints since they arise from the same acts. Decisions in this district have allowed amendments adding § 10(b) claims otherwise untimely to relate back. *See Sommer v. PMEC Assocs and Co. Ltd.,* No. 88 Civ. 2537 (JFK), 1993 WL 361660 at \*6 (S.D.N.Y. Sept. 14, 1993) ("the Court finds that the federal securities law claim [under § 10(b) of the Exchange Act] that Plaintiffs now seek to add to their complaint relates back to the date of the complaint's

original filing" pursuant to Fed.R.Civ.P. 15(c)); *Sperber Adams Assocs. v. Jem Mgmt Assocs.*, No. 90 Civ. 7450 (JSM), 1992 WL 28444 at *2 (S.D.N.Y. February 7, 1992) (holding, in case in which amended complaint adding a § 10(b) claim was filed on July 19, 1991 and more than three years after the sale at issue, that "[b]ecause the Section 10(b) claim against Muss arises from the same transaction or occurrence as the claim for common law fraud, it relates back to the filing of the original complaint"); *cf. BRS Assocs., L.P. v. Dansker*, 246 B.R. 755, 770 (Bankr. S.D.N.Y. 2000) (allegations of fraud in cross-claims provided sufficient notice to defendants to allow later RICO claims to relate back).

Defendants' reliance on *SEC v. Seaboard Corp.*, 677 F. 2d 1301, 1304-05 (9th Cir. 1982), is misplaced. First, *Seaboard* was decided on a motion for summary judgment. Second, the Ninth Circuit held that certain claims did not relate back because defendants did not have "notice of the new causes of action." *Id.* at 1314. Here, because of the 10(b) allegations contained in *Shropshire*, Defendants' claim that they were not on notice of 10(b) claims is simply ridiculous.

Defendants also argue that Plaintiff's claims cannot relate back because they concern a different class period. Yet, Plaintiff alleges a *smaller* class period than that alleged in the initial complaints.[24] Thus, Defendants cannot claim with a straight face that they are *surprised* by anything in the Amended Complaint. Defendants' citations on this point are unavailing for the same reason. *See In re Bausch & Lomb, Inc. Sec. Litig.*, 941 F. Supp. 1352, 1365-66 (W.D.N.Y. 1996) (court refused to extend class period *backwards* three months); *In re Worldcom Inc. Sec. Litig.*, 308 F. Supp. 2d 214, 231-32 (S.D.N.Y. 2003) (plaintiffs could not relate back their claims to a bond offering *earlier* than one in the initial complaint); *Ainbinder v. Kelleher*, No. 92 Civ. 7315 (SS),

1997 WL 420279, at *9 (S.D.N.Y. July 25, 1997) (where plaintiff alleged unauthorized trading in his

account but contained no allegations after July, 1998, allegations concerning such trading in

November 1988 did not relate back because defendant was not on notice of trades in such period).

**B.      Even if the 10(b) Claims Do Not Relate Back,**
         **Plaintiff Was Not on Inquiry Notice Until May 31, 2005**

Defendants contend that inquiry notice existed by December 1, 2003 – the date on which

Citigroup announced that the Revenue Guarantee had not been disclosed to the Funds' boards. ¶125.

However, at that time, Defendants said nothing about the phony transfer agent scheme *whatsoever*.

*See id*.  Nor did Defendants even *hint* at the fact that there was self-dealing between Citigroup

entities which netted Defendants over $100 million at the Class' expense.  An investor reading this

announcement would reasonably have thought that it simply concerned CAM's "sub-

contract[ing]…transfer agency services to a third party…with this sub-contractor providing…certain

benefits to CAM or its affiliates."  ¶125.  Investors could not reasonably have known from the

existence of the Revenue Guarantee that Defendants had set up a phony transfer agent middleman to

siphon profits away from investors for the benefit of Citigroup entities.  There were also subsequent

announcements on March 1, 2004 and thereafter, but these did not disclose any new facts, they

simply said the SEC and the U.S. Attorney were investigating this situation.  ¶126.

