**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | 05 Civ. 7583 (WHP) |
| | ECF case |
| SMITH BARNEY TRANSFER AGENT LITIGATION | |
| | |
| This document relates to:  all actions | |

**MEMORANDUM OF LAW IN SUPPORT OF RENEWED MOTION TO DISMISS THE
CONSOLIDATED AND AMENDED COMPLAINT**

WILMER CUTLER PICKERING HALE
  AND DORR LLP
399 Park Avenue
New York, New York  10022
(212) 230-8800

*Counsel for Defendants Smith Barney Fund
Management LLC and Citigroup Global
Markets Inc.*

BAKER BOTTS LLP
One Shell Plaza
910 Louisiana St.
Houston, TX 77002
(713) 229-1231

*Counsel for Defendant
Thomas W. Jones*

SCHULTE ROTH & ZABEL LLP
1152 Fifteenth Street, NW, Suite 850
Washington, DC  20005
(202) 729-7470

*Counsel for Defendant
Lewis E. Daidone*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................ 1

FACTUAL ALLEGATIONS ............................................................................... 4

    A.   The CTB Transfer Agent Arrangement ............................................... 4

    B.   Disclosures Of Regulatory Inquiry Into The Transfer Agent Arrangement ...................... 4

    C.   The SEC Settlement ........................................................................ 6

    D.   The Complaint ............................................................................... 7

    E.   Procedural History ......................................................................... 9

    F.   The Plan Of Distribution Of Settlement Funds ................................... 10

ARGUMENT .................................................................................................. 11

I.    PLAINTIFFS LACK STANDING TO ASSERT SECTION 10(b) CLAIMS AGAINST ALL DEFENDANTS IN CONNECTION WITH THE PAYMENT OF TRANSFER AGENT FEES BY THE FUNDS ...................... 11

    A.   Breaches Of Duty With Respect To The Payment Of Transfer Agent Fees By The Funds Are Derivative And Not Direct Claims ........... 11

    B.   Plaintiffs Lack Standing To Pursue Claims Involving Funds In Which They Did Not Invest .................................................... 16

    C.   The Complaint's "Holder" Claims Should Also Be Dismissed For Lack Of Standing Under *Blue Chip Stamps* And *Merrill Lynch v. Dabit* ... 19

II.   PLAINTIFFS' CLAIMS ARE TIME-BARRED AS TO ALL DEFENDANTS ........... 20

    A.   Plaintiffs' Section 10(b) Claims Were Filed After The Expiration Of The Applicable 2-Year Statute Of Limitations Period ............ 20

    B.   The Section 10(b) Claims Against All Defendants Do Not Relate Back To Prior Complaints ............................................................ 24

    C.   The Claims Against Jones And Daidone Do Not Relate Back For The Additional Reason That Jones and Daidone Were Not Named As Defendants In The Original Complaints ............... 26

III.  PLAINTIFFS' CLAIMS AGAINST JONES SHOULD BE DISMISSED BECAUSE THE ALLEGATIONS AGAINST HIM FAIL TO STATE ANY FACTS GIVING RISE TO A STRONG INFERENCE OF SCIENTER ............ 28

    A.   The Only Logical Inference From The Allegations Is That Jones Believed That Fund Shareholders Received A Full Disclosure Of All Material Information ... 29

    B.   The Complaint Does Not Support An Inference That Jones Had The Motive And Opportunity To Deceive, Manipulate, And Defraud Shareholders ........ 30

    C.   The Complaint Does Not Support An Inference That Jones Intended To Deceive, Manipulate, Or Defraud Fund Shareholders Through Conscious Recklessness ............. 31

**IV. THE SECTION 20(a) CLAIMS AGAINST THE INDIVIDUAL DEFENDANTS SHOULD BE DISMISSED FOR FAILURE TO PLEAD THE REQUISITE STATE OF MIND, AND FOR FAILURE TO PLEAD AN UNDERLYING VIOLATION**................................................................................................. 33

**CONCLUSION** ................................................................................................. 33

## TABLE OF AUTHORITIES

### CASES

*Aimis Art Corp. v. Northern Trust Securities, Inc.*,
    641 F. Supp. 2d 314 (S.D.N.Y. 2009)....................................................................................15

*Amorosa v. Ernst & Young LLP*,
    No. 03 Civ. 3902, 2009 U.S. Dist. LEXIS 112633 (S.D.N.Y. Nov. 30, 2009) ......................19

*Atwood Grain & Supply Co. v. Growmark, Inc.*,
    712 F. Supp. 1360 (N.D. Ill. 1989) .......................................................................................14

*Bank Brussels Lambert v. Chase Manhattan Bank*,
    No. 93 Civ. 5298 (LMM), 1999 WL 672302 (S.D.N.Y. Aug. 27, 1999) ...............................25

*Bay Harbor Management LLC v. Carothers*,
    282 F. App'x 71 (2d Cir. 2008) .............................................................................................30

*Benak v. Alliance Capital Management L.P.*,
    435 F.3d 396 (3d Cir. 2006)...................................................................................................21

*Blue Chip Stamps v. Manor Drug Stores*,
    421 U.S. 723 (1975)..............................................................................................................9, 19

*City of Ann Arbor Employees' Retirement System v. Citigroup Mortgage Loan Trust Inc.*,
    No. CV 08-1418, 2010 WL 1371417 (E.D.N.Y. Apr. 6, 2010)..............................................17

*Dura Pharmaceuticals, Inc. v. Broudo*,
    544 U.S.  336 (2005)..............................................................................................................15

*ECA and Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009)...................................................................................................28

*Forsythe v. Sun Life Finance, Inc.*,
    417 F. Supp. 2d 100 (D. Mass. 2006) ....................................................................................12

*Griffin v. Dugger*,
    823 F.2d 1476 (11th Cir. 1987) .............................................................................................16

*Halebian v. Berv*,
    590 F.3d 195 (2d Cir. 2009)........................................................................................13, 15, 16

*Hoffman v. USB-AG*,
    591 F. Supp. 2d 522 (S.D.N.Y. 2008)....................................................................................17

*In re AIG Advisor Group Securities Litigation*,
 No. 06 Civ. 1625, 2007 WL 1213395 (E.D.N.Y. Apr. 25, 2007),
 *aff'd, on other grounds*, 309 F. App'x 495 (2d Cir. 2009)......................................................18

*In re AllianceBernstein Mutual Fund Excessive Fee Litigation*,
 No. 04 Civ. 4885, 2005 WL 2677753 (S.D.N.Y. Oct. 19, 2005) ....................................11, 15

*In re Bausch & Lomb, Inc. Securities Litigation*,
 941 F. Supp. 1352 (W.D.N.Y. 1996) ...................................................................................26

*In re IBM*,
 163 F.3d 102 (2d Cir. 1998)................................................................................................30

*In re Initial Public Offering Securities Litigation*,
 341 F. Supp. 2d 328 (S.D.N.Y. 2004)......................................................................17, 18, 21

*In re Lehman Brothers Securities & ERISA Litigation*,
 No. 09-MD-2017, 2010 U.S. Dist. LEXIS 13856 (S.D.N.Y. Feb. 17, 2010) ........................18

*In re Salomon Analyst Winstar Litigation*,
 No. 02 Civ. 6171 (GEL), 2006 WL 510526 (S.D.N.Y. Feb. 28, 2006)..................................22

*In re Salomon Smith Barney Mutual Fund Fees Litigation*,
 441 F. Supp. 2d 579 (S.D.N.Y. 2006)..................................................................................18

*In re Smith Barney Fund Transfer Agent Litigation*,
 No. 05 Civ. 7583, 2007 WL 2809600 (S.D.N.Y. Sept. 26, 2007)...................................10, 12

*In re Sunrise Securities Litigation*,
 916 F.2d 874 (3d Cir. 1990)................................................................................................11

*In re Worldcom Inc. Securities Litigation*,
 308 F. Supp. 2d 214 (S.D.N.Y. 2003)..................................................................................26

*In re Yukos Oil Co. Securities Litigation*,
 No. 04 Civ. 5243, 2006 WL 3026024 (S.D.N.Y. Oct. 25, 2006) ..........................................33

*Kalnit v. Eichler*,
 264 F.3d 131 (2d Cir. 2001)...........................................................................................30, 31

*Kauffman v. Dreyfus Fund, Inc.*,
 434 F.2d 727 (3d Cir. 1970)................................................................................................14

*Kuntz v. Shawmut Bank of Boston*,
 No. 86 Civ. 6771, 1987 WL 11172 (S.D.N.Y. May 12, 1987)...............................................14

*Lewis v. Casey*,
    518 U.S. 343 (1996)........................................................................................................16

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)........................................................................................................16

*Marshall v. Millberg LLP*,
    No. 07 Civ. 6950, 2009 WL 5177975 (S.D.N.Y. Dec. 23, 2009)............................24

*Merck & Co. v. Reynolds*,
    559 U.S. __ , 2010 WL 1655827 (Apr. 27, 2010) ...................................................20

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*,
    547 U.S. 71 (2006)..........................................................................................................19

*Nettis v. Levitt*,
    241 F.3d 186 (2d Cir. 2001), *overturned on other grounds*,
    *Slayton v. American Express Co.*, 460 F.3d 215 (2d. Cir. 2006 ...........................25

*New Jersey Carpenters Health Fund v. Residential Capital, LLC*,
    No. 08 Civ. 8781, 2010 WL 1257528 (S.D.N.Y. Mar. 31, 2010) ..........................18

*New Jersey Carpenters Vacation Fund v. Royal Bank of Scotland Group, PLC*,
    No. 08 Civ. 5093, 2010 WL 1172694 (S.D.N.Y. Mar. 26, 2010) ..........................18

*Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Management LLC*,
    595 F.3d 86 (2d Cir. 2010)......................................................................1, 10, 16, 24

*Pape v. Board of Education of the Wappingers Central School District*,
    No. 07-CV-8828, 2009 W. 3151200 (S.D.N.Y. Sept. 29, 2009)............................26

*Perlman v. Salomon Inc.*,
    No. 92 Civ. 5208, 1995 WL 110076 (S.D.N.Y. Mar. 14, 1995) ...........................14

*Rand v. Anaconda-Ericsson, Inc.*,
    794 F.2d 843 (2d Cir. 1986).........................................................................................13

*SEC v. Jones*,
    476 F. Supp. 2d 374 (S.D.N.Y. 2007).........................................................................6

*SEC v. PIMCO Advisors Fund Management*,
    341 F. Supp. 2d 454 (S.D.N.Y. 2004).......................................................................32

*SEC v. Seaboard Corp.*,
    677 F.2d 1301 (9th Cir. 1982) ....................................................................................26

*Shah v. Meeker,*
    435 F.3d 244 (2d Cir. 2006)................................................................22

*South Cherry St., LLC v. Hennessee Group LLC,*
    573 F.3d 98 (2d Cir. 2009).............................................................28, 31

*Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc.,*
    552 U.S. 148 (2008)......................................................................30

*Strougo v. Bassini,*
    282 F.3d 162 (2d Cir. 2002)......................................................12, 15, 16

*Teamsters Local 445 Freight Division Pension Fund v. Bombardier Inc.,*
    No. 05 Civ. 1898, 2005 WL 2148919 (S.D.N.Y. Sept. 6, 2005).............................16

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
    551 U.S. 308 (2007)..................................................................28, 31, 32

*W. R. Huff Asset Management Co., LLC v. Deloitte & Touche LLP,*
    549 F.3d 100 (2d Cir. 2008)..............................................................17

## STATUTES

15 U.S.C. § 78bb(a) ......................................................................15

15 U.S.C. § 78j(b) .......................................................................17

15 U.S.C. § 78u-4(b)(2) ..................................................................28

17 C.F.R. § 240.10b-5....................................................................17

28 U.S.C. § 1658(b) ......................................................................20

Fed. R. Civ. P. 15(c)(1)(B) .............................................................24

Fed. R. Civ. P. 15(c)(1)(C) .............................................................26

## OTHER AUTHORITIES

12B Carol A. Jones, Fletcher Cyclopedia on the Law of Corporations § 5911 (rev. perm.
    ed. 2009) ...........................................................................12

John Downes & Jordon Goodman, Dictionary of Finance and Investment Terms
    (7th ed. 2006).......................................................................15

Defendants Citigroup Global Markets Inc. ("CGMI") and Smith Barney Fund Management LLC ("SBFM") (together, the "Citi Defendants") and Thomas W. Jones ("Jones") and Lewis E. Daidone ("Daidone") (together, the "Individual Defendants") respectfully submit this memorandum of law in support of their renewed motion to dismiss, originally filed on October 3, 2006.

## PRELIMINARY STATEMENT

On February 16, 2010, the Second Circuit affirmed, in part, and vacated and remanded, in part, this Court's September 26, 2007 Order ("Order") dismissing Plaintiffs' June 1, 2006 consolidated and amended complaint ("Complaint") in its entirety for failure to state a claim. The Second Circuit affirmed this Court's dismissal of Plaintiffs' claim under Section 36(b) of the Investment Company Act of 1940, on the ground that it was fundamentally a derivative claim, improperly pleaded as a direct claim. *See Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 98 (2d Cir. 2010). The Second Circuit, however, vacated this Court's dismissal of Plaintiffs' claims under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, holding that Plaintiffs had adequately pleaded materiality and loss causation. 595 F.3d at 92-96. This supplemental memorandum addresses the remanded claims in light of the Second Circuit's decision, as well as intervening legal and factual developments since the Court last received briefing in 2006. For the reasons below, Plaintiffs' claims under Section 10(b) and 20(a) should again be dismissed.[1]

---

[1] With the exception of Point I.B, *infra*, Defendants raised the grounds for dismissal that are asserted in this brief in their initial brief in support of the motion to dismiss filed on October 3, 2006 (Dkt. No. 70). Defendants addressed limitations at pages 42-49 and standing at pages 12-17, 19-22, and 27 n.4; Individual Defendants addressed scienter at pages 38-42 and the Section 20(a) claims at pages 50-53.

Plaintiffs are investors in three out of the 105 mutual funds that are the subject of this litigation (the "Funds"). Plaintiffs allege that the Funds paid excessive transfer agent ("TA") fees to a predecessor of Citicorp Trust Bank, fsb ("CTB")—an affiliate of CGMI and SBFM. CTB allegedly sub-contracted its transfer agent services to another entity at a deep discount, while retaining a substantial profit for itself (which profit was subsequently disgorged to the SEC for further distribution to the Funds). Plaintiffs further allege that Defendants "place[d] their interests in making profit ahead of the interests of the mutual funds they served" (Compl. ¶ 1) and that any profit garnered was "an opportunity belonging to the Funds and their shareholders" (*id.* ¶ 5). Plaintiffs also assert that the boards of the Funds and Fund investors were misled about the CTB arrangement because the transaction was misrepresented as a fair deal or "garden variety" arrangement. (*Id.* ¶¶ 77, 80, 96, 115.)

The claims should be dismissed for the following reasons:

***First***, Plaintiffs' Section 10(b) claims fail as to all Defendants for lack of standing.

1. Plaintiffs' Section 10(b) claims are derivative in nature, premised on allegedly excessive transfer agent fees charged *to the Funds*. As the Complaint makes clear, the core allegation is that Plaintiffs were deprived of an opportunity that properly belonged to the Funds. (Compl. ¶¶ 5, 135-36.) The allegedly excessive TA fees injured Plaintiffs, if at all, only by diminishing the Funds' assets and thereby diminishing the value of Plaintiffs' proportional shareholding in the Funds. Plaintiffs' injury flows entirely from their ownership interest in the Funds, and no Plaintiff suffered injury except through its pro rata investment in the Funds. A claim based on such an injury may only be asserted derivatively, not directly as Plaintiffs attempt to do here. (*Infra*, Part I.A.)

2. Plaintiffs separately lack standing to assert claims based on Funds in which they did not personally invest—amounting to 102 of the 105 Funds. For example, named plaintiff Jeanne Chilton, who claims to have bought shares in Citistreet Large Company Stock Fund, has no basis to bring a Section 10(b) claim related to another Fund whose shares she never owned; she cannot allege injury in connection with the "purchase or sale" of shares in any other Fund. As a result, claims relating to 102 of the 105 Funds at issue must be dismissed. (*Infra*, Part I.B.)

3. Finally, Plaintiffs must purchase or sell shares during the class period to have a claim. A mere holder of shares during the class period cannot assert a violation of Section 10(b). Plaintiffs' certifications, filed in support of this action and required under the Private Securities Litigation Reform Act ("PSLRA"), confirm that plaintiff Jeffrey Weber did not purchase or sell shares during the class period and for that reason cannot assert a claim for injury. (*Infra*, Part I.C.)

*Second*, Plaintiffs' Section 10(b) claims are time-barred as to all Defendants for failure to bring them within the applicable two-year statute of limitations period. The regulatory investigation of the TA arrangement was disclosed in prospectus supplements and other public sources beginning on December 1, 2003. There were additional public disclosures after that date, including a second wave of public filings and press coverage in March 2004. The Complaint was filed on June 1, 2006, more than two years later, and the Section 10(b) claims do not relate back to any earlier complaint. The claims against the Individual Defendants do not relate back for the additional reason that Plaintiffs did not file any claims against the Individual Defendants until June 1, 2006. (*Infra*, Part II.)

*Third*, the Section 10(b) claims fail as to Jones and Daidone because the Complaint fails to allege facts giving rise to a strong inference of scienter. (*Infra*, Part III & n.9.)

- 3 -

*Fourth*, the Section 20(a) claims fail as to Jones and Daidone for failure to plead the requisite state of mind and for failure to plead an underlying violation.  (*Infra*, Part IV.)

## FACTUAL ALLEGATIONS

The factual background has been addressed in the prior opinion of this Court.  For the Court's convenience, the Defendants set forth here only those allegations and recent developments relevant to this supplemental memorandum.

### A.    The CTB Transfer Agent Arrangement

From approximately 1989 through 1999, First Data Investor Services Group ("First Data") provided transfer agent services for the Funds, including processing transactions in the Fund shares, calculating sales charges and commissions, operating a customer call center, distributing proxy and other materials, and performing a variety of additional accounting functions.  (Compl. ¶¶ 25, 36.)  Starting in 1998, SBFM recommended that the Funds enter into a contract with CTB, under which CTB would serve as the primary transfer agent for the Funds and contract with First Data to act as a sub-TA.  (*Id.* ¶¶ 62-71.)  Under the agreement, First Data agreed to direct asset management and investment banking business to affiliates of the Citi Defendants ("Revenue Guarantee").  (*Id.* ¶¶ 62-66.)[2/]  According to the Complaint, First Data also agreed to perform the sub-TA services at a discount, but CTB "ke[pt] most of the discount for itself."  (*Id.* ¶ 1.)  The Funds' boards approved the recommendation, and on October 1, 1999, CTB became the TA for the Funds and First Data became a sub-TA.  (*Id.* ¶¶ 91, 97.)

