**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| IN RE SMITH BARNEY FUND TRANSFER AGENT LITIGATION | 05 Civ. 7583 (WHP) |
|---|---|

**LEAD PLAINTIFF'S MEMORANDUM**
**OF LAW IN OPPOSITION TO DEFENDANTS' RENEWED MOTION**
**TO DISMISS THE CONSOLIDATED AND AMENDED COMPLAINT**

31751v1

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................ iii

PRELIMINARY STATEMENT ...................................................................................... 1

STATEMENT OF FACTS ............................................................................................... 2

ARGUMENT ................................................................................................................... 8

I.   THE APPLICABLE PLEADING STANDARDS ON A MOTION
     TO DISMISS ......................................................................................................... 8

II.  PLAINTIFF HAS STANDING TO ASSERT ALL CLAIMS ............................... 8

     A.   This Court Has Already Stated That Standing Is Properly Addressed
          At Class Certification .............................................................................. 10

     B.   Other Courts Have Similarly Ruled That Standing Is An Issue For
          Class Certification .................................................................................... 10

     C.   Practical Considerations in This Litigation Warrant Maintaining the
          Present Named Plaintiff Structure ........................................................... 13

     D.   Requiring a Named Plaintiff For Every Fund Would Undermine the PSLRA ...... 14

III. PLAINTIFF'S CLAIMS ARE NOT DERIVATIVE; RATHER,
     PLAINTIFF SEEKS REDRESS FOR DIRECT HARM TO SHAREHOLDERS ............ 15

IV.  PLAINTIFF ALLEGES VIABLE CLAIMS ON BEHALF OF HOLDERS ................... 21

V.   PLAINTIFF HAS SUFFICIENTLY ALLEGED SCIENTER FOR
     THE CORPORATE DEFENDANTS AND THE INDIVIDUAL DEFENDANTS ......... 22

     A.   Applicable Legal Standards ..................................................................... 22

     B.   The Complaint Alleges Facts That Constitute Strong Circumstantial
          Evidence of the Individual Defendants' Conscious Misbehavior
          or Recklessness ........................................................................................ 23

          1.   Daidone and Jones Have Already Been Found to Have
               Acted With Scienter In a Case Based on the Same
               Factual Allegations ........................................................................ 23

          2.   Persistent Illegal Activity Is Probative of Scienter ...................... 25

3.      Daidone and Jones Had Access to Information Revealing
the Fraud ........................................................................................27

4.      The Magnitude of the Diverted Funds and Duration of the
Misstatements Are Probative of Scienter.......................................30

5.      The Individual Defendants' Competing Inferences Are
Unconvincing ................................................................................31

VI.     PLAINTIFF'S CLAIMS ARE TIMELY ....................................................36

A.      Applicable Legal Standards .................................................................36

B.      The Merck Decision.............................................................................36

C.      In This Case, The Limitations Period Did Not Begin To Run
Prior To May 31, 2005 ........................................................................38

VII.    PLAINTIFF ADEQUATELY ALLEGES CONTROL PERSON LIABILITY................40

CONCLUSION..................................................................................................40

# TABLE OF AUTHORITIES

## CASES

**Page**

*Aimis Art Corp. v. N. Trust Sec., Inc.*,
  641 F. Supp. 2d 314 (S.D.N.Y. 2009)...........................................................................20

*Akerman v. Arotech Corp.*,
  608 F. Supp. 2d 372 (E.D.N.Y. 2009) .........................................................................23

*In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*,
  381 F. Supp. 2d 192 (S.D.N.Y. 2004)....................................................................25, 30

*Ashcroft v. Iqbal*,
  129 S. Ct. 1937 (2009)...................................................................................................8

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
  No. 01 Civ. 1125 (GEL),
  324 F. Supp. 2d 474 (S.D.N.Y. 2004)...........................................................................29

*Atwood Grain & Supply Co. v. Growmark, Inc.*,
  712 F. Supp. 1360 (N.D. Ill. 1989) ..............................................................................18

*In re BISYS Sec. Litig.*,
  397 F. Supp. 2d 430 (S.D.N.Y. 2005)...........................................................................34

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007).......................................................................................................8

*Bernhardt v. Tradition N. Am.*,
  676 F. Supp. 2d 301 (S.D.N.Y. 2009)............................................................................8

*In re Blech Sec. Litig.*, 94 Civ. 7696 (RWS),
  2003 WL 1610775 (S.D.N.Y. Mar. 26, 2003) ..............................................................12

*Blue Chip Stamps v. Manor Drugs Stores*,
  421 U.S. 723 (1975)................................................................................................21, 22

*Burstyn v. Worldwide Xceed Group, Inc.*,
  No. 01 Civ. 1125, 2002 WL 31191741 (S.D.N.Y. Sept. 30, 2002)...............................30

*Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care,
  L.L.C.*, 504 F.3d 229 (2d Cir. 2007) ..............................................................................9

*Chilton v. Smith Barney Fund Mgmt. LLC*,
    No. 07-5257-cv, 2010 WL 521023 (2d Cir. Feb. 16, 2010) .........................................1, 10

*Chris-Craft Indus., Inc. v. Piper Aircraft Corp.*,
    516 F.2d 172 (2d Cir. 1976).........................................................................................19

*City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat'l, PLC,*,
    423 F. Supp. 2d at 356 (S.D.N.Y. 2006).................................................................23, 29

*Clapsaddle v. Telscape  Int'l*,
    50 F. Supp. 2d 1086 (D.N.M. 1998) ............................................................................21

*In re Complete Mgmt. Inc. Sec. Litig.*,
    153 F. Supp. 2d 314 (S.D.N.Y. 2001)............................................................................8

*In re Dreyfus Aggressive Growth Mut. Fund Litig.*,
    No. 98 Civ. 4318 (HB), 2000 WL 1357509 (S.D.N.Y. Sept. 20, 2000).....................12, 17

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005)....................................................................................................20

*In re Enron Corp. Sec. Litig.*,
    206 F.R.D. 427 (S.D. Tex. 2002)............................................................................13, 14

*In Re Enron Corp. Sec., Deriv. & "ERISA" Litig.*,
    Nos. MDL-1446, Civ.A. H-01-3624,
    2004 WL 405886 (S.D. Tex. Feb. 25, 2004)  .................................................................11

*Freudenberg v. E*Trade Fin. Corp.*,
    No. 07 Civ 8538, 2010 WL 1904314 (S.D.N.Y. May 11, 2010)...............................33, 34

*Ganino v. Citizens Utils. Co.*,
    228 F.3d 154 (2d Cir. 2000)........................................................................................15

*In re Global Crossing, Ltd. Sec. Litig.*,
    471 F. Supp. 2d 338 (S.D.N.Y. 2006)...........................................................................32

*Gould v. American-Hawaiian S.S. Co.*,
    535 F.2d 761 (3d Cir. 1976)........................................................................................20

*In re Grand Theft Auto Video Game Consumer Litig.*,
    No. 06 MD 1739 (SWK)(MHD),
    2006 WL 3039993 (S.D.N.Y. 2006).......................................................................10, 11

*Halebian v. Berv*,
    590 F.3d 195 (2d Cir. 2009)............................................................................17

*Hevesi v. Citigroup, Inc.*,
    366 F.3d 70 (2d Cir. 2004)............................................................................14

*Hicks v. Morgan Stanley & Co.*,
    No. 01 Civ. 10071 (HB), 2003 WL 21672085 (S.D.N.Y. July 16, 2003) ..................12, 17

*Howard v. Everex Sys., Inc.*,
    228 F.3d 1057 (9th Cir. 2000) ......................................................................27

*Hunt v. Alliance N. Am. Gov't Income Trust, Inc.*,
    159 F.3d 723 (2d Cir. 1998)............................................................................16

*In re Initial Pub. Offering Sec. Litig.*,
    341 F. Supp. 2d 328 (S.D.N.Y. 2004)............................................................13

*Kauffman v. Dreyfus Fund*,
    434 F.2d 727 (3d Cir. 1970)............................................................................18

*Kuntz v. Shawmut Bank of Boston*,
    No. 86 Civ. 6771 (MGC), 1987 WL 11172 (S.D.N.Y. May 12, 1987) ..........................19

*In re Leslie Fay Cos. Sec. Litig.*,
    835 F. Supp. 167 (S.D.N.Y. 1993)................................................................30

*Liona Corp. v. PCH Assocs.*,
    949 F.2d 585 (2d Cir. 1991)............................................................................10

*In re Livent, Inc. Sec. Litig.*,
    148 F. Supp. 2d 331 (S.D.N.Y. 2001)............................................................30

*In re Livent., Inc. Sec. Litig.*,
    78 F. Supp. 2d 194 (S.D.N.Y. 1999)..............................................................34

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)........................................................................................8

*Marshall v. Milberg LLP*, 07 Civ. 6950 (LAP),
    2009 WL 5177975 (S.D.N.Y. Dec. 23, 2009) ..............................................39

*Maywalt v. Parker & Parsley Petroleum Co.*,
    147 F.R.D. 51 (S.D.N.Y. 1993) ....................................................................12

*Merck & Co. v. Reynolds*, No. 08-905,
    2010 WL 1655827 (Apr. 27, 2010) ........................................................ *passim*.

*Merrill Lynch, Pierce Fenner & Smith Inc. v. Dabit*,
    547 U.S. 71 (2006) ........................................................................21

*In re MicroStrategy Inc. Sec. Litig.*,
    115 F. Supp. 2d 620 (E.D. Va. 2000) ..............................................29

*In re MobileMedia Sec. Litig.*,
    28 F. Supp. 2d 901 (D.N.J. 1998) ....................................................11

*Mutchka v. Harris*,
    373 F. Supp. 2d 1021 (C.D. Cal. 2005) ...........................................11

*In re Mut. Funds Inv. Litig.*,
    384 F. Supp. 2d 845 (D. Md. 2005) ....................................16, 21, 26

*N.J. Carpenters Health Fund v. Residential Capital, LLC*,
    No. 08 Civ. 8781, 2010 WL 1257528 (S.D.N.Y. Mar. 31, 2010) ...................12

*N.J. Carpenters Vacation Fund v. Royal Bank of Scot. Group*,
    No. 08CV5093 (HB), 2010 WL 1172694 (S.D.N.Y. Mar. 26, 2010) ............12

*Novak v. Kasaks*,
    216 F.3d 300 (2d Cir. 2000) ...........................................25, 29, 33, 34

*In re NTL, Inc. Sec. Litig.*,
    347 F. Supp. 2d 15 (S.D.N.Y. 2004) ...............................................29

*Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt.*,
    595 F.3d 86 (2d. Cir 2010) ...........................................................*passim*.

