USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _1/25/11_

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - -X
                                              :

IN RE: SMITH BARNEY TRANSFER       :        05 Civ. 7583 (WHP)
AGENT LITIGATION
                                   :        MEMORANDUM & ORDER

- - - - - - - - - - - - - - - - - - - - - - - - - - - -X

WILLIAM H. PAULEY III, District Judge:

          Lead Plaintiff Operating Local 649 Annuity Trust Fund ("Local 649") filed this

putative class action against Defendants Smith Barney Fund Management LLC ("Smith

Barney"), Citigroup Global Markets, Inc. ("Citi GM"), Lewis Daidone ("Daidone"), and Thomas

Jones ("Jones"), alleging securities fraud in violation of §§ 10(b) and 20(a) of the Securities

Exchange Act of 1934, 15 U.S.C. § 78j(b), and breaches of fiduciary duty in violation of § 36(b)

of the Investment Company Act of 1940, 15 U.S.C. § 80a-35(b).  On September 26, 2007, this

Court granted Defendants' motion to dismiss the Consolidated and Amended Class Action

Complaint (the "Complaint") in its entirety.  In re Smith Barney Transfer Agent Litig., No. 05

Civ. 7583 (WHP), 2007 WL 2809600 (S.D.N.Y. Sept. 26, 2007) (the "2007 Decision").  On

February 16, 2010, the Court of Appeals vacated and remanded this Court's dismissal of the §

10(b) and Rule 10b-5 claims and affirmed the dismissal of the § 36(b) claims.[1]  Operating Local

649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC, 595 F.3d 86 (2d Cir. 2010).

          Defendants renew their motion to dismiss the § 10(b) claims on grounds not

reached in the 2007 Decision.  Plaintiffs move to lift the discovery stay imposed by the Private

Securities Litigation Reform Act ("PSLRA").  For the following reasons, Defendants' motion to

---

[1] The Court of Appeals did not mention dismissal of the § 20(a) claims in its opinion or mandate.
Because those claims depend on a § 10(b) violation, this Court treats the Court of Appeals'
opinion as vacating its dismissal of the § 20(a) claims as well as the § 10(b) claims.

dismiss is granted in part and denied in part, and Plaintiffs' motion to lift the discovery stay is denied as moot.

## BACKGROUND

This Court presumes familiarity with the facts set forth in its 2007 Decision and in the Court of Appeals' decision, and summarizes only the facts relevant to these motions. This lawsuit began on August 26, 2005 with the filing of Chilton v. Smith Barney Fund Management, LLC, No. 05 Civ. 7583. By Order dated December 28, 2005, this Court consolidated a number of related actions. On June 1, 2006, Plaintiffs filed a Consolidated and Amended Class Action Complaint.

In the 2007 Decision, this Court dismissed Plaintiffs' § 10(b) claims on the grounds that (1) the omitted information concerning the allocation of mutual fund fees and the transfer agent's profit margin was not material; and (2) the Complaint failed to adequately plead loss causation. Smith Barney, 2007 WL 2809600, at *2-3. This Court also dismissed the § 20(a) claims for failure to allege a primary violation under § 10(b). Smith Barney, 2007 WL 2809600, at *3. Finally, this Court dismissed Plaintiffs' § 36(b) claims, finding that they must be pled derivatively because of the nature of the damages sought by Plaintiffs. Smith Barney, 2007 WL 2809600, at *4.

On February 16, 2010, the Court of Appeals affirmed in part and reversed in part. As to the § 10(b) claims, the Court of Appeals found that Plaintiffs adequately pled materiality because "the facts that shareholders were being grossly overcharged for transfer agent services and that CAM was reaping the benefits were ones that would have been viewed by the

-2-

reasonable investor as having significantly altered the total mix of information made available."
Operating Local, 595 F.3d at 93.  The Court of Appeals also found that Plaintiffs adequately pled
loss causation.  Operating Local, 595 F.3d at 95-96.  As to the § 36(b) claims, the Court of
Appeals agreed that Plaintiffs' failure to plead them derivatively warranted dismissal.  Operating
Local, 595 F.3d at 98.


