**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re

SMITH BARNEY TRANSFER
AGENT LITIGATION

This document relates to:  all actions

05 Civ. 7583 (WHP)
ECF case

**DAIDONE'S ANSWER TO THE**
**CONSOLIDATED AND**
**AMENDED CLASS ACTION**
**COMPLAINT**

Defendant Lewis E. Daidone, by his attorneys, Schulte Roth & Zabel LLP, answers the

Consolidated and Amended Class Action Complaint (the "Complaint") as set forth below.  In

answering, Daidone has adopted the convention of the Complaint to use familiar names for

various companies involved without regard to the many intervening name changes and

reorganizations (e.g., referring to the mutual fund business as CAM, even in 1997).  Unless

otherwise specified, Daidone denies or denies knowledge or information sufficient to form a

belief as to all allegations in the Complaint.

Complaint Preamble: Lead Plaintiff Operating Local 649 Annuity Trust Fund ("Plaintiff" or
        "Local 649") brings this action as a class action on behalf of all persons and entities who
        purchased, redeemed, or held shares of the Smith Barney Funds (as defined herein)
        between September 11, 2000 and May 31, 2005 (the "Class Period"), and who were
        damaged thereby.  As a result of the wrongdoing alleged herein, the members of the
        Class (as defined below) were damaged.

*Answer to Preamble:*

Daidone refers to the Complaint for the true and correct contents thereof, and otherwise

denies the allegations contained in the Preamble of the Complaint.  Daidone responds further that

the allegations as to the scope of this putative class action are denied insofar as the scope has

been substantially narrowed by Orders of the United States Court of Appeals for the Second

Circuit, *see* 595 F.3d 86 (Feb. 16, 2010) and this Court, *see* Docket #121 (Jan. 25, 2011).

Complaint paragraph 1:  This action concerns the scheme of two Citigroup-related investment
          advisers and two executives, to place their interests in making a profit ahead of the
          interests of the mutual funds they served.[1]  Defendant Smith Barney Fund Management
          LLC (the "Adviser"), which serves as investment adviser to the Smith Barney Family of
          Funds (the "Funds"), recommended that the Funds contract with an affiliate of the
          Adviser, which would perform limited transfer agent services and sub-contract with the
          Funds' existing transfer agent.  The existing transfer agent would perform almost all of
          the same services it had performed previously, but at deeply discounted rates, permitting
          the affiliate of the Adviser to keep most of the discount for itself and make a high profit
          for performing limited work.  This self-interested transaction permitted the Adviser and
          its affiliates to pocket over $90 million from the transfer agent function at the direct
          expense of the Funds and their shareholders.

*Answer to Complaint paragraph 1:*

        Daidone refers to the Complaint for the true and correct contents thereof.  Daidone denies

the allegations contained in the first sentence of Paragraph 1 of the Complaint.  Daidone

otherwise lacks knowledge or information sufficient to form a belief as to the truth or falsity of

the allegations contained in Paragraph 1 of the Complaint, except admits that, as of November

2003, the Advisor served as investment advisor to the Funds and recommended that certain of

the funds contract with an affiliate of the Advisor for transfer agent services, which would sub-

contract with the funds' existing transfer agent.  With respect to footnote 1 to Paragraph 1 of the

Complaint, the first sentence states a legal conclusion, to which no responsive pleading is

required and Daidone lacks knowledge or information sufficient to form a belief as to the truth or

falsity of the allegations contained in the second and third sentences, which allege facts relating

to mutual funds and their advisers generally.

Complaint paragraph 2:  By way of background, the Adviser and the asset management
          operations of Defendant Citigroup Global Markets, Inc. ("Global Markets") are part of

---

[1] Investment advisers have a fiduciary duty to act in the best interests of the mutual funds they advise and their
shareholders.  Mutual funds pay fees for various services provided to the mutual funds, including transfer agent
services.  Among its duties, an adviser may advise fund boards about the retention of a particular transfer agent and
how much to pay for the transfer agent's services.

Citigroup Asset Management ("CAM"), a business unit of Citigroup Inc. ("Citigroup") that provides investment advisory and management services to Citigroup-sponsored funds.  In 1997, CAM began a formal study of the transfer agent ("TA") function in anticipation of the expiration of the existing contract between the Funds and First Data Investor Services Group ("First Data").  Michael Yellin ("Yellin"), who reported to CAM's chief executive officer, Defendant Thomas W. Jones ("Jones"), supervised the TA review project and personally handled negotiations with First Data.  Yellin briefed Defendant Jones on the status of the TA review project on a regular basis.

*Answer to Complaint paragraph 2:*

Daidone lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 2 of the Complaint, except admits that, as of November 2003, the Adviser and the asset management operations of Global Markets were part of CAM, which was a business unit of Citigroup that provided investment advisory and management services to Citigroup-sponsored funds.

Complaint paragraph 3:  Accordingly, Defendant Jones knew that First Data had been making high profit margins on the TA contract.  Instead of using CAM's strong bargaining position to benefit the Funds in the negotiation of a new TA contract, Defendant Jones sought to keep for CAM much of the profit First Data had been making.  In fact, CAM did not pursue or even inform the Funds' boards of an offer by First Data to continue to perform all transfer agent services for the Funds at a $25 million annual fee discount.

*Answer to Complaint paragraph 3:*

Daidone lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 3 of the Complaint insofar as they concern Jones's knowledge or intentions.  In all other respects, Daidone denies the allegations contained in Paragraph 3 of the Complaint.

Complaint paragraph 4:  CAM ultimately recommended that the Funds replace First Data with an affiliate of the Adviser.  The recommended structure called for the affiliated TA (which is now Citicorp Trust Bank, fsb ("CTB"))[2] to contract directly with the Funds as named TA, perform limited functions and subcontract with First Data for the bulk of the transfer agent service (CAM referred to First Data as "sub-TA").  Except for a small customer

---

[2] The Adviser initially anticipated that it would serve as the TA, but subsequently determined that CTB should serve as the TA.

service function that the affiliated TA would undertake, First Data would continue to perform the *very same work* it performed under the expiring contract, but at a significant discount from the fees it had been charging the Funds — a discount that would start at 33.5% and increase to as much as 60% over the five-year term of the contract.  CAM kept the majority of the savings it had negotiated with First Data for itself, offering the Funds only a limited fee reduction through the institution of fee caps.

*Answer to Complaint paragraph 4:*

Daidone admits that a recommendation was made to the boards to appoint as TA a CAM affiliate which would use First Data as sub-TA.  Daidone lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 4 of the Complaint concerning the present name of the affiliated TA.  Daidone denies the remaining allegations contained in Paragraph 4 of the Complaint, except refers to the relevant contracts for the true and correct contents thereof.

Complaint paragraph 5:  CAM should have first offered these substantial savings to the Funds and their shareholders, as an opportunity belonging to the Funds and their shareholders.  At the very least, CAM should have disclosed this opportunity for significant savings to the Funds.  CAM did neither.  Instead, CAM took the opportunity for itself and then presented a recommendation to the Funds' boards in a memo that gave them the impression that the affiliated TA proposal was the best deal that the Funds could have achieved, which was not true.  In presenting its recommendation to the Funds' boards, CAM did not disclose that First Data was to perform almost all of the same work as before, with the affiliated TA taking most of the profit for doing limited work.

*Answer to Complaint paragraph 5:*

Daidone denies the allegations contained in Paragraph 5 of the Complaint, except to the extent that the first and second sentences of Paragraph 5 state a legal conclusion, to which no responsive pleading is required.

Complaint paragraph 6:  CAM's recommendation also contained numerous material misrepresentations about the particulars of the arrangement, including the extent of the benefits CAM would realize.  Among other things, CAM failed to disclose that it had entered into a side letter agreement (the "Side Letter") with First Data, pursuant to which First Data committed to providing millions of dollars of investment banking and asset management revenue to Citigroup entities (the "Revenue Guarantee").

*Answer to Complaint paragraph 6:*

Daidone denies the allegations contained in Paragraph 6 of the Complaint, except admits that the revenue-guarantee letter was not reviewed with the Boards of certain of the Smith Barney Mutual Funds in 1999.

Complaint paragraph 7:  Defendant Lewis Daidone ("Daidone") had an instrumental role in the scheme.  Defendant Daidone was Senior Vice President and a director of the Adviser and a managing director of Global Markets during the Class Period.  Defendant Daidone negotiated the very contracts that constituted the aforementioned self-dealing.  Further, Defendant Daidone helped prepare and present the materially misleading materials to the Funds' boards.  Defendant Daidone also signed many prospectuses containing materially misleading statements and omissions about the Adviser, as discussed below.

*Answer to Complaint paragraph 7:*

Daidone denies the allegations contained in Paragraph 7 of the Complaint, except admits that he helped to prepare and present certain materials regarding the proposed transfer agent arrangement to the boards of certain of the Smith Barney mutual funds.

Complaint paragraph 8:  Defendant Jones also had an integral role in the scheme.  Defendant Jones was the CEO of CAM.  Defendant Jones made the decision to recommend the affiliated TA proposal to the Funds' boards, fully aware that the affiliated TA would make a huge windfall at the expense of Funds' shareholders through the proposal. Defendant Jones also performed only a cursory review of the memorandum to the Funds' boards and took no meaningful steps to insure that the Funds' boards were informed of the material terms of the TA proposal.

*Answer to Complaint paragraph 8:*

Daidone lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 8 of the Complaint, except refers to the Court's January 25, 2011 Order, *see* Docket # 121, dismissing the case against Jones.

Complaint paragraph 9:  During the Class Period, CTB received an estimated $100 million in net fees for operating a small customer service call center and performing limited additional oversight and quality control functions at a total cost of approximately $10.5 million.

Thus, Citigroup entities appropriated approximately $90 million which rightfully belonged to shareholders of the Funds.[3]

*Answer to Complaint paragraph 9:*

Daidone lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 9 of the Complaint.

Complaint paragraph 10:  Significantly, Defendants Adviser and Global Markets have now *admitted* to the entire scheme of self-dealing described above.  On May 31, 2005, the Adviser and Global Markets entered into an agreement with the Securities and Exchange Commission ("SEC"), agreeing to pay a total of over $200 million in fines and disgorgement penalties as a result of their violation of the Investment Advisers Act of 1940 ("IAA").  Similarly, on March 23, 2006, Adviser Executive Vice President Yellin entered into an agreement with the SEC, paying a fine of $50,000 as a result of his IAA violations, and also admitting to the facts as alleged herein.  Further, Yellin has specifically implicated Defendants Daidone and Jones in the scheme, as has the SEC in an action alleging IAA violations against Daidone and Jones, which is currently pending in this Court.[4]

*Answer to Complaint paragraph 10:*

Daidone denies the allegations contained in the first sentence of Paragraph 10 of the

Complaint, except admits that the Advisor and Global Markets entered into a settlement with the

SEC, pursuant to which it neither admitted nor denied the SEC's allegations, and refers to the

settlement for the true and correct contents thereof.  In all other respects, Daidone lacks

knowledge or information sufficient to form a belief as to the truth or falsity of the allegations

contained in Paragraph 10 of the Complaint, except refers to Judge Casey's April 25, 2006

opinion in *SEC v. Jones*, No. 05 Civ. 7044 (RCC), *see* Docket #25, for the true and correct

contents of that document and Judge Casey's subsequent February 26, 2007 opinion in the same

---

[3] The amount appropriated by the Citigroup entities is only an estimate; Plaintiff cannot pinpoint the precise damages without the benefit of discovery.

[4] Judge Casey denied Daidone and Jones' motion to dismiss in an opinion (the "Casey Decision") dated April 25, 2006 in the case, which is denominated *SEC v. Thomas Jones and Lewis Daidone*, 05 Civ. 7044 (RCC).

case, *see* Docket #77, in which the Court granted the defendants' motions for summary judgment in their entirety.

Complaint paragraph 11:  In prospectuses throughout the Class Period (many of which were signed by Defendant Daidone), the issuers (who were the Funds themselves or families of Funds) made statements concerning the sub-TA arrangement that were misleading due to their failure to disclose the elaborate scheme to inflate profits which was the motivating force behind creating the sub-TA.  These statements, along with the participation of all the Defendants in the manipulative scheme at issue, violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

*Answer to Complaint paragraph 11:*

Daidone denies the allegations contained in the first sentence of Paragraph 11 of the Complaint.  The second sentence of Paragraph 11 states a legal conclusion, to which no responsive pleading is required.

Complaint paragraph 12:  The Adviser also violated the Investment Company Act of 1940 ("ICA") by breaching its fiduciary duties to Funds shareholders by virtue of the scheme alleged herein.

*Answer to Complaint paragraph 12:*

Paragraph 12 of the Complaint states a legal conclusion, to which no responsive pleading is required.  Additionally, this claim has already been dismissed by the Court.

Complaint paragraph 13:  As a result of the scheme, Plaintiff and members of the Class suffered harm.  Among other things, Defendants' actions drained money out of the Funds throughout the Class Period, increased the Funds' expenses, and distorted the net asset value ("NAV") of the Funds.

*Answer to Complaint paragraph 13:*

Daidone denies the allegations contained in Paragraph 13 of the Complaint.

Complaint paragraph 14:  Lead Plaintiff Operating Local 649 Annuity Trust bought shares of one of the Funds, the Smith Barney Capital Preservation Fund, during the Class Period.

*Answer to Complaint paragraph 14:*

Daidone lacks knowledge or information sufficient to form a belief as to the truth or

falsity of the allegations contained in Paragraph 14 of the Complaint.

Complaint paragraph 15:  Plaintiff Jeanne Chilton bought shares of one of the Funds, the
    Citistreet Large Company Stock Fund, during the Class Period.

*Answer to Complaint paragraph 15:*

Daidone lacks knowledge or information sufficient to form a belief as to the truth or

falsity of the allegations contained in Paragraph 15 of the Complaint.

Complaint paragraph 16:  Plaintiff Jeffrey Weber held shares of one of the Funds, the Smith
    Barney Large Cap Growth And Value Fund, during the Class Period.[5]

*Answer to Complaint paragraph 16:*

Daidone lacks knowledge or information sufficient to form a belief as to the truth or

falsity of the allegations contained in Paragraph 16 of the Complaint and refers to the Court's

January 25, 2011 Order, *see* Docket # 121, which dismissed plaintiff Weber's claims.  With

respect to footnote 5, no responsive pleading is required; to the extent a response is required,

Daidone refers to this Court's April 17, 2006 Order, *see* Docket # 51, for the true and correct

contents thereof.

Complaint paragraph 17:  Defendant Smith Barney Fund Management LLC (the Adviser) is a
    limited liability company organized under the laws of Delaware and a subsidiary of
    Citigroup Global Market Holdings, Inc.  The Adviser is located at 333 West 34th Street,
    New York City.  The Adviser is registered with the SEC as an investment adviser
    pursuant to Section 203(c) of the IAA, and serves as investment adviser to the Funds.
    The Adviser is part of CAM, the Citigroup business unit that provides investment
    advisory and management services to Citigroup-sponsored funds, including the Funds.

---

[5] If the Court *deems* it necessary, Plaintiff will, at a later stage of the litigation, add additional class representatives for other Funds.  Cf. the Court's April 17, 2006 Order at 8 ("'Defendants' arguments [that the lead plaintiff applicants lacked standing] are properly addressed at the class certification stage',... [citing *Yates v. Open Jt. Stock Co.*, No. 04 Civ. 9742 (NRB), 2005 U.S. Dist. LEXIS 7717, at *6-7 (Apr. 29, 2005)].... If, in fact, every Fund requires representation in the class leadership, the lead plaintiff may include additional named plaintiffs in this consolidated action.") (First alteration in original).

*Answer to Complaint paragraph 17:*

Daidone lacks knowledge or information sufficient to form a belief as to the truth or

falsity of the allegations contained in Paragraph 17 of the Complaint.

