**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| IN RE SMITH BARNEY<br>FUND TRANSFER AGENT LITIGATION | 05 Civ. 7583 (WHP) |
|---|---|

**MEMORANDUM OF LAW IN SUPPORT OF**
**LEAD PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................................ii

PRELIMINARY STATEMENT ............................................................................................1

STATEMENT OF FACTS .....................................................................................................2

I.  THE MATERIALLY MISLEADING AND INCOMPLETE
    DOCUMENTS FURTHERED DEFENDANTS' SCHEME ..............................................6

II.  HARM SUFFERED BY THE CLASS....................................................................................7

III.  DEFENDANTS ADMITTED TO THE SCHEME ............................................................7

IV.  THE PROPOSED CLASS REPRESENTATIVES ..............................................................8

ARGUMENT ........................................................................................................................11

I.  LEAD PLAINTIFF'S SECURITIES CLAIMS SHOULD PROCEED
    AS A CLASS ACTION ......................................................................................................11

    A.  Standard ........................................................................................................................12

    B.  The Class Meets the Requirements of Rule 23(a) .................................................13

        1.  The Class Is Sufficiently Numerous .....................................................13

        2.  There Are Questions of Law and Fact Common to the Class...................14

        3.  Plaintiffs' Claims Are Typical of the Claims of the Class.........................16

        4.  Plaintiffs Will Adequately Represent the Class........................................18

    C.  The Class Meets the Requirements of Rule 23(b)(3)............................................20

        1.  A Class Action Is Superior to Other Available Methods
           for the Efficient Adjudication of this Controversy ....................................23

    D.  Class Counsel Should Be Appointed Pursuant to Rule 23(g)...............................24

CONCLUSION......................................................................................................................25

# TABLE OF AUTHORITIES

## CASES

*Affiliated Ute Citizens v. United States,*
    406 U.S. 128 (1972)........................................................................................20, 21, 22

*In re Arakis Energy Corp. Sec. Litig.,*
    No. 95-CV-3431, 1999 WL 1021819 (E.D.N.Y. Apr. 27, 1999) ...........................................20

*Amchem Prods. v. Windsor,*
    521 U.S. 591 (1997).......................................................................................................19, 20

*Baffa v Donaldson, Lufkin & Jenrette Secs. Corp.,*
    222 F.3d 52 (2d Cir. 2000)..................................................................................................18

*In re Blech Sec. Litig.,*
    187 F.R.D. 97 (S.D.N.Y. 1999) ....................................................................................13, 24

*Brown v. Kelly,*
    609 F.3d 467 (2d Cir. 2010)...............................................................................................20

*Consol. Rail Corp. v. Town of Hyde Park,*
    47 F.3d 473 (2d Cir. 1995).................................................................................................13

*In re Currency Conversion Fee Antitrust Litig.,*
    264 F.R.D. 100 (S.D.N.Y. 2010) ...............................................................13, 16, 18, 19

*Dura Pharms., Inc. v. Broudo,*
    544 U.S. 336 (2005)............................................................................................................23

*In re Eaton Vance Corp. Sec. Litig.,*
    219 F.R.D. 38 (D. Mass. 2003).........................................................................................13

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.,*
    343 F.3d 189 (2d Cir. 2003)...............................................................................................21

*In re Energy Sys. Equip. Leasing Sec. Litig.,*
    642 F. Supp. 718 (E.D.N.Y. 1986) ..................................................................................17

*Erica P. John Fund, Inc. v. Halliburton Co.,*
    131 S. Ct. 2179 (2011)........................................................................................................11

*In re Flag Telecom Holdings, Ltd. Sec. Litig.,*
    574 F.3d 29 (2d Cir. 2009)............................................................................................12, 16

*Fogarazzo v. Lehman Bros., Inc. (Fogarazzo I),*
    232 F.R.D. 176 (S.D.N.Y. 2005) ...................................................................................21, 22

*Fogarazzo v. Lehman Bros., Inc. (Fogarazzo II),*
    263 F.R.D. 90 (S.D.N.Y. 2009) ...................................................................... *passim*

*Gen. Tel. Co. of Sw. v. Falcon,*
    457 U.S. 147 (1982) .................................................................................14, 16

*In re Initial Pub. Offering Sec. Litig. (IPO),*
    471 F.3d 24 (2d Cir. 2006) ..................................................................................12

*Marisol A. v. Giuliani,*
    126 F.3d 372 (2d Cir. 1997) ...............................................................................17

*In re Marsh & McLennan Cos., Inc. Sec. Litig.,*
    No. 04 Civ. 8144 (CM), 2009 WL 5178546 (S.D.N.Y. Dec. 23, 2009) ..................24

*In re NASDAQ Market-Makers Antitrust Litig.,*
    172 F.R.D. 119 (S.D.N.Y. 1997) .........................................................................16

*N.J. Carpenters Health Fund v. Residential Capital, LLC,*
    272 F.R.D. 160 (S.D.N.Y. 2011) .........................................................................16

*In re NYSE Specialists Sec. Litig.,*
    260 F.R.D. 55 (S.D.N.Y. 2009) ................................................................ 18-19, 20

*Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC,*
    595 F.3d 86 (2d Cir. 2010) ..................................................................7, 15, 18, 22, 23

*In re Oxford Health Plans, Inc.,*
    191 F.R.D. 369 (S.D.N.Y. 2000) .................................................14, 15, 16, 18, 20

*Robinson v. Metro-North Commuter R.R. Co.,*
    267 F.3d 147 (2d Cir. 2001) ..........................................................................16, 17

*In re Sadia, S.A. Sec. Litig.,*
    269 F.R.D. 298 (S.D.N.Y. 2010) .................................................................. *passim*

*Schaefer v. Overland Express Family of Funds,*
    169 F.R.D. 124 (S.D. Cal. 1996) .........................................................................14

*SEC v. Jones,*
    476 F. Supp. 2d 374 (S.D.N.Y. 2007) ...................................................................8

*Siemers v. Wells Fargo & Co.,*
    243 F.R.D. 369 (N.D. Cal. 2007) .........................................................................13

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
    551 U.S. 308 (2007) ..........................................................................................11

*In re Towers Fin. Corp. Noteholders Litig.,*
    177 F.R.D. 167 (S.D.N.Y. 1997) ..............................................................20

*Trief v. Dun & Bradstreet Corp.,*
    144 F.R.D. 193 (S.D.N.Y. 1992) ..............................................................17

*In re Vivendi Universal, S.A. Sec. Litig.,*
    242 F.R.D. 91 (S.D.N.Y. 2007) ..............................................................11

*Wal-Mart Stores, Inc. v. Dukes,*
    No. 10-277, 2011 WL 2437013 (June 20, 2011) ....................................12, 14, 16, 20

*In re WorldCom, Inc. Sec. Litig.,*
    219 F.R.D. 267 (S.D.N.Y. 2003) ..............................................................21

**RULES**

Fed. R. Civ. P. 23 .................................................................................... *passim*

Lead Plaintiff Operating Local 649 Annuity Trust Fund ("Lead Plaintiff" or "Local 649") respectfully submits this memorandum in support of its motion for an order, pursuant to Rules 23(a), 23(b)(3) and 23(g) of the Fed. R. Civ. P., to certify a class as defined below, to appoint Local 649, Jeffrey Weber, Colette Luff, Robert Yiambellis, Ann Yiambellis, the DVL 401(k) Plan, Bharat U. Shah, Steven W. Hall, David Zagunis, Richard W. Rees, Linda Rotskoff, and Renee Miller[1] as Class Representatives, and to appoint Bernstein Liebhard LLP ("Bernstein Liebhard") as Class Counsel.

