# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

IN RE SMITH BARNEY
TRANSFER AGENT LITIGATION

05 Civ. 7583 (WHP)

## ANSWER OF DEFENDANTS SBFM AND CGMI TO THE THIRD CONSOLIDATED AND AMENDED CLASS ACTION COMPLAINT

Defendants Smith Barney Fund Management LLC ("SBFM") and Citigroup Global Markets, Inc. ("CGMI") (together, "Defendants") answer the Third Consolidated and Amended Class Action Complaint (the "Third Amended Complaint") as set forth below.  Unless otherwise specified, Defendants deny or deny knowledge or information sufficient to form a belief as to all allegations in the Third Amended Complaint.

*Lead Plaintiff Operating Local 649 Annuity Trust Fund ("Plaintiff or "Local 649") brings this action as a class action on behalf of all persons and entities who purchased, redeemed, or held shares of the Smith Barney Funds (as defined herein) between September 11, 2000 and May 31, 2005 (the "Class Period"), and who were damaged thereby.  As a result of the wrongdoing alleged herein, the members of the Class (as defined below) were damaged.*

Defendants refer to the Third Amended Complaint for the true and correct contents thereof, and otherwise deny the allegations contained in the Preamble of the Third Amended Complaint.  Defendants respond further that the allegations as to the scope of this putative class action are denied insofar as the scope has been substantially narrowed by Orders of the United States Court of Appeals for the Second Circuit, *see* 595 F.3d 86 (Feb. 16, 2010), and this Court, *see* Docket # 121 (Jan. 25, 2011).  Defendants further respond that the statement in the Preamble of the Third Amended Complaint that purports to bring claims on behalf of persons or entities that "held" shares of the Smith Barney Funds conflicts with this Court's Order dismissing claims on behalf of holders and limiting any potential class to purchasers or sellers.  Docket # 121 (Jan. 25, 2011).

*Plaintiff alleges upon information and belief, except for paragraphs 14-25 hereof, which are alleged upon knowledge, as follows:*

## NATURE OF THE ACTION

1.      *This action concerns the scheme of two Citigroup-related investment advisers and two executives, to place their interests in making a profit ahead of the interests of the mutual*

*funds they served.[1] Defendant Smith Barney Fund Management LLC (the "Adviser"), which served as investment adviser to the Smith Barney Family of Funds (the "Funds"), recommended that the Funds contract with an affiliate of the Adviser, which would perform limited transfer agent services and sub-contract with the Funds' existing transfer agent. The existing transfer agent would perform almost all of the same services it had performed previously, but at deeply discounted rates, permitting the affiliate of the Adviser to keep most of the discount for itself and make a high profit for performing limited work. This self-interested transaction permitted the Adviser and its affiliates to pocket over $90 million from the transfer agent function at the direct expense of the Funds and their shareholders.*

1.      Defendants refer to the Third Amended Complaint for the true and correct contents thereof. Defendants otherwise deny the allegations contained in Paragraph 1 of the Third Amended Complaint, except admit that during the alleged Class Period SBFM served as investment advisor to the Smith Barney family of mutual funds and recommended that certain of the funds contract with an affiliate of SBFM for transfer agent services, which would sub-contract with the funds' existing transfer agent. With respect to footnote 1 to Paragraph 1 of the Third Amended Complaint, the first sentence states a legal conclusion to which no responsive pleading is required, and Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the second and third sentences, which allege facts relating to mutual funds and their advisers generally.

*2.      By way of background, the Adviser and the asset management operations of Defendant Citigroup Global Markets, Inc. ("Global Markets") were part of Citigroup Asset Management ("CAM"), a business unit of Citigroup Inc. ("Citigroup") that provides investment advisory and management services to Citigroup-sponsored funds. In 1997, CAM began a formal study of the transfer agent ("TA") function in anticipation of the expiration of the existing contract between the Funds and First Data Investor Services Group ("First Data"). Michael Yellin ("Yellin"), who reported to CAM's chief executive officer, Thomas W. Jones ("Jones"), supervised the TA review project and personally handled negotiations with First Data. Yellin briefed Jones on the status of the TA review project on a regular basis.*

2.      Defendants deny the allegations contained in Paragraph 2 of the Third Amended Complaint, except admit that SBFM and the asset management operations of CGMI were, during

---

[1] Investment advisers have a fiduciary duty to act in the best interests of the mutual funds they advise and their shareholders. Mutual funds pay fees for various services provided to the mutual funds, including transfer agent services. Among its duties, an adviser may advise fund boards about the retention of a particular transfer agent and how much to pay for the transfer agent's services.

the alleged Class Period, part of Citigroup Asset Management ("CAM"), which at that time was

a business unit of Citigroup Inc. that provided investment advisory and management services to

Citigroup-sponsored funds; that in 1997 CAM began a study of the transfer agent function before

the expiration of the contract between certain of the Smith Barney mutual funds and First Data

Investor Services Group ("First Data"); that Michael Yellin reported to Thomas Jones at one

more points in time during the alleged Class Period; that Jones was CAM's chief executive

officer at one or more points in time during the alleged Class Period; and that Jones received one

or more briefings on the transfer agent project from Yellin.

> *3.      Accordingly, Jones knew that First Data had been making high profit margins on the TA contract.  Instead of using CAM's strong bargaining position to benefit the Funds in the negotiation of a new TA contract, Jones sought to keep for CAM much of the profit First Data had been making.  In fact, CAM did not pursue or even inform the Funds' boards of an offer by First Data to continue to perform all transfer agent services for the Funds at a $25 million annual fee discount.*

3.      Defendants lack knowledge or information sufficient to form a belief as to the

truth or falsity of the allegations contained in the first sentence of Paragraph 3 of the Third

Amended Complaint.  Defendants deny the remaining allegations contained in Paragraph 3.

> *4.      CAM ultimately recommended that the Funds replace First Data with an affiliate of the Adviser.  The recommended structure called for the affiliated TA (which is now Citicorp Trust Bank, fsb ("CTB"))[2] to contract directly with the Funds as named TA, perform limited functions and subcontract with First Data for the bulk of the transfer agent service (CAM referred to First Data as "sub-TA").  Except for a small customer service function that the affiliated TA would undertake, First Data would continue to perform the very same work it performed under the expiring contract, but at a significant discount from the fees it had been charging the Funds — a discount that would start at 33.5% and increase to as much as 60% over the five-year term of the contract.  CAM kept the majority of the savings it had negotiated with First Data for itself, offering the Funds only a limited fee reduction through the institution of fee caps.*

4.      Defendants deny the allegations contained in Paragraph 4 of the Third Amended

Complaint, except admit that CAM recommended that certain of the Smith Barney mutual funds

---

[2] The Adviser initially anticipated that it would serve as the TA, but subsequently determined that CTB should serve as the TA.

contract directly with an affiliate of SBFM; that the affiliate, Smith Barney Private Trust

Company became Citicorp Trust Bank, fsb ("CTB"); that CTB performed certain transfer agent

services for the funds (including operating a customer service function) and sub-contracted with

First Data for certain other transfer agent services; and that Smith Barney Private Trust Company

contracted with First Data for a discount from First Data's standard fees, including a 33.5%

discount on total fee revenue for the period October 1, 1999 to September 30, 2000, and a 60%

discount on total fee revenue over $80 million for the period October 1, 2003 to May 31, 2004.

Defendants further admit that CAM offered the Smith Barney family of mutual funds a transfer

agent fee reduction through the institution of fee caps.  With respect to footnote 2 to Paragraph 4

of the Third Amended Complaint, Defendants admit that CAM at one time planned that SBFM

or its predecessor would serve as the funds' transfer agent, but subsequently decided that CTB

would serve as transfer agent.

> 5.     *CAM should have first offered these substantial savings to the Funds and their shareholders, as an opportunity belonging to the Funds and their shareholders.  At the very least, CAM should have disclosed this opportunity for significant savings to the Funds.  CAM did neither.  Instead, CAM took the opportunity for itself and then presented a recommendation to the Funds' boards in a memo that gave them the impression that the affiliated TA proposal was the best deal that the Funds could have achieved, which was not true.  In presenting its recommendation to the Funds' boards, CAM did not disclose that First Data was to perform almost all of the same work as before, with the affiliated TA taking most of the profit for doing limited work.*

> 5.     Defendants deny the allegations contained in Paragraph 5 of the Third Amended

Complaint, except to the extent that the first and second sentences of Paragraph 5 state a legal

conclusion, to which no responsive pleading is required.

> 6.     *CAM's recommendation also contained numerous material misrepresentations about the particulars of the arrangement, including the extent of the benefits CAM would realize.  Among other things, CAM failed to disclose that it had entered into a side letter agreement (the "Side Letter") with First Data, pursuant to which First Data committed to providing millions of dollars of investment banking and asset management revenue to Citigroup entities (the "Revenue Guarantee").*

6.      Defendants deny the allegations contained in Paragraph 6 of the Third Amended Complaint, except admit that CAM did not disclose the revenue guarantee agreement with First Data to the boards of certain of the Smith Barney mutual funds at the time they considered and approved hiring an SBFM affiliate as transfer agent.

*7.      Defendant Lewis Daidone ("Daidone") had an instrumental role in the scheme. Defendant Daidone was Senior Vice President and a director of the Adviser and a managing director of Global Markets during the Class Period.  Defendant Daidone negotiated the very contracts that constituted the aforementioned self-dealing.  Further, Defendant Daidone helped prepare and present the materially misleading materials to the Funds' boards.  Defendant Daidone also signed many prospectuses containing materially misleading statements and omissions about the Adviser, as discussed below.*

7.      Defendants deny the allegations contained in Paragraph 7 of the Third Amended Complaint, except admit that Lewis Daidone helped to prepare and present certain materials regarding the proposed transfer agent arrangement to the boards of certain of the Smith Barney mutual funds, and state that his electronic signature appears on prospectuses for certain Smith Barney mutual funds.

*8.      Non-party Jones was the CEO of CAM.  Jones made the decision to recommend the affiliated TA proposal to the Funds' boards, fully aware that the affiliated TA would make a huge windfall at the expense of Funds' shareholders through the proposal.  Jones also performed only a cursory review of the memorandum to the Funds' boards and took no meaningful steps to insure that the Funds' boards were informed of the material terms of the TA proposal.*

8.      Defendants lack information sufficient to form a belief as to the truth or falsity of the allegations contained in the last sentence of Paragraph 8 of the Third Amended Complaint. Defendants deny the remaining allegations contained in Paragraph 8, except admit that Thomas Jones, who is no longer a defendant after the Court's order dated January 25, 2011,  participated in the decision to recommend the transfer agent proposal to the boards of the Smith Barney family of mutual funds.

*9.      During the Class Period, CTB received an estimated $100 million in net fees for operating a small customer service call center and performing limited additional oversight and*

*quality control functions at a total cost of approximately $10.5 million. Thus, Citigroup entities appropriated approximately $90 million which rightfully belonged to shareholders of the Funds.[3]*

9. Defendants deny the allegations contained in Paragraph 9 of the Third Amended Complaint, except admit that during the alleged Class Period CTB received approximately $100 million in net fees for performing transfer agent services for the Smith Barney family of mutual funds, and that CTB's costs for providing such services were approximately $11 million. With respect to footnote 3 to Paragraph 9 of the Third Amended Complaint, Defendants deny any allegation of wrongdoing by SBFM or CGMI and deny any allegation that Plaintiff suffered damages as a result of SBFM or CGMI's actions, and with respect to the remainder of the footnote no responsive pleading is required.

*10. Significantly, Defendants Adviser and Global Markets have now admitted to the entire scheme of self-dealing described above. On May 31, 2005, the Adviser and Global Markets entered into an agreement with the Securities and Exchange Commission ("SEC"), agreeing to pay a total of over $200 million in fines and disgorgement penalties as a result of their violation of the Investment Advisers Act of 1940 ("IAA"). Similarly, on March 23, 2006, Adviser Executive Vice President Yellin entered into an agreement with the SEC, paying a fine of $50,000 as a result of his IAA violations, and also admitting to the facts as alleged herein. Further, Yellin has specifically implicated Defendant Daidone in the scheme.*

10. Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of whether Yellin purported to implicate Daidone in any wrongdoing. Defendants deny the remaining allegations contained in Paragraph 10 of the Third Amended Complaint, except admit that on May 31, 2005, without admitting or denying the findings therein, SBFM and CGMI consented to entry by the SEC of an Order Instituting Administrative and Cease-and-Desist Proceedings, and refer to that document for the true and correct contents thereof. Defendants also refer to the March 23, 2006 Order Instituting Administrative and Cease-and-Desist Proceedings entered by the SEC against Michael Yellin.

---

[3] The amount appropriated by the Citigroup entities is only an estimate; Plaintiff cannot pinpoint the precise damages without the benefit of discovery.

*11.     In prospectuses throughout the Class Period (many of which were signed by Defendant Daidone), the issuers (who were the Funds themselves or families of Funds) made statements concerning the sub-TA arrangement that were misleading due to their failure to disclose the elaborate scheme to inflate profits which was the motivating force behind creating the sub-TA.  These statements, along with the participation of all the Defendants in the manipulative scheme at issue, violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").*

11.     Defendants deny the allegations contained in the first sentence of Paragraph 11 of the Third Amended Complaint, except state that Daidone's electronic signature appears on prospectuses for certain of the Smith Barney mutual funds at one or more points in time during the alleged class period.  The second sentence of Paragraph 11 states a legal conclusion as to which no responsive pleading is required.

*12.     As a result of the scheme, Plaintiff and members of the Class suffered harm. Among other things, Defendants' actions drained money out of the Funds throughout the Class Period, increased the Funds' expenses, and distorted the net asset value ("NAV") of the Funds.*

12.     Defendants deny the allegations contained in Paragraph 12 of the Third Amended Complaint.

## PARTIES

*13.     Lead Plaintiff Operating Local 649 Annuity Trust bought and/or redeemed shares of one of the Funds, the Smith Barney Capital Preservation Fund, during the Class Period, as evidenced by its certification filed with its lead plaintiff motion.*

13.     Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 13 of the Third Amended Complaint and the statements in Operating Local 649 Annuity Trust's certification.

*14.     Plaintiff Jeffrey Weber bought and/or redeemed shares in the Smith Barney Large Cap Growth and Value Fund during the Class Period, as demonstrated by his attached amended certification.*

14.     Defendants deny that Plaintiff Webber "bought and/or redeemed shares" in the Smith Barney Large Cap Growth and Value Fund during the alleged Class Period.  Based on information and belief, Defendants admit that Mr. Weber acquired shares of the Smith Barney

Large Cap Growth and Value Fund through automatic reinvestment of dividends and/or capital gains.

*15.     Plaintiff Colette Luff bought and/or redeemed shares in the Smith Barney Dividend Strategy Fund during the Class Period, as demonstrated by her attached certification.*

15.     Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 15 of the Third Amended Complaint and the statements in Luff's attached certification.

*16.     Plaintiff CTL/Thompson Inc. bought and/or redeemed shares in the Smith Barney Global Government Fund during the Class Period, as demonstrated by its attached certification.*

16.     Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 16 of the Third Amended Complaint and the statements in CTL/Thompson Inc.'s attached certification.

*17.     Plaintiffs Robert and Ann Yiambellis bought and/or redeemed shares in the Smith Barney Capital and Income Fund, Smith Barney Aggressive Growth Fund, Smith Barney Fundamental Value Fund, Smith Barney Large Cap Growth Fund, Smith Barney Mid Cap Core Fund, Smith Barney Small Cap Growth Fund, Smith Barney Small Cap Value Fund, and the Salomon Smith Barney Appreciation Fund during the Class Period, as demonstrated by their attached certifications.*

17.     Based on information and belief, Defendants admit that Plaintiffs Robert and Ann Yiambellis bought and/or redeemed shares in the Funds listed in Paragraph 17 of the Third Amended Complaint during the alleged Class Period.  Defendants lack knowledge or information sufficient to form a belief as to whether the Yiambellises' attached certification accurately reflects their alleged purchases and redemptions.  Defendants further respond that, based on information and belief, some of Robert and Ann Yiambellis' acquisitions of shares of the Funds listed in Paragraph 17 were through automatic reinvestments of dividends and/or capital gains.

