**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | 05 Civ. 7583 (WHP) |
| Smith Barney Transfer Agent Litigation | ECF case |
| This document relates to:  all actions | |

**DECLARATION OF VINITA M. JUNEJA, PH.D.**
**IN SUPPORT OF DEFENDANTS' OPPOSITION TO**
**LEAD PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

I, Vinita Juneja, Ph.D., hereby declare as follows pursuant to 28 U.S.C. § 1746:

**I.     Introduction**

   **A. Assignment and Summary of Allegations**

1.      I have been retained by counsel for Smith Barney Fund Management LLC and Citigroup Global Markets, Inc. (collectively, "Citigroup"), to provide economic and financial analyses relevant to class certification in the matter of *In Re Smith Barney Fund Transfer Agent Litigation*, 05 Civ. 7583 (WHP), pending in the United States District Court for the Southern District of New York.  Plaintiffs in this action seek to certify a class of "all persons and entities who purchased, redeemed, or held shares of the Smith Barney Funds … between September 11, 2000 and May 31, 2005 …, and who were damaged thereby."[1]  Plaintiffs allege, in part, that the Smith Barney funds at issue (the "Smith Barney Funds" or the "Funds") paid excessive transfer agency fees ("TA fees") to a Citigroup affiliate over the course of the Alleged Class Period, which "diminished the value of Funds' shares" for the plaintiffs because Citigroup was "paid tens of millions of dollars more for transfer agent services than was necessary and money that belonged to Funds' shareholders went right back into the coffers of Citigroup-related entities."[2]

---

[1] Opening paragraph, Third Consolidated and Amended Class Action Complaint ("Complaint") in the above-referenced action filed June 30, 2011.  The potential class is limited to purchasers or sellers, but not holders, of the Funds between September 11, 2000 and May 31, 2005 (the "Alleged Class Period").  Memorandum and Order filed January 25, 2011.

[2] Complaint, ¶141.

Plaintiffs further claim that "[c]lass members were also damaged by purchasing Funds' shares at distorted NAV values" and "Plaintiffs and the Class have also suffered lost opportunity damages because the money that was drained from their accounts by Defendants' actions could have been invested for further gains."[3]

2.      The Alleged Class Period begins on September 11, 2000, the date when the amended prospectus for the Smith Barney Allocation Series was issued.[4]  The amended prospectus named Citi Fiduciary Trust Company (which was later succeeded by Citicorp Trust Bank, FSB ("CTB")) as the transfer agent for the Funds and PFPC Global Fund Services and PFS Shareholder Services as the Funds' sub-transfer agents.[5]  Plaintiffs allege that Citigroup misrepresented the exact process and nature of the new TA arrangement and the agreement with First Data by which First Data was obligated to provide investment banking business to Citigroup entities (the "Revenue Guarantee Agreement").  Plaintiffs allege that later Securities and Exchange Commission ("SEC") filings continued to make these misstatements until as late as February 25, 2005, when the Smith Barney Trust II Prospectus was filed with the SEC.[6]  In particular, plaintiffs allege that Defendants[7] made materially false and misleading statements during the Alleged Class Period that:

    a.    suggested the TA arrangement "was a garden-variety arrangement between a TA and a sub-TA and failed to disclose that the sub-TA structure was nothing more than an elaborate scheme to inflate Citigroup profits at the expense of Funds' shareholders";

    b.    failed "to disclose the scheme…whereby [PFPC, Inc.] was doing the bulk of the work, while the middleman transfer agent (Citi Fiduciary Trust), a

---

[3] Complaint, ¶¶142-143.

[4] Complaint, ¶121.  Smith Barney Allocation Series is a sub-family of the Smith Barney Funds listed in the Complaint.

[5] Complaint, ¶121.

[6] Complaint, ¶138.

[7] The term "Defendants" refers to Smith Barney Fund Management LLC, Citigroup Global Markets, Inc., and Lewis Daidone collectively.

