**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| |
|---|
| IN RE SMITH BARNEY |
| FUND TRANSFER AGENT LITIGATION |

05 Civ. 7583 (WHP)

**<u>FOURTH CONSOLIDATED AND AMENDED CLASS ACTION COMPLAINT</u>**

STULL, STULL & BRODY
Jules Brody
Mark Levine
Patrick Slyne
6 East 45th Street
New York, NY  10016
(212) 687-7230

WEISS & LURIE
Joseph H. Weiss
Richard A. Acocelli
Michael A. Rogovin
1500 Broadway
New York, NY 10036
(212) 682-3025

Co-Lead Counsel for Plaintiffs

## TABLE OF CONTENTS

NATURE OF THE ACTION…………………………………………………………………1

PARTIES…………………………………………………………………………………….5

   A.   Plaintiffs…………………………………………………………………………5
   B.   Defendants……………………………….…………………………………….7

OTHER RELEVANT PERSONS AND ENTITIES……………………………….………..8

JURISDICTION AND VENUE…………………………...………………………………11

CLASS ACTION ALLEGATIONS…………………………...…………………………..11

STATEMENT OF FACTS…………………………………………………………………12

   A. First Data's Relationship with the Smith Barney Funds…………………………….12
   B. Defendants Seek Huge Profits for CAM by Altering Transfer Agency Relationship…...13
   C. Structural Alternatives for CAM's Transfer Agency Business…………………………15
   D. DST the Early Frontrunner in Remote Vendor Bidding……………………………….16
   E. First Data Offers $25 Million Dollar Fee Concession…………………………….…...17
   F. Deloitte Flags CAM Taking Discounts that Belong to the Smith Barney Funds………..17
   G. First Data Offers Deeper Discounts……………………………………………..…...18
   H. Deloitte Again Warns that First Data Discounts Belong to the Smith Barney Funds…..19
   I. Defendants Fail to Heed Deloitte's Warnings………………………………………..20
   J. First Data Offers a Revenue Guarantee……………………………………………..20
   K. CAM Refers to First Data Discount as a "Revenue Sharing Arrangement"……………21
   L. Negotiation of the Sub-Transfer Agency Agreement and Side Letter Agreement………23
   M. Misleading Board Materials Conceal Defendants' Kickback Scheme…………………24
   N. Defendant Daidone's Presentations to the Smith Barney Funds' Boards………………27
   O. New Smith Barney Funds Added to the Transfer Agency Kickback Scheme…………..30
   P. CAM Sought Transfer Agency Fee Increase in 2003…………………………………32
   Q. Defendants' Kickback Scheme Yields CAM Extraordinary Profits……………………34
   R. Whistleblower Comes Forward in September 2003……………………………………35

SCIENTER…………………………………………………………………………………36

RELIANCE…………………………………………………………………………………36

DAMAGES SUFFERED BY THE CLASS/LOSS CAUSATION………………………...…36

CAUSES OF ACTION……………………………………………………………….…...37

COUNT I  - SCHEME LIABILITY…………………………………………………………..37

Primary Violation Of §10(b) Of The Exchange Act And Rule 10b-5(a) and (c)
Promulgated Thereunder Against All Defendants……………………….…………………37

COUNT II  -  MATERIALLY FALSE PUBLIC STATEMENT LIABILITY………………..…39

Primary Violation Of §10(b) Of The Exchange Act And Rule 10b-5(b) Promulgated
 Thereunder Against Daidone…………………………………………………………………39

MATERIALLY FALSE AND MISLEADING PUBLIC STATEMENTS……………...………40

COUNT III…………………………………………..………………………………………...49

Secondary Violation Of Section 20(a) Of The Exchange Act For Violation of
Rule 10b-5(a) and (c) Against Defendant Jones…………………………………………...49

COUNT IV……………………………………..………………………………………...40

Secondary Violation Of Section 20(a) Of The Exchange Act For Violation of
Rule 10b-5(b) Against Defendant Jones……………………………………………...............50

JURY TRIAL DEMANDED……………………………………………………………………51

Lead Plaintiff David Zagunis ("Lead Plaintiff") and other named Plaintiffs (collectively, "Plaintiffs") bring this action as a class action on behalf of all persons and entities who purchased or sold shares of the Smith Barney Funds (as defined) between September 11, 2000 and May 31, 2005 (the "Class Period"), and who were damaged thereby. As a result of Defendants' wrongdoing alleged herein, Lead Plaintiff and other the members of the Class (as defined) were damaged.

The allegations against Defendants are based on personal knowledge as to Lead Plaintiff's and other named Plaintiffs' own acts, and on information and belief as to all other matters, such information and belief having been informed by the investigation conducted by Lead Plaintiff's counsel ("Lead Counsel"), the materials referenced in this Fourth Consolidated and Amended Class Action Complaint ("Complaint"), and Lead Counsel's review of document discovery produced in the action, and publicly available information related to the Defendants and the Smith Barney Funds. Lead Plaintiff believes that formal additional discovery, including both document discovery and depositions of relevant witnesses, will provide additional evidentiary support for their allegations. By and through their counsel, Plaintiffs, on behalf of themselves and the Class they seek to represent, allege as follows:

## NATURE OF THE ACTION

1.      This is a case of an illegal kickback scheme perpetrated by Defendant Smith Barney Fund Management LLC ("Smith Barney"), Defendant Citigroup Global Markets, Inc. (formerly known as Salomon Smith Barney Inc.) ("Citigroup Global Markets"),[1] and former executives of the Smith Barney Defendants Thomas W. Jones and Lewis E. Daidone, to the detriment of the Plaintiffs and the other members of the Class who purchased or sold shares of

---

[1] Smith Barney and Citigroup Global Markets are referred to collectively as the "Smith Barney Defendants."

certain Smith Barney sponsored Family of Funds ("Smith Barney Funds").

2.      The illegal kickback scheme perpetrated on Class members was hatched when an
opportunity arose for the Smith Barney Funds to benefit from anticipated and substantial
reductions in transfer agency fees upon renegotiation of a then soon to expire contract with the
Smith Barney Funds' stock transfer agent, First Data Investor Services Group ("First Data").[2]
The economic opportunity to the transfer agency fee reductions belonged to the those that were
shareholders of Smith Barney Funds at that time.  Defendants, as registered investment advisors
and fiduciaries, negotiated the stock transfer agent contract on behalf of the Smith Barney Funds.
Indeed, fee reductions were substantial.  First Data ultimately agreed to lower its transfer agency
fees to the Smith Barney Funds by well in excess of $100 million dollars over a period of five
years.  However, notwithstanding Defendants' fiduciary duties to act in the best interests of the
Smith Barney Funds and their shareholders, Defendants knowingly engaged in deceptive and
illegal self-dealing to improperly siphon the First Data transfer agency fee reductions away from
the Smith Barney Funds, and schemed to "capture" or kickback those fee reductions through
Citicorp Trust Bank, fsb. ("CTB"), a newly created stock transfer agency, and affiliate to the
Smith Barney Defendants, and on to corporate parent Citigroup, Inc. ("Citigroup").

3.      To carry out their scheme, Defendants replaced First Data with CTB as Smith
Barney Funds' stock transfer agent of record.  As the Smith Barney Fund's new transfer agent,
CTB charged and collected all fees from the Smith Barney Funds at approximately the same rate
as First Data had charged under the expired transfer agency contract.  CTB, however, provided

---

[2] As the Smith Barney Funds' stock transfer agent, First Data performed a variety of "back
office" functions, including processing buy and sell transactions in Funds shares, processing
dividend transactions, calculating daily net asset values, calculating sales charges and
commissions, operating a customer service call center, distributing proxy and other materials,
and performing a variety of additional accounting functions, including year-end tax reporting.

just a small fraction of the transfer agency services consumed by the Smith Barney Funds and merely staffed a fifteen employee customer call center (about half worked full time), at a cost of $1 million dollars per year, $5 million dollars over five years. CTB subcontracted with First Data, as sub-transfer agent, at sharply reduced rates, to provide the Smith Barney Funds' transfer agency services not supplied by CTB. Thus, notwithstanding their fiduciary duties, Defendants intended to, and did, fraudulently and deceptively kickback the Smith Barney Funds' transfer agency fee savings opportunity through CTB to Citigroup.

4.      Defendants were motivated to carry out their kickback scheme by, among other things, massive projected profits. Indeed, Defendants projected their scheme would reap $258 million of "profit" over five years ($29 million in the first year and escalate to $70 million in the fifth). The so-called "profit" was not earned. The $258 million reflected the Smith Barney Fund's First Data transfer agency fee discounts to be kicked back by Defendants to Citigroup.

5.      In addition to First Data's transfer agency fee reductions, Defendants fraudulently and deceptively arranged to, and did, kickback millions of dollars to Citigroup pursuant to a Side Letter (as defined) agreement between First Data and Defendants that guaranteed Citigroup entities at least $22.5 million in investment banking, asset management and other fee revenue, and $14 million of "pre-tax bottom line" over the five years of the First Data sub-transfer agency agreement. Indeed, while the Revenue Guarantee (as defined) provided by First Data to Citigroup, in lieu of even deeper transfer agency fee reductions to the Smith Barney Funds, provided Citigroup millions of dollars of consideration, it provided the Smith Barney Funds no benefit whatsoever. Thus, Defendants knowingly and deceptively siphoned the Smith Barney Funds' opportunity for additional transfer agency fee reductions and kicked back to Citigroup, a Revenue Guarantee of $22.5 million dollars, and $14 million dollars "pre-tax bottom line" profit.

3

6.       On May 31, 2005, the Securities and Exchange Commission ("SEC") issued an order that found the Smith Barney Defendants, with their kickback scheme, "willfully violated" Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 ("IAA") which, *inter alia*, prohibit investment advisors from engaging in any "transaction, practice or course of business which operates as a fraud or deceit upon any client or prospective client."  The Smith Barney Defendants were ordered to pay disgorgement in the amount of $109,004,551 plus prejudgment interest of $19,055,630.  Smith Barney was also ordered to pay civil money penalties in the amount of $80,000,000.

7.       Investment advisors have a fiduciary duty to act in the best interests of the mutual funds they advise and the shareholders of those mutual funds.  Here, Plaintiffs reasonably expected Defendants would act with uncompromising fidelity and undivided loyalty to the Smith Barney Funds and to the Plaintiffs and other members of the Class as Smith Barney Fund shareholders.

8.       Defendants' conduct, a deceptive kickback scheme, caused moneys to be wrongfully drained from the Smith Barney Funds which reduced the Smith Barney Funds' daily Net Asset Values ("NAVs"), and caused damage to the Plaintiffs and the other members of the Class by distorting the Smith Barney Funds NAVs whose shares they purchased or sold.  As such, Defendants violated Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder by the SEC.

9.       Defendants violated Rule 10b-5(a) and (c) by engaging in a deceptive course of conduct which operated as a fraud upon Plaintiffs and the other members of the Class.  Further, Defendant Daidone violated Rule 10b-5(b) by omitting to disclose in Smith Barney Fund documents filed with the SEC, the basic facts with respect to the kickbacks that the Smith

4

Barney Defendants were receiving the kickbacks "line their own pockets" at the expense of Plaintiffs and the other members of the Class.  Defendants Jones and Daidone also violated Section 20(a) of the Exchange Act as controlling persons of the Smith Barney Defendants' primary Rule 10b-5(a) and (c) violations.  Daidone is also liable under Section 20(a) for primary violations of Rule 10b-5(b).

