```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 8/15/12
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
                                                           :

IN RE: SMITH BARNEY TRANSFER        :        05 Civ. 7583 (WHP)
AGENT LITIGATION
                                    :        MEMORANDUM & ORDER

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

WILLIAM H. PAULEY III, District Judge:

   In the Eclogues, Virgil observed that "time bears away all things, even our minds." As this Memorandum & Order illustrates, Virgil's maxim applies to legal theories as well.

   Plaintiffs in this putative class action assert claims against Defendants Smith Barney Fund Management LLC ("Smith Barney"), Citigroup Global Markets Inc. ("CGMI," together with Smith Barney, the "Citi Defendants"), Lewis E. Daidone ("Daidone"), and Thomas W. Jones ("Jones," together with the Citi Defendants and Daidone, "Defendants") under sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. Defendants move under Federal Rule of Civil Procedure 12(b)(6) to dismiss the Fourth Consolidated and Amended Class Action Complaint for failure to state a claim upon which relief may be granted. For the following reasons, the Citi Defendants' and Jones's motions to dismiss are granted in their entirety. Daidone's motion to dismiss is granted in part and denied in part.

1

BACKGROUND

This Court's Memoranda & Orders dated January 25 and September 22, 2011 set forth the factual and procedural background of this long-running litigation. See In re Smith Barney Transfer Agent Litig., 765 F. Supp. 2d 391, 395-96 (S.D.N.Y. 2011); see also In re Smith Barney Transfer Agent Litig., 823 F. Supp. 2d 202, 203-04 (S.D.N.Y. 2011). This Court briefly recapitulates the relevant facts and procedural history.

A. The Parties and the Industry

Plaintiffs are investors in several mutual funds in the Smith Barney Family of Funds (the "Funds"). (Fourth Consolidated and Amended Class Action Complaint, dated Feb. 28, 2012 ("FAC") ¶¶ 1, 11-19.) At all relevant times, Smith Barney and CGMI were divisions of Citigroup Asset Management ("CAM"). (FAC ¶¶ 20-21.) Smith Barney was the Funds' investment adviser. (FAC ¶ 20.) During the relevant period, Jones served as the Chief Executive Officer of CAM and as Chairman and Chief Executive Officer of Citigroup's Global Investment Management and Private Banking Group. (FAC ¶ 22.) Daidone served as Senior Vice President and Director of Smith Barney, Managing Director of CGMI, and Principal Accounting Officer to many of the Funds. (FAC ¶ 23.)

A mutual fund's investment adviser "selects the fund's directors, manages the fund's investments, and provides other services." Jones v. Harris Assocs. L.P., 130 S. Ct. 1418, 1422 (2010). Investment advisers owe a fiduciary duty regarding their compensation to their client funds. See Jones, 130 S. Ct. at 1423 (citing 15 U.S.C. § 80a-35(b)). Historically, First Data Investor Services Group ("First Data") served as transfer agent for the Funds. (FAC ¶¶ 45-46.) As transfer agent, First Data performed a variety of administrative functions, including processing transactions in the Funds' shares, managing dividend transactions, computing daily

Net Asset Values, calculating sales charges and commissions, operating a customer service call center, and distributing proxy and other materials.  (FAC ¶ 45.)

B. The Alleged Scheme

The scheme giving rise to this litigation arose in connection with the expiration of First Data's transfer agent contract.  (FAC ¶ 2.)  Under a new arrangement overseen by Jones, the Citi Defendants convinced the Funds to replace First Data with a new in-house transfer agent named Citicorp Trust Bank, fsb ("CTB").  (FAC ¶¶ 2-3, 79, 100-06.)  Daidone was instrumental in the Funds' adoption of the proposal, preparing misleading information for the Funds' boards to review and presenting the proposal to the boards at eight separate meetings.  (FAC ¶¶ 85-101.)

Although CTB was responsible for providing all of the Funds' transfer agent services, it consisted of only a small customer service call center.  (FAC ¶¶ 3, 73.)  CTB subcontracted the vast majority of the transfer agent work to First Data for significantly lower fees than First Data had previously charged.  (FAC ¶¶ 2, 56-58, 64, 72.)  But rather than passing those savings on to the Funds, CTB continued to charge the Funds the higher pre-1999 transfer agent fees, thereby earning substantial profits.  (FAC ¶¶ 1-5, 7-8, 31.)  First Data also agreed to provide a specified amount in annual asset management and investment banking business to Citi affiliates over the five-year life of CTB's agreement with First Data.  (FAC ¶¶ 5, 17, 80-84.)  Daidone, along with Smith Barney's Chief Executive Officer R.J. Gerken ("Gerken") and CAM's head of internal control Richard L. Peteka ("Peteka"), signed Securities and Exchange Commission ("SEC") filings that failed to disclose the transfer agent scheme.  (FAC ¶¶ 23, 27-28, App'x A.)  Both Gerken and Peteka served as officers of many of the Funds.  (FAC ¶¶ 27, 28.)