In order to put investors on notice of a fraud, or be considered a "storm warning" as a matter

of law, such a warning "must contradict the allegedly false or misleading statement." *Complete*

*Mgmt.*, 153 F. Supp. 2d at 337-38 (concluding announcements were not storm warnings because they

did not contradict allegedly false statements).  Here, as in *Complete Management*, Defendants fail to

---

24 The initial complaints alleged a class period of August 26, 2000 through and including August
26, 2005.  Plaintiff's Amended Complaint alleges a Class Period of September 11, 2000 through
and including May 31, 2005.

explain how an announcement concerning the Revenue Guarantee contradicts the misleading statements concerning the transfer agent setup.

In *Newman v. Warnaco Group, Inc.*, 335 F. 3d 187 (2d Cir. 2003), the Second Circuit determined that the mere fact that the company twice restated its financial results "by identical amounts," in two separate amended 10-Ks did not put plaintiffs on notice of fraud where the first revised 10-K did not indicate any "flaws ... or any other fraud." *Warnaco*, 335 F.3d at 193, 194. Based on Defendants' "seemingly benign" explanations for the revisions in the first revised 10-K, the Second Circuit concluded there was a lack of "any indication" of a probability of the perpetration of fraud and, therefore, inquiry notice was not triggered. *Id.*; *see Complete Mgmt.*, 153 F. Supp. 2d at 337 (concluding that negative statements about collectibility of receivables tempered with reassurances did not constitute storm warnings).

Similarly here, at the time of the purported "storm warnings," Defendants provided a benign explanation for the fraudulent scheme lurking in the background:  a simple revenue guarantee to a Citigroup entity.

Defendants also bring up a host of news articles and other media sources not included in the Amended Complaint.  But, in considering a motion to dismiss, the "court must limit itself to facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference." *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 775 (2d Cir. 2001).[25]  The 43 "media sources" appended to the Rothermich Declaration were neither attached to the Amended

[25] *See also In re Marsh & McLennan Cos., Inc., Sec. Litig.*, No. 04 Civ. 8144 (SWK), 2006 WL 2057194, at *8 (S.D.N.Y. July 20, 2006); *Global Network Commun. Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006); *In re Luxottica Group, Spa, Inc. Sec. Litig.*, 293 F. Supp. 2d 224, 230 (E.D.N.Y. 2003).

Complaint nor incorporated by reference in the Amended Complaint. Thus, the Court should not take judicial notice of them.[26]

### C.    Defendants Confuse Storm Warnings With Inquiry Notice

Defendants' argument that Plaintiff was on inquiry notice as of December 1, 2003 is also wrong because it is based on the erroneous assumption that a plaintiff merely has two years from the time that inquiry notice is triggered. Yet, in *Rothman v. Gregor*, 220 F.3d 81 (2d Cir. 2000), the Second Circuit explained that inquiry notice "triggers an investor's duty to exercise reasonable diligence," but the limitations period does not begin to run until "the investor, in the exercise of reasonable diligence, should have discovered the facts underlying the alleged fraud." *Rothman*, 220 F.3d at 97 (quoting *Sterlin v. Biomune Sys.*, 154 F.3d 1191, 1201 (10th Cir. 1998)); *LC Capital Partners LP v. Frontier Ins. Group, Inc.*, 318 F.3d 148, 154 (2d Cir. 2003) (explaining that only when an investor "makes no inquiry" is "knowledge [] imputed as the date the duty arose"; otherwise, knowledge is imputed when the exercise of reasonable diligence would have discovered those facts).