### B.    Disclosures Of Regulatory Inquiry Into The Transfer Agent Arrangement

In late 2003, the Securities and Exchange Commission ("SEC") commenced an inquiry into the process by which CTB became TA for the Funds, and whether materials and

---

[2/]  In December 1999, First Data's parent sold First Data's TA business to PFPC, Inc. ("PFPC").  We refer to First Data and PFPC as "First Data."

presentations to the boards of directors of the Funds misdescribed the TA arrangement.  (Compl.

¶ 112; Declaration of John Rothermich, Oct. 3, 2006 (Dkt. No. 71) ("Rothermich Decl."), Ex. B.)

On December 1, 2003, the Citi Defendants disclosed the SEC inquiry in supplements to Fund

prospectuses.  (Compl. ¶ 125.)  The supplements disclosed the Revenue Guarantee and that the

Funds' boards "were not [previously] informed of the Revenue Guarantee."  (*Id.*)  The

prospectus supplements also disclosed that Citigroup Asset Management ("CAM") would

conduct an "independent review to verify the transfer agent fees charged . . . were fairly priced as

compared to competitive alternatives."  (*Id.*)  Finally, these supplements disclosed that the "U.S.

Attorney is investigating the [TA] matter" and that CAM had informed the SEC and other

regulators about it.  (*Id.*)

Extensive news coverage in the domestic and foreign media, and on wire services and

Internet news sites, reported on the TA matter and the previously-undisclosed Revenue

Guarantee, as well as ongoing investigations by the U.S. Attorney and other regulators.  For

example, The Washington Post reported on November 26, 2003, that "federal and state

investigators are trying to determine whether the payment violated disclosure rules or could be

considered an improper kickback."  Brooke Masters, "Fund Probers Target Firm for Shutdown,"

*The Washington Post* (Nov. 23, 2006) (Rothermich Decl., Ex. F).  Other publications similarly

reported that the U.S. Attorney's Office was investigating whether CAM executives

"overstepped their bounds when they hired an unnamed subcontractor to outsource the transfer

agent business."  *TheStreet.com* (Nov. 25, 2003) (Rothermich Decl., Ex. F).

On March 1, 2004, Citigroup Inc., in its Form 10-K Annual Report, disclosed:

> The Company has received subpoenas and other requests for information from
> various government regulators regarding . . . an investigation by the Securities
> and Exchange Commission and a United States Attorney into the arrangements

under which we became the transfer agent for many of the mutual funds in the
Smith Barney fund complex.

(Rothermich Decl., Ex. G, at 126.)  Smith Barney Trust II, a sub-family of the Funds, also

released a prospectus on March 1, 2004, disclosing that "CAM will pay . . . approximately $17

million (plus interest)" to the Funds and that "CAM is strengthening its procedures in order to

avoid similar situations in the future."  (Compl. ¶ 127.)  Further, the prospectus noted that "CAM

has given this information to regulators and other government authorities, and understands that

the SEC and the U.S. Attorney are investigating this situation."  (*Id*.)  These statements were

amplified by a second wave of press coverage in March 2004, in which the media reported that

various government regulators had issued subpoenas and requests for information in connection

with investigations of an "undisclosed arrangement between [Citigroup's] mutual funds and a

vendor that provided transfer-agent services."  *Los Angeles Times* (Mar. 2, 2004) (Rothermich

Decl., Ex. H).

    C.    **The SEC Settlement**

On May 31, 2005, the SEC issued an Order Instituting Administrative Cease and Desist

Proceedings against SBFM and CGMI ("Settlement Order"), which, without any admission of

wrongdoing, resolved the SEC's allegations against the Citi Defendants concerning the allegedly

excessive fees paid by the Funds and the alleged misrepresentation to the Funds' boards.[3/]

(Rothermich Decl., Ex. B, at 1, ¶¶ I.-II.)  According to the Settlement Order, the settled case had

been about "an investment advisor placing its interest in making a profit ahead of the interests of

the mutual funds it serves."  (*Id.* at 2, ¶ 1.)  The Settlement Order memorialized the Citi

---

    [3/]  The Individual Defendants were not parties to the Settlement Order, and the SEC filed
a separate civil action against them.  This Court (the Honorable Richard C. Casey) granted the
Individual Defendants' motion for summary judgment on statute of limitations grounds and
because the SEC did not provide evidence of specific profits subject to disgorgement.  *See SEC
v. Jones*, 476 F. Supp. 2d 374 (S.D.N.Y. 2007).  The SEC did not appeal the judgment.

Defendants' agreement to disgorge to the U.S. Treasury $109,004,551—representing both the total pre-tax profits CTB earned as TA to the Funds from October 1, 1999 through September 30, 2004, and the amount SBFM and its affiliates received under the Revenue Guarantee—and to pay prejudgment interest of $19,055,630, plus a civil penalty of $80 million.  (Rothermich Decl., Ex. B, at 19, ¶¶ IV.E-F; Compl. ¶ 10.)  The Settlement Order mandated that CTB's pre-tax profits from December 1, 2004 through January 1, 2006, when the Funds entered a new TA contract, be held in escrow and that CTB pay to the Funds the difference between the TA fees the Funds paid during this time period and the fees the Funds would have paid had the new contract been in effect during this period.  This amount totaled approximately $9.4 million. (Rothermich Decl., Ex. B, at 18, ¶ 72; *id.*, Ex. E.)  The disgorgement thus covered a period that began before the onset of the alleged class period (September 11, 2000) and ended after the alleged close of the class period (May 31, 2005) (Compl. ¶ 30), and only did not overlap with the class period for the two months of October and November 2004.

### D.    The Complaint

Shortly after the Settlement Order, in August and September 2005, various civil complaints were filed which reiterated the facts contained in the Settlement Order concerning the allegedly excessive fees charged to the Funds and the alleged misrepresentations to the Funds' boards.[4/]

On June 1, 2006, more than two years after the Citi Defendants publicly disclosed the investigations regarding the selection of the TA for the Funds, and that the fee arrangement was

---

[4/] *See Chilton v. Smith Barney Fund Management LLC*, No. 05 Civ. 7583, Dkt. No. 1 (Aug. 26, 2005); *Shropshire v. Smith Barney Fund Management LLC*, No. 05 Civ. 7818, Dkt. No. 1 (Sept. 7, 2005).; *Ratner v. Smith Barney Fund Management LLC*, No. 05 Civ. 8356, Dkt. No. 1 (Sept. 28, 2005); *Weber v. Smith Barney Fund Management LLC*, No. 05 Civ. 8357, Dkt. No. 1 (Sept. 28, 2005); and *Brinn v. Smith Barney Fund Management LLC*, No. 05 Civ. 8399, Dkt. No. 1 (Sept. 30, 2005).

allegedly negotiated without disclosure of material facts to the boards, Operating Local 649 Annuity Trust, Jeanne Chilton, and Jeffrey Weber (collectively, "Plaintiffs") filed the current Complaint. The Amended Complaint added, for the first time, Jones and Daidone as defendants. (Compl. ¶¶ 19-20.) Jones was CAM's Chief Executive Officer, and Daidone was a senior vice president of SBFM and a managing director of CGMI. *Id.* ¶ 7-8.

The gravamen of Plaintiffs' Complaint is that Defendants "place[d] their interests in making profit ahead of the interests of the mutual funds they served" (Compl. ¶ 1), that transfer agent fees were charged "at the direct expense of the Funds and their shareholders" (*id.*), and that any resulting profit was "an opportunity belonging to the Funds and their shareholders" (*id.* ¶ 5). The allegations apparently underlying Plaintiffs' Section 10(b) claims were that, in addition to making allegedly misleading statements to the Funds' boards in 1999 (*id.* ¶¶ 76-97), the Citi Defendants issued prospectuses beginning on September 11, 2000, that were materially misleading and omitted material information. Plaintiffs allege that the prospectuses misleadingly presented the TA arrangement as "garden variety" by not disclosing (1) that the sub-TA structure "was nothing more than an elaborate scheme to inflate Citigroup profits," (2) that under the TA arrangement a Citibank-related entity was receiving "tens of millions of dollars that rightfully belonged to Funds' shareholders," (3) that there had been "a misleading process which led to the appointment of the sub-TA," and (4) the Revenue Guarantee. (*Id.* ¶¶ 115, 118, 124; *see also id.* ¶ 11.) The only injury Plaintiffs allege to have suffered as a result of these non-disclosures, however, is exactly the same injury suffered by the Funds as a result of the allegedly improper TA arrangement: the fees that were improperly charged to the Funds, which in turn reduced the value of Plaintiffs' shares. (*Id.* ¶¶ 136-38.)

Although Plaintiffs purport to assert individual claims on behalf of all persons who purchased, redeemed, or held shares in the approximately 105 SEC-registered mutual funds for which CTB served as transfer agent, Plaintiffs' PSLRA certifications confirm that they transacted in only three of the Funds. Plaintiff Operating Local 649 purchased shares in the Smith Barney Capital Preservation Fund during the alleged class period. (*See* Compl. ¶ 14.)[5/] Plaintiff Jeanne Chilton purchased shares in the Citistreet Large Company Stock Fund during the alleged class period. (*See id.* ¶ 15.) Plaintiff Jeffrey Weber appears to have made no purchases or sales during the alleged class period. Rather, he appears to be a mere "holder," affirming only that he "held shares" in the Smith Barney Large Cap Growth and Value Fund during the alleged class period. (*See id.* ¶ 16.) The Complaint includes no allegations that Plaintiffs sold their shares during the putative class period or would otherwise satisfy the purchase or sale requirement of *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975).