*Perlman v. Solomon Inc.*,
    No. 92 Civ. 5208, 1995 WL 110076 (S.D.N.Y. Mar. 14, 1995) ...................18

*In re Pfizer Inc. Sec. Litig.*,
    584 F. Supp. 2d 621 (S.D.N.Y. 2008) ..............................................33

*In re Prudential Sec. Inc.. Ltd. P'ships Litig.*,
    163 F.R.D. 200 (S.D.N.Y. 1995) ....................................................12

*Rand v. Anaconda-Ericsson, Inc.*,
    794 F.2d 843 (2d Cir. 1996) ...........................................................17

*In re Refco, Inc. Sec. Litig.*,
    503 F. Supp. 2d 611 (S.D.N.Y. 2007)...........................................................................33

*In re Regeneron Pharm., Inc. Sec. Litig.*,
    No. 03 Civ. 3111 (RWS), 2005 WL 225288 (S.D.N.Y. Feb. 1, 2005)............................32

*In re Rent-Way Sec. Litig.*,
    209 F. Supp. 2d 493 (W.D. Pa. 2002)...........................................................................29

*Rothman v. Gregor*,
    220 F.3d 81 (2d Cir. 2000)............................................................................................23

*Rudinger v. Ins. Data Processing, Inc.*,
    778 F. Supp. 1334 (E.D. Pa. 1991) ..............................................................................19

*SEC v. Bank of Am. Corp.*,
    No. 09 Civ. 6829 (JSR),
    2009 WL 2842940 (S.D.N.Y. Aug. 25, 2009)...............................................................35

*SEC v. Bear, Stearns & Co. Inc.*,
    626 F. Supp. 2d 402, 411 (S.D.N.Y. 2009) .............................................................15, 19

*SEC v.  First Jersey Sec., Inc.*,
    101 F.3d 1450 (2d Cir. 1996)....................................................................25, 26, 32, 34

*SEC v. Jones*,
    476 F. Supp. 2d 374 (S.D.N.Y. 2007).................................................................6, 23, 24

*SEC v. Jones*, No. 05 Civ. 7044 (RCC),
    2006 WL 1084276 (S.D.N.Y. Apr. 25, 2006)......................................................23, 24, 25

*SEC v. Martino & CMA Noel, Ltd.*,
    255 F. Supp. 2d 268 (S.D.N.Y. 2003)...........................................................................35

*SEC v. PIMCO Advisors Fund Mgmt., LLC*,
    341 F. Supp. 2d 454 (S.D.N.Y. 2004)...........................................................................17

*SEC v. Price Waterhouse*,
    797 F. Supp. 1217 (S.D.N.Y. 1992)..............................................................................33

*SEC v. U.S. Envtl. Inc.*,
    155 F.3d 107 (2d Cir. 1998).........................................................................................34

*In re Scholastic Corp. Sec. Litig.*,
    252 F.3d 63 (2d Cir. 2001)......................................................................................29, 33

*Siemers v. Wells Fargo & Co.*, No. 05 Civ. 04518 (WHA),
    2006 WL 2355411 (N.D. Cal. Aug. 14, 2006) ..........................................................17, 35

*In re Smith Barney Transfer Agent Litig.*,
    No. 05 Civ. 7583 (WHP),
    2006 WL 991003 (S.D.N.Y. Apr. 4, 2006), *aff'd sub nom. Chilton v. Smith
    Barney Fund Mgmt. LLC.*, No. 07-5257-CV, 2010 WL 521023 (2d Cir. Feb. 16,
    2010) ....................................................................................................................10, 14

*In re Smith Barney Fund Transfer Agent Litig.*, No. 05 Civ. 7583 (WHP),
    2007 WL 2809600 (S.D.N.Y. Sep. 26, 2007),
    *aff'd in part, vacated in part, remanded sub nom.
    Operating Local 649 Annuity Trust Fund v. Smith Barney Fund
    Mgmt. LLC,* 595 F.3d 86 (2d. Cir. 2010) ........................................................17

*Tedesco v. Mishkin,*
    689 F. Supp. 1327 (S.D.N.Y. 1988)........................................................12

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
    551 U.S. 308 (2007)........................................................22, 31, 32

*T.H.C., Inc. v. Fortune Petroleum Corp.,*
    Nos. 96-2690 (DAB), 96-2691 (DAB),
    1999 WL 182593 (S.D.N.Y. Mar. 31, 1999) ........................................................34

*In re Towers Fin. Corp. Noteholders Litig.,*
    996 F. Supp. 266 (S.D.N.Y. 1998)........................................................26

*Tracinda Corp. v. DaimlerChrysler AG,*
    197 F. Supp. 2d 42 (D. Del. 2002)........................................................19

*United States v. Quintieri,*
    306 F.3d 1217 (2d Cir. 2002)........................................................9

*Wagner v. Barrick Gold Corp.,*
    No. 03 Civ. 4302 (RMB), 2006 WL 268753 (S.D.N.Y. Jan. 31, 2006) ........................15

*W.R. Huff Asset Mgmt. Co. LLC v. Deloitte & Touche LLP,*
    549 F.3d 100 (2d Cir. 2008)........................................................13

*Weinberg v. Atlas Air Worldwide Holdings, Inc.,*
    216 F.R.D. 248 (S.D.N.Y. 2003) ........................................................10

*In re WorldCom, Inc. Sec. Litig.,*
    294 F. Supp. 2d 392 (S.D.N.Y. 2003)........................................................32

*Yates v. Open Joint Stock Co.*,
    No. 04 Civ. 9742(NRB),
    2005 U.S. WL 1018428 (S.D.N.Y. Apr. 29, 2005) .........................................................10

*Yoder v. Orthomolecular Nutrition Inst., Inc.*,
    751 F.2d 555 (2d Cir. 1985)......................................................................................8

## STATUTES

28 U.S.C. § 1658(b) .................................................................................................35

## MISCELLANEOUS

1 William B. Rubenstein, Alba Conte & Herbert B. Newberg,
    *Newberg on Class Actions* § 2:1 (4th Ed. 2009)................................................9

7AA Charles Alan Wright, Arthur R. Miller & Mary Kay Kane,
    *Federal Practice and Procedu*re § 1785.1 (3d ed. 2010) ...................................9

Lead Plaintiff Operating Local 649 Annuity Trust Fund ("Plaintiff" or "Local 649"), by and through its undersigned counsel, respectfully submits this memorandum of law in opposition to Defendants Smith Barney Asset Management, LLC ("Smith Barney" or "Adviser"), Citigroup Global Markets, Inc. ("Global Markets") (Smith Barney and Global Markets are collectively referred to as the "Corporate Defendants"), Thomas Jones ("Jones"), and Lewis Daidone's ("Daidone") (Jones and Daidone are collectively referred to as the "Individual Defendants") Renewed Motion to Dismiss the Consolidated and Amended Complaint, dated April 28, 2010.

## PRELIMINARY STATEMENT

This is the second motion to dismiss made by Defendants in this securities fraud class action, which has been pending for nearly five years. After this Court granted Defendants' original motion to dismiss in September 2007, Plaintiff timely appealed. On February 16, 2010, the United States Court of Appeals for the Second Circuit issued an opinion vacating and remanding this Court's judgment with respect to Plaintiff's claims under Section 10(b) and Rule 10b-5, holding that Plaintiff adequately alleged materially false and misleading statements and loss causation.[1] On that same day, the Second Circuit affirmed this Court's decision appointing Local 649 as lead plaintiff in this action and finding that Plaintiff meets the PSLRA's class requirements of Rule 23.[2]

Now, Defendants have re-briefed their remaining motion to dismiss arguments – including the Individual Defendants' scienter, statute of limitations, whether Plaintiff's claims are direct 10(b) or derivative claims, and standing. These arguments, however, are not only generally inapplicable to Plaintiff and/or not case dispositive, but are without merit. For

---

[1] *Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt.*, 595 F.3d 86, 98-99 (2d Cir. 2010).
[2] *Chilton v. Smith Barney Fund Mgmt. LLC*, No. 07-5257-cv, 2010 WL 521023, at *1 (2d Cir. Feb. 16, 2010).

example, this Court has already ruled that standing is properly addressed at class certification. *See infra* at 10.  Numerous courts in this judicial district have agreed.  To grant Defendants' motion with respect to standing and have 105 named plaintiffs in this case – one for each of the Funds (defined below) – is simply unnecessary.  It is also an invitation to needless complications and inefficiencies.  Similarly, Defendants' transparent attempt to recharacterize Plaintiff's 10(b) claims as derivative should also be rejected because Plaintiff alleges, *inter alia*, material misrepresentations and omissions in connection with purchases and sales of securities.

Defendants' other arguments fare no better.  In their original motion to dismiss, Defendants conceded scienter for the Corporate Defendants.[3]  Although the Individual Defendants attempt to dispute their scienter, Judge Casey already found them to have acted with scienter on the very same facts in another proceeding.  *See infra* at 23-25.  Finally, consistent with the Supreme Court's recent decision in *Merck & Co. v. Reynolds*, No. 08-905, 2010 WL 1655827 (Apr. 27, 2010), since the statute of limitations here did not begin to run prior to May 31, 2005, all of Plaintiff's claims against each of the Defendants are timely.

Accordingly, Defendants' renewed motion to dismiss should be denied in its entirety.[4]

### STATEMENT OF FACTS

This action, brought on behalf of all persons and entities (the "Class" or "Class Members") who purchased, redeemed, or held shares of the Smith Barney family of funds (the "Funds") between September 11, 2000 and May 31, 2005 ("Class Period"), concerns Defendants' misstatements in various prospectuses about the purpose and structure of the transfer agents at Smith Barney.  Smith Barney, which serves as investment adviser to the Funds,

---

[3] *See Memorandum of Law in Support of Motion to Dismiss the Consolidated and Amended Complaint by Defendants Smith Barney Fund Management LLC, Citigroup Global Markets, Inc., Thomas Jones and Lewis Daidone*, dated October 3, 2006 ("Def. Orig. Br."), at 38-42.
[4] Concurrently with Defendants' renewed motion to dismiss, Plaintiffs filed a renewed motion to lift the discovery stay.

recommended that the Funds contract with an affiliate of the Adviser, which would perform limited transfer agent services and sub-contract with the Funds' existing transfer agent. The existing transfer agent would perform almost all of the same services it had performed previously, but at deeply discounted rates, permitting the affiliate of the Adviser to keep most of the discount for itself and make a high profit for performing limited work. This self-interested transaction permitted the Adviser and its affiliates to pocket over $90 million from the transfer agent function at the direct expense of the Funds and their shareholders. ¶1.[5]

By way of background, the Adviser and the asset management operations of Global Markets are part of Citigroup Asset Management ("CAM"), a business unit of Citigroup Inc. ("Citigroup") that provides investment advisory and management services to Citigroup-sponsored funds. In 1997, CAM began a formal study of the transfer agent ("TA") function in anticipation of the expiration of the existing contract between the Funds and First Data Investor Services Group ("First Data"). Michael Yellin ("Yellin"), who reported to CAM's chief executive officer, Jones, supervised the TA review project and personally handled negotiations with First Data. Yellin briefed Jones on the status of the TA review project on a regular basis. ¶2.

Accordingly, Jones knew that First Data had been making high profit margins on the TA contract. Instead of using CAM's strong bargaining position to benefit the Funds in the negotiation of a new TA contract, Jones sought to keep for CAM much of the profit First Data had been making. In fact, CAM did not pursue or even inform the Funds' boards of an offer by First Data to continue to perform all transfer agent services for the Funds at a $25 million annual fee discount. ¶3.

---

[5] All paragraph cites, unless otherwise noted, are to Plaintiff's *Consolidated and Amended Class Action Complaint*, filed June 1, 2006 (the "Complaint").

CAM ultimately recommended that the Funds replace First Data with an affiliate of the Adviser.  The recommended structure called for the affiliated TA (which became Citicorp Trust Bank, fsb ("CTB"))[6] to contract directly with the Funds as named TA, perform limited functions and subcontract with First Data for the bulk of the transfer agent service (CAM referred to First Data as "sub-TA").  Except for a small customer service function that the affiliated TA would undertake, First Data would continue to perform the very same work it performed under the expiring contract, but at a significant discount from the fees it had been charging the Funds ─ a discount that would start at 33.5% and increase to as much as 60% over the five-year term of the contract.  CAM kept the majority of the savings it had negotiated with First Data for itself, offering the Funds only a limited fee reduction through the institution of fee caps.  ¶4.

CAM should have first offered these substantial savings to the Funds and their shareholders, as an opportunity belonging to the Funds and their shareholders.  At the very least, CAM should have disclosed this opportunity for significant savings to the Funds.  CAM did neither.  Instead, CAM took the opportunity for itself and then presented a recommendation to the Funds' boards in a memo that gave them the impression that the affiliated TA proposal was the best deal that the Funds could have achieved, which was not true.  In presenting its recommendation to the Funds' boards, CAM did not disclose that First Data was to perform almost all of the same work as before, with the affiliated TA taking most of the profit for doing limited work.  ¶5.

CAM's recommendation also contained numerous material misrepresentations about the particulars of the arrangement, including the extent of the benefits CAM would realize.  Among other things, CAM failed to disclose that it had entered into a side letter agreement ("Side

---

[6] The Adviser initially anticipated that it would serve as the TA, but subsequently determined that CTB should serve as the TA.