I.  The Parties & Other Relevant Entities

        Smith Barney and the asset management operations of Citi GM are units of
Citigroup Asset Management ("CAM").[2]  (Consolidated & Amended Class Action Complaint
("Compl.") dated June 1, 2006 ¶¶ 2, 17-18.)  CAM is a business unit of Citigroup, Inc.
("Citigroup").  (Compl. ¶ 2.)  Mainly through Citi GM employees, CAM provides investment
advisory and management services to Citigroup-sponsored funds, including more than 105 funds
in the Smith Barney Family of Funds (the "Smith Barney Funds").  (Compl. ¶¶ 1-2, 23-24.)
Local 649 purchased shares in three of the Smith Barney Funds.  (Compl. ¶¶ 14-16.)

        Jones was the chief executive officer of CAM.[3]  (Compl. ¶ 8.)  Daidone was a
senior vice president and director of Smith Barney, and a managing director of Citi GM.
(Compl. ¶ 7.)

---

[2] Given the passage of time since the filing of the Complaint, its allegations may no longer be
accurate.  For the purposes of the motion to dismiss, however, this Court accepts them as true.

[3] The Complaint does not specify Jones's tenure as CEO but states that Daidone held his
positions from September 11, 2000 to May 31, 2005 (the "Class Period").

II.  The Transfer Agent Agreement

        In July 1997, CAM retained Deloitte & Touche Consulting ("Deloitte") to review the Smith Barney Funds' agreement with First Data Investor Services Group ("First Data") for the provision of transfer agent services.  (Compl. ¶¶ 2, 38.)  After an initial evaluation, CAM and Deloitte created a plan to restructure the transfer agent arrangement.  Under the new structure, CAM would create a leanly-staffed transfer agent unit to hold the primary contract with the Smith Barney Funds and subcontract the bulk of the transfer agent duties to First Data or one of its competitors.  (Compl. ¶ 44.)  Thereafter, Deloitte solicited proposals from First Data, DST and SunGard.  (Compl. ¶ 44.)

        Daidone and Michael Yellin ("Yellin"), a Smith Barney vice president who reported to Jones, were among the CAM representatives who evaluated the proposals.  (Compl. ¶¶ 2, 10, 47, 51.)  On April 2, 1998, they recommended to Jones that CAM retain DST, one of First Data's competitors, as the subcontractor.  (Compl. ¶¶ 40, 51.)  That recommendation was not implemented.  (Compl. ¶ 53.)

        Instead, Jones instructed Yellin to negotiate with First Data to improve the terms of its proposal.  (Compl. ¶ 53.)  In July 1998, First Data submitted a revised proposal which provided CAM with an annual revenue guarantee (the "Revenue Guarantee") and a percentage of First Data's profits under the contract.  (Compl. ¶¶ 62-66.)  By memorandum dated July 24, 1998, Yellin recommended the revised proposal to Jones, who approved it.  (Compl. ¶ 71.)

        In early 1999, Daidone prepared a memorandum to the Smith Barney Funds' boards concerning the revised First Data proposal.  (Compl. ¶ 76.)  The memorandum omitted key details of the arrangement, including the initial recommendation that DST be selected as

-4-

service provider, the substantial profits earned by the CAM transfer agent unit despite providing minimal services, and the existence of the Revenue Guarantee. (Compl. ¶¶ 77, 79.) According to Complaint, Jones "performed only a cursory review of the memorandum . . . and took no steps to insure the [Smith Barney] Funds' boards were informed of [its] material terms." (Compl. ¶ 8.) Daidone presented the proposal to the Smith Barney Funds' boards at eight board meetings, and the new contract was approved. (Compl. ¶¶ 91, 95.) From 2000 to 2003, Daidone signed numerous prospectuses which failed to disclose significant provisions of the contract. (Compl. ¶¶ 114-24.)