Complaint paragraph 18:  Defendant Global Markets is a New York corporation and a direct
subsidiary of Citigroup Global Markets Holdings, Inc., and an indirect subsidiary of
Citigroup.  Formerly known as Salomon Smith Barney Inc., Global Markets is a
registered investment adviser and broker-dealer.  The asset management segment of
Global Markets falls within the CAM business unit.

*Answer to Complaint paragraph 18:*

Daidone lacks knowledge or information sufficient to form a belief as to the truth or

falsity of the allegations contained in Paragraph 18 of the Complaint.

Complaint paragraph 19:  Defendant Jones was the Chief Executive Officer of CAM during the
Class Period.

*Answer to Complaint paragraph 19:*

Daidone admits, upon information and belief, that Mr. Jones was the Chief Executive

Office of CAM at one or more points in time during the alleged Class Period.  Daidone responds

further that this Court's January 25, 2011 Order, *see* Docket # 121, has dismissed Plaintiff's

claims against Mr. Jones and that the reference to "Defendant Jones" is now inaccurate.

Complaint paragraph 20:  Defendant Daidone was Senior Vice President and a director of the
Adviser, Managing Director of Global Markets, and Principle Accounting Officer for
many subfamilies of the Funds during the Class Period.

*Answer to Complaint paragraph 20:*

Daidone denies the allegations contained in Paragraph 20 of the Complaint, except

admits that, from 1999 or 2000 until 2004, he was employed by CAM as Senior Vice President

of the Adviser and Managing Director of Global Markets.

Complaint paragraph 21:  CTB is a chartered federal savings bank and is an indirect subsidiary
of Citigroup.  CTB is registered as a transfer agent and an investment adviser.  CTB
provides customer service and oversight functions for the Funds and contracts with

9

PFPC, Inc. ("PFPC"), as successor to First Data, for technology, transaction processing and other services. In addition, CTI3's trust department provides investment advisory and other services for high net worth clients.

*Answer to Complaint paragraph 21:*

Daidone lacks knowledge or information sufficient to form a belief as to the truth or

falsity of the allegations contained in Paragraph 21 of the Complaint.

Complaint paragraph 22: Citigroup is a global financial services company that was organized under the laws of Delaware and maintains its headquarters in New York, New York. Citigroup was framed in October 1998, by the merger of Citicorp and Travelers Group Inc. ("Travelers"). Prior to the merger, the Adviser, Global Markets and CAM, were divisions or subsidiaries of Travelers.

*Answer to Complaint paragraph 22:*

Daidone lacks knowledge or information sufficient to form a belief as to the truth or

falsity of the allegations contained in Paragraph 22 of the Complaint, except admits that the

referenced entities were Travelers units and then units of Citigroup.

Complaint paragraph 23: The Funds consist of more than 105 open-end management investment companies registered with the SEC, and include equity, money market, fixed income, municipal, and various specialty funds. The Funds currently have more than $97 billion in assets. Currently, and at all relevant times, all of the directors of the Funds are unaffiliated except the chairman, who is an employee and officer of the Adviser.

*Answer to Complaint paragraph 23:*

Daidone lacks knowledge or information sufficient to form a belief as to the truth or

falsity of the allegations contained in Paragraph 23 of the Complaint. Daidone admits that the

allegations contained in the first sentence of Paragraph 23 would have been true as of November

2003, except that Daidone denies knowledge or information sufficient to admit or to deny the

allegations of the precise number of investment companies.

Complaint paragraph 24: CAM is the Citigroup business unit that provides investment advisory and management services to Citigroup-sponsored funds, including the Funds. Various Citigroup entities fall within and comprise CAM, including the Adviser, the asset management operations of Global Markets, and the other registered investment advisers

for the Citigroup-sponsored funds.  Although the investment advisers, including the Adviser, are separate juridical entities, with their own officers and employees, they are limited in size and function.  The bulk of the administrative services that the advisers provide to their respective fund families are performed by Global Markets employees who fall within the CAM unit.

*Answer to Complaint paragraph 24:*

Daidone lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 24 of the Complaint, Daidone admits that the allegations contained in the first sentence of Paragraph 24 would have been true as of November 2003.

Complaint paragraph 25:  First Data, a subsidiary of First Data Corporation, provided transfer agent and other services to mutual funds until December 1999.  First Data served as full-service TA to the Funds from June 1, 1989 until September 30, 1999, after which it became sub-TA.  In or around December 1999, First Data Corporation sold the transfer agent unit to PFPC, which assumed the role of sub-TA for the Funds.  (The term "First Data" will be used to refer to the TA unit.  The parent company will be referred to as "First Data Corporation").

*Answer to Complaint paragraph 25:*

Daidone lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 25 of the Complaint, except admits that First Data provided transfer agent services to mutual funds including the Smith Barney family of mutual funds or their predecessors until September 30, 1999.  With respect to the last parenthetical sentence of Complaint paragraph 25, no responsive pleading is required.

Complaint paragraph 26:  PFPC acquired First Data in late 1999, assumed First Data's obligations under a sub-TA agreement with CTB, and now serves as sub-TA for the Funds.

*Answer to Complaint paragraph 26:*

Daidone admits the allegations contained in Paragraph 26 of the Complaint, except lacks

knowledge or information sufficient to form a belief as to the truth or falsity of whether PFPC

served as sub-TA for the Funds after November 2003.

Complaint paragraph 27:  The claims asserted herein arise under and pursuant to Sections 10(b)
and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)], Rule 10b-5 promulgated
under Section 10(b) by the SEC [17 C.F.R. § 240.10b-51, as well as pursuant to the ICA,
15 U.S.C. § 80.

*Answer to Complaint paragraph 27:*

Paragraph 27 of the Complaint states a legal conclusion, to which no responsive pleading

is required.  To the extent a response is required, Daidone refers to the Complaint for the true and

correct contents thereof and notes that the Orders of the United States Court of Appeals for the

Second Circuit, *see* 595 F.3d 86 (Feb. 16, 2010) and this Court, *see* Docket #121 (Jan. 25, 2011)

have substantially narrowed the claims asserted therein, including the dismissal in its entirety of

Plaintiff's ICA claims.

Complaint paragraph 28:  This Court has jurisdiction over the subject matter of this action
pursuant to 28 U.S.C. §§ 1331 and 1337, Section 27 of the Exchange Act [15 U.S.C. §
78aa], as well as pursuant to the ICA, 15 U.S.C. § 80a-43.

*Answer to Complaint paragraph 28:*

Paragraph 28 of the Complaint states a legal conclusion, to which no responsive pleading

is required.

Complaint paragraph 29:  Venue is proper in this District because many of the wrongful acts
alleged herein took place or originated in this district.

*Answer to Complaint paragraph 29:*

Paragraph 29 of the Complaint states a legal conclusion, to which no responsive pleading

is required.

Complaint paragraph 30:  Plaintiff brings this action as a class action, pursuant to Federal Rule of Civil Procedure 23, on behalf of all purchasers, redeemers and holders of the mutual fund shares or other ownership interests of one or more of the Funds from September 11, 2000 through May 31, 2005, who were damaged thereby (except the Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any of the Defendants and those who have engaged in the wrongful activities described herein) and their successors in interest, who are or will be threatened with injury arising from Defendants' actions as more fully described herein (the "Class").

*Answer to Complaint paragraph 30:*

Daidone denies the allegations contained in Paragraph 30 of the Complaint, except admits that Plaintiff purports to bring this class action as described in Paragraph 30.  Daidone responds further that the allegations as to the scope of this punitive class action are denied insofar as the scope has been substantially narrowed by the Orders of the United States Court of Appeals for the Second Circuit, *see* 595 F.3d 86 (Feb. 16, 2010) and this Court, *see* Docket #121 (Jan. 25, 2011).

Complaint paragraph 31:  This action is properly maintainable as a class action.

*Answer to Complaint paragraph 31:*

Paragraph 31 of the Complaint states a legal conclusion, to which no responsive pleading is required; to the extent a response is required, Daidone denies the allegations contained in Paragraph 31 of the Complaint.

Complaint paragraph 32:  The Class is so numerous that joinder of all members is impracticable. There are millions of shares of the Funds outstanding.

*Answer to Complaint paragraph 32:*

Paragraph 32 of the Complaint states a legal conclusion, to which no responsive pleading is required; to the extent a response is required, Daidone lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 32 of the Complaint.

Complaint paragraph 33:  There are questions of law and fact which are common to the Class
         including, *inter alia*, the following:  (a) whether Defendants made omissions of material
         fact; (b) whether Defendants participated in a manipulative scheme; and (c) whether
         Defendants have benefited to the detriment of Plaintiff and the other members of the
         Class.

*Answer to Complaint paragraph 33:*

         Paragraph 33 of the Complaint states a legal conclusion, to which no responsive pleading

is required; to the extent a response is required, Daidone denies the allegations contained in

Paragraph 33 of the Complaint.

Complaint paragraph 34:  Plaintiff is committed to prosecuting this action and has retained
         competent counsel experienced in litigation of this nature.  The claims of the Plaintiff are
         typical of the claims of other members of the Class and Plaintiff has the same interests as
         the other members of the Class.  Plaintiff will fairly and adequately represent the Class.

*Answer to Complaint paragraph 34:*

         Daidone lacks knowledge or information sufficient to form a belief as to the truth or

falsity of the allegations contained in the first sentence of Paragraph 34 of the Complaint.  In all

other respects, Paragraph 34 states a legal conclusion, to which no responsive pleading is

required; to the extent a response is required, Daidone lacks knowledge or information sufficient

to form a belief as to the truth or falsity of the allegations contained in Paragraph 34 of the

Complaint.

Complaint paragraph 35:  A class action is superior to all other available methods for the fair and
         efficient adjudication of this controversy since joinder of all members is impracticable
         Furthermore, as the damages suffered by individual Class members may be relatively
         small, the expense and burden of individual litigation make it virtually impossible for
         members of the Class to individually redress the wrongs done to them.  There will be no
         difficulty in the management of this action as a class action.  This Court is an appropriate
         forum for this dispute.

*Answer to Complaint paragraph 35:*

         Paragraph 35 of the Complaint states a legal conclusion, to which no responsive pleading

is required; to the extent a response is required, Daidone lacks knowledge or information

sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 35 of the Complaint.

Complaint paragraph 36:  From 1994 through September 30, 1999, First Data served as full-service TA for the Funds.  As transfer agent, First Data performed a variety of functions for the Funds, including processing buy and sell transactions in Funds shares, processing dividend transactions, calculating daily net asset values, calculating sales charges and commissions, operating a customer service call center, distributing proxy and other materials, and performing a variety of additional accounting functions, including year-end tax reporting.

*Answer to Complaint paragraph 36:*

Daidone denies the allegations contained in Paragraph 36 of the Complaint, except admits that from 1994 through September 30, 1999, First Data provided transfer agent services for certain of the Smith Barney mutual funds, including processing buy and sell transactions, processing dividend transactions, calculating sales charges and commissions, operating a customer service call center, distributing proxy and other materials, and performing additional account functions including year-end tax reporting.

Complaint paragraph 37:  The Funds' business was very profitable to First Data as a result of a very favorable fee schedule and the low cost of servicing the Funds.  Because the Funds are proprietary — sold mostly by Smith Barney brokers — many of the TA functions are and at all relevant times were highly automated.  In addition, Smith Barney brokers performed most of the customer service work — shareholders typically called them with questions and requests.  Accordingly, First Data's customer service function was limited, and consisted primarily of a small call center of approximately eight to twelve people who fielded inquiries from Smith Barney Brokers and shareholders who did not have brokers (who constitute a small minority of Funds shareholders).  As a result of a favorable fee schedule and the low cost of servicing the Funds, First Data realized high profit margins throughout the 1990s, particularly in the late 1990s, when the fee structure changed from a per-account fee to a fee based on a percentage of assets.  As a result of strong markets of the late 1990s, the Funds' assets, and thus TA fees, increased.

*Answer to Complaint paragraph 37:*

Daidone lacks knowledge or information sufficient to form a belief as to the truth or

falsity of the allegations contained in Paragraph 37 of the Complaint, except admits that First

Data's fee structure changed and that assets and TA fees increased in the latter part of the 1990s.

Complaint paragraph 38:  Pursuant to a non-compete agreement between the predecessors of
First Data and the Adviser and Global Markets, CAM was prevented from offering TA
services until the expiration of that non-compete agreement in 1999.  With the First Data
contract and the non-compete provision due to expire in June 1999, CAM retained
Deloitte & Touche Consulting ("Deloitte") in July 1997 to assist it in reviewing the TA
function and options going forward.  The Deloitte team worked closely with
representatives of CAM, including Defendant Daidone and Yellin.

*Answer to Complaint paragraph 38:*

Daidone admits the allegations contained in the first sentence of Paragraph 38 of the

Complaint.  Daidone denies the allegations contained in the second and third sentences of

Paragraph 38 of the Complaint, except admits that, at some point in 1997, CAM retained Deloitte

in connection with a review of the TA function and options going forward and that Deloitte

interacted with CAM representatives, including himself.

Complaint paragraph 39:  Deloitte and CAM established several objectives, including improving
service to Funds shareholders and increasing flexibility for the future.  But CAM also
wanted to capture some of the profits that First Data was making on the TA contract.
CAM determined that it would enter the TA business and it directed Deloitte to develop a
variety of options to accomplish this.

*Answer to Complaint paragraph 39:*

Daidone denies the allegations contained in Paragraph 39 of the Complaint, except

admits that the project had numerous objectives.

Complaint paragraph 40:  During the first phase of the review process, Deloitte and CAM
analyzed different structural alternatives to determine which model was most appropriate
in light of CAM's established objectives.  Deloitte and CAM analyzed the models based
on information obtained from First Data and two of its competitors — DST and SunGard.
Deloitte and CAM assessed several different models, including a "full-service" option, a
"remote vendor" option, and full internalization.

16

*Answer to Complaint paragraph 40:*

Daidone admits the allegations contained in the first sentence of Paragraph 40 of the

Complaint.  Daidone denies the remaining allegations contained in Paragraph 40 of the

Complaint.

Complaint paragraph 41:  The full-service option called for CAM to create an affiliated TA unit
of approximately fourteen people to perform oversight and control functions and to
contract with DST to provide the bulk of transfer agent functions.  Under the full-service
option, DST would receive the bulk of the fees.  Deloitte projected that CAM would
realize annual profits of approximately $8.3 million.  A draft Deloitte presentation dated
November 4, 1997 noted: "DST full service provides little cost advantage over the
current state (under which CAM received no revenue)."

*Answer to Complaint paragraph 41:*

Daidone denies the allegations contained in Paragraph 41 of the Complaint, except refers

to the November 4, 1997 draft Deloitte Power Point for the true and correct contents thereof at

that time.

Complaint paragraph 42:  The remote vendor alternative called for CAM to create an affiliated
TA unit to handle customer service and operations and to contract with DST, First Data
or SunGard for technology only.  Deloitte estimated that the internal TA unit would
require 121 full-time employees.  The November 4 presentation noted that the remote
vendor option required a greater initial investment and conversion effort than the DST
full service option, but offered greater annual profit to CAM (between $16.1 and $22.8
million).

*Answer to Complaint paragraph 42:*

Daidone denies the allegations contained in Paragraph 42 of the Complaint, except refers

to the November 4, 1997 draft Deloitte Power Point for the true and correct contents thereof.

Complaint paragraph 43:  The full-internalization option called for CAM to assume
responsibility for all aspects of the TA function, including technology (by acquiring
software).  Although full-internalization would have offered the highest projected profit
— approximately $548 million per year — the option would have taken more than
eighteen months to implement and would have required a staff of approximately 236 full-
time employees.  Because of the long implementation time and extensive start-up costs
required by this option, Deloitte and CAM decided not to pursue it.

*Answer to Complaint paragraph 43:*

Daidone denies the allegations contained in Paragraph 43 of the Complaint, except refers

to the November 4, 1997 draft Deloitte Power Point for the true and correct contents thereof.