## PRELIMINARY STATEMENT

Pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3), Lead Plaintiff requests certification of a class of mutual fund investors who were harmed by Defendants[2] who, through their wrongful conduct, misstatements and omissions, operated a fraud and deceit upon the class by engaging in, and failing to disclose, an elaborate scheme that inflated the profits of the mutual funds' investment adviser and its affiliate at the expense of the mutual fund shareholders. As such, Lead Plaintiff seeks certification of the following class of mutual fund shareholders:

> All persons and entities who purchased or redeemed shares of the Smith Barney mutual funds (the "Funds"),[3] between September 11, 2000 and May 31, 2005, and their successors in the interest (the "Class"),[4] and who were damaged thereby.

---

[1] Weber, Luff, R. Yiambellis, A. Yiambellis, the DVL 401(k) Plan, Shah, Hall, Zagunis, Rees, Rotskoff and Miller are collectively referred to as the "Proposed Class Representatives." Lead Plaintiff and the Proposed Class Representatives are collectively referred to herein as "Plaintiffs."

[2] "Defendants" mean Smith Barney Fund Management LLC (the "Adviser"), Citigroup Global Markets, Inc. ("Global Markets"), and Lewis Daidone ("Daidone").

[3] The Funds include the 29 mutual funds Plaintiffs invested in during the Class Period as set forth on Appendix A. On the date of this filing Defendants advised that the Salomon Brothers Investors Value Fund was not subject to the transfer agent fees at issue and thus, Ms. Rotskoff may not be a proper class representative. Plaintiffs are reviewing the information provided and will advise the Court if any changes to the Class definition are necessary. Plaintiffs reserve their right seek to modify the class definition to add additional Funds as developments occur in the facts and the law. *See* Fed. R. Civ. P. 23(c)(1)(c).

Claims such as these, arising from one common scheme and course of conduct, are ideally suited for class certification.  Here, Plaintiffs allege a common scheme and course of conduct whereby Defendants negotiated a contract for transfer agent services that saddled all of the Funds with excessive, misleadingly disclosed fees, a significant portion of which were kick-backs to a Smith Barney affiliate.  Defendants concealed this scheme from investors by failing to disclose in the Funds' prospectuses that the sub-transfer agent, First Data Group ("First Data"), was performing the same services it had previously performed under an expired contract at a substantially reduced rate, that a nominal transfer agent (an affiliate of Smith Barney) was performing only minimal functions, and that the affiliate was pocketing the difference between what it charged the Funds and what it paid First Data.

Plaintiffs and the Class have all been injured by the same course of conduct and material omissions and will rely on the same evidence and theories to prove their claims.  As shown herein, common issues predominate over any individual issues and class treatment is far superior to alternative methods of adjudicating Plaintiffs' and the Class's claims.[5]

## STATEMENT OF FACTS

The Adviser and the asset management operations of Global Markets are part of Citigroup Asset Management ("CAM"), a business unit of Citigroup Inc. ("Citigroup") that provided investment advisory and management services to Citigroup-sponsored funds during the

---

[4] Excluded from the Class are:  Defendants and any person, firm, trust, corporation, or other entity related to or affiliated with any of the Defendants and those who engaged in the alleged wrongful activity described in the Third Consolidated and Amended Class Action Complaint (the "Complaint").  References to the Complaint are referred to herein as "Compl. ¶__."

[5] Evidentiary support for Plaintiffs' claims are attached as exhibits to the Declaration of U. Seth Ottensoser in Support of Lead Plaintiff's Motion for Class Certification filed herewith (the "Ottensoser Decl.").  This evidentiary support is the result of discovery completed to date. Additional plaintiff depositions are scheduled in the upcoming weeks.  In addition, Plaintiffs shortly will be noticing the depositions of Defendants and third-parties.  Accordingly, Plaintiffs anticipate obtaining additional evidentiary support through on-going discovery.

Class Period.  Compl. ¶ 2.  In 1997, CAM began a study of the transfer agent ("TA") function in anticipation of the expiration of the existing contract between the Funds and First Data.  *Id*. Michael Yellin ("Yellin"), who reported to CAM's chief executive officer, Thomas W. Jones ("Jones"), supervised the TA review project, personally handled negotiations with First Data, and regularly briefed Jones on the status of the TA review project.  *Id*.

Jones knew that First Data had been making high profit margins on the TA contract with the Funds.  Compl. ¶ 3.  Instead of using CAM's strong bargaining position to benefit the Funds in the negotiation of a new contract however, Jones sought to keep most of the profit First Data had been making for CAM.  *Id*.  In fact, CAM did not inform the Funds' boards of directors (the "Boards") of an offer by First Data to continue to perform all transfer agent services for the Funds at a $25 million annual fee discount.  *Id*.[6]

Discussions with various transfer agents ensued and in March 1998, First Data offered deeper discounts to the Funds – measured as a percentage of the total annual TA fees that First Data would receive from the Funds.  The discounts would start at 32% in 1999 and increase by two percentage points a year, reaching 40% of total TA fees in 2003.  Compl. ¶ 62.[7]

Deloitte & Touche Consulting Group ("Deloitte"), an advisor to CAM, questioned whether the discount offered by First Data would be passed along to the Funds or kept by an internal affiliated TA.  Compl. ¶ 64.  In a presentation dated March 24, 1998, Deloitte questioned:

---

[6] *See also* SEC Ex. 123 (SEC 0012257-59) (March 12, 1998 letter from First Data to Yellin) ("FDC will provide Smith Barney with a concession of $25 million annually") attached as Exhibit 1 to the Ottensoser Decl.

[7] *See also* SEC Ex. 124 (CAMNY 301764-65) (illustrating the payments from First Data to Smith Barney as a percentage of the transfer agent revenue) attached as Exhibit 2 to the Ottensoser Decl.

☐ **Clarify the "Discount" proposed**
· *A true discount would go to the <u>funds</u>, not SSB TA*
· *This relationship will be extremely difficult to sell to* the fund boards[8]

On or about June 10, 1998, Deloitte again warned against the legality of the proposal:

☐ **First Data's proposal requires that First Data remains the TA; First Data received full revenues of TA fees, providing a "rebate" to SSB (proposed as a "discount" by First Data)**

· *This legal structure is questionable at best. Our advisors indicate that this arrangement would in no way be acceptable to* the fund boards *and may not be legally viable.*[9]

Accordingly, CAM and Daidone recommended that the Funds replace First Data with an affiliated transfer agent – Citicorp Trust Bank ("CTB"). Compl. ¶ 68. This recommendation called for CTB to contract directly with the Funds as named TA but perform only limited TA functions. CTB would in turn, subcontract with First Data for the bulk of the transfer agent services (CAM referred to First Data as "sub-TA"). Compl. ¶ 4. Except for a small customer service function that CTB would undertake, First Data would continue to perform the very same work it performed under the expiring contract, but at a significant discount from what it had been charging the Funds ― a discount that would start at 33.5% and increase to as much as 60% over the five-year term of the contract. *Id.* Rather than passing the savings on to the Funds, CAM, through CTB, kept the majority of the savings for itself, offering the Funds only a limited fee reduction through the institution of fee caps. *Id.*

CAM should have offered these substantial savings to the Funds and their shareholders. Compl. ¶ 5. At the very least, CAM should have disclosed the opportunity for significant savings to the Funds. Instead, CAM and Daidone presented a recommendation to the Funds'

---

[8] *See* SEC Ex. 9 (SEC 0090352-355) (Transfer Agency Initiative, First Data Proposal Analysis, March 24, 1998) attached as Exhibit 3 to the Ottensoser Decl.