*18.     Plaintiff DVL 401(k) Plan bought and/or redeemed shares in the Smith Barney Aggressive Growth Fund, the Smith Barney Appreciation Fund, the Smith Barney Fundamental*

*Value Fund, the Smith Barney High Income Fund, the Smith Barney International All Cap Growth Fund, the Smith Barney Investment Grade Bond Fund, the Smith Barney Premium Total Return, the Smith Barney Money Funds Cash Portfolio, the Smith Barney Diversified Strategic Income Fund, the Smith Barney Social Awareness Fund, the Smith Barney Managed Governments Fund, the Smith Barney Convertible Fund, and the Salomon Smith Barney Small Cap Growth Fund, as stated in its attached certification.*

18.     Defendants deny that the Salomon Smith Barney Small Cap Growth Fund was one of "the Funds" to the extent that term is defined to mean the Smith Barney family of mutual funds which used CTB as transfer agent and for which SBFM served as the primary investment advisor during the alleged Class Period.  Based on information and belief, Defendants admit that participants in the DVL 401(k) Plan purchased shares in one of the funds listed in Paragraph 18 of the Third Amended Complaint during the alleged Class Period.  Defendants further respond that the certification filed by Plaintiff DVL 401(k) Plan does not identify the dates of its alleged purchases or sales of the identified Smith Barney Funds and Paragraph 18 does not allege these purchases or sales occurred during the alleged Class Period, and that any purchases that occurred outside the alleged Class Period fail to state a claim.

*19.     Plaintiff Bharat U. Shah bought and/or redeemed shares in the Smith Barney Aggressive Growth Fund, the Smith Barney Dividend Strategy Fund, the Smith Barney Financial Service Fund, the Smith Barney Appreciation Fund, and the Smith Barney Fundamental Value Fund during the Class Period, as demonstrated by his attached certification.*

19.     Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 19 of the Third Amended Complaint and the statements in Shah's attached certification.

*20.     Plaintiff Steven W. Hall bought and/or redeemed shares in the Smith Barney Social Awareness Fund, Smith Barney Aggressive Growth Fund, Smith Barney Appreciation Fund, Smith Barney Fundamental Value Fund, and the Smith Barney Large Cap Growth Fund during the Class Period, as demonstrated by his attached certification.*

20.     Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 20 of the Third Amended Complaint and the statements in Hall's attached certification.

*21.     Plaintiff David Zagunis bought and/or redeemed shares in the Smith Barney Allocation Growth Fund, the Smith Barney Large Cap Fund, the Smith Barney Peachtree Growth Fund, the Smith Barney Growth Fund, and the Smith Barney Large Cap Growth Fund during the Class Period, as demonstrated by his attached certification.*

21.     Defendants deny that Plaintiff David Zagunis "bought and/or redeemed" shares in the funds listed in Paragraph 21 of the Third Amended Complaint during the alleged Class Period.  Based on information and belief, Defendants admit that Mr. Zagunis acquired shares of the Funds listed in Paragraph 21 and his attached certification through automatic reinvestments of dividends and/or capital gains, the merger of two mutual funds, or the exchange of shares in one Fund for shares in another Fund.  Defendants further respond that, upon information and belief, the "Smith Barney Growth Fund" does not exist and never existed, and Plaintiff cannot maintain a claim based on a non-existent mutual fund.

*22.     Plaintiff Richard W.  Rees bought and/or redeemed shares in the Smith Barney Aggressive Growth Fund, Smith Barney Appreciation Fund, Smith Barney Large Cap Core Growth Fund, Smith Barney Fundamental Value Fund, and Smith Barney Managed Muni Fund during the Class Period, as demonstrated by his attached certification.*

22.     Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 22 of the Third Amended Complaint and the statements in Rees' attached certification.  Defendants further respond that, upon information and belief, a Fund named the "Smith Barney Large Cap Core Growth Fund" does not exist and never existed, and Plaintiff cannot maintain a claim based on a non-existent mutual fund.

*23.     Plaintiff Linda Rotskoff, on behalf of her Company, Jenlibrilo, Inc., bought 1943.5040 shares of the Salomon Brothers Investors Value Fund at prices ranging from $13.31 to $22.38 during the Class Period.  Plaintiff Rotskoff, on behalf of Jenlibrilo, previously provided records to her counsel, but was out of touch with her counsel at the time this second Third*

*Amended Complaint was filed. She will submit a certification attesting to these transactions as soon as possible.*

23. Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 23 of the Third Amended Complaint and the statements in Ms. Rotskoff's attached certification..

*24. Plaintiff Renee Miller bought and/or redeemed shares of the Smith Barney Premium Total Return Fund during the Class Period, as demonstrated by her attached certification.*

24. Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 24 of the Third Amended Complaint and the statements in Ms. Miller's attached certification.

*25. Defendant Smith Barney Fund Management LLC (the Adviser) was a limited liability company organized under the laws of Delaware and a subsidiary of Citigroup Global Market Holdings, Inc. At all relevant times, the Adviser was located at 333 West 34th Street, New York City. The Adviser was registered with the SEC as an investment adviser pursuant to Section 203 (c) of the IAA, and served as investment adviser to the Funds. The Adviser was part of CAM, the Citigroup business unit that provided investment advisory and management services to Citigroup-sponsored funds, including the Funds.*

25. Defendants deny the allegations contained in Paragraph 25 of the Third Amended Complaint, except admit that, at one or more points in time during the alleged Class Period, SBFM was a limited liability company organized under the laws of Delaware and a subsidiary of Citigroup Global Market Holdings, Inc.; that SBFM was registered with the SEC as an investment adviser; that SBFM served as investment adviser to the Smith Barney family of mutual funds; and that SBFM was part of CAM, which was the Citigroup business unit that provided investment advisory and management services to Citigroup-sponsored funds, including the Smith Barney family of mutual funds.

*26. At all relevant times, Defendant Global Markets was a New York corporation and a direct subsidiary of Citigroup Global Markets Holdings, Inc., and an indirect subsidiary of Citigroup. Formerly known as Salomon Smith Barney Inc., Global Markets was a registered*

*investment adviser and broker-dealer. The asset management segment of Global Markets fell within the CAM business unit.*

26. Defendants deny the allegations contained in Paragraph 26 of the Third Amended Complaint, except admit that CGMI was, at one or more points in time during the alleged Class Period, a New York corporation, a direct subsidiary of Citigroup Global Markets Holdings, Inc., and an indirect subsidiary of Citigroup; was formerly known as Salomon Smith Barney Inc.; and was at one or more points in time during the alleged Class Period a registered investment adviser and broker-dealer. Defendants further admit that the asset management business of CGMI, at one or more points in time during the alleged Class Period, fell within the CAM business unit.

*27. Defendant Daidone was Senior Vice President and a director of the Adviser, Managing Director of Global Markets, and Principle Accounting Officer for many subfamilies of the Funds during the Class Period.*

27. Defendants deny the allegations contained in Paragraph 27 of the Third Amended Complaint, except admit that that, from 1999 or 2000 until 2004, Daidone was employed as Senior Vice President of SBFM and Managing Director of CGMI.

## OTHER RELEVANT ENTITIES

*28. At all relevant times, CTB was a chartered federal savings bank and is an indirect subsidiary of Citigroup. CTB was registered as a transfer agent and an investment adviser. CTB provided customer service and oversight functions for the Funds and contracts with PFPC, Inc. ("PFPC"), as successor to First Data, for technology, transaction processing and other services. In addition, CTB's trust department provided investment advisory and other services for high net worth clients.*

28. Defendants deny the allegations contained in Paragraph 28 of the Third Amended Complaint, except admit that CTB is a chartered federal savings bank and an indirect subsidiary of Citigroup; that, at one or more points during the alleged Class Period, CTB was registered with the SEC as a transfer agent and investment adviser, provided certain transfer agent services for certain of the Smith Barney mutual funds, and contracted with PFPC, Inc. ("PFPC") for

certain other transfer agent services; and that CTB's trust department provides investment

advisory and other services for high net worth clients.

*29.     At all relevant times, Citigroup was a global financial services company that was organized under the laws of Delaware and maintains its headquarters in New York, New York. Citigroup was formed in October 1998, by the merger of Citicorp and Travelers Group Inc. ("Travelers").  Prior to the merger, the Adviser, Global Markets and CAM, were divisions or subsidiaries of Travelers.*

29.     Defendants admit the allegations contained in Paragraph 29 of the Third

Amended Complaint.

*30.     The Funds consisted of more than 105 open-end management investment companies registered with the SEC, and include equity, money market, fixed income, municipal, and various specialty funds.  At all relevant times, all of the directors of the Funds are unaffiliated except the chairman, who is an employee and officer of the Adviser.*

30.     Defendants deny the allegations contained in Paragraph 30 of the Third Amended

Complaint, except admit that, at one or more points in time during the alleged Class Period, the

Smith Barney family of mutual funds consisted of more than 105 open-end management

investment companies registered with the SEC,  included equity, money market, fixed income,

municipal, and various specialty funds; and that, at one or more points in time during the alleged

Class Period, the directors of the Smith Barney family of mutual funds were unaffiliated except

the chairman, who was an employee and officer of SBFM.

*31.     CAM is the Citigroup business unit that provided investment advisory and management services to Citigroup-sponsored funds, including the Funds.  Various Citigroup entities fell within and comprised CAM, including the Adviser, the asset management operations of Global Markets, and the other registered investment advisers for the Citigroup- sponsored funds.  Although the investment advisers, including the Adviser, were separate juridical entities, with their own officers and employees, they were limited in size and function.  The bulk of the administrative services that the advisers provided to their respective fund families were performed by Global Markets employees who fell within the CAM unit.*

31.     Defendants deny the allegations contained in Paragraph 31 of the Third Amended

Complaint, except admit that, at one or more points in time during the alleged Class Period,

CAM was the Citigroup business unit that provided investment advisory and management

services to Citigroup-sponsored funds, including the Smith Barney family of mutual funds; that

various Citigroup entities fell within and comprised CAM (including SBFM, the asset

management operations of CGMI, and the other registered investment advisers for the Citigroup-

sponsored funds); that SBFM was a separate legal entity with its own officers and employees;

and that some advisory services were provided to the Smith Barney family of mutual funds by

CGMI employees who fell within the CAM business unit.

*32.     First Data, a subsidiary of First Data Corporation, provided transfer agent and other services to mutual funds until December 1999.  First Data served as full-service TA to the Funds from June 1, 1989 until September 30, 1999, after which it became sub-TA.  In or around December 1999, First Data Corporation sold the transfer agent unit to PFPC, which assumed the role of sub-TA for the Funds.  (The term "First Data" will be used to refer to the TA unit. The parent company will be referred to as "First Data Corporation").*

32.     Defendants deny the allegations contained in Paragraph 32 of the Third Amended

Complaint, except admit that First Data was until December 1999 a subsidiary of First Data

Corporation; that First Data provided transfer agent and other services to mutual funds including

the Smith Barney family of mutual funds or their predecessors from June 1, 1989 until

September 30, 1999, after which First Data became a sub-transfer agent to another transfer agent

for certain of those funds; that First Data Corporation in December 1999 sold First Data to

PFPC; and that in December 1999 PFPC assumed the role of sub-transfer agent for certain of the

Smith Barney mutual funds.  As to the last parenthetical sentence of Paragraph 25, no responsive

pleading is required.

*33.     PFPC acquired First Data in late 1999, assumed First Data's obligations under a sub-TA agreement with CTB, and then served as sub-TA for the Funds.*

33.     Defendants deny the allegations contained in Paragraph 33 of the Third Amended

Complaint, except admit that PFPC acquired First Data in late 1999 and assumed First Data's

obligations as sub-transfer agent under an agreement with CTB, and, from that time until the end

of the alleged Class Period, PFPC served as a sub-transfer agent to the Smith Barney family of

mutual funds.

## JURISDICTION AND VENUE

34.    *The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a)*
*of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)], Rule 10b-5 promulgated under Section*
*10(b) by the SEC [17 C.F.R. § 240.10b-5].*

34.    Paragraph 34 states a legal conclusion as to which no responsive pleading is

required.  To the extent a response is required, Defendants refer to the Third Amended

Complaint for the true and correct contents thereof and note that Orders of the United States

Court of Appeals for the Second Circuit, *see* 595 F.3d 86 (Feb. 16, 2010), and this Court, *see*

Docket # 121 (Jan. 25, 2011), have substantially narrowed the claims asserted therein.

35.    *This Court has jurisdiction over the subject matter of this action pursuant to 28*
*U.S.C. §§1331 and 1337, Section 27 of the Exchange Act [15 U.S.C. § 78aa].*

35.    Paragraph 35 states a legal conclusion as to which no responsive pleading is

required.

36.    *Venue is proper in this District because many of the wrongful acts alleged herein*
*took place or originated in this district.*

36.    Paragraph 36 states a legal conclusion as to which no responsive pleading is

required.

## CLASS ACTION ALLEGATIONS

37.    *Plaintiff brings this action as a class action, pursuant to Federal Rule of Civil*
*Procedure 23, on behalf of all purchasers and/or redeemers of the mutual fund shares or other*
*ownership interests of one or more of the Funds from September 11, 2000 through May 31, 2005,*
*who were damaged thereby (except the Defendants herein and any person, firm, trust,*
*corporation, or other entity related to or affiliated with any of the Defendants and those who have*
*engaged in the wrongful activities described herein) and their successors in interest (the "Class")*

37.    Defendants deny the allegations contained in Paragraph 37 of the Third Amended

Complaint, except admit that Plaintiff purports to bring this action as a class action pursuant to

Federal Rule of Civil Procedure 23 on behalf of all purchasers, redeemers and holders of shares or other ownership interests of one or more of the Smith Barney family of mutual funds from September 11, 2000 through May 31, 2005, and their successors in interest.  Defendants respond further that the allegations as to the scope of this putative class action are denied insofar as the scope has been substantially narrowed by Orders of the United States Court of Appeals for the Second Circuit, *see* 595 F.3d 86 (Feb. 16, 2010), and this Court, *see* Docket # 121 (Jan. 25, 2011).

   *38. This action is properly maintainable as a class action.*

   38. Defendants deny the allegations contained in Paragraph 38 of the Third Amended Complaint, except to the extent that Paragraph 38 states a legal conclusion as to which no responsive pleading is required.

   *39. The Class is so numerous that joinder of all members is impracticable. There are millions of shares of the Funds outstanding.*

   39. Defendants admit that there are millions of outstanding shares of the funds that were previously part of the Smith Barney family of mutual funds and are now part of the Legg Mason Partners funds, and deny the remaining allegations contained in Paragraph 39 of the Third Amended Complaint, except to the extent that Paragraph 39 states a legal conclusion as to which no responsive pleading is required.

   *40. There are questions of law and fact which are common to the Class including, inter alia, the following:  (a) whether Defendants made omissions of material fact; (b) whether Defendants participated in a manipulative scheme; and (c) whether Defendants have benefited to the detriment of Plaintiff and the other members of the Class.*

   40. Defendants deny the allegations contained in Paragraph 40 of the Third Amended Complaint, except to the extent that Paragraph 40 states a legal conclusion as to which no responsive pleading is required.

*41.     Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  The claims of the Plaintiff are typical of the claims of other members of the Class and Plaintiff has the same interests as the other members of the Class.  Plaintiff will fairly and adequately represent the Class.*

41.     Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in the first sentence of Paragraph 41 of the Third Amended Complaint.  Defendants deny the remaining allegations contained in Paragraph 41, except to the extent that it states a legal conclusion as to which no responsive pleading is required.

*42.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action. This Court is an appropriate forum for this dispute.*

42.     Defendants deny the allegations contained in Paragraph 42 of the Third Amended Complaint, except to the extent it states a legal conclusion as to which no responsive pleading is required.

## STATEMENT OF FACTS

### The TA Function and First Data Contract

*43.     From 1994 through September 30, 1999, First Data served as full-service TA for the Funds. As transfer agent, First Data performed a variety of functions for the Funds, including processing buy and sell transactions in Funds shares, processing dividend transactions, calculating daily net asset values, calculating sales charges and commissions, operating a customer service call center, distributing proxy and other materials, and performing a variety of additional accounting functions, including year-end tax reporting.*

43.     Defendants deny the allegations contained in Paragraph 43 of the Third Amended Complaint, except admit that from 1994 through September 30, 1999, First Data provided transfer agent services for certain of the Smith Barney mutual funds, including processing buy and sell transactions, processing dividend transactions, calculating sales charges and

commissions, operating a customer service call center, distributing proxy and other materials, and performing additional accounting functions including year-end tax reporting.