Citibank-related entity, received tens of millions of dollars that rightfully belonged to Funds' shareholders for doing next to nothing";

c.   "failed to disclose the misleading process which led to the appointment of the sub-TA"; and

d.   "failed to disclose the Revenue Guarantee…which provided Citigroup entities with millions of dollars of investment banking profits."[8]

3.      Plaintiffs do not allege that Citigroup failed to disclose the total TA fees charged to the Funds.  Instead, the alleged misstatements relate to the fact that the TA fee amounts by which the Smith Barney Funds were allegedly overcharged (the "Allegedly Excessive TA Fees") were being retained by Citigroup.[9]

4.      On November 25, 2003, Citigroup announced that it had discovered improper practices related to the Revenue Guarantee Agreement and that the U.S. Attorney's Office was investigating the TA arrangement.[10]  A week later, on December 1, 2003, Citigroup announced that it would pay the Funds $16 million plus interest as corrective action for the Revenue Guarantee Agreement.[11]

5.      On March 1, 2004, Citigroup wrote in its annual report that the SEC and the U.S. Attorney's Office were investigating Citigroup's TA arrangement with the Smith Barney Funds.[12]  On July 20, 2004, Citigroup announced that the SEC had informed it of a possible enforcement action following the SEC investigation.[13]  On January 20, 2005, Citigroup

---

[8] Complaint, ¶122.

[9] Complaint, ¶¶11, 121-140.

[10] Willetts, Susan, "Citigroup: Focused On Entry Into Transfer Agent Business," *Dow Jones News Service*, November 25, 2003.

[11] "Salomon Brothers High Income Fund Inc Issues Statement," *PR Newswire*, December 1, 2003.

[12] Citigroup SEC Form 10-K filed March 1, 2004, p. 126.

[13] Citigroup SEC Form 8-K filed July 20, 2004.

announced its fourth quarter results, which included a reserve of $171 million for potential resolution of the SEC investigation.[14]

6.       On May 31, 2005, Citigroup settled with the SEC for $208 million.  The settlement consisted of $109,004,551 in disgorgement, $19,055,630 in prejudgment interest, and $80,000,000 in civil money penalties.[15]   The SEC also indicated that Citigroup had been required to set aside future profits related to the Allegedly Excessive TA Fees in an escrow account starting on December 1, 2004 and through "the effective date of a new TA contract for the Funds."[16]   The total disgorgement pursuant to the SEC settlement – comprised primarily of the profits recognized by CTB over the relevant period – is a reasonable proxy for the Allegedly Excessive TA Fees.  The majority of the disgorgement ($92 million in Allegedly Excessive TA Fees along with $11 million in prejudgment interest) was paid to the Funds on May 26, 2010, which was also the last disgorgement payment.[17]

7.       In connection with my retention in the above-referenced action, I have conducted two types of analyses.  First, I have examined the materiality of Citigroup's non-disclosure of the Allegedly Excessive TA Fees in the Funds' SEC filings.  Second, I have examined whether certain plaintiffs received a net benefit by comparing their alleged loss due to alleged misconduct for a particular Fund with the disgorgement received by the Funds in which plaintiffs invested.[18]

**B.  Summary of Opinions**

8.       I have assessed whether the information about the Allegedly Excessive TA Fees that plaintiffs allege was misstated would have been important to the putative class of investors in four ways.  First, I reviewed the relevant academic and professional literature to determine

---

[14] "Citigroup Fourth Quarter Net Income Increases 12% to a Record $5.32 Billion; Fourth Quarter EPS of $1.02, up 12%; Revenues Increase 9% to $21.9 Billion," *Business Wire*, January 20, 2005.

[15] SEC Order dated May 31, 2005.  Available online at: http://www.sec.gov/litigation/fairfundlist.htm#smithbarney. See Complaint, ¶140.

[16] SEC Order dated May 31, 2005, ¶72.

[17] State Street Confirmation Re. Administrative Proceeding File No. 3-11935 dated June 4, 2010. (Bates Range: CITI-SBFTA 00327757-62).