10.     Defendants have not compensated Plaintiffs or other members of the Class for the damages caused to them by Defendants' illegal conduct.  None of the monies from the Smith Barney Defendant's settlement with the SEC were paid to the Plaintiffs or other members of the Class.

**<u>PARTIES</u>**

**A.     Plaintiffs**

11.     Lead Plaintiff David F. Zagunis bought and/or sold shares in the Smith Barney Allocation Growth Fund, the Smith Barney Large Cap Fund, the Smith Barney Peachtree Growth Fund, and the Smith Barney Large Capitalization Growth Fund during the Class Period.

12.     Plaintiff Jeffrey Weber bought and/or sold shares in the Smith Barney Large Cap Growth and Value Fund and the Smith Barney Money Funds Cash Portfolio during the Class Period.

13.     Plaintiff Colette M. Luff bought and/or sold shares in the Smith Barney Dividend Strategy Fund during the Class Period.

14.     Plaintiffs Robert and Ann Yiambellis bought and/or sold shares in the Smith Barney Capital and Income Fund, Smith Barney Aggressive Growth Fund, Smith Barney Fundamental Value Fund, Smith Barney Large Capitalization Growth Fund, Smith Barney Mid Cap Core Fund, Smith Barney Small Cap Growth Fund, Smith Barney Small Cap Value Fund, and the Smith Barney Appreciation Fund during the Class Period.

5

15.     Plaintiff DVL 401(k) Plan bought and/or sold shares in the Smith Barney Aggressive Growth Fund, the Smith Barney Appreciation Fund, the Smith Barney Fundamental Value Fund, the Smith Barney High Income Fund, the Smith Barney International All Cap Growth Portfolio, the Smith Barney Investment Grade Bond Fund, the Smith Barney Premium Total Return Fund, the Smith Barney Money Funds Cash Portfolio, the Smith Barney Diversified Strategic Income Fund, the Smith Barney Social Awareness Fund, the Smith Barney Managed Governments Fund, the Smith Barney Convertible Fund, and the Smith Barney Small Cap Growth Fund.

16.     Plaintiff Bharat U. Shah bought and/or sold shares in the Smith Barney Aggressive Growth Fund, the Smith Barney Dividend Strategy Fund, the Smith Barney Financial Service Fund, the Smith Barney Appreciation Fund, and the Smith Barney Fundamental Value Fund during the Class Period.

17.     Plaintiff Steven W. Hall bought and/or sold shares in the Smith Barney Social Awareness Fund, Smith Barney Aggressive Growth Fund, Smith Barney Appreciation Fund, Smith Barney Fundamental Value Fund, and the Smith Barney Large Capitalization Growth Fund during the Class Period.

18.     Plaintiff Richard W. Rees bought and/or sold shares in the Smith Barney Aggressive Growth Fund, Smith Barney Appreciation Fund, Smith Barney Fundamental Value Fund, and Smith Barney Managed Municipals Fund and Smith Barney Money Funds Cash Portfolio during the Class Period.

19.     Plaintiff Renee Miller bought and/or sold shares of the Smith Barney Premium Total Return Fund during the Class Period.

6

**B.   Defendants**

20.      Defendant Smith Barney was a limited liability company organized under the laws of Delaware and a subsidiary of Citigroup Global Markets Holdings, Inc.  At all relevant times, Smith Barney was located at 333 West 34th Street, New York City.  Smith Barney was registered with the SEC as an investment adviser pursuant to Section 203(c) of the IAA, and served as investment adviser to the Smith Barney Funds.  Defendant Smith Barney was part of the Citigroup Asset Management ("CAM") business unit of Citigroup.

21.      Defendant Citigroup Global Markets, at all relevant times, was a New York corporation and a direct subsidiary of Citigroup Global Markets Holdings, Inc., and an indirect subsidiary of Citigroup.  Citigroup Global Markets was a registered investment adviser pursuant to Section 203(c) of the IAA and a registered broker-dealer.  The asset management segment of Citigroup Global Markets fell within the CAM business unit of Citigroup.

22.      Defendant Thomas W. Jones ("Jones"), during the relevant period, served as Chief Executive Officer of CAM, and as Chairman and Chief Executive Officer of Citigroup's Global Investment Management and Private Banking Group.  As Chief Executive Officer of CAM, Jones possessed the power and control, and exercised that power and control, to cause Defendant Smith Barney, and Defendant Citigroup Global Markets, to engage in conduct that operated as a fraud and deceit upon Plaintiffs and other members of the Class as alleged herein. Defendant Jones was forced to resign from all of his Citigroup related positions in October 2004.

23.      Defendant Louis E. Daidone ("Daidone") was Senior Vice President and a Director of Defendant Smith Barney, Managing Director of Defendant Citigroup Global Markets, and Principle Accounting Officer for many of the Smith Barney Funds during the Class Period.  Daidone possessed the power and control, and exercised that power and control, to cause

Defendants Smith Barney and Citigroup Global Markets to engage in conduct that operated as a fraud and deceit upon Plaintiffs and other members of the Class, and to cause the issuance of materially false and misleading statements as alleged herein.  Defendant Daidone was forced to resign from all of his Citigroup related positions in September 2004.

## OTHER RELEVANT PERSONS AND ENTITIES

24.     Citigroup is a global financial services company organized under the laws of Delaware and maintains its headquarters in New York, New York.  Citigroup was formed in October 1998, by the merger of Citicorp Inc. and Travelers Group Inc.

25.     Travelers Group Inc. ("Travelers") at the time it merged with Citicorp Inc. was a large, American based insurance company.  Prior to the Travelers/Citigroup merger, the Defendants Smith Barney and Citigroup Global Markets, and CAM, (formerly known as Salomon Smith Barney Asset Management), were divisions or subsidiaries of Travelers. CAM, at all relevant times, was a business unit of Citigroup, that provided investment advisory and management services to the Citigroup-sponsored mutual funds.  CAM provided those services through investment advisory entities that fall within the CAM business unit, including Defendant Smith Barney and Defendant Citigroup Global Markets, which provided fund management services for the Smith Barney Funds.

26.     Michael Yellin ("Yellin") served as Executive Vice President and Managing Director of Defendant Citigroup Global Markets.  Yellin served as Chief Administrative Officer of CAM from March 1997 through early 1999, and reported to Defendant Jones, CAM's Chief Executive Officer.  Yellin reported to Defendant Jones, supervised the transfer agency project, and personally handled transfer agency contract negotiations with First Data Investor Services Group ("First Data").  Yellin briefed Defendant Jones on the status of the transfer agency project on a regular basis.  In or about March 1999, Yellin became Chief Operating Officer of the

8

private portfolio group within CAM, and no longer had responsibilities related to the Smith Barney Funds.

27.     R. J. Gerken ("Gerken") during the relevant time period served as managing director of Defendant Citigroup Global Markets and as Chief Executive Officer of Defendant Smith Barney.  Gerken also served as an officer of many of the Smith Barney Funds and signed documents referenced in Appendix A that were materially false and misleading.  Further, Gerken knew, or but for recklessness, should have known his statements were materially false and misleading because, among other thing, (a) Gerken was a CAM insider; (b) Gerken knew or in the absence of recklessness should have known that capturing transfer agency profits was important to CAM and to Defendant Jones; (c) Gerken knew or in the absence of recklessness should have known that transfer agency profits to CTB were extraordinarily high; (d) CTB charges the funds tens of millions of dollars per year for a small customer service call center with seven full time employees; (e) Gerken knew or in the absence of recklessness should have known that CTB was a pass through entity for the kickback of transfer agency fees to Citigroup; (f) that the Smith Barney Defendants' kickback scheme will fully violate the Investment Advisers Act; and (g) Gerken was involved in the request for transfer agency rate increase and knew, or in the absence of recklessness should have known, about the financial arrangement with First Date/PFCP.  Gerken's statements violated section 10(b) and Rule 10b-5(b) and were controlled by Defendant Jones, CEO of CAM.

28.     Richard L. Peteka ("Peteka") during the relevant time period served as director and head of Internal Control for CAM U.S. Mutual Fund Administration.  Peteka also served as an officer of many of the Smith Barney Funds and signed documents referenced in Appendix A that were materially false and misleading.  Further, Peteka knew, of but for recklessness, should

have known his statements were materially false and misleading because  (a) Peteka was a CAM

insider; (b) Peteka knew or in the absence of recklessness should have known that capturing

transfer agency profits was important to CAM and to Defendant Jones; (c) Peteka knew or in the

absence of recklessness should have known that transfer agency profits to CTB were

extraordinarily high; (d) CTB charges the funds tens of millions of dollars per year for a small

customer service call center with seven full time employees; (e) Peteka knew or in the absence of

recklessness should have known that CTB was a pass through entity for the kickback of transfer

agency fees to Citigroup; and (f) that the Smith Barney Defendants' kickback scheme will fully

violate the Investments Advisers Act.  Peteka's statements violated section 10(b) and Rule 10b-

5(b) and were controlled by Defendant Jones, CEO of CAM.

29.    The Smith Barney Funds consisted of more than 105 open-end management

investment companies registered with the SEC, and include equity, money market, fixed income,

municipal, and various specialty funds.  Defendant Daidone was an employee of the Smith

Barney Funds and officer of the Defendant Smith Barney.

30.    First Data served as full-service transfer agent of record to the Smith Barney

Funds from June 1, 1989 until September 30, 1999.  Thereafter, First Data became the Smith

Barney Funds' sub-transfer agent.  In or around December 1999, First Data was sold by its

corporate parent, First Data Corporation, to PFPC Worldwide ("PFPC"), which assumed First

Data's role of sub-transfer agent to the Smith Barney Funds.

31.    Citicorp Trust Bank, fsb. ("CTB"), was a chartered federal savings bank and an

indirect subsidiary of Citigroup.  CTB was registered as a transfer agent and an investment

adviser.  Defendants used CTB as a pass through device to kickback hundreds of millions of

dollars of transfer agency fees from the Smith Barney Funds to Citigroup.

10

32.     Deloitte & Touche Consulting ("Deloitte") at all relevant times was a consulting firm headquartered in New York City, retained by CAM in July in 1997 to assist CAM in a review of the transfer agency function for the Smith Barney Funds.

33.     PFPC, at all relevant times, was an investment servicing subsidiary of PNC Bank Corp.  In or around December 1999, PFPC completed its acquisition of First Data.  Thereafter, PFPC assumed First Data's obligations under First Data's sub-transfer agency agreement with CTB, and PFPC served as sub-transfer agent for the Smith Barney Funds.

## JURISDICTION AND VENUE

34.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)], Rule l0b-5(a), Rule l0b-5(b) and Rule l0b-5(c)  promulgated under Section 10(b) by the SEC [17 C.F.R. § 240.10b-5].

35.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Venue is proper in this District because many of the wrongful acts alleged herein took place or originated in this district.

## CLASS ACTION ALLEGATIONS

36.     Plaintiffs bring this action as a class action, pursuant to Federal Rule of Civil Procedure 23, on behalf of all purchasers and/or sellers of the mutual fund shares or other ownership interests of one or more of the Smith Barney Funds from September 11, 2000 through May 31, 2005, who were damaged thereby (except the Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any of the Defendants and those who have engaged in the wrongful activities described herein) and their successors in interest (the "Class").