On September 30, 2003, a former Citigroup employee alerted the SEC of the scheme. (FAC ¶ 115.)  In May 2005, the SEC settled with Smith Barney and CGMI, which agreed to pay more than $200 million in fines and disgorge the profits generated by the scheme. Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC, 595 F.3d 86, 91 (2d Cir. 2010).

C.  Procedural History

This putative class action began on August 26, 2005, with the filing of Chilton v. Smith Barney Fund Management, LLC, No. 05 Civ. 7583 (WHP).  Several subsequently filed actions were consolidated and this Court appointed Operating Local 649 Annuity Trust Fund ("Local 649") as Lead Plaintiff.  On June 26, 2006, Local 649 filed a consolidated amended complaint alleging securities fraud in violation of sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and breach of fiduciary duty in violation of section 36(b) of the Investment Advisers Act of 1940.  On September 26, 2007, this Court dismissed the consolidated amended complaint in its entirety.  See In re Smith Barney Fund Transfer Agent Litig., No 05 Civ. 7583 (WHP), 2007 WL 2809600, at *5 (S.D.N.Y. Sept. 26, 2007).  Local 649 appealed.

On February 16, 2010, the Court of Appeals vacated and remanded this Court's dismissal of the section 10(b) claim.  Thereafter, Defendants filed another motion to dismiss the section 10(b) claim raising arguments not reached in the prior decisions.  On January 25, 2011, this Court dismissed the 10(b) claim as to those Smith Barney funds in which no named plaintiff invested (the "Dismissed Funds").  See Smith Barney, 765 F. Supp. 2d at 403.  This Court then granted Plaintiffs' application for time to locate purchasers of the Dismissed Funds and for leave to file a second amended complaint.  Plaintiffs filed a second amended complaint on May 5, 2011 and a third amended complaint on June 30, 2011.

In an August 31, 2011 letter to the Court, Local 649 disclosed that it had not purchased any of the funds at issue in the case. On September 22, 2011, this Court granted Local 649's request to withdraw as Lead Plaintiff. See Smith Barney, 823 F. Supp. 2d at 206. Following additional motion practice, this Court appointed David Zagunis as the new Lead Plaintiff on December 15, 2011. See In re Smith Barney Transfer Agent Litig., No. 05 Civ. 7583 (WHP), 2011 WL 6318988, at *1 (S.D.N.Y. Dec. 15, 2011). On January 13, 2012, this Court authorized Plaintiffs to file a fourth amended complaint and fixed a briefing schedule for Defendants' fourth motion addressed to the pleadings. Plaintiffs filed the Fourth Consolidated and Amended Class Action Complaint on March 7, 2012.

## DISCUSSION

I.   Legal Standard

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). To determine plausibility, courts follow a "two pronged-approach." Iqbal, 556 U.S. at 679. "First, although a court must accept as true all of the allegations contained in a complaint, that tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Harris v. Mills, 572 F.3d 66, 72 (2d Cir.2009) (internal punctuation omitted). Second, a court determines "whether the 'well-pleaded factual allegations,' assumed to be true, 'plausibly give rise to an entitlement to relief.'" Hayden v. Paterson, 594 F.3d 150, 161 (2d Cir. 2010) (quoting Iqbal, 556 U.S. at 679).

A plaintiff alleging securities fraud must satisfy the heightened pleading standard of Federal Rule of Civil Procedure 9(b), which requires that "the circumstances constituting fraud . . . be stated with particularity." Novak v. Kasaks, 216 F.3d 300, 306 (2d Cir. 2000). Accordingly, securities fraud claims based solely on "speculation and conclusory allegations" do not suffice. Kalnit v. Eichler, 264 F.3d 131, 142 (2d Cir. 2001).

II.   Scheme Liability Claims Against All Defendants

Under Rule 10b–5(a) or (c), a defendant who uses a "device, scheme, or artifice to defraud," or who engages in "any act, practice, or course of business which operates or would operate as a fraud or deceit," may be liable for securities fraud. 17 C.F.R. § 240.10b-5. "[T]o maintain a private damages action under § 10(b) and Rule 10b-5, a plaintiff must prove (1) a material misstatement or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic damages; and (6) loss causation." Pac. Inv. Mgmt. Co. v. Mayer Brown LLP, 603 F.3d 144, 151 (2d Cir. 2010) ("PIMCO") (quoting Stoneridge Inv. Partners, LLC v. Scientific Atlanta Inc., 552 U.S. 148, 157 (2008)) (internal quotation marks omitted).

In their prior complaints, Plaintiffs based their claims on Defendants' purportedly false and misleading statements, which are actionable under Rule 10b-5(b). But, as Plaintiffs recognize, the Supreme Court's recent decision in Janus Capital Group, Inc. v. First Derivative Traders, 131 S. Ct. 2296, 2304-05 (2011), undermines this theory because the Funds—and not their investment adviser—"made" the challenged statements. In Janus, the Supreme Court held that "[o]ne who prepares or publishes a statement on behalf of another is not its maker." Janus, 131 S. Ct. at 2302. The Supreme Court illustrated this rule by comparing an investment adviser

6

to a speechwriter and its client fund to a speaker: "Even when a speechwriter drafts a speech, the content is entirely within the control of the person who delivers it." Janus, 131 S. Ct. at 2302. Accordingly, in their fourth amended complaint, Plaintiffs abandon all 10b-5(b) claims except as to Daidone, who signed several of the allegedly misleading documents. Instead, they allege that Defendants participated in a deceptive scheme in violation of Rule 10b-5(a) and (c).