To require otherwise would "precipitate groundless or premature suits by requiring plaintiffs to file suit before they can discover with the exercise of reasonable diligence the necessary facts to support their claims." *Rothman*, 220 F.3d at 97 (quoting *Sterlin*, 154 F.3d at 1202). Applying this principle, the *Rothman* court concluded that the mere fact that plaintiffs took over a year to discover the basis for their claims, by obtaining information which was publicly available, but "costly to obtain and 'not readily accessible' to the public," did not require plaintiffs to file within a year. *Id.* at 97-98; *see also Levitt v. Bear Stearns & Co., Inc.*, 340 F.3d 94, 101-104 (2d Cir. 2003) (concluding

---

[26] There is a split of Second Circuit authority on this issue. *See In re Merrill Lynch & Co., Inc.*, 273 F. Supp. 2d 351, 379 (2d Cir. 2001) (discussing cases dismissing complaint based on

Lead Plaintiff's counsel continued to conduct its investigation even after the motion to dismiss amended complaint was fully briefed, thus leading to the expanded allegations of the instant complaint. Plaintiff who took over a year to discover involvement of defendant in fraud not barred by statute of limitations).

Accordingly, the two-year limitation does not mean that plaintiff simply has two years after inquiry notice to conduct a reasonable investigation, but rather plaintiff has two years from the time that it should have discovered the facts underlying its claim.

### D.  Questions Of Fact Concerning Inquiry Notice Cannot Be Resolved On A Motion To Dismiss

Resolution of the inquiry notice issue on a motion to dismiss is "often inappropriate," *LC Capital,* 318 F.3d at 156, because the question of whether a plaintiff exercised due diligence in making the required inquiry is "usually a question of fact for the jury to decide." *In re Integrated Res. Real Estate Ltd. P'ship. Sec. Litig.,* 815 F. Supp. 620, 638 (S.D.N.Y. 1993). Thus, Defendants cannot reasonably claim that their purported "disclosure," as a matter of law, constituted a "storm warning" putting investors on notice that there was fraud afoot. *See Nat'l W. Life Ins. Co. v. Merrill Lynch, Pierce, Fenner & Smith*, 89 Fed. Appx. 287, 293 (2d Cir. 2005) ("There is a triable issue of fact as to whether the events of 1989 reflected in the letters would alert National Western, acting reasonably, to the alleged fact that the investment had been sold to National Western *fraudulently*, as required to put National Western on inquiry notice. ") (Emphasis added).

This is "particularly true where...the defendant bases its notice arguments on documents wholly outside the Complaint." *Id.* Defendants base much of their notice arguments on documents outside the Complaint. *See supra* at 37.

---

publicly-filed documents such as news articles that were not included in complaint).

817v1                                          37

IX.    **PLAINTIFF ADEQUATELY ALLEGES CONTROL PERSON LIABILITY**

Plaintiff alleges sufficient facts against Jones and Daidone to establish a *prima facie*

claim under Section 20 of the Exchange Act.

A.    **To the Extent that Culpable Participation Is An
Element Of A Section 20 Claim, it Does Not Equate with Scienter**

With respect to what constitutes "culpable participation," this Court has acknowledged that

"it is not entirely clear what the 'culpable participation' requirement commands, [but] allegations of

scienter necessarily satisfy the requirement." *In re AOL Time Warner, Inc. Sec. and "ERISA" Litig.*,

381 F. Supp. 2d 192, 235.[27] (S.D.N.Y. 2004). However, while pleading scienter necessarily satisfies

the pleading standard for culpable participation, it is quite clear that "culpable participation" is

something substantially less than scienter. *See In re WorldCom Inc. Sec. Litig.*, No. 02 Civ. 3288

(DLC), 2005 WL 638268, at *13 (S.D.N.Y. March 21, 2005) ("[The Court of Appeals for the Second

Circuit] has essentially rendered the 'culpable participation' requirement meaningless.") (internal

citations omitted).[28]

For example, in *SEC v. First Jersey*, after the plaintiff properly proved control and an

underlying violation of the Exchange Act, the Second Circuit shifted the burden to the defendant to