As to the Individual Defendants, the Complaint contains only sparse allegations, and it in no way suggests that they stood to receive any personal benefits from the alleged "scheme." Instead, it attempts to characterize their roles as "integral" and "instrumental" by alleging that Jones approved the recommendation to the Funds' boards and that Daidone allegedly negotiated the contracts at issue, prepared board presentations, and signed certain Fund prospectuses between May 26, 2000 and February 28, 2003. (Compl. ¶¶ 7-8, 114-124.) Jones and Daidone left their positions at CAM well before the end of the purported class period.

### E.    Procedural History

On September 26, 2007, this Court dismissed Plaintiffs' claim under Section 36(b) on the ground that it could only be brought derivatively. The Court also dismissed Plaintiffs' claims

---

[5/] *See also* Certification of Operating Engineers Local 649 Annuity Trust Fund, attached as Exhibit 1 to the Declaration of Joseph R. Seidman (Dkt. No. 49).

under Section 10(b) for failure to plead the element of materiality, and dismissed the claims

under Section 20(a) for failure to plead an underlying violation of the federal securities laws.

*See In re Smith Barney Fund Transfer Agent Litig.*, No. 05 Civ. 7583, 2007 WL 2809600, at *3-

*5 (S.D.N.Y. Sept. 26, 2007).  The Court did not address Defendants' argument that Plaintiffs

lacked standing to assert their Section 10(b) claims directly, or that the Section 10(b) claims were

time-barred, or that the Section 20(a) claims were barred for failure to plead control or culpable

participation.  *See id.* at *4 n.2.  Although the Court granted leave to replead the Section 36(b)

claims as a derivative action, Plaintiffs elected to stand on their Complaint and appealed the

decision to the U.S. Court of Appeals for the Second Circuit.

The Second Circuit affirmed the dismissal of the Section 36(b) claims, holding that "[t]o

the extent Local 649 seeks damages that inure to its own benefit and not to the Funds', that result

is not permitted by § 36(b)."  *See Operating Local 649*, 595 F.3d at 98.  The Second Circuit

vacated and remanded this Court's dismissal of the Section 10(b) claims, however, holding that

Plaintiffs had adequately pleaded material misrepresentations and loss causation.  *Id.* at 93-96.

Defendants' alternative grounds for dismissal of Plaintiffs' Section 10(b) and 20(a) claims were

not addressed by this Court on Defendants' initial motion in 2006 and, thus, were not reviewed

by the Second Circuit on appeal.

### F.    The Plan Of Distribution Of Settlement Funds

The SEC Settlement Order directed payment of the following amounts to the Funds:

(1) $17 million representing the Revenue Guarantee amounts, plus approximately $7 million in

prejudgment interest (Rothermich Decl., Ex. B, at 19, ¶ IV.E); and (2) the escrowed $9.4 million

in profits for the period December 1, 2004 through January 1, 2006, paid to the Funds in April

2006.  (Rothermich Decl., Ex. E.)  The Citi Defendants paid the remaining disgorgement and

prejudgment interest amounts, representing over $103 million, to the U.S. Treasury, and those

funds were placed in a statutory Fair Fund.  (Rothermich Decl., Ex. B, at 19-20, ¶¶ IV.E-H.)

On February 25, 2010, after the Second Circuit's decision, the SEC posted a revised

Proposed Plan of Distribution for the remaining settlement funds.  *See* Release No. 34-61587,

*available at*: http://www.sec.gov/litigation/admin/2010/34-61587.htm.  The public comment

period for the revised Plan of Distribution closed without comment on March 29, 2010.  *See id.*

On April 15, 2010, the SEC approved the proposed Plan of Distribution.  *See* Order Approving

Plan of Distribution, *available at*: http://www.sec.gov/litigation/admin/2010/34-61917.pdf.  The

approved Plan of Distribution requires that the remaining disgorgement and prejudgment interest

amounts be paid directly to the Funds that paid transfer agent fees to CTB between October 1,

1999, and November 30, 2004, in proportion to the total fees paid by each Fund or class of a

Fund, subject to certain adjustments.  *See* Final Plan of Distribution, *available at*:

http://www.sec.gov/litigation/admin/2010/34-61917-fdp.pdf.

## ARGUMENT

### I. PLAINTIFFS LACK STANDING TO ASSERT SECTION 10(b) CLAIMS AGAINST ALL DEFENDANTS IN CONNECTION WITH THE PAYMENT OF TRANSFER AGENT FEES BY THE FUNDS

#### A. Breaches Of Duty With Respect To The Payment Of Transfer Agent Fees By The Funds Are Derivative And Not Direct Claims

State law generally determines whether a shareholder's claim must be pursued

derivatively, even when the claim is brought under a federal statute.  *See, e.g.*, *Strougo v.*

*Bassini*, 282 F.3d 162, 169 (2d Cir. 2002); *In re Sunrise Sec. Litig.*, 916 F.2d 874, 879 (3d Cir.

1990).  As the Funds are organized under the laws of Maryland and Massachusetts, the law of

those two States governs this dispute.  *See In re AllianceBernstein Mut. Fund Excessive Fee*

*Litig.*, No. 04 Civ. 4885, 2005 WL 2677753, at *3 (S.D.N.Y. Oct. 19, 2005) (when deciding

whether claims should be brought directly or derivatively, courts must look to the law of the fund's State of incorporation).

As this Court previously held with regard to Plaintiffs' Section 36(b) claim, a suit is derivative under Maryland and Massachusetts law if the shareholders' alleged injury "is not 'distinct' from that suffered by the corporation." *In re Smith Barney*, 2007 WL 2809600 at *4. Here, "Plaintiffs have alleged a harm to the Funds—the excessive fees paid by the Funds—but no distinct harm to themselves," because "all alleged damages stem from the purportedly excessive fees paid . . . by the Funds." *Id.* at *4.

The same rationale supports dismissal of Plaintiffs' direct Section 10(b) claims, because the distinction between a direct and a derivative claim turns on the injury alleged, and Plaintiffs' Section 10(b) claims are premised on the same non-"distinct" injury as their Section 36(b) claim. A shareholder must suffer an injury distinct from any injury to the corporation in order to pursue a direct claim based on that injury. *See Strougo*, 282 F.3d at 170 (under Maryland law courts ask "whether the shareholders' injury is 'distinct' from that suffered by the corporation"); *Forsythe v. Sun Life Fin., Inc.,* 417 F. Supp. 2d 100, 112 (D. Mass. 2006) (under Massachusetts law a cause of action is derivative if the shareholder is harmed "because the corporate entity has been injured"); *see generally* 12B Carol A. Jones, Fletcher Cyclopedia on the Law of Corporations § 5911, 517 (rev. perm. ed. 2009) ("It has been stated that the issue of whether a shareholder's claims are derivative or direct turns solely on who suffered the alleged harm and who would receive the benefit of any recovery or other remedy."); *id.* at 519-20 (an action is derivative if the injury is to the corporation or its stock or property, without any severance or distribution among shareholders). In short, if a corporation suffers an injury, and the corporation's shareholders suffer proportionate harm as a result of that injury to the corporation, then shareholder claims

premised on that injury—whether pursued under Section 10(b) or otherwise—may only be pursued derivatively.

Absent a "distinct" injury, courts have dismissed improperly pleaded direct claims.  For example, in the recent Second Circuit decision in *Halebian v. Berv*, 590 F.3d 195 (2d Cir. 2009), the plaintiff had alleged that a proxy statement contained material misstatements, including a failure to say that fund assets were being diverted, allegedly violating Section 20(a) of the Investment Company Act of 1940 and State law.  *Id.* at 201.  The Second Circuit found that one aspect of the plaintiff's claims was "undoubtedly derivative—that the Board violated its fiduciary duties by failing to disclose 'the diversion of CitiTrust assets for the benefit of others.'" *Id.* at 207-08 (citation omitted).  The Second Circuit explained that this was "plainly an attempt to restate a classic derivative claim—that the corporation was harmed because its assets were diverted, thereby harming the corporation's shareholders."  *Id.* at 208.  The court thus held that the district court "did not err in rejecting [those claims] insofar as they contain such allegations." *Id.*  The Second Circuit came to a similar conclusion in an earlier case, *Rand v. Anaconda-Ericsson, Inc.*, 794 F.2d 843 (2d Cir. 1986).  There the court dismissed a Section 10(b) claim, and in doing so suggested that the claimed injury was derivative.  The court found that the shareholders' "damage claim" under Section 10(b) was "identical" to one of the company's own claims against the defendant.  *Id.* at 848.  The Second Circuit expressly found that plaintiffs lacked standing to sue under RICO because "[a]ny decrease in value of plaintiffs' shares merely reflects the decrease in value of the firm as a result of the alleged illegal conduct."  *Id.* at 849. Although the court dismissed the Section 10(b) claim for a different reason, it found that the RICO and Section 10(b) claims were alike:  "The RICO action, *like plaintiffs' Section 10(b)*

*claim*, is a corporate asset, and *shareholders cannot bring it in their own names* without impairing the rights of prior claimants to such assets." *Id.* (emphasis added).