Letter") with First Data, pursuant to which First Data committed to providing millions of dollars of investment banking and asset management revenue to Citigroup entities ("Revenue Guarantee").  ¶6.

Daidone had an instrumental role in the scheme.  Daidone was Senior Vice President and a director of the Adviser and a managing director of Global Markets during the Class Period. Daidone negotiated the very contracts that constituted the aforementioned self-dealing.  Further, Daidone helped prepare and present the materially misleading materials to the Funds' boards. Critically, Daidone also signed many prospectuses containing materially misleading statements and omissions about the Adviser, as discussed below.  ¶7.

Jones, the CEO of CAM, also had an integral role in the scheme, as he made the decision to recommend the affiliated TA proposal to the Funds' boards, fully aware that the affiliated TA would make a huge windfall at the expense of Funds' shareholders through the proposal.  Jones also performed only a cursory review of the memorandum to the Funds' boards and took no meaningful steps to insure that the Funds' boards were informed of the material terms of the TA proposal.  ¶8.

During the Class Period, CTB received an estimated $100 million in net fees for operating a small customer service call center and performing limited additional oversight and quality control functions at a total cost of approximately $10.5 million.  Thus, Citigroup entities appropriated at least $90 million which rightfully belonged to shareholders of the Funds.  ¶9.[7]

Significantly, Adviser and Global Markets have essentially admitted to the entire scheme of self-dealing described above.  On May 31, 2005, Adviser and Global Markets entered into an agreement with the SEC, agreeing to pay a total of over $200 million in fines and disgorgement

---

[7] The amount appropriated by the Citigroup entities is only an estimate; Plaintiff cannot pinpoint the precise damages without the benefit of discovery.

penalties as a result of their violation of the Investment Advisors Act ("IAA").  Similarly, on

March 23, 2006, Yellin entered into an agreement with the SEC, paying a fine of $50,000 as a

result of his IAA violations, and also admitting to the facts as alleged herein.  Further, Yellin has

specifically implicated Daidone and Jones in the scheme, as did the SEC in an action brought

against them alleging IAA violations.  ¶10.[8]

In prospectuses throughout the Class Period (many of which were signed by Daidone),

the issuers (who were the Funds themselves or families of Funds) made misstatements and

omissions concerning the sub-TA arrangement that were misleading because they misrepresented

the nature of the transfer agent arrangement and failed to disclose the elaborate scheme to inflate

profits which was the motivating force behind creating the sub-TA.  The Second Circuit has

found these statements to be materially false and misleading.  *Operating Local*, 595 F.3d at 94-

95.

For example, the prospectuses made the transfer agent structure look like an innocent

business circumstance: "The transfer agent has entered into sub-transfer agency and services

agreements with PFPC Global Fund Services and PFS Shareholder Services to serve as the

portfolios' sub-transfer agents."  ¶114.  In reality, the sub-transfer agent structure was created

solely to siphon money back to Citigroup.  These statements, along with the participation of all

the Defendants in the manipulative scheme at issue, violated Sections 10(b) and 20(a) of the

Exchange Act.  Indeed, the Second Circuit found that:

---

[8] The SEC's case against Daidone and Jones was later dismissed for failure to provide evidence that Daidone and Jones' profits grew as a result of the scheme, and because the conduct at issue occurred (in 1999) more than five years prior to the SEC complaint.  *SEC v. Jones*, 476 F. Supp. 2d 374, 382, 386 (S.D.N.Y. 2007).  The Court's holding in *Jones* does not affect Defendants' statute of limitations argument here because the actions at issue in *Jones* occurred in 1999, and the SEC filed suit in 2005, more than five years later.  *See id.*, 476 F. Supp. 2d at 382.  It was actions – not misstatements – at issue in *Jones* because that case concerned Investment Company Act ("ICA") violations, not 10(b) violations.

> [Defendants] categorized fees that it ultimately pocketed as "other fees" rather than management fees. It did so under the guise of providing transfer agent services through CTB, despite CTB's greatly diminished role in providing such services. In light of the importance the SEC attaches to the proper categorization of fees generally, and the importance Congress has attached to management fees in particular, we hold that defendant's misrepresentations were material because there exists a substantial likelihood that a reasonable investor would consider it important that her fiduciary was, in essence, receiving kickbacks.

*Operating Local*, 595 F. 3d at 95.

As a result of the scheme, Plaintiff and members of the Class suffered harm. Among other things, Defendants' actions siphoned money out of the Funds and increased the Funds' expenses. Plaintiff and the Class also suffered definable lost opportunity damages because the amounts wrongfully removed would have grown at the rate of the particular fund. ¶13. The Second Circuit found that the "losses were real ones because the deductions used to fund the transfer agent 'fees' diminished for Local 649 (and other shareholders) money under management and, as a result, negatively and predictably impacted returns." *Operating Local*, 595 F. 3d at 96.

On February 25, 2010, almost five years after the SEC's May 31, 2005 Cease and Desist Order, the SEC posted a revised proposed plan of distribution (the "Plan") for the disgorgement and prejudgment portions of the settlement funds. *See* Release No. 34-61587, available at http://www.sec.gov.litigation.admin/2010/34-61587.htm. On April 15, 2010, the SEC approved the Plan. Importantly, the approved Plan provides that monies will be paid "directly to the Funds". Def Br. at 11. Accordingly, Class Members who sold their Funds shares during the Class Period (at a materially deflated price) will receive nothing in the SEC settlement.

**ARGUMENT**

## I.    THE APPLICABLE PLEADING STANDARDS ON A MOTION TO DISMISS

In deciding a motion to dismiss a complaint pursuant to Rule 12(b)(6), "the allegations in the complaint are accepted as true and all reasonable inferences are drawn in the plaintiff's favor."  *Bernhardt v. Tradition N. Am.*, 676 F. Supp. 2d 301, 304 (S.D.N.Y. 2009).   "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl.  Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).   For a claim to be plausible, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level;" that is, the claims must lie "across the line from conceivable to plausible."  *Bell Atl. Corp.*, 550 U.S. at 555.

In ruling on a motion to dismiss, the Court is to consider the complaint's allegations in the aggregate, not piecemeal.  *See Yoder v. Orthomolecular Nutrition Inst., Inc.*, 751 F.2d 555, 562 (2d Cir. 1985) ("[i]t is elementary that, on a motion to dismiss, a complaint must be read as a whole"); *In re Complete Mgmt. Inc. Sec. Litig.*, 153 F. Supp. 2d 314, 333 (S.D.N.Y. 2001) (same).

## II.    PLAINTIFF HAS STANDING TO ASSERT ALL CLAIMS

A plaintiff meets the requirements of Article III standing by alleging: (1) that it suffered an injury in fact; (2) a causal connection between its injury and the defendant's misconduct; and (3) the likelihood that the injury will be redressed by a favorable decision.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  In the class action context, a representative plaintiff's "standing" is determined by examining whether that plaintiff personally has a claim against the defendants, *irrespective* of the class nature of the suit.  So long as the named plaintiff has standing to bring the claims advanced in the complaint on an individual basis, any inquiries

regarding the named plaintiff's ability to represent other, absent plaintiffs is examined in the context of class certification under the rubric of Rule 23. As the Second Circuit explained:

> To establish Article III standing in a class action . . . for every named defendant there must be at least one named plaintiff who can assert a claim directly against that defendant, and at that point standing is satisfied and only then will the inquiry shift to a class action analysis.

*Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 241 (2d Cir. 2007) (quoting 1 William B. Rubenstein, Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* § 2:6 n. 3 (4th ed. 2009)).

This view of the relationship between typicality and standing has also been endorsed in Federal Practice and Procedure:

> Representative parties who have a direct and substantial interest have standing; the question whether they may be allowed to present claims on behalf of others who have similar, but not identical, interests depends not on standing, but on an assessment of typicality and adequacy of representation.

7AA Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 1785.1 (3d ed. 2010).[9]

Here, there is no question that Plaintiff and the other named plaintiffs have standing to proceed with this litigation. Each has alleged that: (1) they suffered an injury in fact in the form of the diminished economic value of their respective shares in the Funds; (2) such injuries suffered were caused by Defendants' misconduct alleged in the Complaint; and (3) a favorable decision would redress their injuries. ¶¶125, 140-165. No more need be pled at this stage.

---

[9] The seminal class action treatise, 1 William B. Rubenstein, Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* §2:1 at 51 (4th Ed. 2009), offers the following explanation of the relationship between standing and the Rule 23: "Once the class representative has established her or his standing to bring an action, issues of class representation involve the analysis of Rule 23 procedural requirements rather than the constitutional case or controversy mandate of Article III."

**A.    This Court Has Already Stated That Standing Is Properly Addressed At Class Certification**

At the lead plaintiff stage of this action, other proposed lead plaintiffs competing with Local 649 argued – like Defendants here – "that Local 649 lacks standing to sue on behalf of many class members…because Local 649 purchased shares in only two of Smith Barney's numerous Funds." *Smith Barney Transfer Agent*, 2006 WL 991003, at *3. This Court rejected that argument and noted that "Defendants' arguments [that the lead plaintiff applicant lacked standing for all Funds investors] are properly addressed *at the class certification stage* . . . ." *In re Smith Barney Transfer Agent Litig.*, No. 05 Civ. 7583 (WHP), 2006 WL 991003, at *3 (S.D.N.Y. Apr. 4, 2006), *aff'd subnom, Chilton v. Smith Barney Fund Mgmt. LLC*, No. 07-5257-cv, 2010 WL 521023 (2d Cir. Feb. 16, 2010) (emphasis added) (citing *Yates v. Open Joint Stock Co.*, No. 04 Civ. 9742(NRB), 2005 WL 1018428, at *2 (S.D.N.Y. Apr. 29, 2005) and *Weinberg v. Atlas Air Worldwide Holdings, Inc.*, 216 F.R.D. 248, 254 (S.D.N.Y. 2003)). In the face of the same arguments, the Second Circuit affirmed this Court's lead plaintiff decision. *Chilton,* 2010 WL 521023, at *1.

Nevertheless, Defendants again argue prematurely that Plaintiff does not have standing to represent all investors in the Funds. However, as the standing issue is properly addressed at class certification, Defendants' arguments should be rejected.[10]

**B.    Other Courts Have Similarly Ruled That Standing Is An Issue For Class Certification**

Other courts have found similar standing arguments to be premature on a motion to dismiss. For example, in *In re Grand Theft Auto Video Game Consumer Litig.*, No. 06 MD 1739 (SWK) (MHD), 2006 WL 3039993, at *3 (S.D.N.Y. Oct. 25, 2006), the defendants challenged

---

[10] Under the "law of the case" doctrine, "a decision on an issue of law made at one stage of a case becomes binding precedent to be followed in subsequent stages of the same litigation." *Liona Corp. v. PCH Assocs.*, 949 F.2d 585, 592 (2d Cir. 1991).

the named plaintiffs' standing to bring claims under the laws of states other than those in which

the named plaintiffs resided and purchased the product at issue.  The court held:

> [E]ach of the Named Plaintiffs asserts a personal injury resulting from
> Defendants' allegedly wrongful marketing and sale of GTA under an
> inappropriate content rating. The relevant question, therefore, is not whether the
> Named Plaintiffs have standing to sue Defendants--they most certainly do--but
> whether their injuries are sufficiently similar to those of the purported Class to
> justify the prosecution of a nationwide class action.  This question is, at least in
> the first instance, appropriately answered through the class certification process . .
> . .
>
> Therefore, the alleged standing problems in this case arise only because the
> Named Plaintiffs are attempting to bring claims on behalf of a nationwide class.
> As a result, class certification is logically antecedent to standing and the Court
> will defer consideration of standing until after the class certification issue has
> been resolved.