In 2003, the Securities and Exchange Commission ("SEC") and the Department of Justice opened investigations into the alleged transfer agent scheme. Contemporaneous news articles and public filings described the agencies' investigations into mutual fund fees and sales practices and the failure to disclose certain information to the Smith Barney Funds' boards of directors. (See, e.g., Declaration of John Rothermich ("Rothermich Decl."), Ex F: Jenny Anderson, Probe Enters Citi, U.S. Attorney Eyes Firm's Mutual Fund Business, N.Y. Post, Nov. 26, 2003, at 33; Ex. H: The Associated Press, Citigroup mutual-funds probed by SEC, US Attorney, Mar. 1, 2004.)

## DISCUSSION

### I. Legal Standard

On a motion to dismiss, a court must accept the facts alleged as true and construe all reasonable inferences in plaintiff's favor. ECA Local 134 IBEW Joint Pension Trust Fund of Chi. v. JP Morgan Chase Co., 553 F.3d 187, 196 (2d Cir. 2009). Nevertheless, a complaint must

"contain sufficient factual matter . . . to state a claim to relief that is plausible on its face."

Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (quotations and citation omitted). "A claim has

facial plausibility when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged. The plausibility

standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility

that a defendant has acted unlawfully." Iqbal, 129 S. Ct. at 1949.

A court may consider "any written instrument attached to the complaint,

statements or documents incorporated into the complaint by reference, legally required public

disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff

and upon which it relied in bringing the suit." ATSI Commc'ns, Inc. v. Shaar Fund Ltd., 493

F.3d 87, 98 (2d Cir. 2007) (citation omitted). A court may also take judicial notice of news

articles discussing the conduct raised in the complaint. See In re Salomon Analyst Winstar

Litig., No. 02 Civ. 6171 (GEL), 2006 WL 510526, at *4 (S.D.N.Y. Feb. 28, 2006).

To state a claim under § 10(b), "a plaintiff must allege that the defendant (1) made

misstatements or omissions of material fact, (2) with scienter, (3) in connection with the

purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's

reliance was the proximate cause of its injury." ATSI Commc'ns, 493 F.3d at 105 (citing Lentell

v. Merrill Lynch & Co., 396 F.3d 161, 172 (2d Cir. 2005)); accord In re Omnicom Grp., Inc. Sec.

Litig., 597 F.3d 501, 509 (2d Cir. 2010). A plaintiff alleging securities fraud must satisfy the

heightened pleading standard of Fed. R. Civ. P. 9(b), which requires that "the circumstances

constituting fraud . . . be stated with particularity." Novak v. Kasaks, 216 F.3d 300, 306 (2d Cir.

2000). Accordingly, a plaintiff's claim cannot be based on "speculation and conclusory

allegations." Kalnit v. Eicher, 264 F.3d 131, 142 (2d Cir. 2001).

II.  Standing

             Defendants move to dismiss Plaintiffs' § 10(b) claims for lack of standing on

three grounds: (1) the claims must be pled as derivative rather than direct claims; (2) Plaintiffs

purchased shares in only 3 of the 105 funds at issue; and (3) claims by mere holders of the Smith

Barney Funds are barred because they neither purchased nor sold shares during the Class Period.

             a.  Direct Versus Derivative Claims

             Defendants contend that Plaintiffs must pursue their § 10(b) claims as a derivative

action because they allege only harm to the Smith Barney Funds—i.e., the excessive transfer

agent fees paid by the Funds—and no distinct injury to themselves.  "To determine whether a

party has standing to raise a claim under [§] 10(b), [a] court [generally] looks to federal rather

than state law."  Frankel v. Slotkin, 795 F. Supp. 76, 79 (E.D.N.Y. 1992); see also Drachman v.