Complaint paragraph 44:  CAM and Deloitte concluded that the remote vendor option, which
offered significantly greater profit to CAM than the full-service option, was the preferred
alternative.  Accordingly, Deloitte and CAM solicited remote vendor bids from First
Data, DST and SunGard.  DST and SunGard responded with remote vendor proposals.
First Data declined to submit a remote vendor bid, and instead proposed to renew as full-
service TA with a modest fee discount of its rate under the existing contract of
approximately ten percent.

*Answer to Complaint paragraph 44:*

Daidone denies the allegations contained in Paragraph 44 of the Complaint, except

admits that remote vendor bids were solicited from First Data, DST and SunGard; that DST and

SunGard responded with remote vendor proposals; and that First Data declined to submit a

remote vendor bid.

Complaint paragraph 45:  After analyzing the specific proposals it received from the vendors, in
February 1998, Deloitte recommended that CAM contract with DST as remote service
provider.  The DST proposal, as of February 1998, called for CAM to create an affiliated
TA unit of approximately 100 employees to handle customer service and operations, and
to contract with DST for technology.  The CAM affiliate would be the named TA,
receive fees from the Funds and pay DST a per account fee for technology.  Deloitte
projected that the CAM affiliate would receive more than $40 million per year in profit
under the proposals.

*Answer to Complaint paragraph 45:*

Daidone admits the allegations contained in the first sentence of Paragraph 45 of the

Complaint.  Daidone denies the remaining allegations contained in Paragraph 45 of the

Complaint, except refers to the DST proposal as of February 1998 for the true and correct

contents thereof.

Complaint paragraph 46:  Deloitte concluded that DST's proposal was superior to other options,
including options utilizing First Data, in terms of both pricing and technology.  Because

First Data had not submitted a remote vendor proposal and had offered only a modest fee discount, the DST proposal was greatly superior in terms of the profit potential it offered to CAM. As for technology, Deloitte found that DST offered industry-leading technology (superior to that of First Data) and that switching to DST would better position the Funds for the future.

*Answer to Complaint paragraph 46:*

Daidone denies the allegations contained in Paragraph 46 of the Complaint, except admits that Deloitte advised CAM that DST's proposal was superior to other options in terms of pricing and technology, and specifically that DST offered industry-leading technology which was superior to that offered by First Data.

Complaint paragraph 47: After learning that it was at risk of losing the business, First Data offered significant fee discounts. By letter to Yellin dated March 12, 1998, First Data offered a $25 million annual "fee concession" to CAM if the Funds renewed with First Data as full-service TA. Yellin, however, did not pursue the option of renewing with First Data as full-Service TA and passing along the proposed discount directly to the Funds. Nor did he or anyone else within CAM inform the Funds' boards that First Data had made the offer to renew as full-service TA at deeply discounted rates. Instead, Yellin pursued a deal that would allow CAM to benefit from the discounts First Data was offering.

*Answer to Complaint paragraph 47:*

Daidone lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 47 of the Complaint, except refers to the First Data letter of March 12, 1998 for the true and correct contents thereof.

Complaint paragraph 48: In the March 12 letter, First Data committed to increasing the level of resources First Data dedicated to the Funds and to offering Smith Barney brokers use of SuRPAS, First Data's proprietary sub-accounting system. The SuRPAS system would permit Smith Barney brokers to charge investors a processing fee on sales of non-proprietary (non-Smith Barney) funds, and generate an additional $40 million in annual revenue. In addition, by the middle of March 1998, First Data had pointed out to CAM that First Data Corporation provided $9 million in revenue to various Citigroup (then Travelers) entities through investment banking fees, asset management fees and the purchase of insurance and other products.

*Answer to Complaint paragraph 48:*

Daidone denies the allegations contained in the first sentence of Paragraph 48 of the

Complaint, except refers to the First Data letter of March 12, 1998 for the true and correct

contents thereof.  Daidone lacks knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations contained in the second and third sentences of Paragraph 48 of

the Complaint.

Complaint paragraph 49:  Later in March, First Data improved its bid and offered a deeper
     discount, measured as a percentage of the total annual TA fees that First Data would
     receive from the Funds.  The discounts would start at 32% in 1999 and increase by two
     percentage points each year, reaching 40% of total TA fees in 2003.  Deloitte and CAM
     projected that the percentage discounts would translate into $21 million the first year and
     grow to $39 million in the final year of the contract.

*Answer to Complaint paragraph 49:*

Daidone denies the allegations contained in Paragraph 49 of the Complaint, except refers

to First Data's letter for the true and correct contents thereof.

Complaint paragraph 50:  Deloitte questioned whether the discount offered by First Data would
     be passed along to the Funds or kept by an internal affiliated TA, which would perform
     only limited duties.  In a presentation dated March 24, 1998, which Yellin received,
     Deloitte wrote:
          Clarify the "Discount" proposed
          A true discount would go to the ***funds*** not SSB TA.
          This relationship will be extremely difficult to sell to the fund boards.
     (Emphasis in original).

*Answer to Complaint paragraph 50:*

Daidone denies the allegations contained in the first sentence of Paragraph 50 of the

Complaint.  In all other respects, Daidone lacks knowledge or information sufficient to form a

belief as to the truth or falsity of the allegations contained in Paragraph 50 of the Complaint,

except refers to the March 24, 1998 presentation for the true and correct contents thereof.

Complaint paragraph 51:  After considering First Data's improved offer, CAM representatives,
     including Defendant Daidone and Yellin, concluded, as did Deloitte, that contracting with

DST as remote service provider was the best option and made a formal recommendation to the chief executive officer of CAM, Defendant Jones, by memorandum dated April 2, 1998. The April 2 memo stated that the DST proposal was superior to the First Data proposal in terms of technology and pricing. The memo reiterated Deloitte's findings regarding technology, and indicated that the DST proposal offered $139 million more in profit to CAM over the projected five-year contract period than the First Data proposal offered. The April 2 memo noted that there was conversion risk with switching to DST, but concluded that the conversion risk was minimal.

*Answer to Complaint paragraph 51:*

Daidone denies the allegations contained in Paragraph 51 of the Complaint, except refers

to the April 2, 1998 memo for the true and correct contents thereof.

Complaint paragraph 52:  The April 2 memo noted that switching to DST could cost affiliates of
Citigroup — then Travelers — $8 to $10 million annually in lost revenues from First
Data Corporation but recommended switching to DST notwithstanding the business risk.
The memo concluded:
> Based on economics and technology, our recommendation is to
> move the Transfer Agency processing to DST. We realize that a
> corporate relationship exists between First Data and [Travelers]
> and that relationship should be considered before any decision is
> made.

*Answer to Complaint paragraph 52:*

Daidone denies the allegations contained in Paragraph 52 of the Complaint, except refers

to the April 2, 1998 memo for the true and correct contents thereof.

Complaint paragraph 53:  Defendant Jones agreed with the recommendation, but sometime after
April 2, 1998, the chairman of Travelers asked Defendant Jones to negotiate further with
First Data, stating a preference for remaining with First Data if First Data improved its
offer to the point where it was roughly equivalent to the DST proposal in terms of
pricing.  Accordingly, Defendant Jones instructed Yellin to resume negotiating with First
Data, which Yellin did.

*Answer to Complaint paragraph 53:*

Daidone lacks knowledge or information sufficient to form a belief as to the truth or

falsity of the allegations contained in Paragraph 53 of the Complaint, except admits that

negotiations with First Data resumed sometime after April 2, 1998.

21

Complaint paragraph 54:  On April 6, 1998, Travelers announced a proposed merger with
        Citicorp.  The contemplated merger increased the risk of converting to a new service
        provider because it would decrease the resources available for such a conversion.

*Answer to Complaint paragraph 54:*

Daidone lacks knowledge or information sufficient to form a belief as to the truth or

falsity of the allegations contained in Paragraph 54 of the Complaint, except admits that at some

point there was an announcement of a proposed merger between Travelers and Citicorp, which

announcement speaks for itself.

Complaint paragraph 55:  In a letter dated June 5, 1998, First Data set forth an improved offer,
        which increased the discount First Data was willing to offer.  The June 5 letter included
        the following fee schedule:

| June 1, 1999 to Dec. 3 , 2000 | 32% discount on total fee revenue |
|---|---|
| Jan. 1 to Dec. 31, 2001 | 35% discount on fee revenue up to  $80 million |
| | 60% discount on fee revenue over $80 million |
| Jan. 1, 2002 to Dec. 31, 2003 | 50% discount on fee revenue up to $80 million |
| | 60% discount on fee revenue over $80 million |
| Jan. 1, 2004 to Dec. 31, 2004 | 55% discount on fee revenue up to $80 million |
| | 60% discount on fee revenue over $80 million |

*Answer to Complaint paragraph 55:*

Daidone denies the allegations contained in Paragraph 55 of the Complaint, except refers

to the June 5, 1998 First Data letter for the true and correct contents thereof.

Complaint paragraph 56:  Deloitte again questioned the structure of First Data's proposal.  In a
        presentation dated June 10, 1998, entitled "Transfer Agency Project: Lunch and Learn —
        Financial Model Review," Deloitte questioned the structure in two respects.

*Answer to Complaint paragraph 56:*

Daidone denies the allegations contained in Paragraph 56 of the Complaint, except lacks

knowledge or information sufficient to form a belief as to the truth or falsity of the allegations

contained in Paragraph 56 of the Complaint insofar as they pertain to the sentiments or thinking

of Deloitte and refers to the June 10, 1998 presentation for the true and correct contents thereof.

Complaint paragraph 57:  First, Deloitte questioned whether CAM could justify receiving TA
fees for operating a fourteen-person customer service center:

> We Anticipate a Larger Organization Would be Needed to Satisfy
> the Fund Boards in the First Data Scenario.
>
>                      \* \* \*
>
> We believe at a minimum, the SSB TA would have to assume
> responsibility for Customer Service and Transaction Processing to
> justify receiving TA fees.  This would require at least 65 [full-time
> employees] (rather than 14).

*Answer to Complaint paragraph 57:*

Daidone denies the allegations contained in Paragraph 57 of the Complaint, except refers

to the June 10, 1998 presentation for the true and correct contents thereof.

Complaint paragraph 58:  Second, Deloitte questioned the legality of the discount taking the
form of a rebate to be paid to CAM, not the Funds:

> First Data's proposal requires that First Data remains the TA; First
> Data receives full revenues of TA fees, providing a "rebate" to
> SSB (proposed as a "discount" by First Data).
>
> **This legal structure is questionable at best.  Our advisers
> indicate that this arrangement would in no way be acceptable
> to the fund boards and may not be legally viable.**

(Emphasis added).

*Answer to Complaint paragraph 58:*

Daidone denies the allegations contained in Paragraph 58 of the Complaint, except refers

to the June 10, 1998 presentation for the true and correct contents thereof.

Complaint paragraph 59:  Deloitte's written warning about the legality of the structure followed
several occasions on which Deloitte's team leader raised the issue orally with CAM
representatives.

*Answer to Complaint paragraph 59:*

Daidone denies the allegations contained in Paragraph 59 of the Complaint, except that

lacks knowledge or information sufficient to form a belief as to the truth or falsity of the

allegations contained in Paragraph 59 of the Complaint insofar as they pertain to oral

conversations with other CAM representatives.

Complaint paragraph 60:  Deloitte's team leader personally presented the Lunch and Learn presentation to address the issues raised by the structure of the First Data proposal. Deloitte considered the issues to be very significant and had raised them with CAM representatives prior to the Lunch and Learn meeting.  Indeed, CAM's failure to address the issues prompted Deloitte to schedule the June 10 meeting.

*Answer to Complaint paragraph 60:*

Daidone denies the allegations contained in Paragraph 60 of the Complaint.

Complaint paragraph 61:  Sometime after June 10, 1998, CAM clarified that the CAM-affiliated TA unit would serve as the named TA and First Data would serve as sub-TA.  Under this structure, all TA fees would pass through the CAM affiliate, so First Data would not be collecting fees and "rebating" them to CAM.  This clarification, however, did *not* address the substance of Deloitte's concerns.  CAM did not change the proposed size (the affiliated TA would still be extremely limited in size and would not perform in sufficient functions to justify receiving TA fees) or scope of responsibility of the affiliated TA unit — it would still be limited to a small customer service center.  In addition, even though there would be no "rebate" in a strict sense of the word, the affiliated unit would still be taking the fee discount offered by First Data for itself, instead of passing it along to the Funds.

*Answer to Complaint paragraph 61:*

Daidone lacks knowledge or information sufficient to form a belief as to the truth or

falsity of the allegations contained in the first and second sentences of Paragraph 61 of the

Complaint.  In all other respects, Daidone denies the allegations contained in Paragraph 61 of the

Complaint.

Complaint paragraph 62:  In July 1998, First Data improved its offer in three respects.  First, it increased the fee discount.  Second, it agreed to migrate the Funds from its old technology to its more modern Full Service Retail ("FSR") platform.  Third, and most significantly, by letter to Yellin dated July 14, 1998, First Data offered the Revenue Guarantee.  The July 14 letter stated:

> First Data Corporation and Travelers will agree on "basket of
> services" from which First Data Corporation will generate $8
> million of revenue to Travelers annually.  A "make-whole"
> provision will be included which commits First Data Corporation
> to a fee credit on transfer agent services for any shortfall to the $8

million.  The credit will be 50 cents on each dollar of revenue shortfall.

*Answer to Complaint paragraph 62:*

Daidone denies the allegations contained in Paragraph 62 of the Complaint, except admits that First Data improved its offer by increasing the fee discount, agreeing to migrate the Funds from its old technology to its more modern FSR platform, and offering the Revenue Guarantee and refers to the First Data letter dated July 14, 1998 for the true and correct contents thereof.

Complaint paragraph 63:  By memorandum to Defendant Jones dated July 24, 1998, Yellin recommended that CAM establish an affiliated TA unit of approximately fifteen people to assume responsibility for the customer service call center and contract with First Data for the bulk of the transfer agency services.  The memo estimated the cost of the fifteen call center employees would be $1 million per year.

*Answer to Complaint paragraph 63:*

Daidone denies the allegations contained in Paragraph 63 of the Complaint, except refers to the memorandum of July 24, 1998 for the true and correct contents thereof.

Complaint paragraph 64:  Although the structure of the proposal had been changed so that First Data would not pay a "rebate" to CAM, in substance the fee arrangement remained largely the same as in the prior proposals — First Data would be sharing its profits with CAM.  The July 24 memo set forth the following fee arrangement, which was referred to in the memo as a "revenue sharing arrangement":

Percentage that is earned by [CAM] on:

|        | First $80MM | Over $80 MM [in total TA fees] |
|--------|-------------|-------------------------------|
| Year 1 | 33.5%       | 33.5%                         |
| Year 2 | 40          | 60                            |
| Year 3 | 55          | 60                            |
| Year 4 | 55          | 60                            |
| Year 5 | 58          | 60                            |

*Answer to Complaint paragraph 64:*

Daidone denies the allegations contained in Paragraph 64 of the Complaint, except refers to the memorandum of July 24, 1998 for the true and correct contents thereof.

Complaint paragraph 65:  The memo projected that CAM would earn the following profit under the revenue sharing arrangement (taking into account the $1 million in salaries projected for new staff):

| Year 1 | $29 million |
|--------|-------------|
| Year 2 | $40 million |
| Year 3 | $57 million |
| Year 4 | $62 million |
| Year 5 | $70 million |

*Answer to Complaint paragraph 65:*

Daidone denies the allegations contained in Paragraph 65 of the Complaint, except refers

to the memorandum of July 24, 1998 for the true and correct contents thereof.

Complaint paragraph 66:  The July 24 memo indicated that Citigroup's projected profit under the First Data proposal was $16 million less over the five-year contract period than its projected profit under the DST proposal.  Yellin recommended accepting the differential because contracting with First Data eliminated risks associated with the conversion process and permitted CAM personnel to focus on issues relating to Y2K, the integration of the Salomon Brothers funds, and the Travelers-Citicorp merger, which had been announced in April of that year.