[9] *See* SEC Ex. 134 (SEC 0016160-64) (Transfer Agency Project, Lunch and Learn – Financial Model Review, June 10, 1998) attached as Exhibit 4 to the Ottensoser Decl.

Boards that falsely gave the impression that the affiliated TA proposal was the best deal that the Funds could have achieved.  *Id.*; *see also* Compl. ¶¶ 83-96 (setting forth reasons why the March 4, 1999 recommendation was materially false and misleading).[10]  Among other things, CAM and Daidone failed to disclose that First Data would perform almost *all* of the same work as it did previously, with CTB taking most of the profit.  Compl. ¶ 5.

CAM's and Daidone's recommendation also contained material misrepresentations about the particulars of the arrangement, including the extent of the benefits CAM would realize.  Compl. ¶ 6.  CAM and Daidone also failed to disclose that CAM  entered into a side letter agreement (the "Side Letter") with First Data, pursuant to which First Data committed to providing millions of dollars of investment banking and asset management revenue to Citigroup entities (the "Revenue Guarantee").  Compl. ¶ 6.[11]  The Boards approved the recommendation and a contract applying to all of the Funds was entered into between CTB and First Data.[12]

As stated herein, Defendant Daidone played an instrumental role in the scheme.  Daidone was Senior Vice President and a director of the Adviser and a managing director of Global Markets during the Class Period and negotiated the very contracts that constituted the aforementioned self-dealing.  Compl. ¶ 7.  Further, as set forth above, Daidone helped prepare and present the materially misleading materials to the Funds' Boards.[13]  Importantly, as

---

[10] *See also* SEC Ex. 45 (SEC 0105091-98) (March 4, 1999 materially misleading memo from Daidone to the Smith Barney Investment Companies' board members) attached as Exhibit 5 to the Ottensoser Decl.

[11] *See also* SEC Ex. 18 (SEC 0111306-308) (Side Letter dated November 20, 1998) attached as Exhibit 6 to the Ottensoser Decl.

[12] *See* Subtransfer Agency and Services Agreement dated October 1, 1999 attached as Exhibit 7 to the Ottensoser Decl.

[13] *See* Exhibit 5 to the Ottensoser Decl.

discussed below, Daidone also signed many prospectuses containing materially misleading statements and omissions issued during the Class Period.

## I.  THE MATERIALLY MISLEADING AND INCOMPLETE DOCUMENTS FURTHERED DEFENDANTS' SCHEME

In prospectuses and other marketing documents issued throughout the Class Period (many of which were signed by Daidone), Defendants made misstatements and omissions concerning the sub-TA arrangement that misrepresented the nature of the transfer agent arrangement, failed to disclose the elaborate scheme to inflate profits (the motivating force behind creating the sub-TA), and failed to disclose the scheme to defraud shareholders of the Funds.  For example, the prospectuses made the transfer agent structure look like an innocent business circumstance:  "The transfer agent has entered into sub-transfer agency and services agreements with PFPC Global Fund Services[14] and PFS Shareholder Services to serve as the portfolios' sub-transfer agents."  Compl. ¶ 121.[15]  In reality, the sub-transfer agent structure was created solely to siphon money back to CAM through CTB.

In addition, Defendants misrepresented the services that CTB performed.  None of the prospectuses at issue disclosed the fact that CTB performed only a limited role.  None disclosed that First Data provided the vast majority of the transfer agent services.  Nor did any of the prospectuses disclose that First Data charged just a fraction of the fees that were drained from the Funds and that CAM, through CTB was assuming the full benefit of the discounts.  Compl. ¶¶ 122, 131.  These material statements and omissions, along with the participation of all the Defendants in the manipulative scheme at issue, violated Section 10(b) and Rule 10b-5.

---

[14] PFPC, Inc. ("PFPC") is the successor in interest to First Data.

[15] *See* Exhibit 8 to the Ottensoser Decl. (Amended Prospectus for the Smith Barney Investment Series dated September 11, 2000).  For the sake of brevity Plaintiffs are submitting a prospectus issued during the Class Period as one example of Defendants' false and misleading statements.

## II.     HARM SUFFERED BY THE CLASS

Defendants' arrangement with First Data enabled CTB (and CAM) to receive an estimated $100 million in net fees during the Class Period for operating a small customer service call center and performing limited additional oversight and quality control function, even though the total cost of these services was only approximately $10.5 million.  Compl. ¶ 111.  Thus, Defendants appropriated at least $90 million which rightfully belonged to shareholders of the Funds.  *Id*.  In addition, CAM and its affiliates received approximately $17 million under the Revenue Guarantee.[16]

As a result of the scheme, Plaintiffs and the Class suffered uniform harm.  Defendants' actions siphoned money out of the Funds and increased the Funds' expenses thereby harming the shareholders in their purchases and sales of shares of the Funds.  Plaintiffs and the Class also suffered definable lost opportunity damages because the amounts wrongfully removed would have grown at the rate of the particular fund.  *See Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt., LLC*, 595 F.3d 86, 96 (2d Cir. 2010) ("defendants' misrepresentations caused investors to make *and maintain* investments in Funds that were subject to excessive fees and expenses, and that the periodic deduction of those fees and expenses reduced the value of the investments over time").

## III.    DEFENDANTS ADMITTED TO THE SCHEME

Significantly, the Adviser and Global Markets have essentially admitted to the entire fraudulent scheme.  Compl. ¶ 10.  On May 31, 2005, Defendants entered into an agreement with

---

[16] *See, e.g.*, SEC Ex. 95 (SEC 0110559) (chart illustrating income and expenses of the scheme) attached as Exhibit 9 to the Ottensoser Decl.  The amount appropriated by the Citigroup entities is only an estimate; Plaintiffs cannot pinpoint the precise damages without the benefit of additional discovery.

the Securities and Exchange Commission ("SEC"), agreeing to pay a total of over $200 million

in fines and disgorgement penalties as a result of their violation of the Investment Advisors Act

("IAA"). *Id.* Similarly, on March 23, 2006, Yellin entered into an agreement with the SEC,

paying a fine of $50,000 as a result of his IAA violations, and also admitting to the facts as

alleged in the Complaint. *Id.* Further, Yellin has specifically implicated Daidone and Jones in

the scheme, as did the SEC in an action brought against them alleging IAA violations.[17] *Id.*

On February 25, 2010, almost five years after the SEC's May 31, 2005 Cease and Desist

Order, the SEC posted a revised proposed plan of distribution (the "Plan") for the disgorgement

and prejudgment portions of the settlement funds.[18] On April 15, 2010, the SEC approved the

Plan. The approved Plan provides that monies will be paid "directly to the Funds." Accordingly,

Class members who sold their Funds' shares during the Class Period will receive nothing from

the SEC settlement.