44.    *The Funds' business was very profitable to First Data as a result of a very favorable fee schedule and the low cost of servicing the Funds. Because the Funds were proprietary— sold mostly by Smith Barney brokers — many of the TA functions are and at all relevant times were highly automated. In addition, Smith Barney brokers performed most of the customer service work — shareholders typically called them with questions and requests. Accordingly, First Data's customer service function was limited, and consisted primarily of a small call center of approximately eight to twelve people who fielded inquiries from Smith Barney Brokers and shareholders who did not have brokers (who constitute a small minority of Funds shareholders). As a result of a favorable fee schedule and the low cost of servicing the Funds, First Data realized high profit margins throughout the 1990s, particularly in the late 1990s, when the fee structure changed from a per-account fee to a fee based on a percentage of assets. As a result of strong markets of the late 1990s, the Funds' assets, and thus TA fees, increased.*

44.    Defendants lack knowledge or information sufficient to form a belief as to the profitability of First Data's business with certain of the Funds.  Defendants deny the remaining allegations contained in Paragraph 44 of the Third Amended Complaint, except admit that the Smith Barney family of mutual funds were sold mostly by Smith Barney brokers throughout the alleged Class Period; that during the alleged Class Period some transfer agent services were automated; that Smith Barney brokers provided customer service to the Smith Barney family of mutual funds; that, while First Data was transfer agent for the funds, it also provided customer service to the funds, which included operating a call center that answered questions from brokers and shareholders; that in the late 1990s the fees First Data charged to the Smith Barney family of mutual funds for transfer agent services were calculated on a per-account basis for some funds and a percentage of assets basis for other funds; and that in the late 1990s certain of the Smith Barney mutual funds' assets, as well as transfer agent fees, increased.

**The TA Review Process**

45.    *Pursuant to a non-compete agreement between the predecessors of First Data and the Adviser and Global Markets, CAM was prevented from offering TA services until the expiration of that non-compete agreement in 1999. With the First Data contract and the non-*

*compete provision due to expire in June 1999, CAM retained Deloitte & Touche Consulting ("Deloitte") in July 1997 to assist it in reviewing the TA function and options going forward. The Deloitte team worked closely with representatives of CAM, including Defendant Daidone and Yellin.*

45.     Defendants deny the allegations contained in Paragraph 45 of the Third Amended Complaint, except admit that pursuant to a non-compete agreement between the predecessors of First Data and Defendants, CAM could not offer transfer agent services before 1999; that CAM retained Deloitte & Touche Consulting ("Deloitte") in July 1997 to assist it in reviewing the transfer agent function and options going forward; and that the Deloitte team interacted with representatives of CAM, including Daidone and Yellin.

*46.     Deloitte and CAM established several objectives, including improving service to Funds shareholders and increasing flexibility for the future. But CAM also wanted to capture some of the profits that First Data was making on the TA contract. CAM determined that it would enter the TA business and it directed Deloitte to develop a variety of options to accomplish this.*

46.     Defendants deny the allegations contained in Paragraph 46 of the Third Amended Complaint, except admit that Deloitte was hired in order to develop alternative structures for providing transfer agency services to the Smith Barney family of mutual funds, that Deloitte and CAM discussed various objectives for such alternative structures, and that these objectives included improving service to shareholders and increasing CAM's profitability.

*47.     During the first phase of the review process, Deloitte and CAM analyzed different structural alternatives to determine which model was most appropriate in light of CAM's established objectives. Deloitte and CAM analyzed the models based on information obtained from First Data and two of its competitors — DST and SunGard. Deloitte and CAM assessed several different models, including a "full-service" option, a "remote vendor" option, and full internalization.*

47.     Defendants deny the allegations contained in Paragraph 47 of the Third Amended Complaint, except admit that Deloitte and CAM analyzed different alternatives to determine which transfer agency model was most appropriate, including a full-service option, a remote

service option, and an in-house option, based in part on information obtained from First Data,

DST and SunGard.

*48.     The full-service option called for CAM to create an affiliated TA unit of approximately fourteen people to perform oversight and control functions and to contract with DST to provide the bulk of transfer agent functions. Under the full-service option, DST would receive the bulk of the fees. Deloitte projected that CAM would realize annual profits of approximately $8.3 million. A draft Deloitte presentation dated November 4, 1997 noted: "DST full service provides little cost advantage over the current state (under which CAM received no revenue)."*

48.     Defendants refer to the draft Deloitte presentation dated November 4, 1997 for the

true and correct contents thereof, and otherwise deny the allegations contained in Paragraph 48

of the Third Amended Complaint.

*49.     The remote vendor alternative called for CAM to create an affiliated TA unit to handle customer service and operations and to contract with DST, First Data or SunGard for technology only. Deloitte estimated that the internal TA unit would require 121 full-time employees. The November 4 presentation noted that the remote vendor option required a greater initial investment and conversion effort than the DST full service option, but offered greater annual profit to CAM (between $16.1 and $22.8 million).*

49.     Defendants refer to the draft Deloitte presentation dated November 4, 1997 for the

true and correct contents thereof, and otherwise deny the allegations contained in Paragraph 49

of the Third Amended Complaint.

*50.     The full-internalization option called for CAM to assume responsibility for all aspects of the TA function, including technology (by acquiring software). Although full-internalization would have offered the highest projected profit — approximately $548 million per year — the option would have taken more than eighteen months to implement and would have required a staff of approximately 236 full-time employees. Because of the long implementation time and extensive start-up costs required by this option, Deloitte and CAM decided not to pursue it.*

50.     Defendants refer to the draft Deloitte presentation dated November 4, 1997 for the

true and correct contents thereof, admit that CAM decided not to pursue the full-internalization

option, and otherwise deny the allegations contained in Paragraph 50 of the Third Amended

Complaint.

*51.   CAM and Deloitte concluded that the remote vendor option, which offered significantly greater profit to CAM than the full-service option, was the preferred alternative. Accordingly, Deloitte and CAM solicited remote vendor bids from First Data, DST and SunGard. DST and SunGard responded with remote vendor proposals. First Data declined to submit a remote vendor bid, and instead proposed to renew as full-service TA with a modest fee discount of its rate under the existing contract of approximately ten percent.*

51.   Defendants deny the allegations contained in Paragraph 51 of the Third Amended Complaint, except admit that CAM concluded that the remote vendor option was the preferred alternative; that Deloitte and/or CAM solicited requests for information from First Data, DST, and SunGard; that DST and SunGard responded with remote vendor proposals; and that First Data responded with a full-service transfer agent proposal including a fee discount.

**Deloitte and CAM's Recommendations to Contract with DST**

*52.   After analyzing the specific proposals it received from the vendors, in February 1998, Deloitte recommended that CAM contract with DST as remote service provider. The DST proposal, as of February 1998, called for CAM to create an affiliated TA unit of approximately 100 employees to handle customer service and operations, and to contract with DST for technology. The CAM affiliate would be the named TA, receive fees from the Funds and pay DST a per account fee for technology. Deloitte projected that the CAM affiliate would receive more than $40 million per year in profit under the proposals.*

52.   Defendants deny the allegations contained in Paragraph 52 of the Third Amended Complaint, except admit that in or about February 1998 Deloitte recommended to CAM that CAM create an affiliated transfer agent unit of approximately 100 employees to handle certain transfer agent services as the named transfer agent for certain of the Smith Barney mutual funds, that CAM receive fees from the funds, that CAM contract with DST as a remote service provider for transfer agent technology, and that CAM pay DST a per-account fee for its services. Defendants further admit that, according to Deloitte, the CAM affiliate would receive more than $40 million per year in profit under this arrangement.

*53.   Deloitte concluded that DST's proposal was superior to other options, including options utilizing First Data, in terms of both pricing and technology. Because First Data had not submitted a remote vendor proposal and had offered only a modest fee discount, the DST proposal was greatly superior in terms of the profit potential it offered to CAM. As for*

*technology, Deloitte found that DST offered industry-leading technology (superior to that of First Data) and that switching to DST would better position the Funds for the future.*

53.     Defendants deny the allegations contained in Paragraph 53 of the Third Amended

Complaint, except admit that Deloitte advised CAM that DST's proposal was superior to other

options in terms of pricing and technology, and specifically that DST offered industry-leading

technology which was superior to that offered by First Data.

*54.     After learning that it was at risk of losing the business, First Data offered significant fee discounts. By letter to Yellin dated March 12, 1998, First Data offered a $25 million annual "fee concession" to CAM if the Funds renewed with First Data as full-service TA. Yellin, however, did not pursue the option of renewing with First Data as full-Service TA and passing along the proposed discount directly to the Funds. Nor did he or anyone else within CAM inform the Funds' boards that First Data had made the offer to renew as full-service TA at deeply discounted rates. Instead, Yellin pursued a deal that would allow CAM to benefit from the discounts First Data was offering.*

54.     Defendants refer to the March 12, 1998 letter for the true and correct contents

thereof.  Defendants otherwise deny the allegations contained in Paragraph 54 of the Third

Amended Complaint, except admit that the boards of certain of the Smith Barney mutual funds,

upon information and belief, were not informed that First Data had offered to renew as full-

service transfer agent with a $25 million annual fee concession.

*55.     In the March 12 letter, First Data committed to increasing the level of resources First Data dedicated to the Funds and to offering Smith Barney brokers use of SuRPAS, First Data's proprietary sub-accounting system. The SuRPAS system would permit Smith Barney brokers to charge investors a processing fee on sales of non-proprietary (non-Smith Barney) funds, and generate an additional $40 million in annual revenue. In addition, by the middle of March 1998, First Data had pointed out to CAM that First Data Corporation provided $9 million in revenue to various Citigroup (then Travelers) entities through investment banking fees, asset management fees and the purchase of insurance and other products.*

55.     Defendants refer to the March 12, 1998 letter for the true and correct contents

thereof.  Defendants otherwise deny the allegations contained in Paragraph 55 of the Third

Amended Complaint, except admit that in March 1998 CAM was aware that First Data provided

Travelers affiliates approximately $9 million annually in fees including, among others, asset

management and investment banking fees and insurance product fees.

*56.     Later in March, First Data improved its bid and offered a deeper discount, measured as a percentage of the total annual TA fees that First Data would receive from the Funds. The discounts would start at 32% in 1999 and increase by two percentage points each year, reaching 40% of total TA fees in 2003. Deloitte and CAM projected that the percentage discounts would translate into $21 million the first year and grow to $39 million in the final year of the contract.*

56.     Defendants deny the allegations contained in Paragraph 56 of the Third Amended

Complaint, except admit that by late March 1998 First Data had offered a discount measured as a

percentage of total annual transfer agent fees that First Data would receive from the funds, which

would start at 32% in 1999 and increase by two percentage points each year, reaching 40% in

2003.  Defendants further admit that Deloitte and/or CAM projected that the percentage

discounts would translate into $21 million in the first year of the new contract and grow to $39

million in 2003.

*57.     Deloitte questioned whether the discount offered by First Data would be passed along to the Funds or kept by an internal affiliated TA, which would perform only limited duties. In a presentation dated March 24, 1998, which Yellin received, Deloitte wrote:*

> *Clarify the "Discount" proposed*
> *A true discount would go to the **funds** not SSB TA.*
> *This relationship will be extremely difficult to sell to the fund boards.*

*(Emphasis in original).*

57.     Defendants refer to the March 24, 1998 presentation for the true and correct

contents thereof, and otherwise deny the allegations contained in Paragraph 57 of the Third

Amended Complaint.

*58.     After considering First Data's improved offer, CAM representatives, including Defendant Daidone and Yellin, concluded, as did Deloitte, that contracting with DST as remote service provider was the best option and made a formal recommendation to the chief executive officer of CAM, Jones, by memorandum dated April 2, 1998. The April 2 memo stated that the DST proposal was superior to the First Data proposal in terms of technology and pricing. The*

*memo reiterated Deloitte's findings regarding technology, and indicated that the DST proposal offered $139 million more in profit to CAM over the projected five-year contract period than the First Data proposal offered. The April 2 memo noted that there was conversion risk with switching to DST, but concluded that the conversion risk was minimal.*

58.     Defendants refer to the April 2, 1998 memorandum for the true and correct contents thereof, and otherwise deny the allegations contained in Paragraph 58 of the Third Amended Complaint.

*59.     The April 2 memo noted that switching to DST could cost affiliates of Citigroup — then Travelers — $8 to $10 million annually in lost revenues from First Data Corporation but recommended switching to DST notwithstanding the business risk. The memo concluded:*

> *Based on economics and technology, our recommendation is to move the Transfer Agency processing to DST. We realize that a corporate relationship exists between First Data and [Travelers] and that relationship should be considered before any decision is made.*

59.     Defendants refer to the April 2, 1998 memorandum for the true and correct contents thereof, and otherwise deny the allegations contained in Paragraph 59 of the Third Amended Complaint.

## CAM Continues Negotiating With First Data

*60.     Jones agreed with the recommendation, but sometime after April 2, 1998, the chairman of Travelers asked Jones to negotiate further with First Data, stating a preference for remaining with First Data if First Data improved its offer to the point where it was roughly equivalent to the DST proposal in terms of pricing. Accordingly, Jones instructed Yellin to resume negotiating with First Data, which Yellin did.*

60.     Defendants deny the allegations contained in Paragraph 60 of the Third Amended Complaint, except admit that sometime after April 2, 1998, Travelers senior management encouraged CAM to continue to negotiate with First Data, stating a preference for remaining with First Data if First Data improved its offer to the point where it was roughly equivalent to the DST proposal in terms of pricing, and admit that CAM did continue to negotiate with First Data.

    *61.    On April 6, 1998, Travelers announced a proposed merger with Citicorp. The contemplated merger increased the risk of converting to a new service provider because it would decrease the resources available for such a conversion.*

    61.    Defendants deny the allegations contained in Paragraph 61 of the Third Amended Complaint, except admit that on or about April 6, 1998, Travelers announced a proposed merger with Citicorp.

    *62.    In a letter dated June 5, 1998, First Data set forth an improved offer, which increased the discount First Data was willing to offer. The June 5 letter included the following fee schedule:*

| June 1, 1999 to Dec. 31, 2000 | 32% discount on total fee revenue |
|---|---|
| Jan. 1 to Dec. 31, 2001 | 35% discount on fee revenue up to $80 million<br>60% discount on fee revenue over $80 million |
| Jan. 1, 2002 to Dec. 31, 2003 | 50% discount on fee revenue up to $80 million<br>60% discount on fee revenue over $80 million |
| Jan. 1, 2004 to Dec. 31, 2004 | 55% discount on fee revenue up to $80 million<br>60% discount on fee revenue over $80 million |

    62.    Defendants refer to the June 5, 1998 letter for the true and correct contents thereof, admit, on information and belief, that First Data increased the discount it was willing to offer, and otherwise deny the allegations contained in Paragraph 62 of the Third Amended Complaint.

    *63.    Deloitte again questioned the structure of First Data's proposal. In a presentation dated June 10, 1998, entitled "Transfer Agency Project: Lunch and Learn — Financial Model Review," Deloitte questioned the structure in two respects.*

    63.    Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in the first sentence of Paragraph 63 of the Third Amended Complaint. Defendants refer to the June 10, 1998 presentation for the true and correct contents thereof, and otherwise deny the remaining allegations contained in Paragraph 63.

    *64.    First, Deloitte questioned whether CAM could justify receiving TA fees for operating a fourteen-person customer service center:*

> *We Anticipate a Larger Organization Would be Needed to Satisfy the Fund Boards in the First Data Scenario.*

* * *

> *We believe at a minimum, the SSB TA would have to assume responsibility for Customer Service and Transaction Processing to justify receiving TA fees. This would require at least 65 [full-time employees] (rather than 14).*

64.     Defendants refer to the June 10, 1998 presentation for the true and correct contents thereof, and otherwise deny the allegations contained in Paragraph 64 of the Third Amended Complaint.