[18] As of 2006, the Smith Barney Funds became Legg Mason Funds.  See "Smith Barney Funds Renamed to 'Legg Mason Partners Funds'," *Legg Mason, Inc. Press Release*, April 7, 2006.  Available online at: http://www.leggmason.com/press/releases/04_06_2006.pdf.

whether misstatements about the Allegedly Excessive TA Fees would likely have been material to investors. This review indicates that investors typically do not consider the magnitude of TA fees to be an important factor when making investment decisions.

9.    Second, I compared the TA fees for the Smith Barney Funds with those of their peer funds. This comparison reveals that the TA fees for the Smith Barney funds were lower than or equal to those of their peer funds.

10.   Third, for each of the Smith Barney Funds which remain in the case, I have calculated the dollar impact of the Allegedly Excessive TA Fees on a net asset value ("NAV") basis per share for each Smith Barney Fund in which a named plaintiff allegedly invested. I calculated this impact on a daily basis for each class of shares of the Smith Barney Fund, as the amount of Allegedly Excessive TA Fees often varied by class of shares. The maximum daily per share NAV impact for a Fund class was $0.00028 for the Smith Barney Aggressive Growth Fund Class B, which had a per share NAV ranging from $49.95 to $104.55 from September 11, 2000 through May 31, 2005.

11.   Fourth, I have calculated whether, and to what extent, investors undertook redemptions, or decreased subscriptions, from the Smith Barney Funds upon announcement of the U.S. Attorney's and SEC's investigations and the SEC's settlement with Citigroup. If the information about the Allegedly Excessive TA Fees was material to investors, one would expect these announcements to correspond to increased redemptions and/or decreased subscriptions from the Smith Barney Funds. My analysis did not indicate any material change in redemptions and subscriptions from the Smith Barney Funds following these announcements.

12.   In addition, I have determined that some of the named plaintiffs who purchased shares in particular Smith Barney Funds during the Alleged Class Period, and who held onto those shares until the settlement amounts were fully repaid to the Funds in May 2010, benefited on a net basis. Put differently, the negative impact on the NAV of the holdings of some of the named plaintiffs in particular Funds due to the payment of the Allegedly Excessive TA Fees by the Funds in which these named plaintiffs invested was more than offset by the pro-rata benefit conferred on those plaintiffs by the disgorgement paid to the Funds in May 2010. This analysis is done on a Fund by Fund basis for the Funds in which those named plaintiffs invested.

**C.  Qualifications and Remuneration**

13.    I am a Senior Vice President at NERA Economic Consulting ("NERA").  From 2006 through 2009, I was the Chair of the Global Securities and Finance Practice of NERA ("Securities Practice").  NERA was established in 1961 and now employs over 500 people in over 20 offices worldwide.  The Securities Practice dates from the early 1970s, and employs a research staff of about 150 professionals with degrees in economics, finance, accounting and mathematics.  Our clients include: major securities exchanges; securities regulators; risk managers; principals requiring valuation services; and, parties involved in litigation, mediation and arbitration disputes.

14.    I have a B.A. in economics from the University of Western Ontario.  I also have an M.A. and a Ph.D. in economics from Harvard University.  I have taught courses in economics and business regulation.  My publications include chapters in books on the topics of securities litigation, arbitration and event studies.  I have authored papers on the extent and nature of shareholder claims.  I also have served as an arbitrator for FINRA.  I have testified at trials and at depositions and have submitted expert affidavits in both state and federal courts in the United States.  I have also appeared as an expert witness in Canadian courts and in arbitrations before the New York Stock Exchange, the National Association for Securities Dealers, the American Arbitration Association, and the International Center for Dispute Resolution, among others.

15.    My testimony, affidavits and depositions have covered numerous economic issues arising in many securities, financial economics and valuation-related lawsuits—including many shareholder litigation and derivative actions.  Some of the subjects covered in my testimony, affidavits and depositions include: the evaluation of market efficiency; the materiality of news to reasonable investors; the impact of news on company share prices; class conflicts; causation and damage analyses; and, other issues related to shareholder litigations and derivative actions.  I have spoken frequently on the topics of event studies, shareholder litigation and derivative actions to audiences, including risk managers, regulators, executives from publicly traded corporations, insurance industry participants and lawyers.