37.     This action is properly maintainable as a class action.

38.     The Class is so numerous that joinder of all members is impracticable.  There are millions of shares of the Smith Barney Funds outstanding.

39.     There are questions of law and fact which are common to the Class including, *inter alia*, the following: (a) whether any of the Defendants participated in a deceptive scheme that operated as a fraud upon Plaintiff and the other members of the Class; (b) whether Defendant Daidone made materially false and misleading statements during the Class Period; and (c) whether Defendants' wrongful conduct caused damages to Plaintiffs and the other members of the Class.

40.     Lead Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.

41.     The claims of the Lead Plaintiff are typical of the claims of other members of the Class and Lead Plaintiff has the same interests as the other members of the Class.  Lead Plaintiff will fairly and adequately represent the Class.

42.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for members of the Class to individually redress the wrongs done to them.

43.     There will be no difficulty in the management of this action as a class action. This Court is an appropriate forum for this dispute.

## STATEMENT OF FACTS

**A.     First Data's Relationship with the Smith Barney Funds**

44.     First Data was founded in 1989 as a subsidiary of American Express Company ("American Express") and in 1994, with the divestiture of Shearson Lehman Brothers Inc.

("Shearson") by American Express, and subsequent acquisition of Shearson by Smith Barney,[3] First Data became the Smith Barney Funds' transfer agent.  Also as a result of the Smith Barney acquisition of Shearson, Smith Barney was prohibited by a non-compete agreement from providing transfer agency services until June 1, 1999.

45.     As the Smith Barney Funds' transfer agent, First Data performed a variety of "back office" functions, including processing buy and sell transactions in Smith Barney Funds' shares, processing dividend transactions, calculating daily NAVs, calculating sales charges and commissions, operating a customer service call center, distributing proxy and other materials, and performing a variety of additional accounting functions, including year-end tax reporting. First Data received all fees paid by the Smith Barney Funds for transfer agency services, which in 1998 totaled about $70 million dollars.

46.     Providing Smith Barney Funds transfer agency services was very profitable to First Data.  The First Data transfer agency contract with the Smith Barney Funds, in effect since 1996, was asset-based and not subject to any fee caps.  Along with the very favorable fee schedule, servicing costs were low.  Smith Barney Funds were proprietary, sold mostly by Smith Barney brokers, and many of the transfer agency functions were highly automated.  As a result, First Data realized high profit margins on its transfer agency services to the Smith Barney Funds, particularly in the late 1990s.  Further, with strong securities markets in the late 1990s, the total dollar value of assets invested in the Smith Barney Funds grew and caused First Data's transfer agency asset-based fees to increase.

**B.     Defendants Seek Huge Profits for CAM by Altering Transfer Agency Relationship**

47.     In July 1997, eighteen months prior to the June 1999 expiration of both the First Data transfer agency contract with the Smith Barney Funds and the non-compete agreement,

---

[3] Then known as Smith Barney Harris Upham & Co., Inc.

CAM retained Deloitte to work closely with CAM employees, including Defendant Daidone and Yellin, to review the Smith Barney Funds transfer agency function and options.

48.     Deloitte and CAM established several objectives that included improved service to the Smith Barney Funds' shareholders and increased future flexibility.  However, the most important objective to CAM was to "capture" the transfer agency profits that First Data was earning on its transfer agency contract with the Smith Barney Funds.  To capture the transfer agency profits, CAM decided to enter the transfer agency business and directed Deloitte to develop alternatives.

**C.     Structural Alternatives for CAM's Transfer Agency Business**

49.     Deloitte and CAM analyzed three structural alternatives in which CAM could engage in the transfer agency business: the "full-service" option; the "remote vendor" option, and the full internalization option.  Deloitte and CAM analyzed each alternative structure with information obtained from First Data and two First Data competitors ─ DST and SunGard.

50.     The full-service option called for CAM to create a transfer agency affiliate of approximately fourteen employees to perform oversight and control functions and to sub-contract with DST to provide the bulk of transfer agency functions.  Under the full-service option, DST would do the bulk of the transfer agency work and would therefore receive the bulk of the transfer agency fees.  Deloitte projected that CAM would realize annual profits of approximately $8.3 million.  A draft Deloitte presentation dated November 4, 1997 noted: "DST full service provides little cost advantage over current state [under which CAM received no revenue]."

51.     The remote vendor alternative called for CAM to create a transfer agency affiliate to handle customer service and operations and to contract with DST, First Data or

SunGard for technology only.  Deloitte estimated that the internal transfer agency would require 121 full-time employees.  Deloitte's November 4 presentation noted that the remote vendor option required a greater initial investment and conversion effort than the full service option, but offered greater annual profit to CAM (between $16.1 and $22.8 million).

52.     The full-internalization option called for CAM to assume responsibility for all aspects of the transfer agency function, including technology (by acquiring software).  Although full-internalization would have offered high projected profit — approximately $54.8 million per year — the option would take more than eighteen months to implement and require a staff of approximately 236 full-time employees.  Because of extensive start-up costs, long implementation time and implementation risks, Deloitte and CAM decided not to pursue full-internalization.

53.     CAM concluded that the remote vendor option, which offered greater profit to CAM than the full-service option, was the preferred alternative.  Accordingly, Deloitte and CAM solicited remote vendor bids from First Data, DST and SunGard.  DST and SunGard responded with remote vendor proposals.  First Data declined to submit a remote vendor bid, and instead proposed to renew as full-service transfer agent with a modest ten percent fee discount of its then-existing contract rate.

**D.     DST the Early Frontrunner in Remote Vendor Bidding**

54.     After analyzing the specific proposals received from vendors, in February 1998, Deloitte recommended that CAM contract with DST as remote service provider.  The DST proposal, as of February 1998, called for CAM to create a transfer agent affiliate of approximately 100 employees to handle customer service and operations, and to contract with DST for technology.  The CAM transfer agent affiliate would be the Smith Barney Funds' transfer agent of record, receive fees from the Smith Barney Funds and pay DST a per account

fee for technology.  Deloitte projected that the CAM affiliate would receive more than $40 million dollars per year in profit under DST's remote vendor proposal.

55.     Deloitte concluded that DST's proposal was superior to other options, including options utilizing First Data, in terms of both pricing and technology.  Because First Data had not submitted a remote vendor proposal and had offered only a modest fee discount, the DST proposal was greatly superior in terms of the profit potential to CAM.  As for technology, Deloitte found that DST offered industry-leading technology (superior to that of First Data) and that switching to DST would better position the Smith Barney Funds for the future.

**E.     First Data Offers $25 Million Dollar Fee Concession**

56.     After learning that it was at risk of losing the Smith Barney Funds' transfer agency business, First Data came forward with significant fee discounts.  By letter to Yellin dated March 12, 1998, First Data offered a $25 million dollar annual "fee concession" to CAM if the Smith Barney Funds renewed with First Data contract as full-service transfer agent of record. Yellin, however, did not pursue the option of renewing with First Data transfer agency contract as full-Service transfer agent of record and passing along the proposed $25 million dollars per year fee discount directly to the Smith Barney Funds.  Nor did he or anyone else within CAM inform the Smith Barney Funds' boards that First Data had made the offer to renew as full-service transfer agent at deeply discounted rates.  Instead, Yellin pursued a deal that would result in tens of millions of dollars of ill-gotten profit per year to CAM, rather than saving Smith Barney Funds money, from the transfer agency fee discounts First Data offered.

57.     In the March 12 letter, First Data committed to increasing the level of resources First Data dedicated to the Smith Barney Funds and to offering Smith Barney brokers use of SuRPAS, First Data's proprietary sub-accounting system.  The SuRPAS system would permit

16

Smith Barney brokers to charge investors a processing fee on sales of non-proprietary (non-Smith Barney) funds, and generate an additional $40 million in annual revenue. In addition, by the middle of March 1998, First Data had pointed out to CAM that First Data Corporation provided $9 million in revenue to various Citigroup (then Travelers) entities through investment banking fees, asset management fees and purchases of insurance and other products.

58.     Later in March, First Data improved its bid and offered a deeper discounts, measured as a percentage of the total annual transfer agency fees that First Data would receive from the Smith Barney Funds. The fee discounts would start at 32% in 1999 and increase by two percentage points each year, reaching 40% of total transfer agency fees in 2003. Deloitte and CAM projected that the percentage discounts would translate into $21 million dollars profit the first year and grow to $39 million dollars profit in the final year of the contract.

**F.     Deloitte Flags CAM Taking Discounts that Belong to the Smith Barney Funds**

59.     Deloitte warned that fee concessions on transfer agency services performed by First Data must be passed on to the Smith Barney Funds, not captured by a small, fourteen employee transfer agent affiliate, that performed only a small fraction of transfer agency services for the Smith Barney Funds. In a March 24, 1998 presentation to CAM, with hard copy sent to Yellin, Deloitte warned:

>        Clarify the "Discount" proposed
>        A true discount would go to the **funds** not SSB TA.
>        This relationship will be extremely difficult to sell to the fund boards.

(Emphasis original).

60.     After considering First Data's March 12 offer, CAM representatives, including Defendant Daidone and Yellin, recommended in an April 2, 1998 memorandum to Defendant Jones, CAM's Chief Executive Officer, that creating a 100 employee transfer agency affiliate to

become the Smith Barney Fund's transfer agent of record and contracting with DST for

technology only was CAM's best transfer agency option.  The April 2 memo stated that the DST

proposal was superior to the then-current First Data proposal in terms of technology and pricing.

The memo reiterated Deloitte's findings regarding technology, and indicated that the DST

proposal offered $139 million more in profit to CAM over the projected five-year contract period

than the March 12 First Data proposal.

61.      The April 2 memo reiterated CAM's primary concern, ***its own profits***, and

advised that a switch to DST from First Data could lose Citigroup ─ then Travelers ─ $8 to $10

million annually in investment banking and asset management fee revenues from First Data

Corporation.  The memo stated:

> Based on economics and technology, our recommendation is to move the
> Transfer Agency processing to DST.  We realize that a corporate
> relationship exists between First Data and [Travelers] and that relationship
> should be considered before any decision is made.

62.      On April 6, 1998, Travelers announced a proposed merger with Citicorp.

63.      In early April 1998, the Chairman of Travelers asked Defendant Jones to

negotiate further with First Data, stating a preference to remain with First Data if First Data

improved its offer to the point where it was roughly equivalent to the DST proposal in terms of

profits to CAM.  Accordingly, Jones instructed Yellin to continue negotiations with First Data,

which Yellin did.

**G.     First Data Offers Deeper Discounts**

64.      On June 5, 1998, First Data offered deeper discounts on transfer agency services

for the Smith Barney Funds.  First Data's June 5 letter offer included the following fee schedule:

| June 1, 1999 to Dec. 31, 2000 | 32% discount on total fee revenue |
|---|---|
| Jan. 1 to Dec. 31, 2001 | 40% discount on fee revenue up to $80 million |
| | 60% discount on fee revenue over $80 million |
| Jan. 1, 2002 to Dec. 31, 2003 | 55% discount on fee revenue up to $80 million |

| | 60% discount on fee revenue over $80 million |
| Jan. 1, 2004 to Dec. 31, 2004 | 60% discount on fee revenue over $80 million |

**H.   Deloitte Again Warns the First Data Discounts Belong to the Smith Barney Funds**

65.   Deloitte again warned CAM that the discounts for transfer agency services reflected in First Data's June 5 proposal belonged to the Smith Barney Funds.  In a presentation dated June 10, 1998, entitled "Transfer Agency Project: Lunch and Learn ─ Financial Model Review," Deloitte questioned the arrangement in two respects.