Defendants launch a three-front attack on Plaintiffs' new scheme liability theory. First, they argue that the bulk of Plaintiffs' claims are barred by the applicable five-year statute of repose. Second, they maintain that Plaintiffs' scheme liability theory hinges on alleged misstatements they did not make, and is barred by Janus. Finally, they contend that Plaintiffs' scheme liability claims fail because Plaintiffs do not allege that they relied on any deceptive conduct in connection with their decisions to invest in the mutual funds at issue.

A. Statute of Repose

Defendants argue that the applicable statute of repose bars most of Plaintiffs' claims. Under 28 U.S.C. § 1658(b)(2), claims "concerning the securities laws . . . may be brought not later than . . . 5 years after such violation." 28 U.S.C. § 1658(b)(2). Thus, according to Defendants, the repose period expired for all claims no later than February 25, 2010, which is five years after the last alleged violation.

1. Applicability of *American Pipe*

Under American Pipe & Construction Co. v. Utah, 414 U.S. 538, 554 (1974), "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action." Courts in this district are divided, however, as to whether the filing of a class action complaint similarly tolls the applicable statute of repose. Compare Int'l Fund Mgmt. S.A.

v. Citigroup Inc., 822 F. Supp. 2d 368, 380 (S.D.N.Y. 2011) (American Pipe tolling applies), and
In re Morgan Stanley Mortg. Pass-Through Certificates Litig., 810 F. Supp. 2d 650, 667
(S.D.N.Y. 2011) (same), with In re Lehman Bros. Sec. & ERISA Litig., 799 F. Supp. 2d 258,
310 (S.D.N.Y. 2011) (American Pipe tolling does not apply), and Footbridge Ltd. Trust v.
Countrywide Fin. Corp., 770 F. Supp. 2d 618, 624 (S.D.N.Y. 2011) (same).

      Footbridge and Lehman—which classify the American Pipe doctrine as a form of
equitable tolling—are persuasive in many respects. See P. Stolz Family P'ship, L.P. v. Daum,
355 F.3d 92, 102-03 (2d Cir. 2004) ("[A] statute of repose begins to run without interruption
once the necessary triggering event has occurred, even if equitable considerations would warrant
tolling[.]"). But this Court is reluctant to conclude that American Pipe tolling is categorically
inapplicable to statutes of repose. In Crown, Cork & Seal Co. v. Parker, 462 U.S. 345, 350
(1983), the Supreme Court reasoned "that unless the statute of limitations was tolled by the filing
of the class action, class members would not be able to rely on the existence of the suit to protect
their rights." "The same reasoning applies to the statute of repose." Int'l Fund Mgmt., 822 F.
Supp. 2d at 380. If American Pipe did not apply, "putative class members would have
significant incentives to file protective motions to secure their claims." Morgan Stanley, 810 F.
Supp. 2d at 668. "The result would be a needless multiplicity of actions—precisely the situation
that Federal Rule of Civil Procedure 23 and the tolling rule of American Pipe were designed to
avoid." Crown, Cork & Seal, 462 U.S. at 351.

      Further, "class action tolling does not disserve the purposes of the statute of
repose." Int'l Fund Mgmt., 822 F. Supp. 2d at 380. Rather, "because a class action complaint
was filed, defendants were on notice of the substantive claim as well as the number and generic
identities of potential plaintiffs." Int'l Fund Mgmt., 822 F. Supp. 2d at 381(quoting Joseph v.

Wiles, 223 F.3d 1155, 1168 (10th Cir. 2000)) (internal quotation marks omitted). Accordingly, American Pipe tolling applies here, and Plaintiffs' claims are timely.

2.  Applicability of *American Pipe* Where Original Plaintiffs Lacked Standing

Defendants also contend that American Pipe tolling is unavailable for claims initiated by named plaintiffs without standing. Courts in this district are divided on this issue as well. Compare N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc., No. 08 Civ. 5653 (PAC), 2010 WL 6508190, at *2 (S.D.N.Y. Dec. 15, 2010) (American Pipe does not apply), with In re Wachovia Equity Sec. Litig., 753 F. Supp. 2d 326, 372 (S.D.N.Y. 2011) (American Pipe applies). In general, "[c]ourts that have declined to apply tolling in such circumstances have cited its potential for abuse . . . and have also raised concerns about the court's constitutional authority to toll claims over which it had no subject matter jurisdiction." Morgan Stanley, 810 F. Supp. 2d at 668-69 (citing Palmer v. Stassinos, 236 F.R.D. 460, 465-66, n.6 (N.D. Cal. 2006)). On the other hand, "[c]ourts that have applied tolling where the original plaintiff lacked standing have emphasized its furtherance of the policies of economy and efficiency that underpin American Pipe." Morgan Stanley, 810 F. Supp. 2d at 669.