---

[27]  Plaintiffs respectfully submit that they need not plead violations of Section 20(a) and Section
15 with particularity under 9(b) or the heightened pleading standard of the PSLRA.  *See Suez
Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 101 (2d Cir. 2001) ("somewhat
broad" allegations are sufficient to plead a violation under a Section 20(a)); *IPO*, 241 F. Supp. 2d
at 352, 396 (holding that there is no culpable participation requirement for Section 20(a) or
Section 15 and the Rule 8 pleading standard applies); *In re WorldCom, Inc. Sec. Litig.*, 294 F.
Supp. 2d 392, 415 (S.D.N.Y. 2003) (holding that there is no state of mind required to show
defendants' culpable participation and that Rule 8 pleading standards apply).  However, even
courts that require scienter or recklessness have followed *Suez Equity Investors*, and have found
Rule 8 notice pleading sufficient to state a claim of control person liability.  *See In re Vivendi
Universal, S.A.*, 381 F. Supp. 2d 158, 189-90 (S.D.N.Y. 2003) (holding that plaintiff must plead
recklessness or conscious misbehavior under Section 20(a) but only in accordance with Rule 8(a)
(citing *Suez Equity Investors*, 250 F.3d at 101)).

prove that: 1) he did not induce the controlled firm's violations of the Exchange Act; and 2) that he also enforced a reasonable system of supervision over the controlled firm. *See* 101 F.3d at 1473. Revealingly, the Court neglected to discuss whether or not the plaintiff met its burden to show culpable participation or scienter despite stating that that plaintiff had to show that "the controlling person was 'in some meaningful sense [a] culpable participant [] in the fraud perpetrated by [the] controlled person[]." *Id.* at 1472; *see also Marbury Mgmt., Inc. v. Kohn*, 629 F.2d 705 (2d Cir. 1980) (neglecting to discuss culpable participation when reversing district courts' dismissal of Section 20(a) claims).

Rather than scienter, it is more likely that culpable participation is akin to negligence. In an instance where the Second Circuit has considered the pleading requirement for culpable participation, and required plaintiff to establish "culpable participation," the court held that the plaintiff's allegations that the defendant "was an officer of the [company that violated Rule 10(b)] and that he had primary responsibility for the dealings of that [company] "were sufficient to plead a Section 20(a) claim. *Suez Equity Investors*, 250 F.3d at 101.

In *IPO*, 241 F. Supp. 2d at 392-97, Judge Scheindlin persuasively posits that the Second Circuit did not intend to impose a scienter requirement when it stated "culpable participation" was an element of a Section 20(a) claim. Instead, "the notion that Section 20(a) only requires proof that a defendant acted negligently, permitting a defendant to prove that her conduct was *not* negligent, may be precisely what the Court of Appeals had in mind by promulgating a 'culpable participation' standard." *Id* at 396 n.184. The court further noted that in a different context, the Second Circuit held "'a culpable state of mind' only requires negligence, but does not require affirmative proof of 'bad faith.'" *See id.* (citing *Residential Funding Corp. v. Degeorge Fin. Corp.*, 306 F.3d 99, 108 (2d

---

[28] Defendants acknowledge the split in authority. *See* Def. Mem. at 52.

Cir. 2002) (involving a discovery dispute)). The *IPO* Court held that culpable behavior could be "done unintentionally or unknowingly." 241 F. Supp. 2d at 394 n.182. Thus, to the extent that the Court requires the pleading of culpable participation, Plaintiff respectfully suggests that this element is satisfied by pleading that the controlling Defendants acted negligently in exercising oversight over the primary violators of Section 10(b).

### B.    Plaintiff Has Adequately Pled Its Section 20 Claims

In the Second Circuit, "the 'control person' provisions are broadly construed as they 'were meant to expand the scope of liability under the securities laws.'" *Compudyne Corp. v. Shane*, No. 05 Civ. 4300 (RWS), 2006 WL 2792206, at *17 (S.D.N.Y. Sept. 29, 2006) (citing *Dietrich v. Bauer*, 126 F.Supp. 2d 759, 764 (S.D.N.Y. 2001). "For purposes of Section 20(a) liability, 'actual control requires only the ability to direct the actions of the controlled person, and not the active exercise thereof.'" *Id.* (citations omitted). Whether a person is a "controlling person" is a fact-intensive inquiry, and generally should not be resolved on a motion to dismiss. *In re Oxford Health Plans Inc. Sec. Litig.,* 187 F.R.D. 133, 143 (S.D.N.Y. 1999).