Numerous decisions by this Court and others are in accord. *See, e.g.*, *Kauffman v. Dreyfus Fund, Inc.*, 434 F.2d 727, 732 (3d Cir. 1970) (mutual fund shareholder lacked standing to assert direct claims under Sherman Act, Investment Company Act, Securities Exchange Act, and Investment Advisers Act, where alleged injury was "inflicted upon the corporation and the only injury to the shareholder is the indirect harm which consists in the diminution in value of his corporate shares"); *Perlman v. Salomon Inc.*, No. 92 Civ. 5208, 1995 WL 110076 (S.D.N.Y. Mar. 14, 1995) (plaintiff who did not purchase shares at artificially inflated prices did not suffer "distinct" injury and so lacked standing to bring direct securities fraud claims); *Atwood Grain & Supply Co. v. Growmark, Inc.*, 712 F. Supp. 1360, 1364 (N.D. Ill. 1989) (claims under Exchange Act, RICO, and for fraud and breach of fiduciary duty could not be asserted directly because claims stated an injury to the company); *Kuntz v. Shawmut Bank of Boston*, No. 86 Civ. 6771, 1987 WL 11172, at *2-*3 (S.D.N.Y. May 12, 1987) (no direct claim for alleged violations of securities laws, including Rule 10b-5, where "[t]he only injury which plaintiff alleges he personally suffered is the decline in value of his shares").

The Complaint only asserts a derivative injury because the alleged injury to Plaintiffs results only from the diminished value of the Funds due to the price paid for TA services by the Funds. Plaintiffs allege that the Defendants "diminished the value" of the Plaintiffs' shares in the Funds "by misappropriating and diverting tens of millions of dollars from [the] Funds' shareholders" in the form of excessive fees. (Compl. ¶ 136; *see id.* (alleging increased "transaction fees"); *id.* at ¶ 13 ("Defendants' actions drained money *out of the Funds* throughout the Class Period" and "increased *the Funds' expenses*" (emphasis added)).) Plaintiffs thus claim

- 14 -

that they were harmed by diminished share value, "a classic derivative claim" in which "the corporation was harmed because its assets were diverted, thereby harming the corporation's shareholders." *Halebian*, 590 F.3d at 208; *see also, e.g.*, *Strougo*, 282 F.3d at 174 (decreased share price due to decreased corporate assets "precisely" the type of injury that can be redressed only through derivative suit); *In re AllianceBernstein*, 2005 WL 2677753, at *4. There is no injury pleaded that is distinct from an injury to the Funds.

The Complaint's other allegations of injury are also manifestly derivative. *First*, Plaintiffs allege that they were injured by purchasing the Funds' shares "at distorted NAV values." (Compl. ¶ 137.) But Net Asset Value, as the term implies, is simply derived from the net value of the *Fund's* assets (total assets minus liabilities), divided by the number of outstanding shares. *See* John Downes & Jordon Goodman, Dictionary of Finance and Investment Terms, 454 (7th ed. 2006). This measure of "injury" is just another way of saying that excessive TA fees injured the Funds by diminishing their assets. In any event, merely *purchasing* shares at "distorted" values does not state an injury under Section 10(b). *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005) ("as a matter of pure logic, at the moment the transaction takes place, the plaintiff has suffered no loss"). *Second*, Plaintiffs allege that there were "lost opportunity damages" because money the Funds paid in TA fees "could have been invested for further gains." (Compl. ¶ 138.) But this asserts no injury distinct from injury to the Funds, and lost investment opportunities are otherwise too speculative to provide a basis for damages under Section 10(b). *See Aimis Art Corp. v. Northern Trust Sec., Inc.*, 641 F. Supp. 2d 314, 320 (S.D.N.Y. 2009) (plaintiff cannot recover for damages based on hypothetical investments he did not make); *see also* 15 U.S.C. § 78bb(a) (damages recovered may not be in

excess of "actual damages"). Plaintiffs' claimed injuries simply cannot support a direct claim under Section 10(b).

Indeed, the Second Circuit's analysis of why Plaintiffs' Complaint adequately alleged loss causation reinforces the conclusion that Plaintiffs pleaded only *derivative* loss—an issue the Second Circuit did not consider. The Second Circuit found that according to the Complaint, misrepresentations caused investors to make and maintain investments "in Funds that were subject to excessive fees and expenses" and that the "deduction of those fees and expenses reduced the value of the investments over time" and "negatively and predictably impacted returns." *Operating Local*, 595 F.3d at 96. Any such injuries to shareholders clearly flow from the diversion of assets *from the Funds*, and are thus plainly derivative. *See Halebian*, 590 F.3d at 208; *Strougo*, 282 F.3d at 172.

### B.  Plaintiffs Lack Standing To Pursue Claims Involving Funds In Which They Did Not Invest

Plaintiffs lack standing to assert claims on behalf of investors in 102 of the Funds because they did not invest in those Funds and did not personally suffer a "concrete and particularized" injury that is "fairly traceable to the challenged action of the defendant" and that would be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (alterations and ellipsis omitted). Article III requires that the named plaintiff suffer the injury that gives rise to the claim. *See Lewis v. Casey*, 518 U.S. 343, 357-58 & n.6 (1996) (named plaintiff lacked standing to assert class claim based on specific injuries that he did not personally suffer); *Griffin v. Dugger*, 823 F.2d 1476, 1483 (11th Cir. 1987) (same). The standard requires that the "named plaintiff in a class action that purchased securities from one issuer does not have standing to bring claims on behalf of purchasers of securities from a *different issuer*." *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, No. 05

- 16 -

Civ. 1898, 2005 WL 2148919, at *4 (S.D.N.Y. Sept. 6, 2005) (emphasis in original) (citing *In re Initial Public Offering Sec. Litig.*, 341 F. Supp. 2d 328, 346 (S.D.N.Y. 2004) (dismissing Section 10(b) claims for lack of standing)).

Named plaintiffs have only purchased shares in three of the 105 Funds (Compl. ¶¶ 14-16), and do not purport to have transacted in shares of any other of the Funds. They thus did not suffer any injury "in connection with the purchase or sale" of shares of the other 102 Funds. 15 U.S.C. § 78j(b); *see also* 17 C.F.R. § 240.10b-5 (same); *W. R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 111 (2d Cir. 2008) (holding that investment adviser lacked standing to assert claims for violation of securities laws because adviser did not hold legal title to securities); *Hoffman v. USB-AG*, 591 F. Supp. 2d 522, 530-31 (S.D.N.Y. 2008) (dismissing Section 10(b) claims for lack of standing because plaintiffs could not "claim to be personally injured by violations relating to [funds in which they had not personally invested]").

A recent decision by Judge Wexler of the Eastern District of New York is illustrative of these principles. In *City of Ann Arbor Employees' Retirement System v. Citigroup Mortgage Loan Trust Inc.*, No. CV 08-1418, 2010 WL 1371417 (E.D.N.Y. Apr. 6, 2010), the plaintiff alleged that it and the putative class members had purchased mortgage-backed securities issued by eighteen different trusts, in reliance on statements in the trusts' registration statements and prospectuses. *Id.* at *4. Plaintiff, however, purchased securities issued by only two of the eighteen trusts. The Court concluded that plaintiff therefore lacked standing to make "any claim of injury flowing from false statements" about mortgage-backed securities in which it did not invest. *Id.* at *7. The key inquiry was not whether the alleged misstatements in the various prospectuses were similar or even identical, but rather whether the named plaintiff "suffered . . . injury that is traceable to Defendants' conduct." *Id.* Courts of this District have repeatedly

- 17 -

applied this fundamental principle in comparable cases and dismissed claims for lack of

standing.  *See New Jersey Carpenters Health Fund v. Residential Capital, LLC*, No. 08 Civ.

8781, 2010 WL 1257528, at *4 (S.D.N.Y. Mar. 31, 2010) (dismissing claims relating to offerings

that named plaintiffs did not purchase for lack of standing); *New Jersey Carpenters Vacation

Fund v. Royal Bank of Scotland Group, PLC*, No. 08 Civ. 5093, 2010 WL 1172694, at *8

(S.D.N.Y. Mar. 26, 2010) (same); *In re Lehman Bros. Sec. & ERISA Litig.*, No. 09-MD-2017,

2010 U.S. Dist. Lexis 13856, *8 (S.D.N.Y. Feb. 17, 2010) (dismissing claims relating to 85 of 94

securities offerings because "no named plaintiff has alleged that he or she purchased Certificates

in any of the other eighty-five offerings"); *In re Salomon Smith Barney Mut. Fund Fees Litig.*,

441 F. Supp. 2d 579, 605-07 (S.D.N.Y. 2006) (dismissing claims relating to 68 mutual funds in

which plaintiffs did not invest); *see also In re AIG Advisor Group Sec. Litig.*, No. 06 Civ. 1625,

2007 WL 1213395, at *3-6 (E.D.N.Y. Apr. 25, 2007) (dismissing claims relating to "funds other

than the ones in which plaintiffs allege they actually invested"), *aff'd*, *on other grounds,* 309 F.

App'x 495 (2d Cir. 2009).

Although Plaintiffs maintained during the scheduling conference that their adequacy to

represent investors in the 102 Funds in which they did not invest should be deferred until class

certification, Plaintiffs have conflated standing with typicality or adequacy under Rule 23 of the

Federal Rules of Civil Procedure.  If no named plaintiff has standing to bring a claim based on

transactions in the shares of a particular Fund, the Court lacks subject matter jurisdiction as to

those claims, and they should be dismissed at the outset.  *See, e.g.*, *In re Initial Pub. Offering

Sec. Litig.*, 341 F. Supp. 2d at 346 (dismissing Section 10(b) claims for lack of standing and

noting that "while the question of standing may be deferred to the class certification stage in

exceptional circumstances, such deferral is not warranted here").