2006 WL 3039993, at *3 (internal citations omitted).

These principles apply with equal force when the representative plaintiff has invested in

different securities than those owned by absent class members.  For example, in *In re

MobileMedia Sec. Litig.*, 28 F. Supp. 2d 901 (D.N.J. 1998), the defendants had issued stocks and

notes pursuant to an allegedly fraudulent prospectus.  Though the named plaintiffs themselves

had only purchased stocks, the court rejected the argument that they had no "standing" to

represent noteholders.  As the court explained:

> Plaintiffs have alleged an injury traceable to … the same offering in which the
> Notes were issued . . . .  Given Plaintiffs have sufficiently alleged individual
> cognizable injuries pursuant to Section 11 and Section 12(a)(2), Plaintiffs have
> standing to bring these claims. Concerns over whether stock purchasers should
> represent notes purchasers are better addressed at the time of class certification.

*Id.* at 911 n.7 (internal citations omitted).  *See also In re Enron Corp. Sec., Deriv. & "ERISA"

Litig.*, Nos. MDL-1446, Civ.A. H-01-3624, 2004 WL 405886, at *2 (S.D. Tex. Feb. 25, 2004)

(the "[c]ourt would deal with issues regarding standing and the creation of classes or subclasses

at class certification time"); *Mutchka v. Harris*, 373 F. Supp. 2d 1021, 1024 (C.D. Cal. 2005)

11

(same).

Numerous courts in this district are in accord. *Hicks v. Morgan Stanley & Co.*, No. 01 Civ. 10071 (HB), 2003 WL 21672085, at *3 (S.D.N.Y. July 16, 2003) (appointing class representative for two mutual funds who only bought in one of the funds); *In re Blech Sec. Litig.*, 94 Civ. 7696 (RWS), 2003 WL 1610775, at *17 (S.D.N.Y. Mar. 26, 2003) (seven named representatives could represent purchasers of all securities because "[t]here need not be a class representative for every Blech security, as long as the securities are part of a common fraudulent or manipulative scheme"); *In re Dreyfus Aggressive Growth Mut. Fund Litig.*, No. 98 Civ. 4318 (HB), 2000 WL 1357509 (S.D.N.Y. Sept. 20, 2000) (named plaintiffs certified class representatives of investors in two different mutual funds); *In re Prudential Sec. Inc.. Ltd. P'ships Litig.*, 163 F.R.D. 200 (S.D.N.Y. 1995) (certifying class who invested in series of partnerships all sponsored by the same defendants although named plaintiffs only invested in small subset of over 700 partnerships); *Maywalt v. Parker & Parsley Petroleum Co.*, 147 F.R.D. 51, 56-57 (S.D.N.Y. 1993); *Tedesco v. Mishkin*, 689 F. Supp. 1327, 1335-36 (S.D.N.Y. 1988).

Note, however, that there is a split in Southern District courts on when to address standing in securities fraud class actions – at class certification or at the pleading stage. *Compare Hicks,* 2003 WL 21672085, at *3 with *N.J. Carpenters Health Fund v. Residential Capital, LLC*, No. 08 Civ. 8781 (HB), 2010 WL 1257528, at *4 (S.D.N.Y. Mar. 31, 2010).[11] Significantly, though, the Second Circuit has not ruled on this issue – which is currently before it in *In re Salomon Smith Barney Mutual Fund Fees Litig.*, (2d Cir. 08-0038).

---

[11] Further, the two *New Jersey Carpenters* cases cited by Defendants (Def. Br. at 18) are inapposite because Judge Baer relied on the fact that there were "different details" in prospectus supplements that created different reliance issues.  *See N.J. Carpenters Vacation Fund v. Royal Bank of Scot. Group*, No. 08CV5093 (HB), 2010 WL 1172694, at *4 (S.D.N.Y. Mar. 26, 2010); *N.J. Carpenters Health Fund ,* 2010 WL 1257528, at *4.

Defendants' citation to *In re Initial Pub. Offering Sec. Litig.,* 341 F. Supp. 2d 328, 346 (S.D.N.Y. 2004), falls flat.  In that case, Judge Scheindlin ruled that there was no standing for certain plaintiffs because they did not buy any shares from two of the *defendant* issuers.  *See id.* ("Lante and New Focus are separate entities from each other and from the rest of the Issuer Defendants").  Here, Plaintiffs allege that every Defendant has harmed Lead Plaintiff, the named plaintiffs, and *all other Class Members*.  ¶¶ 125, 140-165.  Therefore, they have standing for their own claims, as well as those of other Class Members, and any further inquiry gives rise to class certification issues, which are not ripe for adjudication on the instant motion.

Finally, Defendants also cite *W.R. Huff Asset Mgmt. Co. LLC v. Deloitte & Touche LLP*, 549 F. 3d 100 (2d Cir. 2008) for the unremarkable proposition that Article III requires a plaintiff, whether suing individually or on behalf of a class, to have personally suffered a redressable injury.  As noted above, Lead Plaintiff and named plaintiffs have redressable injuries.  ¶¶ 125, 140-165.  The issue is whether their ability to sue on behalf of similarly situated Class Members should be decided at class certification or at this stage.  In contrast, *Huff* concerned whether an investment advisor had standing to pursue claims on behalf its clients, who were the real parties in interest.  *See Huff*, 549 F. 3d at 108.  In other words, in *Huff*, the issue was not representative plaintiffs with standing to sue on behalf of others; rather, it was whether the representative plaintiff *itself* had standing.

### C.   Practical Considerations in This Litigation Warrant Maintaining the Present Named Plaintiff Structure

The current representative structure not only satisfies the legal requirements described above, but makes practical sense. Plaintiff could always add scores of additional named plaintiffs to represent each fund; however, doing so at this stage would create substantial inefficiencies in the management of this litigation and certainly increase expenses.  *Cf. In re Enron Corp. Sec.*

*Litig.*, 206 F.R.D. 427,  451 (S.D. Tex. 2002) ("[W]hile the parties have set out some well-founded and persuasive arguments for separate representation and classes or subclasses at class certification, as well as for trial, the Court does not find that such divisions are essential now"). Thus, at this stage of the litigation, it is impractical and unnecessary to require each fund to have a separate class representative.

Defendants' "standing" argument is not a basis for dismissal of any claims with prejudice at this stage.  More sensible procedural mechanisms – short of dismissal – exist for dealing with any issues regarding Plaintiff's representation of the putative Class.  For instance, the Court may (1) allow Plaintiff to proceed and add named plaintiffs at the class certification stage, after the close of discovery, or at another point prior to trial, if the Court deems such a step necessary; or (2) allow Plaintiff to provide a list of additional plaintiffs who can be added and the Court can deem the complaints amended *nunc pro tunc* in this regard, if necessary.

### D.     Requiring a Named Plaintiff For Every Fund Would Undermine the PSLRA

Including 102 more named plaintiffs to cover every Fund would undermine the purpose of the PSLRA – strong, unified leadership.  It would also lead to radical inefficiencies.  Indeed, this Court noted in its lead plaintiff decision that "any requirement that a different lead plaintiff be appointed to bring every single available claim would contravene the main purpose of having a lead plaintiff-namely, to empower one or several investors with a major stake in the litigation to exercise control over the litigation as a whole."  *In re Smith Barney Transfer Agent Litig.*, 2006 WL 991003, at *3 (citing *Hevesi v. Citigroup, Inc.*, 366 F.3d 70, 83 n.13 (2d Cir. 2004)). Because of the critical importance of having an investor with the largest loss be in charge of the litigation, it is inevitable that in cases where there are many related funds linked by the same misconduct and misstatements, a lead plaintiff will not always have purchased shares in each fund.

14

**III.    PLAINTIFF'S CLAIMS ARE NOT DERIVATIVE; RATHER, PLAINTIFF SEEKS REDRESS FOR DIRECT HARM TO SHAREHOLDERS**

Defendants' attempt to put a round peg in a square hole – turning Plaintiff's 10(b) allegations into derivative allegations – would (beyond flying in the face of relevant caselaw) fail to provide many shareholders with a recovery (as Defendants are currently doing with their SEC distribution). This is because any derivative recovery would go to the Funds themselves, and would benefit only current holders of the Funds. But, since the Class Period here runs from September 11, 2000 to May 31, 2005 it is likely that many Class Members have sold their Funds. This Court has noted the importance of recoveries flowing to the proper injured parties. *See SEC v. Bear, Stearns & Co. Inc.*, 626 F. Supp. 2d 402, 411 (S.D.N.Y. 2009). If the Court here allows Defendants misreading of Plaintiffs' allegations, there would similarly be a "complete disconnect between [the recovery] and investor losses." *Id.* Further, it is clear the Second Circuit viewed this as a 10(b) case, or it would not have analyzed materiality and loss causation. *Operating Local*, 595 F.3d at 95.

Regardless, Plaintiff clearly states a claim under Section 10(b). To state a claim under Section 10(b), a plaintiff "must plead that the defendant, in connection with the purchase or sale of securities, made a materially false statement or omitted a material fact, with scienter, and that the plaintiff's reliance on the defendant's action caused injury to the plaintiff." *Wagner v. Barrick Gold Corp.*, No. 03 Civ. 4302 (RMB), 2006 WL 268753, at *2 (S.D.N.Y. Jan. 31, 2006) (citing *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000)). That is precisely what Plaintiff has alleged here. ¶¶141-47.

The Second Circuit has already held that Defendants made materially false and misleading statements causing Plaintiffs economic harm:

> Local 649 has alleged that the defendants' misrepresentations proximately resulted in the regular deduction of identifiable amounts that would not have been deducted had defendants conformed their conduct to what the law required. The…losses were real ones because the deductions used to fund the transfer agent "fees" diminished for Local 649 (and other shareholders) money under management and, as a result, negatively and predictably impacted returns.

*Operating Local*, 595 F.3d at 95.  *See also id.* at 98 (Second Circuit, when affirming dismissal of Plaintiff's 36(b) claims, found that "[t]o the extent Local 649 seeks damages *that inure to its own benefit and not to the Funds'*, that result is not permitted by § 36(b)") (emphasis added).

There are scores of cases – in this Circuit and elsewhere – in which courts have held that mutual fund shareholders have stated individual claims – as opposed to derivative claims – under the federal securities laws where they alleged material misrepresentations and/or omissions, loss causation, and damages stemming from a decline in value of their mutual fund shares.  For example, in *Hunt v. Alliance N. Am. Gov't Income Trust, Inc.*, 159 F.3d 723, 728 (2d Cir. 1998), the Second Circuit reversed the district court's dismissal of a securities class action, holding that investors in an open-ended mutual fund stated a claim under Section 11 of the Securities Act of 1933 by alleging material misrepresentations and a subsequent decline in the net asset value of the mutual fund.  The plaintiffs in *Hunt* – like Lead Plaintiff here – alleged that they lost money because the net asset value of their funds fell.  *Id*.  In *Hunt,* although all mutual fund shareholders suffered a common injury – as is true with any Section 10(b) case – because the harm was linked to public misrepresentations, the Court held that the plaintiffs stated a claim under the federal securities laws.  *See also In re Mutual Funds Inv. Litig.*, 384 F. Supp. 2d 845, 864-65 (D. Md. 2005) (sustaining mutual fund shareholders' Section 10(b) claims where

damages stemmed from, inter alia, misrepresentations and omissions connected to monies being siphoned out of funds).[12]

The two Second Circuit cases cited by Defendants, *Halebian v. Berv*, 590 F.3d 195 (2d Cir. 2009) and *Rand v. Anaconda-Ericsson, Inc.*, 794 F.2d 843 (2d Cir. 1996), are inapposite.  In *Halebian*, the Second Circuit held that an ICA claim – which concerns breaches of fiduciary duties and not public misstatements – was properly derivative (as this Court found earlier with respect to Section 36(b) of the ICA).[13]

Likewise, *Rand* concerned markedly different circumstances.  In *Rand*, the plaintiffs alleged that defendant Ericsson issued a fraudulent press release stating that Teltronics, to whom Ericsson supplied goods, was in default under its security agreement with Ericsson, to discourage corporate suitors interested in Teltronics and cause a Teltronics bankruptcy.  794 F.2d at 846-47. Teltronics subsequently declared bankruptcy and the plaintiffs claimed that the conversion of their Teltronics shares into cash was a "forced sale".  *Id*.  The court dismissed the plaintiffs' 10(b) claim because there was no "purchase or sale of a security[;]" there was only a conversion of stock into cash at bankruptcy.  *Id*.  The *dicta* Defendants hang their hat on – that the 10(b)

---

[12] *See also SEC v. PIMCO Advisors Fund Mgmt., LLC*, 341 F. Supp. 2d 454, 461 (S.D.N.Y. 2004) (sustaining mutual fund shareholders' 10(b) claims where they sought "disgorgement of profits, payment of monetary penalties, and imposition of several equitable remedies"); *Hicks*, 2003 WL 21672085, at *3 (certifying class of mutual fund shareholders who alleged, under Section 10(b), damages stemming from inflated net asset value of funds); *In re Dreyfus Aggressive Growth Mut. Fund Litig.*, 2000 WL 1357509, at *5 (same, but with damages stemming from, *inter alia*, "advance[ing]…financial interests…of…business associates at the expense of the Funds' capital growth).  *Accord Siemers v. Wells Fargo & Co., Inc.*, No. 05 Civ. 04518 (WHA), 2006 WL 2355411, at *12 (N.D. Cal. Aug. 14, 2006) (sustaining Section 10(b) claims by mutual fund shareholders where damages alleged were, inter alia, dissipation of assets stemming from excessive fees).