Harvey, 453 F.2d 722, 727-30 (2d Cir. 1971) ("Federal law must be consulted to decide whether

there is standing to sue under the Exchange Act.").  While Defendants contend that state law

controls, they fail to identify any authority applying state law to the issue of standing under §

10(b); rather, courts addressing the issue consult federal precedent.[4]  See Farey-Jones v.

Buckingham, 132 F. Supp. 2d 92, 99 (E.D.N.Y. 2001) (relying on federal law to determine

whether a shareholder had standing to bring a § 10(b) claim as a derivative action); Sanguinetti

---

[4] Defendants cite decisions relying on state law to resolve a shareholder's standing under the
Investment Act of 1940.  See Strougo v. Bassini, 282 F.3d 162, 168 (2d Cir. 2002); In re
AllianceBernstein Mut. Fund Excessive Fee Litig., No. 04 Civ. 4885 (SWK), 2005 WL 2677753,
at *3 (S.D.N.Y. Oct. 19, 2005).  Absent authority applying the reasoning in these cases to
standing under § 10(b), this Court declines to adopt it.

v. Viewlogic Sys., Inc., 1996 WL 33967, at *7-8 (N.D. Cal. Jan. 24, 1996) (relying on federal

law to determine whether plaintiff should have brought a § 10(b) claim as a derivative action);

Glusband v. Fittin Cunningham Lauzon, Inc., 582 F. Supp. 145, 148-49 (S.D.N.Y. 1984)

(Sprizzo, J.) ("[W]ith respect to the federal law claims, [including those under § 10(b),]

plaintiff's capacity to sue under state law is irrelevant.").

       Federal law governing the determination of whether a § 10(b) claim must be pled

derivatively is not well-developed. Despite the ubiquity of § 10(b) claims, few decisions address

the failure to allege a § 10(b) action derivatively. See Rand v. Anaconda-Ericsson, Inc., 794

F.2d 843, 849 (2d Cir. 1986) (dismissing claim under the Racketeer Influenced and Corrupt

Organizations Act ("RICO") for failure to plead it as a derivative action but dismissing a § 10(b)

claim on different grounds). The direct/derivative question is especially obscure in the context

of mutual funds. In that arena, the question is intertwined with issues of loss causation and the

possibility of recovery for mere holders of mutual funds securities.

       While the essential inquiry is whether a plaintiff "suffered an individual injury

distinct from the injury to the corporation," Perlman v. Salomon Inc., No. 92 Civ. 5208 (RPP),

1995 WL 110076, at *2 (S.D.N.Y. Mar. 14, 1995), courts have varied in their analysis of that

issue. Some courts examine the target of the alleged fraud:

> A derivative action is one in which the right claimed by the
> shareholder is one the corporation could itself have enforced in
> court. In other words, an action is derivative if it seeks damages
> arising from an injury to the corporation. Each shareholder of the
> Bank may well have a valid cause of action against the directors
> for the decline in the stock's value, and such action would be
> derivative. However, [the defendant] mistakenly . . . characterizes
> [the plaintiff's claims] as also premised on corporate
> mismanagement. The reasons for the alleged worthlessness of the
> stocks purchased by [the plaintiff] are essentially irrelevant to his

> claims. What is essential [to plaintiff's claims] is his allegation
> that the defendants knew of the lack of value, yet fraudulently
> represented to [him] that the bank [in which he invested] was in
> fine shape.

Howard v. Haddad, 916 F.2d 167, 169-70 (4th Cir. 1990) (internal quotations and citations

omitted); see also Medsker v. Feingold, 307 F. App'x 262, 265 (11th Cir. 2008) (per curiam)

("[D]efendants [allegedly] made intentional misrepresentations to these plaintiffs and thereby

fraudulently induced them to invest their money into [the corporations] which they would not

otherwise have done. This is not an injury to the corporation, but to these investors . . . .").