*Answer to Complaint paragraph 66:*

Daidone denies the allegations contained in Paragraph 66 of the Complaint, except refers

to the memorandum of July 24, 1998 for the true and correct contents thereof.

Complaint paragraph 67:  The July 24 memo also stated that, because of CAM's fiduciary obligations to the Funds, it was obligated to implement a fee reduction.  The recommended reduction called for the Funds to continue to pay the same asset-based fees that were being charged by First Data, subject to caps that limited TA fees to the lesser of the asset-based fee or a set amount (which ranged from $13 to $14.50 per account).  The July 24 memo projected an annual fee reduction of $6-$8 million.

*Answer to Complaint paragraph 67:*

Daidone denies the allegations contained in Paragraph 67 of the Complaint, except refers

to the memorandum of July 24, 1998 for the true and correct contents thereof.

Complaint paragraph 68:  The July 24 memo noted that because of the different structures of the DST and First Data proposals, implementing the fee reduction would virtually eliminate the $16 million differential between the DST and First Data proposals.  This was because

the reduced revenue stream that would result from the fee reduction would have a greater
impact on CAM's profit under the DST proposal than under the First Data proposal.

*Answer to Complaint paragraph 68:*

Daidone denies the allegations contained in Paragraph 68 of the Complaint, except refers

to the memorandum of July 24, 1998 for the true and correct contents thereof.

Complaint paragraph 69:  With respect to the Revenue Guarantee, Yellin's July 24 memo
indicated that First Data had committed to:
Providing CAM with additional assets to manage sufficient to
generate $1.5 million per year in asset management fees.

Making Salomon Smith Barney First Data's investment banker of
choice and generating at least $3 million per year in investment
banking fees.

Paying 50 cents for every dollar of shortfall of investment banking
fees and 90 cents for every dollar of shortfall of asset management
fees, by way of credit on TA fees paid by CAM to First Data.

*Answer to Complaint paragraph 69:*

Daidone denies the allegations contained in Paragraph 69 of the Complaint, except refers

to the memorandum of July 24, 1998 for the true and correct contents thereof.

Complaint paragraph 70:  Yellin's memo stated that the Revenue Guarantee would generate at
least $22.5 million in revenue or $14 million of "pre-tax bottom line" over the five years
of the agreement.

*Answer to Complaint paragraph 70:*

Daidone denies the allegations contained in Paragraph 70 of the Complaint, except refers

to the memorandum of July 24, 1998 for the true and correct contents thereof.

Complaint paragraph 71:  Finally, in a section entitled "Mutual Fund Board Issues," Yellin's
memo stated that the chairman of the Funds' boards, who was an officer of CAM, was
"comfortable that the new First Data arrangement is supportable to the Fund boards."
The memo noted that service levels, "while good, will improve," and the funds would
receive a fee reduction.  Defendant Jones approved the recommendation.

*Answer to Complaint paragraph 71:*

Daidone denies the allegations contained in Paragraph 71 of the Complaint, except refers

to the memorandum of July 24, 1998 for the true and correct contents thereof.

Complaint paragraph 72:  On August 4, 1998, First Data produced the first draft of the Side
Letter to Yellin, which addressed the Revenue Guarantee and other significant
commitments between the parties, including First Data's commitment to migrate the
Funds to FSR.

*Answer to Complaint paragraph 72:*

Daidone denies the allegations contained in Paragraph 72 of the Complaint, except refers

to the August 4, 1998 draft of the side letter for the true and correct contents thereof.

Complaint paragraph 73:  Representatives of CAM and First Data negotiated the terms of the
Side Letter and simultaneously prepared a sub-TA agreement (the "Sub-TA Agreement")
between First Data and Mutual Management Corp., the Citigroup entity initially chosen
by CAM to serve as the affiliated TA.  At some point prior to the finalization of the two
agreements, First Data's commitment to migrate the Funds to FSR was removed from the
Side Letter and included as a schedule to the Sub-TA Agreement.

*Answer to Complaint paragraph 73:*

Daidone admits the allegations contained in Paragraph 73 of the Complaint.

Complaint paragraph 74:  Both agreements were finalized on November 20, 1998.  The Side
Letter, which specifically referenced the Sub-TA Agreement, contained the following
provisions:

The Revenue Guarantee;

First Data's commitment to provide its SuRPAS system for sub-
accounting;

CAM's commitment to treat First Data as "favored nation vendor"
for proxy and fulfillment services (which required CAM to solicit a
bid from First Data when proxy and fulfillment services were
required and to recommend First Data if CAM determined in good
faith that its bid was competitive with the other bids received)

CAM's agreement, subject to its fiduciary duties, to "use all
reasonable and lawful means to encourage the Funds" "to continue
[First Data] as sub-transfer agent for existing Funds and any or all
subsequent expansion, consolidation, affiliation, or addition to the
Funds for which CAM provides investment management services";

> CAM's agreement to consider in good faith retaining or
> recommending First Data to provide other services to the Funds.

*Answer to Complaint paragraph 74:*

Daidone admits the allegations contained in the first sentence of Paragraph 74 of the

Complaint.  In all other respects, Daidone denies the allegations contained in Paragraph 74 of the

Complaint, except refers to the document for the true and correct contents thereof.

Complaint paragraph 75:  The Sub-TA Agreement included an integration clause, which
provided that the Agreement, "including Schedules, Addenda and Exhibits" thereto,
constituted the parties' entire agreement about the subject matter of the Sub-TA
Agreement and superseded all prior and contemporaneous agreements regarding the
subject matter.  Notwithstanding the obvious significance to the Funds of the benefits to
CAM affiliates contained in the Side Letter, the Side Letter (or its substance) was not
provided to the Funds' boards or filed with the SEC as part of the Funds' registration
statements.

*Answer to Complaint paragraph 75:*

Daidone denies the allegations contained in Paragraph 75 of the Complaint, except refers

to the Sub-Transfer Agency and Services Agreement for the true and correct contents thereof.

Complaint paragraph 76:  In late February-early March 1999, after Yellin left the mutual fund
business, Defendant Daidone took the lead in preparing a memorandum (the "Board
Memo") and a Power Point presentation (the "Power Point") to present to the Funds'
boards concerning its recommendation for a new TA contract.  CAM included the final
version of the Board Memo, which is dated March 4, 1999, and the Sub-TA Agreement
in the materials that it sent to board members in advance of the meetings.  Neither the
Side Letter nor the Power Point was included in the packet of materials that was sent to
board members.

*Answer to Complaint paragraph 76:*

Daidone denies the allegations contained in Paragraph 76 of the Complaint, except

admits that he was involved, with counsel, consultants and fellow executives, in the preparation

of written board materials and refers to those materials for the true and correct contents thereof.

Complaint paragraph 77:  Defendant Daidone prepared the memorandum in a way that would
make the affiliated TA proposal *appear* as if it was in the Funds' best interest, which was
not true.  The Board Memo did not candidly present the proposal in terms that would

have made clear to the board that First Data would continue to perform almost all of the TA functions, leaving CTB with a tremendous profit for manning a fifteen-person call center and performing limited additional oversight and quality control functions.  The Board Memo did not explain in a meaningful way how duties were to be divided between CTB and First Data.  To the contrary, the Board Memo gave the misleading impression that First Data was providing "technology" only, which was not true, and that CTB would be a much more substantial operation then it actually would be.

*Answer to Complaint paragraph 77:*

Daidone denies the allegations contained in Paragraph 77 of the Complaint, except refers

to the materials presented to the boards for the true and correct contents thereof.

Complaint paragraph 78:  The board materials also stated that CAM approached the TA review process by looking at all available alternatives to provide the Funds with better service at lower prices.  This was also untrue.  From the beginning, CAM approached the review process with the goal of maximizing profit to CAM and, in order to attain its own goals, CAM did not pursue options that would have provided much greater value to the Funds.  Contrary to representations in the board materials, the only options CAM ever seriously considered were options that involved making a CAM affiliate the TA.  The Board Memo did not disclose that First Data had made a series of offers to perform all TA services at deeply discounted rates — including the initial $25 million annual fee discount offer and the later percentage-based discount offers — all proposals that, if offered directly to the Funds, would have provided greater savings than the proposal CAM recommended.

*Answer to Complaint paragraph 78:*

Daidone denies the allegations contained in Paragraph 78 of the Complaint, except refers

to the materials presented to the boards for the true and correct contents thereof.

Complaint paragraph 79:  Even with respect to the alternatives that CAM actually considered, CAM did not disclose that Deloitte and CAM management had initially recommended DST, that CAM resumed negotiating with First Data only after Travelers management had requested that they do so because First Data was an investment banking client, and that CAM decided to recommend First Data only after First Data had increased the value of its proposal to CAM and offered the Revenue Guarantee.  In fact, CAM failed to disclose the Side Letter or any of its terms.

*Answer to Complaint paragraph 79:*

Daidone denies the allegations contained in Paragraph 79 of the Complaint, except

admits that the Side Letter, which merely acknowledged existing relationships, was not reviewed

with the Boards in 1999.

Complaint paragraph 80:  Instead of making full and accurate disclosure regarding the TA
review process and CAM's interest in the proposal, the Board Memo gave the incorrect
impression that CAM was acting in the Funds' best interest and had expended significant
effort and money to identify and negotiate the best deal for the Funds.  The introduction
of the Board Memo contains the following statement:
> [I]n anticipation of the expiration of the non-compete agreement
> [with First Data], SSB began an exhaustive study in late 1997
> utilizing the services of Deloitte Consulting to examine transfer
> agency alternatives to First Data with the goal of reducing fees,
> improving service and offering the Smith Barney Funds access to
> alternative channels of distribution (*e.g.*, 401k) to promote further
> growth.  This effort was completed in mid-1998 at a cost of $2.5
> million.

*Answer to Complaint paragraph 80:*

Daidone denies the allegations contained in Paragraph 80 of the Complaint, except refers

to the materials presented to the boards for the true and correct contents thereof.

Complaint paragraph 81:  This paragraph was materially inaccurate and misleading.  Reducing
fees was not a goal of the review process.  The idea of a fee reduction was first raised in
the summer of 1998, by the chairman of the Funds' boards, and was separate from the
decision on how to structure the TA function.

*Answer to Complaint paragraph 81:*

Daidone denies the allegations contained in Paragraph 81 of the Complaint.

Complaint paragraph 82:  The Board Memo also bolstered the case for the recommended
proposal by giving the incorrect impression that no viable alternatives existed.  The
following paragraph, entitled "Change of Transfer Agent Vendor," was intended to
describe all remote TA vendor proposals, including the DST proposal:
> Results showed that the internalization of transfer agency functions
> and engagement of another technology vendor could reduce the
> fees paid by the Smith Barney Funds and also be the most
> profitable alternative to SSB.  However, full internalization of the
> transfer agent functionality would have entailed the creation of an

31

organization of 150 employees.  In addition, the conversion and software modifications required to migrate to a new technology and services provider would have taken at least two and a half years.  In short the Smith Barney Funds would not realize any cost savings for several years under this scenario.

*Answer to Complaint paragraph 82:*

Daidone denies the allegations contained in Paragraph 82 of the Complaint, except refers

to the materials presented to the boards for the true and correct contents thereof.

Complaint paragraph 83:  This paragraph failed to discuss the DST proposal in any detail or to disclose that Deloitte had recommended it.  In addition, to the extent that the figures contained in the paragraph were intended to describe the DST proposal, they are inaccurate.  The DST proposal would have required CAM to hire approximately 100 employees, not 150; the conversion to DST would have taken twelve to eighteen months, not thirty; and under the DST proposal the Funds would have realized savings in the first year after conversion.  Moreover, the paragraph falsely suggests that CAM was foregoing some profit and recommending First Data in order to pass along fee reductions to the Funds.  The First Data proposal, however, was economically superior — for CAM and its affiliates — to the DST proposal.

*Answer to Complaint paragraph 83:*

Daidone denies the allegations contained in Paragraph 83 of the Complaint, except refers

to the materials presented to the boards for the true and correct contents thereof.

Complaint paragraph 84:  In a separate paragraph, the Board Memo reinforced the false impression that CAM was sacrificing its own interests to the benefit of the Funds:
> The decision to remain with First Data and establish an internal transfer agency capability was made with the recognition that although not the most favorable option financially to SSB, it represented a prudent course of action with immediate results.  The revenue shortfall as a result of accepting the proposed First Data contract over our most attractive alternative was approximately $16.0 million.

*Answer to Complaint paragraph 84:*

Daidone denies the allegations contained in Paragraph 84 of the Complaint, except refers

to the materials presented to the boards for the true and correct contents thereof.

Complaint paragraph 85:  These statements were materially incorrect.  The First Data proposal
was projected to provide greater profit to CAM than the DST proposal, not $16 million
less.

*Answer to Complaint paragraph 85:*

Daidone denies the allegations contained in Paragraph 85 of the Complaint.

Complaint paragraph 86:  Although the Board Memo disclosed that the affiliated TA would make a
profit, the disclosure regarding the economic benefit to CAM was limited and
misleading.  The only paragraph of the Board Memo that discusses the projected profit to
CAM appears in a section entitled "Proposed Transfer Agency Fee and Fund Savings
Analysis," and states:

> SSB commits to reviewing the transfer agent service and fees on
> an annual basis with the Smith Barney Fund boards.  SSB
> anticipates that the SSB transfer agency business unit will operate
> on a 33% margin based on the June 1, 1999 First Data fee
> schedules.  While First Data discounts may increase over the life of
> the contract, it is expected that expenses will rise on a
> commensurate basis as SSB adds to its transfer agent capabilities.

*Answer to Complaint paragraph 86:*

Daidone denies the allegations contained in Paragraph 86 of the Complaint, except refers

to the materials presented to the boards for the true and correct contents thereof.

Complaint paragraph 87:  At the time, CAM was projecting that it would earns tens of millions
of dollars in profit each year for operating a fifteen person call center and performing
limited additional oversight and quality control functions.  There was no meaningful
disclosure about how limited the services were that CTB was to contribute in return for
all this profit.

*Answer to Complaint paragraph 87:*

Daidone denies the allegations contained in Paragraph 87 of the Complaint, except refers

to the materials presented to the boards for the true and correct contents thereof.

Complaint paragraph 88:  Because virtually all of the work was to be done by First Data, the
33% profit margin figure was itself misleading.  The margin was based on an analysis
that treated sub-TA payments to First Data as expenses of CTB.  The economic reality
would have been more accurately portrayed by deducting payments to First Data from
revenue — not treating them as expenses of CTB.  CTB is essentially a pass-through for
those payments.  In fact, internally, CAM described the fee arrangement with First Data
as a revenue sharing agreement.  Had payments to First Data not been treated as an

33

expense of CTB, the projected pre-tax profit margin would have been approximately 70%.

*Answer to Complaint paragraph 88:*

Daidone denies the allegations contained in Paragraph 88 of the Complaint, except refers to the March 4, 1999 memorandum for the true and correct contents thereof.

Complaint paragraph 89:  The Power Point disclosed that "Revenue Generation" was one of CAM's goals, and included a table that contained profit projections in dollar amounts. The table, however, was not provided to the directors in advance of the meeting.  Had board members received the projections in advance and had the opportunity to scrutinize them, they at least would have had a chance to understand that CAM expected to earn tens of millions in profit.  But they still would not have understood just how limited CAM's proposed contribution to the venture really was.

*Answer to Complaint paragraph 89:*

Daidone denies the allegations contained in Paragraph 89 of the Complaint, except lacks knowledge or information sufficient to form a belief as to the truth or falsity of whether the March 1999 PowerPoint presentation was provided to board members in advance of the meeting and refers to that PowerPoint presentation for the true and correct contents thereof.

Complaint paragraph 90:  Finally, the Board Memo incorrectly indicated that the fees charged to the Funds by First Data were significantly below industry average.