## IV.    THE PROPOSED CLASS REPRESENTATIVES

- **Local 649:** Lead Plaintiff Local 649 invested in the Smith Barney Capital Preservation Fund during the Class Period. Compl. ¶ 13. Lead Plaintiff has prosecuted this action, representing the absent class members, since 2005. Local 649's deposition is scheduled for July 19, 2011.

- **Jeffrey Weber:** Jeffrey Weber invested in the Smith Barney Large Cap Growth and Value Fund during the Class Period. Compl. ¶ 14. Mr. Weber testified as to the nature of the action, understands Plaintiffs' theory of damages, and will prosecute this case including attending trial if there is one.[19]

---

[17] The SEC's case against Daidone and Jones was later dismissed for failure to provide evidence that Daidone's and Jones' profits grew as a result of the scheme and because the conduct at issue occurred (in 1999) more than five years prior to the SEC complaint. *SEC v. Jones*, 476 F. Supp. 2d 374, 382, 386 (S.D.N.Y. 2007).

[18] *See* Release No. 34-61587, attached as Exhibit 10 to the Ottensoser Decl., *available at* http://www.sec.gov.litigation.admin/2010/34-61587.htm.

[19] Weber Tr. 96:25-97:13(transfer agent took out excessive fees which affected price of shares); 93:25-94:9 (describing damages incurred by the Class); 115:25-116:23 (will appear at trial) (the relevant excerpts from the Weber transcript are attached to the Ottensoser Decl. at Exhibit 11).

- **Robert and Ann Yiambellis:** Robert and Ann Yiambellis invested in the following Funds during the Class Period: Smith Barney Capital and Income Fund, Smith Barney Aggressive Growth Fund, Smith Barney Fundamental Value Fund, Smith Barney Large Cap Growth Fund, Smith Barney Mid Cap Core Fund, Smith Barney Small Cap Growth Fund, Smith Barney Small Cap Value Fund, and Salomon Smith Barney Appreciation Fund. Compl. ¶ 17. Mr. and Mrs. Yiambellis are familiar with the facts and allegations set forth in the Complaint[20] and both understand their responsibilities as class representatives.[21]

- **DVL 401(k) Plan:** DVL 401(k) Plan invested in the following Funds during the Class Period: Smith Barney Aggressive Growth Fund, Smith Barney Appreciation Fund, Smith Barney Fundamental Value Fund, Smith Barney High Income Fund, Smith Barney International All Cap Growth Fund, Smith Barney Investment Grade Bond Fund, Smith Barney Premium Total Return, Smith Barney Money Funds Cash Portfolio, Smith Barney Diversified Strategic Income Fund, Smith Barney Social Awareness Fund, Smith Barney Managed Governments Fund, Smith Barney Convertible Fund, and Salomon Smith Barney Small Cap Growth Fund. Compl. ¶ 18. The DVL 401(k) Plan, through its trustee Alan Casnoff, is an adequate class representative and is familiar with the facts and allegations alleged in the Complaint.[22]

---

[20] *See* A. Yiambellis Tr. 65:6-65:25 (was defrauded by Defendants' failure to disclose excessive fees); 103:22-104:4 (same); and 91:23-92:8 (seeking damages based on excessive fees taken out of her account) (the relevant excerpts from A. Yiambellis transcript are attached to the Ottensoser Decl. at Exhibit 12). R. Yiambellis Tr. 130:23-133:11 (testimony as to how Defendants defrauded the shareholders); 134:8-13 (prospectuses did not disclose kick-back scheme); 139:3-10 (Daidone signed the false prospectuses and was the architect of the scheme); 162:15-21 (explaining how the Funds were overcharged); 184:25-185:24 (transfer agent fees important to him no matter how small if the money was stolen) (relevant excerpts from the R. Yiambellis transcript are attached to the Ottensoser Decl. at Exhibit 13).

[21] *See* Exhibit 12 at 176:5-21 (would want to pursue litigation on behalf of all people hurt by Defendants' conduct); *see also* Exhibit 13 at 146:14-20 (Defendants "cheated people out of money," pursuing the lawsuit because it's the "right thing to do" "whether it's worth a penny or more").

[22] *See* Casnoff Tr. 50:25-51:14 (serves as a fiduciary and joined the lawsuit because he has a duty to try and get back money if participants were overcharged); 57:6-20 (reviewed and commented on multiple copies of the complaint); 90:20-91:9 (read the prospectus and was misled); 89:10-23 (describing the nature of the alleged fraud); 98:10-99:21 (same); 108:2-9 (explaining that Defendants should have negotiated the lowest fee); 119:16-120:5 (prospectus omitted information concerning reduced transfer agent fees and was therefore "not disclosure" but "false or misleading"); and 141:23-142-10 (explaining Plaintiffs' theory of damages) (relevant excerpts from the Casnoff transcript are attached to the Ottensoser Decl. at Exhibit 14).

- **David Zagunis:**  David Zagunis invested in the following Funds during the Class Period: Smith Barney Allocation Growth Fund, Smith Barney Peachtree Growth Fund, Smith Barney Growth Fund, and Smith Barney Large Cap Growth Fund.  Compl. ¶ 21.[23]  Mr. Zagunis is an adequate class representative and is familiar with the facts and allegations set forth in the Complaint.[24]

- **Renee Miller:**  Renee Miller invested in the Smith Barney Premium Total Return Fund during the Class Period.  Compl. ¶ 24. Ms. Miller is an adequate class representative, is familiar with the facts and allegations set forth in the Complaint,[25] and has expressed an willingness to act on behalf of the Class.[26]

- **Colette Luff:**  Colette Luff purchased shares in the Smith Barney Dividend Strategy Fund during the Class Period.  Compl. ¶ 15.  Ms. Luff's deposition has not yet been scheduled.

- **Bharat U. Shah:**  Bharat U. Shah purchased shares in the following Funds during the Class Period:  Smith Barney Aggressive Growth Fund, Smith Barney Dividend Strategy Fund, Smith Barney Financial Services Fund, the Smith Barney Appreciation Fund, and Smith Barney Fundamental Value Fund.  Compl. ¶ 19.  Mr. Shah's deposition is scheduled for July 29, 2011.

- **Steven W. Hall:**  Steven W. Hall purchased shares in the following Funds during the Class Period:  Smith Barney Social Awareness Fund, Smith Barney Aggressive Growth Fund, Smith Barney Appreciation Fund, Smith Barney Fundamental Value Fund, and Smith Barney Large Cap Growth Fund.  Compl. ¶ 20.  Mr. Hall's deposition has not yet been scheduled.

---

[23] *See* Zagunis Tr. 56:25-59:9 (testifying as to a typographical error in the Complaint and clarifying that he did not invest in the Smith Barney Large Cap Fund) (relevant excerpts from the Zagunis transcript are attached to the Ottensoser Decl. at Exhibit 15).

[24] *Id.* at 83:14-84-9 (describing the alleged fraud); 116:15-117:2 (same); 118:24-119:13 (explaining Plaintiffs' damages theory); 130:10-131:5 (believed information in prospectuses was truthful and complete).