> 65.     *Second, Deloitte questioned the legality of the discount taking the form of a rebate to be paid to CAM, not the Funds:*

> > *First Data's proposal requires that First Data remains the TA; First Data receives full revenues of TA fees, providing a "rebate" to SSB (proposed as a "discount" by First Data).*

> > ***This legal structure is questionable at best. Our advisers indicate that this arrangement would in no way be acceptable to the fund boards and may not be legally viable.***

> *(Emphasis added).*

65.     Defendants refer to the June 10, 1998 presentation for the true and correct contents thereof, and otherwise deny the allegations contained in Paragraph 65 of the Third Amended Complaint.

> 66.     *Deloitte's written warning about the legality of the structure followed several occasions on which Deloitte's team leader raised the issue orally with CAM representatives.*

66.     Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 66.

> 67.     *Deloitte's team leader personally presented the Lunch and Learn presentation to address the issues raised by the structure of the First Data proposal. Deloitte considered the issues to be very significant and had raised them with CAM representatives prior to the Lunch and Learn meeting. Indeed, CAM's failure to address the issues prompted Deloitte to schedule the June 10 meeting.*

67.     Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 67.

*68.     Sometime after June 10, 1998, CAM clarified that the CAM-affiliated TA unit would serve as the named TA and First Data would serve as sub-TA. Under this structure, all TA fees would pass through the CAM affiliate, so First Data would not be collecting fees and "rebating" them to CAM. This clarification, however, did not address the substance of Deloitte's concerns. CAM did not change the proposed size (the affiliated TA would still be extremely limited in size and would not perform sufficient functions to justify receiving TA fees) or scope of responsibility of the affiliated TA unit — it would still be limited to a small customer service center. In addition, even though there would be no "rebate" in a strict sense of the word, the affiliated unit would still be taking the fee discount offered by First Data for itself, instead of passing it along to the Funds.*

68.     Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of whether Deloitte was concerned about this transfer agent structure.  Defendants deny the remaining allegations contained in Paragraph 68 of the Third Amended Complaint, except admit that CAM determined that the affiliated transfer agent unit would serve as the named transfer agent for certain of the Smith Barney mutual funds and that First Data would serve as sub-transfer agent, such that the CAM affiliate would receive transfer agent fees directly from the funds.

## CAM's Decision to Recommend First Data Proposal

*69.     In July 1998, First Data improved its offer in three respects. First, it increased the fee discount. Second, it agreed to migrate the Funds from its old technology to its more modern Full Service Retail ("FSR") platform. Third, and most significantly, by letter to Yellin dated July 14, 1998, First Data offered the Revenue Guarantee. The July 14 letter stated:*

> *First Data Corporation and Travelers will agree on "basket of services" from which First Data Corporation will generate $8 million of revenue to Travelers annually. A "make-whole" provision will be included which commits First Data Corporation to a fee credit on transfer agent services for any shortfall to the $8 million. The credit will be 50 cents on each dollar of revenue shortfall.*

69.     Defendants refer to the July 14, 1998 letter for the true and correct contents thereof, admit, on information and belief, that First Data improved its offer, and otherwise deny the allegations contained in Paragraph 69 of the Third Amended Complaint.

*70.     By memorandum to Jones dated July 24, 1998, Yellin recommended that CAM establish an affiliated TA unit of approximately fifteen people to assume responsibility for the customer service call center and contract with First Data for the bulk of the transfer agency services. The memo estimated the cost of the fifteen call center employees would be $1 million per year.*

70.     Defendants refer to the July 24, 1998 memorandum for the true and correct contents thereof, and otherwise deny the allegations contained in Paragraph 70 of the Third Amended Complaint.

*71.     Although the structure of the proposal had been changed so that First Data would not pay a "rebate" to CAM, in substance the fee arrangement remained largely the same as in the prior proposals — First Data would be sharing its profits with CAM. The July 24 memo set forth the following fee arrangement, which was referred to in the memo as a "revenue sharing arrangement":*

Percentage that is earned by [CAM] on:

|        | First $80MM | Over $80 MM [in total TA fees] |
|--------|-------------|-------------------------------|
| Year 1 | 33.5%       | 33.5%                         |
| Year 2 | 40          | 60                            |
| Year 3 | 55          | 60                            |
| Year 4 | 55          | 60                            |
| Year 5 | 58          | 60                            |

71.     Defendants refer to the July 24, 1998 memorandum for the true and correct contents thereof, and otherwise deny the allegations contained in Paragraph 71 of the Third Amended Complaint.

*72.     The memo projected that CAM would earn the following profit under the revenue sharing arrangement (taking into account the $1 million in salaries projected for new staff):*

| Year 1 | $29 million |
|--------|-------------|
| Year 2 | $40 million |
| Year 3 | $57 million |
| Year 4 | $62 million |

| Year 5 | $70 million |
|--------|-------------|

72.    Defendants refer to the July 24, 1998 memorandum for the true and correct contents thereof, and otherwise deny the allegations contained in Paragraph 72 of the Third Amended Complaint.

*73.    The July 24 memo indicated that Citigroup's projected profit under the First Data proposal was $16 million less over the five-year contract period than its projected profit under the DST proposal. Yellin recommended accepting the differential because contracting with First Data eliminated risks associated with the conversion process and permitted CAM personnel to focus on issues relating to Y2K, the integration of the Salomon Brothers funds, and the Travelers-Citicorp merger, which had been announced in April of that year.*

73.    Defendants refer to the July 24, 1998 memorandum for the true and correct contents thereof, and otherwise deny the allegations contained in Paragraph 73 of the Third Amended Complaint.

*74.    The July 24 memo also stated that, because of CAM's fiduciary obligations to the Funds, it was obligated to implement a fee reduction. The recommended reduction called for the Funds to continue to pay the same asset-based fees that were being charged by First Data, subject to caps that limited TA fees to the lesser of the asset-based fee or a set amount (which ranged from $13 to $14.50 per account). The July 24 memo projected an annual fee reduction of $6-$8 million.*

74.    Defendants refer to the July 24, 1998 memorandum for the true and correct contents thereof, and otherwise deny the allegations contained in Paragraph 74 of the Third Amended Complaint.

*75.    The July 24 memo noted that because of the different structures of the DST and First Data proposals, implementing the fee reduction would virtually eliminate the $16 million differential between the DST and First Data proposals. This was because the reduced revenue stream that would result from the fee reduction would have a greater impact on CAM's profit under the DST proposal than under the First Data proposal.*

75.    Defendants refer to the July 24, 1998 memorandum for the true and correct contents thereof, and otherwise deny the allegations contained in Paragraph 75 of the Third Amended Complaint.

76.     *With respect to the Revenue Guarantee, Yellin's July 24 memo indicated that First Data had committed to:*

> *Providing CAM with additional assets to manage sufficient to generate $1.5 million per year in asset management fees.*
>
> *Making Salomon Smith Barney First Data's investment banker of choice and generating at least $3 million per year in investment banking fees.*
>
> *Paying 50 cents for every dollar of shortfall of investment banking fees and 90 cents for every dollar of shortfall of asset management fees, by way of credit on TA fees paid by CAM to First Data.*

76.     Defendants refer to the July 24, 1998 memorandum for the true and correct

contents thereof, and otherwise deny the allegations contained in Paragraph 76 of the Third

Amended Complaint.

77.     *Yellin's memo stated that the Revenue Guarantee would generate at least $22.5 million in revenue or $14 million of "pre-tax bottom line" over the five years of the agreement.*

77.     Defendants refer to the July 24, 1998 memorandum for the true and correct

contents thereof, and otherwise deny the allegations contained in Paragraph 77 of the Third

Amended Complaint.

78.     *Finally, in a section entitled "Mutual Fund Board Issues," Yellin's memo stated that the chairman of the Funds' boards, who was an officer of CAM, was "comfortable that the new First Data arrangement is supportable to the Fund boards." The memo noted that service levels, "while good, will improve," and the funds would receive a fee reduction. Jones approved the recommendation.*

78.     Defendants refer to the July 24, 1998 memorandum for the true and correct

contents thereof.  Defendants deny the remaining allegations contained in Paragraph 78 of the

Third Amended Complaint.

**The Sub-TA Agreement and Side Letter**

79.     *On August 4, 1998, First Data produced the first draft of the Side Letter to Yellin, which addressed the Revenue Guarantee and other significant commitments between the parties, including First Data's commitment to migrate the Funds to FSR.*

79.     Defendants deny the allegations contained in Paragraph 79 of the Third Amended Complaint, except admit that on or about August 4, 1998 First Data produced the first draft of the revenue guarantee agreement to CAM, and refer to the August 4, 1998 letter for the true and correct contents thereof.

*80.     Representatives of CAM and First Data negotiated the terms of the Side Letter and simultaneously prepared a sub-TA agreement (the "Sub-TA Agreement") between First Data and Mutual Management Corp., the Citigroup entity initially chosen by CAM to serve as the affiliated TA. At some point prior to the finalization of the two agreements, First Data's commitment to migrate the Funds to FSR was removed from the Side Letter and included as a schedule to the Sub-TA Agreement.*

80.     Defendants admit the allegations contained in Paragraph 80 of the Third Amended Complaint.

*81.     Both agreements were finalized on November 20, 1998. The Side Letter, which specifically referenced the Sub-TA Agreement, contained the following provisions:*

> *The Revenue Guarantee;*
>
> *First Data's commitment to provide its SuRPAS system for sub-accounting;*
>
> *CAM's commitment to treat First Data as "favored nation vendor" for proxy and fulfillment services (which required CAM to solicit a bid from First Data when proxy and fulfillment services were required and to recommend First Data if CAM determined in good faith that its bid was competitive with the other bids received)*
>
> *CAM's agreement, subject to its fiduciary duties, to "use all reasonable and lawful means to encourage the Funds" "to continue [First Data] as sub-transfer agent for existing Funds and any or all subsequent expansion, consolidation, affiliation, or addition to the Funds for which CAM provides investment management services";*
>
> *CAM's agreement to consider in good faith retaining or recommending First Data to provide other services to the Funds.*

81.     Defendants admit that the Sub-Transfer Agency and Services Agreement and November 20, 1998 revenue guarantee agreement were finalized on or around November 20,

1998, refer to those documents for the true and correct contents thereof, and otherwise deny the

allegations contained in Paragraph 81 of the Third Amended Complaint.

> *82.     The Sub-TA Agreement included an integration clause, which provided that the Agreement, "including Schedules, Addenda and Exhibits" thereto, constituted the parties' entire agreement about the subject matter of the Sub-TA Agreement and superseded all prior and contemporaneous agreements regarding the subject matter. Notwithstanding the obvious significance to the Funds of the benefits to CAM affiliates contained in the Side Letter, the Side Letter (or its substance) was not provided to the Funds' boards or filed with the SEC as part of the Funds' registration statements.*

82.     Defendants refer to the Sub-Transfer Agency and Services Agreement for the true

and correct contents thereof.  Defendants deny the remaining allegations contained in Paragraph

82 of the Third Amended Complaint, except admit that CAM did not disclose the revenue

guarantee agreement with First Data to the boards of certain of the Smith Barney mutual funds at

the time they considered and approved hiring an SBFM affiliate as transfer agent, and did not file

the revenue guarantee agreement with the SEC as part of the funds' registration statements.

## The Materially Misleading Board Materials

> *83.     In late February-early March 1999, after Yellin left the mutual fund business, Defendant Daidone took the lead in preparing a memorandum (the "Board Memo") and a Power Point presentation (the "Power Point") to present to the Funds' boards concerning its recommendation for a new TA contract. CAM included the final version of the Board Memo, which is dated March 4, 1999, and the Sub-TA Agreement in the materials that it sent to board members in advance of the meetings. Neither the Side Letter nor the Power Point was included in the packet of materials that was sent to board members.*

83.     Defendants deny the allegations contained in Paragraph 83 of the Third Amended

Complaint, except admit that, in or about late February-early March 1999, CAM prepared a

memorandum and PowerPoint presentation to present to the boards of certain of the Smith

Barney mutual funds concerning CAM's recommendation for a new transfer agent contract, and

sent the final memorandum, dated March 4, 1999, and the Sub-Transfer Agency and Services

Agreement, to board members in advance of the meetings, but did not send in advance of the

meetings the PowerPoint presentation given at the meetings, and did not provide the November

20, 1998 revenue guarantee letter.  Defendants further admit that Yellin left CAM prior to

November 20, 1998, but lack knowledge or information sufficient to admit or deny whether he

left the mutual fund business entirely at that time.

*84.   Defendant Daidone prepared the memorandum in a way that would make the affiliated TA proposal appear as if it was in the Funds' best interest, which was not true. The Board Memo did not candidly present the proposal in terms that would have made clear to the board that First Data would continue to perform almost all of the TA functions, leaving CTB with a tremendous profit for manning a fifteen-person call center and performing limited additional oversight and quality control functions. The Board Memo did not explain in a meaningful way how duties were to be divided between CTB and First Data. To the contrary, the Board Memo gave the misleading impression that First Data was providing "technology" only, which was not true, and that CTB would be a much more substantial operation then it actually would be.*

84.   Defendants refer to the March 4, 1999 memorandum for the true and correct

contents thereof, and otherwise deny the allegations contained in Paragraph 84 of the Third

Amended Complaint.

*85.   The board materials also stated that CAM approached the TA review process by looking at all available alternatives to provide the Funds with better service at lower prices. This was also untrue. From the beginning, CAM approached the review process with the goal of maximizing profit to CAM and, in order to attain its own goals, CAM did not pursue options that would have provided much greater value to the Funds. Contrary to representations in the board materials, the only options CAM ever seriously considered were options that involved making a CAM affiliate the TA. The Board Memo did not disclose that First Data had made a series of offers to perform all TA services at deeply discounted rates — including the initial $25 million annual fee discount offer and the later percentage-based discount offers — all proposals that, if offered directly to the Funds, would have provided greater savings than the proposal CAM recommended.*

85.   Defendants refer to the March 4, 1999 memorandum for the true and correct

contents thereof, and otherwise deny the allegations contained in Paragraph 85 of the Third

Amended Complaint.

*86.   Even with respect to the alternatives that CAM actually considered, CAM did not disclose that Deloitte and CAM management had initially recommended DST, that CAM resumed negotiating with First Data only after Travelers management had requested that they do so because First Data was an investment banking client, and that CAM decided to recommend First Data only after First Data had increased the value of its proposal to CAM and*

*offered the Revenue Guarantee. In fact, CAM failed to disclose the Side Letter or any of its terms.*

86.     Defendants refer to the March 4, 1999 memorandum for the true and correct contents thereof.  Defendants otherwise deny the allegations contained in Paragraph 86 of the Third Amended Complaint, except admit that CAM did not disclose the revenue guarantee agreement with First Data to the boards of certain of the Smith Barney mutual funds at the time they considered and approved hiring an SBFM affiliate as transfer agent.

*87.     Instead of making full and accurate disclosure regarding the TA review process and CAM's interest in the proposal, the Board Memo gave the incorrect impression that CAM was acting in the Funds' best interest and had expended significant effort and money to identify and negotiate the best deal for the Funds. The introduction of the Board Memo contains the following statement:*

> *[I]n anticipation of the expiration of the non-compete agreement [with First Data], SSB began an exhaustive study in late 1997 utilizing the services of Deloitte Consulting to examine transfer agency alternatives to First Data with the goal of reducing fees, improving service and offering the Smith Barney Funds access to alternative channels of distribution (e.g., 401k) to promote further growth. This effort was completed in mid-1998 at a cost of $2.5 million.*

87.     Defendants refer to the March 4, 1999 memorandum for the true and correct contents thereof, and otherwise deny the allegations contained in Paragraph 87 of the Third Amended Complaint.

*88.     This paragraph was materially inaccurate and misleading. Reducing fees was not a goal of the review process. The idea of a fee reduction was first raised in the summer of 1998, by the chairman of the Funds' boards, and was separate from the decision on how to structure the TA function.*

88.     Defendants lack sufficient knowledge or information to admit or deny the allegations contained in the third sentence of Paragraph 81 of the Third Amended Complaint. Defendants refer to the March 4, 1999 memorandum for the true and correct contents thereof, and otherwise deny the remaining allegations contained in Paragraph 88.