16.    My curriculum vitae listing publications from the past ten years and testifying experience from the past four years is attached as *Exhibit 1*.  Other professionals employed by

NERA assisted me in preparing this declaration. Throughout this process, these professionals worked under my supervision and review.

    Exhibit 1.  *Curriculum Vitae of Vinita M. Juneja*

   17.  NERA is being compensated according to our hourly billing rates. My hourly billing rate is $675. The hourly rates for other NERA professionals involved in this case range from $195 to $675. Payments to NERA are not contingent in any way on the opinions expressed in this report, or on the outcome of this matter.

## II.  Materials Relied Upon

   18.  The materials relied upon in forming the opinions expressed in this declaration are listed in *Exhibit 2*.

    Exhibit 2.  *Materials Relied Upon*

## III.  Materiality of Allegedly Excessive TA Fee Profits Realized By Citigroup

### A. Overview of NAV and TA Fees

   19.  The NAV of a mutual fund is simply the value of the fund's assets less its liabilities, including TA fees. To get the NAV per share, this net asset figure is divided by the number of shares. The NAV changes as the value of the underlying investments change. When investors purchase shares of the fund, the portfolio manager will purchase additional securities or may hold the additional cash. When investors redeem (or sell) shares of the fund, the portfolio manager will sell securities and return cash to the investor.

   20.  Since the NAV of a fund is a function of the value of the fund's underlying securities and other assets and liabilities, negative information regarding a mutual fund will not directly impact the NAV except to the extent that it changes the value of the fund's assets and liabilities. The only way for the NAV to be negatively impacted is if there are large enough fund outflows that the portfolio manager has to sell underlying securities and has to do so below prevailing market prices. There is no evidence or argument in plaintiffs' Motion for Class Certification that Fund flows were negatively and materially affected by news about the Allegedly Excessive TA Fees to such an extent.

21.     Transfer agents perform services for mutual funds, including record-keeping and administrative services.  These services may include performing dividend and NAV calculations, mailing fund statements and tax-related documents to shareholders, and maintaining departments to respond to shareholders inquiries.[19]  TA fees may differ across different classes of a mutual fund.  According to the Investment Company Institute, annual TA fees for stock mutual funds ranged from 18 basis points in 2002 (or 0.18% of net assets) to 15 basis points in 2005 (or 0.15% of net assets); these TA fees represent 15% and 13% of total fees and expenses, respectively.[20]  TA fees are embedded in fund annual expense ratios and are typically reported in the "other expenses" category of fund annual operating expenses.[21]

## B. The Literature Suggests that TA Fees are Not Considered A Material Factor in Fund Investor Decisions

22.     I have conducted a review of the literature regarding the importance of mutual fund TA fees in investor decisions to purchase or not to purchase specific mutual funds.[22]  My literature review did not yield any papers that specifically address TA fees, suggesting that TA fees do not play a major role in investor decision-making.  The literature does address the role of mutual fund fees in investor decision-making.  The consensus within this set of literature is that investors pay little, if any, attention to mutual fund fees.  For example:

    a.  "The academic literature over the past decade … find[s] that most fund investors are unaware of the investment objectives, composition, and risks of their funds. Most investors are also ignorant of the level of fees and

---

[19]  "[Transfer agents]...maintain records of shareholder accounts, calculate and distribute dividends and capital gains, and prepare and mail shareholder account statements, federal income tax information, and other shareholder notices. Some transfer agents also prepare and mail statements confirming shareholder transactions and account balances, and maintain customer service departments, including call centers, to respond to shareholder inquiries."  *2011 Investment Company Fact Book 51st Edition*. Investment Company Institute, 2011. p. 195. Available online at: http://www.icifactbook.org/.