66.   First, Deloitte questioned the legality of the First Data transfer agency fee discount taking the form of a rebate to be paid to CAM, not the Funds:

> First Data's proposal requires that First Data remains the TA; First Data receives full revenues of TA fees, providing a "rebate" to SSB (proposed as a "discount" by First Data).
>
> **This legal structure is questionable at best.  Our advisors indicate that this arrangement would in no way be acceptable to the fund boards and may not be legally viable**.

(Emphasis added).

67.   Second, Deloitte questioned whether CAM could justify receiving transfer agency fees for merely operating a fourteen full-time employee customer service center:

> We Anticipate a Larger Organization Would be Needed to Satisfy the Fund Boards in the First Data Scenario.
>
> * * *
>
> We believe at a minimum, the SSB TA would have to assume responsibility for Customer Service and Transaction Processing to justify receiving TA fees.  This would require at least 65 [full-time employees] (rather than 14).

68.   Deloitte's written warning followed several occasions on which Deloitte's team leader raised the issue orally with CAM representatives.

69.     Deloitte's team leader personally delivered the Lunch and Learn presentation to confront issues raised by the First Data proposal that Deloitte considered very significant and had brought to the attention of CAM but CAM had failed to address.

**I.      Defendants Fail to Heed Deloitte's Warnings**

70.     Sometime subsequent to June 10, 1998, CAM clarified that the CAM-affiliated transfer agency unit would serve as the Smith Barney Funds' transfer agent of record and First Data would serve as sub-transfer agent.  Under this arrangement, all transfer agency fees paid by the Smith Barney Funds would be paid to (and pass through) the CAM affiliate, so the CAM affiliate (ultimately CTB) would pay First Data discounted transfer agency fees as sub-transfer agent rather than First Data collecting transfer agency fees from the Smith Barney Funds and "rebating" the agreed upon discount back to the CAM transfer agent affiliate.

71.     This clarification, however, did *not* address the substance of either of Deloitte's warnings.  First, the CAM affiliated transfer agency would still be improperly taking the fee discount offered by First Data for itself, instead of passing that discount along to the Smith Barney Funds.  Second, CAM did not change the proposed meager size (the affiliated transfer agency would still be extremely limited in size and would not perform sufficient functions to justify receiving transfer agency fees) or scope of responsibility of the affiliated transfer agency ─ it would still be limited to a small customer service center.

**J.      First Data Offers a Revenue Guarantee**

72.     In July 1998, First Data again improved its offer to provide transfer agency services to the Smith Barney Funds in three respects.  First, it increased the fee discount.  Second, it agreed to migrate the Smith Barney Funds from its old technology to its more modern Full Service Retail platform.  Third, and most significantly, by letter to Yellin dated July 14,

1998, First Data offered that First Data Corporation would generate a guaranteed $8 million

dollars of revenue to Travelers annually.  The July 14 letter stated:

> First Data Corporation and Travelers will agree on "basket of services"
> from which First Data Corporation will generate at least $8 million of
> revenue to Travelers annually.  A "make-whole" provision will be
> included which commits First Data Corporation to a fee credit on transfer
> agent services for any shortfall to the $8 million.  The credit will be 50
> cents on each dollar of revenue shortfall.

**K.      CAM Refers to First Data Discount as a "Revenue Sharing Arrangement"**

73.      On July 24, 1998, in a memorandum from Yellin to Defendant Jones, Yellin

recommended that CAM establish an affiliated transfer agency of approximately fifteen

employees to assume responsibility for a customer service call center for the Smith Barney

Funds and to contract with First Data to provide bulk of the transfer agency services to the Smith

Barney Funds, as sub-transfer agent.  The memo estimated the cost of the fifteen call center

employees at $1 million dollars per year.

74.      Although the CAM affiliate/First Data transfer agency arrangement had been

revised so that the CAM affiliate would pay First Data discounted rates for transfer agency

services to the Smith Barney Funds, rather than First Data "rebate" the discount to the CAM

affiliate, the economics of the fee sharing arrangement remained the same as in the prior

proposals Deloitte had warned about ─ First Data would be improperly sharing revenue with

CAM at the expense of the Smith Barney Funds' shareholders.  The July 24 memo set forth the

following "revenue sharing arrangement":

Percentage that is earned by [CAM] on:

|        | First $80MM | Over $80 MM [in total TA fees] |
|--------|-------------|-------------------------------|
| Year 1 | 33.5%       | 33.5%                         |
| Year 2 | 40          | 60                            |
| Year 3 | 55          | 60                            |
| Year 4 | 55          | 60                            |
| Year 5 | 58          | 60                            |

75.     The memo projected that CAM would receive $258 million of profit from the revenue sharing arrangement:

| Year 1 | $29 million |
| Year 2 | $40 million |
| Year 3 | $57 million |
| Year 4 | $62 million |
| Year 5 | $70 million |

76.     The July 24 memo also stated that, because of CAM's fiduciary obligations to the Smith Barney Funds, CAM was obligated to implement a transfer agency fee reduction. The recommended reduction called for the Smith Barney Funds to continue to pay the same asset-based fees that First Data charged the Smith Barney Funds under the 1996 transfer agency agreement, but subject to fee caps that limited transfer agency fees to the lesser of the asset-based fee or a set amount (which ranged from $13 to $14.50 per account). The July 24 memo projected an annual transfer agency fee reduction to the Smith Barney Funds of $6-$8 million. With respect to the First Data Corporation Revenue Guarantee, Yellin's July 24 memo indicated that First Data had committed to:

> Providing CAM with additional assets to manage sufficient to generate $1.5 million per year in asset management fees.

> Making Salomon Smith Barney First Data's investment banker of choice and generating at least $3 million per year in investment banking fees.

> Paying 50 cents for every dollar of shortfall of investment banking fees and 90 cents for every dollar of shortfall of asset management fees, by way of credit on TA fees paid by CAM to First Data.

77.     Yellin's memo stated that the Revenue Guarantee would generate at least $22.5 million in revenue or $14 million of "pre-tax bottom line" to Citigroup over the five year agreement.

78.     Finally, in a section entitled "Mutual Fund Board Issues," Yellin's memo stated that the Chairman of the Smith Barney Funds' boards, who was an officer of CAM, was

"comfortable that the new First Data arrangement is supportable to the [Smith Barney] Fund boards." The memo noted that service levels, "while good, will improve," and the Smith Barney funds would receive a transfer agency fee reduction.

79.     Knowing, among other things, the Smith Barney Defendants' fiduciary obligations, and that CAM intended to kickback First Data's transfer agency fee discounts as ill-gotten profits, Defendant Jones, in his capacity as CAM's Chief Executive Officer, approved the recommendation and caused the Smith Barney Defendants to move forward with the kickback scheme.

**L.     Negotiation of the Sub-Transfer Agency Agreement and Side Letter Agreement**

80.     Representatives of CAM and First Data simultaneously negotiated terms of a Sub-Transfer Agency Agreement between First Data and Mutual Management Corp., the Citigroup entity initially chosen by CAM to serve as the transfer agency affiliate, and a Side Letter agreement ("Side Letter").

81.     On August 4, 1998, First Data produced the first draft of the Side Letter to Yellin, which addressed the Revenue Guarantee and other significant commitments between the parties, including First Data's commitment to migrate the Smith Barney Funds to First Data's Full Service Retail transfer agency platform.

82.     Both agreements were finalized on November 20, 1998. The Side Letter, which specifically referenced the Sub-Transfer Agency Agreement, contained the following provisions:

> (a) First Data's commitment to provide its SuRPAS system for sub-accounting;
>
> (b) CAM's commitment to treat First Data as a favored nation vendor for proxy and fulfillment services (which required CAM to solicit a bid from First Data when proxy and fulfillment services were required and to recommend First Data if CAM determined in good faith that its bid was competitive with the other bids received);

23

(c) CAM's agreement, subject to its fiduciary duties, to "use all reasonable and lawful means to encourage the Funds" "to continue [First Data] as sub-transfer agent for existing Funds and any or all subsequent expansion, consolidation, affiliation, or addition to the Funds for which [CAM] provides investment management services"; and

(d) CAM's agreement to consider in good faith retaining or recommending First Data to provide other services to the Funds.

83.     At some point prior to the finalization of the Sub-Transfer Agency Agreement and the Side Letter, First Data's commitment to migrate the Smith Barney Funds to its Full Service Retail platform was removed from the Side Letter and included as a schedule to the Sub-Transfer Agency Agreement.

84.     The Sub-Transfer Agency Agreement included an integration clause, which provided that the Agreement, "including Schedules, Addenda and Exhibits" thereto, constituted the parties' entire agreement about the subject matter of the Sub-TA Agreement and superseded all prior and contemporaneous agreements regarding the subject matter.  Notwithstanding the obvious significance to the Smith Barney Funds that the Side Letter called for millions of dollars of consideration to be paid to CAM, and no benefits whatsoever to the Smith Barney Funds, neither the Side Letter (nor its substance) was provided to the Smith Barney Funds' boards or filed with the SEC as part of the Smith Barney Funds' registration statements.

**M.     Materially Misleading Board Materials Conceal Defendants' Kickback Scheme**

85.     After Yellin changed positions within CAM in February-early March 1999 and no longer had responsibilities related to its mutual fund business, Defendant Daidone took the lead in preparing a March 4, 1999 memorandum (the "Board Memo") and a Power Point presentation (the "Power Point Presentation") to recommend ratification of the new transfer agency proposal by the Smith Barney Funds' boards.  CAM included the Board Memo and the Sub-Transfer

Agency Agreement in the materials sent to Smith Barney Funds board members in advance of board meetings (the Side Letter and Power Point Presentation were included).

86.     Defendant Daidone prepared the memorandum in a way that made the transfer agency proposal facially *appear* as if it was in the Smith Barney Funds' best interest, which was not true.  The Board Memo did not candidly present the proposal in terms that would have made clear to the boards that First Data would continue to perform almost all of the transfer agency functions for the Smith Barney Funds and was  "sharing revenues" with CTB in exchange for tens of millions of dollars of transfer agency fee concessions each year from First Data – pure profit for CTB – while CTB staffed a fifteen-employee (seven employed full-time) call center and performed limited additional oversight and quality control functions.  The Board Memo did not explain in a meaningful way how transfer agency duties were to be divided between CTB and First Data.  To the contrary, the Board Memo gave the misleading impression that First Data was providing "technology" only, which was not true, and that CTB would be a much more substantial transfer agency operation then it actually would be.

87.     The board materials also stated that CAM approached the transfer agency review process by looking at all available alternatives to provide the Smith Barney Funds with better service at lower prices.  This was also untrue.  From the beginning, CAM approached the review process with the primary goal of maximizing profit to CAM and, in order to attain its own goals, CAM did not pursue options that would have provided virtually the same transfer agency services at far less cost (tens of millions of dollars per year less cost) to the Smith Barney Funds. Contrary to representations in the board materials, the only options CAM ever seriously considered were options that involved CAM receiving the most profit at the least possible cost to CAM.  The Board Memo did not disclose that First Data had made a series of offers to perform

all transfer agency services at deeply discounted rates ─ including the initial $25 million annual fee discount offer and the later percentage-based discount offers ─ all proposals that, if offered directly to the Smith Barney Funds, would have provided virtually the same service at far less cost than the proposal CAM recommended.