If American Pipe tolling did not apply where a named plaintiff lacked standing, "[p]utative class members . . . would be unable to rely on their purported representatives. They instead would be forced to make protective filings to preserve their claims in the event that those representatives were determined not to have standing." In re IndyMac Mortg.-Backed Sec. Litig., 793 F. Supp. 2d 637, 646 (S.D.N.Y. 2011). This rule would be "unduly harsh," Morgan Stanley, 810 F. Supp. 2d at 669, as new plaintiffs would be "punished for their failure to anticipate or timely remedy the standing deficiencies of the original [plaintiffs.]" Wachovia, 753 F. Supp. 2d at 372. And applying American Pipe here is constitutionally permissible, as

"members of the asserted class are treated for limitations purposes as having instituted their own actions." In re WorldCom Sec. Litig., 496 F.3d 245, 255 (2d Cir. 2007).   Accordingly, this Court concludes that American Pipe tolling applies despite the original plaintiffs' lack of standing.

        B.  Deceptive Conduct

        Defendants next assert that Plaintiffs' scheme liability theory is improper because the scheme depended on misleading statements, rather than deceptive conduct.  Of course, "[c]onduct itself can be deceptive." Stoneridge, 552 U.S. at 158.  Accordingly, parties may incur primary liability under Rule 10b-5(a) and (c) without making an "oral or written statement," and courts refer to such liability as "scheme liability." Stoneridge, 552 U.S. at 158-59.  Nevertheless, the three subsections of Rule 10b-5 are distinct, and courts must scrutinize pleadings to ensure that misrepresentation or omission claims do not proceed under the scheme liability rubric. "Courts have not allowed subsections (a) and (c) of Rule 10b-5 to be used as a 'back door into liability for those who help others make a false statement or omission in violation of subsection (b) of Rule 10b-5.'" SEC v. Kelly, 817 F. Supp. 2d 340, 343 (S.D.N.Y. 2011) (quoting In re Parmalat Sec. Litig., 376 F. Supp. 2d 472, 503 (S.D.N.Y. 2005)).  Thus, where "the core misconduct alleged is in fact a misstatement, it [is] improper to impose primary liability . . . by designating the alleged fraud a 'manipulative device' rather than a 'misstatement.'" SEC v. KPMG LLP, 412 F. Supp. 2d 349, 377-78 (S.D.N.Y. 2006).  Rather, "[s]cheme liability under subsections (a) and (c) of Rule 10b-5 hinges on the performance of an inherently deceptive act that is distinct from an alleged misstatement." Kelly, 817 F. Supp. 2d at 344; see also WPP Lux. Gamma Three Sarl v. Spot Runner, Inc., 655 F.3d 1039, 1057 (9th Cir. 2011) ("A defendant may only be liable as part of a fraudulent scheme based upon misrepresentations and omissions under

10

Rules 10b-5(a) and (c) when the scheme also encompasses conduct beyond those misrepresentations or omissions."); Pub. Pension Fund Grp. v. KV Pharm. Co., 679 F.3d 972, 987 (8th Cir. 2012) (same).

Here, Plaintiffs allege that Defendants engaged in deceptive conduct separate from any alleged misstatements or omissions. According to Plaintiffs, Defendants created CTB, which in turn subcontracted the bulk of its transfer agent duties to First Data, to obscure the fact that the Citi Defendants—and not the Funds—would reap the benefits of First Data's newly discounted rate. That the alleged scheme also involved "misleadingly disclosed fees," Smith Barney, 595 F.3d at 89, does not defeat Plaintiffs' scheme liability theory. Rather, Defendants' creation of CTB, CTB's subcontracting agreement with First Data, and the subsequent funneling of cost savings away from the Funds were deceptive acts committed in addition to any misleading statements or omissions. See WPP Lux., 655 F.3d at 1057. Accordingly, Plaintiffs' adequately allege that Defendants engaged in a deceptive scheme under section 10(b) and Rule 10b-5(a) and (c).

In arguing against this conclusion, Defendants maintain that there is nothing deceptive about a mutual fund's internalizing the transfer agent function. But while this may be true as a general proposition, the scheme alleged here involved conduct beyond simply creating an in-house transfer agent. Specifically, Plaintiffs allege that Defendants created CTB in order to conceal a scheme designed to channel transfer agent cost savings away from the Funds, to which the savings rightfully belonged. Such conduct is "inherently deceptive," and it is actionable in a private damages action under Rule 10b-5(a) and (c). Kelly, 817 F. Supp. 2d at 344.

C. Reliance

"Reliance by the plaintiff upon the defendant's deceptive acts is an essential element of the § 10(b) private cause of action." Stoneridge, 552 U.S. at 159. "The traditional (and most direct) way a plaintiff can demonstrate reliance is by showing that he was aware of a company's statement and engaged in a relevant transaction—e.g., purchasing common stock—based on that specific misrepresentation. In that situation, the plaintiff plainly would have relied on the company's deceptive conduct." Erica P. John Fund, Inc. v. Halliburton Co., 131 S. Ct. 2179, 2185 (2011).