Jones and Daidone argue that there are insufficient facts to establish their control over the corporate defendants. On the contrary, Plaintiff pleads *detailed* allegations demonstrating control:

- Defendant Daidone was Senior Vice President and a director of the Adviser and a managing director of Global Markets during the Class Period. (¶7);

- Defendant Jones was the CEO of CAM. (¶8);

- Defendant Daidone negotiated the very contracts that constituted the aforementioned self-dealing. Further, Defendant Daidone helped prepare and present the materially misleading materials to the Funds' boards. Defendant Daidone also signed many prospectuses containing materially misleading statements and omissions about the Adviser. (*Id.*);

- Defendant Jones also had an integral role in the scheme. Defendant Jones

> was the CEO of CAM. Defendant Jones made the decision to recommend the affiliated TA proposal to the Funds' boards, fully aware that the affiliated TA would make a huge windfall at the expense of Funds' shareholders through the proposal. (¶8).

*See also* ¶38 (Daidone "worked closely" with Deloitte team in TA search), ¶51 (Daidone decides

contracting with DST is best choice and conveys same to Jones), ¶53 (Jones agrees with

recommendation, but is told to keep negotiating with First Data), ¶63 (Jones informed by

memorandum that an affiliated Citigroup TA with First Data still performing bulk of services

would be optimal), ¶76 (Jones agrees with First Data arrangement), ¶77 (Daidone prepared

memorandum making it *appear* that the affiliated TA proposal was in funds best interests), ¶¶91-

96 (Daidone misleadingly presents affiliated TA proposal to the Funds' boards), ¶¶99-101, 102,

105 (Daidone and Jones, present at board meetings, fail to disclose facts about affiliated TA

proposal), ¶109 (Daidone member of team making fee increase presentation to Funds' boards).

These detailed allegations of outright deception demonstrate that Jones and Daidone "knew

or should have known that the primary violator, over whom that person had control, was engaging in

fraudulent conduct." *In re Global Crossing, Ltd. Sec. Litig.*, No. 02 Civ. 910, 2006 WL 1628469, at

*11 (S.D.N.Y. June 13, 2006). *Cf. In re Alstom, SA*, No. 03 Civ. 6595 (VM), 2006 WL 2819588, at

*15 (Sept. 29, 2006) (particularized allegations about "involvement" in subject of misstatements

sufficed to plead control person liability). Signatures are also probative of control. *See also Alstom,*

*SA*, 406 F. Supp. 2d at 494-95 (signing document probative of control person status); *In re Flag*

*Telecom Holding, Ltd. Sec. Litig.*, 352 F.Supp. 2d 429, 457 (S.D.N.Y. 2005) (concluding that officers

or directors who signed registration statement controlled company); *In re Philip Servs. Corp. Sec.*

*Litig.*, 383 F.Supp.2d 463, 485 (S.D.N.Y. 2004) (holding that directors who also signed registration

statement controlled those who wrote the report).

Defendants' arguments here do not hold water. Defendants compare the extensive allegations concerning Daidone and Jones to cases where plaintiffs based control person allegations on "their positions as officers and/or directors…and their ownership of…stock, [and] the [i]ndividual [d]efendants['] …power and authority to cause [defendant] to engage in the wrongful conduct." Def. Mem. at 51 (citing *Flag Telecom*, 308 F. Supp. 2d at 274). This bears no analogy to this case. Defendants' other citations fare no better. *See, e.g., In re CINAR Corp. Sec. Litig.*, 186 F. Supp. 2d 279, 309 (E.D.N.Y. 2002) (status alone insufficient to plead control).