C.    **The Complaint's "Holder" Claims Should Also Be Dismissed For Lack Of Standing Under *Blue Chip Stamps* And *Merrill Lynch v. Dabit***

Mutual fund holders who neither purchased nor sold fund shares during the class period do not have claims under Section 10(b) of the Exchange Act.  *See Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 80-82 (2006) (noting that Court has long held that only purchasers and sellers have private cause of action under Exchange Act (citing *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975))); *Amorosa v. Ernst & Young LLP*, No. 03 Civ. 3902, 2009 U.S. Dist. Lexis 112633, at *44 (S.D.N.Y. Nov. 30, 2009) ("[A] 'holder' plaintiff continues to have no private right of action under Section 10(b) of the 1934 Act.").  As the Supreme Court explained in *Blue Chip Stamps* and reiterated in *Dabit*, the scope of the implied private right of action under Section 10(b) excludes "holders" in order to strike the proper balance between "the federal interest in protecting the integrity and efficient operation of the market for nationally traded securities" and "a danger of vexatiousness different in degree and in kind from that which accompanies litigation in general."  *Dabit*, 547 U.S. at 78, 80 (citing *Blue Chip Stamps*).

Plaintiffs purport to assert holder claims in this case, despite the longstanding and frequently affirmed bar against them.  Plaintiffs allege generally that "[t]hroughout the Class Period," Defendants made misleading statements about transfer agent fees on which Plaintiffs "directly or indirectly" relied (Compl. ¶¶ 141, 144), and that as a consequence Plaintiffs "*held* their Fund shares during the Class Period" (*id.* ¶ 145) (emphasis added).  As a particular example, named plaintiff Jeffrey Weber has made none of the required representations to pursue a claim, failing to allege that he either purchased or sold fund shares during the putative class

period.[6/]  *Blue Chip Stamps* and *Dabit* require that his claims relating to the Smith Barney Large

Cap Growth and Value Fund be dismissed.

## II.    PLAINTIFFS' CLAIMS ARE TIME-BARRED AS TO ALL DEFENDANTS

### A.    Plaintiffs' Section 10(b) Claims Were Filed After The Expiration Of The Applicable 2-Year Statute Of Limitations Period

Plaintiffs' Section 10(b) claims are time-barred unless filed within two years from

discovery of the facts constituting securities fraud.  28 U.S.C. § 1658(b).  This limitations period

begins to run "once the plaintiff did discover or a reasonably diligent plaintiff would have

discovered the facts constituting the violation."  *Merck & Co. v. Reynolds*, 559 U.S. __ , 2010

WL 1655827, at *15 (Apr. 27, 2010), slip op. at 17 (internal quotation marks and alterations

omitted).  The word "discovery" in this context "refers not only to a plaintiffs' *actual* discovery

of certain facts, but also to the facts that a reasonably diligent plaintiff would have discovered."

2010 WL 1655827, at *9, slip op. at 8 (emphasis in original).  Here, a reasonably diligent

investor would have discovered the facts constituting the alleged Section 10(b) violation—

including scienter—on December 1, 2003, or at the very latest by March 1, 2004, which was

over two years before the Complaint was filed on June 1, 2006.  *Id.*

The Funds' prospectus supplements filed in November and December 2003, and

additional public filings in March 2004, provided ample disclosure for a reasonably diligent

investor to discover facts constituting the alleged securities violation.  Investors "are presumed to

have read prospectuses . . . and other information related to their investments." *Benak v. Alliance*

---

[6/]  Certification of Jeffrey Weber, attached as Exhibit 1 to the Declaration of Joseph R. Seidman (Dkt. No. 49).

*Capital Mgmt. L.P.*, 435 F.3d 396, 400 (3d Cir. 2006).  On December 1, 2003, for instance,[7/] the

prospectus supplements for the Smith Barney Capital Preservation Fund and Smith Barney Large

Cap Growth and Value Fund' disclosed:

> CAM is reviewing **its entry, through an affiliate, into the transfer agent business in the period 1997-1999**. . . . CAM **sub-contracted** for a period of five years certain of the **transfer agency services to a third party and also concluded a revenue guarantee agreement with this sub-contractor providing that the sub-contractor would guarantee certain benefits to CAM or its affiliates (the "Revenue Guarantee Agreement")**. . . .
>
> **The Boards of the CAM-managed funds ("the Boards") were not informed of the Revenue Guarantee Agreement** . . . .
>
> CAM has begun to take corrective actions.  CAM will pay to the applicable funds $16 million (plus interest) that CAM and its affiliates received from the Revenue Guarantee Agreement.  **CAM also plans an independent review to verify that the transfer agency fees charged by CAM were fairly priced as compared to competitive alternatives**. . .
>
> CAM has briefed the SEC, New York State Attorney General and other regulators with respect to this matter, as well as the **U.S. Attorney who is investigating the matter**.

(Compl. ¶ 125) (emphasis added).

Information in other documents published in 2003 provided more facts about the alleged

securities fraud to the diligent investor.  Plaintiffs are charged with knowledge of publicly

available news articles to the extent they provide facts constituting the alleged fraud.  *See In re*

*Initial Pub. Offering Sec. Litig.*, 341 F. Supp. 2d 328, 345 (S.D.N.Y. 2004).  Beginning on

November 25, 2003, a flood of articles in widely read news publications reported on the very

---

[7/]  For some Funds, the prospectus supplements disclosing this information were dated between late November 2003 and January 24, 2004; the content of these prospectus supplements is identical to the December 1, 2003 supplements for the Smith Barney Capital Preservation Fund and Smith Barney Large Cap Growth and Value Fund that are cited in this brief and the Complaint (Compl. ¶ 125).

issues raised by the Complaint.[8/]  These publications, similar to the prospectus supplements,

disclose the Revenue Guarantee, raise doubts about the entire TA arrangement and discuss the

active criminal and regulatory investigations concerning the TA arrangement.  Exhibit F to the

Declaration of John Rothermich (Dkt. No. 71) includes 28 media publications dated November

or December 2003.

       In sum, as of December 2003, Plaintiffs knew that

- CAM was reviewing its affiliate's entry into the transfer agent business;
- the Citi Defendants had negotiated a revenue guarantee agreement to their benefit;
- a one-time payment had been made to eliminate the continuing right to those benefits;
- the Fund boards were *not* contemporaneously informed of the revenue guarantee agreement or its amendment;
- CAM was paying over $16 million dollars as a corrective action to the Funds;
- CAM had instituted new procedures to ensure that no similar arrangements would be entered into in the future;
- the SEC, the New York Attorney General and the United States Attorney for the Southern District of New York were investigating potential improprieties;
- the investigations were looking into improprieties including possible intentional misconduct, false disclosures, and improper kickbacks;
- there were "problems" in the revenue-guarantee agreement;
- media sources suggested that executives of the asset-management unit had overstepped their bounds; and
- the TA arrangement "was not done the way it should have been," and that "[t]hese errors never should have occurred."

(Rothermich Decl., Ex. F.).

       The public disclosures made in 2003 covered each of the four ways in which the

Complaint, filed in 2006, alleges fraud.  *First*, the Complaint alleges failure to disclose the

Revenue Guarantee.  (Compl. ¶ 115.)  However, by December 1, 2003—more than two years

before the Complaint was filed—Fund prospectuses and news articles disclosed the Revenue

---

       [8/] The Court may take judicial notice of newspaper articles discussing the issues raised by the Complaint.  *Shah v. Meeker*, 435 F.3d 244, 249 (2d Cir. 2006); *In re Salomon Analyst Winstar Litig.*, No. 02 Civ. 6171 (GEL), 2006 WL 510526, at *4 n.6 (S.D.N.Y. Feb. 28, 2006).

Guarantee, that the Fund boards "were not informed of the Revenue Guarantee" (*id.* ¶ 125), and that investigators were determining whether disclosure rules were violated (Masters, *Washington Post*, *supra*). *Second*, the Complaint refers to "the misleading process which led to the appointment of the sub-TA." (*Id.* ¶ 115.) However, by December 1, 2003, public disclosures and news articles explicitly stated that the Revenue Guarantee was not disclosed to Fund boards and that prosecutors, regulators, and CAM were investigating the process in which CAM entered the TA business. *Third*, the Complaint alleges misstatements and omissions concerning the amount and fairness of TA fees. (*Id.* ¶ 115.) Yet again, by December 1, 2003, the prospectus and widely read media publications reported that CAM was reviewing "whether the transfer agency fees charged . . . were fairly priced" (*id.* ¶ 125) and that regulators were investigating the possibility of "an improper kickback" (Masters, *Washington Post*, *supra*). *Finally*, while the Complaint alleges misstatements and omissions concerning the nature of the contract and division of labor between the TA and the sub-TA (*id.* ¶ 115), by December 1, 2003, the fact that "First Data [was]. . . providing much of those same [TA] services, only this time as a subcontractor" had been disclosed.

Additional prospectuses and news stories containing additional public disclosures about the TA arrangement were released in March 2004. For instance, Smith Barney Trust II disclosed in a prospectus issued March 1, 2004, that "CAM will pay . . . approximately $17 million (plus interest)" to the Funds, that "CAM is strengthening its procedures in order to avoid similar situations in the future," and that "CAM has given this information to regulators and other government authorities, and understands that the SEC and the U.S. Attorney are investigating this situation." (Compl. ¶ 127.) Also on March 1, 2004, Citigroup filed an annual report with the SEC disclosing that the company had "received subpoenas and other requests for information

from various government regulators . . . in connection with various investigations, including an

investigation by the [SEC] and a United States Attorney into the arrangements under which we

became the transfer agent for many of the mutual funds in the Smith Barney fund complex."

(Rothermich Decl., Ex. G, at 126.)  These disclosures were followed by a second wave of press

coverage in March 2004.  (Rothermich Decl., ¶ 9 & Ex. H.)