[13] *See In re Smith Barney Fund Transfer Agent Litig.*, No. 05 Civ. 7583 (WHP), 2007 WL 2809600, at *3-5 (S.D.N.Y. Sep. 26, 2007), *aff'd in part, vacated in part, remanded sub nom. Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC.*, 595 F.3d 86 (2d Cir. 2010).

claim was a "corporate asset" – was only relevant in *Rand* because there *was* no viable 10(b)

claim; rather, Teltronics itself had a tortious interference claim against Ericsson.[14]

 *Perlman v. Solomon Inc.*, No. 92 Civ. 5208, 1995 WL 110076, at *1 (S.D.N.Y. Mar. 14,

1995), also cited by Defendants in support of their argument that Plaintiff's claims are really

derivative (*see* Def. Br. at 14), actually supports Plaintiff's arguments.  In *Perlman*, the plaintiff,

who did not allege a 10(b) claim, sued Salomon alleging that her Salomon shares lost value as a

result of corporate misconduct. *Id.* The court held that such a claim was properly derivative.  *Id.*

Significantly, the court noted:

> [I]nvestors such as Plaintiff may have standing to sue the corporation if they can
> demonstrate that corporate misconduct caused them an individual injury distinct
> from the injury to the corporation. **The events of March 1991 to August 1991
> triggered a number of securities fraud actions by shareholders who claim to
> have sustained such special injury** . . . . Plaintiff was denied class membership
> in these actions upon disclosure that her 400 shares were not purchased during the
> period of asserted stock inflation.

*Id.* at *2 (emphasis added).  Here, this case is a "securities fraud action" on behalf of purchasers,

sellers, and holders, who have alleged special injury.  *See id.*  As noted, the Second Circuit, when

affirming the dismissal of Plaintiff's 36(b) claims, found that "[t]o the extent Local 649 seeks

damages *that inure to its own benefit and not to the Funds'*, that result is not permitted by §

36(b)."  *Operating Local*, 595 F.3d at 98 (emphasis added).

 The other cases cited by Defendants are either contrary to well-settled Second Circuit

case law or allege classically derivative mismanagement claims.  *See, e.g., Kauffman v. Dreyfus

Fund*, 434 F.2d 727, 732 (3d Cir. 1970) (flies in the face of consistent Second Circuit caselaw);

*Atwood Grain & Supply Co. v. Growmark, Inc.*, 712 F. Supp. 1360, 1361, 1363-64, 1366 (N.D.

---

[14]  Moreover, the Second Circuit found that "[i]f Teltronics' bankruptcy were to trigger an
otherwise non-existent Section 10(b) claim, the bankruptcy court would not be able to accord the
various claimants their proper priority in the distribution of assets.  A major corporate asset, the
claim against Ericsson, would by virtue of the bankruptcy itself be shared by the bankruptcy
trustee and the shareholders as well."  794 F.2d at 848.

Ill. 1989) (purported federal securities claims were derivative in nature because they sounded in mismanagement, i.e., it was directors' conduct (selling certain assets) − not statements − that led to harm); *Kuntz v. Shawmut Bank of Boston*, No. 86 Civ. 6771 (MGC), 1987 WL 11172, at *2-4 (S.D.N.Y. May 12, 1987) (wrongdoing was "in connection with the acquisition and sale of two companies" rather than in connection with the purchase or sale of a security).

Defendants also claim that any damages suffered here belong to the Funds and thus, Plaintiff's claims are derivative. But Defendants view the "injury common to all shareholders" characteristic of a derivative case in a vacuum. As mentioned above, in any Section 10(b) case, shareholders suffer a common injury – decline in the value of their shares due to misrepresentations and omissions. The real difference between derivative and federal securities claims is that derivative allegations sound in mismanagement, whereas federal securities claims, as here, relate to public misstatements and/or omissions made in connection with the purchase or sale of a security.

As noted, it is significant that Class Members who sold their Funds shares during the Class Period will not be made whole pursuant to the SEC distribution plan. Indeed, this shows Plaintiff alleges distinct injury to Class Members and not mere damage to the Funds, and that any derivative recovery in this case would be meaningless. *Cf. SEC v. Bear, Stearns & Co. Inc.*, 626 F. Supp. 2d 402, 411 (S.D.N.Y. 2009).

In addition, in this case, unlike the SEC case, Plaintiff also alleges lost opportunity damages, which courts hold are viable under Section 10(b) when clearly articulated and not speculative.[15] Here, there is no speculation. Plaintiffs' lost opportunity damages are the amount

---

[15] *See Chris-Craft Indus., Inc. v. Piper Aircraft Corp.*, 516 F. 2d 172, 188-192 (2d Cir. 1975) (lost opportunity damages sustained under Section 10(b)); *Tracinda Corp. v. DaimlerChrysler AG*, 197 F. Supp. 2d 42, 68 (D. Del. 2002) ("A plaintiff can maintain a claim under Section 10(b)

of money removed from each fund times the return rate over the relevant time period.   The

Second Circuit in remanding this action agreed.  *Operating Local*, 595 F.3d at 96 ("losses were

real ones because the deductions used to fund the transfer agent 'fees' diminished for Local 649

(and other shareholders) money under management and, *as a result, negatively and predictably*

*impacted returns*") (emphasis added).[16]

Defendants' citations in favor of their position that no lost opportunity damages are

possible here, lack merit.   Defendants cite *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342

(2005) in favor of the proposition that there is no loss at the moment a stock is purchased.

However, Plaintiff does not allege harm at the moment of purchase; Plaintiff alleges harm as

money was siphoned out of the Funds and re-routed to other Citigroup entities.   Further, the

Second Circuit held that Plaintiff satisfied *Dura* here.   *See Operating Local*, 595 F.3d at 96.

Defendants' other citation is also inapposite.   *See Aimis Art Corp. v. N. Trust Sec., Inc.*, 641 F.

Supp. 2d 314, 320 n.4 (S.D.N.Y. 2009) (upholding lost opportunity damages but finding them

inapplicable because plaintiff rescinded transaction).

Finally, Defendants understand fully that loss opportunity damages are meaningful and

applicable here.   Paragraph 15 of the Plan – which only provides monies to the Funds – states

that "the plan will reimburse Respondents…for these amounts [the amounts already advanced]

---

of the Exchange Act based on 'lost opportunity' damages") (citation omitted); *Rudinger v. Ins. Data Processing, Inc.*, 778 F. Supp. 1334, 1340 (E.D. Pa. 1991) (recovery under Section 10(b) not limited to out-of-pocket loss because otherwise "securities laws could be violated with impunity in any situation in which the violation does not cause out of pocket loss") (citing *Gould v. American-Hawaiian S.S. Co.*, 535 F.2d 761, 781 (3d Cir. 1976)).

[16]   Defendants' claim that this statement from the Second Circuit supports their claim that Plaintiff's claims are derivative (Def. Br. at 16) is mistaken.   "Deduction of fees" and "predictabl[e] impact [] [on] returns" has no relation to the *nature* of Plaintiff's claims.   Here, Class members who sold their Funds shares were short-changed on the NAV at time of sale because of Defendants' misrepresentations and omissions.

*plus the estimated pro rata earnings attributable to the Fund or class from the date of such advance through the date of distribution of the Citigroup Fair Fund.*"  (Emphasis added).

## IV.    PLAINTIFF ALLEGES VIABLE CLAIMS ON BEHALF OF HOLDERS

Plaintiffs bring this action on behalf of holders, sellers, and purchasers of Funds shares.

¶30.  Defendants claim that holders (as opposed to purchasers and sellers) cannot assert Section 10(b) violations.  Defendants are wrong.  Courts have allowed holders of mutual funds to assert such claims.  In *Mutual Funds*, 384 F. Supp. 2d at 854, Judge Motz rejected the very argument proffered by Defendants here:

> I question whether *Blue Chip Stamps* bars suits under Rule 10b-5 by persons who held (but did not purchase or sell) mutual fund shares during a relevant class period when profits were being siphoned off from the funds by market timers and late traders. In my view, to so hold might, as is too often done, elevate rule over principle . . . . Here, the prudential consideration that led the Supreme Court to adopt (in my view wisely) the Blue Chip Stamps rule-the risk of vexatious, manufactured litigation-does not exist because holder plaintiffs by definition held mutual fund shares during the period that the value of the shares was diluted . . . . Their claims are not based upon an inherently speculative inquiry into their subjective state of mind but upon the . . . fact of their continued share ownership.

*Id* (emphasis added).

Defendants' case citations do bear scrutiny.  *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 737-38, 753-55 (1975) only held that a private right of action under §10(b) is not available to one who neither purchased nor sold a security, but claims he *would have purchased* but for an overly pessimistic prospectus.  *Blue Chip Stamps*, 421 U.S. at 726, 743.  "None of the plaintiffs in Blue Chip actually purchased any of the stock. Thus, the plaintiffs were complaining about a transaction that never occurred; no securities or compensation ever changed hands." *Clapsaddle v. Telscape Int'l*, 50 F. Supp. 2d 1086, 1089 (D.N.M. 1998).

Similarly, Defendants' reliance on *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 75 (2006) is misplaced.  In *Dabit*, the Supreme Court held that an investor who held

a stock claiming that he would have sold could not allege a 10(b) claim for the same reasons as in *Blue Chip* – it would open the door to speculative suits of *what investors would have done* had they known otherwise.  This case concerns no such speculation.  Plaintiffs who sold or held shares during the Class Period are not alleging they would have done otherwise had Defendants' statements been true.  Rather, Plaintiff alleges Class Members were injured when Defendants diverted money from the Funds.  Thus, Class Members who sold their shares received less than they should have upon the sale and those who bought and held hold shares that have been materially reduced in value.

## V.    PLAINTIFF HAS SUFFICIENTLY ALLEGED SCIENTER FOR THE CORPORATE DEFENDANTS AND THE INDIVIDUAL DEFENDANTS

In their renewed motion to dismiss, the Corporate Defendants concede that Plaintiff has adequately pleaded their scienter.  Def. Br. at 28.  However, the Individual Defendants argue that the Complaint's allegations fail to give rise to a strong inference of their scienter.   These arguments should be rejected.

### A.    Applicable Legal Standards

Section 78u-4(b)(2) of the PSLRA requires plaintiffs to plead facts giving rise to a "strong inference" that defendants acted with scienter.  In *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007), the Supreme Court explained that the court must take the plaintiffs' allegations as true, *see id.* at 323, consider the allegations collectively and not "scrutinize[]" them "in isolation," and ultimately determine if "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference."  *Id.* at 324.