Other courts examine only whether a plaintiff's losses flow from the diminution

of value of the shares held in the corporation. See Perlman, 1995 WL 110076, at *3 ("It is a

well-settled rule of law that even in cases of alleged corporate fraud, a decrease in the value of

stock in and of itself is not an injury which confers standing to sue upon an individual

stockholder."); see also Lewin v. Lipper Convertibles, Nos. 03 Civ. 1117 (RMB), 03 Civ. 2632

(RMB), 2010 WL 4669040, at *7 (S.D.N.Y. Nov. 17, 2010) ("Plaintiffs have failed to establish

standing because . . . [they] suffered only through diminution in the value of their share[s]" in the

corporation). Importantly, this approach is more often applied to claims under RICO, see Rand,

794 F.2d at 849, or under the Investment Act of 1940 which incorporates application of state

law, see Halebian v. Berv, 590 F.3d 195, 208 (2d Cir. 2009).

> In discussing loss causation in this case, the Court of Appeals held that:
>
> Local 649 alleges that [D]efendants' misrepresentations caused
> investors to make and maintain investments in [Smith Barney]
> Funds that were subject to excessive fees and expenses, and that
> the periodic deduction of those fees and expenses reduced the
> value of the investments over time. Put another way, Local 649
> has alleged that the [D]efendants' misrepresentations proximately
> resulted in the regular deduction of identifiable amounts that would

> not have been deducted had [D]efendants conformed their conduct
> to what the law required.  The [D]efendants' losses were real ones
> because the deductions used to fund the transfer agent "fees"
> diminished for Local 649 (and other shareholders) money under
> management and, as a result, negatively and predictably impacted
> returns.

Operating Local, 595 F.3d at 96.  The loss causation and the direct versus derivative inquires are

different.  However, focusing the inquiry on whether Plaintiffs' losses flowed from the

diminution of Smith Barney Funds' shares ignores the Court of Appeals' characterization of

Plaintiffs' injuries—that Defendants' misrepresentations induced Plaintiffs' purchase and/or sale

of Smith Barney Funds.

   Plaintiffs claim that they were fraudulently induced to purchase shares in the

Smith Barney Funds based on material misrepresentations regarding the transfer agent fees in the

prospectuses.  If those misrepresentations induced Plaintiffs' investment, they can be said to

have suffered a direct injury.  See Howard, 916 F.2d at 169-70.  This conclusion comports with

decisions regarding shareholder standing in analogous contexts.  See, e.g., Anwar v. Fairfield

Greenwich Ltd., --- F. Supp. 2d ----, 2010 WL 3341636, at *15 (S.D.N.Y. Aug. 18, 2010)

("[A]llegations by investors of having been tortiously induced to invest or to retain an investment

are not derivative claims.").  Indeed, a determination that Plaintiffs § 10(b) claims are derivative

claims—i.e., that the Smith Barney Funds were the primary victim of the Defendants' alleged

fraud—overlooks the fact that Defendants' misrepresentations were directed primarily at

investors in the Smith Barney Funds.  That Plaintiffs seek losses similar to those recoverable by

the Smith Barney Funds in a derivative action does not deprive them of standing—direct and

derivative actions based on the same underlying conduct are not mutually exclusive.  See, e.g.,

Ceribelli v. Elghanayan, 990 F.2d 62, 64 (2d Cir. 1993) (noting the possibility of both claims in

-10-

the RICO context); Katz v. Pels, 774 F. Supp. 121, 127 (S.D.N.Y. 1991) (same as to § 10(b)

claims).

      b.  Standing for Funds Not Owned by Plaintiffs

        Defendants further contend that Plaintiffs fail to allege injury in connection with

102 of the 105 Smith Barney Funds because they neither purchased nor sold shares in those

funds. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992) ("[An] injury has to be

fairly traceable to the challenged action of the defendant.") (quotations and citations omitted). In

general, "[p]laintiffs lack standing for claims relating to funds in which they did not personally

invest." Hoffman v. USB-AG, 591 F. Supp. 2d 522, 530-31 (S.D.N.Y. 2008); see also In re