*Answer to Complaint paragraph 90:*

Daidone denies the allegations contained in Paragraph 90 of the Complaint.

Complaint paragraph 91:  At regularly scheduled meetings during the first half of 1999, Defendant Daidone presented the TA proposal to the Funds' boards — including counsel for the Funds and directors — which approved the proposal.  During a transition period between June 1999 and October 1999, CAM received revenue from First Data associated with the establishment of the affiliated TA unit.  On October 1, 1999, a CAM affiliate, now CTB, became the named TA for the Funds, and assumed responsibility for the customer service function, First Data — now PFPC — continued to perform the bulk of the TA services as sub-TA.  As named TA, CTB receives 100% of the fees and makes sub-TA payments to PFPC and to Primerica Financial Services ("PFS"), a Citigroup affiliate that sells certain of the Funds and performs sub-TA work.[6]

---

[6] The approved TA arrangement included implementation of per account fee caps.  The fee caps had the effect of lowering the total fees paid by the Funds by 23% for the period June 1999, when the fee caps were implemented,

*Answer to Complaint paragraph 91:*

Daidone lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 91 of the Complaint, except admits that during the first half of 1999, CAM representatives, together with counsel, presented the transfer agent proposal to the boards of certain of the Smith Barney mutual funds and these boards approved the proposal. With respect to footnote 6 to Paragraph 91 of the Complaint, Daidone lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations, except admits the allegations contained in the first and third sentences.

Complaint paragraph 92: CTB had approximately fifteen employees performing work for the Funds, only seven of whom worked full-time for the Funds. As intended, CTB realized high profits for performing limited work. The one function that CTB assumed from First Data/PFPC is the customer service function, which consists primarily of a call center staffed by seven full-time employees who are dedicated to Funds business. Five of those employees answer calls, two are supervisors. The seven call center staff members are the only CTB employees who spend all of their time on Funds-related work.

*Answer to Complaint paragraph 92:*

Daidone denies the allegations contained in the second sentence of Paragraph of the Complaint. In all other respects, Daidone lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 92 of the Complaint.

Complaint paragraph 93: CAM representatives supervise the TA operations of CTB, which are part the CAM business unit for budget and reporting purposes. CAM is responsible for the cost of CTB's TA operations and receives the benefit of the revenue that the TA operations generate.

*Answer to Complaint paragraph 93:*

Daidone lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 93 of the Complaint.

---

through September 2004. During the first quarter of 2003, CTB requested a fee increase from the Funds' boards, but withdrew the request after it was rejected by one board.

Complaint paragraph 94:  For the period September 11, 2000 through May 31, 2005, CTB earned pre-tax revenues of an estimated $100 million from Funds business (which is lower than projected due to, among other things, the downturn in the market that began in 2001). Over the same period, CTB has had total operating expenses (excluding sub-TA payments) of approximately $10.5 million.  In addition, CAM and its affiliates received approximately $17 under the Revenue Guarantee.

*Answer to Complaint paragraph 94:*

Daidone lacks knowledge or information sufficient to form a belief as to the truth or

falsity of the allegations contained in Paragraph 94 of the Complaint.

Complaint paragraph 95:  At regularly scheduled board meetings during the first half of 1999, Defendant Daidone presented the proposal to the Funds' boards.  The meetings took place on March 10, 1999, March 19, 1999, March 30, 1999, April 14, 1999, April 28, 1999, May 26, 1999, June 2, 1999, and June 14, 1999.

*Answer to Complaint paragraph 95:*

Daidone admits the allegations contained in Paragraph 95 of the Complaint, except

denies the implication that he made the presentations by himself and not together with counsel.

Complaint paragraph 96:  In his presentation to the Funds' boards at those meetings, Defendant Daidone intentionally led the boards to believe that the affiliated TA would be a substantial organization, and that approving the affiliated TA proposal was in the Funds' best interest, which was not true.  Defendant Daidone used the Power Point presentation, which, like the Board Memo, was spun to sell the proposal to the Funds' boards and failed to make full and accurate disclosure regarding the material terms of the proposal. At the meetings, Defendant Daidone failed to disclose, among other things that First Data had offered to renew as full-service TA at deeply discounted rates, CAM management and Deloitte had first recommended DST as a technology provider, the affiliated TA would do minimal work, Deloitte had warned CAM about the structure of the affiliated TA proposal, and CAM and First Data had entered into the Side Letter.

*Answer to Complaint paragraph 96:*

Daidone denies the allegations contained in Paragraph 96 of the Complaint, except refers

to the materials presented to the boards for the true and correct contents thereof.

Complaint paragraph 97:  All of the boards approved the recommendation during the meetings at which it was presented.

*Answer to Complaint paragraph 97:*

> Daidone admits the allegations contained in Paragraph 97 of the Complaint.

Complaint paragraph 98:  In 2001 and 2002, CAM proposed the creation of new mutual funds, which would become part of the Funds.  CAM made its recommendations to the boards of trustees/directors that would serve as the boards for the newly created funds.  As part of its recommendation, CAM recommended that CTB be appointed TA and that PFPC be appointed as sub-TA on the same terms that existed for existing Funds.

*Answer to Complaint paragraph 98:*

> Daidone admits the allegations contained in Paragraph 98 of the Complaint.

Complaint paragraph 99:  At a board meeting on August 6, 2001, for example, CAM proposed that the trustees of a sub-group of funds, known as the Smith Barney Trust II ("SBTII"), approve the creation of a new fund called the Smith Barney Investors Value Fund, which would become one of the SBTII subfamilies of funds.  During that meeting, representatives of CAM recommended that CTB (then known as Citi Fiduciary Trust Company) be appointed as TA for the newly-created fund and that PFPC be appointed as sub-TA on the same terms as existed between those entities and the already-existing Funds.  Neither Defendant Jones, who was still CEO of CAM in 2001, nor Defendant Daidone, who attended the August 6, 2001 board meeting, informed the SBTII trustees of all material facts regarding the TA arrangements with CTB, including, but not limited to, that the affiliated TA was receiving tens of millions of dollars per year for limited work, that First Data PFPC had offered to renew as full-service TA at deeply discounted rates, and that CAM and First Data had entered into the Side Letter.  The SBTII trustees approved CAM's recommendation to appoint CTB as TA and PFPC as sub-TA without knowing these and other material facts.  Sometime after the August 6, 2001 meeting, CTB began serving as TA for the Smith Barney Investors Value Fund and receiving TA fees.

*Answer to Complaint paragraph 99:*

> Daidone admits the allegations contained in the last two sentences of Paragraph 99 of the Complaint and that he attended the August 6, 2001 board meeting.  In all other respects, Daidone denies the allegations contained in Paragraph 99 of the Complaint.

Complaint paragraph 100:  On March 22, 2002, CAM recommended that the trustees of SBTII approve the creation of the Smith Barney Capital Preservation Fund, shares of which were bought by Lead Plaintiff Local 649.  As with the recommendation to create the Smith Barney Investors Value Fund, CAM recommended that CTB (then Travelers Bank and Trust, fsb) be appointed TA and PFPC be appointed sub-TA for the newly-created fund on the same terms as existed between those entities and the already-existing Funds.

And, as with the prior recommendation, neither Defendant Jones nor Defendant Daidone made full disclosure of all material facts regarding the TA arrangements with CTB and PFPC. The trustees approved the recommendation at the March 22, 2002 meeting, which Defendant Daidone attended. Sometime after the March 22, 2002 meeting, CTB became TA for the Smith Barney Capital Preservation Fund and began receiving TA fees.

*Answer to Complaint paragraph 100:*

Daidone admits the allegations contained in the last two sentences of Paragraph 100 of the Complaint and that he attended the March 22, 2002 meeting. In all other respects, Daidone denies the allegations contained in Paragraph 100 of the Complaint.

Complaint paragraph 101: On September 4, 2002, CAM held an organizational meeting for a new sub-family of Funds, the Smith Barney Multiple Discipline Trust ("SBMDT"). At the meeting, which Defendant Daidone attended, the newly-constituted board of SBMDT voted to approve, among other things, the creation of the new funds that constituted SBMDT and CAM's recommendation that CTB be appointed TA and PFPC sub-TA for the newly-created funds. Four of the six trustees of SBMDT were also members of boards that voted on the TA proposal in 1999 based on the materially misleading board presentation. At no point prior to, during or after the September 4, 2002 meeting of the SBMDT board, did Defendant Jones, Defendant Daidone or anyone within CAM inform the members of the SBMDT board or any of the new funds' boards that the 1999 board presentations and materials were materially misleading. Based on the misleading information provided in 1999 and the failure of Defendant Jones and Defendant Daidone to make full disclosure regarding the TA proposal and operations subsequent to 1999, the trustees of SBMDT approved the recommendation to appoint CTB as TA and PFPC as sub-TA. CTB became TA for the SBMDT in 2002 and began receiving TA fees.

*Answer to Complaint paragraph 101:*

Daidone admits that he attended the September 4, 2002 SBMDT organizational meeting; that the trustee approved the formation of the new funds and the recommended transfer agency arrangements; that certain SBMDT trustees had been serving on other boards in 1999; and that CTB became the paid TA for SBMDT in 2002. In all other respects, Daidone denies the allegations contained in Paragraph 101 of the Complaint.

Complaint paragraph 102: CTB was appointed TA for additional newly-created funds during meetings in February, May and August 2002. Neither Defendant Jones nor Defendant Daidone informed the boards of the newly created funds of material information regarding the TA agreements with CTB and PFPC.

38

*Answer to Complaint paragraph 102:*

Daidone admits the allegations contained in the first sentence of Paragraph 102 of the

Complaint.  In all other respects, Daidone denies the allegations contained in Paragraph 102 of

the Complaint.

Complaint paragraph 103:  As intended, CTB has realized high profits for performing limited
work.  The one function that CTB assumed from First Data PFPC was the customer
service function, which consisted primarily of a call center.  As described above, from the
inception of the CTB TA contract through September 30, 2004, the call center was
staffed by approximately seven full-time employees who are dedicated to Fund business.
Five of those employees answered calls; two were supervisors.  The seven call center
staff members were the only CTB employees who spent all of their time on Fund-related
work.  Approximately eight other CTB employees performed work for the Funds during
that period.  None of those other employees devoted 100% of their time to the Funds.  It
cost CTB approximately $2.2 million per year to provide these limited services.

*Answer to Complaint paragraph 103:*

Daidone denies the allegations contained in the first sentence of Paragraph 103 of the

Complaint.  In all other respects, Daidone lacks knowledge or information sufficient to form a

belief as to the truth or falsity of the allegations contained in Paragraph 103 of the Complaint.

Complaint paragraph 104:  As mentioned above, for the period September 11, 2000 through May
31, 2005, CTB earned net pretax revenues of an estimated $100 million from Funds
business.  The profit is lower than the originally projected profit due to, among other
things, the downturn in the market that began in 2001.  Over the same period, CTB had
total operating expenses (excluding sub-TA payments) of approximately $10.5 million.
In addition, CAM and its affiliates received approximately $17 million under the
Revenue Guarantee.

*Answer to Complaint paragraph 104:*

Daidone lacks knowledge or information sufficient to form a belief as to the truth or

falsity of the allegations contained in Paragraph 104 of the Complaint.

Complaint paragraph 105:  From the inception of the CTB TA contract in October 1999, CTB
billed the Funds and received TA fee payments on a monthly basis.  Defendants Jones
and Daidone had an ongoing fiduciary duty to make full disclosure of the material facts
regarding the TA contract and operations to the Funds' boards throughout the contract

period, but failed to fulfill that duty.  Had Defendant Jones or Defendant Daidone made full disclosure, the TA contract could have been voided.

*Answer to Complaint paragraph 105:*

Daidone admits the allegations contained in the first sentence of Paragraph 105 of the Complaint.  In all other respects, Paragraph 105 states legal conclusions, to which no responsive pleading is required; to the extent a response is required, Daidone denies the allegations contained in the second and third sentences of Paragraph 105 of the Complaint.

Complaint paragraph 106:  CAM representatives supervise the TA operations of CTB, which are part of the CAM business unit for budget and reporting purposes.  For purpose of setting compensation, Defendant Jones received credit for the revenue that CTB's TA operations generated.

*Answer to Complaint paragraph 106:*

Daidone lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 106 of the Complaint.

Complaint paragraph 107:  In 2000, 2001 and 2002, CTB had pre-tax revenues from Funds-TA business of $26.2 million, $26.3 million and $21 million, respectively.  The annual operating expenses of the CTB TA unit for those same years were $2.2 million, $2.3 million and $2.2 million, respectively.  Thus, during the first three years of the contract, CTB made $73.5 million for doing $6.7 million worth of work.

*Answer to Complaint paragraph 107:*

Daidone lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in the first sentence of Paragraph 107 of the Complaint.

Daidone denies the remaining allegations contained in Paragraph 107 of the Complaint.

Complaint paragraph 108:  For CAM, this profit was not enough.  During the first quarter of 2003, CAM went back to the Funds' boards and requested a fee increase.  In its original proposal to the Funds' boards in 1999, CAM proposed charging the Funds a percentage of assets under management, expecting that the markets would continue to perform well and the Funds' assets levels would continue to increase.  The Funds agreed.  When the market did not perform as CAM expected, it proposed that the Funds agree to return to a per account structure at per account fee levels that were above what even First Data had been charging the Funds.

*Answer to Complaint paragraph 108:*

Daidone denies the allegations contained in Paragraph 108 of the Complaint, except

admits that a different fee structure was discussed with the Boards in 2003.

Complaint paragraph 109:  CAM presented its recommendation for a fee increase to certain of
the Funds' boards in February and March 2003.  Defendant Daidone was a member of the
team that made the presentation.  As with CAM's initial presentations to the Funds in
1999, CAM's presentation to the Funds' boards in 2003 was again materially misleading.
Among other things, CAM representatives failed to provide complete information
regarding CTB's profitability.  A power point presentation given to the boards indicated
that CTB's fees and profitability were below market levels.  Nowhere in the presentation,
however, did CAM disclose how much profit CTB had made during the first three years
of the contract.  Nor did it disclose just how little work CTB did to earn that profit.

*Answer to Complaint paragraph 109:*

Daidone admits that TA fee increases were recommended to certain boards in February

and March 2003.  In all other respects, Daidone denies the allegations contained in Paragraph

109 of the Complaint, except refers to the presentation materials for the true and correct contents

thereof.

Complaint paragraph 110:  CAM tried to justify the fee increase by stating that an increase in
CTB's profitability would benefit the Funds by allowing CTB "to stay competitive with
industry peers, devote the required resources to the business, continue to improve service
and stay current with technological improvements."  The presentation, however, did not
identify any areas in which service was lagging or any specific projects that CTB had
been unable to fund.  Having made pre-tax profit of approximately $66 million the prior
three years, CTB did not need a fee increase to stay competitive with industry peers.
CAM simply wanted to increase its profit margin on the TA business.

*Answer to Complaint paragraph 110:*

Daidone denies the allegations contained in Paragraph 110 of the Complaint, except

refers to the presentation materials for the true and correct contents thereof.

Complaint paragraph 111:  At least one board approved the request for a fee increase.  One
board, however, rejected the request.  The Funds had not been performing well over the
prior couple of years, and the board believed it was an inappropriate time to request a fee

increase from the shareholders.  CAM then withdrew the request as to all Funds, and the fee increase never went into effect.

*Answer to Complaint paragraph 111:*

Daidone admits the allegations contained in Paragraph 111 of the Complaint.

Complaint paragraph 112:  On September 30, 2003, a former Citigroup employee alerted the SEC staff of the scheme.  Thereafter, the SEC began a cause examination of CAM and CTB, and requested documents and information.  In late November 2003, Citigroup's counsel reported to the SEC staff that Citigroup had discovered the Side Letter and Revenue Guarantee.  Citigroup's counsel told the SEC staff that the Revenue Guarantee had never been disclosed to the Funds' boards, and admitted that it should have been disclosed.