[25] *See* Miller Tr. 85:6-14 (fraudulent for Smith Barney to profit on fees when they were not disclosed to investors or the Funds' Boards); 87:14-20 (same); 158:5-11 (amount of transfer fees important because the scheme impacted her); 166:9-17 (testifying as to lost opportunity damages); 209:6-22 (reviewed prospectuses and assumed they were accurate and truthful) (relevant excerpts of the Miller transcript are attached to the Ottensoser Decl. at Exhibit 16).

[26] *Id.* at 140:12-141:2 (testifying that she is included in Plaintiffs' damages claims and it doesn't matter how much she is entitled to recover); 160:2-19 (small amount of money is still important because of how it was used).

- **Richard W. Rees:**  Richard W. Rees purchased shares in the following Funds during the Class Period:  Smith Barney Aggressive Growth Fund, Smith Barney Appreciation Fund, Smith Barney Large Cap Core Growth Fund, Smith Barney Fundamental Value Fund, and Smith Barney Managed Muni Fund.  Compl. ¶ 22.  Mr. Rees's deposition is scheduled for July 26, 2011.

- **Linda Rotskoff:**  Linda Rotskoff purchased shares in the Salomon Brothers Investors Value Fund during the Class Period both individually and on behalf of her company, Jenlibrilo, Inc.  Compl. ¶ 23.[27]  Her deposition has been temporarily postponed.

## ARGUMENT

### I.    LEAD PLAINTIFF'S SECURITIES CLAIMS SHOULD PROCEED AS A CLASS ACTION

Class certification of securities fraud actions is consistent with established precedent in the United States Supreme Court and the Second Circuit.  *See, e.g.*, *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313-14, 320 n.4 (2007); *In re Vivendi Universal, S.A. Sec. Litig.*, 242 F.R.D. 91 (S.D.N.Y. 2007).  Indeed, in a recent decision, *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179 (2011), the Supreme Court reaffirmed the appropriateness of certifying class actions as a means of resolving claims based on the securities laws.   In *Halliburton*, the Supreme Court rejected the Fifth Circuit's "stringent loss causation requirement," holding that a plaintiff did not have to prove loss causation at the class certification stage in order to invoke the presumption of class-wide reliance.  *Halliburton*, 131 S. Ct. at 2184.

---

[27] The Complaint inadvertently states that Ms. Rotskoff only purchased shares on behalf of her company, Jenlibrilo, Inc.  However, as Ms. Rotskoff served Defendants with two separate Certifications, one reflecting the relevant trades on her own behalf and one reflecting trades made on behalf of Jenlibrilo, Inc., it has been clear from the outset that she seeks to serve as a Class Representative both with respect to her own trades and those trades made by Jenlibrilo, Inc.  *See* Ottensoser Decl. Exhibits 17 and 18 (Certifications served by Ms. Rotskoff).

A.      **Standard**

Class certification is governed by Rule 23 of the Federal Rules of Civil Procedure.  A party seeking class certification must first show that the class satisfies the following four requirements:  "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a).  Once a court determines that the Rule 23(a) requirements have been met, it may grant class certification if it finds that the plaintiffs satisfy at least one of the subsections of Rule 23(b). *Wal-Mart Stores, Inc. v. Dukes*, No. 10-277, 2011 WL 2437013, at *1, *20 (June 20, 2011). Here, Lead Plaintiff moves for class certification under Rule 23(b)(3), which requires that "questions of law or fact common to class members predominate over any questions affecting only individual matters, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

Courts should "assess all of the relevant evidence admitted at the class certification stage and determine whether each Rule 23 requirement has been met."  *In re Initial Pub. Offering Sec. Litig. (IPO)*, 471 F.3d 24, 42 (2d Cir. 2006).  Lead Plaintiff must satisfy the requirements of Rule 23 by a mere preponderance of the evidence. *Wal-Mart*, 2011 WL 2437013, at *7 n.7; *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009).  While a court's obligation to make such determinations is not lessened by an overlap between a Rule 23 requirement and a merits issue, "a district judge should not assess any [specific] aspect of the merits unrelated to a Rule 23 requirement."  *IPO*, 471 F.3d at 41.  Courts have "ample discretion to circumscribe both the extent of discovery concerning Rule 23 requirements and the extent of a hearing to determine whether such requirements are met in order to assure a class certification motion does not

become a pretext for a partial trial of the merits." *Id.* As demonstrated below, Lead Plaintiff has met its burden as the requirements of Rule 23(a) and 23(b)(3) have been satisfied.

### B.    The Class Meets the Requirements of Rule 23(a)

#### 1.    The Class Is Sufficiently Numerous

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "Impracticable does not mean impossible; joinder may merely be difficult or inconvenient, rendering use of a class action the most efficient method to resolve plaintiffs' claims." *Fogarazzo v. Lehman Bros., Inc., (Fogarazzo II)*, 263 F.R.D. 90, 96 (S.D.N.Y. 2009) (citation omitted). Sufficient numerosity can be presumed at a level of forty members or more. *In re Currency Conversion Fee Antitrust Litig.*, 264 F.R.D. 100, 111 (S.D.N.Y. 2010) (Pauley III, J.) (citing *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995)). Plaintiffs "may rely on reasonable inferences drawn from the available facts in order to estimate the size of the class," and a court "may make common sense assumptions to support a finding of numerosity." *In re Blech Sec. Litig.*, 187 F.R.D. 97, 103 (S.D.N.Y. 1999).

This case easily satisfies the numerosity requirement. There are hundreds of thousands of investors who purchased and/or sold shares of the Funds during the Class Period. Indeed, just one of the Funds, the Smith Barney Capital Preservation Fund, had over five million shares of Class A shares outstanding during the Class Period.[28] Thus, the Class, which consists of shareholders of all of the Funds, likely consists, at the very least, of hundreds of thousands of Class members. *See Siemers v. Wells Fargo & Co.*, 243 F.R.D. 369, 373 (N.D. Cal. 2007) (numerosity found given that thousands of investors purchased the mutual funds); *In re Eaton Vance Corp. Sec. Litig.*, 219 F.R.D. 38, 43 (D. Mass. 2003) (millions of shares of a mutual funds

---

[28] *See* Smith Barney Capital Preservation Fund II, Annual Report to Shareholders dated October 31, 2003 attached to the Ottensoser Decl. as Exhibit 19.

outstanding); *Schaefer v. Overland Express Family of Funds*, 169 F.R.D. 124 (S.D. Cal. 1996) (over 195 million shares of mutual fund outstanding).

### 2.    There Are Questions of Law and Fact Common to the Class

Rule 23(a)(2) requires that there be at least one question of law or fact common to the Class. *Wal-Mart*, 2011 WL 2437013, at *11 ("We quite agree that for purposes of Rule 23(a)(2) 'even a single [common] question' will do.'") (citation omitted). The requirement "does not mandate that all class members make identical claims and arguments." *Fogarazzo II*, 263 F.R.D. at 90. Rather, "[c]ommonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'" *Wal-Mart*, 2011 WL 2437013, at *7 (citing *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 148 (1982)). Where "there exists a common nucleus of operative facts affecting all members, common questions unquestionably prevail." *In re Oxford Health Plans, Inc.*, 191 F.R.D. 369, 374 (S.D.N.Y. 2000).