89.     *The Board Memo also bolstered the case for the recommended proposal by giving the incorrect impression that no viable alternatives existed. The following paragraph, entitled "Change of Transfer Agent Vendor," was intended to describe all remote TA vendor proposals, including the DST proposal:*

> *Results showed that the internalization of transfer agency functions and engagement of another technology vendor could reduce the fees paid by the Smith Barney Funds and also be the most profitable alternative to SSB. However, full internalization of the transfer agent functionality would have entailed the creation of an organization of 150 employees. In addition, the conversion and software modifications required to migrate to a new technology and services provider would have taken at least two and a half years. In short the Smith Barney Funds would not realize any cost savings for several years under this scenario.*

89.     Defendants refer to the March 4, 1999 memorandum for the true and correct contents thereof, and otherwise deny the allegations contained in Paragraph 89 of the Third Amended Complaint.

90.     *This paragraph failed to discuss the DST proposal in any detail or to disclose that Deloitte had recommended it. In addition, to the extent that the figures contained in the paragraph were intended to describe the DST proposal, they are inaccurate. The DST proposal would have required CAM to hire approximately 100 employees, not 150; the conversion to DST would have taken twelve to eighteen months, not thirty; and under the DST proposal the Funds would have realized savings in the first year after conversion. Moreover, the paragraph falsely suggests that CAM was foregoing some profit and recommending First Data in order to pass along fee reductions to the Funds. The First Data proposal, however, was economically superior — for CAM and its affiliates — to the DST proposal.*

90.     Defendants refer to the March 4, 1999 memorandum for the true and correct contents thereof, and otherwise deny the allegations contained in Paragraph 90 of the Third Amended Complaint.

91.     *In a separate paragraph, the Board Memo reinforced the false impression that CAM was sacrificing its own interests to the benefit of the Funds:*

> *The decision to remain with First Data and establish an internal transfer agency capability was made with the recognition that although not the most favorable option financially to SSB, it represented a prudent course of action with immediate results. The revenue shortfall as a result of accepting the proposed First Data*

> *contract over our most attractive alternative was approximately*
> *$16.0 million.*

91.     Defendants refer to the March 4, 1999 memorandum for the true and correct

contents thereof, and otherwise deny the allegations contained in Paragraph 91 of the Third

Amended Complaint.

> *92.     These statements were materially incorrect. The First Data proposal was*
> *projected to provide greater profit to CAM than the DST proposal, not $16 million less.*

92.     Defendants deny the allegations contained in Paragraph 92 of the Third Amended

Complaint.

> *93.     Although the Board Memo disclosed that the affiliated TA would make a profit,*
> *the disclosure regarding the economic benefit to CAM was limited and misleading. The only*
> *paragraph of the Board Memo that discusses the projected profit to CAM appears in a section*
> *entitled "Proposed Transfer Agency Fee and Fund Savings Analysis," and states:*

>> *SSB commits to reviewing the transfer agent service and fees on an*
>> *annual basis with the Smith Barney Fund boards. SSB anticipates*
>> *that the SSB transfer agency business unit will operate on a 33%*
>> *margin based on the June 1, 1999 First Data fee schedules. While*
>> *First Data discounts may increase over the life of the contract, it is*
>> *expected that expenses will rise on a commensurate basis as SSB*
>> *adds to its transfer agent capabilities.*

93.     Defendants refer to the March 4, 1999 memorandum for the true and correct

contents thereof, and otherwise deny the allegations contained in Paragraph 93 of the Third

Amended Complaint.

> *94.     At the time, CAM was projecting that it would earns tens of millions of dollars in*
> *profit each year for operating a fifteen person call center and performing limited additional*
> *oversight and quality control functions. There was no meaningful disclosure about how limited*
> *the services were that CTB was to contribute in return for all this profit.*

94.     Defendants refer to the March 4, 1999 memorandum for the true and correct

contents thereof, and otherwise deny the allegations contained in Paragraph 94 of the Third

Amended Complaint.

*95.    Because virtually all of the work was to be done by First Data, the 33% profit margin figure was itself misleading. The margin was based on an analysis that treated sub-TA payments to First Data as expenses of CTB. The economic reality would have been more accurately portrayed by deducting payments to First Data from revenue - not treating them as expenses of CTB. CTB is essentially a pass-through for those payments. In fact, internally, CAM described the fee arrangement with First Data as a revenue sharing agreement. Had payments to First Data not been treated as an expense of CTB, the projected pre-tax profit margin would have been approximately 70%.*

95.    Defendants refer to the March 4, 1999 memorandum for the true and correct contents thereof, and otherwise deny the allegations contained in Paragraph 95 of the Third Amended Complaint, except admit that at one or more points in time CAM referred internally to the fee arrangement with First Data as a revenue sharing agreement.

*96.    The Power Point disclosed that "Revenue Generation" was one of CAM's goals, and included a table that contained profit projections in dollar amounts. The table, however, was not provided to the directors in advance of the meeting. Had board members received the projections in advance and had the opportunity to scrutinize them, they at least would have had a chance to understand that CAM expected to earn tens of millions in profit. But they still would not have understood just how limited CAM's proposed contribution to the venture really was.*

96.    Defendants refer to the March 1999 PowerPoint presentation for the true and correct contents thereof, and otherwise deny the allegations contained in Paragraph 96 of the Third Amended Complaint, except admit that the PowerPoint presentation was not provided to board members in advance of the meeting.

*97.    Finally, the Board Memo incorrectly indicated that the fees charged to the Funds by First Data were significantly below industry average.*

97.    Defendants refer to the March 4, 1999 memorandum for the true and correct contents thereof, and otherwise deny the allegations contained in Paragraph 97 of the Third Amended Complaint.

**CTB's Fees and Expenses as TA**

*98.    At regularly scheduled meetings during the first half of 1999, Defendant Daidone presented the TA proposal to the Funds' boards — including counsel for the Funds and directors — which approved the proposal. During a transition period between June 1999 and October 1999, CAM received revenue from First Data associated with the establishment of the affiliated*

*TA unit. On October 1, 1999, a CAM affiliate, now CTB, became the named TA for the Funds, and assumed responsibility for the customer service function, First Data — now PFPC — continued to perform the bulk of the TA services as sub-TA. As named TA, CTB receives 100% of the fees and makes sub-TA payments to PFPC and to Primerica Financial Services ("PFS"), a Citigroup affiliate that sells certain of the Funds and performs sub-TA work.[4]*

98.     Defendants deny the allegations contained in Paragraph 98 of the Third Amended Complaint, except admit that during the first half of 1999, CAM representatives presented the transfer agent proposal to the boards of certain of the Smith Barney mutual funds; these boards approved the proposal; between June 1999 and October 1999 CAM received revenue from First Data in connection with the new transfer agent structure; on October 1, 1999, a CAM affiliate, now CTB, became the named transfer agent for certain of the Smith Barney mutual funds; and at one or more points in time during the alleged Class Period CTB received fees from the funds and made payments to PFPC and to Primerica Financial Services, a Citigroup affiliate that sold certain of the funds and performed sub-transfer agent work.  With respect to footnote 6 to Paragraph 91 of the Third Amended Complaint, Defendants admit that the transfer agent arrangement included implementation of per-account fee caps, which lowered the fees paid by certain of the Smith Barney mutual funds by 23% between June 1999, when the fee caps were implemented, and September 2004, and admit that during the first quarter of 2003 CTB requested a fee increase from the boards of the funds, but withdrew the request after it was rejected by one board.

*99.     CTB had approximately fifteen employees performing work for the Funds, only seven of whom worked full-time for the Funds. As intended, CTB realized high profits for performing limited work. The one function that CTB assumed from First Data/PFPC is the customer service function, which consists primarily of a call center staffed by seven full-time employees who are dedicated to Funds business. Five of those employees answer calls, two are supervisors. The seven call center staff members are the only CTB employees who spend all of their time on Funds-related work.*

---

[4] *The approved TA arrangement included implementation of per account fee caps. The fee caps had the effect of lowering the total fees paid by the Funds by 23% for the period June 1999, when the fee caps were implemented, through September 2004. During the first quarter of 2003, CTB requested a fee increase from the Funds' boards, but withdrew the request after it was rejected by one board.*

99.     Defendants deny the allegations contained in Paragraph 99 of the Third Amended Complaint, except admit that, at one or more points in time during the alleged Class Period, CTB had approximately fifteen employees performing work for certain of the Smith Barney mutual funds, approximately seven of whom worked full-time for the funds; that CTB's call center was staffed by approximately seven full-time employees dedicated to the business of the funds; and that approximately five of those employees answered calls and approximately two were supervisors.

*100.     CAM representatives supervise the TA operations of CTB, which are part the CAM business unit for budget and reporting purposes. CAM is responsible for the cost of CTB's TA operations and receives the benefit of the revenue that the TA operations generate.*

100.     Defendants deny the allegations contained in Paragraph 100 of the Third Amended Complaint, except admit that, at one or more points in time during the alleged Class Period, CAM representatives supervised the transfer agent operations of CTB, which were part the CAM business unit for budget and reporting purposes, and that CAM was responsible for the cost of CTB's transfer agent operations and received the benefit of some of the revenue that the transfer agent operations generated.

*101.     For the period September 11, 2000 through May 31, 2005, CTB earned pre-tax revenues of an estimated $100 million from Funds business (which is lower than projected due to, among other things, the downturn in the market that began in 2001). Over the same period, CTB has had total operating expenses (excluding sub-TA payments) of approximately $10.5 million. In addition, CAM and its affiliates received approximately $17 under the Revenue Guarantee.*

101.     Defendants deny the allegations contained in Paragraph 101 of the Third Amended Complaint, except admit that during the alleged Class Period CTB received approximately $100 million in net fees for performing transfer agent services for the Smith Barney family of mutual funds, and that CTB's costs for providing such services were approximately $11 million.

*102.    At regularly scheduled board meetings during the first half of 1999, Defendant Daidone presented the proposal to the Funds' boards. The meetings took place on March 10, 1999, March 19, 1999, March 30, 1999, April 14, 1999, April 28, 1999, May 26, 1999, June 2, 1999, and June 14, 1999.*

102.    Defendants admit the allegations contained in Paragraph 102 of the Third

Amended Complaint.

*103.    In his presentation to the Funds' boards at those meetings, Defendant Daidone intentionally led the boards to believe that the affiliated TA would be a substantial organization, and that approving the affiliated TA proposal was in the Funds' best interest, which was not true. Defendant Daidone used the Power Point presentation, which, like the Board Memo, was spun to sell the proposal to the Funds' boards and failed to make full and accurate disclosure regarding the material terms of the proposal. At the meetings, Defendant Daidone failed to disclose, among other things that First Data had offered to renew as full- service TA at deeply discounted rates, CAM management and Deloitte had first recommended DST as a technology provider, the affiliated TA would do minimal work, Deloitte had warned CAM about the structure of the affiliated TA proposal, and CAM and First Data had entered into the Side Letter.*

103.    Defendants refer to the PowerPoint presentation for the true and correct contents

thereof, and otherwise deny the allegations contained in Paragraph 103 of the Third Amended

Complaint.

*104.    All of the boards approved the recommendation during the meetings at which it was presented.*

104.    Defendants admit the allegations contained in Paragraph 104 of the Third

Amended Complaint.

**New Funds Are Added To The TA-Scheme**

*105.    In 2001 and 2002, CAM proposed the creation of new mutual funds, which would become part of the Funds. CAM made its recommendations to the boards of trustees/directors that would serve as the boards for the newly created funds. As part of its recommendation, CAM recommended that CTB be appointed TA and that PFPC be appointed as sub-TA on the same terms that existed for existing Funds.*

105.    Defendants admit the allegations contained in Paragraph 105 of the Third

Amended Complaint.

*106.    At a board meeting on August 6, 2001, for example, CAM proposed that the trustees of a sub-group of funds, known as the Smith Barney Trust II ("SBTH"), approve the*

*creation of a new fund called the Smith Barney Investors Value Fund, which would become one of the SBTII subfamilies of funds. During that meeting, representatives of CAM recommended that CTB (then known as Citi Fiduciary Trust Company) be appointed as TA for the newly-created fund and that PFPC be appointed as sub-TA on the same terms as existed between those entities and the already-existing Funds. Neither Jones, who was still CEO of CAM in 2001, nor Defendant Daidone, who attended the August 6, 2001 board meeting, informed the SBTII trustees of all material facts regarding the TA arrangements with CTB, including, but not limited to, that the affiliated TA was receiving tens of millions of dollars per year for limited work, that First Data PFPC had offered to renew as full-service TA at deeply discounted rates, and that CAM and First Data had entered into the Side Letter. The SBTII trustees approved CAM's recommendation to appoint CTB as TA and PFPC as sub-TA without knowing these and other material facts. Sometime after the August 6, 2001 meeting, CTB began serving as TA for the Smith Barney Investors Value Fund and receiving TA fees.*

106.    Defendants deny the allegations contained in Paragraph 106 of the Third Amended Complaint, except admit that at a board meeting on August 6, 2001, CAM proposed that the trustees of Smith Barney Trust II ("SBTII") approve the creation of a new fund called the Smith Barney Investors Value Fund, and that CTB (then known as Citi Fiduciary Trust Company) be appointed as transfer agent for the newly-created fund and PFPC be appointed as sub-transfer agent on the same terms as existed between those entities and the already-existing Smith Barney mutual funds; that Jones was CEO of CAM in 2001; that Daidone attended the August 6, 2001 board meeting; that SBTII trustees approved CAM's recommendation to appoint CTB as transfer agent and PFPC as sub-transfer agent; and that after August 6, 2001 CTB began serving as transfer agent for the Smith Barney Investors Value Fund and received transfer agent fees.

*107.    On March 22, 2002, CAM recommended that the trustees of SBTII approve the creation of the Smith Barney Capital Preservation Fund, shares of which were bought by Lead Plaintiff Local 649. As with the recommendation to create the Smith Barney Investors Value Fund, CAM recommended that CTB (then Travelers Bank and Trust, fsb) be appointed TA and PFPC be appointed sub-TA for the newly-created fund on the same terms as existed between those entities and the already-existing Funds. And, as with the prior recommendation, neither Jones nor Defendant Daidone made full disclosure of all material facts regarding the TA arrangements with CTB and PFPC. The trustees approved the recommendation at the March 22, 2002 meeting, which Defendant Daidone attended. Sometime after the March 22, 2002 meeting, CTB became TA for the Smith Barney Capital Preservation Fund and began receiving TA fees.*

107.    Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of whether shares of the Smith Barney Capital Preservation Fund were bought by Plaintiff Local 649.  Defendants deny the remaining allegations contained in Paragraph 100 of the Third Amended Complaint, except admit that on March 22, 2002, CAM recommended that the trustees of SBTII approve the creation of the Smith Barney Capital Preservation Fund and that CTB (then Travelers Bank and Trust, fsb) be appointed transfer agent and PFPC sub-transfer agent on the same terms as existed between those entities and the already-existing Smith Barney mutual funds; that the trustees approved the recommendation to create the new fund at the March 22, 2002 meeting; that Daidone attended that meeting; and that after March 22, 2002 CTB began serving as transfer agent for the Smith Barney Capital Preservation Fund and received transfer agent fees.

*108.    On September 4, 2002, CAM held an organizational meeting for a new sub-family of Funds, the Smith Barney Multiple Discipline Trust ("SBMDT"). At the meeting, which Defendant Daidone attended, the newly-constituted board of SBMDT voted to approve, among other things, the creation of the new funds that constituted SBMDT and CAM's recommendation that CTB be appointed TA and PFPC sub-TA for the newly-created funds. Four of the six trustees of SBMDT were also members of boards that voted on the TA proposal in 1999 based on the materially misleading board presentation. At no point prior to, during or after the September 4, 2002 meeting of the SBMDT board, did Jones, Defendant Daidone or anyone within CAM inform the members of the SBMDT board or any of the new funds' boards that the 1999 board presentations and materials were materially misleading. Based on the misleading information provided in 1999 and the failure of Jones and Defendant Daidone to make full disclosure regarding the TA proposal and operations subsequent to 1999, the trustees of SBMDT approved the recommendation to appoint CTB as TA and PFPC as sub-TA. CTB became TA for the SBMDT in 2002 and began receiving TA fees.*

108.    Defendants deny the allegations contained in Paragraph 108 of the Third Amended Complaint, except admit that on September 4, 2002, CAM held a meeting for Smith Barney Multiple Discipline Trust ("SBMDT"); that Daidone attended that meeting; that the board of SBMDT voted to approve the creation of the new funds that constituted SBMDT and that CTB be appointed transfer agent and PFPC sub-transfer agent for the funds; that four of the

six trustees of SBMDT were also members of boards that voted on the transfer agent proposal in

1999; and that CTB became transfer agent for the SBMDT in 2002 and began receiving transfer

agent fees.