[20]  "Fees and Expenses of Mutual Funds, 2005," *Investment Company Institute Research Fundamentals*, June 2006, Vol. 15, No. 4, p. 6.

[21]  "Mutual Fund Fees and Expenses," *U.S. Securities and Exchange Commission.* Available online at: http://www.sec.gov/answers/mffees.htm#other.

[22]  I have searched for literature and articles regarding TA fees and mutual fund fees in general.  I have searched specifically for analyses relevant to materiality of these fees to investors.  Sources include academic literature (SSRN, EconLit, and Google Scholar), industry publications (Morningstar and Lipper), and public news (Dow Jones Factiva).

expenses charged by their funds, and these costs are not a significant factor in their fund choices."[23]

    b.   "Only 19% of the respondents could give an *estimate* of expenses for their largest mutual fund."[24]

    c.   "Our results indicate that past performance is very important to consumers and weighs more heavily in the decision process than fees."[25]

    d.   "… the evidence regarding management fees is quite compelling; it is a relatively unimportant criterion for 75 percent of mutual fund investors."[26]

23.     These quotations were obtained from peer reviewed journals and other reputable and widely relied-upon publications, and my literature review indicates that they represent the general consensus on this topic.

### C. The Smith Barney Funds Paid TA Fees Comparable to or Lower than Industry Benchmarks

24.     I also have conducted a literature search on TA fees for funds comparable to the Smith Barney Funds. Although detailed research specifically regarding TA fees is rare, I obtained a paper entitled "The Sources of Scale Economies Within Large Mutual Fund Families,"[27] by David A. Latzko, which gathered data on the "eight largest mutual fund families (Fidelity, Vanguard, American, Putnam, Janus, AIM, T. Rowe Price, and MFS)" from various fund financial reports in 1999 and 2000. These data include each fund family's expense ratio,

---

[23] Palmiter, Alan R. and Ahmed E. Taha, "Mutual Fund Investors: Divergent Profiles," *Wake Forest University School of Law*, February 2008.

[24] Palmiter, Alan R. and Ahmed E. Taha, "Mutual Fund Investors: Divergent Profiles," *Wake Forest University School of Law*, February 2008.

[25] Wilcox, Ronald T.,"Bargain hunting or stargazing? Investors' preferences for stock mutual funds," *Journal of Business*, 2003.

[26] Capon, Noel, Gavan J. Fitzsimons, and Russ Alan Prince, "An Individual Level Analysis of the Mutual Fund Investment Decision," *Journal of Financial Services Research*, 10:59-82, 1996.

[27] Latzko, David A., "The Sources of Scale Economies Within Large Mutual Fund Families," Paper presented at the 2001 CEPR/JFI Symposium at INSEAD, "Institutional Investors and Financial Markets: New Frontiers," Fontainebleu, France, April 21, 2001. Available online at: http://www2.yk.psu.edu/~dxl31/research/research.html.

the breakdown of fund expenses by category, and total net assets.  Of the eight fund families, only four reported transfer agent fees as a separate category.  Based on data from this paper, the ratio of annual TA fees relative to total net assets[28] are on average 0.18, 0.09, 0.22 and 0.16 percent for the following fund families respectively: Fidelity Investments, American Funds, Janus and AIM Funds.

25.   A second paper entitled "Examination of Fund Transfer Agency Services Agreement Between Citicorp Trust Bank FSB and its Affiliated Mutual Funds," by Geoffrey H. Bobroff,[29] corroborates findings in the paper by Mr. Latzko.  Mr. Bobroff provided a detailed study on behalf of Citigroup in connection with the SEC investigation.[30]  The study concluded that TA fees as a percent of total net assets for the Smith Barney Funds[31] were well below average among peer funds.[32]  The paper by Mr. Bobroff indicates that the average annual TA fees for long-term funds were 0.105 percent of assets for the Smith Barney funds versus 0.133 percent for the peer group funds.

[28] I calculated the ratio of TA fees to total net assets by multiplying the expense ratio by the percent of TA fees in total cost for each fund family.