88.     Even with respect to the alternatives that CAM actually considered, CAM did not disclose that Deloitte and CAM management had initially recommended DST, that CAM resumed negotiating with First Data only after Travelers management had requested that they do so because First Data was Travelers' investment banking client, and that CAM decided to recommend First Data only after First Data had increased the value of its proposal to CAM and offered the Revenue Guarantee.  In fact, CAM failed to disclose the Side Letter or any of its terms.

89.     Instead of making a full and candid disclosure regarding the transfer agency review process and the extent of CAM's conflicted financial interest in the proposal, the Board Memo gave an incorrect impression that CAM was acting in the Smith Barney Funds' best interest and had expended significant effort and money to identify and negotiate the best deal for the Smith Barney Funds.  The introduction of the Board Memo contains the following statement:

> [I]n anticipation of the expiration of the non-compete agreement [with First Data], SSB began an exhaustive study in late 1997 utilizing the services of Deloitte Consulting to examine transfer agency alternatives to First Data with the goal of reducing fees, improving service and offering the Smith Barney Funds access to alternative channels of distribution (e.g., 401k) to promote further growth.  This effort was completed in mid 1998 at a cost of $2.5 million.

90.     This paragraph was materially inaccurate and misleading.  Reducing fees was not a goal of the review process.  The idea of a fee reduction was first raised in the summer of 1998, by the chairman of the Smith Barney Funds' boards, and was separate from the decision on how to structure the transfer agency function.

91.    The Board Memo also bolstered the case for the recommended proposal by giving the incorrect impression that no viable alternatives existed.  The following paragraph, entitled "Change of Transfer Agent Vendor," was purportedly intended to describe all remote transfer agency vendor proposals, including the DST proposal:

> Results showed that the internalization of transfer agency functions and engagement of another technology vendor could reduce the fees paid by the Smith Barney Funds and also be the most profitable alternative to SSB. However, full internalization of the transfer agent functionality would have entailed creation of an organization of 150 employees.  In addition, the conversion and software modifications required to migrate to a new technology and services provider would have taken at least two and a half years.  In short the Smith Barney Funds would not realize any cost savings for several years under this scenario.

92.    This paragraph failed to discuss the DST proposal in any detail or to disclose that Deloitte had recommended it.  In addition, to the extent that the figures contained in the paragraph were intended to describe the DST proposal, they are inaccurate.  The DST proposal would have required CAM to hire approximately 100 employees, not 150; the conversion to DST would have taken twelve to eighteen months, not thirty; and under the DST proposal the Funds would have realized savings in the first year after conversion.  Moreover, the paragraph falsely suggests that CAM was foregoing some profit and recommending First Data in order to pass along fee reductions to the Funds.  The First Data proposal, however, was economically superior — for CAM and its affiliates — to the DST proposal.

93.    In a separate paragraph, the Board Memo reinforced the false impression that CAM was sacrificing its own interests to the benefit of the Smith Barney Funds:

> The decision to remain with First Data and establish an internal transfer agency capability was made with the recognition that although not the most favorable option financially to SSB, it represented a prudent course of action with immediate results.  The revenue shortfall as a result of accepting the proposed First Data contract versus our most attractive alternative was approximately $16.0 million.

27

94.     These statements were materially incorrect.  The First Data proposal was projected to provide greater profit to CAM than the DST proposal, not $16 million less.

95.     Although the Board Memo disclosed that the affiliated transfer agent would make a profit, the disclosure regarding the economic benefit to CAM was limited and misleading.  The only paragraph of the Board Memo that discusses the projected profit to CAM appears in a section entitled "Proposed Transfer Agency Fee and Fund Savings Analysis," and states:

> SSB commits to reviewing the transfer agent service and fees on an annual basis with the Smith Barney Fund boards. SSB anticipates that the SSB transfer agency business unit will operate on a 33% margin based on the June 1, 1999 First Data fee schedules.  While First Data discounts may increase over the life of the contract, it is expected that expenses will rise on a commensurate basis as SSB adds to its transfer agent capabilities.

96.     At the time, CAM was projecting that it would receive tens of millions of dollars in profit each year, in essence, the First Data fee discounts, while operating a fifteen employee call center and performing limited additional oversight and quality control functions at a cost of about $1 million dollars per year.  There was no meaningful disclosure about how limited the services were that CTB was to contribute in return for all this profit.

97.     Because virtually all of the transfer agency services were to be performed by First Data, the 33% profit margin figure was itself misleading.  The margin was based on an analysis that treated sub-transfer agency payments to First Data as CTB's operating expenses.  The economic reality would have been more accurately portrayed by deducting payments to First Data from CTB's revenue – not treating transfer agency fees paid to First Data as CTB's operating expenses.  CTB was merely a pass-through for those payments.  In fact, internally, CAM referred to the fee arrangement with First Data as "revenue sharing."  Had payments to First Data not been calculated as if they were CTB's operating expenses, the projected profit margin would have exceeded 70%.

28

98.     The Power Point Presentation stated that "Revenue Generation" was one of CAM's goals, and included a table that contained profit projections in dollar amounts.  The table, omitted to disclose just how limited CAM's proposed contribution to the venture really was, and therefore rendered the profit projections misleading.

99.     Finally, the Board Memo misleadingly indicated that the fees charged to the Funds by First Data were significantly below industry average.

## N.    Defendant Daidone's Presentations to the Smith Barney Funds' Boards

100.     At a series of regularly scheduled Smith Barney Funds board meetings during the first half of 1999,[4] Defendant Daidone presented the new transfer agency proposal to the Smith Barney Funds' boards — including counsel for the Smith Barney Funds and counsel for the directors.

101.     In his presentation, Defendant Daidone intentionally led the Smith Barney Funds' boards to believe that approving the new transfer agency proposal was in the Smith Barney Funds' best interest, which Defendant Daidone knew was not true.  Defendant Daidone's pitch, like the Board Memo and Power Point Presentation failed to make full and candid disclosure regarding the material terms of the transfer agency proposal.  Defendant Daidone's board presentations failed to disclose, among other things, that First Data had offered to renew its contract with the Smith Barney Funds as transfer agent of record at deeply discounted rates, that the CAM transfer agency affiliate would perform only a small fraction of transfer agency services required by the Smith Barney Funds, that First Data would continue to perform almost all of the transfer agency functions for the Smith Barney Funds and was improperly "sharing revenues" with CTB in exchange for tens of millions of dollars of transfer agency fee

---

4 The Smith Barney Fund meetings took place on March 10, 1999, March 19, 1999, March 30, 1999, April 14, 1999, April 28, 1999, May 26, 1999, June 2, 1999, and June 14, 1999.

concessions each year from First Data, that Deloitte had warned CAM the First Data transfer

agency fee discounts belonged to the Smith Barney Funds, and that CAM and First Data had

entered into the Side Letter that provided CAM millions of dollars in consideration, but provided

no value whatsoever to the Smith Barney Funds.

102.    The Smith Barney Funds' boards presumably could have inquired further of

Defendant Daidone and CAM and demanded additional details not presented in the board

materials or presentations and uncovered Defendants' deceptive kickback scheme.  The Smith

Barney Funds' boards, however, did not.  All of the Smith Barney Funds boards approved the

new transfer agency recommendation at the very first board meeting at which the proposal was

presented.

**O.    New Smith Barney Funds Added to the Transfer Agency Kickback Scheme**

103.    In 2001 and 2002, new mutual funds were created and added to the Smith Barney

Funds.  CAM recommended to the boards that would serve the newly created Smith Barney

Funds that those boards adopt the CTB/PFPC transfer agency arrangement on the same terms as

for the existing Smith Barney Funds.  For example, on August 6, 2001, CAM proposed that the

Smith Barney Investors Value Fund board appoint CTB (then known as Citi Fiduciary Trust

Company) as transfer agent of record and PFPC as sub-transfer agent on the same terms as

existed between those entities and the already-existing Smith Barney Funds.[5]

104.    Neither Defendant Jones, still CAM's Chief Executive Officer in 2001, nor

Defendant Daidone, who attended the August 6, 2001 board meeting, informed the board of all

material facts regarding the transfer agency arrangements with CTB, including, but not limited

---

[5] CTB was appointed transfer agent of record for additional newly-created Smith Barney Funds during board
meetings in February, May and August 2002.  Neither Defendant Jones, Defendant Daidone nor CAM informed the
boards of the newly-created funds of material information regarding the transfer agency arrangement with CTB and
PFPC.

to, that First Data had offered to renew its contract as transfer agent of record at deeply discounted rates, that the CAM transfer agency affiliate would perform only a small fraction of transfer agency services required by the Smith Barney Funds, that First Data would continue to perform almost all of the transfer agency functions for the Smith Barney Funds and was improperly "sharing revenues" with CTB in exchange for tens of millions of dollars of transfer agency fee concessions each year from First Data, that Deloitte had warned CAM the First Data transfer agency fee discounts belonged to the Smith Barney Funds, and that CAM and First Data had entered into the Side Letter that provided CAM millions of dollars in consideration, but provided no value whatsoever to the Smith Barney Funds.  The Smith Barney Investors Value Fund board adopted CAM's transfer agency recommendation without knowing these and other material facts.  Sometime after the August 6, 2001 meeting, CTB became transfer agent of record for the Smith Barney Investors Value Fund and began sharing transfer agency fees with PFPC.

105.    On March 22, 2002, CAM recommended that the newly created Smith Barney Capital Preservation Fund board adopt the CTB-PFPC arrangement.  Like in prior Smith Barney Funds board meetings, neither Defendant Jones nor Defendant Daidone made full disclosure of all material facts and the Smith Barney Capital Preservation Fund board approved the transfer agency recommendation at the March 22, 2002 meeting, which Defendant Daidone attended. Sometime after the March 22, 2002 meeting, CTB became transfer agent of record for the Smith Barney Investors Value Fund and began sharing the Smith Barney Funds' transfer agency fees with PFPC.

106.    On September 4, 2002, CAM recommend to the board of the newly created Smith Barney Multiple Discipline Trust adopt the CTB/PFPC arrangement.  At the meeting, which Defendant Daidone attended, Defendants did not make full disclosure of all material facts and

the Smith Barney Multiple Discipline Trust board approved CAM's transfer agency recommendation.  Four of the six SBMDT board members were also members of boards that voted on the transfer agency proposal in 1999 based on materially misleading board presentation.  Based on the misleading incomplete information, and the failure of Jones and Defendant Daidone to make full candid disclosure regarding the transfer agency proposal the Smith Barney Multiple Discipline Trust approved CAM's transfer agency recommendation.  Sometime after the September 4, 2002 meeting, CTB became transfer agent of record for the Smith Barney Multiple Discipline Trust and began sharing the Smith Barney Funds' transfer agency fees with PFPC.