Where a plaintiff does not allege such actual reliance, the Supreme Court has "found a rebuttable presumption of reliance in two different circumstances." Stoneridge, 552 U.S. at 159. First, under Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128 (1972), courts presume reliance "when a defendant fail[s] to disclose material information that it was obligated to share." In re SLM Corp. Sec. Litig., No. 08 Civ. 1029 (WHP), 2012 WL 209095, at *4 (S.D.N.Y. Jan. 24, 2012) (citing Affiliated Ute, 406 U.S. at 153-54). Second, under the "fraud-on-the-market" theory, "where a defendant has (1) publicly made (2) a material misrepresentation (3) about stock traded on an impersonal, well-developed (i.e., efficient) market, investors' reliance on those misrepresentations may be presumed." In re Salomon Analyst Metromedia Litig., 544 F.3d 474, 481 (2d Cir. 2008) (citing Basic v. Levinson, 485 U.S. 224, 248 n.7 (1988)).

Plaintiffs do not invoke either presumption of reliance here. First, the Affiliated Ute presumption is inapplicable because Plaintiffs do not allege that Defendants owed them a duty of disclosure. See Pa. Ave. Funds v. Inyx Inc., No. 08 Civ. 6857 (PKC), 2011 WL 2732544, at *8 (S.D.N.Y. July 5, 2011) (explaining that, under Afilliated Ute, plaintiffs must

"show[] that the defendant had an obligation to disclose the information"); see also Janus, 131 S. Ct. at 2304 ("Only [a mutual fund]—not [its investment adviser]—bears the statutory obligation to file the prospectuses with the SEC." (citing 15 U.S.C. §§ 77e(b)(2), 80a-8(b), 80a-29(a)-(b))); 17 C.F.R. § 230.497 (imposing requirements on "investment companies"). Further, as Plaintiffs acknowledged at oral argument, the Funds' shares never traded in an efficient market. (Hearing Transcript dated June 13, 2012 ("Hr'g Tr.") at 29-30 (ECF No. 246).) Accordingly, Plaintiffs may not invoke the "fraud-on-the-market" reliance presumption. See Salomon Analyst, 544 F.3d at 481.

   Nor do Plaintiffs allege that they knew about Defendants' deceptive conduct and traded in reliance on that conduct. (Hr'g Tr. at 30.) Instead, Plaintiffs plead generally that they "reasonably expected Defendants would act with uncompromising fidelity and undivided loyalty to the [Funds] and to Plaintiffs[.]" (FAC ¶ 118.) But this allegation, even if true, does not show reliance. Plaintiffs do not allege that any plaintiff bought or sold shares based on a "specific misrepresentation" or specific deceptive conduct. Halliburton, 131 S. Ct. at 2185. "[A]nd as the requisite reliance cannot be shown, [Defendants] have no liability to [Plaintiffs] under the implied right of action." Stoneridge, 552 U.S. at 167.

   To be sure, this case is distinguishable in certain respects from Stoneridge, the case on which Defendants principally rely. In Stoneridge, investors sued "entities who, acting both as customers and suppliers, agreed to arrangements that allowed the investors' company to mislead its auditor and issue a misleading financial statement." Stoneridge, 552 U.S. at 152-53. The Supreme Court "held that dismissal of the complaint was proper because the public could not have relied on the entities' undisclosed acts." Janus, 131 S. Ct. at 2303 (citing Stoneridge, 552 U.S. at 152-53, 166-67). In reaching that conclusion, the Court "emphasized that 'nothing

the defendants did made it necessary or inevitable for the company to record the transactions as it did.'" Janus, 131 S. Ct. at 2303 (quoting Stoneridge, 552 U.S. at 161) (internal alterations omitted); see also PIMCO, 603 F.3d at 159-60 (rejecting scheme liability claims where "nothing about [Defendants'] actions made it necessary or inevitable that [the issuer] would mislead investors").

Here, by contrast, Defendants' deceptive conduct arguably did make it "necessary or inevitable" that the Funds would issue misleading prospectuses. Stoneridge, 552 U.S. at 161. The crux of Plaintiffs' allegations is that Defendants hid their deceptive transfer agent scheme from the Funds' boards. Specifically, the directors of the Funds were unaware that—as a consequence of the subcontracting agreement with First Data—Defendants siphoned massive cost savings away from the Funds. (FAC ¶¶ 4, 74-75, 85-99, 100-08.) Accordingly, the causal connection between Defendants' deceptive acts and Plaintiffs' losses is proximately closer than the tenuous links rejected in Stoneridge and PIMCO.

Nonetheless, Plaintiffs' allegations of reliance are deficient. Plaintiffs do not invoke the well-recognized Affiliated Ute or "fraud-on-the-market" reliance presumptions. Nor do they contend that they bought or sold securities in reliance on specific deceptive acts of which they were aware. Rather, they argue that they traded in the Funds' shares in reliance on the assumption that Defendants would honor their fiduciary duties. (FAC ¶ 118.) But this theory of reliance—if accepted—would amount to a novel presumption of reliance in the mutual fund context. And as the Supreme Court has cautioned, "[a]ny reapportionment of liability in the securities industry in light of the close relationship between investment advisers and mutual funds is properly the responsibility of Congress and not the courts." Janus, 131 S.Ct. at 2304.