## X.    PLAINTIFF ALLEGES VIABLE ICA CLAIMS

To plead ICA claims, plaintiffs must set forth only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); *Pfeiffer v. Bjurman, Barry & Assocs.*, No. 03 Civ. 9741 (DLC), 2004 WL 1903075, at *3 (S.D.N.Y. Aug. 26, 2004) (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002)); *IPO*, 241 F. Supp. 2d at 295 (the general requirements for pleading are found in Rule 8 unless a specific statute sets forth a different pleading standard). Plaintiffs need only provide a "factual basis for believing that a legal violation has actually occurred." *Migdal v. Rowe-Price Fleming Int'l*, 248 F.3d 321, 326 (4th Cir. 2001). "It is unnecessary for the plaintiff to set forth evidentiary details to support this allegation," or to plead evidentiary support for each element of the claim which must be established at trial. *Pfeiffer*, 2004 WL 1903075, at *4.

As an initial matter, a private right of action exists under Section 36(b). Section 36(b) imposes a fiduciary duty on investment advisers and others "with respect to the receipt of compensation for services" and creates an express private right of action "for breach of fiduciary duty in respect of such compensation." *Migdal*, 248 F.3d at 328. *See also Meyer v. Oppenheimer Mgmt. Corp.*, 895 F.2d 861, 866 (2d Cir. 1990).

Moreover, such claims are direct rather derivative. *See Fox. v. Reich & Tang, Inc.*, 692 F.2d 250, 262 (2d Cir. 1982); *Kamen v. Kemper Fin. Serv.*, 506 U.S. 90, 108 (1992) ("[Section] 36(b) of the ICA expressly provides that an individual shareholder may bring an action on behalf of the investment company for breach of the investment adviser's fiduciary duty…[and such action] is direct rather than derivative and can therefore be maintained without any precomplaint demand on the directors"); *Cohen v. Fund Asset Mgmt.*, Civ. 79-2512, 1980 WL 1488, at *4 (S.D.N.Y. Mar. 31, 1980) (derivative action dismissed "since sales charges flow directly from the investor to the distributor or securities dealer, it is the investor who is the proper party…, not the Fund, nor the plaintiff shareholder on behalf of the Fund"); *Krinsk v. Fund Asset Mgmt,* 654 F. Supp. 1227, 1235 (S.D.N.Y. 1987) ($65 charge to each shareholder does not create derivative action under 36(b)); *cf. Mutual Funds*, 384 F. Supp. 2d 845, 867 n.22 (issue of whether 36(b) alleged direct or derivative claims held in abeyance on motion to dismiss).[29]

Defendants wrongly claim that the real injury was to Smith Barney and Global Markets and, thus, that Plaintiff suffered a *derivative* rather than a *direct* injury. Defendants are wrong, and their citation to *AllianceBernstein*, 2005 WL 2677753, at *3-4 (S.D.N.Y. Oct. 19, 2005) highlights their error. In *AllianceBernstein*, this Court found a derivative injury where the *corporation's* assets were depleted. *Id.* Here, the assets of the corporation, and its affiliates, *increased* at expense of shareholders, causing them a *direct* injury.

Defendants' attempt to make an end-run around the federal securities claims by stating (Def. Mem. at 12) that even Plaintiff's *Section 10(b)* claims should be brought as derivative claims because the only harm was to the Funds, should be rejected. Courts, including this one, have repeatedly held

---

[29] Defendants' claim that no named plaintiffs are alleged to currently own Fund shares begs the question; that is only required in derivative actions.

that public misstatements by mutual fund-related entities are the predicate for a *federal securities* cause of action on behalf of *investors*, not a *derivative* action on behalf of underlying *funds*. *See, e.g., Hicks,* 2003 WL 21672085, at *3 (S.D.N.Y. July 16, 2003); *Dreyfus,* 2000 WL 1357509, at *5 (S.D.N.Y. Sept. 20, 2000); *Mutual Funds,* 384 F. Supp. 2d at 872 (sustaining 10(b) allegations concerning misstatements and omissions concerning market timing and late trading in mutual funds); *Wells Fargo,* 2006 WL 2355411, at *1, 8-13 (sustaining 10(b) claim where mutual fund failed to disclose scheme funneling kickbacks to brokers for steering clients to certain funds). Further, as discussed *supra*, Plaintiff satisfies all the elements of a 10(b) claim.