        These public disclosures were sufficient to lead a reasonably diligent plaintiff to discover

the facts constituting each element of the alleged violation more than two years before the

Complaint was filed on June 1, 2006.  Considered collectively, the disclosures made prior to

June 1, 2004 alerted investors to the alleged "faithlessness" of the Funds' investment adviser—

which the Second Circuit relied on in holding that the Complaint sufficiently pleaded a Section

10(b) claim.  *Operating Local*, 595 F.3d at 93.  To the extent Plaintiffs allege scienter (which

they fail to allege as to Jones or Daidone, *see infra* Part III & n.9), such scienter was sufficiently

disclosed by Fund documents and media stories expressly referencing criminal investigations,

"kickbacks," and CAM's acknowledgement that the arrangement was improper.  *Cf. Marshall v.

Millberg LLP*, 07 Civ. 6950(LAP), 2009 WL 5177975 at * 3 (S.D.N.Y. Dec. 23, 2009) (news

articles disclosing grand jury investigation put plaintiff on inquiry notice).

        **B.    The Section 10(b) Claims Against All Defendants Do Not Relate Back To
                Prior Complaints**

        Plaintiffs' Section 10(b) claims do not relate back to the complaints filed in 2005.  Where

an amended complaint includes allegations that do not arise "out of the conduct, transaction, or

occurrence set forth or attempted to be set forth in the original pleading," these allegations do not

relate back to the original complaint and are assessed for statute-of-limitations purposes from the

date the amended complaint was filed.  Fed. R. Civ. P. 15(c)(1)(B).  Allegations in an amended

complaint that set forth "a different set of operative facts" do not arise out of the same conduct,

transaction, or occurrence set forth in the prior complaint, even if the amended complaint and the

original complaint assert the same legal theory or rest on "the same ultimate event." *Bank

Brussels Lambert v. Chase Manhattan Bank*, No. 93 Civ. 5298 (LMM), 1999 WL 672302, at *2

(S.D.N.Y. Aug. 27, 1999); *see also, e.g.*, *Nettis v. Levitt,* 241 F.3d 186, 192-93 (2d Cir. 2001),

*overturned on other grounds*, *Slayton v. American Express Co.*, 460 F. 3d 215, 226-28 (2d. Cir.

2006) (amending standard of review from abuse of discretion to de novo).

        Here, the Section 10(b) claims in the Complaint do not relate back to the prior complaints

as to any of the Defendants because they set forth a different claim based on a distinct set of

operative facts.  Specifically, the conduct, transaction, or occurrence alleged in the Complaint

and providing the basis for Plaintiffs' Section 10(b) claims is that, from September 2000 through

May 2005, Fund investors were misled by misrepresentations and omissions in Fund

prospectuses and other public filings.  (*See e.g.*, Compl. ¶ 30, ¶¶ 114-35, ¶¶ 140-47.)   By

contrast, the prior complaints, filed in August and September 2005, only reiterated the SEC

Settlement Order that Defendants misled the Funds' *boards* with internal memoranda and

presentations made in 1999.  (*See, e.g.*, Compl. ¶¶ 63-77, *Chilton v. Smith Barney Fund*

*Management LLC*, No. 05 Civ. 7583, Dkt. No. 1 (Aug. 26, 2005).)  Although one of these

claimants subsequently filed an amended complaint adding a Section 10(b) claim, (*see* Amended

Complaint ¶¶ 63-77, *Shropshire v. Smith Barney Fund Management LLC*, No. 05 Civ. 7818, Dkt.

No. 6 (Oct. 10, 2005)), that amended complaint was still based upon the same factual allegations

relating to statements made to the Funds' boards.  None of the initial complaints alleged

misrepresentations or omissions in statements to investors.

        Courts have routinely determined that there was no relation back where the prior

complaints restated SEC allegations of a particular type of misconduct, whereas the amended

complaint "alleged for the first time" a distinct type of misconduct such as "misrepresentations and omissions in the prospectus." *SEC v. Seaboard Corp.*, 677 F.2d 1301, 1304-05, 1314 (9th Cir. 1982); *see also In re Worldcom Inc. Sec. Litig.*, 308 F. Supp. 2d 214, 231-32 (S.D.N.Y. 2003). By alleging misstatements and omissions made in different documents during a different time period, the Section 10(b) claims in the Complaint set forth "a separate alleged act of fraud" that does not relate back to the prior complaints. *In re Bausch & Lomb, Inc. Sec. Litig.*, 941 F. Supp. 1352, 1366 (W.D.N.Y. 1996).

### C. The Claims Against Jones And Daidone Do Not Relate Back For The Additional Reason That Jones and Daidone Were Not Named As Defendants In The Original Complaints

Plaintiffs' claims against Jones and Daidone were not filed until June 1, 2006. Those claims do not relate back to the original complaints filed between August 26 and September 30, 2005, for the additional reason that none of those complaints named Jones or Daidone as defendants.

Under Federal Rule of Civil Procedure 15(c)(1)(C), an amendment that "changes the party . . . against whom a claim is asserted" relates back to the original pleading *only* when: (1) the claim arose out of the same conduct, transaction, or occurrence; *and* (2) the newly added party received notice of the action within 120 days of the filing of the initial complaint; *and* (3) the newly added party "knew or should have known that the action would have been brought against it, *but for a mistake concerning the proper party's identity*." Rule 15(c)(1)(C) (emphasis added). Further, where an individual's identity is a matter of public record, a plaintiff's failure to name him in an initial pleading is "inexplicable." *See Pape v. Bd. of Educ. of the Wappingers Cent. Sch. Dist.*, No. 07-CV-8828, 2009 WL 3151200, at *15 (S.D.N.Y. Sept. 29, 2009).

As Plaintiffs recognize, the claims against the Individual Defendants do not relate back to the original complaints because there was no mistake concerning their identity. *See* Mem. in

Opp. to Defendants' Motion to Dismiss ("Pl. Mem.") (Dkt. No. 72) at 31-34.  Indeed, the

Individual Defendants were not incorrectly identified in the original complaints, nor were other

parties mistakenly named in their place.  Instead, the previous pleadings simply omitted Jones

and Daidone despite the fact that Daidone was listed on numerous public filings with the SEC.

Accordingly, June 1, 2006, the date on which the Individual Defendants were added to this

action, is the pertinent date for statute of limitations purposes.  *See Pape*, 2009 WL 3151200, at

*15.

Thus, the key inquiry for the Individual Defendants is what Plaintiffs knew as of June

2004.  In addition to all the information Plaintiffs had learned as of December 2003, *see supra*

Part II.A, Plaintiffs also had notice of additional facts further illuminating the alleged violation.

In particular, by March 2004—more than two years before Plaintiffs added Jones and Daidone as

party defendants—Plaintiffs also knew that

- CAM was paying over $17 million dollars as a corrective action to the Funds;
- CAM was strengthening its procedures to avoid similar situations in the future;
- CAM had received subpoenas and other requests for information from various government regulators in connection with investigations by the SEC and the United States Attorney for the Southern District of New York; and
- CAM had given information to regulators and other governmental authorities.

These additional facts, including the interest of government authorities responsible for

prosecuting fraud and other intentional misconduct, provided further information allowing a

reasonably diligent plaintiff to discover elements of Plaintiffs' allegations, including scienter to

the extent it is alleged (and it is not alleged adequately as to Jones, *see infra* Part III).  Because

this information was available more than two years before filing the Complaint, the claims as to

Jones and Daidone are barred by the statute of limitations.

**III.    PLAINTIFFS' CLAIMS AGAINST JONES SHOULD BE DISMISSED BECAUSE THE ALLEGATIONS AGAINST HIM FAIL TO STATE ANY FACTS GIVING RISE TO A STRONG INFERENCE OF SCIENTER[9/]**

Plaintiffs claim that misleading statements in Fund prospectuses and other SEC filings "deceive[d] the investing public" and "induce[d] Class members to purchase shares of the Funds at distorted prices."  (Compl. ¶¶ 141, 114-35.)  There are no allegations connecting Jones to the prospectuses or the SEC filing—which are the only communications to Plaintiffs alleged in the Complaint.  Because the Complaint fails to state any "facts giving rise to a strong inference" that Jones acted with scienter as to these statements, the Court should dismiss Plaintiffs' claims against Jones.  PSLRA § 21D(b)(2) (15 U.S.C. § 78u-4(b)(2)); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).

Scienter requires an "intention to deceive, manipulate, or defraud."  *Tellabs*, 551 U.S. at 319 (internal quotation omitted).  The Second Circuit recognizes two methods for pleading scienter: (1) by alleging facts showing that the defendant had the motive and opportunity to commit the fraud, or (2) by alleging facts showing strong circumstantial evidence of conscious misbehavior or recklessness.  *ECA and Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009); *South Cherry St., LLC v. Hennessee Group LLC*, 573 F.3d 98, 111 (2d Cir. 2009).  To qualify as a *strong* inference, however, the inference of scienter must be "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *Tellabs*, 551 U.S. at 314.

---

[9/]    In the initial briefs filed in support of this motion, Daidone advanced the arguments that scienter was not adequately pleaded as to him and that, in any event, Plaintiffs' controlling person claims under Section 20(a) were fatally flawed.  Rather than burden the Court with duplicative arguments, Daidone relies on the initial briefs in support of these assertions.  Both Jones and Daidone incorporate by reference the initial briefs.

### A.    The Only Logical Inference From The Allegations Is That Jones Believed That Fund Shareholders Received A Full Disclosure Of All Material Information

Plaintiffs claim that misleading statements in prospectuses and an SEC filing misrepresented and failed to disclose facts concerning the Funds' transfer agent. Jones was the CEO of CAM, a nonparty entity that was the Citigroup business unit that included, among other business entities, the Funds' Investment Adviser. (Compl. ¶ 131.) The allegations support only an inference that Jones played a limited role—long before the class period—in events leading to the decision to appoint a CAM affiliate as transfer agent and First Data as sub-transfer agent. There is no allegation that Jones had any role during the class period in making any allegedly misleading communications to Fund shareholders.