The inference of "scienter need not be irrefutable, *i.e.*, of the smoking-gun genre, or even the most plausible of competing inferences."  *Id.* at 324 (internal quotation makes omitted). Instead, an inference of scienter is "strong" when it is *at least as likely as* any other inference.

22

*Id.*; *Akerman v. Arotech Corp.* 608 F. Supp. 2d 372, 382 (E.D.N.Y. 2009) ("When the competing inferences rest in equipoise, the tie goes to the plaintiff'") (internal quotations omitted). Thus, under *Tellabs*, it is Defendants' burden to show that the Complaint's allegations give rise to an inference of innocent behavior that is ***stronger*** than the inference of scienter.

A complaint establishes a strong inference of scienter by pleading facts that ***either*** constitute strong circumstantial evidence of conscious misbehavior or recklessness, ***or*** show that defendants had both motive and opportunity to commit fraud. *City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat'l, PLC*, 423 F. Supp. 2d 348, 356 (S.D.N.Y. 2006) (*citing Rothman v. Gregor*, 220 F.3d 81, 90 (2d Cir. 2000)).

> **B.      The Complaint Alleges Facts That Constitute Strong Circumstantial Evidence of the Individual Defendants' Conscious Misbehavior or Recklessness**
>
>> **1.      Daidone and Jones Have Already Been Found to Have Acted With Scienter In a Case Based on the Same Factual Allegations**

The misstatements at issue here were egregious.   Defendants made garden-variety statements about the Adviser's transfer agent structure when the structure was a sham from start to finish – set up for the sole reason to divert money to Citigroup entities.   The Second Circuit found:

> We agree with Local 649 that CAM's misrepresentations were material. A substantial likelihood exists that a reasonable investor would view them as significant alterations of the "total mix" of information made available. Basic Inc., 485 U.S. at 232, 108 S.Ct. 978. *First and foremost, what the Fund investors could not divine from the disclosures was that they were at the mercy of a faithless fiduciary*.

*Operating Local*, 595 F. 3d at 96 (emphasis added).

Critically, in *SEC v. Jones*, a case based on the exact same factual allegations as here, Judge Casey found that the Individual Defendants acted with scienter in aiding and abetting IAA violations:

The Complaint alleges that Jones made CAM's transfer agent arrangement a priority (Complaint ¶¶ 26, 28), that he wanted to capture the profit that First Data had been enjoying at CAM's expense (id. ¶ 28), that he instructed the executive vice president to continue negotiations with First Data after April 2, 1998 (id. ¶ 46), and that he approved the ultimate CAM-affiliate arrangement and the allegedly misrepresenting board materials with the understanding that doing so would guarantee CAM $8 million in annual revenue from First Data (id. ¶¶ 54, 61, 94). Further, the Complaint alleges that he did so in disregard of his fiduciary responsibilities to the Funds and their shareholders. (Id. 61.) The Court finds that the existence of a securities law violation by Citigroup and CAM has been established. (May 31, 2005 Cease and Desist Order.) With respect to the scienter requirement, the SEC claims that Jones knew that First Data was making large profits as CAM's transfer agent (Complaint ¶ 26), that First Data was willing to commit to providing a certain level of business to CAM's then-parent Travelers (id. ¶ 54), and that he "understood" that the true economics of the TA arrangement ultimately presented to the Funds' boards would not be disclosed (id. ¶ 58). Without addressing the question of whether Jones owed the Funds a fiduciary duty, the Court finds these claims, which still must be proven to the satisfaction of a jury, adequately allege Jones' knowledge of the underlying violation.

SEC v. Jones, No. 05 Civ. 7044 (RCC), 2006 WL 1084276, at *7 (S.D.N.Y. Apr. 25, 2006).[17]

These allegations concerning Jones are also alleged here. *See* ¶¶ 51, 53, 63, 76, 99-101, 102, 105.

Daidone was also found to have acted with scienter:

Plaintiffs allege Daidone aided and abetted CAM's fraud by not disclosing to the Funds' boards the true nature of the agreed upon transfer agent arrangement. In conformity with Rule 9(b), the Complaint alleges that Daidone led the Funds' boards to believe that the transfer agent arrangement involving the CAM-affiliate and First Data was in the Funds' best interests, when in reality it was supported by Defendants because it would result in profits to CAM and other Citigroup entities. (Complaint ¶ 96.) It identifies Daidone as the lead author of the board materials and the presentation given at the board meetings. (Id. ¶¶ 6, 68, 73-74, 96-97.) It also clearly identifies the dates on which Daidone made his presentations and distributed the board materials. (Id. ¶ 96.) Finally, it adequately explains why the board materials and Daidone's presentation were fraudulent. For example, it alleges that Daidone spun the facts to make it appear the Funds were getting the

---

[17] As mentioned, the *Jones* case was later dismissed on a motion for summary judgment on totally separate grounds – statute of limitations and lack of evidence demonstrating that Jones and Daidone's personal profits rose as a result of the TA scheme, which proof was necessary to disgorge such profits. *SEC v. Jones*, 476 F. Supp. 2d 374, 382, 386 (S.D.N.Y. 2007). Accordingly, Judge Casey's finding is relevant here.

best transfer agent deal available (*id.* ¶¶ 6, 75, 78-9, 81, 83, 86, 88, 93, 95); that he did not disclose the existence of the revenue guarantee from First Data that would benefit Citigroup entities (*id.* ¶ 7, 80, 97); and that he did not explain that the CAM-affiliate transfer agent would, in reality, be doing very little transfer agent work (*id.* ¶¶ 76-77, 90, 97). Accordingly, the Court finds Daidone's objection that the circumstances surrounding his participation in the alleged fraud have not be plead with sufficient specificity unavailing….

Here, the Complaint alleges that Daidone knew that First Data had been making substantial profits from its role as CAM's transfer agent, which CAM intended to enjoy itself. (Complaint ¶¶ 3, 31.) The SEC claims Daidone was a member of CAM's transfer agent team, was privy to Deloitte's concerns about the CAM-affiliate proposal, understood CAM's desire to press ahead with the CAM-affiliate and First Data deal and the negotiations leading to the ultimate arrangement, including First Data's revenue guarantee. (*Id.* ¶¶ 29, 50, 63, 65.) Further, Daidone allegedly instructed the Deloitte representative charged with preparing the first draft of the board materials to describe the arrangement in a way that would be attractive to the Funds' boards without clearly identifying the profit that CAM would enjoy. (*Id.* ¶¶ 70-71, 75.) Finally, the SEC claims Daidone was well aware of the revenue guarantee, as he signed the document himself (*id.* ¶ 65), but never disclosed its existence to the boards in the materials he prepared or the presentations he made ( *id.* ¶ 97). Accordingly, the Court finds that the Complaint presents a sufficient factual basis to support its allegations of scienter against Daidone.

*Id.*, 2006 WL 1084276, at *8-9. These allegations concerning Daidone are, like those for Jones, contained in the Complaint. *See* ¶¶ 38, 51, 77, 91-96, 99-101, 102, 105, 109.

## 2.  Persistent Illegal Activity Is Probative of Scienter

Courts have held that engaging in "deliberately illegal behavior" supports a strong inference of scienter. *See Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000). Particularly relevant here, courts have noted that illegal kick-back arrangements, when weighed with other factors, are probative of scienter. For example, in *In re AOL Time Warner Sec. & "ERISA" Litig.*, 381 F. Supp. 2d 192, 229 (S.D.N.Y. 2004), the plaintiffs alleged that AOL negotiated a deal with Veritas Software Corporation in which AOL agreed to pay Veritas $50 million for $30 million worth of software. *Id.* The extra $20 million was then round-tripped back to AOL in a purported separate deal in which Veritas purchased online advertising from AOL − making it

appear as if there were two wholly unrelated transactions.  *Id.*  The plaintiffs alleged that, in reality, it was a "'kick-back' arrangement in violation of APB 29 . . . structured this way so that the extra $20 million could be booked as revenue before the end of the last quarter . . ."  *Id.*  The Court held that such illegal actions supported a strong inference of scienter: "By specifically alleging Colburn's engineering of a 'kick-back' arrangement with Veritas, [plaintiff] has adequately alleged that . . . Colburn acted with fraudulent intent.  *Id.* at 230.  *See also id.* at 219 (finding scienter because, inter alia, "[t]he Homestore and Purchase Pro transactions show 'deliberate illegal behavior'"); *In re Towers Fin. Corp. Noteholders Litig.*, 996 F. Supp. 266, 276 (S.D.N.Y. 1998) (illegal acts probative of scienter); *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1471-72 (2d Cir. 1996) (same); *Mutual Funds*, 384 F. Supp. 2d at 865 (scienter plead against Bear Stearns and Bank of America by virtue of their deceptive acts, "the very commission of which reflect guilty knowledge.").

Here, the Corporate Defendants entered into an agreement with the SEC in which they agreed to pay over $200 million in fines and disgorgement penalties as a result of their violation of the IAA. Daidone and Jones have also been implicated in the very same kick-back scheme (¶ 10) and Plaintiff alleges they knew about the tens of millions of dollars kicked back to Citigroup entities through the TA scheme.  *See* ¶¶ 38, 51, 53, 63, 76, 77, 91-96, 99-101, 102, 105, 109. Accordingly, such illegal behavior supports a finding of scienter.

### 3.  Daidone and Jones Had Access to Information Revealing the Fraud

There are compelling facts that demonstrating that the Individual Defendants had – at the very least – access to information about the scheme.  As to Daidone:

- Daidone was Senior Vice President and a Director of the Adviser, Managing Director of Global Markets, and Principle Accounting Officer for many subfamilies of the Funds during the Class Period (¶20);

- Daidone knew that First Data had been making substantial profits from its role

as CAM's transfer agent, which CAM intended to enjoy itself (¶77);

- Daidone was a member of CAM's transfer agent team and worked closely with Deloitte on the TA function and options going forward (¶38);

- Daidone was privy to Deloitte's concerns about the CAM-affiliate proposal, and understood CAM's desire to press ahead with the CAM-affiliate and First Data deal and the negotiations leading to the ultimate arrangement, including First Data's Revenue Guarantee (¶¶50-51, 73-74);

- Daidone and other CAM representatives negotiated the terms of the Side Letter and sub-TA agreement.  The Side Letter included, among other things, the Revenue Guarantee (¶¶72-75);

- Daidone was the lead author of the Board Memo and a Power Point presentation provided to the Funds' boards concerning CAM's recommendation for a new TA contract which omitted material information (¶¶76-81);

- Daidone did not disclose to the Funds' boards the true nature of the agreed upon transfer agent arrangement. Daidone led the Funds' boards to believe that the transfer agent arrangement involving the CAM-affiliate and First Data was in the Funds' best interests, when in reality it was supported by Defendants because it would result in profits to CAM and other Citigroup entities (¶¶79-81);

- Daidone spun the facts to make it appear the Funds were getting the best transfer agent deal available (¶80), did not disclose the existence of the Revenue Guarantee from First Data that would benefit Citigroup entities (¶85), and did not explain that the CAM-affiliate transfer agent would, in reality, be doing very little transfer agent work (¶¶87-88);

- Daidone signed many prospectuses and a Form 485BPOS concerning the sub-TA arrangement that failed to disclose the elaborate scheme to inflate profits which was the motivating force behind creating the sub-TA (¶¶114-124);[18]

- Daidone was implicated in the alleged scheme by Smith Barney Individual Vice President Michael Yellin (¶10).

As to Jones:

- Jones was the CEO of CAM during the Class Period (¶¶2, 19);

---

[18] In each instance, as signatory, Daidone was attesting to the accuracy of the information contained in the filing.  Courts have found that such attestations support a strong inference of scienter.  *E.g.*, *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1061 (9th Cir. 2000).