Salomon Smith Barney Mut. Fund Fees Litig., 441 F. Supp. 2d 579, 607 (S.D.N.Y. 2006) ("With

regard to the sixty-eight funds of which Plaintiffs own no shares, Plaintiffs do not have standing

to assert any claims because Plaintiffs cannot satisfy the standing requirements."); In re AIG

Advisor Grp., 06 Civ. 1625 (JG), 2007 WL 1213395, at *4 (E.D.N.Y. Apr. 25, 2007) ("In this

securities fraud case, the named plaintiffs can allege no injury from the purchase or sale of funds

they never invested in.").

        Plaintiffs argue that this Court already held that "Defendants' arguments [that the

lead plaintiff lacked standing] are properly addressed at the class certification stage" rather than

on a motion to dismiss. In re Smith Barney Transfer Agent Litig., No. 05 Civ. 7583 (WHP),

2006 WL 991003, at *4 (S.D.N.Y. Apr. 17, 2006) (parenthetically quoting Yates v. Open Joint

Stock Co., No. 04 Civ. 9742 (NRB), 2005 U.S. Dist. LEXIS 7717, at *6-7 (S.D.N.Y. Apr. 29,

2005)). However, Plaintiffs ignore the difference between the appointment of a lead plaintiff to

represent the class and the requirement that there be a named plaintiff who invested in each of

-11-

the Smith Barney Funds at issue. "While plaintiffs are correct that <u>lead</u> plaintiffs, appointed

pursuant to the PSLRA, need not satisfy all elements of standing with respect to the entire

lawsuit, the selection of lead plaintiffs does not remove the basic requirement that at least one

<u>named</u> plaintiff must have standing to pursue each claim alleged." <u>In re Salomon Analyst Level</u>

<u>3 Litig.</u>, 350 F. Supp. 2d 477, 496 (S.D.N.Y. 2004) (Lynch, J.). Accordingly, Plaintiffs lack

standing to pursue claims related to the Smith Barney Funds in which no named plaintiff

invested.

          c.  <u>Claims by Holders</u>

          Plaintiffs' claims on behalf of mere holders of Smith Barney Funds securities

should be dismissed because § 10(b) limits private causes of action to purchasers and sellers.

Indeed, "a 'holder' plaintiff continues to have no private right of action under Section 10(b) of

the 1934 Act." <u>Amorosa v. Ernst & Young LLP</u>, 672 F. Supp. 2d 493, 510 (S.D.N.Y. 2009).

Accordingly, any potential class is limited to purchasers or sellers of the Smith Barney Funds.


III.  <u>Statute of Limitations</u>

          A claim under § 10(b) must be brought within "[two] years after discovery of the

facts constituting the violation or [five] years after such violation." 28 U.S.C. § 1658. The two-

year limitations period does not commence until all facts constituting the § 10(b) violation are

discovered, including facts establishing a defendant's scienter. <u>Merck & Co., Inc. v. Reynolds</u>,

130 S. Ct. 1784, 1796 (2010). Furthermore, "discovery refers . . . to a plaintiff's actual discovery

of certain facts, [as well as] to the facts that a reasonably diligent plaintiff would have

discovered." <u>Merck</u>, 130 S. Ct. at 1793. This is not an "inquiry notice" standard; the limitations

period is not triggered merely upon knowledge of facts that would lead a reasonable person to "begin investigating the possibility that his legal rights had been infringed." Merck, 130 S. Ct. at 1797 (quoting Franze v. Equitable Assurance, 296 F.3d 1250, 1254 (11th Cir. 2002)). "[T]he point where the facts would lead a reasonably diligent plaintiff to investigate further . . . is not necessarily the point at which the plaintiff would already have discovered . . . facts constituting the violation." Merck, 130 S. Ct. at 1797.