*Answer to Complaint paragraph 112:*

Daidone lacks knowledge or information sufficient to form a belief as to the truth or

falsity of the allegations contained in Paragraph 112 of the Complaint.

Complaint paragraph 113:  The SEC's Order Instituting Administrative and Cease and Desist Proceedings against the Adviser and Global Markets was not filed until May 31, 2005, the last day of the Class Period.

*Answer to Complaint paragraph 113:*

Daidone lacks knowledge or information sufficient to form a belief as to the truth or

falsity of the allegations contained in Paragraph 113 of the Complaint.

Complaint paragraph 114:  The Class Period begins on September 11, 2000.  On that date, the Smith Barney Allocation Series ("SBAS"), a sub-family of the Funds, issued an amended prospectus, originally issued on May 26, 2000, which contained the following statements: Transfer agent and shareholder servicing agent

> Citi Fiduciary Trust Company [successor to CTB] serves as the portfolios' transfer agent and shareholder servicing agent (the "transfer agent").  The transfer agent has entered into sub-transfer agency and services agreements with PFPC Global Fund Services and PFS Shareholder Services to serve as the portfolios' sub-transfer agents (the "sub-transfer agents").  The sub-transfer agents will perform certain shareholder record keeping and accounting services.

*       *       *

42

Transfer Agent.  Citi Fiduciary Trust Company, located at 388 Greenwich Street, New York, New York 10013, serves as the fund's transfer and dividend-paying agent.  Under the transfer agency agreement, the transfer agent maintains the shareholder account records for the fund, handles certain communications between shareholders and the fund, distributes dividends and distributions payable by the fund and produces statements with respect to account activity for the fund and its shareholders.  For these services, the transfer agent receives fees from the fund computed on the basis of the number of shareholder accounts that the transfer agent maintains for the fund during the month and is reimbursed for out-of-pocket expenses.

Sub-Transfer Agent.  PFPC Global Fund Services, located at P.O. Box 9699, Providence, RI 02940-9699, serves as one of the fund's sub-transfer agents.  Under the transfer agency agreement, the sub-transfer agent maintains the shareholder account records for the fund, handles certain communications between shareholders and the fund and distributes dividends and distributions payable by the fund.  For these services, the sub-transfer agent receives a monthly fee computed on the basis of the number of shareholder accounts it maintains for the fund during the month, and is reimbursed for out-of-pocket expenses.

The fund has also engaged the services of PFS Shareholder Services as a sub-transfer agent for PFS Accounts.  This sub-transfer agent is located at 3100 Breckinridge Blvd., Bldg. 200, Duluth, GA 30099.

*Answer to Complaint paragraph 114:*

Daidone admits that the alleged Class Period purports to begin on September 11, 2000.

Daidone denies the remaining allegations contained in Paragraph 114 of the Complaint, except

refers to the prospectus for the true and correct contents thereof.

Complaint paragraph 115:  These statements were materially false and misleading and omitted material information when made because:

    (i)     they suggest that this was a garden-variety arrangement between a TA and a sub-TA and failed to disclose that the sub-TA structure was nothing more than an elaborate scheme to inflate Citigroup profits at the expense of Funds' shareholders;

    (ii)    they omitted to disclose the scheme complained of herein whereby PFPC was doing the bulk of the work, while the middleman transfer agent (Citi Fiduciary Trust), a Citibank-related entity, received tens of millions of

dollars that rightfully belonged to Funds' shareholders for doing next to nothing;

(iii)    they failed to disclose the misleading process which led to the appointment of the sub-TA; and

(iv)    they failed to disclose the Revenue Guarantee, a material part of the scheme, which provided Citigroup entities with millions of dollars of investment banking profits.

*Answer to Complaint paragraph 115:*

Daidone denies the allegations contained in Paragraph 115 of the Complaint.

Complaint paragraph 116:  This prospectus listed Defendant Daidone as Senior Vice President and Treasurer of the SBAS.  The amended prospectus contained no signatures but Defendant Daidone signed the original May 26, 2000 prospectus.[7]

*Answer to Complaint paragraph 116:*

Daidone denies the allegations contained in Paragraph 116 of the Complaint, except

refers to the prospectuses for the true and correct contents thereof.

Complaint paragraph 117:  On April 24, 2001, a prospectus for the SBAS was issued stating:
Transfer Agent and shareholder servicing agent

Citi Fiduciary Trust Company serves as the portfolios' transfer agent and shareholder servicing agent (the "transfer agent"). Pursuant to a sub-transfer agency and services agreement with the transfer agent, PFPC Global Fund Services serves as the portfolios' sub-transfer agent (the "sub-transfer agent").  The sub-transfer agent performs certain shareholder record keeping and accounting services.

*Answer to Complaint paragraph 117:*

Daidone denies the allegations contained in Paragraph 117 of the Complaint, except

refers to the prospectus for the true and correct contents thereof.

---

[7] Since there are 105 different Funds and many Funds, as well as sub-families, issue numerous prospectuses per year, Plaintiff has given a sample of the scores of Defendants' Class Period misleading statements, which, for each fund, are substantially similar if not verbatim.

Complaint paragraph 118:  These statements were materially false and misleading for the reasons given in paragraph 115.  Defendant Daidone signed this prospectus as Principle Accounting Officer for SBAS.

*Answer to Complaint paragraph 118:*

Daidone denies the allegations contained in Paragraph 118 of the Complaint, except

refers to the prospectus for the true and correct contents thereof.

Complaint paragraph 119:  On March 29, 2002, Smith Barney Trust II sub-family caused to be filed a Form 485BPOS (a registration statement for investment companies) with the SEC. Smith Barney Trust II covers several funds including the Smith Barney Capital Appreciation Fund ("SBCAF"), shares of which were purchased by Local 649 during the Class Period.  The March 2002 Form 485BPOS, which was signed by Defendant Daidone, stated:

> Travelers Bank & Trust, fsb serves as the fund's transfer agent and shareholder servicing agent.  The transfer agent has entered into sub-transfer agency and services agreements with PFPC Global Fund Services and Primerica Shareholder Services to serve as the fund's sub-transfer agent.  The sub-transfer agents will perform certain functions including shareholder record keeping and accounting services.

*Answer to Complaint paragraph 119:*

Daidone lacks knowledge or information sufficient to form a belief as to the truth or

falsity of the allegations that LOCAL 649 purchased shares of SBCAF during the purported

Class Period.  Daidone denies the remaining allegations contained in Paragraph 119 of the

Complaint, except refers to the registration statement for the true and correct contents thereof.

Complaint paragraph 120:  Later in the same document, the Form 485BPOS stated:
TRANSFER AGENT

> The trust has entered into a Transfer Agency and Service Agreement pursuant to which Travelers Bank & Trust, fsb, an affiliate of Salomon Smith Barney ("Travelers"), acts as transfer agent for the fund.  Under the Transfer Agency and Service Agreement, Travelers maintains the shareholder account records for the fund, handles certain communications between shareholders and the fund and distributes dividends and distributions payable by the fund.  For these services, Travelers receives a monthly fee computed on the basis of the number of

shareholder accounts it maintains for the fund during the month and is reimbursed for out-of-pocket expenses.

PFPC Global Fund Services ("PFPC") and Primerica Shareholder Services act as sub-transfer agents pursuant to agreements with Travelers.  Under each sub-transfer agency agreement, the sub-transfer agent maintains the shareholder account records for the fund, handles certain communications between shareholders and the fund, and distributes dividends and distributions payable by the fund.  For these services, each sub-transfer agent receives a monthly fee computed on the basis of the number of shareholder accounts it maintains for the fund during the month, and is reimbursed for out-of-pocket expenses.

*Answer to Complaint paragraph 120:*

Daidone denies the allegations contained in Paragraph 120 of the Complaint, except

refers to the registration statement for the true and correct contents thereof.

Complaint paragraph 121:  The statements in paragraphs 121 and 122 were materially false and misleading for the reasons given in paragraph 115.  As mentioned above, this document was signed by Senior Vice President Daidone.  Daidone also acted as Principle Accounting Officer of the registrant, Smith Barney Trust II.

*Answer to Complaint paragraph 121:*

Daidone denies the allegations contained in Paragraph 121 of the Complaint, except

refers to the registration statement for the true and correct contents thereof.

Complaint paragraph 122:  On June 24, 2002, Citistreet Funds, a sub family of the Funds including the Large Company Stock Fund ("LCSF"), shares of which were then held by additional named plaintiff Jeanne Chilton, filed a proxy statement on Form 14A requesting approval of the Adviser as LCSF's subadviser:

Dear CitiStreet Funds Investor:

I am writing to let you know that CitiStreet Funds, Inc. will hold a special meeting on July 30, 2002.  The purpose of the meeting is to vote on two proposals for the Funds.  You have the opportunity to voice your opinion by voting on these proposals, and we encourage you to do so.

This package contains detailed information about the proposals and voting instruction cards for you to use in casting your vote.  Proposal 1 seeks your approval of Smith Barney Fund Management LLC as a new subadviser for the Large Company

46

> Stock Fund.  If approved, Smith Barney Fund Management LLC
> would replace Putnam Investment Management, LLC.  Based on
> the amount of assets the Fund currently allocates to its subadvisers,
> advisory fees paid by the Fund would decrease if you approve
> Proposal 1.  Proposal 2 seeks your approval of revised
> fundamental investment restrictions for the Funds.

*Answer to Complaint paragraph 122:*

Daidone lacks knowledge or information sufficient to form a belief as to the truth or

falsity of the allegations that Jeanne Chilton owned shares of LCSF.  Daidone denies the

remaining allegations contained in Paragraph 122 of the Complaint, except refers to the proxy

statement for the true and correct contents thereof.

Complaint paragraph 123:  These statements were materially false and misleading for the reasons
given in paragraph 115.

*Answer to Complaint paragraph 123:*

Daidone denies the allegations contained in Paragraph 123 of the Complaint.

Complaint paragraph 124:  There were substantially similar, if not verbatim, statements in
numerous Funds prospectuses throughout the Class Period.  *See, e.g.*, the April 30, 2002
SBAS prospectus, the June 14, 2002 Smith Barney Capital Preservation Fund 2
("SBCPF2") prospectus, the September 17,
2002 SBCPF2 prospectus, the December 13, 2002 SBCPF prospectus, the January 24,
2003 SBAGF prospectus, the February 6, 2003 and February 28, 2003 SBCPF and
SBCPF2 prospectuses, which were both signed by Defendant Daidone, the April 30,
2003 SBAS prospectus, and the May 29, 2003 SBAS prospectus.

*Answer to Complaint paragraph 124:*

Daidone denies the allegations contained in Paragraph 124 of the Complaint, except

refers to the prospectuses for the true and correct contents thereof.

Complaint paragraph 125:  After a whistleblower came forward to the SEC in September of
2003, the truth was subsequently partially disclosed on December 1, 2003 in a
supplement to certain of the Funds' prospectuses, including those issued for the Smith
Barney Capital Preservation Fund:
SUPPLEMENT DATED DECEMBER 1, 2003
TO THE
PROSPECTUSES

OF THE
FUNDS INDICATED BELOW

The following text supplements the section entitled "Management" in each of the currently effective Prospectuses for each of the Funds listed below.

Recent Developments

The Fund has received the following information from Citigroup Asset Management ("CAM"), the Citigroup business unit which includes the Fund's Investment Manager and other investment advisory companies, all of which are indirect, wholly-owned subsidiaries of Citigroup.  CAM is reviewing its entry, through an affiliate, into the transfer agent business in the period 1997-1999. As CAM currently understands the facts, at the time CAM decided to enter the transfer agent business, CAM sub-contracted for a period of five years certain of the transfer agency services to a third party and also concluded a revenue guarantee agreement with this sub-contractor providing that the sub-contractor would guarantee certain benefits to CAM or its affiliates (the "Revenue Guarantee Agreement").  In connection with the subsequent purchase of the sub-contractor's business by an affiliate of the current sub-transfer agent (PFPC Inc.) used by CAM on many of the funds it manages, this Revenue Guarantee Agreement was amended, eliminating those benefits in exchange for arrangements that included a one-time payment from the subcontractor.

The Boards of CAM-managed funds (the "Boards") were not informed of the Revenue Guarantee Agreement with the sub-contractor at the time the Boards considered and approved the transfer agent arrangements.  Nor were the Boards informed of the subsequent amendment to the Revenue Guarantee Agreement when that occurred.

CAM has begun to take corrective actions.  CAM will pay to the applicable funds $16 million (plus interest) that CAM and its affiliates received from the Revenue Guarantee Agreement and its amendment.  CAM also plans an independent review to verify that the transfer agency fees charged by CAM were fairly priced as compared to competitive alternatives.  CAM is instituting new procedures and making changes designed to ensure no similar arrangements are entered into in the future.

CAM has briefed the SEC, the New York State Attorney General and other regulators with respect to this matter, as well as the U.S. Attorney who is investigating the matter.  CAM is cooperating with governmental authorities on this matter.

| | |
|---|---|
| SMITH BARNEY CONNECTICUT MONEY MARKET PORTFOLIO | December 31, 2002 |
| Class A and Y Shares | |
| SB ADJUSTABLE RATE INCOME FUND | September 26, 2003 |
| Smith Barney Shares | |
| SMITH BARNEY AGGRESSIVE GROWTH FUND INC. | December 30, 2002 |
| SMITH BARNEY ALLOCATION SERIES INC. | May 30, 2003 |
| BALANCED PORTFOLIO | |
| CONSERVATIVE PORTFOLIO | |
| GLOBAL PORTFOLIO | |
| GROWTH PORTFOLIO | |
| HIGH GROWTH PORTFOLIO | |
| INCOME PORTFOLIO | |
| SMITH BARNEY APPRECIATION FUND INC. | April 30, 2003 |
| SMITH BARNEY ARIZONA MUNICIPALS FUND INC. | September 26, 2003 |
| SMITH BARNEY CALIFORNIA MUNICIPALS FUND INC. | June 27, 2003 |
| SMITH BARNEY EQUITY FUNDS | May 31, 2003 |
| SMITH BARNEY SOCIAL AWARENESS FUND | |
| SMITH BARNEY FUNDAMENTAL VALUE FUND INC. | January 28, 2003 |
| SMITH BARNEY FUNDS, INC. | |
| SMITH BARNEY LARGE CAP VALUE FUND | April 30, 2003 |
| SMITH BARNEY SHORT-TERM HIGH | April 30, 2003 |
| GRADE BOND FUND | |
| U.S. GOVERNMENT SECURITIES FUND | April 30, 2003 |
| SMITH BARNEY INSTITUTIONAL CASH MANAGEMENT FUND INC. | September 29, 2003 |
| CASH PORTFOLIO | |
| GOVERNMENT PORTFOLIO | |
| MUNICIPAL PORTFOLIO | |
| SMITH BARNEY INVESTMENT | |

| | |
|---|---|
| FUNDS INC. | |
| SMITH BARNEY GOVERNMENT | |
| SECURITIES FUND | April 30, 2003 |
| SMITH BARNEY GROUP | |
| SPECTRUM FUND | January 28, 2003 |
| SMITH BARNEY HANSBERGER | |
| GLOBAL VALUE FUND | August 28, 2003 |
| SMITH BARNEY INVESTMENT | |
| GRADE BOND FUND | April 30, 2003 |
| SMITH BARNEY PREMIER | |
| SELECTIONS ALL CAP | |
| GROWTH FUND | August 28, 2003 |
| SMITH BARNEY PREMIER | |
| SELECTIONS GLOBAL GROWTH | |
| FUND | August 28, 2003 |
| SMITH BARNEY PREMIER | |
| SELECTIONS LARGE CAP FUND | August 28, 2003 |
| SMITH BARNEY SMALL CAP | |
| VALUE FUND SMITH BARNEY | |
| SMALL CAP GROWTH FUND | January 28, 2003 |
| | |
| SMITH BARNEY INVESTMENT | |
| SERIES | February 28, 2003 |
| SB GROWTH AND INCOME | |
| FUND | |
| Smith Barney Shares | |
| SMITH BARNEY | |
| INTERNATIONAL FUND | |
| SMITH BARNEY LARGE CAP | |
| CORE FUND | |
| SMITH BARNEY INVESTMENT | |
| TRUST | |
| SMITH BARNEY | |
| INTERMEDIATE | March 28, 2003 |
| MATURITY CALIFORNIA | |
| MUNICIPALS FUND | |
| SMITH BARNEY | |
| INTERMEDIATE | March 28, 2003 |
| MATURITY NEW YORK | |
| MUNICIPALS FUND | March 28, 2003 |
| SMITH BARNEY LARGE | |
| CAPITALIZATION GROWTH | |
| FUND | |
| SMITH BARNEY MID CAP CORE | |
| FUND | March 28, 2003 |
| SMITH BARNEY CLASSIC | February 10, 2003 |