Here, all Class members have been harmed by the same course of fraudulent conduct – Defendants' misrepresentations and concealment of material facts regarding their self-dealing that drained money out of the Funds, increased the Funds' expenses, and distorted the net asset value ("NAV") of the Funds. There are numerous questions of law and fact concerning Defendants' deceptive scheme that are common to the entire Class, including: (i) whether Defendants implemented or engaged in the wrongful scheme alleged; (ii) whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; (iii) whether all Defendants participated in the scheme or acted to operate a fraud by knowingly or recklessly failing to disclose material information concerning the transfer agent fees charged to the Funds; (iv) whether particular Defendants are control persons under Section 20(a) of the Exchange Act; (v) whether there is a causal connection between the omissions and scheme and the economic

losses suffered by the Class; and (vi) the extent of and appropriate measure of damages suffered by the Class.  All Class members will need to establish these common issues in order to prove their claims.  Accordingly, the commonality requirement of Rule 23 is satisfied.  *See, e.g.*, *In re Sadia, S.A. Sec. Litig.*, 269 F.R.D. 298, 308 (S.D.N.Y. 2010) (commonality demonstrated where plaintiffs alleged a course of conduct affecting the entire class); *In re Oxford*, 191 F.R.D. at 374 ("Where the facts as alleged show that Defendants' course of conduct concealed material information from an entire putative class, the commonality requirement is met.").

Indeed, regardless which Funds they owned, proof of issues concerning Defendants' common course of conduct will not vary from one Class member to another.   As noted above, *one* contract between the affiliated TA, CTB, and First Data applied to *all* of the Funds.[29]  The decision to contract with CTB as the TA and have CTB sub-contract with First Data, and the omissions from the Funds' prospectuses of material facts concerning the structure of the TA services, fees, and kick-back arrangement, were common to all of the Funds and affected the Class as a whole.[30]  As such, the evidence needed to prove the existence, nature and significance of Defendants' fraudulent scheme is the same for all Class members.  Likewise, the evidence needed to prove that Defendants' public statements issued during the Class Period were materially false and misleading will be the same for all Class members.

The key issues of law are also common.  For example, the evidence needed to establish that Defendants' Class Period statements and omissions were material will be the same for all Class members.  While the Second Circuit has held that Plaintiffs have adequately alleged the materiality of Defendants' failure to disclose that CAM (though CTB) was assuming nearly the full benefit of the discounts generated by the Funds' agreement with First Data (*Smith Barney*

---

[29] *See* Exhibit 7 to the Ottensoser Decl.

[30] *See* Exhibits 1, 3 and 7 to the Ottensoser Decl.

*Fund Mgmt.*, 595 F.3d at 95), whether Plaintiffs will be able to prove this at trial, and the evidence needed to do so – is the same for the entire Class.  Whether Plaintiffs can establish loss causation as a result of Defendants' fraudulent scheme is also a Class-wide question.  Likewise, the proof necessary to establish that Daidone acted with the requisite scienter pursuant to Section 10(b) is the same for all Class members.  Accordingly, the commonality requirement is easily satisfied here.  *See Wal-Mart*, 2011 WL 2437013, at \*16 (even a single common question will do).

**3.      Plaintiffs' Claims Are Typical of the Claims of the Class**

The Supreme Court recently observed that "commonality and typicality requirements of Rule 23(a) tend to merge.  Both serve as guideposts for determining whether . . . the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence."  *Wal-Mart*, 2011 WL 2437013, at \*7, n.5 (citing *Falcon*, 457 U.S. at 157 n.13).  The "typicality prong requires that 'each class member's claim arise from the same course of events and each class member makes similar legal arguments to prove the defendant's liability.'"  *N.J. Carpenters Health Fund v. Residential Capital, LLC*, 272 F.R.D. 160, 165 (S.D.N.Y. 2011) (citing *Flag Telecom*, 574 F.3d at 35); *In re Currency Conversion*, 264 F.R.D. at 111.  Typicality ensures that absent class members are protected because the class representatives "have the [same] incentive to prove all the elements of the cause of action which would be presented by the individual members of the class were they initiating individualized actions."  *Oxford*, 191 F.R.D. at 375 (citation omitted); *see also In re NASDAQ Market-Makers Antitrust Litig.*, 172 F.R.D. 119, 126 (S.D.N.Y. 1997).

The Second Circuit has noted that Rule 23(a)(3)'s typicality requirement is not demanding.  *Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 155 (2d Cir. 2001). Typicality does not require that the situations of the named representatives and the class

members be identical.  *Trief v. Dun & Bradstreet Corp.*, 144 F.R.D. 193, 200 (S.D.N.Y. 1992).

Rather,

> Typicality refers to the nature of the claim of the class representative, and not to
> specific facts from which the claim rose or relief is sought.  The proper inquiry is
> whether other members of the class have the same or similar injury, whether the
> action is based on conduct not special or unique to the named plaintiffs, and
> whether other class members have been injured by the same course of conduct.
> Factual differences will not defeat class certification where the various claims
> arise from the same legal theory.  Thus, a difference in the amount of damage,
> date, size or manner of purchase, the type of purchaser, and even the specific
> document influencing the purchase will not render the claim atypical in most
> securities actions.

*In re Energy Sys. Equip. Leasing Sec. Litig.*, 642 F. Supp. 718, 750 (E.D.N.Y. 1986).  The

typicality requirement "may be satisfied where 'injuries derive from a unitary course of conduct

by a single system.'"  *Fogarazzo II*, 263 F.R.D. at 90 (quoting *Marisol A. v. Giuliani*, 126 F.3d

372, 377 (2d Cir. 1997)).

Plaintiffs' claims are typical of the claims of the Class because the same deceptive

scheme and course of conduct operated as a fraud upon the entire Class and "each class member

makes similar legal arguments to prove defendant's liability."  *Robinson*, 268 F.3d at 155

(quoting *Marisol A.*, 126 F.3d at 376).  As alleged in the Complaint, Defendants negotiated a

contract for transfer agent services that saddled *all* of the Funds with excessive, misleadingly

disclosed fees, a significant portion of which were kick-backs to a Smith Barney affiliate.

Defendants concealed this scheme from investors by failing to disclose in the Funds'

prospectuses that First Data continued to perform the same services it had previously performed

at a substantially reduced rate, or that the nominal transfer agent, CTB, would perform only

minimal functions but would pocket the difference between what it charged the Funds and what

it paid First Data.  Defendants also misled the Funds' Boards as to the benefits of the transfer

agreement structure through a misleading recommendation memo.[31]  As a result, Plaintiffs and the Class have all been injured similarly and seek damages arising from the same conduct – Defendants' siphoning of money out of the Funds and increasing the Funds' expenses.  *See Smith Barney Fund Mgmt.*, 595 F.3d at 96.

Accordingly, Plaintiffs stand in the same position as other Class members and must prove the same facts and legal theories that absent Class members must prove.  *See Currency Conversion*, 264 F.R.D. at 111 (named plaintiffs typical because they must prove the alleged conspiracy, its effectuation, and damages – "precisely what the absent class members must prove to recover"); *Oxford*, 191 F.R.D. at 375 (typicality satisfied where claims of the representative plaintiffs arose "from same conduct from which the other class members' claims and injuries arise"); *Sadia, S.A.*, 269 F.R.D. at 309 (same).  Plaintiffs have satisfied the typicality requirement.