*109.    CTB was appointed TA for additional newly-created funds during meetings in February, May and August 2002. Neither Jones nor Defendant Daidone informed the boards of the newly created funds of material information regarding the TA agreements with CTB and PFPC.*

109.    Defendants deny the allegations contained in Paragraph 109 of the Third

Amended Complaint, except admit that CTB was appointed transfer agent for certain additional

Smith Barney mutual funds during meetings in February, May and August 2002.

## CTB Made Exorbitant Profits for Performing Limited Work

*110.    As intended, CTB has realized high profits for performing limited work. The one function that CTB assumed from First Data PFPC was the customer service function, which consisted primarily of a call center. As described above, from the inception of the CTB TA contract through September 30, 2004, the call center was staffed by approximately seven full-time employees who are dedicated to Fund business. Five of those employees answered calls; two were supervisors. The seven call center staff members were the only CTB employees who spent all of their time on Fund-related work. Approximately eight other CTB employees performed work for the Funds during that period. None of those other employees devoted 100% of their time to the Funds. It cost CTB approximately $2.2 million per year to provide these limited services.*

110.    Defendants lack sufficient knowledge or information to admit or deny the

allegations of the last sentence of Paragraph 110.  Defendants deny the remaining allegations

contained in Paragraph 110 of the Third Amended Complaint, except admit that, as of the last

day of the alleged Class Period, CTB had approximately fifteen employees performing work for

the Smith Barney family of mutual funds, approximately seven of whom worked full-time for the

funds; that CTB's call center was staffed by approximately seven full-time employees dedicated

to the business of the funds; and that approximately five of those employees answered calls and

approximately two were supervisors.

*111.    As mentioned above, for the period September 11, 2000 through May 31, 2005, CTB earned net pretax revenues of an estimated $100 million from Funds business. The profit is lower than the originally projected profit due to, among other things, the downturn in the market that began in 2001. Over the same period, CTB had total operating expenses (excluding sub-TA payments) of approximately $10.5 million. In addition, CAM and its affiliates received approximately $17 million under the Revenue Guarantee.*

111.    Defendants deny the allegations contained in Paragraph 111 of the Third

Amended Complaint, except admit that during the alleged Class Period CTB received

approximately $100 million in net fees for performing transfer agent services for the Smith

Barney family of mutual funds, and CTB's costs for providing such services were approximately

$11 million.

*112.    From the inception of the CTB TA contract in October 1999, CTB billed the Funds and received TA fee payments on a monthly basis. Jones and Defendant Daidone had an ongoing fiduciary duty to make full disclosure of the material facts regarding the TA contract and operations to the Funds' boards throughout the contract period, but failed to fulfill that duty. Had Defendant Jones or Defendant Daidone made full disclosure, the TA contract could have been voided.*

112.    The second sentence of Paragraph 105 of the Third Amended Complaint calls for

a legal conclusion to which no responsive pleading is required.  To the extent a response may be

required, and with respect to the first and third sentences, Defendants deny the allegations

contained in Paragraph 112, except admit that while CTB was transfer agent for certain of the

Smith Barney mutual funds it billed the funds and received transfer agent fee payments on a

monthly basis.

*113.    CAM representatives supervise the TA operations of CTB, which are part of the CAM business unit for budget and reporting purposes. For purpose of setting compensation, Jones received credit for the revenue that CTB's TA operations generated.*

113.    Defendants deny the allegations contained in Paragraph 113 of the Third

Amended Complaint, except admit that at one or more points in time during the alleged Class

Period CAM representatives supervised the transfer agent operations of CTB, which were part

the CAM business unit for budget and reporting purposes.

*114.    In 2000, 2001 and 2002, CTB had pre-tax revenues from Funds-TA business of $26.2 million, $26.3 million and $21 million, respectively. The annual operating expenses of the CTB TA unit for those same years were $2.2 million, $2.3 million and $2.2 million, respectively. Thus, during the first three years of the contract, CTB made $73.5 million for doing $6.7 million worth of work.*

114.    Defendants admit that in 2000, 2001, and 2002, CTB received revenue from its TA business and incurred expenses to operate that business, but lack sufficient information to admit or deny the specific amounts alleged in Paragraph 114 of the Third Amended Complaint.

*115.    For CAM, this profit was not enough. During the first quarter of 2003, CAM went back to the Funds' boards and requested a fee increase.  In its original proposal to the Funds' boards in 1999, CAM proposed charging the Funds a percentage of assets under management, expecting that the markets would continue to perform well and the Funds' assets levels would continue to increase. The Funds agreed. When the market did not perform as CAM expected, it proposed that the Funds agree to return to a per account structure at per account fee levels that were above what even First Data had been charging the Funds.*

115.    Defendants deny the allegations contained in Paragraph 115 of the Third Amended Complaint, except admit that during the first quarter of 2003 CAM proposed to the boards of certain of the Smith Barney mutual funds a per-account fee structure for transfer agent fees.

*116.    CAM presented its recommendation for a fee increase to certain of the Funds' boards in February and March 2003. Defendant Daidone was a member of the team that made the presentation. As with CAM's initial presentations to the Funds in 1999, CAM's presentation to the Funds' boards in 2003 was again materially misleading. Among other things, CAM representatives failed to provide complete information regarding CTB's profitability. A power point presentation given to the boards indicated that CTB's fees and profitability were below market levels. Nowhere in the presentation, however, did CAM disclose how much profit CTB had made during the first three years of the contract. Nor did it disclose just how little work CTB did to earn that profit.*

116.    Defendants refer to the PowerPoint presentations for the true and correct contents thereof, and otherwise deny the allegations contained in Paragraph 116 of the Third Amended Complaint, except admit that CAM presented its proposal for a per-account fee structure for transfer agent fees to the boards of certain of the Smith Barney mutual funds in or about February and March 2003, and that Daidone participated in these presentations.

117.    *CAM tried to justify the fee increase by stating that an increase in CTB's profitability would benefit the Funds by allowing CTB "to stay competitive with industry peers, devote the required resources to the business, continue to improve service and stay current with technological improvements." The presentation, however, did not identify any areas in which service was lagging or any specific projects that CTB had been unable to fund. Having made pre-tax profit of approximately $66 million the prior three years, CTB did not need a fee increase to stay competitive with industry peers. CAM simply wanted to increase its profit margin on the TA business.*

117.    Defendants refer to the PowerPoint presentations for the true and correct contents thereof, and otherwise deny the allegations contained in Paragraph 117 of the Third Amended Complaint.

118.    *At least one board approved the request for a fee increase. One board, however, rejected the request. The Funds had not been performing well over the prior couple of years, and the board believed it was an inappropriate time to request a fee increase from the shareholders. CAM then withdrew the request as to all Funds, and the fee increase never went into effect.*

118.    Defendants deny the allegations contained in Paragraph 118 of the Third Amended Complaint, except admit that one Smith Barney mutual fund board rejected CAM's proposal for a new fee structure, and that CAM then withdrew its proposal as to all Smith Barney mutual funds.

## A Whistleblower Comes Forward in September 2003

119.    *On September 30, 2003, a former Citigroup employee alerted the SEC staff of the scheme. Thereafter, the SEC began a cause examination of CAM and CTB, and requested documents and information. In late November 2003, Citigroup's counsel reported to the SEC staff that Citigroup had discovered the Side Letter and Revenue Guarantee. Citigroup's counsel told the SEC staff that the Revenue Guarantee had never been disclosed to the Funds' boards, and admitted that it should have been disclosed.*

119.    Defendants deny the allegations contained in Paragraph 119 of the Third Amended Complaint, except admit that in November 2003, Citigroup, through its counsel, engaged in confidential settlement discussions which are not admissible in evidence.

120.    *The SEC's Order Instituting Administrative and Cease and Desist Proceedings against the Adviser and Global Markets was not filed until May 31, 2005, the last day of the Class Period.*

120.     Defendants admit the allegations contained in Paragraph 120 of the Third

Amended Complaint.

## DEFENDANTS' MATERIALLY MISLEADING STATEMENTS TO INVESTORS

*121.    The Class Period begins on September 11, 2000. On that date, the Smith Barney Allocation Series ("SB AS"), a sub-family of the Funds, issued an amended prospectus, originally issued on May 26, 2000, which contained the following statements:*

*Transfer agent and shareholder servicing agent*

> *Citi Fiduciary Trust Company [successor to CTB] serves as the portfolios' transfer agent and shareholder servicing agent (the "transfer agent"). The transfer agent has entered into sub-transfer agency and services agreements with PFPC Global Fund Services and PFS Shareholder Services to serve as the portfolios' sub-transfer agents (the "sub-transfer agents"). The sub-transfer agents will perform certain shareholder record keeping and accounting services.*

> \*   \*   \*

> *Transfer Agent. Citi Fiduciary Trust Company, located at 388 Greenwich Street, New York, New York 10013, serves as the fund's transfer and dividend-paying agent. Under the transfer agency agreement, the transfer agent maintains the shareholder account records for the fund, handles certain communications between shareholders and the fund, distributes dividends and distributions payable by the fund and produces statements with respect to account activity for the fond and its shareholders. For these services, the transfer agent receives fees from the fund computed on the basis of the number of shareholder accounts that the transfer agent maintains for the fund during the month and is reimbursed for out-of-pocket expenses.*

> *Sub-Transfer Agent. PFPC Global Fund Services, located at P.O. Box 9699, Providence, RI 02940-9699, serves as one of the fund's sub-transfer agents. Under the transfer agency agreement, the sub-transfer agent maintains the shareholder account records for the fund, handles certain communications between shareholders and the fund and distributes dividends and distributions payable by the fund. For these services, the sub-transfer agent receives a monthly fee computed on the basis of the number of shareholder accounts it maintains for the fund during the month, and is reimbursed for out-of-pocket expenses.*

> *The fund has also engaged the services of PFS Shareholder Services as a sub-transfer agent for PFS Accounts. This sub-transfer agent is located at 3100 Breckinridge Blvd., Bldg. 200, Duluth, GA 30099.*

121.    Defendants admit that the alleged Class Period begins on September 11, 2000 and that, on or about that date, Smith Barney Allocation Series Inc. issued an amended prospectus. Defendants refer to that prospectus for the true and correct contents thereof and otherwise deny the remaining allegations contained in Paragraph 121 of the Third Amended Complaint.

*122.    These statements were materially false and misleading and omitted material information when made because:*

> (i)     *they suggest that this was a garden-variety arrangement between a TA and a sub-TA and failed to disclose that the sub-TA structure was nothing more than an elaborate scheme to inflate Citigroup profits at the expense of Funds' shareholders;*

> (ii)    *they omitted to disclose the scheme complained of herein whereby PFPC was doing the bulk of the work, while the middleman transfer agent (Citi Fiduciary Trust), a Citibank-related entity, received tens of millions of dollars that rightfully belonged to Funds' shareholders for doing next to nothing;*

> (iii)   *they failed to disclose the misleading process which led to the appointment of the sub-TA; and*

> (iv)    *they failed to disclose the Revenue Guarantee, a material part of the scheme, which provided Citgroup entities with millions of dollars of investment banking profits.*

122.    Defendants deny the allegations contained in Paragraph 122 of the Third Amended Complaint.

*123.    This prospectus listed Defendant Daidone as Senior Vice President and Treasurer of the SB AS. The amended prospectus contained no signatures but Defendant Daidone signed the original May 26, 2000 prospectus.[5]*

---

[5] *Since there are 105 different Funds and many Funds, as well as sub-families, issue numerous prospectuses per year, Plaintiff has given a sample of the scores of Defendants' Class Period misleading statements, which, for each fund, are substantially similar if not verbatim.*

123.    Defendants refer to the prospectuses for the true and correct contents thereof, and otherwise deny the remaining allegations contained in Paragraph 123 and footnote 5 of the Third Amended Complaint.

*124.    On April 24, 2001, a prospectus for the SB AS was issued stating:*

> *Transfer Agent and shareholder servicing agent*
>
> *Citi Fiduciary Trust Company serves as the portfolios' transfer agent and shareholder servicing agent (the "transfer agent"). Pursuant to a sub-transfer agency and services agreement with the transfer agent, PFPC Global Fund Services serves as the portfolios' sub-transfer agent (the "sub-transfer agent"). The sub-transfer agent performs certain shareholder record keeping and accounting services.*

124.    Defendants deny the allegations contained in Paragraph 124 of the Third Amended Complaint, except admit that on or about May 1, 2001 Smith Barney Allocation Series Inc. issued a prospectus, and refer to that prospectus for the true and correct contents thereof.

*125.    These statements were materially false and misleading for the reasons given in paragraph 122. Defendant Daidone signed this prospectus as Principle Accounting Officer for SBAS.*

125.    Defendants deny the allegations contained in Paragraph 118 of the Third Amended Complaint, except state that Daidone's electronic signature appears on the May 1, 2001 Smith Barney Allocation Series Inc. prospectus on or about April 24, 2001 as Principal Accounting Officer and Senior Vice President and Treasurer, and refer to that prospectus for the true and correct contents thereof.

*126.    On March 29, 2002, Smith Barney Trust II sub-family caused to be filed a Form 485BPOS (a registration statement for investment companies) with the SEC. Smith Barney Trust II covers several funds including the Smith Barney Capital Appreciation Fund  ("SBCAF"), shares of which were purchased by Local 649 during the Class Period. The March 2002 Form 485BPOS, which was signed by Defendant Daidone, stated:*

> *Travelers Bank & Trust, fsb serves as the fund's transfer agent and shareholder servicing agent. The transfer agent has entered into sub-transfer agency and services agreements with PFPC Global*

*Fund Services and Primerica Shareholder Services to serve as the fund's sub-transfer agent. The sub-transfer agents will perform certain functions including shareholder record keeping and accounting services.*

126.    Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of whether Local 649 purchased shares of the Smith Barney Capital Appreciation Fund during the purported Class Period.  Defendants deny the remaining allegations contained in Paragraph 126 of the Third Amended Complaint, except state that on or about March 29, 2002, Smith Barney Trust II filed a registration statement with the SEC upon which Daidone's electronic signature appears, and refer to that document for the true and correct contents thereof.

127.    *Later in the same document, the Form 485BPOS stated:*

*TRANSFER AGENT*

*The trust has entered into a Transfer Agency and Service Agreement pursuant to which Travelers Bank & Trust, fsb, an affiliate of Salomon Smith Barney ("Travelers"), acts as transfer agent for the fund. Under the Transfer Agency and Service Agreement, Travelers maintains the shareholder account records for the fund, handles certain communications between shareholders and the fund and distributes dividends and distributions payable by the fund. For these services, Travelers receives a monthly fee computed on the basis of the number of shareholder accounts it maintains for the fund during the month and is reimbursed for out-of-pocket expenses.*

*PFPC Global Fund Services ("PFPC") and Primerica Shareholder Services act as sub-transfer agents pursuant to agreements with Travelers. Under each sub-transfer agency agreement, the sub-transfer agent maintains the shareholder account records for the fund, handles certain communications between shareholders and the fund, and distributes dividends and distributions payable by the fund. For these services, each sub-transfer agent receives a monthly fee computed on the basis of the number of shareholder accounts it maintains for the fund during the month, and is reimbursed for out-of-pocket expenses.*

127.     Defendants refer to the registration statement for the true and correct contents thereof, and otherwise deny the allegations contained in Paragraph 127 of the Third Amended Complaint.

*128.     The statements in paragraphs 126 and 127 were materially false and misleading for the reasons given in paragraph 122.  As mentioned above, this document was signed by Senior Vice President Daidone. Daidone also acted as Principle Accounting Officer of the registrant, Smith Barney Trust II.*

128.     Defendants refer to the March 29, 2002 Smith Barney Trust II registration statement for the true and correct contents thereof, and otherwise deny the allegations in Paragraph 128 of the Third Amended Complaint.