[29] According to this same report, "Bobroff Consulting's principal employee, Geoffrey H. Bobroff, has held various positions in the investment management industry spanning over three decades.  Immediately prior to establishing his consulting practice in October 1993, he served for more than five years as senior vice president of Lipper Analytical Services, Inc., overseeing its Denver office. For the previous five years, he was executive vice president of Integrated Resources, Inc., where he was responsible for the money management, broker-dealer and other operations of the firm. During the eleven-year period from 1973 through 1983, Mr. Bobroff served as executive vice president of J. & W. Seligman & Co., where he had responsibility for the operations and financial affairs of that firm. He began his professional career as a trial attorney for the Securities and Exchange Commission in Washington, D.C., where for three years he conducted investigations and instituted enforcement actions in the investment management industry."

[30] The underlying data in Mr. Bobroff's report were obtained from Lipper Analytical Inc., a widely relied-upon source for this type of data.  Further, the TA fees as a percentage of net assets for the non-Smith Barney funds are not materially different from those calculated in the paper by Mr. Latzko, and can be considered as corroborating those TA fees.

[31] Only a subset of all the Smith Barney Funds, namely, those in which named plaintiffs allegedly made purchases or sales during the Alleged Class Period, are at issue in this case.

[32] The TA fees paid by the Smith Barney Funds were among the lowest across peer funds in all fund categories except for institutional money funds, where Mr. Bobroff concludes that there is insufficient evidence to establish a norm in that fund category.  The paper includes printing and postage fees in its analysis of TA fees because several peer funds used in comparison include printing and postage fees within TA expenses.

26.     Separately, for each Fund, I have examined monthly data on TA fees,[33] annualized these figures, and divided them by the Fund's average assets over each respective month. .Based on these calculations, the TA fees for the Funds range from an annualized fee of 0.02% to 0.15% of assets, averaging 0.08% during the Alleged Class Period.  These fees put the Funds in a favorable competitive position with regards to TA fees, when compared with their peer funds.  The full details of my calculations and the comparison to the peer funds from the two papers cited above are in *Exhibit 3.*

*Exhibit 3.*        *TA Fees – Smith Barney Funds at Issue vs. Peer Funds*

### D.  Allegedly Excessive TA Fees As a Percentage of NAV

27.     The profits recognized by CTB are a reasonable proxy for the Allegedly Excessive TA Fees, as Citigroup was required to disgorge all of CTB's profits as a condition of its settlement with the SEC.[34]  There are two sets of relevant disgorgements relating to the SEC case:

a.   A $109 million disgorgement covering the period of the SEC case, from October 1, 1999 through September 30, 2004.  This figure includes a disgorgement of $92 million of Allegedly Excessive TA Fees and $17 million related to the Revenue Guarantee Agreement.  There was also $19 million in prejudgment interest.[35]  The $17 million disgorgement for the Revenue Guarantee Agreement along with $7 million in prejudgment interest was disbursed to the Funds prior to May 31, 2005.[36]  The remaining $92 million disgorgement for Allegedly Excessive TA Fees

---

[33] KPMG Independent Accountants' Report On Applying Agreed-Upon Procedures dated April 19, 2010 (Bates Range: CITI-SBFTA 00317002-00317083).

[34] SEC Final Plan of Distribution, p. 2.  Available online at http://www.sec.gov/litigation/fairfundlist.htm# smithbarney.

[35] SEC Order dated May 31, 2005.

[36] SEC Order dated May 31, 2005.

along with $12 million in prejudgment interest, was disbursed to the Funds on May 26, 2010.[37]

b. A $9 million disgorgement, representing Allegedly Excessive TA Fees paid from December 1, 2004 though end of 2005, was placed in escrow by Citigroup.[38]  This disgorgement was disbursed to the Funds on April 3, 2006.