**P.      CAM Sought Transfer Agency Fee Increase in 2003**

107.    By 2003, CAM's ill-gotten share of PFPC's transfer agency fee revenue was not enough.  During the first quarter of 2003, CAM went back to the Smith Barney Funds' boards to request a transfer agency fee increase.  In its original proposal to the Smith Barney Funds' boards in 1999, CAM proposed charging the Smith Barney Funds transfer agency fees based upon percentage of mutual fund assets under management, and expected that the financial markets would continue to perform well and the Smith Barney Funds' assets under management would continue to grow.  The Smith Barney Funds agreed.  The financial markets, however, did not perform as CAM had hoped, and the Smith Barney Funds' assets under management did not grow.  To boost its transfer agency profits, CAM proposed that the Smith Barney Funds agree to a "per account" fee structure at levels that were above what even First Data had charged the Smith Barney Funds under the 1996 transfer agency contract.

108.    CAM recommended the fee increase proposal to certain of the Smith Barney Funds' boards in February and March 2003.  Defendant Daidone was a member of the team that

made the board presentations.  As with CAM's initial transfer agency presentations to the Smith

Barney Funds' boards in 1999, CAM's 2003 presentations were again materially misleading.

Among other things, CAM representatives failed to provide complete information regarding

CTB's profitability.  A power point presentation shown to the boards indicated that CTB's

transfer agency fees and profitability were below market levels.  Not true.   Moreover, nowhere

in the presentation did CAM disclose that First Data had offered to renew its contract as transfer

agent of record at deeply discounted rates, that the CAM transfer agency affiliate performed only

a small fraction of transfer agency services required by the Smith Barney Funds, that PFPC

continued to perform almost all of the transfer agency functions for the Smith Barney Funds and

was improperly "sharing revenues" with CTB in exchange for tens of millions of dollars of

transfer agency fee concessions each year from First Data, that Deloitte had warned CAM the

First Data transfer agency fee discounts belonged to the Smith Barney Funds, and that CAM and

First Data had entered into the Side Letter that provided CAM millions of dollars in

consideration, but provided no value whatsoever to the Smith Barney Funds.

109.    CAM attempted to justify the CTB transfer agency fee increase proposal stating

that to increase CTB's profitability would benefit the Smith Barney Funds by allowing CTB "to

stay competitive with industry peers, devote the required resources to the business, continue to

improve service and stay current with technological improvements."  The presentation, however,

did not identify any areas in which service was lagging or any specific projects that CTB had

been unable to fund due to low transfer agency fees -- nor could it.  CTB did not need a fee

increase.  CAM simply wanted to increase its transfer agency profit margin.

110.    At least one Smith Barney Fund board approved the request for a CTB transfer

agency fee increase.  At least one Smith Barney Fund board, however, rejected the fee request,

not because the kickback scheme had been uncovered, but because the Smith Barney Funds had

not been performing well in the prior years, and the Smith Barney Fund board believed it an

inappropriate time to request a transfer agency fee increase from the shareholders.  CAM then

withdrew the fee increase request as to all Smith Barney Funds, and the transfer agency fee

increase never went into effect as to any Smith Barney Funds, even those which boards had

approved the fee increase.

**Q.      Defendants' Kickback Scheme Yields CAM Extraordinary Profits**

111.    As intended, Defendants' kickback scheme yielded CAM extraordinary profits.

The CTB transfer agency was within the CAM business unit for budget and financial reporting.

Defendant Jones, for compensation purposes, received credit for CTB's internally reported

profits.  As of the commencement of the kickback scheme, CTB projected profits in excess of

$250 million over the five-year transfer agency contract period to be purportedly "earned" by

just seven full-time employees (five answered phones calls, two supervised) and eight part-time

employees, operating a small customer service call center at a total per year cost of $2.2 million

dollars.

112.    Beginning in June 1999, CAM received transfer agency revenue from First Data.

As of the October 1, 1999, CTB became transfer agent of record for the Smith Barney Funds and

received all transfer agency fee payments from the Smith Barney Funds.  First Data, and its

successor, PFCP, continued to perform that bulk of the transfer agency services for the Smith

Barney Funds as sub-transfer agent.  CTB paid First Data and its successor, PFCP, the deeply

discounted rates for transfer agency services.  First Data/PFPC improperly shared revenues with

CTB in exchange for tens of millions of dollars of transfer agency fee concessions each year

34

agreed to by First Data, that Deloitte had warned CAM belonged to the Smith Barney Funds shareholders.

113.    In addition, to ill-gotten revenue sharing "profit", CAM and its affiliates arranged received approximately $17 million under the Revenue Guarantee.

114.    Defendants, and each of them, had an ongoing fiduciary duty to make full, accurate and candid disclosure of the material facts regarding the transfer agency contract and operations to the Smith Barney Funds' boards throughout the contract period, but failed to fulfill that duty.  Instead, Defendant's knowingly defrauded the Smith Barney Funds and shareholders with intent to line their own pockets through the kickback scheme.

**R.      Whistleblower Comes Forward in September 2003**

115.    On September 30, 2003, a former Citigroup employee alerted the SEC staff of the scheme.  Thereafter, the SEC began a cause examination of CAM and CTB, and requested documents and information.  In late November 2003, Citigroup's counsel reported to the SEC staff that Citigroup had discovered the Side Letter and Revenue Guarantee.  Citigroup's counsel told the SEC staff that the Revenue Guarantee had never been disclosed to the Funds' boards, and admitted that it should have been disclosed.

116.    The SEC's Order Instituting Administrative and Cease and Desist Proceedings against the Adviser and Global Markets was not filed until May 31, 2005, the last day of the Class Period.

## SCIENTER

117.    Defendants' scienter is clear because the elaborate scheme discussed herein could not have occurred absent actual knowledge.  Indeed, Defendants Smith Barney, Citigroup Global Markets, Jones and Daidone, were each integral, knowing participants in the scheme.

35

Defendants were also motivated by greed and to boost the Citigroup entities profits by tens of millions of dollars.

## **RELIANCE**

118.     Investment advisors have a fiduciary duty to act in the best interests of the mutual funds they advise and the shareholders of those mutual funds.  Here, Plaintiffs reasonably expected Defendants would act with uncompromising fidelity and undivided loyalty to the Smith Barney Funds and to the Plaintiffs and the other members of the Class as Smith Barney Fund shareholders.

## **DAMAGES SUFFERED BY THE CLASS/LOSS CAUSATION**

119.     Throughout the Class Period, Plaintiffs and other members of the Class members were damaged by Defendants' fraudulent kickback scheme.  As described above, Defendants' kickback scheme diminished the value of Funds' shares by siphoning away tens of millions of dollars from Funds' shareholders through a Citigroup-related entity (CTB) as transfer agent while the original transfer agent, PFPC (originally First Data) performed the bulk of the transfer agency serviced as sub-transfer agent for deeply reduced fees.  The transfer agency fee discounts belonged to the Smith Barney Funds and their shareholders but were kicked back to Citigroup through Defendants' deceptive scheme.

120.     Plaintiffs and the other members of the Class were also damaged by purchasing, maintaining shares purchased during the Class Period, and selling Smith Barney Funds' shares at distorted NAV values.

121.     Plaintiffs and the other members of the Class have also suffered lost opportunity damages because the money that was drained from their accounts by Defendants' actions could have been invested for further gains.

36

122.    Plaintiffs and other members of the Class were further harmed because the Smith Barney Funds' shareholders paid fees for two transfer agents instead of one.

## CAUSES OF ACTION

## COUNT I

## SCHEME LIABILITY

### Primary Violation Of §10(b) Of The Exchange Act And
### Rule 10b-5(a) and (c) Promulgated Thereunder Against All Defendants

123.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein except those paragraphs that refer to the issuance of materially false and misleading public statements.  Plaintiffs bring Count I on behalf of themselves and all other Class members that purchased and/or sold of the mutual fund shares or other ownership interests of one or more of the Smith Barney Funds.

124.    Throughout the Class Period, Defendants, and each of them, carried out a plan, scheme, and course of conduct that was intended to and did: (i) deceive the investing public, including Plaintiffs and the other Class members, as alleged herein; and (ii) induce Class members to purchase shares of the Smith Barney Funds at distorted prices, and prices would continue to be adversely impacted by Defendants' scheme.  In furtherance of their unlawful scheme and course of conduct, Defendants took the actions set forth herein.  Moreover, Defendants' plan, scheme and course of conduct was carried out at the CAM business unit level through Defendants and caused harm to Plaintiffs and the other members of the Class.

125.    Defendants knew that, as investment advisors, the Smith Barney Defendants owed a duty of uncompromising fidelity and undivided loyalty to the Smith Barney Funds and the plaintiffs and the other members of the Class as Smith Barney Fund shareholders.

126.    Defendants knew that the economic opportunity to negotiate for, and secure, discounted transfer agency fees belonged to the Smith Barney Funds and their shareholders.

127.    Defendants knew that they were obligated to negotiate the best possible transfer agency arrangement for the Smith Barney Funds and their shareholders.

128.    Defendants knowingly committed violations of federal securities laws.

129.    Plaintiffs and the other members of the Class reasonably expected Defendants would act with uncompromising fidelity and undivided loyalty to the Smith Barney Funds and Plaintiffs and the other members of the Class as Smith Barney Fund shareholders.

130.    Had Plaintiffs and the other members of the Class known that Defendants were lining their own pockets at the expense of Smith Barney Funds' shareholders by engaging in the scheme as alleged herein, Plaintiffs and other members of the Class would not have transacted in the Smith Barney Funds to continually pay improper kickbacks to Citigroup.

131.    Defendants' deceptive conduct caused Plaintiffs and the other members of the Class to suffer damages by improperly draining assets from the Smith Barney Funds to Citigroup and causing the NAVs of the Smith Barney Funds to be lower than they would have been, but for the Defendants' wrongful acts, conduct and scheme.

## COUNT II

## MATERIALLY FALSE PUBLIC STATEMENT LIABILITY

### Primary Violation Of §10(b) of the Exchange Act
### And Rule 10b-5(b)Promulgated Thereunder Against Daidone

132.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

133.    Plaintiffs bring Count II on behalf of themselves and all other members of the Class who purchased or sold 24 of the 105 Smith Barney Funds[6] that sold mutual fund shares pursuant to prospectuses and other public documents issued during the Class Period.  Each of the Smith Barney Funds issued prospectuses, Statements of Additional Information ("SAI"), and prospectus supplements and amendments during the Class Period that were materially false and misleading because they omitted material information concerning, *inter alia*, the transfer agent and sub-transfer agent arrangement between CTB and First Data/PFPC, as well as the true nature of the transfer agency fees being paid by the Smith Barney Funds to CTB.  Class Period materially misleading statements, which, for many Funds during many years were substantially similar, are compiled and described with particularity in Appendix A attached hereto. Defendants Diadone's materially misleading Class Period statements with respect to the Money Funds Inc, Cash Portfolio (defined below), and the material omissions that give rise to Defendant Diadone's liability under Count II, are described herein.