14

Because Plaintiffs do not sufficiently allege that they relied on Defendants' deceptive conduct, their scheme liability claims fail.[1]

## III.    Section 10(b) and Rule 10b-5(b) Claim Against Daidone

In addition to asserting scheme liability claims against all Defendants, Plaintiffs claim that Daidone is liable under section 10(b) and Rule 10b-5(b) because he, along with others, signed materially misleading prospectuses and other Fund documents filed with the SEC. (FAC ¶ 134.) Under Rule 10b-5(b), it is unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading[.]" 17 CFR § 240.10b-5(b). In Janus, the Supreme Court held that "[f]or purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it." Janus, 131 S. Ct. at 2302. Daidone contends that he is not liable under Rule 10b-5(b) because he did not have "ultimate authority" over the Funds' misleading disclosures.[2]

Daidone's argument is not novel. After Janus, defendants who signed misleading disclosure documents have often contended that only their company or its board of directors—and not they themselves—possessed "ultimate authority." But courts in this district and across the country have rejected this argument. Rather, courts consistently hold that signatories of misleading documents "made" the statements in those documents, and so face liability under Rule 10b-5(b). See, e.g., In re Stillwater Capital Partners Inc. Litig., ---F. Supp. 2d----, 2012 WL 1416837, at *7 (S.D.N.Y. 2012) ("Janus, which involved two separate entities and whether

---

[1] In view of this disposition, this Court expresses no view on whether dividend reinvestment purchasers may demonstrate reliance under any circumstances.

[2] For the reasons discussed above, Daidone's statute of repose argument is without merit.

statements of one could be attributed to the other, cannot be used to shield [the defendant], who

signed the documents at issue and thereby 'made' the alleged misstatements." (footnote

omitted)); see also In re Pfizer Inc. Sec. Litig., Nos. 04 Civ. 9866 (LTS)(HBP), 05 MD 1688

(LTS), 2012 WL 983548, at *4 n.3 (S.D.N.Y. Mar. 22, 2012) ("The [complaint] also alleges that

Defendant McKinnell signed Pfizer's public filings . . . and so adequately alleges his liability,

under Janus, for misrepresentations in those filings."); City of Roseville Emps.' Ret. Sys. v.

EnergySolutions, Inc., 814 F. Supp. 2d 395, 417 (S.D.N.Y. 2011) (same); SEC v. Brown, ---F.

Supp. 2d----, 2012 WL 2927712, at *5 (D.D.C. 2012) (same); SEC v. Carter, No. 10 C 6145,

2011 WL 5980966, at *3 (N.D. Ill. Nov. 28, 2011) (same); In re Merck & Co., Inc. Sec.,

Derivative & "ERISA" Litig., MDL No. 1658 (SRC), 2011 WL 3444199, at *25 (D.N.J. Aug. 8,

2011) (same).  As these cases illustrate, Janus did not change the longstanding rule that corporate

officials are liable for misstatements to which they give their imprimatur.  See Janus, 131 S. Ct.

at 2302 ("[I]n the ordinary case, attribution within a statement or implicit from surrounding

circumstances is strong evidence that a statement was made by—and only by—the party to

whom it is attributed."); see also Howard v. Everex Sys., Inc., 228 F.3d 1057, 1061 (9th Cir.

2000) ("[W]hen a corporate officer signs a document on behalf of the corporation, that signature

will be rendered meaningless unless the officer believes that the statements in the document are

true.").

          The rule that a corporate officer who signs disclosure documents "makes" the

statements in those documents is faithful to Janus.  To be sure, Janus instructs that individuals

who do not "make" statements cannot be liable solely on account of their close relationship with

the "maker."  See Haw. Ironworkers Annuity Trust Fund v. Cole, No. 3:10CV371, 2011 WL

3862206, at *3 (N.D. Ohio Sept. 1, 2011) ("The Court's interpretation of the verb 'to make' is an

interpretation of the statutory language . . . and therefore cannot be ignored simply because the defendants are corporate insiders."). But where, as here, a defendant communicates with the public by signing disclosure documents, he is "the speaker, the corporation [is] the speechwriter, and 'it is the speaker who takes credit—or blame—for what is ultimately said.'" Haw. Ironworkers, 2011 WL 3862206, at *4 n.3 (quoting Janus, 131 S. Ct. at 2302). Indeed, as the Supreme Court held, "attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by—and only by—the party to whom it is attributed." Janus, 131 S. Ct. at 2302. By signing the SEC filings at issue here, Daidone attested to their accuracy. See Steamfitters Local 449 Pension Fund v. Alter, No. 09-4730, 2011 WL 4528385, at *9 (E.D. Pa. Sept. 30, 2011) ("Courts assume that corporate officers have read the SEC filings they sign, and in signing attest to their accuracy and accept responsibility for the contents."). He did not merely "prepare[] or publish[] a statement on behalf of another." Janus, 131 S. Ct. at 2302. Accordingly, Daidone "made" misleading statements to the public in violation of section 10(b) and Rule 10b-5(b).