Defendants' reliance on *Papilsky v. Berndt*, 466 F.2d 251, 253, 255 (2d Cir. 1972) is wholly misplaced. In *Papilsky*, the Second Circuit affirmed the denial of the defendants' motion for summary judgment on *res judicata* grounds where a prior derivative suit had been dismissed. The Second Circuit never even *reached* the issue of whether Section 10(b) claims can be subsumed under a derivative case. *Papilsky* solely concerned the effect of the dismissal of a derivative action on a *later*, similar case that alleged federal securities laws violations. *Id*. Thus, *Papilsky* bears no relation to this action.

Plaintiffs were also correct in not naming Citicorp Trust Bank, fsb ("CTB"), which received the excessive fees but was a mere conduit for other Citigroup entities, as a defendant. First, the text of Section 36(b) expressly states involves payments to "to such investment adviser *or any affiliated person of such investment adviser*." 15 U.S.C. § 80a-35(b) (emphasis added). Citigroup entities – affiliated persons – received payments under Section 36(b). *See* ¶¶5, 9, 10. Second, Defendants received compensation[30] for investment advisory services, which suffices under Section 36(b):

---

[30] Indeed, why would Defendants have paid $200 million to the SEC if they hadn't received any ill-gotten gains?

"CAM [of which Defendants are branches] kept the majority of the savings it had negotiated with First Data for itself,..." ¶4. Defendants' own citation, *In re Evergreen Mut. Funds Fee Litig.*, 423 F. Supp. 2d 249, 259 (S.D.N.Y. 2006), is not to the contrary because *Evergreen* dismissed defendants who did *not* receive compensation for such services. *See also In re Oppenheimer Funds Fees Litig.*, 419 F. Supp. 2d 593 (S.D.N.Y. 2006).[31]

## CONCLUSION

For all the aforementioned reasons, Defendants' motion to dismiss Plaintiff's Amended Complaint should be denied in its entirety.

Dated:  November 28, 2006

**BERNSTEIN LIEBHARD & LIFSHITZ, LLP**

/s/

_____
Sandy A. Liebhard (SL-0836)
U. Seth Ottensoser (UO-9703)
Joseph R. Seidman, Jr. (JS-9260)
10 East 40th Street
New York, New York  10016
Tel:  (212) 779-1414

**Lead Counsel for Lead Plaintiff and the Class**

Brad Lakin
**LAKIN LAW FIRM, P.C.**
300 Evans Ave., P.O. Box 229
Wood River, Illinois  62095-0229
Tel:  (618) 254-1127

_____

[31] Finally, whether Plaintiff can recover damages under Section 36(b) for longer than one year prior to the inception of the original action (August 27, 2004) is a damage issue irrelevant at this juncture. *Compare* Def. Mem. at 23-24.

817v1                                   45

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the attached document was served upon the

following counsel of record in the action filed in this Court by federal express on November 28,

2006:


Robert B. McCaw, Esq.
**WILMER CUTLER PICKERING HALE**
  **·  & DORR LLP**
399 Park Avenue, 30th Floor
New York, NY  10022

Mark D. Cahn, Esq.
Michael Plotnick, Esq.
**WILMER CUTLER PICKERING HALE**
    **& DORR LLP**
2445 M Street, NW
Washington, DC  20037

G. Irvin Terrell, Jr., Esq.
**BAKER BOTTS LLP**
One Shell Plaza
910 Louisiana St.
Houston, TX  77002

Michael O. Ware, Esq.
**MAYER, BROWN, ROWE & MAW LLP**
1675 Broadway
New York, NY  10019


                                        /s/
                                        _____
                                        JOSEPH R. SEIDMAN, JR.