The Complaint is more remarkable for what it does *not* say than what it does say about Jones. There is no allegation that, before the class period, Jones participated in the details of the negotiations leading up to the transfer agent proposal (*id.* ¶¶ 44-47, 55-62), was aware of Deloitte & Touche Consulting's presentations expressing concerns over various aspects of the First Data proposal (*id.* ¶¶ 50, 56-58), or attended any of the meetings in March-June 1999, when a revised First Data proposal was presented to the Funds' boards (*id.* ¶ 76). Instead, the Complaint alleges vaguely that Yellin "briefed . . . Jones on the status of the [transfer agent] review project on a regular basis" (*id.* ¶ 2), that Jones approved Yellin's July 1998 recommendation concerning the transfer agent proposal (*id.* ¶ 71), and that Jones cursorily reviewed a memorandum recommending the proposal to the Funds' boards (*id.* ¶ 8). There is no allegation that Jones, as opposed to others, knew or decided what would be disclosed to the Fund boards, much less the public.

There is also no allegation tying Jones to the class period statements made to shareholders long after the Fund boards initially approved the proposal. Jones is not alleged to

have signed, read, drafted, reviewed, approved, or confirmed the supposedly misleading statements in the Fund prospectuses or the SEC filing. (*See id.* ¶¶ 114-35.) Officers of the Funds—not Jones—signed the representations to Fund shareholders. (*See*, *e.g.*, *id.* ¶¶ 118, 121.) It is only those public statements to shareholders during the class period for which Plaintiffs can seek to impose liability. *See Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 149 (2008) (rejecting argument that a plaintiff may base a Section 10(b) claim "not only upon the public statements relating to a security but also upon the transactions those statements reflect"); *In re IBM*, 163 F.3d 102, 107 (2d Cir. 1998) ("[a] defendant . . . is liable only for those statements made during the class period"). The most compelling inference about those statements is that Jones—who was not a Fund officer or a lawyer—believed that the persons responsible for communicating with Fund shareholders in prospectuses or SEC filings would and did fully disclose material information concerning the transfer agent arrangement.

### B.   The Complaint Does Not Support An Inference That Jones Had The Motive And Opportunity To Deceive, Manipulate, And Defraud Shareholders

The Complaint does not attempt to plead scienter through the first method—motive and opportunity. In fact, in the prior round of briefing, Plaintiffs argued that they did "not have to" allege motive to plead scienter. *See* Pl. Mem. at 23 (Dkt. No. 72). To allege motive, a plaintiff must "assert a concrete and personal benefit to the individual defendant[] resulting from the fraud." *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001). "Motives that are generally possessed by most corporate directors and officers do not suffice." *Id.* "[G]eneral allegations of economic self-interest," for example, are insufficient. *Bay Harbor Mgmt. LLC v. Carothers*, 282 F. App'x 71, 76 (2d Cir. 2008).

The Complaint does not satisfy the standard for pleading scienter through motive. Rather, it contains only a vague assertion that "[f]or the purpose of setting compensation . . .

Jones received credit for the revenue" the transfer agent operations generated.  (Compl. ¶ 106.)

This vague allegation of unspecified "credit" is not only "too generalized to demonstrate" any

concrete and personal benefit, *Kalnit*, 264 F.3d at 140, it also has nothing to do with the alleged

misrepresentations to Plaintiffs.  The allegations fail to support any inference that Jones received

a concrete and personal benefit from allegedly misleading statements in Fund prospectuses and

SEC filings, much less that such an inference is as compelling as a nonfraudulent inference.

*Tellabs*, 551 U.S. at 314.

> **C.    The Complaint Does Not Support An Inference That Jones Intended To Deceive, Manipulate, Or Defraud Fund Shareholders Through Conscious Recklessness**

The Complaint also fails to plead scienter through the second method—conscious

recklessness indicating an "'intention to deceive, manipulate, or defraud'" shareholders.  *South*

*Cherry*, 573 F.3d at 108 (quoting *Tellabs*, 551 U.S. at 319).  The Second Circuit describes the

requisite "conscious recklessness" as:

> a state of mind *approximating actual intent*, and *not merely a heightened form of*
> *negligence*. . . .  [W]e have referred to conduct that at the least is highly
> unreasonable and which represents an extreme departure from the ordinary
> standards of care to the extent that *the danger was either known to the defendant*
> *or so obvious that the defendant must have been aware of it*; or to evidence that
> the defendants failed to review or check *information that they had a duty to*
> *monitor*, or ignored *obvious* signs of fraud, and hence should have known that
> they were misrepresenting material facts.  An *egregious* refusal to see the *obvious*,
> or to *investigate the doubtful*, may in some cases give rise to an inference of
> recklessness.

*Id.* at 109 (emphases in original) (internal quotations and citations omitted).  Plaintiffs' burden is

heavy: "Where motive is not apparent . . . the strength of the circumstantial allegations" of

conscious misbehavior or recklessness "must be correspondingly greater."  *Kalnit*, 264 F.3d at

142.

The Complaint does not support an inference that Jones was consciously reckless with respect to statements in the prospectuses and SEC filings issued long after his alleged involvement in pre-class period events.  Generally, an individual like Jones, who neither signed, drafted, produced, reviewed nor disseminated a prospectus, cannot be primarily liable under Section 10(b) for misrepresentations contained in it.  *See, e.g.*, *SEC v. PIMCO Advisors Fund Mgmt.*, 341 F. Supp. 2d 454, 466-67, 72 (S.D.N.Y. 2004) (dismissing Section 10(b) primary liability claim against mutual fund executive who did not sign or draft the allegedly misleading statements).

The claims against Jones fail not only because he cannot be liable for a misstatement or omission in communications he did not make, *see id.*, but also because the allegations do not support an inference that he was consciously reckless.  The Complaint does not allege that Jones knew the contents of or alleged omissions in the prospectuses or filings, or that anyone made him aware that certain information would not be disclosed to shareholders.  Instead, the only logical inference from the allegations is that Jones believed that those persons responsible for statements to Fund shareholders, along with legal and other advisers, would ensure a full disclosure of all material information concerning the transfer agent arrangement to Fund shareholders.

Under *Tellabs*, the inference that a defendant acted with scienter must be at least as compelling as any non-fraudulent inference, including negligence.  *Tellabs*, 551 U.S. at 314; *South Cherry*, 573 F.3d at 114.  Because the Complaint supports no inference that Jones acted with scienter, the claims against him must be dismissed.

- 32 -

**IV.    THE SECTION 20(a) CLAIMS AGAINST THE INDIVIDUAL DEFENDANTS SHOULD BE DISMISSED FOR FAILURE TO PLEAD THE REQUISITE STATE OF MIND, AND FOR FAILURE TO PLEAD AN UNDERLYING VIOLATION**

For the same reasons described above with respect to the Section 10(b) claims, Plaintiffs' Section 20(a) claim against Jones and Daidone should be dismissed for failure to plead the requisite state of mind.  A Section 20(a) claim "requires proof that the defendant acted with a particular state of mind," and the PSLRA thus "requires that, like scienter, the 'culpable participation' element of control person liability must be pled with particularity."  *In re Yukos Oil Co. Sec. Litig.*, No. 04 Civ. 5243, 2006 WL 3026024, at *23 (S.D.N.Y. Oct. 25, 2006) (Pauley, J.) (dismissing Section 20(a) claims for failure to plead facts supporting an inference of conscious misbehavior or recklessness).

Additionally, Plaintiffs' Section 20(a) claim against Jones and Daidone should be dismissed because, for the reasons described above, Plaintiffs failed to state an underlying Section 10(b) claim against the Citi Defendants.

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed with prejudice.

- 33 -

April 28, 2010

Respectfully submitted,

WILMER CUTLER PICKERING HALE
  AND DORR LLP

By:____/s/Lori A. Martin_____
Lori A. Martin
(lori.martin@wilmerhale.com)
Peter K. Vigeland
(peter.vigeland@wilmerhale.com)
David S. Lesser
(david.lesser@wilmerhale.com)
Catherine Marlantes Rahm
(catherine.rahm@wilmerhale.com)
Brian Sutherland
(brian.sutherland@wilmerhale.com)
399 Park Avenue
New York, NY 10022
Tel: (212) 230-8800
Fax: (212) 230-8888

and

David P. Nicolardi
(david.nicolardi@wilmerhale.com)
1875 Pennsylvania Avenue, NW
Washington, DC 20036
Tel: (202) 663-6000
Fax: (202) 663-6363

*Counsel for Defendants Smith Barney*
*Fund Management LLC and Citigroup*
*Global Markets Inc.*

BAKER BOTTS LLP


By:    /s/G. Irvin Terell, Jr.
G. Irvin Terell, Jr.
(irv.terrell@bakerbotts.com)
One Shell Plaza
910 Louisiana St.
Houston, TX 77002
(713) 229-1231


*Counsel for Defendant*
*Thomas W. Jones*


SCHULTE ROTH & ZABEL LLP


By:    /s/Richard J. Morvillo
Richard J. Morvillo
(Richard.Morvillo@srz.com)
Peter H. White
(Peter.White@srz.com)
1152 Fifteenth Street, NW, Suite 850
Washington, DC  20005
(202) 729-7470


*Counsel for Defendant*
*Lewis E. Daidone*