- Jones was briefed on the status of the TA project, including competing vendor proposals, by CAM representatives, including Daidone and Yellin, on a regular basis (¶¶2, 51-52, 63-71);

- Jones knew that First Data had been making high profit margins on the TA contract and sought to keep for CAM much of the profit First Data had been making (¶¶3, 37);

- Jones agreed with Deloitte's recommendation that CAM contract with DST, but after agreeing with that recommendation, was asked by the Chairman of Travelers to continue negotiating with First Data. Jones then instructed Yellin to continue negotiations with First Data (¶¶45-53),

- On or about June 5, 1998, First Data improved its offer, which provided for a substantial discount to CAM taking the form of a rebate to be paid to CAM, not the Funds (¶55),

- On numerous occasions, Deloitte warned CAM representatives about the legality of the structure of First Data's improved offer (¶¶56-60);

- In July 1998, First Data improved its offer again. The offer, which was memorialized in a memo by Yellin to Jones dated July 24, 1998, included a lucrative "Revenue Guarantee" that would result in a huge windfall to CAM at the expense of Fund shareholders. Yellin recommended to Jones that the Funds consummate the deal with First Data (¶¶62-70);

- Jones approved Yellin's recommendation and then recommended the affiliated TA proposal to the Funds' boards (¶¶8, 71);

- CAM representatives, including Yellin, negotiated the terms of a Side Letter and a sub-TA agreement. The Side Letter included, among other things, the Revenue Guarantee (¶¶72-75);

- In late February-early March 1999, Daidone prepared a Board Memo and Power Point presentation to present to the Funds' boards CAM's recommendation for a new TA contract. CAM's presentation, which did not include the Side Letter, gave the impression to the Funds' boards that the TA proposal was the best deal that the Funds could have achieved, which was not true, and did not disclose that First Data was to perform almost all of the same work as before, with the affiliated TA taking most of the profit for doing limited work (¶¶72-90);

- Jones only performed a cursory review of the Board Memo and took no meaningful steps to insure that the Funds' boards were informed of the material terms of the TA proposal, which were omitted (¶8);

- Jones understood that the true economics of the TA arrangement ultimately

28

presented to the Funds' boards would not be disclosed (¶¶99-102, 105);

- Smith Barney Executive Vice President Michael Yellin implicated Jones in the alleged scheme (¶10).

Such facts establish the Individual Defendants' access to information concerning the true nature of the transfer agent arrangement sufficient to establish their scienter. *See, e.g., In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72-73, 76-77 (2d Cir. 2001); *Sterling Heights*, 423 F. Supp. 2d at 362. Indeed, courts have found that where defendants are aware of facts or have access to information that directly contradicts their public statements, a strong inference of scienter can be inferred. *See, e.g., Novak*, 216 F.3d at 308 ("securities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements"); *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004) (scienter pled where available facts contradict a high-level officers' public statements); *In re NTL Inc. Sec. Litig.*, 347 F. Supp. 2d 15, 28 (S.D.N.Y. 2004) (allegations of defendant's knowledge of facts or access to contradictory information are sufficient to state a claim based on recklessness).

### 4. The Magnitude of the Diverted Funds and Duration of the Misstatements Are Probative of Scienter

The length of time during which Defendants made misstatements is also probative of scienter. Numerous courts have found that the duration of the fraud, while not determinative of scienter, is probative of it. *See, e.g., In re Rent-Way Sec. Litig.*, 209 F. Supp. 2d 493, 507 (W.D. Pa. 2002) (accounting irregularities spanning two years probative of scienter); *In re MicroStrategy Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 636 (E.D. Va. 2000) (strong inference of scienter raised where company allegedly overstated revenues for seven consecutive quarters). In

this case, the alleged fraudulent misrepresentation of the true nature of the Funds' transfer agent arrangement lasted for over four and a half years.  ¶30.

The magnitude of the fraud also supports a strong inference of scienter.  *See AOL*, 381 F. Supp. 2d at 219 (risk of losing $140 million in advertising revenue, when compared with optimistic statements, pled strong inference of scienter); *Atlas Air*, 324 F. Supp. 2d at 489; *Burstyn v. Worldwide Xceed Group, Inc.*, No. 01 Civ. 1125 (GEL), 2002 WL 31191741, at *6 (S.D.N.Y. Sept. 30, 2002) ("magnitude of the adjustments raises questions about defendants' credibility"); *In re Livent Inc. Sec. Litig.*, 148 F. Supp. 2d 331, 367-68 ("other things being equal, more opportunities should exist to discover a larger fraud than a smaller fraud, especially where, as here, the magnitude of the fraud was not accomplished by one fraudulent transaction of enormous monetary significance, . . . ") (citation omitted); *In re Leslie Fay Cos. Sec. Litig.*, 835 F. Supp. 167, 175 (S.D.N.Y. 1993); *see also Rothman*, 220 F.3d at 92.

According to the SEC, and as alleged in the Complaint, the cumulative effect of Defendants' scheme was to provide CTB with pretax revenues of approximately $100 million off set by operating expenses of $10.5 million, and to funnel to CAM and its affiliates approximately $17 million in additional revenue based on the Revenue Guarantee.  ¶ 9.  In addition, the Second Circuit found Defendants were "grossly overcharging" Class Members:

> We conclude that the facts that shareholders were being grossly overcharged for transfer agent services and that CAM was reaping the benefits were ones that would have 'been viewed by the reasonable investor as having significantly altered the total mix of information made available ….  ***Few facts would likely constitute more important ingredients in investors' 'total mix' of information than the fact that, in violation of these disclosure requirements the expenses categorized as transfer fees were not transfer agent fees at all and included kickbacks to CTB and ultimately, CAM*** ….  In light of the importance the SEC attaches to the proper categorization of fees generally, and the importance Congress has attached to management fees in particular, we hold that defendant's misrepresentations were material because there exists a substantial likelihood that

a reasonable investor would consider it important that her fiduciary was, in essence, receiving kickbacks.

*Operating Local*, 595 F.3d at 93-96 (citation omitted) (emphasis added). Thus, the magnitude and duration of the fraud are probative of scienter.

### 5. The Individual Defendants' Competing Inferences Are Unconvincing

Defendants' proposed competing inferences under *Tellabs* amount to nothing more than improper fact-based defenses and outright denials of Plaintiff's factual allegations. For example, Jones argues that Plaintiff does not allege that he "participated in the details of the negotiations leading up to the transfer agent proposal," "was aware of Deloitte & Touche Consulting's presentations expressing concerns over various aspects of the First Data proposal," or "attended any of the meetings in March-June 1999, when a revised First Data proposal was presented to the Funds' boards." Def. Br. at 29 (citations omitted). Plaintiff, however, alleges chapter and verse about Jones' involvement. *See* ¶¶ 51, 53, 63, 76, 99-101, 102, 105. Thus, Jones's claims he was not at certain meetings or was not aware of certain Deloitte statements, is in no way a competing inference. *See Tellabs*, 551 U.S. at 324.

Daidone argues that Plaintiff alleges that he signed SEC filings containing misleading statements absent allegations that he knew those documents allegedly misrepresented or omitted material information (Def. Orig. Br. at 41). Daidone's claim is simply wrong. Plaintiff alleges detailed facts demonstrating Daidone knowingly or recklessly signed misleading documents. *See* ¶¶38, 51, 77, 91-96, 99-101, 102, 105, 109.

Defendants also argue that "Daidone must have known that the directors of the Funds, as fiduciaries, would carefully scrutinize the presentation he made regarding the transfer agent proposal," and that "Daidone's willingness to make the 1999 presentations to the Funds' boards when he knew that he could be called on to answer additional questions from the directors is

inconsistent with the conduct of a person trying to hide behind incomplete disclosure." Def. Orig. Br. at 41. On the contrary, the most competing inference under *Tellabs* is that such conduct is *precisely* consistent with someone hiding behind incomplete disclosure. Knowing he could be called on to answer more questions is exactly what Daidone forestalled by his misleading presentation.

Further, such denials of Plaintiff's factual allegations, self-serving conclusions and fact-based defenses cannot succeed on a motion to dismiss, where the Court must accept as true the facts alleged in the Complaint, and where "[a]ll reasonable inferences are to be drawn in the plaintiff's favor." *In re Global Crossing, Ltd. Sec. Litig.*, 471 F. Supp. 2d 338, 343 (S.D.N.Y. 2006). *See also In re Regeneron Pharm., Inc. Sec. Litig.*, No. 03 Civ. 3111 (RWS), 2005 WL 225288, at *24 (S.D.N.Y. Feb. 1, 2005) ("Plaintiffs need not foreclose all other characterizations of fact, as the task of weighing contrary accounts is reserved for the fact finder") (internal citations omitted). *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 431 (S.D.N.Y. 2003) ("disputes over facts are not appropriate for a motion to dismiss").

Daidone also claims Plaintiff's allegations of recklessness "rest solely on the prospectuses' omissions of information concerning the Revenue Guarantee and the division of fees and services between CTB and First Data," information which Defendants characterize as "immaterial information which there was no duty to disclose [and thus] cannot create a strong inference of Daidone's scienter …." Def. Orig. Br. at 42. This argument fails, as the Second Circuit has ruled that "defendants' disclosures concerning the transfer fee arrangements were inadequate" and "[Defendants'] misrepresentations were material." *Operating Local*, 595 F.3d at 92.

Jones' claim that he did not have any role during the Class Period in making any allegedly misleading communications to Fund shareholders (Def. Br. at 29-32), falls flat as "[s]enior officers may also be held liable for statements made by others." *Freudenberg v. E*Trade Fin. Corp.*, No. 07 Civ. 8538, 2010 WL 1904314, at *21 (S.D.N.Y. May 11, 2010) (citing *In re Scholastic Corp. Sec. Litig.*, 252 F.3d at 75-76 (vice president for finance and investor relations responsible for company's communications with investors who had access to internal data liable for statements though they were not publicly attributable to him); *First Jersey*, 101 F.3d at 1471 ("Primary liability may be imposed 'not only on persons who made fraudulent misrepresentations but also on those who had knowledge of the fraud and assisted in its perpetration'")).  Indeed, it is well-established that a plaintiff can show conscious misbehavior or recklessness by alleging that "defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud." *Novak*, 216 F.3d at 308; *see also SEC v. Price Waterhouse*, 797 F. Supp. 1217, 1240 (S.D.N.Y. 1992) (recklessness is the "egregious refusal to see the obvious, or to investigate the doubtful") (internal citations omitted).

Jones' argument also fails because he may be presumed responsible for the misleading communications to Fund shareholders under the group pleading doctrine.  This is a pleading presumption that statements in "prospectuses, registration statements, annual reports, press releases, or other group-published information, are the collective work of those individuals with direct involvement in the everyday business of the company." *In re Pfizer Inc. Sec. Litig.*, 584 F. Supp. 2d 621, 637 (S.D.N.Y. 2008) (citation omitted).  Indeed, as Judge Lynch has observed, there is no "apparent contradiction between the idea that each defendant's role must be pled with particularity and the fact that corporate officers may work as a group to produce particular document[s]." *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 641-42 (S.D.N.Y. 2007).  Thus,

the majority of district courts in this district and others have held that the group pleading doctrine is "alive and well" following the passage of the PSLRA. *In re Pfizer,* 584 F. Supp. 2d at 638 (citing *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 439 (S.D.N.Y. 2005) (collecting cases)). *See also Freudenberg*, 2010 WL 1904314, at *22 (same).