Defendants contend that a reasonably diligent plaintiff would have discovered the alleged transfer agent scheme in late 2003 and early 2004—more than two years prior to the filing of the Amended Complaint on June 1, 2006—because it was reported in news articles and disclosed in public filings during that time. This Court disagrees. The most damaging statement in those articles is that "federal and state investigators [were] trying to determine whether the payment violated disclosure rules or could be considered an improper kickback . . . ." (Rothermich Decl., Ex. F: Brooke A. Masters, Fund Probers Target Firm for Shutdown, Washington Post, Nov. 26, 2003, at E1.) While the term "kickback" suggests that Defendants acted willfully, the fact that investigators were "trying to determine" Defendants' culpability demonstrates that any evidence of Defendants' mental state had not yet been uncovered. Thus, because a reasonably diligent investor would not necessarily have discovered facts establishing that Defendants acted intentionally or with reckless disregard, Plaintiffs' claims are not time-barred. See Merck, 130 S. Ct. at 1798. Since Defendants have failed to establish that a reasonably diligent plaintiff would have discovered facts constituting scienter as of early 2004, this Court need not address Defendants' arguments concerning whether the Amended Complaint relates back to the original complaints.

-13-

IV. False Statements by Jones

          Jones moves to dismiss the Complaint asserting, inter alia, that he did not make any of the false statements alleged in the Complaint. In general, "a defendant must actually make a false or misleading statement in order to be held liable under [§] 10(b). Anything short of such conduct is merely aiding and abetting, and no matter how substantial that aid may be, it is not enough to trigger liability under [§] 10(b)." Wright v. Ernst & Young LLP, 152 F.3d 169, 175 (2d Cir. 1998). "Under the doctrine of group pleading, however, plaintiffs can circumvent [that general rule] by relying on a presumption that statements in prospectuses, registration statements, annual reports, press releases, or group-published information, are the collective work of those individuals with direct involvement in the everyday business of the company." In re Refco, Inc. Sec. Litig., 503 F. Supp. 2d 611, 641 (S.D.N.Y. 2007) (Lynch, J.) (quotations and citations omitted). "In order to invoke the group pleading doctrine against a particular defendant the complaint must allege facts indicating that the defendant was a corporate insider, with direct involvement in day-to-day affairs, at the entity issuing the statement." In re Alstom SA, 406 F. Supp. 2d 433, 449 (S.D.N.Y. 2005).

          Here, Jones was an officer of CAM, not the Smith Barney Funds, and the Complaint alleges no direct involvement by Jones in day-to-day affairs of the Smith Barney Funds or in the issuance of their prospectuses. See In re Refco, 503 F. Supp. 2d at 641-42 (group pleading doctrine applicable where defendants "prepared and approved the allegedly fraudulent documents"); S.E.C. v. Pimco Advisors Fund Mgmt. LLC, 341 F. Supp. 2d 454, 467 (S.D.N.Y. 2004) (group pleading doctrine inapplicable where plaintiff failed to allege that defendant held "primary responsibility for development or communication of any of the misleading

-14-

statements"). Moreover, the allegations that Jones was involved in the negotiations with First

Data and performed only a "cursory review" of the memorandum drafted by Daidone to the

Smith Barney Funds' boards does not establish Jones' responsibility for the memorandum's

content with sufficient specificity to satisfy the heightened pleading standard. See Iqbal, 129 S.

Ct. at 1949. Rather, those allegations properly relate to Plaintiffs' fiduciary duty claim, which

has been dismissed, or an aiding and abetting claim, which only the SEC may pursue. See

Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, 552 U.S. 148, 158 (2008) ("The § 10(b)

implied private right of action does not extend to aiders and abettors."). Accordingly, the § 10(b)

claim against Jones is dismissed. See In re Refco, 503 F. Supp. 2d at 641-42; Pimco Advisors,