50

VALUES FUND

| | |
|---|---|
| SMITH BARNEY MANAGED MUNICIPALS FUND INC. | June 27, 2003 |
| SMITH BARNEY MASSACHUSETTS MUNICIPALS FUND | March 28, 2003 |
| SMITH BARNEY MONEY FUNDS, INC. | April 30, 2003 |
| | |
| SMITH BARNEY MUNI FUNDS | |
| CALIFORNIA MONEY MARKET PORTFOLIO | July 29, 2003 |
| FLORIDA PORTFOLIO | July 29, 2003 |
| GEORGIA PORTFOLIO | July 29, 2003 |
| LIMITED TERM PORTFOLIO | July 29, 2003 |
| MASSACHUSET1'S MONEY MARKET PORTFOLIO | July 29, 2003 |
| NATIONAL PORTFOLIO | July 29, 2003 |
| NEW YORK MONEY MARKET PORTFOLIO | July 29, 2003 |
| NEW YORK PORTFOLIO | July 29, 2003 |
| PENNSYLVANIA PORTFOLIO | July 29, 2003 |
| | |
| SMITH BARNEY MUNICIPAL MONEY MARKET FUND, INC. | July 29, 2003 |
| | |
| SMITH BARNEY NEW JERSEY MUNICIPALS FUND, INC. | July 29, 2003 |
| SMITH BARNEY OREGON MUNICIPALS FUND SMITH BARNEY PRINCIPAL RETURN FUND | August 28, 2003 |
| SECURITY AND GROWTH FUND | March 31, 2003 |
| | |
| SMITH BARNEY SECTOR SERIES FUND INC. | February 28, 2003 |
| SMITH BARNEY FINANCIAL SERVICES FUND | |
| SMITH BARNEY HEALTH SCIENCES FUND | |
| SMITH BARNEY TECHNOLOGY FUND | |
| | |
| SMITH BARNEY SMALL CAP CORE FUND, INC. | April 30, 2003 |

|  |  |
|---|---|
| SMITH BARNEY<br>TELECOMMUNICATIONS<br>TRUST<br>SMITH BARNEY<br>TELECOMMUNICATIONS<br>INCOME FUND | April 30, 2003 |
| SMITH BARNEY TRUST II<br>SMITH BARNEY DIVERSIFIED<br>LARGE CAP GROWTH FUND | February 28, 2003 |
| SMITH BARNEY<br>INTERNATIONAL LARGE CAPE<br>FUND | April 30, 2003 |
| SMITH BARNEY SMALL CAP<br>.GROWTH OPPORTUNITIES<br>FUND | February 28, 2003 |
| SMITH BARNEY CAPITAL<br>PRESERVATION FUND | February 28, 2003 |
| SMITH BARNEY CAPITAL<br>PRESERVATION FUND II | February 28, 2003 |
| SMITH BARNEY SHORT<br>DURATION MUNICIPAL<br>INCOME FUND | March 3, 2003 |
| SMITH BARNEY WORLD<br>FUNDS, INC. GLOBAL<br>GOVERNMENT BOND<br>PORTFOLIO | February 28, 2003 |
| INTERNATIONAL ALL CAP<br>GROWTH PORTFOLIO | |

*Answer to Complaint paragraph 125:*

Daidone denies the allegations contained in Paragraph 125 of the Complaint, except

refers to the supplement for the true and correct contents thereof.

Complaint paragraph 126:  This statement disclosed some of the facts surrounding the Revenue
Guarantee.  It was still misleading, however, because it failed to disclose the scheme
behind the sub-TA, *e.g.*, that CTB was paid tens of millions of dollars (that rightfully
belonged to shareholders) for doing little work while, moreover, PFPC did the bulk of the
work at radically reduced rates.  That information was not made public until the SEC
instituted proceedings against the Adviser and Global Markets on May 31, 2005.

*Answer to Complaint paragraph 126:*

Daidone denies the allegations contained in Paragraph 126 of the Complaint, except

refers to the supplement for the true and correct contents thereof.

Complaint paragraph 127:  The misleading statements continued throughout 2004.  On March 1,
2004, the Smith Barney Trust II, a sub-family of the Funds including the Smith Barney
Capital Preservation Fund, made the following statements in a prospectus:

>TRANSFER AGENT AND SHAREHOLDER SERVICING AGENT
>Citicorp Trust Bank, fsb, an affiliate of the manager, serves as the fund's
>transfer agent and shareholder servicing agent (the "transfer agent").  The
>transfer agent has entered into a sub-transfer agency and services
>agreement with PFPC Inc. to serve as the fund's sub-transfer agent (the
>"sub-transfer agent").  The sub-transfer agent will perform certain
>functions including shareholder record keeping and accounting services.
>
>RECENT DEVELOPMENTS During the period from 1997-1999,
>Citicorp Trust Bank, fsb ("Citicorp Trust"), an affiliate of Citigroup Asset
>Management ("CAM"), entered the transfer agent business.  CAM is the
>Citigroup business unit that includes the fund's investment manager and
>other investment advisory companies.  Citicorp Trust hired a
>subcontractor to perform some of the transfer agent services.  The
>subcontractor, in exchange, signed a separate agreement with CAM in
>1998 that guaranteed investment management revenue to CAM and
>investment banking revenue to a CAM affiliate.  The sub-contractor's
>business was later taken over by PFPC Inc. (the fund's current sub-
>transfer agent), and at that time the revenue guarantee was eliminated and
>a one-time payment was made by the subcontractor to a CAM affiliate.
>
>CAM did not disclose the revenue guarantee agreement when the Board
>of the fund and various other CAM-managed funds hired Citicorp Trust as
>transfer agent.  Nor did CAM disclose the one-time payment to the boards
>of the CAM-managed funds when it was made.
>
>CAM is taking corrective actions.  CAM will pay to the applicable funds
>approximately $17 million (plus interest) that CAM and its affiliates
>received from the revenue guarantee agreement and the one-time
>payment.  CAM is also conducting an independent review to verify that
>the transfer agency fees charged by Citicorp Trust were fair compared to
>competitive alternatives.  CAM is strengthening its procedures in order to
>avoid similar situations in the future.
>
>CAM has given this information to regulators and other government
>authorities, and understands that the SEC and the U.S. Attorney are
>investigating this situation.

*Answer to Complaint paragraph 127:*

Daidone denies the allegations contained in Paragraph 127 of the Complaint, except

refers to the prospectus for the true and correct contents thereof.

Complaint paragraph 128:  These statements were materially false and misleading for the reasons
given in paragraph 126.

*Answer to Complaint paragraph 128:*

Daidone denies the allegations contained in Paragraph 128 of the Complaint.

Complaint paragraph 129:  On August 28, 2004, the SBIF, a sub-family of the Funds which
includes the Smith Barney Large Cap Growth and Value Fund, shares of which were held
by additional named plaintiff Jeffrey Weber, issued a prospectus stating:

Transfer agent and shareholder servicing agent Citicorp Trust Bank, fsb
("Citicorp Trust") serves as each fund's transfer agent and shareholder
servicing agent (the "transfer agent").  The transfer agent has entered into
sub-transfer agency and services agreements with PFPC Inc. and
Primerica Shareholder Services to serve as each fund's sub-transfer agents
(the "sub-transfer agents").  The sub-transfer agents will perform certain
functions including shareholder record keeping and accounting services.

Citigroup has been notified by the Staff of the SEC that the Staff is
considering recommending a civil injunctive action and/or an
administrative proceeding against Citigroup Asset Management (CAM),
including its applicable investment advisory companies and Citicorp
Trust, relating to the creation and operation of the internal transfer agent
unit to serve certain CAM managed funds, including the funds.  This
notification arises out of a previously disclosed investigation by the SEC
and the U.S. Attorney and relates to Citicorp Trust's entry in 1999 into the
transfer agency business, CAM's retention of, and agreements with an
unaffiliated sub-transfer agent, the adequacy of the disclosures made to
the fund boards that approved the transfer agency arrangements (including
CAM's failure to disclose a related revenue guarantee agreement
benefiting CAM and its affiliates), and CAM's operation of and
compensation for the transfer agency business.  The revenue guarantee
described above was terminated in 1999 and CAM will be paying the
applicable funds, primarily through fee waivers, a total of approximately
$17 million (plus interest) that is the amount of the revenue received by
Citigroup relating to the revenue guarantee.  Citigroup is cooperating fully
in the investigation and will seek to resolve the matter in discussions with
the SEC Staff.  Although there can be no assurance, Citigroup does not
believe that this matter will have a material adverse effect on the funds.

*Answer to Complaint paragraph 129:*

Daidone lacks knowledge or information sufficient to form a belief as to the truth or

falsity of the allegations that Jeffery Weber owned shares of Smith Barney Large Cap Growth

and Value Fund.  Daidone denies the remaining allegations contained in Paragraph 129 of the

Complaint, except refers to the prospectus for the true and correct contents thereof.

Complaint paragraph 130:  These statements were materially false and misleading for the reasons
given in paragraph 126.

*Answer to Complaint paragraph 130:*

Daidone denies the allegations contained in Paragraph 130 of the Complaint.

Complaint paragraph 131:  On January 21, 2005, Citigroup, Global Markets' parent company,
announced in a supplement to numerous Funds' prospectuses:

> In connection with an investigation previously disclosed by Citigroup, the
> Staff of the Securities and Exchange Commission (SEC) has notified
> Citigroup Asset Management (CAM), the Citigroup business unit that
> includes the funds' investment manager and other investment advisory
> companies; Citicorp Trust Bank (CTB), an affiliate of CAM; Thomas W.
> Jones, the former CEO of CAM; and three other individuals, one of whom
> is an employee and two of whom are fowler employees of CAM, that the
> SEC Staff is considering recommending a civil injunctive action and/or an
> administrative proceeding against each of them relating to the creation and
> operation of an internal transfer agent unit to serve various CAM-
> managed funds.
>
> In 1999, CTB entered the transfer agent business.  CTB hired an
> unaffiliated subcontractor to perform some of the transfer agent services.
> The subcontractor, in exchange, had signed a separate agreement with
> CAM in 1998 that guaranteed investment management revenue to CAM
> and investment banking revenue to a CAM affiliate.  The subcontractor's
> business was later taken over by PFPC Inc., and at that time the revenue
> guarantee was eliminated and a one-time payment was made by the
> subcontractor to a CAM affiliate.
>
> CAM did not disclose the revenue guarantee when the boards of various
> CAM-managed funds hired CTB as transfer agent.  Nor did CAM disclose
> to the boards of the various CAM-managed funds the one-time payment
> received by the CAM affiliate when it was made.  As previously
> disclosed, CAM has already paid the applicable funds, primarily through
> fee waivers, a total of approximately $17 million (plus interest) that is the

amount of the revenue received by Citigroup relating to the revenue guarantee.

In addition, the SEC Staff has indicated that it is considering recommending action based on the adequacy of the disclosures made to the fund boards that approved the transfer agency arrangement, CAM's initiation and operation of, and compensation for, the transfer agent business and CAM's retention of, and agreements with, the subcontractor.

Citigroup is cooperating fully in the SEC's investigation and is seeking to resolve the matter in discussions with the SEC staff.  On January 20, 2005, Citigroup stated that it had established an aggregate reserve of $196 million ($25 million in the third quarter of 2004 and $171 million in the fourth quarter of 2004) related to its discussions with the SEC Staff. Settlement negotiations are ongoing and any settlement of this matter with the SEC will require approval by the Citigroup Board and acceptance by the Commission.

Unless and until any settlement is consummated, there can be no assurance that any amount reserved by Citigroup will be distributed.  Nor is there at this time any certainty as to how the proceeds of any settlement would be distributed, to whom any such distribution would be made, the methodology by which such distribution would be allocated, and when such distribution would be made.

Although there can be no assurance, Citigroup does not believe that this matter will have a material adverse effect on the funds.

*Answer to Complaint paragraph 131:*

Daidone denies the allegations contained in Paragraph 131 of the Complaint, except

refers to the supplement for the true and correct contents thereof.

Complaint paragraph 132:  These statements were materially false and misleading for the reasons given in paragraph 126.

*Answer to Complaint paragraph 132:*

Daidone denies the allegations contained in Paragraph 132 of the Complaint.

Complaint paragraph 133:  On February 25, 2005, the Smith Barney Trust II stated the following in a prospectus:

TRANSFER AGENT AND SHAREHOLDER SERVICING AGENT
Citicorp Trust Bank, fsb serves as the fund's transfer agent and shareholder servicing agent (the "transfer agent").  The transfer agent has entered into a sub-transfer agency and services agreement with PFPC Inc.

to serve as the fund's sub-transfer agent (the "sub-transfer agent").  The sub-transfer agent will perform certain shareholder record keeping and accounting services.

RECENT DEVELOPMENTS

In connection with an investigation previously disclosed by Citigroup, the Staff of the SEC has notified Citigroup Asset Management (CAM), the Citigroup business unit that includes the fund's investment manager and other investment advisory companies; Citigroup Trust Bank (CTB), an affiliate of CAM; Thomas W. Jones, the former CEO of CAM; and three other individuals, one of whom is an employee and the other two of whom are former employees of CAM, that the SEC Staff is considering recommending a civil injunctive action and/or an administrative proceeding against each of them relating to the creation and operation of an internal transfer agent unit to serve various CAM-managed funds.

In 1999, CTB entered the transfer agent business.  CTB hired an unaffiliated subcontractor to perform in some of the transfer agent services.  The subcontractor, in exchange, had signed a separate agreement with CAM in 1998 that guaranteed investment management revenue to CAM and investment banking revenue to a CAM affiliate.  The subcontractor's business was later taken over by PFPC Inc., and at that time the revenue guarantee was eliminated and a one-time payment was made by the subcontractor to a CAM affiliate.

CAM did not disclose the revenue guarantee when the boards of various CAM-managed funds hired CTB as transfer agent.  Nor did CAM disclose to the boards of the various CAM-managed funds the one-time payment received by the CAM affiliate when it was made.  As previously disclosed, CAM has already paid the applicable funds, primarily through fee waivers, a total of approximately $17 million (plus interest) that is the amount of the revenue received by Citigroup relating to the revenue guarantee.  In addition, the SEC Staff has indicated that it is considering recommending action based on the adequacy of the disclosures made to the fund boards that approved the transfer agency arrangement, CAM's initiation and operation of, and compensation for, the transfer agent business and CAM's retention of, and agreements with, the subcontractor.

Citigroup is cooperating fully in the SEC's investigation and is seeking to resolve the matter in discussions with the SEC Staff.  On January 20, 2005, Citigroup stated that it had established an aggregate reserve of $196 million ($25 million in the third quarter of 2004 and $171 million in the fourth quarter of 2004) related to its discussions with the SEC Staff.  Settlement negotiations are ongoing and any settlement of this matter with the SEC will require approval by the Citigroup Board and acceptance by the Commission.

Unless and until any settlement is consummated, there can be no assurance that any amount reserved by Citigroup will be distributed. Nor is there at this time any certainty as to how the proceeds of any settlement would be distributed, to whom any such distribution would be made, the methodology by which such distribution would be allocated, and when such distribution would be made.