### 4.      Plaintiffs Will Adequately Represent the Class

Rule 23(a)(4) requires that Plaintiffs show that they "will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  To meet this requirement, it is sufficient that (1) the interests of the proposed class representatives are not antagonistic to the other members of the Class; and (2) the attorneys they have selected to represent them and the Class are qualified, experienced and generally able to conduct the litigation.  *Baffa v Donaldson, Lufkin & Jenrette Secs. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000) (citations omitted).  Plaintiffs and their counsel, satisfy both prongs of the adequacy test.

First, Plaintiffs' interests are certainly not antagonistic to those of the proposed Class. This analysis focuses on "whether the proposed class representatives 'possess the same interest

---

[31] *See* Exhibit 5 to the Ottensoser Decl.

and suffer the same injury as the class members.'" *In re NYSE Specialists Sec. Litig.*, 260 F.R.D. 55, 73 (S.D.N.Y. 2009) (quoting *Amchem Prods. v. Windsor*, 521 U.S. 591, 625-26 (1997)). As discussed above, Plaintiffs purchased and/or sold shares in the Funds during the Class Period and have been injured by the same wrongful course of conduct as the Class.[32] Accordingly, it is in the interests of each of them to vigorously prosecute this action. *See Currency Conversion*, 264 F.R.D. at 112-13 (named plaintiffs alleging a unitary, overreaching, price-fixing conspiracy requires adequate representatives).

Indeed, Lead Plaintiff has vigorously prosecuted this action for over five years and has actively been engaged in the litigation, including appealing this Court's prior dismissal of the action. Plaintiffs have also been engaging in discovery, responding to document requests and appearing for depositions. Without a doubt, Plaintiffs will adequately protect the interests of the Class. *See Sadia, S.A.*, 269 F.R.D. at 309 (proposed class representatives who had litigated the action for over two years and engaged in motion practice and discovery adequately represented the putative class).

Second, Lead Plaintiff has protected the interest of the Class by retaining Bernstein Liebhard, who are qualified, experienced and able to conduct the litigation. Bernstein Liebhard has the experience to litigate this case going forward and, if necessary, try the case, having previously served as lead counsel in numerous other securities fraud cases.[33] Thus, Bernstein Liebhard is qualified to represent the Class, and as shown throughout the litigation, will vigorously protect the interests of absent Class members. Accordingly, the requirements of Rule 23(a)(4) are satisfied.

---

[32] *See also* Plaintiffs' Certifications, attached to the Ottensoser Decl. as Exhibits 17, 18 and 20 through 30, respectively.

[33] *See* Bernstein Liebhard's firm resume attached as Exhibit 31 to the Ottensoser Decl.

### C.      The Class Meets the Requirements of Rule 23(b)(3)

Having met each of the four requirements of Rule 23(a), Plaintiffs must show that the class is "maintainable" under one of the alternate prongs of Rule 23(b).  *Wal-Mart*, 2011 WL 2437013, at *7 n.6.  "The predominance requirement is met if the plaintiff can establish that the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole . . . predominate over those issues that are subject only to individualized proof." *Sadia*, *S.A.*, 269 F.R.D. at 306 (quoting *Brown v. Kelly*, 609 F.3d 467, 483 (2d Cir. 2010)). Predominance "does not require plaintiff to show that there are no individual issues." *NYSE Specialists*, 260 F.R.D. at 75.

Courts have frequently recognized that common questions of law or fact will predominate in securities fraud actions that allege materially false representations or omissions made to large groups of investors.  *See, e.g.*, *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153-54 (1972); *Oxford*, 191 F.R.D. at 377; *In re Arakis Energy Corp. Sec. Litig.*, No. 95-CV-3431, 1999 WL 1021819, at *10 (E.D.N.Y. Apr. 27, 1999) ("In securities fraud class actions in which the fraud is alleged to have been carried out through public communications to a wide variety of market participants, common issues of law and fact will generally predominate over individual issues.") (citing *In re Towers Fin. Corp. Noteholders Litig.*, 177 F.R.D. 167, 171 (S.D.N.Y. 1997)).  The Supreme Court has observed that the predominance requirement is "readily met in certain cases alleging consumer or securities fraud . . . ." *Amchem Prods.*, 521 U.S. at 625.

Plaintiffs allege that Defendants violated Section 10(b) and Rule 10b-5, and that Daidone, is jointly and severally liable under Section 20(a).  Compl. ¶¶ 145-56.  As set forth above, common issues far outnumber any individual issues that may arise.  The core issues of liability – Defendants' deceptive scheme, their failure to disclose material facts about the Funds' transfer agent services and fees in the Funds' prospectuses, their scienter, their participation in the

scheme, and whether Defendants' wrongful conduct proximately caused Plaintiffs' damages –
are issues common to the entire Class.

Further, while parties opposing certification often argue that individual questions of
reliance and loss causation outweigh common issues – this is not the case here.  First, as set forth
below, Plaintiffs are entitled to rely upon the presumption of reliance set forth in *Affilated Ute*
and thus, the question of reliance is again a Class-wide issue.  Second, questions concerning the
losses suffered by the Class are predicated on the same legal theory based on the same harm
caused to all of the Funds.  Thus, it is difficult (if not impossible) to discern any issues that are
not common to the entire Class.

To state their claims for securities fraud, Plaintiffs and the Class "must plead both
transaction causation (also known as reliance) and loss causation."  *Fogarazzo II*, 263 F.R.D. at
98 (citation omitted).  Reliance refers to "the casual link between the defendants' misconduct
and the plaintiff's decision to buy or sell securities."  *Emergent Capital Inv. Mgmt., LLC v.
Stonepath Group, Inc.*, 343 F.3d 189, 197 (2d Cir. 2003).  To establish reliance, a plaintiff must
show that "but for the claimed misrepresentations or omissions, the plaintiff would not have
entered into the detrimental securities transaction."  *Sadia, S.A.*, 269 F.R.D. at 307 (citation
omitted).

Here, reliance is presumed for the entire Class because Plaintiffs are entitled to rely on
the presumption set forth in *Affiliated Ute*, 406 U.S. at 153-54.  Under the *Affiliated Ute*
presumption, "reliance is presumed when the claim rests on the omission of a material fact."
*Fogarazzo v. Lehman Bros. Inc.* (*Fogarazzo I*), 232 F.R.D. 176, 185 (S.D.N.Y. 2005).  "There is
no burden to prove reliance on an omission."  *In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267,
298 (S.D.N.Y. 2003).  Rather, once the plaintiff establishes the materiality of an omission, the

defendant must prove "that even if the material facts had been disclosed, plaintiff's decision as to the transaction would not have been different from what it was." *Sadia, S.A.*, 269 F.R.D. at 308 (internal quotation marks and citation omitted); *Fogarazzo II*, 263 F.R.D. at 100 (same).