*129.     There were substantially similar, if not verbatim, statements in numerous Funds prospectuses throughout the Class Period. See, e.g., the April 30, 2002 SBAS prospectus, the June 14, 2002 Smith Barney Capital Preservation Fund 2 ("SBCPF2") prospectus, which was signed by Defendant Daidone, the September 17, 2002 SBCPF2 prospectus, the December 13, 2002 SBCPF prospectus, the January 24, 2003 SBAGF prospectus, the February 6, 2003 and February 28, 2003 SBCPF and SBCPF2 prospectuses, which were both signed by Defendant Daidone, the April 30, 2003 SBAS prospectus, and the May 29, 2003 SBAS prospectus.*

129.     Defendants refer to the prospectuses for the true and correct contents thereof, and otherwise deny the allegations in Paragraph 129 of the Third Amended Complaint.

**The December 1, 2003 Partial Disclosure**

*130.     After a whistleblower came forward to the SEC in September of 2003, the truth was subsequently partially disclosed on December 1, 2003 in a supplement to certain of the Funds' prospectuses, including those issued for the Smith Barney Capital Preservation Fund:*

*SUPPLEMENT DATED DECEMBER 1, 2003*
*TO THE*
*PROSPECTUSES*
*OF THE*
*FUNDS INDICATED BELOW*

*The following text supplements the section entitled "Management" in each of the currently effective Prospectuses for each of the Funds listed below.*

*Recent Developments*

*The Fund has received the following information from Citigroup Asset Management ("CAM"), the Citigroup business unit which includes the Fund's Investment Manager and other investment advisory companies, all of which are indirect, wholly-owned subsidiaries of Citigroup. CAM is reviewing its entry, through an affiliate, into the transfer agent business in the period 1997-1999. As CAM currently understands the facts, at the time CAM decided to enter the transfer agent business, CAM sub-contracted for a period of five years certain of the transfer agency services to a third party and also concluded a revenue guarantee agreement with this sub-contractor providing that the sub-contractor would guarantee certain benefits to CAM or its affiliates (the "Revenue Guarantee Agreement"). In connection with the subsequent purchase of the sub-contractor's business by an affiliate of the current sub-transfer agent (PFPC Inc.) used by CAM on many of the funds it manages, this Revenue Guarantee Agreement was amended, eliminating those benefits in exchange for arrangements that included a one-time payment from the subcontractor.*

*The Boards of CAM-managed funds (the "Boards") were not informed of the Revenue Guarantee Agreement with the sub-contractor at the time the Boards considered and approved the transfer agent arrangements. Nor were the Boards informed of the subsequent amendment to the Revenue Guarantee Agreement when that occurred.*

*CAM has begun to take corrective actions. CAM will pay to the applicable funds $16 million (plus interest) that CAM and its affiliates received from the Revenue Guarantee Agreement and its amendment. CAM also plans an independent review to verify that the transfer agency fees charged by CAM were fairly priced as compared to competitive alternatives. CAM is instituting new procedures and making changes designed to ensure no similar arrangements are entered into in the future.*

*CAM has briefed the SEC, the New York State Attorney General and other regulators with respect to this matter, as well as the U.S. Attorney who is investigating the matter. CAM is cooperating with governmental authorities on this matter.*

*SMITH BARNEY CONNECTICUT MONEY MARKET PORTFOLIO                          December 31, 2002*
*Class A and Y Shares*

*SB ADJUSTABLE RATE INCOME FUND  September 26, 2003*
*Smith Barney Shares*

*SMITH BARNEY AGGRESSIVE GROWTH  December 30, 2002*
*FUND INC.*

*SMITH BARNEY ALLOCATION SERIES INC. May 30, 2003*
*BALANCED PORTFOLIO*
*CONSERVATIVE PORTFOLIO*
*GLOBAL PORTFOLIO*
*GROWTH PORTFOLIO*

*HIGH GROWTH PORTFOLIO*
*INCOME PORTFOLIO*

*SMITH BARNEY APPRECIATION FUND INC. April 30, 2003*
*SMITH BARNEY ARIZONA MUNICIPALS  September 26, 2003*
*FUND INC.*
*SMITH BARNEY CALIFORNIA MUNICIPALS June 27, 2003*
*FUND INC.*

*SMITH BARNEY EQUITY FUNDS   May 31, 2003*
*SMITH BARNEY SOCIAL AWARENESS*
*FUND*

*SMITH BARNEY FUNDAMENTAL VALUE  January 28, 2003*
*FUND INC.*

*SMITH BARNEY FUNDS, INC.*
*SMITH BARNEY LARGE CAP VALUE FUND April 30, 2003*
*SMITH BARNEY SHORT-TERM HIGH  April 30, 2003*
*GRADE BOND FUND*

*U.S. GOVERNMENT SECURITIES FUND  April 30, 2003*

*SMITH BARNEY INSTITUTIONAL CASH  September 29, 2003*
*MANAGEMENT FUND INC.*
*CASH PORTFOLIO*
*GOVERNMENT PORTFOLIO*
*MUNICIPAL PORTFOLIO*

*SMITH BARNEY INVESTMENT FUNDS INC.*
*SMITH BARNEY GOVERNMENT            April 30, 2003*
*SECURITIES FUND*
*SMITH BARNEY GROUP SPECTRUM FUND  January 28, 2003*
*SMITH BARNEY HANSBERGER GLOBAL  August 28, 2003*
*VALUE FUND*
*SMITH BARNEY INVESTMENT GRADE  April 30, 2003*
*BOND FUND*
*SMITH BARNEY PREMIER SELECTIONS  August 28, 2003*
*ALL CAP GROWTH FUND*
*SMITH BARNEY PREMIER SELECTIONS  August 28, 2003*
*GLOBAL GROWTH FUND*
*SMITH BARNEY PREMIER SELECTIONS  August 28, 2003*
*LARGE CAP FUND*
*SMITH BARNEY SMALL CAP VALUE FUND January 28, 2003*
*SMITH BARNEY SMALL CAP GROWTH  January 28, 2003*
*FUND*

*SMITH BARNEY INVESTMENT SERIES  February 28, 2003*
*SB GROWTH AND INCOME FUND*
*Smith Barney Shares*
*SMITH BARNEY INTERNATIONAL FUND*
*SMITH BARNEY LARGE CAP CORE FUND*
*SMITH BARNEY INVESTMENT TRUST*
*SMITH BARNEY INTERMEDIATE  March 28, 2003*
*MATURITY CALIFORNIA MUNICIPALS*
*FUND*
*SMITH BARNEY INTERMEDIATE          March 28, 2003*
*MATURITY NEW YORK MUNICIPALS*
*FUND*
*SMITH BARNEY LARGE CAPITALIZATION March 28, 2003*
*GROWTH FUND*
*SMITH BARNEY MID CAP CORE FUND  March 28, 2003*
*SMITH BARNEY CLASSIC VALUES FUND  February 10, 2003*

*SMITH BARNEY MANAGED MUNICIPALS  June 27, 2003*
*FUND INC.*
*SMITH BARNEY MASSACHUSETTS          March 28, 2003*
*MUNICIPALS FUND*
*SMITH BARNEY MONEY FUNDS, INC.  April 30, 2003*

*SMITH BARNEY MUNI FUNDS*
*CALIFORNIA MONEY MARKET          July 29, 2003*
*PORTFOLIO*
*FLORIDA PORTFOLIO          July 29, 2003*
*GEORGIA PORTFOLIO          July 29, 2003*
*LIMITED TERM PORTFOLIO          July 29, 2003*
*MASSACHUSETTS MONEY MARKET  July 29, 2003*
*PORTFOLIO*
*NATIONAL PORTFOLIO          July 29, 2003*
*NEW YORK MONEY MARKET PORTFOLIO  July 29, 2003*
*NEW YORK PORTFOLIO          July 29, 2003*
*PENNSYLVANIA PORTFOLIO          July 29, 2003*

*SMITH BARNEY MUNICIPAL MONEY MARKET  July 29, 2003*
*FUND, INC.*

*SMITH BARNEY NEW JERSEY MUNICIPALS  July 29, 2003*
*FUND, INC.*
*SMITH BARNEY OREGON MUNICIPALS FUND  August 28, 2003*
*SMITH BARNEY PRINCIPAL RETURN FUND*
*SECURITY AND GROWTH FUND          March 31, 2003*

*SMITH BARNEY SECTOR SERIES FUND INC.  February 28, 2003*
*SMITH BARNEY FINANCIAL SERVICES*

*FUND*
*SMITH BARNEY HEALTH SCIENCES FUND*
*SMITH BARNEY TECHNOLOGY FUND*

*SMITH BARNEY SMALL CAP CORE FUND, INC. April 30, 2003*

*SMITH BARNEY TELECOMMUNICATIONS*
*TRUST*
*SMITH BARNEY TELECOMMUNICATIONS*
*INCOME FUND                                April 30, 2003*

*SMITH BARNEY TRUST II*
*SMITH BARNEY DIVERSIFIED LARGE CAP February 28, 2003*
*GROWTH FUND*
*SMITH BARNEY INTERNATIONAL LARGE  April 30, 2003*
*CAP FUND*
*SMITH BARNEY SMALL CAP GROWTH  February 28, 2003*
*OPPORTUNITIES FUND*
*SMITH BARNEY CAPITAL PRESERVATION  February 28, 2003*
*FUND*
*SMITH BARNEY CAPITAL PRESERVATION  February 28, 2003*
*FUND II*
*SMITH BARNEY SHORT DURATION  March 3, 2003*
*MUNICIPAL INCOME FUND*

*SMITH BARNEY WORLD FUNDS, INC.  February 28, 2003*
*GLOBAL GOVERNMENT BOND*
*PORTFOLIO*
*INTERNATIONAL ALL CAP GROWTH*
*PORTFOLIO*

130.    Defendants deny the allegations contained in Paragraph 130 of the Third

Amended Complaint, except admit that on or about December 1, 2003 a supplement to

prospectuses of certain Smith Barney mutual funds, including the Smith Barney Capital

Preservation Fund, was issued, and refer to those supplements for the true and correct contents

thereof.

*131.    This statement disclosed some of the facts surrounding the Revenue Guarantee. It*
*was still misleading, however, because it failed to disclose the scheme behind the sub-TA, e.g.,*
*that CTB was paid tens of millions of dollars (that rightfully belonged to shareholders) for doing*
*little work while, moreover, PFPC did the bulk of the work at radically reduced rates. That*
*information was not made public until the SEC instituted proceedings against the Adviser and*
*Global Markets on May 31, 2005.*

131. Defendants deny the allegations contained in Paragraph 131 of the Third Amended Complaint, except admit that the supplements disclosed facts surrounding the Revenue Guarantee, and refer to those supplements for the true and correct contents thereof.

*132. The misleading statements continued throughout 2004. On March 1, 2004, the Smith Barney Trust II, a sub-family of the Funds including the Smith Barney Capital Preservation Fund, made the following statements in a prospectus:*

*TRANSFER AGENT AND SHAREHOLDER SERVICING AGENT Citicorp Trust Bank, fsb, an affiliate of the manager, serves as the fund's transfer agent and shareholder servicing agent (the "transfer agent"). The transfer agent has entered into a sub-transfer agency and services agreement with PFPC Inc. to serve as the fund's sub-transfer agent (the "sub-transfer agent"). The sub-transfer agent will perform certain functions including shareholder record keeping and accounting services.*

*RECENT DEVELOPMENTS During the period from 1997-1999, Citicorp Trust Bank, fsb ("Citicorp Trust"), an affiliate of Citigroup Asset Management ("CAM"), entered the transfer agent business. CAM is the Citigroup business unit that includes the fund's investment manager and other investment advisory companies. Citicorp Trust hired a subcontractor to perform some of the transfer agent services. The subcontractor, in exchange, signed a separate agreement with CAM in 1998 that guaranteed investment management revenue to CAM and investment banking revenue to a CAM affiliate. The subcontractor's business was later taken over by PFPC Inc. (the fund's current sub-transfer agent), and at that time the revenue guarantee was eliminated and a one-time payment was made by the subcontractor to a CAM affiliate.*

*CAM did not disclose the revenue guarantee agreement when the Board of the fund and various other CAM-managed funds hired Citicorp Trust as transfer agent. Nor did CAM disclose the one-time payment to the boards of the CAM-managed funds when it was made.*

*CAM is taking corrective actions. CAM will pay to the applicable funds approximately $17 million (plus interest) that CAM and its affiliates received from the revenue guarantee agreement and the one-time payment. CAM is also conducting an independent review to verify that the transfer agency fees charged by Citicorp Trust were fair compared to competitive alternatives. CAM is strengthening its procedures in order to avoid similar situations in the future.*

*CAM has given this information to regulators and other government authorities, and understands that the SEC and the U.S. Attorney are investigating this situation.*

132.    Defendants deny the allegations contained in Paragraph 132 of the Third

Amended Complaint, except admit that on or about March 1, 2004 Smith Barney Trust II issued

a prospectus, and refer to that document for the true and correct contents thereof.

*133.    These statements were materially false and misleading for the reasons given in paragraph 131.*

133.    Defendants deny the allegations contained in Paragraph 133.

*134.    On August 28, 2004, the SBIF, a sub-family of the Funds which includes the Smith Barney Large Cap Growth and Value Fund, issued a prospectus stating:*

*Transfer agent and shareholder servicing agent Citicorp Trust Bank, fsb ("Citicorp Trust") serves as each fund's transfer agent and shareholder servicing agent (the "transfer agent"). The transfer agent has entered into sub-transfer agency and services agreements with PFPC Inc. and Primerica Shareholder Services to serve as each fund's sub-transfer agents (the "sub-transfer agents"). The sub-transfer agents will perform certain functions including shareholder record keeping and accounting services.*

*Citigroup has been notified by the Staff of the SEC that the Staff is considering recommending a civil injunctive action and/or an administrative proceeding against Citigroup Asset Management (CAM), including its applicable investment advisory companies and Citicorp Trust, relating to the creation and operation of the internal transfer agent unit to serve certain CAM-managed funds, including the funds. This notification arises out of a previously disclosed investigation by the SEC and the U.S. Attorney and relates to Citicorp Trust's entry in 1999 into the transfer agency business, CAM's retention of, and agreements with an unaffiliated sub-transfer agent, the adequacy of the disclosures made to the fund boards that approved the transfer agency arrangements (including CAM's failure to disclose a related revenue guarantee agreement benefiting CAM and its affiliates), and CAM's operation of and compensation for the transfer agency business. The revenue guarantee described above was terminated in 1999 and CAM will be paying the applicable funds, primarily through fee waivers, a total of approximately $17 million (plus interest) that is the amount of the revenue received by Citigroup relating to the revenue guarantee. Citigroup is cooperating fully in the investigation and will seek to resolve the matter in discussions with the SEC Staff. Although there can be no assurance, Citigroup does not believe that this matter will have a material adverse effect on the funds.*

134.    Defendants lack knowledge or information sufficient to form a belief as to the

truth or falsity of whether Jeffrey Weber owned shares in the Smith Barney Large Cap Growth

and Value Fund.  Defendants deny the remaining allegations contained in Paragraph 129 of the

Third Amended Complaint, except admit that on or about August 27, 2004, Smith Barney

Investment Funds Inc. issued a prospectus, and refer to that prospectus for the true and correct

contents thereof

*135.     These statements were materially false and misleading for the reasons given in*
*paragraph 131.*

135.     Defendants deny the allegations contained in Paragraph 135 of the Third

Amended Complaint.