28.    To calculate the amount of Allegedly Excessive TA Fees attributable to each particular Smith Barney Fund and Fund class at issue, I followed the same SEC-approved procedure used in the actual disgorgements themselves (as indicated in an independent auditor's review of the disgorgement dated April 19, 2010), and used the distribution plan for certain escrowed TA fee profits from late 2004 to the end of 2005.[39]

a. The $92 million disgorgement was allocated to the Fund and Fund classes based on the percentage of TA fees charged to each Fund and Fund class from October 1, 1999 to September 30, 2004.[40]  To calculate the daily impact on each Fund and Fund class per share NAV, I similarly allocated the disgorgement amount according to the amount of TA fees accrued by each Fund and Fund class across time.[41]

b. Per the SEC settlement in 2005, Citigroup was required to set aside all Allegedly Excessive TA Fees in an escrow account starting on December 1, 2004, and continuing through the end of 2005.  However, there are no

---

[37] State Street Confirmation Re. Administrative Proceeding File No. 3-11935 dated June 4, 2010 (Bates Range: CITI-SBFTA 00327757-62).

[38] Plan of Distribution of Escrowed Amounts Under to Admin. Proc. File No. 3-11935 (Bates Range: CITI-SBFTA 00327763-81).

[39] KPMG Independent Accountants' Report On Applying Agreed-Upon Procedures dated April 19, 2010 (Bates Range: CITI-SBFTA 00317002-00317083). Plan of Distribution of Escrowed Amounts Under to Admin. Proc. File No. 3-11935 (Bates Range: CITI-SBFTA 00327763-81).

[40] I have excluded the prejudgment interest in my calculations.  Had the Allegedly Excessive TA Fees not been charged to the Funds, the per share Fund NAVs would not have been affected by the prejudgment interest amounts.

[41] The TA fee data were available on a monthly basis only, but the shares outstanding were available on a daily basis.  I used this data to estimate a daily NAV per share impact.

available data on the timing of the Allegedly Excessive TA Fees over this period.  Accordingly, I have conservatively used the minimum shares outstanding for each Fund and Fund class to calculate a maximum daily impact on NAV per share over this time period.

    c.    The disgorgement disbursed by the SEC to the Funds for Allegedly Excessive TA Fees covered the time period from October 1, 1999 through December 31, 2005, a period which extends both before and after the Alleged Class Period of September 11, 2000 through May 31, 2005.  Accordingly, I have included only the disgorgement amounts that correspond to TA fees charged during the Alleged Class Period in my calculation.

29.    My resulting estimates of the impact of the Allegedly Excessive TA Fees on NAV per share are very small.  On average, the impact amounts to less than a thousandth of one penny.  It is extremely unlikely that this daily impact on NAV per share would influence an investor's decision on a given day to make a purchase or redemption of shares of one of the Funds.  See *Exhibit 4*.

    *Exhibit 4.*      *Maximum Impact of Allegedly Excessive TA Fees on Daily Per Share NAV*

**E.  Event Study and Statistical Analysis of Fund Flows**

30.    I have obtained daily net flow and net asset data for most of the Funds and Fund classes.  These data were obtained directly from Legg Mason's[42] internal historical databases.  I have calculated the net flows as a percentage of net assets on a daily basis for each Fund and Fund class.  I also have calculated the annual mean and standard deviation of the net flows as a percentage of net assets on a rolling basis during the Alleged Class Period.  Finally, I have examined the Fund and Fund class net flows as a percentage of net assets on each date following public disclosure about the Allegedly Excessive TA Fees.  Those dates are summarized in

---

[42] As of 2006, the Smith Barney Funds became Legg Mason Funds.  See "Smith Barney Funds Renamed to 'Legg Mason Partners Funds,'" *Legg Mason, Inc. Press Release*, April 7, 2006.  Available online at: http://www.leggmason.com/press/releases/04_06_2006.pdf.

*Exhibit 5*.[43]  If investors had considered the Allegedly Excessive TA Fees material to their decisions to invest in the Smith Barney Funds, one would expect to see a material change in the flow of investor money within the Funds following each of these dates.