## MATERIALLY FALSE AND MISLEADING PUBLIC STATEMENTS

134.    On April 27, 2000, the Smith Barney Money Funds, Inc. ("Money Funds") caused to be filed with the SEC a Form 485BPOS.  The Money Funds are a sub-family of Smith Barney funds that include the Cash Portfolio, ("Cash Portfolio"), one of the Smith Barney Funds currently at issue.  Shares of the Cash Portfolio were purchased and/or sold during the Class period by Plaintiffs Weber and DVL 401(k).  The April 2000 Money Funds Form 485BPOS was

---

[6] The 24 Smith Barney Funds are: Smith Barney Aggressive Growth Fund, Smith Barney Allocation Growth Portfolio, Smith Barney Appreciation Fund, Smith Barney Convertible Fund, Smith Barney Diversified Strategic Income Fund, Smith Barney High Income Fund, Smith Barney Capital and Income Fund, Smith Barney Dividend Strategy Fund, Smith Barney Financial Services Fund, Smith Barney International All Cap Growth Portfolio, Smith Barney Fundamental Value Fund, Smith Barney Managed Governments Fund, Smith Barney Small Cap Value Fund, Smith Barney Peachtree Growth Fund, Smith Barney Investment Growth Bond Fund, Smith Barney Small Cap Growth Fund, Smith Barney Large Cap Growth and Value Fund, Smith Barney Mid Cap Core Fund, Smith Barney Large Capitalization Growth Fund, Smith Barney Managed Municipals Fund, Smith Barney Money Funds – Cash Portfolio, Smith Barney Large Cap Fund, and Smith Barney Social Awareness Fund.

issued on behalf of the Cash Portfolio, and contained a prospectus and SAI that provides

shareholders with information pertinent to their Cash Portfolio investment. Money Fund

investors, including Plaintiffs Weber and DVL 401(k) but omits material information that would

have been important to investors when making investment decisions with respect to in the

Money Funds-Cash Portfolio investments. The April 2000 Money Funds Form 485 BPOS,

signed by Defendant Daidone as Treasurer, and Principal Financial and Accounting Officer of

the Money Funds, contained the following statements in the Cash Portfolio prospectus:

> Transfer agent and shareholder servicing agent Citi Fiduciary Trust Company
> serves as the fund's transfer agent and shareholder servicing agent (the
> "transfer agent"). Pursuant to a sub-transfer agency and services agreement
> with the transfer agent, PFPC Global Fund Services serves as the fund's sub-
> transfer agent (the "sub-transfer agent") to render certain shareholder record
> keeping and accounting services and functions.

The April 2000 Money Funds Form 485BPOS contained a Cash Portfolio SAI which included

the following statements:

> Transfer and Dividend Disbursing Agent and Sub-Transfer Agents. Smith Barney
> Private Trust Company, located at 388 Greenwich Street, New York, New York 10013
> serves as the Company's transfer, dividend disbursing and shareholder services agent.
> PFPC Global Fund Services (formerly First Data Investor Services Group, Inc.), 101
> Federal Street, Boston, Massachusetts 02110 serves as the Company's sub-transfer
> agent to render certain shareholder record keeping and accounting services functions.
> PFS Shareholder Services serves as the sub-transfer agent for PFS Accounts. PFS
> Shareholder Services is located at 3100 Breckinridge Boulevard, Building 200, Duluth,
> Georgia 30099-0062.

     135.    The statements included in April 2000 Money Fund Form 485BPOS prospectus

and SAI and described in paragraph 134 herein were materially misleading when made because

they omitted and otherwise failed to disclose among other things, the following material

information:

     (i)    that the sub-transfer agency structure was nothing more than an elaborate

           scheme to inflate Citigroup profits at the expense of Funds' shareholders;

(ii)     that  the scheme complained of herein whereby PFPC was doing the bulk of

the work, while CFT,  the middleman transfer agent, a Citibank-related entity,

received tens of millions of dollars that rightfully belonged to Funds'

shareholders for doing next to nothing;

(iii)    the misleading process which led to the appointment of the sub-transfer agent;

and the Revenue Guarantee, a material part of the scheme, which provided

Citigroup entities with millions of dollars of investment banking profits; and

(iv)     the existence of the Revenue Guarantee, a material part of the scheme, which

provided Citigroup entities with millions of dollars of investment banking

profits.

136.    On April 26, 2001, the Money Funds caused to be filed with the SEC a Form

485BPOS on behalf of the Cash Portfolio.  The April 2001 Money Funds Form 485BPOS

contained a prospectus and SAI that provides shareholders with information pertinent to their

investment in Cash Portfolio, and Money Fund investors, including Plaintiffs Weber and DVL

401(k), but omits material information that would have been important to investors when making

investment decisions with respect to in the Money Funds-Cash Portfolio investments.  The April

2001 Money Funds Form 485 BPOS, signed by Defendant Daidone as Treasurer and Principal

Financial and Accounting Officer of the Money Funds, contained the following statements in the

Cash Portfolio prospectus:

> Transfer agent and shareholder servicing agent Citi Fiduciary Trust Company serves
> as the fund's transfer agent and shareholder servicing agent (the "transfer agent").
> The transfer agent has entered into sub-transfer agency and services agreements with
> PFPC Global Fund Services and PFS Shareholder Services, respectively to serve as the
> funds' sub-transfer agents (the "sub-transfer agents"). The sub-transfer agents will
> perform certain functions including shareholder recordkeeping and accounting
> services.

The April 2001 Money Funds Form 485BPOS contained a Cash Portfolio SAI which included the following statements:

> Transfer and Dividend Disbursing Agent and Sub-Transfer Agents. Citi Fiduciary Trust Company, located at 125 Broad Street, New York, New York 10004 serves as the Company's transfer, dividend disbursing and shareholder services agent. PFPC Global Fund Services, P.O. Box 9699, Providence, Rhode Island 02940 serves as the Company's sub- transfer agent to render certain shareholder record keeping and accounting services functions. PFS Shareholder Services serves as the sub-transfer agent for PFS Accounts. PFS Shareholder Services is located at 3100 Breckinridge Boulevard, Building 200, Duluth, Georgia 30099-0062.

137.    The statements made in the April 2001 Money Funds Form 485BPOS Cash Portfolio prospectus and SAI, described in paragraph 136 herein, were materially misleading when made because they omit information for the same reasons set forth in paragraph 135.

138.    On April 26, 2002, the Money Funds caused to be filed with the SEC a Form 485BPOS on behalf of the Cash Portfolio.  The April 2002 Money Funds Form 485BPOS contained a prospectus and SAI that provides shareholders with information pertinent to their investment in Cash Portfolio, and investors, including Plaintiffs Weber and DVL 401(k) but omits material information that would have been important to investors when making investment decisions with respect to in the Money Funds-Cash Portfolio investments.  The April 2002 Money Funds Form 485 BPOS, signed by Defendant Daidone as Treasurer and Principal Financial and Accounting Officer of the Money Funds, contained the following statements in the Cash Portfolio prospectus:

> Transfer agent and shareholder servicing agent Travelers Bank & Trust, fsb (formerly known as Citi Fiduciary Trust Company) serves as the funds' transfer agent and shareholder servicing agent (the "transfer agent"). The transfer agent has entered into a sub-transfer agency and services agreement with PFPC Global Fund Services, to serve as the funds' sub-transfer agent (the "sub-transfer agent"). The sub-transfer agent will perform certain shareholder recordkeeping and accounting services.

The April 2002 Money Funds Form 485BPOS contained a Cash Portfolio SAI which included the following statements:

> Transfer and Dividend Disbursing Agent and Sub-Transfer Agents. Travelers Bank & Trust, fsb, (formerly known as Citi Fiduciary Trust Company), located at 125 Broad Street, New York, New York 10004 serves as the Company's transfer, dividend disbursing and shareholder services agent. PFPC Global Fund Services, P.O. Box 9699, Providence, Rhode Island 02940-9699 serves as the Company's sub-transfer agent to render certain shareholder record keeping and accounting services functions. PrimericaPFS Shareholder Services serves as the sub-transfer agent for PFS Accounts. Primerica Shareholder Services is located at 3100 Breckinridge Boulevard, Building 200, Duluth, Georgia 30099.

139.    The statements made in the April 2002 Money Funds Form 485BPOS Cash Portfolio prospectus and SAI, described in paragraph 138 above, were materially misleading when made because they omit information for the same reasons set forth in paragraph 135.

140.    On April 24, 2003, the Money Funds caused to be filed with the SEC a Form 485BPOS on behalf of the Cash Portfolio.  The April 2003 Money Funds Form 485BPOS contained a prospectus and SAI that provides shareholders with certain information pertinent to their investment in Cash Portfolio, Class Members who purchased or sold the Money Fund and including Plaintiffs Weber and DVL 401(k), but omits material information that would have been important to investors when making investment decisions with respect to in the Money Funds-Cash Portfolio investments.  The April 2003 Money Funds Form 485 BPOS, signed by R. Jay Gerken ("Gerken") as Chairman of the Board, President and CEO of the Money Funds and Defendant Daidone as Senior Vice President and Chief Financial Officer of the Money Funds, contained the following statements in the Cash Portfolio prospectus:

> Transfer agent and shareholder servicing agent Citicorp Trust Bank, fsb (formerly Travelers Bank & Trust, fsb) serves as the funds' transfer agent (the "transfer agent"). The transfer agent has entered into a sub-transfer agency and services agreement with PFPC Global Fund Services to serve as the funds' sub-transfer agent (the "sub-transfer agent"). The sub-transfer agent will perform certain shareholder recordkeeping and accounting services.

43

The April 2003 Money Funds Form 485BPOS contained a Cash Portfolio SAI which included the following statements:

> Transfer and Dividend Disbursing Agent and Sub-Transfer Agents. Citicorp Trust Bank, fsb (formerly Travelers Bank & Trust, fsb), located at 125 Broad Street, New York, New York 10004, serves as the Company's transfer, dividend disbursing and shareholder services agent. PFPC Global Fund Services, P.O. Box 9699, Providence, Rhode Island 02940-9699 serves as the Company's sub-transfer agent to render certain shareholder record keeping and accounting services functions. Primerica Shareholder Services serves as the sub-transfer agent for PFS accounts. Primerica Shareholder Services is located at 3100 Breckinridge Boulevard, Building 200, Duluth, Georgia 30099.

141.     The statements made in the April 2003 Money Funds Form 485BPOS Cash Portfolio prospectus and SAI, described in paragraph 140 above, were materially misleading when made because they omit information for the same reasons set forth in paragraph 135.

142.     On December 1, 2003, the Money Funds caused to be filed with the SEC a Form 497, which supplemented the "management" section of the April 24, 2003 Money Funds-Cash Portfolio prospectus which was part of the then-effective Money Funds April 2003 Form 485BPOS ("December 2003 Supplement").  Although the December 2003 Supplement did not contain signatures, Gerken and Defendant Daidone had signed the April 2003 Form 4385POS that was still in effect as Chairman of the Board, President and CEO and Senior Vice President and Chief Financial Officer of the Money Funds, respectively.  The December 2003 Supplement contained the following statements:

> **Recent Developments**
>
> The Fund has received the following information from Citigroup Asset Management ("CAM"), the Citigroup business unit which includes the Fund's Investment Manager and other investment advisory companies, all of which are indirect, wholly-owned subsidiaries of Citigroup. CAM is reviewing its entry, through an affiliate, into the transfer agent business in the period 1997-1999. As CAM currently understands the facts, at the time CAM decided to enter the

transfer agent business, CAM sub-contracted for a period of five years certain of the transfer agency services to a third party and also concluded a revenue guarantee agreement with this sub-contractor providing that the sub-contractor would guarantee certain benefits to CAM or its affiliates (the "Revenue Guarantee Agreement"). In connection with the subsequent purchase of the sub-contractor's business by an affiliate of the current sub-transfer agent (PFPC Inc.) used by CAM on many of the funds it manages, this Revenue Guarantee Agreement was amended eliminating those benefits in exchange for arrangements that included a one-time payment from the subcontractor.