The cases that Daidone cites do not hold otherwise. In In re Optimal U.S. Litig., No. 10 Civ. 4095 (SAS), 2011 WL 4908745, at *5 (S.D.N.Y. Oct. 14, 2011), the court concluded that a fund's investment manager and sole voting shareholder lacked "ultimate authority" over the fund's disclosures. In reaching this conclusion, the court reasoned that "it was the board of directors of [the fund], not the shareholders, which had 'ultimate authority' to issue the [disclosures]." Optimal, 2011 WL 4908745, at *5. The Court also concluded that the identification of the investment manager, along with several other "support professionals," on the cover pages of the fund's disclosure documents did not demonstrate "ultimate authority." Optimal, 2011 WL 4908745, at *6. The Court did not, however, consider whether a fund officer

who signed a fund's disclosure documents could be liable for misstatements in those documents. Therefore, Daidone's heavy reliance on Optimal is misplaced.

Similarly, in SEC v. Perry, No. CV-11-1309 R, 2012 WL 1959566, at *8 (C.D. Cal. May 31, 2012), the court did not address whether officers signing misleading disclosure documents possess "ultimate authority." Rather, the court held that "the SEC's allegations based on the . . . prospectuses fail as a matter of law because Defendants did not prepare, review, or sign the prospectuses, and thus were not 'makers' of the statements contained therein." Perry, 2012 WL 1959566, at *8 (citing Janus, 131 S. Ct. at 2302) (emphasis added). While the court acknowledged that "Defendants signed the Form S-3 registration statement," it held that this did not show "ultimate authority" because "they did so more than a year before the prospectuses were filed." Perry, 2012 WL 1959566, at *8. Here, by contrast, Daidone's signature appears on the very documents containing the misleading disclosures. Perry thus provides no shelter for Daidone.

Accordingly, Daidone's motion to dismiss "Count II" is denied as to misstatements in documents that he signed. However, Daidone is not responsible for misleading statements in SEC filings he did not sign. Because he did not sign those filings, he did not "make" the statements they contained. See Roseville, 814 F. Supp. 2d at 417 ("However, two Individual Defendants, Roriston and Winder, did not sign the November 2007 Registration Statement . . . . Accordingly, Roriston and Winder cannot be held liable for any alleged misstatements in the November 2007 Registration Statement."). The authority on which Plaintiffs rely to resist this conclusion is unpersuasive. In City of Pontiac General Employees' Retirement System v. Lockheed Martin Corp., ---F. Supp. 2d----, 2012 WL 2866425, at *14-*15 (S.D.N.Y. 2012), the court concluded that a corporate insider can "make" certain statements he

18

did not sign, reasoning that <u>Janus</u> "has no bearing on how corporate officers who work together in the same entity can be held jointly responsible on a theory of primary liability." But— contrary to <u>Pontiac</u>—"nothing in the Court's decision in <u>Janus</u> limits the key holding . . . to legally separate entities." <u>Haw. Ironworkers</u>, 2011 WL 3862206, at *3. This Court therefore holds that only those officers whose signatures appear on misleading statements may be liable as the "makers" of those statements. As such, Daidone's motion to dismiss "Count II" is granted with respect to misstatements in documents on which his signature does not appear.

IV.   Section 20(a) Claims Against Jones

Jones moves to dismiss Plaintiffs' claims under section 20(a) of the Exchange Act. According to Plaintiffs, Jones is liable as a "control person" for Defendants' violations of Rule 10b-5. "In order to establish a prima facie case of liability under section 20(a), a plaintiff must show: (1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) that the controlling person was in some meaningful sense a culpable participant in the primary violation." <u>In re PXRE Grp., Ltd., Sec. Litig.</u>, 600 F. Supp. 2d 510, 548 (S.D.N.Y. 2009) (citing <u>Boguslavsky v. Kaplan</u>, 159 F.3d 715, 720 (2d Cir. 1998)). "[B]ecause fraud is not an essential element" of a section 20(a) claim, "[a] plaintiff's pleading as to these elements must meet the requirements of Federal Rule of Civil Procedure Rule 8(a) . . . rather than the particularity requirements of Rule 9(b)." <u>Sedona Corp. v. Ladenburg Thalmann & Co.</u>, No. 03 Civ. 3120 (LTS)(THK), 2005 WL 1902780, at *16 (S.D.N.Y. Aug. 9, 2005) (quoting <u>In re Initial Pub. Offering Sec. Litig.</u>, 358 F. Supp. 2d 189, 208 (S.D.N.Y. 2004) (internal quotation marks omitted)).

A. Control of Rule 10b-5(a) and (c) Violators

For the reasons discussed above, Plaintiffs fail to state a claim for "a primary violation [of Rule 10b-5(a) and (c)] by a controlled person." PXRE, 600 F. Supp. 2d at 548. Accordingly, "Count III" is dismissed.

B. Control of Rule 10b-5(b) Violators

Plaintiffs also allege that Jones exercised control over Daidone, who in turn violated section 10(b) and Rule 10b-5(b) by signing documents containing false and misleading statements. Plaintiffs further contend that Jones exercised control over non-defendants Gerken and Peteka, who also signed misleading SEC filings.