Consistent with the limits of particularized pleading, it is reasonable to assume that the kinds of documents Plaintiff seeks to impute to Jones would only be the product of a group effort. *See* ¶ 150 ("Jones and Daidone had direct and supervisory involvement in the day-to-day operations of the Adviser and Global markets and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein"). Jones was the CEO of CAM, a parent of the Adviser, and intimately involved in and responsible for the TA project. ¶¶8, 19. As such, he contributed to or approved the Adviser's false and misleading statements, even if he did not sign Fund prospectuses or SEC filings. *See* ¶150. The fact that, among other things, Daidone was in direct communication with Jones regarding the TA project also raises a strong inference that Jones had actual knowledge of the fraudulent scheme.[19]

Jones also argues that he "believed that those persons responsible for statements to Fund shareholders, along with legal and other advisers, would ensure a full disclosure of material

---

[19] *See SEC v. U.S. Envtl. Inc.*, 155 F.3d 107, 111 (2d Cir. 1998) ("It is well-settled that knowledge of the proscribed activity is sufficient scienter under § 10(b)"); *Novak*, 216 F.3d at 311-12 (defendants knew about serious inventory problems and need to mark down inventory, but refused to do so because it would damage company's financial position); *First Jersey Sec.*, 101 F.3d at 1472 (allegations that defendant "was intimately involved in" and "orchestrated" fraudulent scheme are sufficient to plead scienter); *Livent,* 78 F. Supp. 2d at 214-16 (scienter adequately pleaded where two defendants "are alleged to have orchestrated the fraud in general and to have personally carried out many of its specifics" and two others "are alleged to have participated in carrying it out with knowledge of its impropriety," even absent knowledge of effect of schemes on financial statements); *T.H.C., Inc. v. Fortune Petroleum Corp.*, Nos. 96-2690 (DAB), 96-2691 (DAB), 1999 WL 182593, at *4 n.6 (S.D.N.Y. Mar. 31, 1999) (allegation that defendant directed manipulative transaction is sufficient to plead scienter).

information concerning the transfer agent arrangement to Fund shareholders." Def. Br. at 32. This is simply not a convincing inference based on the numerous facts implicating Jones. Jones also claims that his wrongful acts only took place before the Class Period, but Plaintiff alleges that Jones was the CEO of CAM *throughout* the Class Period. ¶8. The inference that his intimate knowledge of the scheme vanished during the Class Period is ridiculous.[20]

Finally, Defendants claim that Plaintiff has not alleged motive and opportunity to defraud (Def. Br. at 30). Plaintiff does not have to, however, as motive is *one* way of pleading scienter in this Circuit, and Plaintiff has pled *voluminous* allegations demonstrating conscious misbehavior or recklessness.

## VI. PLAINTIFF'S CLAIMS ARE TIMELY

### A. Applicable Legal Standards

Section 1658(b) of Title 28 of the United States Code provides that a complaint filed in a private securities fraud action is timely if filed no more than two years after the plaintiff *"discover[ed] the facts constituting the violation."* *Merck & Co.*, 2010 WL 1655827, at *15 (emphasis added) (citing 28 U.S.C. § 1658(b)). In *Merck*, the Supreme Court rejected the concept of "inquiry notice" as inconsistent with the statute's use of the term "discovery." *See id.* at *14 ("the 'discovery' of facts that put a plaintiff on 'inquiry notice' does not automatically begin the running on the limitations period."). Rather, in determining the time at which "discovery" of those "facts" occurred, while terms such as "inquiry notice" and "storm

---

[20] Further, an assertion of reliance on counsel is a highly fact-intensive affirmative defense which cannot negate scienter at the pleading stage. *See SEC v. Bank of Am. Corp.*, No. 09 Civ. 6829 (JSR), 2009 WL 2842940, at *2 (S.D.N.Y. Aug. 25, 2009) (defendant's argument that none of its individual officers were responsible for misstatements because "all [were] negotiated and worked on  by lawyers" was "at war with common sense"); *Siemers*, 2006 WL 2355411, at *9 ("If defendants wish to rely on advice of counsel defense, that would be a matter for an affirmative defense" subject to discovery); *SEC v. Martino & CMA Noel, Ltd.*, 255 F. Supp. 2d 268, 285 (S.D.N.Y. 2003) (listing facts that must be established for defense to be invoked).

warnings" may be useful to the extent that they identify a time when the facts would have prompted a reasonably diligent plaintiff to begin investigating, *see id.* at \*15, the running of the two-year limitations period does not begin to run until a plaintiff actually discovers **or** a "reasonably diligent plaintiff" would have discovered "the facts constituting the violation, **including scienter** – irrespective of whether the actual plaintiff undertook a reasonably diligent investigation." *Id.* (emphasis added). Thus, the statute requires actual or constructive "discovery" as the event triggering the statute of limitations, not the mere initiation of an investigation or inquiry.

### B. The Merck Decision

In *Merck*, plaintiffs filed suit on November 6, 2003, asserting that Merck defrauded investors by promoting the "naproxen hypothesis" in which Merck claimed that any increased adverse cardiovascular events observed in a clinical trial comparing its Vioxx painkiller to Naproxen could be explained by a unique benefit of Naproxen rather than harm caused by Vioxx.

The issue was whether the lawsuit was untimely under the 2-year discovery limitations period since Vioxx and the naproxen hypothesis had been the subject of public debate involving Merck and the FDA throughout 2001 (*i.e.*, prior to November 6, 2001 (over two years before the date the suit was filed)). For example, in September 2001, the FDA issued a warning letter to Merck (released to the public) stating that its marketing of Vioxx was "lacking in fair balance, or otherwise misleading." The FDA also found that Merck's "'promotional campaign selectively present[ed]' [the naproxen hypothesis] without adequately acknowledging 'another reasonable explanation,' namely, 'that Vioxx may have pro-thrombotic [i.e., adverse cardiovascular] properties." *Id.* at \*6. In further support of its argument, Merck also cited to product liability

lawsuits filed prior to November 2001 which alleged that Merck had knowingly downplayed the risks of Vioxx.

In *Merck*, the defendant argued that the fact that its statements (or omissions) were materially false or misleading was sufficient to demonstrate scienter.  *See Merck & Co.*, 2010 WL 1655827, at *2.  But the Supreme Court disagreed and held that, for the purposes of a Section 10(b) claim, the "relation of factual falsity and state of mind" was "more context specific" such that a misrepresentation does not automatically demonstrate scienter.  For example, "[a]n incorrect prediction about a firm's future earnings, by itself, does not automatically tell us whether the speaker deliberately lied or just made an innocent (and therefore nonactionable) error.  Hence, the statute may require "discovery" of scienter-related facts beyond the facts that show a statement (or omission) to be materially false or misleading." *Id.* at *13.

Accordingly, in *Merck*, the Supreme Court found that "[t]he FDA's warning letter … shows little or nothing about the here-relevant scienter, i.e., whether Merck advanced the naproxen hypothesis with fraudulent intent" and that "[t]he FDA itself described the pro-Vioxx naproxen hypothesis as a 'possible explanation'" for the results of the clinical trial, "faulting Merck only for failing sufficiently to publicize the alternative less favorable to Merck, that Vioxx might be harmful." *Id.* at *15.  The Court also found that the products-liability complaints' statements about Merck's knowledge "show[ed] little more" and "alleged only in general terms that Merck had concealed information about Vioxx . . . ." *Id.*  In the Court's view, "neither these two circumstances nor any of the other pre-November 2001 circumstances … whether viewed separately or together, reveal 'facts' indicating scienter." *Id.* at *16.

C.   **In This Case, The Limitations Period Did Not Begin To Run Prior To May 31, 2005**

When juxtaposed with *Merck*, there is no question that, in this case, none of Defendants' statements or the related news articles prior to May 31, 2005 contain facts constituting the alleged violation – including scienter – sufficient to trigger the statute of limitations. The gravamen of Plaintiff's claims is that Defendants falsely represented in Fund prospectuses and SEC filings that the transfer agent arrangement was garden-variety and in the Funds' best interests when, internally, they knew the truth – that Defendants concocted a scheme involving a phony sub-transfer agent to divert tens of millions of dollars from Class Members' accounts to Citigroup coffers.  Here, investors had no basis to suspect before May 31, 2005 – when, for the first time, Defendants' intricate scheme was revealed – that Defendants did not believe that the transfer agent arrangement at issue was proper or that Defendants' statements lacked a reasonable basis.  Investors therefore could not have discovered prior to May 31, 2005 that Defendants' statements were false, let alone with scienter and in violation of Section 10(b).

Nevertheless, Defendants contend that "a reasonably diligent investor would have discovered the facts constituting the alleged Section 10(b) violation – including scienter – on December 1, 2003, or at the very latest by March 1, 2004 …" as "[t]he Funds' prospectus supplements filed in November and December 2003, and additional public filings in March 2004, provided ample disclosure for a reasonably diligent investor to discover facts constituting the alleged securities violation."  Def. Br. at 20.  While December 1, 2003 is the date on which Citigroup announced that the Revenue Guarantee had not been disclosed to the Funds' boards (¶125), at that time, no one, including Defendants, said ***anything*** about the phony transfer agent scheme.  *See id*.  Nor did Defendants or anyone else even hint at the fact that there was self-dealing between Citigroup entities which netted Defendants over $100 million at the Class'

38

expense.  An investor reading this announcement would reasonably have thought that it simply concerned CAM's "sub-contract[ing]…transfer agency services to a third party…with this sub-contractor providing…certain benefits to CAM or its affiliates."   ¶125.  The announcement concerning the Revenue Guarantee, just like Defendants' announcements that CAM was strengthening its procedures in order to avoid similar situations in the future (Def. Br. at 22-23), "does not automatically tell us whether the speaker deliberately lied or just made an innocent (and therefore nonactionable) error."  *Merck & Co.*, 2010 WL 1655827, at *13.  Investors could not reasonably have known from the existence of the Revenue Guarantee that Defendants had knowingly set up a phony transfer agent middleman to siphon profits away from investors for the benefit of Citigroup entities.

Similarly, the "flood of news articles" cited by Defendants that were published in November and December of 2003 (s*ee* Def. Br. at 21-22), as well as the announcements of March 1, 2004, did not disclose any new facts – including facts evidencing Defendants' scienter – but rather, simply said the SEC and the U.S. Attorney were investigating this situation.  ¶126. Much like the FDA's publicly issued warning letter in *Merck* failed to demonstrate scienter, much more was needed in this case beyond, for example, the mere fact that regulators were investigating "***potential*** improprieties" including "***possible*** intentional misconduct, false disclosures, and improper kickbacks" (*see* Def. Br. at 22-24 (emphasis added)), to provide reasonable grounds even to suggest that Defendants' belief in their statements concerning the nature of the TA arrangement was false.[21]

---

[21] Defendants' reliance upon *Marshall v. Milberg LLP*, 07 Civ. 6950 (LAP), 2009 WL 5177975 (S.D.N.Y. Dec. 23, 2009), is misplaced, as the Supreme Court in *Merck* rejected the concept of "inquiry notice" as inconsistent with the statute's use of the term "discovery."  *See id.* at *14. Moreover, should the Court deem it relevant, Plaintiff incorporates by reference its relation back argument set forth in its opposition to Defendants' original motion to dismiss.  *See Lead*

Accordingly, the Complaint, filed on June 1, 2006, is timely with respect to all Defendants.

## VII.   PLAINTIFF ADEQUATELY ALLEGES CONTROL PERSON LIABILITY

Plaintiff alleges sufficient facts against Jones and Daidone to establish a *prima facie* claim under Section 20 of the Exchange Act.   As the Individual Defendants make no new arguments on control person liability here, Plaintiff respectfully refers the Court to Plaintiff's original memorandum of law in opposition to Defendants' motion to dismiss, at 38-42.

## CONCLUSION

For all the aforementioned reasons, Defendants' renewed motion to dismiss Plaintiff's Complaint should be denied in its entirety.

Dated:  May 28, 2010

<div style="margin-left: 40%;">

BERNSTEIN LIEBHARD LLP

/s/

_____
Sandy A. Liebhard (liebhard@bernlieb.com)
U. Seth Ottensoser (ottensoser@bernlieb.com)
Brian S. Cohen (cohen@bernlieb.com)
Joseph R. Seidman, Jr. (seidman@bernlieb.com)
10 East 40th Street
New York, New York  10016
Tel:  (212) 779-1414

Lead Counsel for Lead Plaintiff and the Class

Brad Lakin
LAKIN LAW FIRM, P.C.
300 Evans Ave., P.O. Box 229
Wood River, Illinois  62095-0229
Tel:  (618) 254-1127

</div>

---

*Plaintiff's Memorandum in Opposition to Defendants' Motion to Dismiss,* dated November 28, 2006, at 31-37.