341 F. Supp. 2d at 467.


V.   Scienter as to Daidone

             "To establish liability under § 10(b) and Rule 10b-5, a private plaintiff must prove

that the defendant acted with scienter, a mental state embracing intent to deceive, manipulate, or

defraud." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 319 (2007). "[A] strong

inference of the requisite state of mind may arise where the complaint sufficiently alleges that

the defendant[]: (1) benefited in a concrete and personal way from the purported fraud; (2)

engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting

that their public statements were not accurate; or (4) failed to check information they had a duty

to monitor." S. Cherry St., LLC v. Hennessee Grp. LLC, 573 F.3d 98, 109 (2d Cir. 2009). "The

Second Circuit has long held that the scienter element can be satisfied by a strong showing of

reckless disregard for the truth." S. Cherry, 573 F.3d at 109 (citations omitted). Reckless

-15-

disregard means "conscious recklessness—i.e., a state of mind approximating actual intent, and not merely a heightened form of negligence." S. Cherry, 573 F.3d at 109 (emphasis omitted).

The scienter inquiry requires a court to assess "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." Tellabs, 551 U.S. at 323; S. Cherry, 573 F.3d at 111. Nevertheless, an inference of scienter is "strong" only if it is "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." Tellabs, 551 U.S. at 314; accord Slayton v. Am. Exp. Co., 604 F.3d 758, 773 (2d Cir. 2010).

The Complaint's allegations concerning Daidone's scienter are more than sufficient to withstand a motion to dismiss. According to the Complaint, Daidone helped evaluate the Agreement, drafted a comprehensive memorandum concerning its details, and presented the proposal to the Smith Barney Funds' boards. Then, over a four-year period, Daidone signed numerous prospectuses that failed to disclose the transfer agent scheme. Accordingly, the Complaint adequately alleges that Daidone "knew facts or had access to information suggesting that [his] public statements were not accurate . . . ." S. Cherry, 573 F.3d at 110; see Novak, 216 F.3d at 308 ("[S]ecurities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements.").

-16-

VI.  Section 20(a) Claim

        "In order to establish a prima facie case of liability under [§] 20(a), a plaintiff must show: (1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) that the controlling person was in some meaningful sense a culpable participant in the primary violation." In re PXRE Grp., Ltd., Sec. Litig., 600 F. Supp. 2d 510, 548 (S.D.N.Y. 2009) (citing Boguslavsky v. Kaplan, 159 F.3d 715, 720 (2d Cir. 1998)).

        Because Plaintiffs "ha[ve] not adequately pled a primary violation under § 10(b) and Rule 10b-5 [against Jones], [his] motion to dismiss the § 20(a) claim is granted." Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Exp. Co., 724 F. Supp. 2d 447, 464 (S.D.N.Y. 2010).  However, because Daidone was an officer and/or director of Smith Barney and Citi GM and was "responsible for many of the allegedly fraudulent statements throughout the Class Period," his motion to dismiss the § 20(a) claim is denied. In re SLM Corp. Sec. Litig., --- F. Supp. 2d ----, 2010 WL 3783749, at *13 (S.D.N.Y. Sept. 24, 2010).

VII.  Plaintiffs' Motion to Lift the Discovery Stay

        Having denied Defendants' motion to dismiss in part, Plaintiffs' motion to lift the discovery stay is moot.

CONCLUSION

        For the foregoing reasons, Defendants' motion to dismiss is granted in part and denied in part. Defendants' motion to dismiss the claims by mere holders and the claims related to Smith Barney Funds in which no named plaintiff invested is granted. Defendant Thomas Jones's motion to dismiss the § 10(b) and § 20(a) claims is granted. Defendants' motion to dismiss on all other grounds is denied. Plaintiffs' motion to lift the PLSRA stay is denied as moot. The parties are directed to appear for a conference on February 15, 2011 at 11:00 a.m. The Clerk of the Court is directed to terminate the motion pending at Docket No. 101.

Dated: January 25, 2011
      New York, New York

                      SO ORDERED:

                      WILLIAM H. PAULEY III
                          U.S.D.J.

*All Counsel of Record*

-18-