Although there can be no assurance, Citigroup does not believe that this matter will have a material adverse effect on the fund.

*Answer to Complaint paragraph 133:*

Daidone denies the allegations contained in Paragraph 133 of the Complaint, except

refers to the prospectus for the true and correct contents thereof.

Complaint paragraph 134: These statements were materially false and misleading for the reasons given in paragraph 126.

*Answer to Complaint paragraph 134:*

Daidone denies the allegations contained in Paragraph 134 of the Complaint.

Complaint paragraph 135: On May 31, 2005, the last day of the Class Period, the SEC published an Order announcing that in anticipation of proceedings against the Adviser and Global Markets, these entities submitted an offer to the SEC which the SEC had "determined to accept". This order, for the first time, revealed the intricate scheme behind the creation of the sub-TA by which Defendants diverted tens of millions of dollars from the Funds to another Citigroup entity.

*Answer to Complaint paragraph 135:*

Daidone lacks knowledge or information sufficient to form a belief as to the truth or

falsity of the allegations contained in Paragraph 135 of the Complaint, except admits that the

alleged Class Period ends on May 31, 2005.

Complaint paragraph 136: Throughout the Class Period, Plaintiff and Class members were damaged by Defendants' fraudulent scheme alleged herein. As described above, Defendants' scheme diminished the value of Funds' shares by mis-appropriating and diverting tens of millions of dollars from Funds' shareholders through the creation of a Citigroup-related entity (CTB) as transfer agent while the original transfer agent, PFPC (originally First Data) performed the bulk of the work as sub-transfer agent for radically reduced fees. Defendants' scheme also harmed Funds' shareholders by increasing transaction fees by using two transfer agents instead of one. Accordingly, Defendants paid tens of millions of dollars more for transfer agent services than was necessary and

money that belonged to Funds' shareholders went right back into the coffers of Citigroup-related entities.

*Answer to Complaint paragraph 136:*

Daidone denies the allegations contained in Paragraph 136 of the Complaint.

Complaint paragraph 137:  Class members were also damaged by purchasing Funds' shares at distorted NAV values.

*Answer to Complaint paragraph 137:*

Daidone denies the allegations contained in Paragraph 137 of the Complaint.

Complaint paragraph 138:  Plaintiff and the Class have also suffered lost opportunity damages because the money that was drained from their accounts by Defendants' actions could have been invested for further gains.

*Answer to Complaint paragraph 138:*

Daidone denies the allegations contained in Paragraph 138 of the Complaint.

Complaint paragraph 139:  Defendants' scienter is clear because the elaborate scheme discussed herein could not have occurred absent actual knowledge.  Indeed, Defendants Adviser, Global Markets, Jones, and Daidone were integral participants in the scheme. Defendants were also motivated to construct the scheme alleged herein because it provided tens of millions of dollars in extra profits for Citigroup entities.  *Cf.* Casey Decision at 6-9.

*Answer to Complaint paragraph 139:*

Daidone denies the allegations contained in Paragraph 139 of the Complaint.

Complaint paragraph 140:  Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

*Answer to Complaint paragraph 140:*

Daidone repeats and incorporates by reference all of the foregoing paragraphs of this

Answer as if fully set forth herein.

Complaint paragraph 141:  Throughout the Class Period, the Adviser, Global Markets, Jones and Daidone carried out a plan, scheme, and course of conduct that was intended to and did: (i) deceive the investing public, including Plaintiff and the other Class members, as alleged herein; and (ii) induce Class members to purchase shares of the Funds at distorted

prices.  In furtherance of this unlawful scheme and course of conduct, Defendants took the actions set forth herein.

*Answer to Complaint paragraph 141:*

Daidone denies the allegations contained in Paragraph 141 of the Complaint.

Complaint paragraph 142:  Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Funds in an effort to induce Class members to purchase shares of the Funds at distorted prices in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

*Answer to Complaint paragraph 142:*

Daidone denies the allegations contained in Paragraph 142 of the Complaint.

Complaint paragraph 143:  The Adviser, Global Markets, Jones, and Daidone, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct in order to profit as a result of the undisclosed scheme discussed herein.

*Answer to Complaint paragraph 143:*

Daidone denies the allegations contained in Paragraph 143 of the Complaint.

Complaint paragraph 144:  As a result of Defendants' scheme and failure to disclose material facts, as set forth above, the price of Funds shares was distorted and did not reflect their true value.  In ignorance of this, and relying directly or indirectly on the false and misleading public statements alleged herein, or upon the integrity of the market in which the Funds trade, Plaintiff and Class members suffered harm throughout the Class Period.

*Answer to Complaint paragraph 144:*

Daidone denies the allegations contained in Paragraph 144 of the Complaint.

Complaint paragraph 145:  At the time of said omissions, Plaintiff and the other members of the Class were important of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known of the truth, which was not disclosed by the Adviser, Global Markets, Jones, or Daidone, Plaintiff and the other members of the Class would not have purchased or held their Funds shares during the Class Period, or if they had, they would not have done so at distorted prices.

*Answer to Complaint paragraph 145:*

Daidone lacks knowledge or information sufficient to form a belief as to the truth or

falsity of the allegations contained in Paragraph 145 of the Complaint.

Complaint paragraph 146:  By virtue of the foregoing, the Adviser, Global Markets, Jones, and
Daidone have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated
thereunder.

*Answer to Complaint paragraph 146:*

Paragraph 146 of the Complaint states a legal conclusion, as to which no responsive

pleading is required; to the extent it alleges facts, Daidone denies the allegations contained in

Paragraph 146 of the Complaint.

Complaint paragraph 147:  As a direct and proximate result of Defendants' wrongful conduct,
Plaintiff and the other members of the Class suffered damages during the Class Period.

*Answer to Complaint paragraph 147:*

Paragraph 147 of the Complaint states a legal conclusion, as to which no responsive

pleading is required; to the extent it alleges facts, Daidone denies the allegations contained in

Paragraph 147 of the Complaint.

Complaint paragraph 148:  Plaintiff repeats and realleges each and every allegation contained
above as if fully set forth herein.

*Answer to Complaint paragraph 148:*

Daidone repeats and incorporates by reference all of the foregoing paragraphs of this

Answer as if fully set forth herein.

Complaint paragraph 149:  Jones and Daidone acted as controlling persons of the Adviser and
Global Markets within the meaning of Section 20(a) of the Exchange Act as alleged
herein.  By virtue of their high-level positions, and their ownership and contractual rights,
participation in and/or awareness of the Adviser and Global Markets' operations and/or
intimate knowledge of the statements filed by the Funds and/or the Adviser and Global
Markets with the SEC and disseminated to the investing public, Jones and Daidone had
the power to influence and control and did influence and control, directly or indirectly,
the decision-making of the Adviser and Global Markets, including the content and

dissemination of the various statements that Plaintiff contends are false and misleading. Jones and Daidone were provided with or had unlimited access to copies of the Funds, the Adviser and/or Global Markets' reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

*Answer to Complaint paragraph 149:*

Paragraph 149 of the Complaint states a legal conclusion, as to which no responsive pleading is required; to the extent it alleges facts, Daidone denies the allegations contained in Paragraph 149 of the Complaint.

Complaint paragraph 150:  In particular, Jones and Daidone had direct and supervisory involvement in the day-to-day operations of the Adviser and Global Markets and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

*Answer to Complaint paragraph 150:*

Paragraph 150 of the Complaint states a legal conclusion, as to which no responsive pleading is required; to the extent it alleges facts, Daidone denies the allegations contained in Paragraph 150 of the Complaint.

Complaint paragraph 151:  As set forth above, the Adviser, Global Markets, Jones, and Daidone violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, Jones and Daidone are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of the Adviser, Global Markets, Jones and Daidone's wrongful conduct, Plaintiff and the other members of the Class suffered damages during the Class Period.

*Answer to Complaint paragraph 151:*

Paragraph 151 of the Complaint states a legal conclusion, as to which no responsive pleading is required; to the extent it alleges facts, Daidone denies the allegations contained in Paragraph 151 of the Complaint.

Complaint paragraph 152:  Plaintiff incorporates by reference the preceding paragraphs.

*Answer to Complaint paragraph 152:*

No response to Paragraph 152 is required, as Count III has been dismissed by the Court

in its entirety.

Complaint paragraph 153:  The Funds consist of registered investment companies within the
meaning of Section 2 of the ICA.

*Answer to Complaint paragraph 153:*

No response to Paragraph 153 is required, as Count III has been dismissed by the Court

in its entirety.

Complaint paragraph 154:  The Adviser is an investment adviser for the Funds as that term is
defined in Section 2 of the ICA.

*Answer to Complaint paragraph 154:*

No response to Paragraph 154 is required, as Count III has been dismissed by the Court

in its entirety.

Complaint paragraph 155:  Pursuant to Section 36(b) of the ICA, 15 U.S.C. § 80a-35(b), the
investment adviser of a mutual fund owes to its mutual funds and their shareholders the
fiduciary duties of loyalty, candor, and due care with respect to the receipt of
compensation for services or payments of a material nature paid by the mutual fund to
such investment adviser or any affiliated person.  Those fiduciary duties apply not only to
the terms of the advisory fee agreements, but also to the manner in which advisers seek
approval of such agreements.

*Answer to Complaint paragraph 155:*

No response to Paragraph 155 is required, as Count III has been dismissed by the Court

in its entirety.

Complaint paragraph 156:  Pursuant to Section 36(b) of the ICA, 15 U.S.C. §80a-35(b), the
Adviser owes and owed to the Funds and their shareholders the fiduciary duties of
loyalty, candor, and due care with respect to its receipt of compensation for services or
payments of any material nature paid by the Funds or its shareholders to the Adviser or
any affiliated person.

*Answer to Complaint paragraph 156:*

No response to Paragraph 156 is required, as Count III has been dismissed by the Court in its entirety.

Complaint paragraph 157:  Pursuant to Section 15(c) of the ICA, 15 U.S.C. § 80a-15(c), the investment adviser of a mutual fund owes to the mutual fund the duty to furnish the directors of the fund "such information as may reasonably be necessary to evaluate the terms of any contract whereby a person undertakes regularly to serve or act as investment adviser of such [mutual fund] company."

*Answer to Complaint paragraph 157:*

No response to Paragraph 157 is required, as Count III has been dismissed by the Court in its entirety.

Complaint paragraph 158:  Thus, among other things, Section 36(b) of the ICA prohibits and prohibited the Adviser from soliciting the approval of any advisory agreement from the Funds by use of false or misleading information, or by failing to disclose information material to the Funds regarding the Adviser's compensation or the compensation of the Adviser's affiliate, CTB.  Information concerning conflicts of interest are particularly important to the Funds.

*Answer to Complaint paragraph 158:*

No response to Paragraph 158 is required, as Count III has been dismissed by the Court in its entirety.

Complaint paragraph 159:  The Adviser did not make full and fair disclosure to the Funds' boards of all information that would be material to the Funds' decision regarding the choice of its transfer agent.

*Answer to Complaint paragraph 159:*

No response to Paragraph 159 is required, as Count III has been dismissed by the Court in its entirety.

Complaint paragraph 160:  Pursuant to Section 36(b) of the Investment Company Act, 15 U.S.C. § 80a-35(b), a mutual fund shareholder may bring a civil action against an investment adviser or any affiliated person who has breached his or its fiduciary duty concerning such compensation or other payments.

*Answer to Complaint paragraph 160:*

No response to Paragraph 160 is required, as Count III has been dismissed by the Court

in its entirety.

Complaint paragraph 161:  The Adviser breached its fiduciary duty to the Funds by the acts
alleged in this Complaint including, without limitation, participating in the sub-TA
scheme, by which the Funds contracted with CTB for transfer agent services at excessive
rates for little work, which scheme inured to the benefit of Citigroup entities and to the
detriment of Funds' shareholders.

*Answer to Complaint paragraph 161:*

No response to Paragraph 161 is required, as Count III has been dismissed by the Court

in its entirety.

Complaint paragraph 162:  By recommending that the Funds contract with an affiliate of the
Adviser for transfer agent services, the Adviser placed its own self-interest in maximizing
its compensation and other payments over the interests of the Funds and their
shareholders.

*Answer to Complaint paragraph 162:*

No response to Paragraph 162 is required, as Count III has been dismissed by the Court

in its entirety.

Complaint paragraph 163:  As alleged herein, the Adviser breached its fiduciary duties with
respect to the receipt of compensation for services or other payments of a material nature
from the Funds or their shareholders.

*Answer to Complaint paragraph 163:*

No response to Paragraph 163 is required, as Count III has been dismissed by the Court

in its entirety.

Complaint paragraph 164:  By virtue of the foregoing, the Adviser has violated Section 36(b) of
the Investment Company Act, 15 U.S.C. § 80a-35(b).

*Answer to Complaint paragraph 164:*

No response to Paragraph 164 is required, as Count III has been dismissed by the Court in its entirety.

Complaint paragraph 165:  As a direct and proximate result of the wrongful conduct alleged above, the Funds were harmed by, among other things, the adoption and approval of the advisory agreements.

*Answer to Complaint paragraph 165:*

No response to Paragraph 165 is required, as Count III has been dismissed by the Court in its entirety.

As for the Complaint's prayer for relief, Daidone denies that Plaintiffs are entitled to any of the requested relief.

Daidone further asserts the following defenses:

### <u>FIRST AFFIRMATIVE DEFENSE</u>

1.      The Complaint fails to state a claim upon which relief may be granted.

### <u>SECOND AFFIRMATIVE DEFENSE</u>

2.      Plaintiffs lack standing and/or capacity to assert the claims alleged in the Compliant.

### <u>THIRD AFFIRMATIVE DEFENSE</u>

3.      The claims alleged in the Complaint are barred, in whole or in part, by the applicable statutes of limitation.

### <u>FOURTH AFFIRMATIVE DEFENSE</u>

4.      The claims alleged in the Complaint are barred, in whole or in part, by the doctrine of estoppel.

## FIFTH AFFIRMATIVE DEFENSE

5.     The claims alleged in the Complaint are barred, in whole or in part, by the doctrine of waiver.

## SIXTH AFFIRMATIVE DEFENSE

7.     The claims alleged in the Complaint are barred because Plaintiffs have suffered no damages.

## SEVENTH AFFIRMATIVE DEFENSE

8.     Defendants are entitled to an offset, against any damages determined to be owed to Plaintiffs, in the amount that Plaintiffs have already been reimbursed for their alleged damages as a result of disgorgement to the funds made pursuant to a settlement order with the SEC.

## EIGHTH AFFIRMATIVE DEFENSE

9.     Plaintiff Chilton fails to state a claim upon which relief can be granted because the fund in which she allegedly invested did not use CTB or its successor as transfer agent and therefore the alleged wrongdoing in the Complaint did not cause any damages to that fund or its shareholders.

## NINTH AFFIRMATIVE DEFENSE

10.     Plaintiff Weber fails to state a claim upon which relief can be granted because he did not purchase or sell any shares of the fund in which he allegedly invested during the alleged Class Period.

## TENTH AFFIRMATIVE DEFENSE

11.     Daidone reserves his right to assert additional affirmative defenses as they are ascertained during the course of discovery.

WHEREFORE, Lewis E. Daidone respectfully requests that this Court enter judgment as follows:

(i)      Dismissing the Complaint with prejudice,

(ii)     Awarding Daidone his costs and expenses incurred in defending this action, including reasonable attorneys' fees; and

(iii)    Granting Daidone such other and further relief as to this Court deems just and proper.

Dated:  Washington DC
      March 10, 2011

SCHULTE ROTH & ZABEL LLP

By:   /s/  Richard J. Morvillo
Richard J. Morvillo
(Richard.Morvillo@srz.com)
Peter H. White
(Peter.White@srz.com)
1152 Fifteenth Street, NW, Suite 850
Washington, DC 20005
(202) 729-7470

*Counsel for Defendant*
*Lewis E. Daidone*