The Second Circuit has already held that Defendants' failure to disclose that CAM was assuming nearly the full benefit of the discounts generated by the Funds' agreement with First Data was material in that, there "exists a substantial likelihood that a reasonable investor would consider it important that her fiduciary was, in essence, receiving kickbacks." *See Smith Barney Fund Mgmt.*, 595 F.3d at 95.  As the Second Circuit noted, "[f]irst and foremost, what the Fund investors could not divine from the disclosures was that they were at the mercy of a faithless fiduciary." *Id.* at 93.  Indeed, Proposed Class Representative Casnoff (on behalf of the DVL 401(k) Plan) testified that if he knew of the transfer agent scheme, he would have found it significant.[34]  Even "where plaintiffs' claims are based on a combination of omissions and misstatements, courts in this Circuit have acknowledged the applicability of the *Affiliated Ute* presumption." *Fogarazzo I*, 232 F.R.D. at 186.  Accordingly, since the alleged omissions have been found to be material, Plaintiffs and the Class are entitled to rely on the *Affiliated Ute* presumption.

Loss causation is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff.  *Smith Barney Fund Mgmt.*, 595 F.3d at 95.  This again, is a Class-wide question.  As set above, Defendants' misrepresentations caused all Class members to make and maintain investments in the Funds that were subject to excessive fees and expenses and that the periodic deduction of these fees and expenses diminished the value of the investments over time.  The Second Circuit has already held that such allegations adequately

---

[34] *See* Exhibit 14 at 194:7-194:12.

alleged materiality and loss causation.  *See Smith Barney Fund Mgmt.*, 595 F.3d at 96 (citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 343-44 (2005)).

Questions as to the amount of losses suffered by the Class also predominate over any individual issues.  Each Class members' losses have been caused in the same manner, by the same conduct.  Each Class member invested or sold shares in the Funds that were undervalued during the Class Period because they were subject to excessive fees and expenses.  As a result, the NAV of all of the Funds was lower than what they should have been, reducing the Funds' assets available for investment over time, inflating the purchase price of the Funds for Class Members who purchased shares during the Class Period, and undervaluing the price of shares sold by Class Members during the Class Period.

Based on these common issues, and *inter alia*, the information contained in the SEC's Order Instituting Administrative and Cease and Desist Proceedings and trading and transfer records of each Fund during the Class Period, Plaintiffs will be able to ascertain how much each Class member was overcharged as a result of Defendants' scheme and wrongful course of conduct, thus, a Class member's damages will be easily calculated.  This is sufficient at the class certification stage.  *See Fogarazzo II*, 263 F.R.D. at 109 (finding damages could be easily calculated even though plaintiffs did not put forth a specific formula for calculating damages).  Thus, the predominance requirement is satisfied.

> **1.      A Class Action Is Superior to Other Available Methods for the Efficient Adjudication of this Controversy**

A plaintiff must establish that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  Rule 23(b)(3) also sets forth the following factors to be considered in making a "superiority" determination:

"[1]  the class members' interests in individually controlling the prosecution . . . of separate

actions; [2]  the extent and nature of any litigation concerning the controversy already begun by

. . . class members; [3]  the desirability . . . of concentrating the litigation of the claims in the

particular forum; and [4]  the likely difficulties in managing a class action."  *Id.*

A class is clearly superior to resolve identical claims of thousands of similarly-situated

investors in the Funds in one case.  *See In re Blech*, 187 F.R.D. at 107.  Conversely, the interest

of absent class members in individually controlling the prosecution of separate actions is

minimal, since the costs and expenses of individual actions, when weighed against the individual

recoveries potentially obtainable, would be prohibitive.  *See In re Marsh & McLennan Cos., Inc.*

*Sec. Litig.*, No. 04 Civ. 8144 (CM), 2009 WL 5178546, at *11 (S.D.N.Y. Dec. 23, 2009).

Lead Plaintiff and counsel have spent a significant amount of time and effort litigating

this case, including preparation of multiple complaints, resolution of disputed motions to

dismiss, an appeal to the Second Circuit, and partaking in ongoing discovery.  Further, the

parties have a mutual interest in proceeding in one forum, which will avoid inconsistent rulings

and promote the fair and efficient use of the judicial system.  Also, having already decided the

motions to dismiss, the Court is familiar with the claims in this case, making it desirable to

continue litigating in this forum.  Finally, managing this action as a class action will not pose any

substantial difficulties, since the procedures for managing this class action are well established.

### D.    Class Counsel Should Be Appointed Pursuant to Rule 23(g)

In the event class certification is granted, Lead Plaintiff respectfully requests that

Bernstein Liebhard be appointed as Class Counsel pursuant to Rule 23(g).  "[A] court that

certifies a class must appoint class counsel."  Fed. R. Civ. P. 23(g)(1).  In doing so, a court must

consider the following:  "(i) the work counsel had done in identifying or investigating potential

claims in the action; (ii) counsel's experience in handling class actions, other complex litigation,

24

and the types of claims asserted in the actions; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A). The Court "may also consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B).

Here, since its appointment as lead counsel in 2005, Bernstein Liebhard has actively and capably litigated this case, including its pre-and-post-filing investigation, preparation of pleadings, briefing and arguing motions to dismiss, briefing before the Second Circuit, document discovery, discovery of the Plaintiffs, and class certification. Bernstein Liebhard is fully committed to litigating this case and has devoted, and will continue to devote, the necessary resources to obtain a successful resolution.

## **CONCLUSION**

For the reasons set forth above, Lead Plaintiff respectfully requests that the Court grant its motion for class certification, appoint Lead Plaintiff and the Proposed Class Representatives as Class Representatives, and appoint Bernstein Liebhard to serve as Class Counsel.

Dated:  July 15, 2011
         New York, New York

BERNSTEIN LIEBHARD LLP

/s/
_____
Sandy A. Liebhard (liebhard@bernlieb.com)
U. Seth Ottensoser (ottensoser@bernlieb.com)
Stephanie M. Beige (beige@bernlieb.com)
Joseph R. Seidman, Jr. (seidman@bernlieb.com)
Brian Lehman (lehman@bernlieb.com)
10 East 40th Street
New York, New York  10016
Tel:  (212) 779-1414
Fax:  (212) 779-3218

*Lead Counsel for Lead Plaintiff and the Class*

## APPENDIX A

Smith Barney Aggressive Growth Fund
Smith Barney Allocation Growth Fund
Smith Barney Appreciation Fund
Smith Barney Capital and Income Fund
Smith Barney Capital Preservation Fund
Smith Barney Convertible Fund
Smith Barney Diversified Strategic Income Fund
Smith Barney Dividend Strategy Fund
Smith Barney Fundamental Value Fund
Smith Barney Financial Service Fund
Smith Barney Growth Fund
Smith Barney High Income Fund
Smith Barney International All Cap Growth Fund
Smith Barney Investment Grade Bond Fund
Smith Barney Large Cap Core Growth Fund
Smith Barney Large Cap Growth Fund
Smith Barney Large Cap Growth and Value Fund
Smith Barney Managed Governments Fund
Smith Barney Managed Muni Fund
Smith Barney Mid Cap Core Fund
Smith Barney Money Funds Cash Portfolio
Smith Barney Peachtree Growth Fund
Smith Barney Premium Total Return
Smith Barney Small Cap Growth Fund
Smith Barney Small Cap Value Fund
Smith Barney Social Awareness Fund
Salomon Brothers Investors Value Fund
Salomon Smith Barney Appreciation Fund
Salomon Smith Barney Small Cap Growth Fund