*136.     On January 21, 2005, Citigroup, Global Markets' then-parent company,*
*announced in a supplement to numerous Funds' prospectuses:*

> *In connection with an investigation previously disclosed by Citigroup, the Staff of the*
> *Securities and Exchange Commission (SEC) has notified Citigroup Asset Management*
> *(CAM), the Citigroup business unit that includes the funds' investment manager and*
> *other investment advisory companies; Citicorp Trust Bank (CTB), an affiliate of CAM;*
> *Thomas W. Jones, the former CEO of CAM; and three other individuals, one of whom is*
> *an employee and two of whom are former employees of CAM, that the SEC Staff is*
> *considering recommending a civil injunctive action and/or an administrative proceeding*
> *against each of them relating to the creation and operation of an internal transfer agent*
> *unit to serve various CAM-managed funds.*
>
> *In 1999, CTB entered the transfer agent business. CTB hired an unaffiliated*
> *subcontractor to perform some of the transfer agent services. The subcontractor, in*
> *exchange, had signed a separate agreement with CAM in 1998 that guaranteed*
> *investment management revenue to CAM and investment banking revenue to a CAM*
> *affiliate. The subcontractor's business was later taken over by PFPC Inc., and at that*
> *time the revenue guarantee was eliminated and a one-time payment was made by the*
> *subcontractor to a CAM affiliate.*
>
> *CAM did not disclose the revenue guarantee when the boards of various CAM-managed*
> *funds hired CTB as transfer agent. Nor did CAM disclose to the boards of the various*
> *CAM-managed funds the one-time payment received by the CAM affiliate when it was*
> *made. As previously disclosed, CAM has already paid the applicable funds, primarily*
> *through fee waivers, a total of approximately $17 million (plus interest) that is the*
> *amount of the revenue received by Citigroup relating to the revenue guarantee.*
>
> *In addition, the SEC Staff has indicated that it is considering recommending action based*
> *on the adequacy of the disclosures made to the fund boards that approved the transfer*
> *agency arrangement, CAM's initiation and operation of, and compensation for, the*
> *transfer agent business and CAM's retention of, and agreements with, the subcontractor.*
>
> *Citigroup is cooperating fully in the SEC's investigation and is seeking to resolve the*
> *matter in discussions with the SEC staff. On January 20, 2005, Citigroup stated that it*
> *had established an aggregate reserve of $ 196 million ($25 million in the third quarter of*

*2004 and $171 million in the fourth quarter of 2004) related to its discussions with the SEC Staff. Settlement negotiations are ongoing and any settlement of this matter with the SEC will require approval by the Citigroup Board and acceptance by the Commission.*

*Unless and until any settlement is consummated, there can be no assurance that any amount reserved by Citigroup will be distributed. Nor is there at this time any certainty as to how the proceeds of any settlement would be distributed, to whom any such distribution would be made, the methodology by which such distribution would be allocated, and when such distribution would be made.*

*Although there can be no assurance, Citigroup does not believe that this matter will have a material adverse effect on the funds.*

136. Defendants deny the allegations contained in Paragraph 136 of the Third Amended Complaint, except admit that on or about January 21, 2005 a supplement to certain Smith Barney mutual funds' prospectuses was released, and refer to that supplement for the true and correct contents thereof.

*137. These statements were materially false and misleading for the reasons given in paragraph 131.*

137. Defendants deny the allegations contained in Paragraph 137 of the Third Amended Complaint.

*138. On February 25, 2005, the Smith Barney Trust II stated the following in a prospectus:*

*TRANSFER AGENT AND SHAREHOLDER SERVICING AGENT Citicorp Trust Bank, fsb, serves as the fund's transfer agent and shareholder servicing agent (the "transfer agent"). The transfer agent has entered into a sub-transfer agency and services agreement with PFPC Inc. to serve as the fund's sub-transfer agent (the "sub-transfer agent"). The sub-transfer agent will perform certain shareholder record keeping and accounting services.*

*RECENT DEVELOPMENTS*
*In connection with an investigation previously disclosed by Citigroup, the Staff of the SEC has notified Citigroup Asset Management (CAM), the Citigroup business unit that includes the fund's investment manager and other investment advisory companies; Citigroup Trust Bank (CTB), an affiliate of CAM; Thomas W. Jones, the former CEO of CAM; and three other individuals, one of whom is an employee and the other two of whom are former employees of CAM, that the SEC Staff is considering recommending a civil injunctive action and/or an administrative proceeding against each of them relating*

*to the creation and operation of an internal transfer agent unit to serve various CAM-managed funds.*

*In 1999, CTB entered the transfer agent business. CTB hired an unaffiliated subcontractor to perform some of the transfer agent services. The subcontractor, in exchange, had signed a separate agreement with CAM in 1998 that guaranteed investment management revenue to CAM and investment banking revenue to a CAM affiliate. The subcontractor's business was later taken over by PFPC Inc., and at that time the revenue guarantee was eliminated and a one-time payment was made by the subcontractor to a CAM affiliate.*

*CAM did not disclose the revenue guarantee when the boards of various CAM-managed funds hired CTB as transfer agent. Nor did CAM disclose to the boards of the various CAM-managed funds the one-time payment received by the CAM affiliate when it was made. As previously disclosed, CAM has already paid the applicable funds, primarily through fee waivers, a total of approximately $17 million (plus interest) that is the amount of the revenue received by Citigroup relating to the revenue guarantee. In addition, the SEC Staff has indicated that it is considering recommending action based on the adequacy of the disclosures made to the fund boards that approved the transfer agency arrangement, CAM's initiation and operation of, and compensation for, the transfer agent business and CAM's retention of, and agreements with, the subcontractor.*

*Citigroup is cooperating fully in the SEC's investigation and is seeking to resolve the matter in discussions with the SEC Staff. On January 20, 2005, Citigroup stated that it had established an aggregate reserve of $ 196 million ($25 million in the third quarter of 2004 and $171 million in the fourth quarter of 2004) related to its discussions with the SEC Staff. Settlement negotiations are ongoing and any settlement of this matter with the SEC will require approval by the Citigroup Board and acceptance by the Commission.*

*Unless and until any settlement is consummated, there can be no assurance that any amount reserved by Citigroup will be distributed. Nor is there at this time any certainty as to how the proceeds of any settlement would be distributed, to whom any such distribution would be made, the methodology by which such distribution would be allocated, and when such distribution would be made.*

*Although there can be no assurance, Citigroup does not believe that this matter will have a material adverse effect on the fund.*

138.    Defendants deny the allegations contained in Paragraph 138 of the Third Amended Complaint, except admit that on or about February 25, 2005, Smith Barney Trust II released a prospectus, and refer to that prospectus for the true and correct contents thereof.

*139.    These statements were materially false and misleading for the reasons given in paragraph 131.*

139.     Defendants deny the allegations contained in Paragraph 139 of the Third

Amended Complaint.

*140.     On May 31, 2005, the last day of the Class Period, the SEC published an Order announcing that in anticipation of proceedings against the Adviser and Global Markets, these entities submitted an offer to the SEC which the SEC had "determined to accept". This order, for the first time, revealed the intricate scheme behind the creation of the sub-TA by which Defendants diverted tens of millions of dollars from the Funds to another Citigroup entity.*

140.     Defendants deny the allegations contained in Paragraph 140 of the Third

Amended Complaint, except admit that on or about May 31, 2005, the SEC entered against

SBFM and CGMI an Order Instituting Administrative and Cease-and-Desist Proceedings, and

refer to that document for the true and correct contents thereof.

## DAMAGES SUFFERED BY THE CLASS/LOSS CAUSATION

*141.     Throughout the Class Period, Plaintiffs and Class members were damaged by Defendants' fraudulent scheme alleged herein. As described above, Defendants' scheme diminished the value of Funds' shares by mis-appropriating and diverting tens of millions of dollars from Funds' shareholders through the creation of a Citigroup-related entity (CTB) as transfer agent while the original transfer agent, PFPC (originally First Data) performed the bulk of the work as sub-transfer agent for radically reduced fees. Defendants' scheme also harmed Funds' shareholders by increasing transaction fees by using two transfer agents instead of one. Accordingly, Defendants paid tens of millions of dollars more for transfer agent services than was necessary and money that belonged to Funds' shareholders went right back into the coffers of Citigroup-related entities.*

141.     Defendants deny the allegations contained in Paragraph 141 of the Third

Amended Complaint.

*142.     Class members were also damaged by purchasing Funds' shares at distorted NAV values.*

142.     Defendants deny the allegations contained in Paragraph 142 of the Third

Amended Complaint.

*143.     Plaintiff and the Class have also suffered lost opportunity damages because the money that was drained from their accounts by Defendants' actions could have been invested for further gains.*

143.     Defendants deny the allegations contained in Paragraph 143 of the Third

Amended Complaint.

## SCIENTER

*144.     Defendants' scienter is clear because the elaborate scheme discussed herein could not have occurred absent actual knowledge. Indeed, Defendants Adviser, Global Markets, and Daidone were integral participants in the scheme. Defendants were also motivated to construct the scheme alleged herein because it provided tens of millions of dollars in extra profits for Citigroup entities.*

144.     Defendants deny the allegations contained in Paragraph 144 of the Third

Amended Complaint.

## CAUSES OF ACTION

## COUNT I

**Violation Of Section 10(b) Of The Exchange Act And Rule 10b-5
Promulgated Thereunder Against The Adviser, Global Markets, and Daidone**

*145.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.*

145.     Defendants repeat and incorporate by reference all of the foregoing paragraphs of

this Answer as if fully set forth herein.

*146.     Throughout the Class Period, the Adviser, Global Markets, and Daidone carried out a plan, scheme, and course of conduct that was intended to and did: (i) deceive the investing public, including Plaintiff and the other Class members, as alleged herein; and (ii) induce Class members to purchase shares of the Funds at distorted prices. In furtherance of this unlawful scheme and course of conduct, Defendants took the actions set forth herein.*

146.     Defendants deny the allegations contained in Paragraph 146 of the Third

Amended Complaint.

*147.     Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Funds in an effort to induce Class members to purchase shares of the Funds at distorted prices in violation of Section 10(b) of the Exchange Act and Rule 10b-5.*

147.     Defendants deny the allegations contained in Paragraph 147 of the Third Amended Complaint, except to the extent that Paragraph 147 states a legal conclusion, as to which no responsive pleading is required.

*148.     The Adviser, Global Markets, and Daidone, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct in order to profit as a result of the undisclosed scheme discussed herein.*

148.     Defendants deny the allegations contained in Paragraph 148 of the Third Amended Complaint.

*149.     As a result of Defendants' scheme and failure to disclose material facts, as set forth above, the price of Funds shares was distorted and did not reflect their true value. In ignorance of this, and relying directly or indirectly on the false and misleading public statements alleged herein, or upon the integrity of the market in which the Funds trade, Plaintiff and Class members suffered harm throughout the Class Period.*

149.     Defendants deny the allegations contained in Paragraph 149 of the Third Amended Complaint.

*150.     At the time of said omissions, Plaintiff and the other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known of the truth, which was not disclosed by the Adviser, Global Markets, or Daidone, Plaintiff and the other members of the Class would not have purchased or held their Funds shares during the Class Period, or if they had, they would not have done so at distorted prices.*

150.     Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations contained in Paragraph 150 of the Third Amended Complaint.

*151.     By virtue of the foregoing, the Adviser, Global Markets, and Daidone have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.*

151.     Defendants deny the allegations contained in Paragraph 146 of the Third Amended Complaint, except to the extent that Paragraph 151 states a legal conclusion, as to which no responsive pleading is required.

*152.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages during the Class Period.*

152.    Defendants deny the allegations contained in Paragraph 152 of the Third

Amended Complaint.

## COUNT II

### Violation Of Section 20(a) Of The Exchange Act Against Daidone

*153.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.*

153.    Defendants repeat and incorporate by reference all of the foregoing paragraphs of

this Answer as if fully set forth herein.

*154.    Daidone acted as controlling persons of the Adviser and Global Markets within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Adviser and Global Markets' operations and/or intimate knowledge of the statements filed by the Funds and/or the Adviser and Global Markets with the SEC and disseminated to the investing public, Daidone had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Adviser and Global Markets, including the content and dissemination of the various statements that Plaintiff contends are false and misleading. Daidone were provided with or had unlimited access to copies of the Funds, the Adviser and/or Global Markets' reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.*

154.    Defendants deny the allegations contained in Paragraph 154 of the Third

Amended Complaint, except to the extent that Paragraph 149 states a legal conclusion, as to

which no responsive pleading is required.

*155.    In particular, Daidone had direct and supervisory involvement in the day-to-day operations of the Adviser and Global Markets and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.*

155.    Defendants deny the allegations contained in Paragraph 155 of the Third

Amended Complaint, except to the extent that Paragraph 155 states a legal conclusion, as to

which no responsive pleading is required.

*156.    As set forth above, the Adviser, Global Markets, and Daidone violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their*

*positions as controlling persons, Daidone are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of the Adviser, Global Markets, and Daidone's wrongful conduct, Plaintiff and the other members of the Class suffered damages during the Class Period.*

156.    Defendants deny the allegations contained in Paragraph 156 of the Third Amended Complaint, except to the extent that Paragraph 156 states a legal conclusion, as to which no responsive pleading is required.

WHEREFORE, Plaintiffs and the Class pray for judgment as follows:

*A.    Awarding monetary damages against all of the Defendants for all losses and damages suffered as a result of the wrongdoings alleged in this Complaint, together with interest thereon;*

*B.    Awarding Plaintiffs the fees and expenses incurred in this action including reasonable allowance of fees for Plaintiffs' attorneys, and experts; and*

*C.    Granting Plaintiffs such other and further relief as the Court may deem just and proper.*

Defendants deny that Plaintiff is entitled to any of the relief requested in its prayer for judgment, and to the extent the prayer for judgment contains factual allegations of wrongdoing by Defendants, Defendants deny those allegations.

Defendants further assert the following defenses:

## FIRST AFFIRMATIVE DEFENSE

1.    The Third Amended Complaint fails to state a claim upon which relief may be granted.

## SECOND AFFIRMATIVE DEFENSE

2.    The Third Amended Complaint fails to state a claim against Defendants because some of the allegedly misleading statements, in whole or in part, were not made by Defendants. *See Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. __, 131 S. Ct. 2296 (2011).

## THIRD AFFIRMATIVE DEFENSE

3.      Plaintiffs lack standing and/or capacity to assert the claims alleged in the Third

Amended Complaint.

## FOURTH AFFIRMATIVE DEFENSE

4.      The claims alleged in the Third Amended Complaint are barred, in whole or in

part, by the applicable statutes of limitation.

## FIFTH AFFIRMATIVE DEFENSE

5.      The claims alleged in the Third Amended Complaint by named plaintiffs who

were not included in the first amended complaint are untimely pursuant to the five-year statute of

repose set forth in 28 U.S.C. § 1658(b)(2), and the two-year statute of limitations set forth in 28

U.S.C. § 1658(b)(1).  *See* Defendants Memorandum of Law in Support of Defendants' Motion

for Judgment on the Pleadings that the Newly Named Plaintiffs' Claims Are Time-Barred, Dkt. #

143 (July 8, 2011).

## SIXTH AFFIRMATIVE DEFENSE

6.      The claims alleged in the Third Amended Complaint are barred, in whole or in

part, by the doctrine of estoppel.

## SEVENTH AFFIRMATIVE DEFENSE

7.      The claims alleged in the Third Amended Complaint are barred, in whole or in

part, by the doctrine of waiver.

## EIGHTH AFFIRMATIVE DEFENSE

8.      The claims alleged in the Third Amended Complaint are barred because Plaintiffs

have suffered no damage.

## NINTH AFFIRMATIVE DEFENSE

9.      Defendants are entitled to an offset, against any damages determined to be owed

to Plaintiffs, in the amount that Plaintiffs have already been reimbursed for their alleged damages

as a result of disgorgement to the Funds made pursuant to a settlement order with the SEC.

## TENTH AFFIRMATIVE DEFENSE

10.     Defendants reserve their right to assert additional affirmative defenses as they are

ascertained during the course of discovery.


WHEREFORE, Smith Barney Fund Management LLC and Citigroup Global Markets

Inc. respectfully request that this Court enter judgment as follows:

(i)      Dismissing the Third Amended Complaint with prejudice;

(ii)     Awarding Smith Barney Fund Management LLC and Citigroup Global Markets

Inc. their costs and expenses incurred in defending this action, including reasonable attorneys'

fees; and

(iii)    Granting Smith Barney Fund Management LLC and Citigroup Global Markets

Inc. such other and further relief as this Court deems just and proper.

Dated: New York, New York
       July 18, 2011

                    WILMER CUTLER PICKERING
                       HALE AND DORR LLP


                    By: /s/ Lori A. Martin_____
                    Lori A. Martin
                    (lori.martin@wilmerhale.com)
                    Peter K. Vigeland
                    (peter.vigeland@wilmerhale.com)
                    David M. Burkoff
                    (david.burkoff@wilmerhale.com)
                    David P. Nicolardi
                    (david.nicolardi@wilmerhale.com)
                    Brian Sutherland
                    (brian.sutherland@wilmerhale.com)
                    399 Park Avenue
                    Tamar Kaplan-Marans
                    (tamar.kaplan-marans@wilmerhale.com)
                    New York, NY 10022
                    Tel: (212) 230-8800
                    Fax: (212) 230-8888

                    *Counsel for Defendants Smith Barney
                    Fund Management LLC and Citigroup
                    Global Markets Inc.*