31.     As *Exhibit 6* shows, the vast majority of days with news related to the allegations were *not* followed by Fund flow deviations from the mean that were negative and statistically significant at the 5% level.  This is the level generally accepted in the academic literature as the threshold for statistical significance.[44]  If the news announcements had been considered important by reasonable investors, one would have expected a statistically significant change in net flows, which in turn would indicate the materiality of the announcements to such investors. This lack of outflow is further evidence that any misstatements about the Allegedly Excessive TA Fees were not material to investors.

> Exhibit 5.      *Potential Alleged Disclosures of Allegedly Excessive TA Fees and Revenue Guarantee Agreement*
>
> Exhibit 6.      *Statistical Analysis of Net Fund Flows Over and Around Potential Alleged Disclosures of Allegedly Excessive TA Fees and Revenue Guarantee Agreement*

## IV.     Many Named Plaintiffs Received Disgorgement Amounts Greater Than Their Alleged Losses

32.     I have performed analyses of the disgorgements to the Smith Barney Funds in which certain named plaintiffs were shareholders on May 26, 2010, when the SEC distributed the majority and last of the disgorgement amounts to the Smith Barney Funds.  I calculated the amount of disgorgement to each Fund and Fund class as indicated by the agreed-upon procedures analysis conducted by KPMG, which I described in Section III.D of this declaration.

---

[43] I calculated the percentage gross and net change in assets for all Funds and Fund classes for every day during the Alleged Class Period.  I then calculated the average gross and net fund flows, and the standard deviation for each Fund and Fund class from year to year, and determined whether fund flows appeared to be materially affected by public news related to the Allegedly Excessive TA Fees.

[44] See, for example, Kaye, David and David Freedman, Reference Guide on Statistics, in Reference Manual on Scientific Evidence, Second Edition, Federal Judicial Center, 2000, p. 124, available online at: www.fjc.gov/public/pdf.nsf/lookup/sciman00.pdf/$file/sciman00.pdf.  See also *In re American International Group, Inc. Securities Litigation*, 265 F.R.D. 157, 187 (S.D.N.Y. 2010).

33.     While the disgorgement amounts were paid to each Fund, each shareholder who held shares in a Fund as of May 26, 2010 benefited from the payment on a proportionate basis according to their holdings in each Fund and Fund class.  Accordingly, I calculated the amount of benefit conferred on each named plaintiff by multiplying the percentage of shares of each Fund class held by each by the total disgorgement to that Fund class.

34.     I then compared this amount of benefit conferred by the SEC settlement to the possible damages claimed by certain named plaintiffs.  Plaintiffs' theory of damages is that named plaintiffs would have experienced lower TA fees during the Alleged Class Period, had the Funds in which they invested not paid the Allegedly Excessive TA Fees to Citigroup.  I assumed that the Allegedly Excessive TA Fees, had they not been paid by the Funds in which the named plaintiffs invested, would have been reinvested, at the time, back into those Funds.[45]

35.     For certain named plaintiffs, I have determined that the benefits from the disgorgement amounts received were greater than the Allegedly Excessive TA Fees attributable to the shares held, even assuming that these monies were reinvested contemporaneously in the particular Smith Barney Fund.  See *Exhibit 7.*

> *Exhibit 7.        Named Plaintiffs with Funds Where Disgorgement Benefit is Greater Than Alleged Overcharge*

36.     I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 31, 2011, in New York, New York.

Vinita M. Juneja, Ph.D.

---

[45] A July 20, 2011 letter from plaintiffs' counsel in this matter concerning outstanding discovery issues states on the first page that "[a]s set forth in various legal memoranda filed in this case to date… plaintiffs claim that, beyond losing the amounts wrongly drained from their funds by being saddled with excessive fees, they were also damaged because if those excessive fees were not taken, the assets under management for the relevant funds would have been greater and would have grown at the rate each respective fund grew during the Class Period." Accordingly, I do not apply prejudgment interest to each named plaintiffs' alleged loss due to the Allegedly Excessive TA Fees, and instead assume that the amounts at issue would have been reinvested in the appropriate Fund.