The Boards of CAM-managed funds (the "Boards") were not informed of the Revenue Guarantee Agreement with the sub-contractor at the time the Boards considered and approved the transfer agent arrangements. Nor were the Boards informed of the subsequent amendment to the Revenue Guarantee Agreement when that occurred.

CAM has begun to take corrective actions. CAM will pay to the applicable funds $16 million (plus interest) that CAM and its affiliates received from the Revenue Guarantee Agreement and its amendment. CAM also plans an independent review to verify that the transfer agency fees charged by CAM were fairly priced as compared to competitive alternatives. CAM is instituting new procedures and making changes designed to ensure no similar arrangements are entered into in the future.

CAM has briefed the SEC, the New York State Attorney General and other regulators with respect to this matter, as well as the U.S. Attorney who is investigating the matter. CAM is cooperating with governmental authorities on this matter.

143.    The statement made in the December 2003 Supplement issued by Money Funds

on behalf of the Cash Portfolio and described in paragraph 142 was materially misleading when

made because, although this statement disclosed some of the facts surrounding the Revenue

Guarantee, it continued to omit material information about, and failed to fully disclose, the

scheme behind the sub-transfer agency, *e.g.*, that CTB was paid tens of millions of dollars (that

rightfully belonged to shareholders) for doing little work while, moreover, PFPC did the bulk of

the work at radically reduced rates.  That information was not made public until the SEC

instituted proceedings against the Smith Barney Defendants on May 31, 2005.  Moreover, the

December 2003 Supplement did not cure the material omissions contained in the Money Funds

April 2003 Form 485BPOS or in the earlier Cash Portfolio Class Period statements for the same reasons.

144.     As set forth in the Compendium of Materially False and Misleading Class Period Statements by Fund, submitted herewith as Appendix A, virtually identical materially misleading statements that omitted identical material information were disseminated by all of the 24 Funds at issue during the Class Period, including those signed by Defendant Daidone.  As such, Plaintiffs and all other investors in the 24 Funds during the Class Period were materially misled and damaged thereby.

145.     The truth was finally revealed on when the SEC issued an order stating, *inter alia*, that Defendants had willfully violated Section 206(1) of the Investment Advisers Act of 1940 by designing and carrying out the sub-transfer agency scheme described herein, censured the Smith Barney Defendants, and required Citigroup to pay approximately $208 million in disgorgement of profits, interest and civil penalties. Defendants finally fully disclosed the sub-transfer agency scheme when on June 2, 2005 a Form 497 was filed on behalf of the Money Funds and all other Smith Barney Funds that amended the then-current prospectuses by replacing the existing "Management": section with the following statement:

> On May 31, 2005, the U.S. Securities and Exchange Commission ("SEC") issued an order in connection with the settlement of an administrative proceeding against Smith Barney Fund Management LLC ("SBFM") and Citigroup Global Markets Inc. ("CGMI") relating to the appointment of an affiliated transfer agent for the Smith Barney family of mutual funds (the "Funds").
>
> The SEC order finds that SBFM and CGMI willfully violated Section 206(1) of the Investment Advisers Act of 1940 ("Advisers Act").Specifically, the order finds that SBFM and CGMI knowingly or recklessly failed to disclose to the boards of the Funds in 1999 when proposing a new transfer agent arrangement with an affiliated transfer agent that: First Data Investors Services Group ("First Data"), the Funds 'then-existing transfer agent, had offered to continue as transfer agent and do the same work for substantially less money than before; and that Citigroup Asset Management ("CAM"), the Citigroup business unit that includes the fund's investment manager and other

investment advisory companies, had entered into a side letter with First Data under which CAM agreed to recommend the appointment of First Data as sub-transfer agent to the affiliated transfer agent in exchange, among other things, for a guarantee by First Data of specified amounts of asset management and investment banking fees to CAM and CGMI. The order also finds that SBFM and CGMI willfully violated Section 206(2) of the Advisers Act by virtue of the omissions discussed above and other misrepresentations and omissions in the materials provided to the Funds' boards, including the failure to make clear that the affiliated transfer agent would earn a high profit for performing limited functions while First Data continued to perform almost all of the transfer agent functions, and the suggestion that the proposed arrangement was in the Funds' best that no viable alternatives existed. SBFM and CGMI do not admit or deny any wrongdoing or liability. The settlement does not establish wrongdoing or liability for purposes of any other proceeding.

The SEC censured SBFM and CGMI and ordered them to cease and desist from violations of Sections 206(1) and 206(2) of the Advisers Act. The order requires Citigroup to pay $208.1 million, including $109 million in disgorgement of profits, $19.1 million in interest, and a civil money penalty of $80 million. Approximately $24.4 million has already been paid to the Funds, primarily through fee waivers. The remaining$183.7 million, including the penalty, will be paid to the U.S. Treasury and then distributed pursuant to a plan to be prepared by Citigroup and submitted within 90 days of the entry of the order for approval by the SEC. The order also requires that transfer agency fees received from the Funds since December 1, 2004 less certain expenses be placed in escrow and provides that a portion of such fees may be subsequently distributed in accordance with the terms of the order.

The order requires SBFM to recommend a new transfer agent contract to the Fund boards within 180 days of the entry of the order; if a Citigroup affiliate submits a proposal to serve as transfer agent or sub-transfer agent, an independent monitor must be engaged at the expense of SBFM and CGMI to oversee a competitive bidding process. Under the order, Citigroup also must comply with an amended version of a vendor policy that Citigroup instituted in August 2004. That policy, as amended, among other things, requires that when requested by a Fund board, CAM will retain at its own expense an independent consulting expert to advise and assist the board on the selection of certain service providers affiliated with Citigroup.

At this time, there is no certainty as to how the proceeds of the settlement will be distributed, to whom such distributions will be made, the methodology by which such distributions will be allocated, and when such distributions will be made. Although there can be no assurance, Citigroup does not believe that this matter will have a material adverse effect on the Funds.

146.    Defendant Daidone, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails knowingly, engaged and participated in a continuous course of conduct as a result of the undisclosed scheme discussed herein.

147.    As a result of the issuance of materially false and misleading statements, that failed to disclose material facts, as set forth above, the market prices of Smith Barney Funds shares were distorted and affected by the increased transfer agent fees borne by the Plaintiffs and the other members of the Class and did not reflect their true value.  In ignorance of this, Plaintiffs and other members of the Class suffered harm throughout the Class Period.

148.    At the time of said omissions, Plaintiffs and the other members of the Class were ignorant of the fact that Daidone had omitted the material information set forth above.  Had Plaintiffs and the other members of the Class known of the omitted information about the kickback scheme in the various prospectuses and SAIs, which was not disclosed they would not have purchased or sold their Smith Barney Fund shares during the Class Period, or if they had, they would not have done so at distorted prices.

149.    By virtue of the foregoing, Defendant Daidone violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.  Further, while not defendants herein, Gerken and Peteka violated section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder.

150.    As a direct and proximate result of the primary violations of 10b-5(b) Plaintiffs and the other members of the Class suffered damages during the Class Period.

## COUNT III

**Secondary Violation Of Section 20(a)
Of The Exchange Act For Violation Of Rule 10b-5(a) and (c)
<u>Against Defendant Jones</u>**

151.    Plaintiffs repeat and reallege each and every allegation except Count II and those

paragraphs that refer to the issuance of materially false and misleading statements contained above as if fully set forth herein.

152.    Defendants Jones acted as a controlling person of the Smith Barney Defendants and Defendant Daidone within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of his high-level positions, and participation in and/or awareness of the Defendants' operations and/or intimate knowledge of the kickback scheme, Defendant Jones had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Smith Barney Defendants and Defendant Daidone.  Defendant as Chief Executive Offices of CAM Jones had unlimited access to internal CAM documents and members of CAM's management.

153.    Defendant Jones had direct and supervisory involvement in the day-to-day operations of CAM and the Smith Barney Defendants and Defendant Daidone, engaging in the kickback scheme therefore, is presumed to have, and did have, the power to control or influence the particular conduct which comprise the kickback scheme as alleged herein, and exercised the same.

154.    By virtue of his position as controlling persons, Defendant Jones is liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of the Smith Barney Defendants' and Daidone's wrongful conduct, Plaintiffs and the other members of the Class suffered damages during the Class Period.

## COUNT IV

### Secondary Violation Of Section 20(a)
### Of The Exchange Act For Violation Of Rule 10b-5(b)
### Against Defendant Jones

155.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

49

156.   Defendants Jones acted as a controlling person of Defendant Daidone Gerken and Peteka within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of his high-level positions, and participation in and/or awareness of the Smith Barney Defendants' operations and/or intimate knowledge of the statements filed by Smith Barney Funds and/or the Smith Barney Defendants with the SEC and disseminated to the investing public, Defendant Jones had the power to influence and control, and did influence and control, directly or indirectly, the materially misleading statements contained in Count II of this Complaint and in Appendix A therein, including the omission of the fact regarding the kickback scheme, and the content and dissemination of the various statements that Plaintiffs contend are materially false and misleading.  Defendant Jones was provided with or had unlimited access to copies of the Smith Barney Funds', public filings, alleged by Plaintiffs to be materially misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

157.   As set forth above, the Defendant Daidone, Gerken, and Peteka violated Section 10(b) and Rule 10b-5(b) by their acts and omissions as alleged in this Complaint.  By virtue of his position as a controlling person, Defendant Jones is liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendant Daidone, Gerken and Peteka's wrongful conduct, Plaintiffs and other members of the Class suffered damages during the Class Period.

158.   By virtue of his position as controlling persons, Defendant Jones is liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of the Smith Barney Defendants' and Daidone's wrongful conduct, Plaintiffs and the other members of the Class suffered damages during the Class Period.

WHEREFORE, Plaintiffs and the Class pray for judgment as follows:

A.      Certifying the Plaintiffs as Class Representatives and Stull, Stull & Brody and Weiss & Lurie as Class Counsel;

B.      Awarding monetary damages against all of the Defendants for all losses and damages suffered as a result of the wrongdoings alleged in this Complaint, together with interest thereon;

C.      Awarding Plaintiffs the fees and expenses incurred in this action including reasonable allowance of fees for Plaintiffs' attorneys, and experts; and

D.      Granting Plaintiffs such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs hereby demand a trial by jury of all issues so triable.

Dated:  February 28, 2012

> STULL, STULL & BRODY
> Jules Brody
> Mark Levine
> Patrick Slyne
> 6 East 45th Street
> New York, NY  10016
> (212) 687-7230
>
> Co-Lead Counsel for Plaintiffs

WEISS & LURIE

By:___Richard A. Acocelli_____
Joseph H. Weiss
Richard A. Acocelli
Michael A. Rogovin
1500 Broadway
New York, NY 10036
(212) 682-3025

Co-Lead Counsel for Plaintiffs

LAKIN LAW FIRM, P.C.
Brad Lakin
300 Evans Ave., P.O. Box 229
Wood River, Illinois  62095-0229

ZAMANSKY & ASSOCIATES
Edward Glenn
50 Broadway - 32nd Floor
New York, NY 10004
(212) 742-1414

BERNSTEIN LIEBHARD LLP
Sandy A. Liebhard
U. Seth Ottensoser
Joseph R. Seidman, Jr.
10 East 40th Street
New York, New York 10016
(212)-779-1414

Additional Plaintiffs' Counsel

52