As discussed above, Plaintiffs have stated a Rule 10b-5(b) claim against Daidone. But for Jones to incur section 20(a) liability as a consequence of Daidone's violations—or those of Gerken and Peteka—he "must not only have control over the primary violator, but have control over the transaction in question." H&H Acquisition Co. v. Fin. Intranet Holdings, 669 F. Supp. 2d 351, 361 (S.D.N.Y. 2009). Thus, "[i]t is not sufficient for [Plaintiffs] to allege that [Jones] has control person status; instead, [Plaintiffs] must assert that [Jones] exercised actual control over the matters at issue." In re Bristol Myers Squibb Co. Sec. Litig., 586 F. Supp. 2d 148, 170 (S.D.N.Y. 2008) (citing In re Scottish Re Grp. Sec. Litig., 524 F. Supp. 2d 370, 386 (S.D.N.Y. 2007)) (emphasis in original). Further, "[c]onclusory allegations of control are insufficient as a matter of law." In re Global Crossing, Ltd. Sec. Litig., No. 02 Civ. 910 (GEL), 2005 WL 1907005, at *12 (S.D.N.Y. Aug. 8, 2005); see also Harris, 572 F.3d at 72 ("[A]lthough a court must accept as true all of the allegations contained in a complaint, that tenet is inapplicable to legal conclusions[.]").

Here, Plaintiffs' allegations regarding Jones's control over the putative 10b-5(b) violators and their misstatements are insufficient.  According to Plaintiffs, Jones controlled the misstatements of Daidone, Gerken, and Peteka "by virtue of his high-level positions," his "awareness of [Defendants'] operations," and his "intimate knowledge of the statements filed . . . with the SEC and disseminated to the investing public."  (FAC ¶ 156.)  They also contend that Jones "had the ability to prevent the issuance of the statements or cause the statements to be corrected."  (FAC ¶ 156.)  But these allegations are unavailing because they focus exclusively on Jones's "control person status" rather than Jones's exercise of "actual control over the matters at issue."  Bristol Myers, 586 F. Supp. 2d at 170 (emphasis omitted).  Plaintiffs do not allege that Jones had any contact whatsoever with Gerken or Peteka, and Jones's sole alleged contact with Daidone occurred in April 1998, well before the issuance of the misleading disclosures.  (FAC ¶ 60.)  While Plaintiffs aver that Jones "was provided with or had unlimited access to copies of the [Funds'] public filings," (FAC ¶ 156), they do not allege that Jones signed, drafted, approved, or confirmed a misleading statement.  Nor do Plaintiffs contend that Jones ordered or encouraged Daidone, Gerken, or Peteka to sign a misleading statement.  (FAC ¶¶ 86-106.)

Plaintiffs' allegations of Jones's control person status are also deficient.  Unlike Daidone, Gerken, and Peteka, Jones was not an officer of any of the Funds.  (FAC ¶¶ 23, 27, 28.)  And it was the Funds—not CAM—that filed the allegedly misleading documents.  See Janus, 131 S. Ct. at 2304 (describing filing obligations of mutual funds).  When Daidone, Gerken, and Peteka signed the SEC filings at issue, they did so in their capacity as officers of the Funds and did not report to Jones.  As a general matter, "officer or director status alone does not constitute control."  Global Crossing, 2005 WL 1907005, at *12 (quoting Wallace v. Buttar, 239 F. Supp. 2d 388, 396 (S.D.N.Y. 2003)) (internal quotation marks omitted).  It follows, then, that Jones's

21

position at entities other than the Funds does not demonstrate his control over misleading statements in the Funds' SEC filings.

Absent allegations of actual control, Plaintiffs' theory of liability rests on Jones's status as CEO of CAM and his role in overseeing the creation of CTB and the subcontracting agreement with First Data. But Plaintiffs fail to allege that Jones actually controlled any misleading disclosures, as opposed to any deceptive acts. See Bristol Myers, 586 F. Supp. 2d at 170. Jones's alleged control over the deceptive scheme does not imply that he controlled Daidone, Gerken, and Peteka's deceptive statements, which they made as officers of the Funds. Accordingly, "Count IV" is dismissed.[3]

---

[3] This Court expresses no opinion on Jones's arguments that the claims against him are untimely, or should be deemed waived.

CONCLUSION

"No court can make time stand still" while a case is pending. Scripps-Howard Radio, Inc. v. FCC, 316 U.S. 4, 9 (1942). As the parties sparred over seven years before this Court and the Court of Appeals, the law underlying Plaintiffs' claims changed considerably. When this action began, the Supreme Court had not decided Stoneridge or Janus. And Plaintiffs are largely unable to surmount the new hurdles erected by those decisions.

For the foregoing reasons, the Citi Defendants' and Jones's motions to dismiss are granted in their entirety. Daidone's motion to dismiss is denied with respect to misleading statements in documents on which his signature appears, but granted in all other respects. The Clerk of the Court is directed to terminate the motions pending at ECF Nos. 217 and 220.

Dated: August 15, 2012
       New York, New York

SO ORDERED:

_____
WILLIAM H. PAULEY III
U.S.D.J.

*All Counsel of Record*

23